ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1256
  Telephone:  (213) 269-6767
  Fax:  (213) 897-2638
  E-mail: Jeremy.Brown@doj.ca.gov
  Alicia.Roessler@doj.ca.gov
  Rebecca.Hunter@doj.ca.gov

*Attorneys for Plaintiff
State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>*Plaintiff,*<br><br>v.<br><br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br><br>*Defendants.* | Case No. 2:26-cv-3396-SVW-SSCx<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br><br>Date: June 1, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

Pursuant to Federal Rule of Evidence 201, Plaintiff State of California ("California"), respectfully requests that the Court take judicial notice of the following documents in support of its Motion for Preliminary Injunction and Stay.

The Court may take judicial notice of a fact, including the existence of a document "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2). Upon a request from a party and upon being supplied the necessary information showing that a fact is judicially noticeable, the Court must grant judicial notice. Fed. R. Evid. 201(c)(2). Through the present motion, California requests judicial notice of certain documents, the relevance of is set forth in its Memorandum of Points and Authorities in support of its Motion for Preliminary Injunction and Stay.

Each of the documents California seeks in this request are proper subjects of judicial notice. First, **Exhibits 1, 3-5, 10-11, and 13-15,** which include reports, orders, letters, a permit, and opinion authored by government entities are judicially noticeable as government records. Courts may take judicial notice of "records and reports" of government and administrative bodies. *See Lundquist v. Continental Casualty Co.*, 394 F.Supp.2d 1230, 1243 (C.D. Cal. Sept. 30, 2005). "[G]overnment memoranda, bulletins, reports, letters, and statements of public record" fall into the scope of judicially noticeable documents. *Cnty. of Santa Clara v. Trump*, 267 F.Supp.3d 1201, 1217 fn. 11 (N.D. Cal. 2017); *see also S.A. v. Trump*, 363 F.Supp.3d 1048, 1061 n.36 (N.D. Cal. 2018) ("[t]he court can take judicial notice of the Executive Order . . . as a matter of public record"). Similarly, "[p]ublic records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies" are also judicially noticeable. *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp.3d 1011, 1033 (C.D. Cal. 2015) (internal quotations and citations omitted).

/ /

2

Second, **Exhibits 2, 6-9, and 12,** which include a consent decree, court order, and other court filings, are judicially noticeable as they are court documents in cases related to the instant matter. *See* Plaintiff's Notice of Related Cases filed in this case on March 31, 2026 (ECF No. 3). The Court may take judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (internal quotations and citations omitted); *see also Reyn's Pasta Bella, LLC v. Vista, Inc.*, 442 F.3d 741, 746 fn. 6 (9th Cir. 2006) (courts "may take judicial notice of court filings and other matters of public record."); *Coffee Hut v. Cnty. of Ventura*, 2021 WL 461591, at *2 (C.D. Cal. Feb. 9, 2021) (taking judicial notice of the existence of declarations that were filed in state court actions).

Third, **Exhibit 16,** which includes a press release, is judicially noticeable as it is a press release that is a matter of public record. *See Reyn's Pasta Bella, LLC v. Vista, Inc.*, 442 F.3d 741, 746 fn. 6 (9th Cir. 2006) (a court may take judicial notice of "matters of public record."); *See Knight v. Kia America, Inc.*, 2025 WL 3902218 at *6-7 (C.D. Cal. 2025) (granting judicial review of the existence of, among other materials, press releases as public records). Indeed, the press release California seeks judicial notice of is also filed on the United States Securities and Exchange Commission ("SEC") website, making it judicially noticeable on that ground as well. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (noting that SEC filings are subject to judicial notice).

//
//
//
//
//
//

3

Accordingly, California requests that the Court take judicial notice of the following:

1.    The Pipeline Capacity Prioritization and Allocation Order (Wright Order) issued by the United States of America Secretary of Energy, Chris Wright on March 13, 2026, available at: https://www.sec.gov/Archives/edgar/data/1831481/000183148126000030/a993doe dpa_orderxsablex031.htm. A true and correct copy of the Wright Order is attached hereto as **Exhibit 1**.

2.    The Consent Decree filed in *United States of America, et al. v. Plains All American Pipeline, L.P., et al.* (Case No. 2:20-cv-02415) on March 13, 2020. A true and correct copy of the Consent Decree is attached hereto as **Exhibit 2**.

3.    The Failure Investigation Report prepared by the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA), released in May 2016, available at: https://www.phmsa.dot.gov/foia/plains-pipeline-lp-line-901-failure-investigation-report. A true and correct copy of an excerpt from the PHMSA Failure Investigation Report is attached hereto as **Exhibit 3**.

4.    The presentation titled *Update on the Status of the Existing Offshore Oil and Gas Production and Pipeline Leases Managed by the Commission prepared by the California State Lands Commission*, prepared by the California State Lands Commission ("CSLC Presentation") , dated April 26, 2022, available at: https://www.slc.ca.gov/oil-gas/leases/.  A true and correct copy of the CSLC Presentation is attached hereto as **Exhibit 4.**

5.    The Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment ("Final Damage Assessment") prepared by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife

Service, and National Oceanic and Atmospheric Administration, released in June 2021, available at: https://wildlife.ca.gov/ospr/nrda/refugio. A true and correct copy of an excerpt from the Final Damage Assessment is attached hereto as **Exhibit 5**.

6.     The Order to Enter Consent Decree ("Consent Decree Order") filed in *United States of America, et al. v. Plains All American Pipeline, L.P., et al.* (Case No. 2:20-cv-02415) on October 14, 2020. A true and correct copy of the Consent Decree Order is attached hereto as **Exhibit 6**.

7.     Exhibit E to the Request for Judicial Notice filed *United States of America, et al. v. Plains All American Pipeline, L.P., et al.* (Case No. 2:20-cv-02415) in California Plaintiff's Ex Parte Emergency Motion to Enforce the Consent Decree on March 16, 2026. Exhibit E is a letter dated February 19, 2024, and enclosure (the "Assumption Agreement") dated February 14, 2024, from ExxonMobil (Andrew Craig, Venture Manager) to Office of the State Fire Marshal (OSFM) and other government agencies regarding Sable's agreement to be bound by the Consent Decree. A true and correct copy of Exhibits E, excerpted from the Request for Judicial Notice, is attached hereto as **Exhibit 7**.

8.     The Order Re: Preliminary Injunction and Undertaking filed in *Ctr. for Biological Diversity, et al., v. California Dep't of Forestry and Fire Protection, et al.*, Santa Barbara Superior Court No. 25CV02244, on July 29, 2025. A true and correct copy of the Order re: Preliminary Injunction and Undertaking is attached hereto as **Exhibit 8**.

9.     The Minute Order filed in *Ctr. for Biological Diversity, et al., v. California Dep't of Forestry and Fire Protection, et al.*, Santa Barbara Superior Court No. 25CV02244, entered on April 17, 2026. A true and correct copy of the Minute Order is attached hereto as **Exhibit 9**.

10.    Letter from OSFM (Daniel Berlant, State Fire Marshal) to Sable Offshore Corp. ("Sable") (Lance Yearwood, Vice President), dated October 22, 2025, available at:

5

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148125000086/socc-20251023.htm. A true and correct copy of the Letter is attached hereto as **Exhibit 10**.

11.     Letter from PHMSA (Linda Daugherty) to Sable (J. Caldwell) (the "Federalization Order"), dated December 17, 2025, available at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000137/sablelasflores_121725.htm. A true and correct copy of the Federalization Order is attached hereto as **Exhibit 11**.

12.     The Second Supplemental Declaration of Jeffrey D. Dintzer, dated February 26, 2026, filed in *Center for Biological Diversity, et al. v. Cal. Dept. of Forestry and Fire Protection*, *et al.*, Santa Barabra Superior Court Case No. 25CV02244, attaching as Exhibit A a letter in which Sable takes the position that Lines CA-325 is not subject to state regulation and that Sable is abandoning its State Waivers. A true and correct copy of the Second Supplemental Declaration of Jeffrey D. Dintzer is attached hereto as **Exhibit 12**.

13.     Slip Opinion issued on March 3, 2026 by the Office of Legal Counsel, U.S. Department of Justice, titled *Preemptive Effective of Defense Production Act Order on State Law* ("OLC Slip Opinion"), available at: https://www.justice.gov/olc/media/1429671/dl?inline. A true and correct copy of the Slip Opinion is attached hereto as **Exhibit 13**.

14.     Executive Order 14391 issued by President Donald J. Trump on March 13, 2026, titled *Adjusting Certain Delegations Under the Defense Production Act* ("Delegations EO"), available at: https://www.govinfo.gov/content/pkg/FR-2026-03-18/pdf/2026-05382.pdf. A true and correct copy of the Executive Order is attached hereto as **Exhibit 14**.

15.     A press release published on March 13, 2026 by Defendant Department of Energy titled *Secretary Wright Directs Sable Offshore to Restore the Santa Ynez Unit and Pipeline*, available at:

6

https://www.energy.gov/articles/secretary-wright-directs-sable-offshore-restore-santa-ynez-unit-and-pipeline. A true and correct copy of the press release is attached hereto as **Exhibit 15**.

16.    A press release published on March 16, 2026, by Sable titled *Sable Resumes Oil Flow as Ordered by the Federal DPA with Expected Gross Oil Rate of 50,000 Bbls/d and Expects First Sales by April 1, 2026*, available at: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/0001831481260000 30/socc-20260313.htm. A true and correct copy of the press release is attached hereto as **Exhibit 16**.

Dated:  May 1, 2026                              Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorney General
REBECCA HUNTER
STACY LAU
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General


ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

# Exhibit 1

## PIPELINE CAPACITY PRIORITIZATION AND ALLOCATION ORDER

I.      AUTHORITY

The Department of Energy (DOE) is authorized to issue orders pursuant to Executive Order 13603 section 201, which delegates to the Secretary of Energy the authority of the President conferred by the Defense Production Act of 1950 (DPA), sections 101(a) & (c).  By delegation, section 101(a) authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense with respect to all forms of energy.  Section 101(c)[1] authorizes the Secretary to require the allocation of, or the priority performance of contracts or orders relating to, materials, equipment, and services to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation.

II.     COVERED ENTITIES

Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable")
Attn: Lance Yearwood
845 Texas Avenue
Suite 2800
Houston, TX 77002
(713) 579-8118

III.    NEED FOR PRIORITY PERFORMANCE AND ALLOCATION

In Executive Order 14156, President Trump declared a national emergency, determining that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[2]  Further, President Trump found, "[i]n an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets.  An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation."[3]  The President determined that problems are most pronounced in our Nation's West Coast, "where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population."[4]

Sable is the lessee, owner, and operator of the Santa Ynez Unit (SYU), an offshore oil and gas unit located in Federal waters off the coast of California.[5]  Sable and the Department of the Interior are

---

[1] Pub. L. No. 81-774 (50 U.S.C. §§ 4511(a), 4511(c)).

[2] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[3] *Id.*

[4] *Id.*

[5] Sable Offshore Corp. (2025). Form 10-K. U.S. Securities and Exchange Commission, at 1-2, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001831481/652c5f0a-582e-42c9-b069-e47f9af7bc7f.pdf ("the 'Santa Ynez Unit' or 'SYU' refers to the 16 federal leases, three offshore production platforms (Hondo, Harmony, and

1

currently updating a previously approved Development and Production Plan, which would allow for continuous production to address energy vulnerabilities on the West Coast.[6]  The SYU is a critical energy resource on the West Coast.  It is one of the largest known offshore oilfields in the United States.[7]  This resource cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence, without reliable transport of SYU's production through the Santa Ynez Pipeline System (SYPS) to market on mainland California.

For most of SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California.[8]  From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System.[9]  This interstate pipeline system running from the SYU to the Pentland Station terminal in Pentland, California is known as the SYPS, which Sable owns and operates.[10]  According to Sable, the State of California is impeding it from resuming transportation of SYU production through the SYPS.  As Sable reports, "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[11]

---

Heritage), and associated ancillary facilities located in federal waters offshore California") (hereinafter "Sable 10-K").

[6] *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James Noe, Partner, Holland & Knight, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1-2 (Dec. 12, 2025) (hereinafter "Sable Request").

[7] U.S. Energy Information Administration, *Top 100 U.S. Oil and Gas Fields*, at 5 (Mar. 2015), https://www.eia.gov/naturalgas/crudeoilreserves/top100/pdf/top100.pdf.

[8] Sable Request at 2.

[9] *Id.*

[10] *Id. See also*, Letter for Linda Daugherty, Acting Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration (PHMSA), from J. Caldwell Flores, President and Chief Operating Officer, Pacific Pipeline Company / Sable Offshore Corp., *RE: Application for Emergency Special Permit Sable Offshore Corp.* at 1 (Dec. 19, 2025) ("As part of this Application, Sable requests that PHMSA issue an Emergency Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS)."); Letter for J. Caldwell Flores, President and Chief Operating Officer, Sable Offshore Corp., *RE: Determination of Interstate Classification* at 2 (Dec. 17, 2025) ("PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline."); Sable 10-K at 1-2 ("the 'Santa Ynez Pipeline System' (or 'SYPS') refers to the interstate pipeline connecting the Santa Ynez Unit to the Pentland Station terminal, inclusive of 'Pipeline Segment 324' and 'Pipeline Segment 325', or collectively referred to as 'Pipeline Segments 324 and 325' (formerly known as '901/903 Assets' and as defined in the Sable-[Exxon Mobil Corporation] Purchase Agreement), the Las Flores Canyon ('LFC') onshore processing, storage, and related pipeline assets, and the offshore pipeline connecting the Santa Ynez Unit to LFC. The SYU Assets include the Santa Ynez Unit and the Santa Ynez Pipeline System.").

[11] Sable Request at 6.

IV.	ORDER

In light of my findings and determinations in accordance with Title I of the DPA that the actions directed below are necessary or appropriate to promote the national defense and to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation and maintenance or expansion of exploration, production, refining, transportation cannot reasonably be accomplished without exercising the authority in this Order, it is directed that:

A. Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.

B. Sable is directed to immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought, for hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, at which point hydrocarbons move through the Plains All American Line 2000 for transport to refineries.

C. Such contracts for hydrocarbon transportation services from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, shall take priority over other non-SYPS hydrocarbon transportation contracts or orders for such services from the SYU that are entered, hereinafter are entered, or could as an alternative to the SYPS be entered into for hydrocarbon transportation services from the point of production in the SYU.  For purposes of assuring such priority, Sable is directed to accept and perform such contracts or order up to and so long as the SYPS has capacity to transport.

D. Any person contracting for or ordering, or who hereinafter does contract for or order hydrocarbon transportation services from Sable from the point of production in the SYU is directed to prefer and utilize such capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, in preference to other such non-pipeline contracts or orders by other persons capable of hydrocarbon transportation service, including but not limited to by truck, vessel, or alternative pipeline, up to the capacity of the SYPS.

E. Sable, and any person seeking hydrocarbon transportation services from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, are authorized to enter into such orders and contracts as those parties negotiate, as appropriate.

F. Sable is directed to provide a monthly report to DOE via askcr@hq.doe.gov on the use of this priority and allocation order, including the volumes of hydrocarbons transported or contracted for under this Order during the previous month.

G. Sable is ordered to comply with this order immediately and to maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise.

Issued in Washington, D.C. on this 13th day of March 2026

_____

Chris Wright

Secretary of Energy

# Exhibit 2

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Plaintiffs,<br><br>                    v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>        Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 05/13/20 Page 2 of 102 Page ID #:95

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

**TABLE OF CONTENTS**

I. BACKGROUND ............................................................................... - 5 -

II. JURISDICTION AND VENUE ....................................................... - 6 -

III. APPLICABILITY ........................................................................... - 7 -

IV. DEFINITIONS ............................................................................... - 7 -

V. CIVIL PENALTIES ....................................................................... - 13 -

VI. NATURAL RESOURCE DAMAGES ........................................... - 17 -

VII. TRUSTEES' MANAGEMENT AND APPLICABILITY
    OF JOINT NRD FUNDS ............................................................... - 21 -

VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL
    USE FUNDS ................................................................................... - 22 -

IX. INJUNCTIVE RELIEF ................................................................. - 23 -

X. CORRECTIVE ACTION ORDER ................................................. - 27 -

XI. STIPULATED PENALTIES .......................................................... - 27 -

XII. FORCE MAJEURE ....................................................................... - 35 -

XIII. DISPUTE RESOLUTION ............................................................. - 37 -

XIV. REPORTING ................................................................................. - 39 -

XV. CERTIFICATION .......................................................................... - 40 -

XVI. INFORMATION COLLECTION AND RETENTION ..................... - 40 -

XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........... - 43 -

XVIII. TRANSFER AND ACQUISITION OF ASSETS ............................ - 49 -

XIX. COSTS .......................................................................................... - 50 -

XX. NOTICES ...................................................................................... - 51 -

XXI. EFFECTIVE DATE ....................................................................... - 54 -

XXII. RETENTION OF JURISDICTION ................................................ - 54 -

XXIII. MODIFICATION ........................................................................... - 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XXIV.    TERMINATION ........................................................................................ - 55 -

XXV.    PUBLIC PARTICIPATION....................................................................... - 56 -

XXVI.    SIGNATORIES/SERVICE ....................................................................... - 56 -

XXVII.    INTEGRATION ........................................................................................ - 57 -

XXVIII. FINAL JUDGMENT ................................................................................. - 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION ................. - 57 -

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:20-cv-02423-SVW-AS    Document 6-1    Filed 05/13/20    Page 5 of 102    Page ID #:91

A.     WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.     WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.     WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

D.      WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.      WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.      WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.      WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.      WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

I.   WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.   WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.   WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.   WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.     WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.     WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.     WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.     WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.     WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.     WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.     WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.     BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 5 -

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*., and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq*., and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*  The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355.  This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367.  To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2.    Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

## III. APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree. For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H.html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley.  Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 11 -

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V.    CIVIL PENALTIES

A.    Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment").  The Penalty Payment shall be allocated as follows:

8.    <u>Penalty Payment to the United States (PHMSA)</u>.  For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made as follows:

   a.    Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

   b.    One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

   c.    Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.     At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.     Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a.     As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil
Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)       To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10. Penalty Payment to be Paid to CDFW. For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11. Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.  NATURAL RESOURCE DAMAGES

12. Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961.  The NRD Payment shall be allocated as follows:

        a.     To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment.  Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds).  Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
>     Restoration Program
> Attention:  Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C.  20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198.  DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 18 -

b.      To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
> 　　　Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.      To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d. To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

The Regents of the University of California
Attn: Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account. The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees. The projects shall address the research, education, and outreach missions of the University of California. UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13. The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants. To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII. TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14. DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident. DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15. DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 22 -

19. The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20. UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.  INJUNCTIVE RELIEF

21. Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22. <u>Material Changes to Plains' IMP</u>.

a. Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1) Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2) Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3) White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

4) Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5) Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6) Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation.  The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 24 -

Days. Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23. <u>Material Changes in Control Room Management Plan and Control Center General Procedures</u>.

a. Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree. Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph. For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b. At least thirty (30) Days prior to making a material modification to the above sections of its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 25 -

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice.  In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days.  Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.      Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals.  Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 26 -

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.   CORRECTIVE ACTION ORDER

25.   Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.   STIPULATED PENALTIES

26.   Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.   <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.   If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.   If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.   If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. <u>Stipulated Penalties for Non-Performance of Injunctive Relief</u>. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

h. For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i. For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j. For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k. For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l. For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m. For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n. For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o. For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p. For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q. For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.      For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.      For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.      For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.      For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.      For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.      For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.      For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.      The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
| --- | --- |
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

29. <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u>  Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

       a.    For operation of Line 901 in violation of paragraph 1.a of Appendix D;

       b.    For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

       c.    For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

       d.    For operation of Line 903, in violation of paragraph 1.e of Appendix D;

       e.    For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

       f.    For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

       g.    For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

       h.    For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

       i.    The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30. Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31. For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32. For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33. For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34. For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

a.     Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.     Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.     Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.     If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.     For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.     For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

      a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

      b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

c. If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41. If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42. The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43. Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.   FORCE MAJEURE

44. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 35 -

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 37 -

Decree.

50.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51.     Formal Dispute Resolution.  Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52.     Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position.  Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs.  Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53.     Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute.  The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 38 -

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54.     Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55.     Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56.     The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute.  Payment shall be stayed pending resolution of the dispute.  If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV.  REPORTING

57.     After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV. CERTIFICATION

58. Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59. Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 40 -

      c.     obtain documentary evidence, including photographs and similar data; and

      d.     assess Defendants' compliance with this Consent Decree.

60. Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree. At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62. For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63. The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67.    At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68.    [*Intentionally left blank.*]

## XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.    This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70.    Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 43 -

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

    a.    49 C.F.R. Part 194 Subpart B – Response Plans;

    b.    49 C.F.R. Part 195 Subpart B – Reporting;

    c.    49 C.F.R. Part 195 Subpart E – Pressure Testing;

    d.    49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

    e.    49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

    f.    49 C.F.R. Part 195 Subpart H – Corrosion Control;

    g.    49 C.F.R. Part 199 – Drug and Alcohol Testing; and

    h.    All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

> a. The Pipeline Safety Laws specified in Paragraph 70; and
>
> b. California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 46 -

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81. Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82. By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII. TRANSFER AND ACQUISITION OF ASSETS

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision. Those provisions of Appendix B are:

> a. For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

> b. For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

> c. For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

> d. For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer. Defendants shall

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 49 -

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements. Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree. Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90. In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree. Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer. Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91. For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX. COSTS

92. Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XX. NOTICES

93. Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:    eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail:    EES Case Management Unit
Environment and Natural Resources
     Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA:    James M. Pates
Assistant Chief Counsel
     for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials
     Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA:    Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 51 -

As to DOI:                    Clare Cragan
                              U.S. Department of the Interior
                              Office of the Solicitor
                              755 Parfet St., Suite 151
                              Lakewood, Colorado 80215

As to NOAA:                   National Oceanic and Atmospheric
                                  Administration
                              Office of General Counsel
                              Natural Resources Section
                              ATTN:  Christopher J. Plaisted
                              501 W. Ocean Blvd, Suite 4470
                              Long Beach, California  90802

As to USCG:                   Patricia V. Kingcade
                              Attorney Advisor
                              National Pollution Funds Center,
                                  US Coast Guard
                              2703 Martin Luther King Jr. Ave SE
                              Washington, DC 20593-7605

As to the State Agencies:     Michael Zarro
                              Deputy Attorney General
                              Office of the Attorney General
                              Natural Resources Law Section
                              300 S. Spring St., Suite 11220
                              Los Angeles, California 90013

As to CDFW:                   California Department of Fish
                                  and Wildlife
                              Office of Spill Prevention and Response
                              Attn: Katherine Verrue-Slater
                              Senior Counsel
                              P.O. Box 160362
                              Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 52 -

As to CDPR:                    California Department of Parks and
                                   Recreation
                               Attn: Laura A. Reimche, Senior Counsel
                               1416 Ninth Street, Room 1404-6
                               Sacramento, California 95814

As to CSLC:                    California State Lands Commission
                               Attn: Patrick Huber, Legal Division
                               100 Howe Avenue, Suite 100-South
                               Sacramento, California 95825

As to OSFM:                    California Department of Forestry and
                                   Fire Protection
                               Legal Services Office
                               Attn: Joshua Cleaver, Staff Counsel
                               P.O. Box 944246
                               Sacramento, California 94244-2460

As to RWQCB:                   California Central Coast Regional Water
                               Quality Control Board
                               Attn: Naomi Rubin, Attorney III
                               801 K Street
                               Sacramento, California 95814

As to UC:                      Barton Lounsbury, Senior Counsel
                               University of California
                               Office of the General Counsel
                               1111 Franklin Street, 8th Floor
                               Oakland, California  94607

As to Defendants:              Megan Prout
                               Senior Vice President
                               Commercial Law and Litigation
                               333 Clay Street, Suite 1600
                               Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.    EFFECTIVE DATE

96.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.    RETENTION OF JURISDICTION

97.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.   MODIFICATION

98.     The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

99. Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV. TERMINATION

100. After Defendants have: (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation. Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination. If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101. Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement. The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree. If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102. If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution). However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 55 -

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.    PUBLIC PARTICIPATION

103.   This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.   Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.   SIGNATORIES/SERVICE

105.   Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.   This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII.  INTEGRATION

107.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.     FINAL JUDGMENT

108.   Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.   For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.


_____
UNITED STATES DISTRICT JUDGE


*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 57 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020
Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
    Division U.S. Department of Justice

3/13/2020
Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
    Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 59 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
    Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020
_____
Date

_____
AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
     Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/2/20_____
Date

_____Lisa Ann L Mangat_____
LISA ANN L. MANGAT
Director
California Department of Parks
    and Recreation

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
_____
Date

_____
THOMAS W. PORTER
Director
California Department of Forestry and
        Fire Protection

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 65 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
    Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____                    _____

Date                                     BARTON LOUNSBURY
                                         Senior Counsel
                                         Office of the General Counsel

*3 March 2020*                           _____

Date                                     PEGGY FIEDLER
                                         Executive Director
                                         UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 A -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 68 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.


2/25/2020
Date

HARRY PEFANIS
President

---

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

# APPENDIX A

# (*Set of maps that generally depict Lines 901, 903, and 2000*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:25-cv-04395-SVW-AS    Document 1    Filed 05/13/25    Page 76 of 169   Page ID #:169



*Appendix A – Line 901*

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Scale: 1:100,000

Sheet No:   1/1

Case 2:26-cv-03306-SVW-SSC Document 16-1 Filed 05/01/26 Page 90 of 265 Page
ID #:163
Case 2:26-cv-02306-SVW-AS Document 1 Filed 03/19/25 Page 77 of 109 Page ID #:70



*Appendix A – Line 903*

Scale: 1:700,000

Sheet No: 1/1

Owner:

**PLAINS**
ALL AMERICAN
PIPELINE, L.P.

Case 2:26-cv-02396-SVW-SSC Document 16-1 Filed 05/01/26 Page 91 of 265 Page
Case 2:25-cv-02396-SVW-SSC Document 1-1 Filed 05/13/25 Page 78 of 109 Page ID #:91
ID #:164



# APPENDIX B

## *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1.  **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

    A.  Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901.  Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

    B.  Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

    C.  Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

    D.  Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

    E.  To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver.  Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received.  Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver.  Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2.  **Replacement, Restart, or Abandonment of Lines 901 and 903:**

    A.  Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners.  Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

   1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **Integrity Management**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

-77-

loss, within one year of discovery.  If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

   i. Assessment data from ILI tool runs;

   ii. Dig and repair data;

4

iii. Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv. Operational data, such as pressure and flow data;

v. Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi. Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii. Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2. ILI Measures

a. <u>Initial ILI Runs</u>. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i. All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

ii. In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b. <u>Subsequent ILI Runs</u>. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c. <u>All ILI Runs</u>. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5. **<u>Valves</u>**

A. Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1. Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2. Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B. Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C. Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

6.    **Risk Analysis**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

        1.    Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

            a.    The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

            b.    Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis.  The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

            c.    The risk analysis shall be due within one year from entry of the CD.

7.    **Leak Detection**

    A.    For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

    B.    Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8.    **Non-waiver**

    A.    Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

**ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES**

9.    **Integrity Management**

    A.    New Procedures for Interim Reviews and Assessments

7

Case 2:26-cv-03396-SXW-SSC   Document 16-1   Filed 05/01/26   Page 100 of 265
Case 2:20-cv-02415-SVW-AS   Document 6-1   Filed 03/13/20   Page 87 of 102   Page ID #:180
Page ID #:173

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment.  If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment.  Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review.  Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD.  If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

   a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

   b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

<blockquote>

<blockquote>

c. The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

</blockquote>

2. In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3. In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

</blockquote>

C. Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

## 10. **Valves and O&M**

A. Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B. Within two years of entry of the CD, Plains shall develop and implement procedures to:

1. If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2. Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3. Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4. Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C. Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-03396-SXW-SSC   Document 16-1   Filed 05/01/26   Page 102 of 265
Case 2:20-cv-02415-SVW-AS   Document 6-1   Filed 03/15/20   Page 89 of 102   Page ID #:182
Page ID #:175

D.    For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

  1.    Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room.  Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.    Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.  **Leak Detection**

A.    Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

  1.    Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.    For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.    Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

  1.    Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.    Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

  1.    Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.    Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection.  The results of the meetings will be documented and shared with appropriate personnel.  The recommendations will be evaluated and documented.

F.    Instrumentation and Display

    1.    To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

        a.    Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

        b.    Track these conditions through to resolution, including instrumentation relocation when necessary.

12.    **Control Room Management**

A.    For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

    1.    Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

    2.    Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

    3.    Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

    4.    Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

B.    For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.    Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

A.    California-Specific Provisions:

1.    Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05.  Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B.    Company-Wide Provisions

1.    Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2.    Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response.  Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3.    Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

Plains.  Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills.  Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter.  Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment).  Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill.  Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173.  Plains shall direct the third party to transmit a copy of the final report to PHMSA.  Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

Case 2:26-cv-03396-SXW-SSC   Document 16-1   Filed 05/01/26   Page 106 of 265
Case 2:20-cv-02413-SVW-AS   Document 6-1   Filed 03/13/20   Page 93 of 102   Page ID #:186
Page ID #:179

B.      Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.    **Drug and Alcohol Program**

A.      Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-03396-SVW-SSC    Document 16-1    Filed 05/01/26    Page 107 of 265
Case 2:20-cv-02415-SVW-AS    Document 6-1    Filed 03/13/20    Page 94 of 102    Page ID #:187
Page ID #:180

# APPENDIX C

## (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:20-cv-02415-SVW-AS    Document 6-1    Filed 03/13/20    Page 95 of 102    Page ID #:181

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-90-

## APPENDIX D

1.      All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

    a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

    b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

        1)      Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

        2)      Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

        3)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

        4)      A specific day-light restart that includes advance communications with local emergency response officials;

        5)      Master Control Room enhancements, including:

            a) Implementation of advanced leak-detection

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3) Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1) The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

Case 2:26-cv-02396-SVW-SSC    Document 16-1    Filed 05/01/26    Page 114 of 265    Page ID
Case 2:20-cv-02413-SVW-AS    Document 6-1    Filed 03/13/20    Page 101 of 102    Page ID
#:194
#:187

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)    The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)    The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)    Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:20-cv-02413-SVW-AS Document 6-1 Filed 03/13/20 Page 102 of 102 Page ID #:188

3)      The Appendix D Documentation Report shall include but not be limited to:

A.   Table of Contents;

B.   [*intentionally left blank.*]

C.   [*intentionally left blank.*]

D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

E.   [*intentionally left blank.*]

F.   [*intentionally left blank.*]

G.   Lessons learned while fulfilling the requirements of this Appendix D.

# Exhibit 3



**U.S. Department
of Transportation**

**Pipeline and
Hazardous Materials
Safety Administration**

**Failure Investigation Report**

**Plains Pipeline, LP, Line 901
Crude Oil Release, May 19, 2015
Santa Barbara County, California**

**May 2016**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Table of Contents

Executive Summary ..................................................................................................... 3

Final Report Methodology ........................................................................................... 4

Facility Background .................................................................................................... 4

Events Immediately Prior to and During the Crude Oil Release .................................. 6

Plains' Field Response and National Response Center Notifications ........................... 7

PHMSA's Corrective Action Order ............................................................................... 9

Pipeline Alignment ..................................................................................................... 9

 Las Flores Station to Gaviota Station Line 901 Elevation Description ....................... 9

 Gaviota to Pentland Station Line 903 Elevation Description ................................... 10

Post-Incident Investigation Results .......................................................................... 11

 Metallurgical Evaluation of Failed Pipe ................................................................ 11

 In-Line Inspection Survey Review ......................................................................... 12

    Number of Anomalies ....................................................................................... 13

 Cathodic Protection Findings ............................................................................... 13

 Spill Volume Estimate from Plains' Third-Party Consultant .................................. 13

Investigation Findings and Conclusions .................................................................... 14

 Proximate or Direct Cause ................................................................................... 14

 Contributory Causes ............................................................................................ 14

PHMSA Post-Incident Action Chronology ................................................................. 18

Appendices ............................................................................................................... 20

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Executive Summary

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl) of heavy crude oil.[i]  An estimated 500 bbl of crude oil entered the Pacific Ocean.  Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station.  On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901.  Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release.  As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified.  On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan.[ii] No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline

- The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.

- The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture

- The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.

- Control room staff did not detect the abnormal conditions in regards to the release as they occurred.  This resulted in a delayed shutdown of the pipeline.

- The pipeline controller restarted the Line 901 pipeline after the release occurred.

- The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report.  PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage.  PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## Final Report Methodology

PHMSA conducted relevant interviews, gathered and reviewed numerous historical documents and available records, and performed a thorough review of the Plains Control Room in Midland, TX. An ILI subject matter expert (SME) was hired to review the raw magnetic flux leakage (MFL) data and final vendor reports from the MFL surveys, and evaluated Plains actions as a result of their review of the vendor reports.  PHMSA issued a CAO which in part instructed Plains to have the failed pipe examined by a PHMSA-approved metallurgical laboratory and to have a root cause failure analysis (RCFA) performed by a third party independent consultant.

The factual evidence reviewed includes: the Plains Integrity Management Plan (IMP), CP records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures and reports obtained from the pipeline operator and PHMSA SMEs.

The arrangement of this report provides a general description of the pipeline system, the events that occurred on the day of the release, and acts or omissions of the operator that led to this failure and release of crude oil.  Specific evidence is supplied and pertinent statements from each report are excerpted where appropriate.

## Facility Background

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries.  Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively.  The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation.   Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903.  The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

(1) Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57).  There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station.  All of Line 901 crude oil throughput enters Line 903.  Line 901 was manufactured of low carbon steel by Nippon Steel

Page **4** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam.  The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.



**Figure 1.** Map of Plains' Western Division Pipelines.  The arrow points to the approximate release site on Line 901.

At Sisquoc Station, crude oil can be pumped to one of two locations: a nearby refinery via a 12-inch diameter pipeline operated by Phillips 66, or continue down Line 903 to Pentland Station. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream.  At Emidio Station crude oil is delivered to above-ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.

Prior to the May 19, 2015 release, there had been four small releases meeting PHMSA reportable criteria at pump stations on Lines 901 and 903. No releases were reported to PHMSA on the pipelines outside of pump stations prior to 2015.  The  operator reported maximum operating pressure (MOP) of Line 901 is 1,341 psig.

At the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 and Line 903 under a Federal Energy Regulatory Commission (FERC) certificate  of economic regulatory jurisdiction that was issued in 1987.  Plains Pipeline, LP, is a subsidiary of PAAPL.  Based on the FERC filing, Lines 901 and 903 were classified as interstate  pipelines, pursuant to 49 U.S.C. § 60101(7), as facilities used to transport hazardous liquid in  interstate or foreign commerce, and as such, were regulated by PHMSA as interstate pipelines. Plains cancelled the FERC certificates for Lines 901 and 903 on February 12, 2016 and April 29, 2016,

Santa Barbara County, California Crude Oil Release - May 19, 2015

respectively, stating that the transportation service was no longer available in interstate commerce. Line 903 from Gaviota to Sisquoc to Pentland Stations was purged with nitrogen in accordance with Amendment No. 2 to the CAO, and remains shut down between these stations. The Pentland to Emidio segment of Line 903 is active and operating intermittently at low pressures. This section of pipe between Pentland and Emidio is not directly connected to the Gaviota to Pentland segment and is used to transport crude product from breakout tanks in Pentland Station.

## Events Immediately Prior to and During the Crude Oil Release

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 bbl per hour (BPH) leaving the Las Flores Station, and the discharge pressure was approximately 575 psig.  Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903.  A Plains instrumentation and electrical technician was dispatched that morning to disconnect and remove a motor from a non-operational pump at the Sisquoc Station.  While the technician was performing his work, the operational pump (Pump 401) at the Sisquoc Station was shut down unintentionally (i.e., "uncommanded").  When Pump 401 on Line 903 stopped operating, the pressure in Line 901 increased. The pressure rose to a maximum of 696 psig at the Las Flores Station discharge.  The controller shut down the pump at Las Flores Station and the pressure remained at 677 psig.  Approximately four minutes later, the pump at Las Flores Station was restarted.  At approximately 10:55 a.m. PDT, the flow rate at Las Flores Station climbed from zero to 2,042 BPH.  Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the Las Flores pump was shut down a second and final time.  Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release. PHMSA has determined that Pump 401 going offline in an "uncommanded" manner on the morning of May 19, 2015, was an abnormal event, but that this in itself should not have caused Line 901 to rupture.

PHMSA performed a detailed review of the SCADA event and alarm logs, and pressure and flow records.  The review indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure.  The alarm was not set at an appropriate value.  The alarm also did not have a major priority/severity or safety-related alarm status.  The controller did not recognize the information he received as indicative of an abnormal operation.  Evidence indicates that the controller was focused on the events at Sisquoc Station (i.e., restarting the Sisquoc pump that had gone down once uncommanded, and a second time on high case temperature along with other duties).[iii]

Due to the Sisquoc Station maintenance activity resulting in an unplanned pump shutdown, the controller anticipated alarms would be activated from the pipeline leak monitoring (PLM) system.  According to interviews and a review of the alarm log, the PLM inhibit was requested by the controller to the step-up shift supervisor between 11:15 and 11:22 a.m.[iv]  The step-up shift supervisor then inhibited (shut off) the PLM system alarms.[v]  Also, during this time, the controller started an investigation of the SCADA data in an attempt to understand the operational abnormalities that were occurring.  After attempting to restart the Sisquoc pump twice, the controller shut down the pipeline.  PHMSA requested the operator review the flow imbalance calculations and provide a time when the PLM system would have generated an alarm if not inhibited, and it was determined that  alarms would have been generated

Page **6** of **21**

# Exhibit 4

**Item 61**

# Update on the Status of the Existing Offshore Oil and Gas Production and Pipeline Leases Managed by the Commission

*Goleta, CA* | April 26, 2022

CALIFORNIA STATE LANDS COMMISSION



California State
Lands Commission

# *SUMMARY OF STATE OFFSHORE LEASES*

- **11** Active Oil-producing Leases
    - -Ventura and Orange Counties
- **5** Inactive Oil and Gas Leases
    - -Awaiting Quitclaim
    - -Compensatory Agreements
- **13** Pipeline Leases
    - -11 Active
    - -1 Expired
    - -1 Terminated





California State Lands Commission

# San Pedro Channel



# Santa Barbara Channel



# *SANTA BARBARA COUNTY*

## Overview

- **0** Active oil and Gas Leases

- **2** Inactive Oil and Gas Leases

- **3** Recently Quitclaimed Oil and Gas Leases

- **3** Recently Terminated Leases

- **5** Pipeline Leases



Sunrise- Isla Vista, 2013

California State
Lands Commission

5

# *SANTA BARBARA COUNTY*

## Shell Mounds (Leases 1824, 3150)

**Lessee: Chevron**

**Status: Inactive**

- **9,512** Acres

- Site of previously removed 4H platforms

- **$5,000** in annual rent for Lease 1824

- Quitclaim pending





# SANTA BARBARA COUNTY

## Platform Holly and the City of Goleta (Leases 3242, 3120, 421)

**Status: QUITCLAIMED (2017)**

Formerly operated by Venoco Inc.

**Leases 3242 and 3120:**

- Issued in 1964 and 1965
- Produced from platform Holly
- 30 Wells
- Last produced in 2015

**Lease 421:**

- Issued in 1949
- Produced from artificial pier near shore
- 2 Wells
- Last produced in 1994

  *Plug and Abandonment operations ongoing…*



Platform Holly

# *SANTA BARBARA COUNTY*

## Carpinteria Oil Field (Leases 7911, 4000, 3133)

**Status: TERMINATED** (2019)

Formerly operated by Carone Petroleum

- Leases originally issued in late 1960s

- All lease facilities removed, and all wells plugged and abandoned by 1996

- Lease areas assigned to Carone in 1996

- Leases terminated by Commission in 2019



# SANTA BARBARA COUNTY

## Pipeline Leases: 5 Active

| Lease | Lessee | Location | Status | Issued/ Expiration | Term (years) | Annual Rent | Bond | Lease Characteristics |
|-------|--------|----------|--------|-------------------|--------------|-------------|------|----------------------|
| **Lease 7163** (Shore to Federal Platform Harmony) | Exxon Mobil Corp. | offshore El Capitan State Beach, near the City of Goleta | Active | Feb-1988/ Jan-2022 | 34 | $178,174 | $1 million | single point mooring facility, a crude oil/water emulsion pipeline, three power cables, and a produced water outfall |
| **Lease 4977** (Federal Platform Hondo to Shore) | Exxon Mobil Corp. | offshore, near Los Flores Canyon | Active | Jan-1989/ Dec-2021 | 33 | $60,000 | $1 million | Sour Gas Pipeline |
| **Lease 6911** (Federal Platform Irene to Shore) | Plains Exploration and Production (PXP) | near Point Pedernales, offshore of the city of Lompoc | Active | Nov-2009/ Oct-2022 | 13 | $129,285 | $3 million | Power cable, crude oil pipeline, natural gas pipeline, wastewater pipeline. |
| **Lease 6942** (Federal Platform Hermosa to Shore) | Point Arguello Pipeline co. | Offshore, near Point Conception | Active | Feb-2011/ Jan-2031 | 20 | $74, 383 | $100,000 | crude oil emulsion pipeline |
| **Lease 6943** (Federal Platform Hermosa to Shore) | Plains Exploration and Production (PXP) | Offshore, near Point Conception | Active | Feb-2011/ Jan-2031 | 30 | $72,144 | $300,000 | natural gas pipeline |

- For Pipeline Leases 7163 and 4977, Commission staff is  processing the lessee's renewal applications for both leases.



California State
Lands Commission

9

# *VENTURA COUNTY*
## Overview

- **2** Active Oil and Gas Leases

- **1** Inactive Oil and Gas Lease

- **3** Recently Quitclaimed Oil and Gas Leases

- **3** Pipeline Leases



Offshore Rincon Island- 2018



California State
Lands Commission

10

# VENTURA COUNTY

## West Montalvo (Leases 3314, 735) Status: **Active and Producing**

**Lessee**: California Resources Petroleum Corp./Vintage Petroleum

| Lease | 3314 | 735 |
|---|---|---|
| Issued | 1965 | 1952 |
| Acres | 5,430 | 220 |
| Royalty Rate | Sliding Scale | 16 2/3% |
| Annual Rent | $ 5,430 | $960 |
| Wells | 18 | 3 |
| Production (bbls) 20/21 | 47,976 | 11,561 |
| Royalty 20/21 | $ 396, 916 | $ 101,229 |
| Bonding | $ 7 Million | |





California State Lands Commission

11

# *VENTURA COUNTY*

## Lease 427

**Status: Inactive (Awaiting Quitclaim)**

Lessee: Exxon

- 148 Acres

- Last Produced in 1993

- All wells plugged and abandoned

- Quitclaim pending





# *VENTURA COUNTY*

## Rincon Island  (Leases 145, 410, 1466)
**Status: <span style="color:red">QUITCLAIMED</span> (2017)**

- Originally Issued in 1940s and 50s

- Last Produced in 2008 and quitclaimed in 2017

- All 75 wells have been plugged and abandoned

- Decommissioning Plan currently in development



Rincon Island- 2021



California State
Lands Commission

13

# VENTURA COUNTY

## Pipeline Leases: 1 Active, 1 Expired, 1 Terminated

| Lease | Lessee | Location | Status | Issued/ Expiration | Term (years) | Annual Rent | Bond | Lease Characteristics |
|---|---|---|---|---|---|---|---|---|
| **Lease 5967** (Shore to Federal Platforms Gina/Gilda) | DCOR, LLC | Santa Barbara Channel, connecting to Mandalay Generating Station | Active | Apr-1981, Apr-2006/Mar-2026 | 20 | $ 102, 525 | 3 million + parental guarentee | two bundled pipeline systems conveying crude oil, natural gas, water, and electrical lines |
| **Lease 4017** (Federal Platform "A" to Shore) | DCOR, LLC | Santa Barbara Channel, near Sea Cliff | Expired | Aug-1968/Aug-2017 | 49 | NA | 3 million + parental guarentee | two 12-inch oil and gas pipelines connecting to Rincon Operating Facility |
| **Lease 3914** (Federal Platform Hogan to Shore) | Signal Hill Service, Inc. | Santa Barbara Channel, near Rincon Point | Terminated | Feb-1968, Sep-2013/June-2019 | 10 | NA | NA | water pipeline, oil pipelines, gas pipeline; outfall pipeline. |

- For Lease 4017, Commission staff is in discussions with the Lessee to eventually renew the Lease.

- For terminated Lease 3914, decommissioning is pending.



California State Lands Commission

14

# *LOS ANGELES COUNTY*

## Long Beach Unit and West Wilmington Operations (Granted Lands)

**Long Beach Unit**

❑ FY 2020-21:

  5.86 million barrels of oil

  $52,916,448 state share of net profits

❑ Total offshore wells: 1349

❑ Total onshore wells: 903 (June 2021)

❑ Field Life: 2036*

**West Wilmington**

❑ FY 2020-21:

  1.48 million barrels of oil

  $16,099,372 state share of net profits

❑ Total onshore wells: 903 (June 2021)

❑ Field Life: 2036*



Offshore Junipero Beach, Long Beach- 2022

*Based on oil price used in CRC's year end 2020 SEC filing ($39.6 per barrel)



California State Lands Commission          15

# *ORANGE COUNTY*

## Overview

- **9** Active Oil and Gas Leases

- **2** Compensatory Agreements

- **3** Platforms

- **1** Granted Lands Area

- **5** Pipeline Leases



Platform Emmy



California State
Lands Commission

16

# ORANGE COUNTY

**Platform Emmy and Huntington Beach (Leases 91, 163, 392, 425, and 426)**
**Status: Active and Producing**
**Lessee**: SoCal Holding, LLC.

| Lease | 91 | 163 | 392 | 425 | 426 |
|-------|-----|-----|-----|-----|-----|
| Issued | 1943 | 1944 | 1938 | 1950 | 1950 |
| Acres | 589 | 640 | 835 | 835 | 649 |
| Annual Rent | $500 | $3,200 | $835 | $4,175 | $3,200 |
| Wells | 13 Onshore | 163 Onshore | 161 Onshore, 1 Emmy | 44 Onshore, 18 Emmy | 26 Onshore, 12 Emmy |



- 2017 Royalty Modification

- 1.2 million bbls oil (FY 20/21)

- $ 14.8 million in royalty (FY 20/21)

- $ 30 million Bond + additional Sinking Fund

California State
Lands Commission

17

# ORANGE COUNTY

**Platforms Eva and Esther (Leases 3033, 3095, and 3413)**
**Status: Active and Producing**
**Lessee**: DCOR, LLC

Platform Eva



| Lease | 3033 | 3095 | 3413 |
|---|---|---|---|
| Issued | 1963 | 1964 | 1965 |
| Acres | 2113 | 3360 | 1871 |
| Royalty Rate | 17.26% | 16.88% | 17.26% |
| Annual Rent | $3,200 | $3,360 | $1,871 |
| Wells | 35 Platform Eva | 30 Platform Esther | 7 Platform Eva |

- 425,438 bbls oil (FY 20/21)
- $ 3.5 million in royalty (FY 20/21)
- $ 23 million bond



Platform Esther



California State
Lands Commission

18

# ORANGE COUNTY

**Island Chaffee (Lease 186)**

**Status: Active and Producing**

**Lessee**: California Resources Long Beach, Inc.

- Originally issued in 1945 and produces from Belmont Offshore Oil Field.

- 1255 Acres

- Royalty rate of 17.88%

- $ 5,000 annual rent

- 35 wells drilled from Island Chaffee

- $5,000 bond, no state abandonment liability

- 212,446 bbls oil (FY 20/21)

- $1.9 million in royalty (FY 20/21)



Island Chaffee from Rosie's Dog Beach- 2022



California State
Lands Commission

19

# ORANGE COUNTY

**Compensatory Agreements (Agreements 4736, 1482)**
**Status: Royalty generating**

| Agreement | 4736 | 1482 |
|---|---|---|
| Issued | 1965 | 1955 |
| Location | Adjacent Bolsa Chica Wetlands | Alamitos Bay, Seal Beach |
| Acres | 70 | 54 |
| Royalty Rate | <1% North, 1% South | 16 2/3% |
| Annual Rent | NA | NA |
| Royalty 20/21 | $22,555 | $16,422 |



- No Wells located within state lease areas
- Royalty generated from nearby "drainage wells"



# ORANGE COUNTY

## Pipeline Leases: 5 Active

| Lease | Lessee | Location | Status | Issued/ Expiration | Term (years) | Annual Rent | Bond | Lease Characteristics |
|---|---|---|---|---|---|---|---|---|
| **Lease 6417** (Shore to State platform Eva and Federal Platform Edith) | DCOR, LLC | offshore of Huntington Beach | Active | Dec-2007/Nov-2027 | 20 | $75,044 | $18 million blanket bond | one 24-inch diameter pipeline containing two power cables and use of one six-inch diameter gas pipeline |
| **Lease 3394** (State Platform Esther to Shore) | DCOR, LLC | San Pedro Bay, near Seal Beach | Active | Oct-2010/Oct-2030 | 20 | $49, 680 | $21 million blanket bond | oil pipeline, gas pipeline, freshwater pipeline, electrical conduit. |
| **Lease 3116** (State Platform Eva to Shore) | DCOR, LLC | San Pedro Bay, near Huntington Beach | Active | Mar-1983/ Mar-2029 | 46 | $160,574 | $21 million blanket bond + $350,000 bond | submarine pipelines and a power cable |
| **PRC 5636** (Federal Leases to Shore) | San Pedro Bay Pipeline co. | San Pedro Bay, near Seal Beach and Huntington Beach | Active | Mar-2008/Mar-2028 | 20 | $104,958 | $8.9 million | 16-inch diameter crude oil pipeline |
| **PRC 5663** (State Platform Emmy to Shore) | SoCal Holding, LLC | San Pedro Bay, near Seal Beach and Huntington Beach | Active | May 1979/long as producing | continuous use | NA | $ 30 million + parental guarantee | oil pipeline |

California State Lands Commission

21

# *ORANGE COUNTY*

## Newport Beach Granted Lands

The City of Newport Beach owns and operates 16 oil wells that were drilled between 1953 and 1958 and are slant-drilled into the tidelands area of the Newport offshore oil field. There is no revenue sharing with the state, and all revenue generated must be used for the purposes of maintaining the tidelines, such as funding improvements to tidelands property, dredging Lower Newport Bay, lifeguards, and beach cleaning. The Commission has no approval authority over these operations.



California State
Lands Commission

22

# CONCLUSION

In the last six years, the Commission has facilitated the termination of 10 offshore oil and gas leases, returning over 20,000 acres to the Coastal Sanctuary.

We are pursuing parallel tracks of facilitating geothermal, solar, and wind development, while actively working with our state agency partners and lessees to:

- Ensure the State is adequately protected

- Abandon idle wells

- Decommission offshore facilities

- Remediate offshore orphan legacy wells

- Implement spill prevention and inspection programs

California State
Lands Commission



23

www.slc.ca.gov

# THANK YOU & QUESTIONS

Nate Dozier
Mineral Resources Management Division
Nate.dozier@slc.ca.gov
562.590.5237

 @CAStateLands



California State
Lands Commission

# Exhibit 5



   

# Refugio Beach Oil Spill
## Final Damage Assessment and Restoration Plan/Environmental Assessment

Prepared by:
California Department of Fish and Wildlife
California State Lands Commission
California Department of Parks and Recreation
University of California
The Department of Interior, U.S. Fish and Wildlife Service
National Oceanic and Atmospheric Administration

      

# Refugio Beach Oil Spill

# FINAL

# Damage Assessment and Restoration Plan/Environmental Assessment

June 2021

**On the Cover:**
Oiled Beach by U.S. Coast Guard
Oiled octopus and invertebrates by Natural Resource Damage Assessment Trustees
Dolphins by Natural Resource Damage Assessment Trustees
Pelicans by Natural Resource Damage Assessment Trustees
Harbor seal by Santa Barbara Channelkeeper

**Suggested Citation:**
Refugio Beach Oil Spill Trustees. 2021. *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment.* Prepared by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration.

# Refugio Beach Oil Spill Natural Resource Damage Assessment Summary:

## Shoreline Habitats
**$5.5 million**

**Injury:** Approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.

## Subtidal and Fish Habitats
**$6.1 million**

**Injury:** Approximately 2,200 acres of benthic subtidal habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, remove Ellwood seawall, restore sand dwelling kelp offshore of Goleta Beach.

## Birds
**$2.2 million**

**Injury:** 558 birds were estimated killed, representing over 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.

## Marine Mammals
**$2.3 million**

**Injury:** 156 pinnipeds and 76 cetaceans were estimated injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbra and Ventura County, and Increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

## Human Uses
**$3.9 million**

**Injury:** The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

**Restoration:**
Restoration funds (53%) will be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach.

Restoration funds (46%) will be administered by State Trustees for use on projects benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach.

Restoration funds (approximately 1%) will be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

## Restoration Planning, Implementation, and Oversight
**$2 million**

## Public Input

Full Document: https://go.usa.gov/xvWEg

Administrative Record: https://go.usa.gov/xvWEc

Submit Questions: RefugioRestoration@fws.gov

3

# Executive Summary

On May 19, 2015 a 24-inch diameter on-shore pipeline (Line 901) that extends approximately 10.7 miles along the Santa Barbara County coastline in California ruptured resulting in the release of approximately 2,934 barrels (123,228 gallons) of heavy crude oil (U.S. DOT 2016, hereafter referred to as "the spill"). Line 901 is a buried, insulated pipeline that transported heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. The pipeline is owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains). The Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that the cause of the Line 901 failure was external corrosion under insulation that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. Crude oil from the buried pipeline saturated the soil and flowed into a culvert that crosses under Highway 101 and railroad tracks, and ultimately discharged into the Pacific Ocean at Refugio State Beach.

The crude oil that entered the ocean posed a significant risk to and injured marine plants and wildlife, including seagrasses, kelp, invertebrates, fish, birds, and mammals. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend, resulting in losses for local businesses and lost opportunities for the public to visit and enjoy the shore and offshore areas. Tar balls attributable to the Line 901 release were carried by southerly ocean currents and eventually reached some beaches in Los Angeles County (California Department of Fish and Wildlife 2016).

The response (cleanup) to this significant spill brought together a number of federal, state, local agencies, and Native American tribes operating under a Unified Command. For the spill response, Incident Commanders consisted of representatives of the United States Coast Guard (USCG), California Department of Fish and Wildlife, Office of Spill Prevention and Response (CDFW-OSPR), Santa Barbara County, and Plains[1]. The Refugio Beach oil spill cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard, 2016). Phase III monitoring activities were largely concluded on May 26, 2016 and the Unified Command disestablished on March 10, 2017 (U.S. Coast Guard 2017).

In parallel with the response and cleanup effort, the natural resources trustee agencies (Trustees) conducted a Natural Resource Damage Assessment (NRDA) to quantify the injuries to natural resources from the spill and assess natural resource damages. In this case, the Trustees for the natural resources injured by the spill include the United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the United States Fish and Wildlife Service

---

[1] The National Contingency Plan calls for the Responsible Party to be a member of the Unified Command; ref. 40 CFR 300.135(d)

4

(USFWS), National Park Service (NPS) and Bureau of Land Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California (the Trustees). As a designated Trustee, each of these agencies is authorized to act on behalf of the public under state and/or federal laws to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

In accordance with the Oil Pollution Act (OPA) NRDA regulations (33 U.S.C. 2706(e)), the Trustees have cooperatively gathered information and prepared this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA). This document describes the injuries resulting from the spill and the restoration projects selected to compensate the public for those injuries. This document is also an Environmental Assessment intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the proposed restoration projects under the National Environmental Policy Act (NEPA) and is therefore called a DARP/EA. Prior to releasing this Final DARP/EA, the Trustees released a Draft DARP/EA for public review and comment.  After considering the public comments received, the Trustees prepared this Final DARP/EA.  A full environmental review would be premature for some of the selected projects in this Final DARP/EA, as well as projects that were deemed "second tier" or of lower priority. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

This document describes the restoration projects selected by the Trustees to address the various resources impacted by the spill, as well as a process to identify appropriate human use projects for funding. All of the selected projects are designed to restore, replace, or acquire the equivalent of the lost resources and/or their services through restorative on-the-ground actions. Furthermore, several of the projects address multiple resources. The projects were selected based upon the biological needs of the injured species and the feasibility of restoring the resources.

Under OPA, the responsible party is liable for the cost of implementing restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees settled their claim for natural resource damages with Plains. A summary of the injury to each resource category, the approximate allocation of damages and selected restoration projects are shown below. Web links to data used in the injury assessment can be found in Appendix B of the DARP/EA.

5

SHORELINE HABITATS                                                    $5.5 million

**Injury:** Trustees estimate that approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.



SUBTIDAL AND FISH HABITATS                                           $6.1 million

**Injury:** Trustees estimate that approximately 2,200 acres of benthic subtidal and fish habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, restore sand-dwelling kelp offshore of Goleta Beach, and remove Ellwood seawall.

6



BIRDS                                                                                    $2.2 million

**Injury:** Trustees estimate 558 birds were killed, representing approximately 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.



MARINE MAMMALS                                                                           $2.3 million

**Injury:** Trustees estimate 156 pinnipeds and 76 cetaceans were injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties, and increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

7



HUMAN USE                                                                          $3.9 million

**Injury:** Trustees estimate over 140,000 recreational user days were lost.

**Restoration:** Various projects to improve human recreation, to be administrated as follows - 53% to State Parks for projects benefitting camping or shore-based recreation including and upcoast of El Capitan State Beach; 46% for a grants program for projects downcoast of El Capitan State Beach, on non-State Parks lands benefitting coastal recreation as well as boating and off-shore recreation in Santa Barbara, Ventura, and Los Angeles Counties; and approximately 1% to Coal Oil Point Reserve for projects benefitting research, education, and outreach.



RESTORATION PLANNING, IMPLEMENTATION, AND OVERSIGHT                 $2.0 million

The Trustees have prepared this Final DARP/EA to inform the public about the natural resource damage assessment (NRDA) and restoration planning efforts that have been conducted following the spill. This document is also an Environmental Assessment (EA) intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects, and the alternatives considered, under NEPA.  As environmental review would be premature for some of the projects in the document, additional review may be required in some instances.  This will be determined once recreational use projects are identified and/or when more detailed engineering design work or operational plans for the selected projects are available.  To coordinate and oversee implementation of this DARP/EA, the Trustees have formed a Trustee Council comprised of representatives from each of the Trustee agencies.  To submit questions or contact the Trustee Council, please use the following contact information:

## Electronic Mail:
RefugioRestoration@fws.gov

## U.S. Mail:
Refugio Beach Oil Spill Natural Resource Trustees
C/O Ventura Fish and Wildlife Office
2493 Portola Road, Suite B
Ventura, California 93003

Attn:
Michael Anderson, California Department of Fish and Wildlife
Jennifer Boyce, National Oceanic and Atmospheric Administration
Colleen Grant, U.S. Fish and Wildlife Service

9

# Exhibit 6

FILED
CLERK, U.S. DISTRICT COURT

10/14/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ **WH** _____ DEPUTY

JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415-PSG-JEM <br><br> ~~**[PROPOSED]**~~ **ORDER TO ENTER CONSENT DECREE** <br><br> ~~**Date:** October 26, 2020~~ <br> ~~**Time:** 1:30 p.m.~~ <br> ~~**Location:** Telephonic~~ <br> **Judge:** Hon. Philip S. Gutierrez |

# [~~PROPOSED~~] ORDER

For the reasons set forth in the United States' Motion to Enter Consent Decree and Memorandum of Law in Support thereof that was filed on August 19, 2020 and for good cause shown, the Consent Decree that was lodged on March 13, 2020 (Docket No. 6-1), is hereby ENTERED and shall constitute final judgment of the Court in this matter.

IT IS SO ORDERED.

DATED: __10/14/2020_____          _____

                                     THE HONORABLE PHILIP S. GUTIERREZ
                                     UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
[~~Proposed~~] Order to Enter Consent Decree
-1-

# Exhibit 7

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MICHAEL DORSI (CA Bar Number: 281865)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel: (415) 510-4400
E-mail: Michael.Dorsi@doj.ca.gov
*Counsel for Plaintiffs California Department of*
*Forestry and Fire Protection's Office of State Fire*
*Marshal*

*Additional counsel listed on following page*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>Defendants. | Case No. 2:20-cv-02415-SVW-SSCx<br><br>**CALIFORNIA PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF EX PARTE EMERGENCY MOTION TO ENFORCE CONSENT DECREE**<br><br>Dept:     10A<br><br>Action Filed: Mar. 13, 2020<br>Judgment: Oct. 14, 2020 |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JAKE GOLD (CA Bar Number: 347131)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6327
E-mail: Michael.Zarro@doj.ca.gov
*Counsel for Plaintiff California Department of
Forestry and Fire Protection's Office of State Fire
Marshal*

JESSICA TUCKER-MOHL
Supervising Deputy Attorney General
MATTHEW STRUHAR (CA Bar Number: 293973)
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, California 95814-2951
Tel: (916) 210-7246
E-mail: Matthew.Struhar@doj.ca.gov
*Counsel for Plaintiff California Department
of Parks and Recreation*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

-1-

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that Plaintiffs People of the State of California ex rel. California Department of Forestry and Fire Protection's Office of the State Fire Marshal and California State Parks seek judicial notice of the attached documents under Federal Rule of Evidence 201.

The exhibits and the facts that they identify are the proper subject of judicial notice because the facts and documents are publicly available on government websites or otherwise in government records, including private party submissions to government agencies, and the facts for which they are relied upon here can be accurately and readily determined from these sources whose accuracy cannot reasonably be questioned. *See, e.g.*, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (stating that it was appropriate to take judicial notice of information "made publicly available by government entities" on their websites where "neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein"); *Martinez v. Mead Johnson & Co.*, No. 5:22-cv-00213-JWH-SHK, 2022 WL 15053334, at *4 (C.D. Cal. Oct. 22, 2022) (finding that FDA guidance was judicially noticeable because it was "publicly available and it was disseminated by a government agency"); *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG, 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009) ("Information on government agency websites has often been treated as properly subject to judicial notice."); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (a court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice."). The documents to be judicially noticed are identified in the attached index.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

-2-

Dated: March 16, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
ERIC M. KATZ
JESSICA TUCKER-MOHL
Supervising Deputy Attorneys
General


/s/ Michael S. Dorsi
MICHAEL DORSI
Deputy Attorney General
*Counsel for Plaintiffs State of
California, et al.*


### DECLARATION OF AUTHENTICATION

As the attorney who prepared this Declaration, I attest that I compiled the attached exhibits and confirmed their authenticity by obtaining the documents from official government websites or from government employees with knowledge of their authenticity.

/s/ Michael S. Dorsi
MICHAEL DORSI
Deputy Attorney General

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

-3-

**INDEX OF EXHIBITS**

Exhibit A:     Petition for Review filed by California on January 23, 2026

Exhibit A-1: PHMSA Preemption Letter, dated December 17, 2025

Exhibit A-2: PHMSA Restart Plan Approval, dated December 22, 2025

Exhibit A-3: PHMSA Special Permit, dated December 23, 2025

Exhibit B:     Complaint, *Pacific Pipeline Company v. California* (Kern County) (*Exhibits to Complaint omitted*), filed September 29, 2025

Exhibit C:     OSFM Response to Motion for Reconsideration of Preliminary Injunction (Santa Barbara County Superior Court), filed February 1, 2026

Exhibit D:     Opinion by Office of Legal Counsel, United States Department of Justice, titled Preemptive Effect of Defense Production Act Order on State Law, 50 Op. O.L.C. ___ (Mar. 3, 2026)

Exhibit E:     Sable Assumption Agreement, dated February 19, 2024

Exhibit F:     Notice of Entry of Orders re Preliminary Injunction, Preliminary Injunction entered on July 29, 2025, Notice of Entry docketed February 27, 2026

Exhibit G:     Selected Pages from Answer by Sable Offshore Corp and Pacific Pipeline Company, filed on September 17, 2025

Exhibit H:     Letter from PHMSA to OSFM re Intrastate Designation, dated May 18, 2016

Exhibit I:     State Waiver for CA-324

Exhibit J:     State Waiver for CA-325

Exhibit K:     OSFM letter to Sable re Tool Tolerance, dated October 22, 2025

Exhibit L:     Sable letter to OSFM re Tool Tolerance, dated October 23, 2025

Exhibit M:     Sable letter to PHMSA re Interstate Designation, dated November 26, 2025

Exhibit N:     Minute Order Denying Motion for Reconsideration of Preliminary Injunction (Santa Barbara County Superior Court), entered February 27. 2026

Exhibit O:     Letter from Sable to OSFM by which "Sable hereby relinquishes, surrenders and abandons the State Waivers," sent February 26, 2026

Exhibit P:     Sable Announcement of Resumption of Oil Flow, dated March 16, 2026

Exhibit Q:     Secretary of Energy Order under Defense Production Act, dated March 13, 2026

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

-4-

# Exhibit E

**ExxonMobil Pipeline Company LLC**
22777 Springwoods Village Parkway
Spring, Texas 77389



February 19, 2024

*Via Electronic Delivery*

Mr. Joshua Cleaver
Staff Counsel
Legal Services Office
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, California 94244
joshua.cleaver@fire.ca.gov

See Attached Service List

**Re:     Civil Action No. 2:20-CV-02415 Consent Decree**
**DOJ Case #90-5-1-1-1130**
**Notification of Transfer of Assets**

Mr. Cleaver:

In accordance with Section XVIII, Paragraph 89, of the above referenced Consent Decree, Exxon Mobil Pipeline Company LLC, and its affiliate, Mobil Pacific Pipeline Company, hereby provide notice to the California Department of Forestry and Fire Protection's Office of the State Fire Marshal, of the transfer of certain assets subject to the Consent Decree.  All terms used but not defined herein shall have the meanings given such terms in the Consent Decree.

On February 14, 2024, Mobil Pacific Pipeline Company, the exclusive shareholder of Pacific Pipeline Company, divested 100% of its interest in Pacific Pipeline Company to Sable Offshore Corp.  Pacific Pipeline Company owns Line 901 and the Gaviota to Pentland segment of Line 903 and all associated personal property related to these lines (collectively, the Assets). Enclosed for your records is a copy of the executed Consent Decree Assumption Agreement whereby Sable Offshore Corp. has agreed to be bound by the provisions of the Consent Decree and Appendices B and D thereof that are transferrable and specifically applicable to the Assets. Please direct future communications concerning the Assets and their corresponding Consent Decree obligations to:

    Anthony Duenner
    General Counsel
    Sable Offshore Corp.
    700 Milam St, Suite 3400
    Houston, TX 77002
    E-Mail: aduenner@sableoffshore.com

Case 2:20-cv-02395-SVW-SSC    Document 48-1    Filed 05/06/26    Page 169 of 265
Page ID #:828
Consent Decree: Notification of Transfer of Assets                                    Page 2

ExxonMobil Pipeline Company LLC and its affiliates, including but not limited to, Mobil Pacific Pipeline Company, retain no ownership interest in the Assets or responsibility for complying with the Consent Decree.

If you have any questions, please contact Rebekah Bennett, General Counsel, ExxonMobil Pipeline Company LLC at (346) 467-9756 or rebekah.r.bennett@exxonmobil.com.

Sincerely,

Andrew Craig
Venture Manager
ExxonMobil Pipeline Company LLC

Enclosure
Consent Decree Assumption Agreement

cc:    Brian Carlin, ExxonMobil Pipeline Company LLC
       Rebekah Bennett, ExxonMobil Pipeline Company LLC
       Karah Brazell, ExxonMobil Pipeline Company LLC
       Anthony Duenner, Pacific Pipeline Company and Sable Offshore Corp.

# SERVICE LIST: CONSENT DECREE CONTACTS OF RECORD

United States:
EES Case Management Unit
Environmental and Natural Resource Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C 20044-7611
Re: DJ # 90-5-1-1-1130
eescdcopy.enrd@usdoj.gov

PHMSA:
Joseph E. Hainline
Attorney-Advisor
Office of Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials
Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, D.C. 20590
joseph.hainline@dot.gov

EPA:
Andrew Helmlinger
Supervising Attorney
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94105
helmlinger.andrew@epa.gov

DOI:
Clare Cragan
U.S. Department of the Interior
Office of the Solicitor
755 Parfet St., Suite 151
Lakewood, Colorado 80215
clare.cragan@sol.doi.gov

NOAA:
National Oceanic and Atmospheric
Administration
Office of General Counsel
Natural Resources Section
ATTN: Christopher J. Plaisted
501 W. Ocean Blvd, Suite 4470
Long Beach, California 90802
christopher.plaisted@noaa.gov

USCG:
Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center,
US Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, D.C. 20593-7605
patricia.v.kingcade@uscg.mil

State Agencies:
Michael Zarro
Deputy Attorney General
Office of the Attorney General
Natural Resources Law Section
300 S. Spring St., Suite 11220
Los Angeles, California 90013
michael.zarro@doj.ca.gov

CDFW:
California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Eric B. Milstein
Assistant Chief Counsel
P.O. Box 944209
Sacramento, California 94244-2090
eric.milstein@wildlife.ca.gov

CDPR:
California Department of Parks and Recreation
Attn: Laura A. Reimche, Senior Counsel
1416 Ninth Street, Room 1404-6
Sacramento, California 95814
Laura.Reimche@parks.ca.gov

CSLC:
California State Lands Commission
Legal Division
Attn: Warren L. Crunk,
Assistant Chief Counsel
100 Howe Avenue, Suite 100-South
Sacramento, California 95825
warren.crunk@slc.ca.gov

OSFM:
California Department of Forestry and Fire Protection
Legal Services Office
Attn: Joshua Cleaver, Staff Counsel
P.O. Box 944246
Sacramento, California 94244-2460
joshua.cleaver@fire.ca.gov

RWQCB:
California Central Coast Regional Water
Quality Control Board
Office of Enforcement
Attn: Naomi Rubin, Attorney III
801 K Street, Suite 2300
Sacramento, California 95814
naomi.rubin@waterboards.ca.gov

UC:
Barton Lounsbury, Managing Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607
barton.lounsbury@ucop.edu

An **ExxonMobil** Subsidiary

DocuSign Envelope ID: 9DF511ED-FF14-4502-8EA9-35E2D307312A

## CONSENT DECREE ASSUMPTION AGREEMENT

This CONSENT DECREE ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of February 14, 2024 (the "*Effective Date*"), is made and entered into by and between Mobil Pacific Pipeline Company, a Delaware corporation ("*Seller*"), Pacific Pipeline Company, a Delaware corporation ("*PPC*") and Sable Offshore Corp., a Delaware corporation ("*Buyer*").

## WITNESSETH:

**WHEREAS**, reference is made herein to that certain Consent Decree issued by the United States District Court for the Central District of California in relation to Civil Action No. 2:20-cv-02415 (*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*) (the "*Consent Decree*"), a copy of which was provided to Buyer on January 18, 2024;

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated November 1, 2022, by and between Seller and Buyer (the "*Purchase Agreement*") and those certain instruments of sale, assignment, transfer and conveyance executed in connection with the Purchase Agreement, Buyer has acquired one hundred percent (100%) of the issued equity of PPC from Seller.

**WHEREAS**, PPC is the owner of Line 901 (as defined in Consent Decree) and the segment of Line 903 (as defined in the Consent Decree) from Gaviota pump station to Pentland pump station (collectively, the "*Assets*") pursuant to that certain Purchase and Sale Agreement dated October 10, 2022 between Plains Pipeline, L.P. ("*Plains*") and PPC;

**WHEREAS**, Paragraphs 88-89 of the Consent Decree require that PPC agree to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets, unless Seller has already completed the required action or unless the California Department of Forestry and Fire Protection's – Office of the State Fire Marshal (and any of its successor departments or agencies) agrees to relieve Buyer of the obligations of any otherwise applicable provision, which agreement is evidenced by that certain Consent Decree Assumption Agreement dated October 13, 2022 between Plains and PPC (the "*PPC Assumption Agreement*"); and

**WHEREAS**, pursuant to this Agreement, Seller and Buyer intend to evidence Buyer's agreement to cause PPC to be bound by, and to affirm and acknowledge PPC's agreement to those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the acquired Assets as required by Paragraphs 88-89 of the Consent Decree.

**NOW, THEREFORE**, in consideration of the mutual covenants set forth herein and in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller, PPC and Buyer hereby agree as follows:

1. Pursuant to Paragraphs 88-89 of the Consent Decree, PPC hereby agrees to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets.

2.  From time to time, as and when requested by Seller, PPC shall execute and deliver, and Buyer shall cause to be executed and delivered by PPC, such documents and instruments and shall take, or cause to be taken, such further or other actions, as Seller or its successors and permitted assigns may reasonably deem necessary or desirable to comply with the Consent Decree, including Paragraphs 88-89 thereof.

3.  This Agreement may be executed in one or more counterparts (including be means of facsimile or a portable document format (*.pdf)), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

4.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CHOICE OF LAW RULES WHICH MAY DIRECT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. EACH OF THE PARTIES HERETO IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT HEREOF SHALL BE BROUGHT AND DETERMINED IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HOUSTON, HARRIS COUNTY, TEXAS. EACH OF THE PARTIES HERETO HEREBY (I) IRREVOCABLY SUBMITS WITH REGARD TO ANY SUCH ACTION OR PROCEEDING TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE AFORESAID COURTS IN THE EVENT ANY DISPUTE ARISES OUT OF THIS AGREEMENT AND WAIVES THE DEFENSE OF SOVEREIGN IMMUNITY, (II) AGREES THAT IT SHALL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT OR THAT SUCH ACTION IS BROUGHT IN AN INCONVENIENT FORUM AND (III) AGREES THAT IT SHALL NOT BRING ANY ACTION RELATING TO THIS AGREEMENT IN ANY COURT OTHER THAN THE ABOVE COURTS. THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY A PARTY HERETO AGAINST THE OTHER PARTY IN ANY MATTER WHATSOEVER ARISING OUT OF OR IN RELATION TO OR IN CONNECTION WITH THIS AGREEMENT.

5.  This Agreement shall not be assigned by any party hereto without the written consent of the other party hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

*[Signature Pages to Follow]*

DocuSign Envelope ID: 9DF541ED-FF14-4502-8FA9-35E2D307312A

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**MOBIL PACIFIC PIPELINE COMPANY**

By:

Name: David H. Welsh

Title: President

*Signature Page to Consent Decree Assumption Agreement*

DocuSign Envelope ID: 9DF541ED-FF14-4502-8FA9-35F2D307312A

**PACIFIC PIPELINE COMPANY**

By: _Saul Flota_
DocuSigned by:
Saul Flota
B9D9FB1AA64D410...

Name: Saul Flota

Title: Vice President

*Signature Page to Consent Decree Assumption Agreement*

DocuSign Envelope ID: 9DF541ED-FF14-4502-8FA9-35E2D307312A

**SABLE OFFSHORE CORP.**

By: _____

Name: James C. Flores

Title: Chairman and Chief Executive Officer

# Exhibit 8

Pursuant to CRC 2.259, this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 7/25/2025

Case 2:25-cv-05396-SVW-SSC    Document 1    Filed 06/01/26    Page 177 of 265    TC
Page ID #:252

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive, <br><br> Respondents/Defendants. <br> ———————————————— <br> SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive, <br><br> Real Parties in Interest. | Case No.: 25CV02244 <br><br> [~~PROPOSED~~] ORDER RE: PRELIMINARY INJUNCTION AND UNDERTAKING <br><br> Hearing: July 18, 2025 <br> Time:  10:00 a.m. <br> Dept.:  4 <br> Judge:  Hon. Donna D. Geck <br><br> Action Filed: April 15, 2025 <br> Trial: None Set |

F I L E D
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
**07/29/2025**
Darrel E. Parker, Executive Officer
BY___Chavez, Terri_____
Deputy Clerk

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

The application of Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") for a preliminary injunction was heard on July 18, 2025, at 10:00 A.M. in Department 4 of the above-captioned Court. Appearing as attorneys were Talia Nimmer for Petitioners; Michael Dorsi for Respondents California Department of Fire and Forestry and State Fire Marshal Daniel Berlant (collectively, "Respondents"); and Jeffrey Dintzer, Garret Stanton, and Trevor Large for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable").

At the hearing, the Court adopted its tentative ruling to grant, in part, Petitioners' application. The order of the Court is set forth in its tentative — and now final — ruling, attached hereto as **Exhibit A.**

**IT IS SO ORDERED.**

DATED: _____, 2025

07/29/2025

_____
JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

---

2
[Proposed] Order Re: Preliminary Injunction and Undertaking

# <u>EXHIBIT A</u>

7/22/25, 1:59 PM
Case 2:26-cv-03396-SVW-SSC
Document 16-1
25CV02244 | Superior Court of California | County of Santa Barbara
Filed 05/01/26
Page 180 of 265
Page ID #:253



SUPERIOR COURT OF CALIFORNIA
**COUNTY OF SANTA BARBARA**



NOTICE: Effective September 1, 2025, the cost of e-filing will increase from $6.45 to $10.00 per envelope. For more information click here .

Notice: The court is aware of fraudulent messages and scams being sent to the public. For more information please click here.

# Center for Biological Diversity et al vs California Dept of Forestry and Fire Protection et al

## Case Number

25CV02244

## Case Type

Civil Law & Motion

## Hearing Date / Time

Fri, 07/18/2025 - 10:00

## Nature of Proceedings

CMC; OSC Preliminary Injunction; Motion to Compel; Motion to Strike

## Tentative Ruling

Case 2:26-cv-03396-SVW-SSC    Document 16-1    Filed 05/01/26    Page 181 of 265
Page ID #:254

(1)    The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction.

(2)    On or before July 25, 2025, petitioners in each case shall lodge with the court an order for signature and filing.

(3)    The court fixes the undertaking required by Code of Civil Procedure section 529 in the amount of $1,000.00, to be filed in each case by the respective petitioners. Petitioners shall file such undertaking on or before July 25, 2025.

(4)    For the reasons set forth herein, the motion of Sable (case No. 25CV02244) to compel the deposition of Richard B. Kuprewicz, the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions, the motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz, and the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions are all denied.

(1)    OSC re Preliminary Injunction

These are two related cases involving the same underlying incidents and activity. Pursuant to the parties' stipulation, the responding parties and real parties in interest have filed the same brief addressing both cases in each of these cases and the respective petitioners have filed reply papers in each of their respective cases. The court therefore will address the orders to show cause re issuance of preliminary injunctions (OSCs) together.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

## Background:

The parties have submitted voluminous evidence in support of, and in opposition to, these OSCs. The court has reviewed all of the papers presented by the parties, and has relied only upon admissible evidence in making this ruling. The discussion herein is not intended to be exhaustive, but to provide context for the court's analysis and ruling.

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (Rusch decl., ¶ 33 & exhibit N [the Federal Consent Decree].)

The Federal Consent Decree includes the following provisions:

"1.     State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):

"A.     Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

"B.     Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic

protection on Line 903. Plains must receive a State Waiver from the OSFM prior

to restarting Line 903.

"C.     Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

"D.     Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

"E.      To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

"2.      Replacement, Restart, or Abandonment of Lines 901 and 903:

"A.      Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of

Plains.

"1.      On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

"a.      Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

"b.      Conduct a close interval survey (CIS) and AC/DC interference survey.

"c.      Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

"B.      As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

"C.      As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations." (Federal Consent Decree, appen. B, art. I, §§ 1, 2.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

In May 2024, Sable began conducting repair and maintenance activities to the Las Flores Pipelines. (Rusch decl., ¶ 5.) According to Sable, these activities were completed pursuant to previously granted coastal development permits, approvals, and EIR. (*Ibid*.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (Rusch decl., ¶ 7 & exhibits B, C.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (Rusch decl., ¶ 9 & exhibit E.)

On April 2, 2025, OSFM issued letters noting its receipt of PHMSA's decision stating that it has no objection to granting the State Waivers. (Rusch decl., ¶ 10 & exhibits F, G.)

Case 2:26-cv-03396-SVW-SSC   Document 16-1   Filed 05/01/26   Page 186 of 265 Page.ID #:259

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for this date.

The applications for issuance of a preliminary injunction are opposed by OSFM and by Sable.

**Analysis:**

Notwithstanding the issuance of the TRO, the burden is on petitioners, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481.) A preliminary injunction is available "[w]hen it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a)(2).)

"The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations.] '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.)

7/22/25, 1:59 PM
25CV02244 | Superior Court of California | County of Santa Barbara
Case 2:26-cv-03396-SVW-SSC    Document 16-1    Filed 05/01/26    Page 187 of 265
Page ID #:260

(A)    Likelihood of Success on the Merits

Petitioners raise multiple claims in their petitions that separately could support issuance of an injunction. It is therefore necessary to address these claims in turn.

(i)    CEQA

Petitioners each assert a claim under CEQA based upon OSFM's issuance of the State Waivers without preparing environmental documentation, without providing public notice, and without providing an opportunity for public comment. (CBD Petition, ¶¶ 128-129; EDC Petition, ¶ 224.)

"[CEQA] and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' [Citation.]" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*).)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson, supra*, 54 Cal.4th at p. 286.)

Case 2:26-cv-03396-SVW-SSC   Document 16-1   Filed 05/01/26   Page 188 of 265 Page ID #:261

"The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' [Citations.] Otherwise, the agency must proceed to the third step, which entails preparation of an environmental impact report before approval of the project. (§§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)

CBD asserts that restarting the Las Flores Pipelines by issuance of the State Waivers is a "project" under CEQA requiring environmental review. (CBD Application, at pp. 21-23.) OSFM and Sable argue that the issuance of the State Waivers is not a "project" or is otherwise not subject to CEQA.

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] … [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

"The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).)

Under this definition, the issuance of the State Waivers does not appear to constitute a "project" separately subject to CEQA review. The State Waivers would at most constitute a separate governmental approval for the underlying activity, which is the restart of the Las Flores Pipelines. The court concludes that the issuance of the State Waivers does not itself cause a change or authorize a change in the environment. (See *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 466.)

If the State Waivers were considered more broadly, i.e., as a proxy for the restart of the Las Flores Pipelines, the resolution under CEQA is not clear. OSFM and Sable argue that, in such instance, the categorical existing facilities exemption applies.

"Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1." (Cal. Code Regs., tit. 14, § 15301; see also Pub. Resources Code, § 21084; Cal. Code Regs., tit. 14, § 15300.)

"Examples include but are not limited to: [¶] … [¶] (d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety, unless it is determined that the damage was substantial and resulted from an environmental hazard such as earthquake, landslide, or flood." (Cal. Code Regs., tit. 14, § 15301, subd. (d).)

An issue now before the California Supreme Court is whether "negligible" in this exemption pertains to a negligible change in use or to a change that presents a negligible risk of environmental harm. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, review granted Dec. 18, 2024, S287414 (*Sunflower*).) Under broader circumstances, this issue may bear upon the application of the exemption. But as the issue is presented here, such analysis is premature because the State Waivers are not themselves directly or indirectly causing change to the environment.

EDC, in particular, focuses its argument on the need for updated environmental review:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a)    Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b)    Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c)    New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166.)

Case 2:26-cv-03396-SVW-SSC Document 16-1 Filed 05/01/26 Page 190 of 265 Page ID #:263

"When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1)     Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2)     Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3)     New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A)     The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B)     Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C)     Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D)     Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

(Cal. Code Regs., tit. 14, § 15162, subd. (a).)

EDC argues that a subsequent EIR is required because: (1) operating the pipeline system without an effective cathodic protection system throughout the entire length of the pipeline constitutes a change in the project that increases the risk and severity of impacts, requiring major revisions to the 1985 EIR; (2) the failure of the pipeline system's cathodic protection system and resulting corrosion constitutes a change in circumstances; (3) it was only after the 2015 oil spill that the pipeline system was discovered to lack effective cathodic protection, which constitutes new information showing that the risk of an oil spill is substantially more severe than previously determined.

The petitioners rely largely upon the declaration and reports of expert Richard Kuprewicz for evidence regarding pipeline safety. The testimony of Kuprewicz is the subject of other motions also pending before the court (discussed below) based in part upon Kuprewicz's present unavailability to be subject to a deposition. For purposes of these motions, the court will consider Kuprewicz's evidence with Kuprewicz's unavailability going to the weight of the evidence in the context of these applications for preliminary injunctions.

"After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project [citation, fn.], and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928.)

The 1985 EIR addressed the potential for an oil spill from pipeline operation. (Dorsi decl., exhibit 5.) There is a dispute among the parties as to whether the 2015 spill and the failure of effective cathodic protection demonstrate new information requiring more or different analysis than present the 1985 EIR. However, this analysis, like the discussion above, is an analysis of a "project," and in particular the restart of pipeline operations as compared with the State Waivers at issue here.

The court concludes that, in the present administrative posture, petitioners are not likely to succeed on the merits of showing a violation of CEQA. Nonetheless, the court finds that petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

     (ii)    Federal Claims

In addition to violations of CEQA, petitioners assert violations of the FPSA in failing to provide a public process and failing to provide a statement of reasons.

Case 2:26-cv-03396-SVW-SSC   Document 16-1   Filed 05/01/26   Page 192 of 265 Page ID #:265

"General requirements.--A person owning or operating a pipeline facility shall--

"(1)     comply with applicable safety standards prescribed under this chapter, except as provided in this section or in section 60126;

"(2)     prepare and carry out a plan for inspection and maintenance required under section 60108(a) and (b) of this title;

"(3)     allow access to or copying of records, make reports and provide information, and allow entry or inspection required under subsections (a) through (e) of section 60117 of this title; and

"(4)     conduct a risk analysis, and adopt and implement an integrity management program, for pipeline facilities as required under section 60109(c)." (49 U.S.C. § 60118(a).)

"Waivers by Secretary.--

(1)     Nonemergency waivers.--

"(A)     In general.--On application of an owner or operator of a pipeline facility, the Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety.

"(B) Hearing.--The Secretary may act on a waiver under this paragraph only after notice and an opportunity for a hearing."

(49 U.S.C. § 60118(c)(1).)

"Statement of reasons.--The Secretary shall state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3).)

"Waivers by State authorities.--If a certification under section 60105 of this title or an agreement under section 60106 of this title is in effect, the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c) of this section. However, the authority must give the Secretary written notice of the waiver at least 60 days before its effective date. If the Secretary makes a written objection before the effective date of the waiver, the waiver is stayed. After notifying the authority of the objection, the Secretary shall provide a prompt opportunity for a hearing. The Secretary shall make the final decision on granting the waiver." (49 U.S.C. § 60118(d).)

Petitioners argue that, because "the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c)" and because the Secretary may act on a waiver only after notice and an opportunity for a hearing and by stating reasons, petitioners may set aside the State Waivers until the OSFM complies with section 60118.

OSFM and Sable argue that petitioners may not seek such remedies under federal law for violation of these non-discretionary procedural requirements, citing *City and County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993 (*San Francisco*). In *San Francisco*, the litigation was initiated following an explosion of a natural gas transmission pipeline. (*Id.* at p. 995.) Fearing a recurrence, the City and County of San Francisco sued under the FPSA's citizen suit provision alleging that the PHMSA failed to comply with the FPSA. (*Ibid.*) The city sought declaratory and injunctive relief to compel the FPSA to comply with its duties under the FPSA. (*Id.* at pp. 997-998.) The District Court dismissed the suit with leave to amend, finding that the citizen suit provision (49 U.S.C. § 60121) was " 'not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations.' " (*Id.* at p. 998.) The city amended its complaint to include claims under the Administrative Procedures Act, arguing that the PHMSA approval of the state agency's certification was arbitrary and capricious, and a failure to act, in violation of title 5, United States Code section 706. (*Ibid.*) The District Court dismissed these claims as well. (*Ibid.*)

On appeal in *San Francisco*, the Ninth Circuit affirmed. (*San Francisco*, *supra*, 796 F.3d at p. 1004.) "The Pipeline Safety Act, by its plain language, allows only a very limited private right of action. It permits injunctive citizen suits against the United States or other entities 'for a violation of this chapter or a regulation prescribed or order issued under this chapter.' [Citation.] In other words, private citizen suits are authorized for substantive statutory or regulatory violations. By its terms, the provision does not authorize a mandamus-type action to compel the Agency to perform non-discretionary regulatory duties." (*Id*. at pp. 998–999.)

The OSFM also argues that the notice and hearing requirements of section 60121 appear in the FPSA as procedural protections for the benefit of the applicant seeking the waiver and not for the more general purpose of public participation. This latter point is consistent with the corresponding regulations: "Hearing means an informal conference or a proceeding for oral presentation. Unless otherwise specifically prescribed in this part, the use of 'hearing' is not intended to require a hearing on the record in accordance with section 554 of title 5, U.S.C." (49 C.F.R. § 190.3 (2025).)

Considering these regulations and the reasoning of *San Francisco*, there is a reasonable basis to find that federal law does not require a hearing with generalized public participation and hence to find no violation of the procedural aspects of the FPSA. Despite this lack of requirement, petitioners, nonetheless, actually submitted evidence to the OSFM. (CDB Petition, ¶¶ 68-74; EDC Petition, ¶ 116.) A reasonable inference is that the petitioners have had an opportunity to present evidence to OSFM regardless of whether there is a public participation requirement.

The court finds that petitioners have not shown a likelihood of success on the merits as to claims based on federal law, but again petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

(iii)    State Claims

Corresponding to their FPSA claims, petitioners also assert violations of the CPSA.

"It is the intent of the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and, to the extent authorized by agreement between the State Fire Marshal and the United States Secretary of Transportation, may act as agent for the United States Secretary of Transportation to implement the federal Hazardous Liquid Pipeline Safety Act of 1979 (49 U.S.C. Sec. 60101 et seq.) and federal pipeline safety regulations as to those portions of interstate pipelines located within this state, as necessary to obtain annual federal certification." (Gov. Code, § 51010.)

"The State Fire Marshal shall adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety, including, but not limited to, compliance orders, penalties, and inspection and maintenance provisions, and including amendments to those laws and regulations that may be hereafter enacted and adopted." (Gov. Code, § 51011, subd. (a).)

"The State Fire Marshal may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).)

"Notification of exemptions shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code, § 51011, subd. (c).)

"Title 49 of the Code of Federal Regulations, Part 195 is hereby adopted by reference as it relates to hazardous liquid pipelines." (Cal. Code Regs., tit. 19, § 2000.)

While federal procedural law may not separately provide for mandate remedies, California procedural law generally provides for writs of mandate to command California officials to comply with the law. (See Code Civ. Proc., §§ 1085, 1094.5.)

Reviewing the State Waivers, the court concludes that the State Waivers do not contain a discussion of factors that the OSFM considered significant in granting the exemption beyond conclusions.

"Administrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein. [Citation.] However, findings by implication cannot be substituted for specific findings when they are required by law." (*Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954.)

Given the specific findings required by section 51011, subdivision (b), it appears that the statutorily-required discussion of subdivision (c) must in some appropriate way at least connect the factors stated (and their significance) to the findings that the risk to public safety is slight and the probability of injury or damage remote. The court finds that petitioners have established a reasonable probability of success on the merits on this claim.

(B)    Greater Harms

Petitioners argue that they, and the portion of the public they represent, would suffer the greater harm by the erroneous denial of a preliminary injunction. In particular, petitioners argue that the potential harm to natural resources and the failure to consider impacts of the project or to allow public input outweigh any delay for Sable. Sable argues that such harm is purely speculative and that it, and the general public, would suffer economic harms delaying or preventing the domestic oil production from Sable's use of the pipelines by the erroneous issuance of a preliminary injunction. The OSFM argues that erroneous issuance of an injunction against public officers in performing their duties is a form of irreparable injury.

As discussed below, because the petitions focus on deficiencies in the State Waivers as issued by OSFM and because additional approvals are required before the pipelines subject to the State Waivers may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction.

(C)    Balance of Equities

In arguing that CEQA is inapplicable, Sable and OSFM make the point that the State Waivers constitute but one approval of several necessary to restart the Las Flores Pipelines. This argument is carried forward into their analysis of the relative harms: "Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition, at p. 19.)

The principal harms argued both by petitioners and by Sable are based upon what would or would not happen when the Las Flores Pipelines are restarted. The evidence presented by all parties, however, shows that the restart of the Las Flores Pipelines is dependent upon approvals that have not yet been given. The respective potential harms are thus premature in this analysis. As the OSFM argues, there are potential harms in premature and potentially unnecessary judicial interference with the activities of regulators.

As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits.

(D) Bond

"On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).)

In view of the nature of the injunction issued, the potential damages caused by a wrongful injunction are minimal. The court fixes the amount of the undertaking required by section 529 at $1,000.00, to be filed by CBD and EDU, respectively in each case, on or before July 25, 2025.

(2) Motions re Richard B. Kuprewicz

In addition to the applications for issuance of preliminary injunctions, the parties have filed motions related to petitioners' expert witness Richard B. Kuprewicz: (1) motion of Sable (case No. 25CV02244) to compel the deposition of Kuprewicz; (2) the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions; (3) motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz; and (4) the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions. There are also motions now set for hearing in October in each case to quash Sable's deposition subpoena and notice of deposition, and to stay the deposition of Kuprewicz.

As discussed briefly above, the court has considered, but does not rely upon, the substance of the declaration of Kuprewicz to reach its conclusions in this ruling. The motions to strike the declaration will be denied. The motions to compel the deposition of Kuprewicz are denied as moot. To the extent these ruling moot the pending motions to quash, the court expects the parties to advise the court of that fact.

Based upon the court's ruling on the merits of the applications for preliminary injunction, it is not necessary at this time to determine what role, if any, the testimony of Kuprewicz may have in further proceedings. The court expects that petitioners will fully consider the issues raised by Sable in these motions in any further filings with the court.

## JUDGES

### JUDGE DONNA GECK

Dept. 4 SB-Anacapa

1100 Anacapa Street P.O. Box 21107

Santa Barbara, CA 93121-1107

US

# Exhibit 9

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

Dated and Entered:  04/17/2026                          Time:   10:00 AM
Judicial Officer:       Donna D Geck
Deputy Clerk:          Preston Frye                           Dept:   SB Dept 4
Bailiff/Court Officer:  Eduardo Munoz              Case No: 25CV02244
Court Reporter:        Michele McNeil

---

**Center for Biological Diversity  et al vs California Department of Forestry and Fire Protection  et al**

Parties Present:
Dintzer, Jeffrey D              Attorney for Real Parties in Interest
Dorsi, Michael S                Attorney for Respondents
Krop, Linda J                      Attorney for Petitioners Environmental Defense Center, Get Oil Oult!,
                                        Santa Barbara County Action Network, Sierra Club, Santa Barbara
                                        Channelkeeper and Environmental Defense Center
Large, Trevor                     Attorney for Real Parties in Interest
Stanton, Garrett B              Attorney for Real Parties in Interest
Nimmer, Talia                    Attorney for Petitioners Center for Biological Diversity and Wishtoyo
                                        Foundation
Frankel, Jeremy                 Attorney for Petitioners Environmental Defense Center, Get Oil Outt!,
                                        Santa Barbara County Action Network, Sierra Club, Santa Barbara
                                        Channelkeeper and Environmental Defense Center
Simmonds, Julie Teel         Attorney for Petitioner (via Zoom)
Roessler, Alicia                   Attorney for Respondents

---

**NATURE OF PROCEEDINGS*: *Ex Parte Hearing re Application for Enforcement of Preliminary Injunction and for an Order to Show Cause Why Real Parties in Interest Should not be Found in Contempt of Court; Ex Parte Hearing re Request for Immediate Recission of Preliminary Injunction**

The matter was called with appearances as stated above.

Mr. Dintzler, Mr. Dorsi, and Ms. Krop provided oral argument as to the Court's Tentative Ruling.

At the conclusion of oral argument, the Court adopted its Tentative Ruling as follows:

# Tentative Ruling

1. (1)      For the reasons set forth herein, the motion of real parties in interest Sable Offshore Corp. and Pacific Pipeline Company to dissolve or modify the preliminary injunction issued in this case is denied.
2. (2)      The application of petitioners for issuance of an order to show cause why real parties should not be found in contempt and to enter additional orders is continued to May 22, 2026.

These are two consolidated cases involving the same underlying incidents and activity.

---

SC-2411 (Revised July 1, 2013)                          **MINUTE ORDER**

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

The court has reviewed all of the papers filed by the parties in reaching this decision. The discussion below provides background to understand the court's reasoning; the discussion is not intended to be a comprehensive summary of the facts or arguments of the parties.
**Background:**

As alleged in the petitioners' respective petitions:

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)
In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (CBD Petition, ¶¶ 59-62; EDC Petition, ¶¶ 85-88 & fn. 3 [the Federal Consent Decree].)

The Federal Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery." (CBD Petition, ¶ 60.) The Federal Consent Decree also expressly required that prior to any restart, the operator

"shall apply for a State Waiver through [OSFM] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [OSFM] prior to restarting." (CBD Petition, ¶ 61.) The Federal Consent Decree stated that OSFM has the discretion to require additional terms and conditions if it grants any request for a State Waiver. (CBD Petition, ¶ 62.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

---

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)
On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (EDC Petition, ¶ 115; CBD Petition, ¶ 71.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (EDC Petition, ¶ 117.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for July 18, 2025.

On July 8, 2025, Sable filed demurrers and motions to strike as to the CBD Petition and EDC Petition, all noticed for hearing on September 19, 2025.

On July 18, 2025, the court granted in part petitioners' applications for issuance of preliminary injunctions.

On July 29, 2025, the court entered its written orders granting preliminary injunctions. The orders provide:

"The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has

received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction." (Order, filed July 29, 2025, exhibit A.)

On August 27, 2025, petitioners filed their motions to bifurcate "procedural" from "substantive" claims.

On September 8, 2025, Sable withdrew their demurrers and motions to strike. On September 17, 2025, Sable filed their answers to the petitions, admitting and denying allegations in the petitions and asserting 25 (in answer to the CBD Petition) and 19 (in answer to the EDC Petition) affirmative defenses.

On September 19, 2025, the court denied the motions to bifurcate.

On December 2, 2025, on the stipulation of the parties, the court entered its order consolidating both cases with case No. 25CV02244 as the lead case.

On January 5, 2026, Sable filed their motion for reconsideration of the preliminary injunction. The basis for this motion was the assertion of jurisdiction over the Las Flores Pipelines by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).

On February 27, 2026, the court denied Sable's motion for reconsideration.

On March 16, 2026, petitioners filed their ex parte application for an order to show cause (OSC) why Sable should not be held in contempt for violating the preliminary injunction. Also on March 16, Sable filed their ex parte application for an order dissolving the preliminary injunction.

The court held a hearing on the two ex parte applications on March 17, 2026. Noting that the two applications raised issues too complex reasonably to address at an ex parte hearing, the court continued the hearing on both applications to this hearing date of April 17, allowing all parties to file supplemental briefs.

The parties have filed extensive papers both in connection with the original applications and as supplemental briefing.

**Analysis:**

(1)    Requests for Judicial Notice

In support of its application, Sable requests that the court take judicial notice of the following documents: (Sable Request for Judicial Notice, filed Mar. 16, 2026 [Sable RJN], exhibit A) the Pipeline Capacity Prioritization and Allocation Order, dated March 13, 2026; and (exhibit F) Executive Order No. 14391 (91 Fed.Reg. 13199 (Mar. 13, 2026)).

In further support of its application, Sable also requests that the court take judicial notice of the following documents: (Sable Second Request for Judicial Notice, filed Apr. 1, 2026 [Sable RJN2], exhibit H) Executive Order No. 14156 (90 Fed.Reg. 8433 (Jan. 20, 2025)); and (exhibit J) a minute order, dated

March 23, 2026, in *United States v. Plains All American Pipeline L.P.*, United States District Court for the Central District of California, case No. 2:20-cv-02415-SVW-SSC.

The court will grant judicial notice as to these documents, all of which constitute court records or official acts. (See Evid. Code, § 452, subds. (c), (d).) Judicial notice does not extend to the truth of factual matters set forth in such documents. (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

(2)      Application to Dissolve Preliminary Injunction

"In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

The party seeking modification or dissolution of an injunction bears the burden to show that changed circumstances justifies modification or dissolution of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

Sable argues that the order of the Secretary of Energy (Sable RJN, exhibit A) constitutes a material change justifying dissolution of the preliminary injunction order.

(A)      Prior Ruling on Preliminary Injunction and Subsequent Events

The court need not here repeat the background and analysis set forth in the court's July 2025 ruling granting plaintiffs' applications for preliminary injunction, which ruling is incorporated by this reference. However, it is useful to highlight past events reflected in the court's record in order to evaluate Sable's motion for dissolution.

In ruling on plaintiffs' applications for preliminary injunction, the court did not find that plaintiffs had made a sufficient evidentiary showing of a likelihood of success on the merits of plaintiffs' causes of action except as related to the State Fire Marshal's findings under the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51010 et seq.).

In opposing the issuance of the preliminary injunction, Sable and OSFM argued that much, if not all, of plaintiffs' claims of harm were premature because those claims depended upon the restart of the Las Flores Pipelines and that multiple approvals were necessary before such restart. As argued by Sable in that opposition:

"Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition re Preliminary Injunction, filed July 8, 2025, at p. 19.)

Accepting this argument in part, the court granted the preliminary injunction narrowly. As the court stated in its July 18 ruling:

"As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to

address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

"Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. 'Restart' shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

"Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits." (Minute Order, filed July 18, 2025, at pp. 13-14.)

Sable has not filed and served a notice under the existing terms of the preliminary injunction to restart the Las Flores Pipelines.

Subsequent to the court's grant of the preliminary injunction, the PHMSA has asserted that the Las Flores Pipelines constitute an interstate pipeline subject to PHMSA's exclusive jurisdiction. (Flores decl., dated Jan. 5, 2026, ¶ 3 & exhibit A.) The PHMSA further issued their own approvals and an emergency special permit. (Flores decl., dated Jan. 5, 2026, ¶¶ 4-7 & exhibits B, C.) These approvals are the subject of proceedings in the Ninth Circuit Court of Appeals, which has not issued a final ruling. (OSFM RJN, filed Feb. 13, 2026, exhibit A; Simmonds decl., dated Jan. 6, 2026, ¶¶ 7-11 & exhibits F-J.)

In denying Sable's request for reconsideration or for modification or dissolution of the preliminary injunction on the grounds of the PHMSA actions, the court stated:

"Sable argues that because the PHMSA has asserted exclusive jurisdiction over the Las Flores Pipelines, the preliminary injunction issued by this court has been preempted. Acknowledging that preemption issues are being resolved in other jurisdictions, including the Ninth Circuit Court of Appeals, OSFM and Petitioners argue that, at least until there is binding authority otherwise, this court is bound by the terms of the Federal Consent Degree and the preliminary injunction remains on a firm foundation.

"The Federal Consent Decree provides, among other things, that 'Plains must receive a State Waiver from the OSFM prior to restarting Line 901.' (Federal Consent Decree, appen. B, art. I, § 1(A).) While Sable now argues that it is not a party to the proceedings in which the Federal Consent Decree was entered, Sable's authority to operate the Las Flores Pipelines derives from rights obtained by Plains, for which Plains was, and remains, subject to conditions including conditions set forth in the Federal Consent Decree. Sable has not demonstrated any right to operate the Las Flores Pipelines separate from the rights derived from Plains and subject to the Federal Consent Decree. (See, e.g., Federal Consent Decree, art. III, § 4 [obligations binding on successors and assigns].)

"The arguments raised by Sable thus question the continuing authority of the Federal Consent Decree. " 'In a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. [Citations.] As the high court has recognized, stipulated judgments bear the earmarks both of judgments entered after litigation and contracts derived through mutual agreement: "[C]onsent decrees 'have attributes both of contracts and of judicial decrees'; a dual character that has resulted in different treatment for different purposes." As in [*Firefighters v. City of Cleveland* (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405]*, the issue before us is "not whether we can label a consent decree as a 'contract' or a 'judgment,' for we can do both." [Citation.]' (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663–664.)

"For purposes of this discussion, it is sufficient to observe that by the Federal Consent Decree, the Las Flores Pipelines may not be restarted (as defined therein) without obtaining a State Waiver from the OSFM. Thus, the Federal Consent Decree by its terms requires authorization from the OSFM, whether that authorization is couched in regulatory, contract, or collateral estoppel terms. The court is not persuaded on this record that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process.

"As pertinent to the preliminary injunction ruling, Petitioners' actions challenge whether OSFM meets OSFM's statutory and regulatory obligations in providing the authorization directed by the Federal Consent Decree. The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is, by its own reckoning, fully authorized and ready to restart the Las Flores Pipelines. At that time the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms (such as those highlighted previously by Sable) and with the benefit of any then-existing legal developments from the federal courts." (Minute Order, filed Feb. 27, 2026, pp. 8-9.)

After the court denied Sable's application on February 27, the President issued an Executive Order which was followed by an order (DPA Order) from the Secretary of Energy under the Defense Production Act of 1950 (DPA, 50 U.S.C. § 4501 et seq.). Sable's current application is based upon Sable's argument that the DPA Order preempts the preliminary injunction. Petitioners and OSFM dispute the effect of the DPA Order on the preliminary injunction.

    (B)    Defense Production Act

As set forth in the DPA Order: "Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." (DPA Order, § IV(A).) The authority for this order, and the other orders in the DPA Order, is listed as section 101 of the DPA. (DPA Order, § I.)

---

Section 101 of the DPA is codified in title 50 United States Code section 4511. (See 64 Stat. 799, ch. 932 (Sept. 8, 1950).)

"The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." (50 U.S.C. § 4511(a).)

"(1)    Notwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders (other than contracts of employment) relating to, materials, equipment, and services in order to maximize domestic energy supplies if he makes the findings required by paragraph (3) of this subsection.

"(2)    The authority granted by this subsection may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that--

"(A)    such materials, services, and facilities are scarce, critical, and essential--

"(i)     to maintain or expand exploration, production, refining, transportation;

"(ii)    to conserve energy supplies; or

"(iii)   to construct or maintain energy facilities; and

"(B)    maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection.

"(3)    During any period when the authority conferred by this subsection is being exercised, the President shall take such action as may be appropriate to assure that such authority is being exercised in a manner which assures the coordinated administration of such authority with any priorities or allocations established under subsection (a) of this section and in effect during the same period." (50 U.S.C. § 4511(c).)

"No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under subchapter I of this chapter or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner." (50 U.S.C. § 4557.)

        (C)    Preemption
Sable argues that the DPA Order is inconsistent with the preliminary injunction and therefore the preliminary injunction is preempted by the federal order. "[C]onflict preemption will be found when simultaneous compliance with both state and federal directives is impossible." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.) " ' "[C]ourts are

---

reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' [Citations.]" (*Ibid*.)

In order to consider this issue, it is important to re-emphasize the limited scope of the court's preliminary injunction. The court determined to enter the preliminary injunction based upon its conclusion that the Federal Consent Decree by its terms requires that Sable, whose rights to use the Las Flores Pipelines are derivative of Plains, obtain State Waivers from the OSFM. The entry of the preliminary injunction rested upon noncompliance of the OSFM to the required State Waivers.

By design, performance consistent with the Federal Consent Decree is performance permitted under the preliminary injunction. Correspondingly, there is no conflict between the Federal Consent Decree and the preliminary injunction. The conflict issue raised by Sable is not a conflict between state law and federal law, but a conflict between the DPA Order, as interpreted here by Sable, and the Federal Consent Decree. To the extent that the Federal Consent Decree is binding on the parties, there is no preemption issue.

(D)    DPA Order and the Federal Consent Decree

The parties have informed this court of the multiple actions and proceedings pending in the federal courts regarding the operation of the Las Flores Pipelines, including particularly efforts to modify the Federal Consent Decree. Nonetheless, in the present, the Federal Consent Decree remains a binding determination as to the requirements for operations of the Las Flores Pipelines. Against this legal backdrop, Sable argues that the DPA Order supersedes the requirements of the Federal Consent Decree.

As quoted above, the DPA is concerned with allocation of resources and performance of contracts. This is backed by the immunity provision of section 4557. Two cases are instructive as to the scope of the DPA in the present context, *Hercules Inc. v. U.S.* (Fed. Cir. 1994) 24 F.3d 188 (*Hercules*), affirmed on other grounds (1996) 516 U.S. 417 [116 S.Ct. 981, 134 L.Ed.2d 47], and *U.S. v. Vertac Chemical Corp.* (8th Cir. 1995) 46 F.3d 803 (*Vertac*).

In *Hercules*, plaintiff chemical manufacturers of Agent Orange (a defoliant used for military purposes during the Vietnam War) were involved in numerous tort actions filed by Vietnam veterans and their families alleging that the veterans' exposure to components in Agent Orange caused cancer and other health problems. (*Hercules, supra*, 24 F.3d at p. 191.) Following settlement of the tort actions, the plaintiffs brought an action against the United States in the Claims Court seeking indemnification for their respective contributions to the settlement. (*Id*. at p. 193.) The Claims Court held for the United States. (*Id*. at pp. 195-196.) Among other things, the Claims Court "rejected the contention that an implied-in-fact contract indemnification term arose from section 707 of the DPA [now, 50 U.S.C. § 4557], because that section merely 'excuses a Government contractor's breach of its other, non-Government contracts which were adversely affected by the priority given to the Government's procurement demands under the DPA.' [Citation.]" (*Id*. at p. 195.)

In affirming the judgment of the Claims Court, the Federal Circuit in *Hercules* stated:

"The language of section 101(a) [now, 50 U.S.C. § 4511(a)] makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense. Indeed, section 101 is titled 'Priority in contracts and orders.' Although Thompson correctly observes that the statute authorizes the President to compel both contract performance and contract acceptance, section 101(a) expressly states that the granting of such authority is 'for the purpose of assuring ... priority.' Significantly, section 101(a) does not mention either the specific nature of performance under a DPA contract, or the subsequent use of goods produced under such a contract. Therefore, we conclude that, while the risk imposed by section 101(a) does include the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA

contract, it does not include the risk that the product produced under the DPA contract will be inherently unsafe to users.

"Once a contractor has been compelled to accept a national defense contract under section 101(a), section 707 acts to shield the contractor from liability resulting from compliance with that section. At issue in this case is the nature of the liability against which the contractor is shielded.

"As noted above, in complying with DPA section 101(a) a contractor may have to re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract. It stands to reason that the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization. First, it is a settled rule of statutory interpretation that separate provisions of a statute are to be construed and interpreted together and in light of each other to ascertain the true legislative intent. This court has explained:
" [']When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident. This rather straightforward homily is captured in the more pretentious proposition that parts of a statute *in pari materia* must be construed together.[']

"[Citations.] To hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule.
"Furthermore, the language of section 707 itself supports the conclusion that the section does not extend the kind of indemnity asserted by Hercules. The second sentence of section 707, which prohibits discrimination 'against contracts to which priority is assigned ...,' reinforces the view that the immunity from suit provided by section 707 does not extend to tort suits in which it is alleged that the item produced by the DPA contractor is inherently unsafe to users. Rather, we conclude that to the extent relevant here, the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed. [Citation.] We also agree with the district court, [citation], that if Congress had intended section 707 to impose upon the government the kind of liability asserted by Thompson, it would have said so in clear and unequivocal terms. [Citation.]" (*Hercules*, *supra*, 24 F.3d at pp. 203–204.)
As explained in *Vertac*, back in 1967, the United States issued a DPA directive ordering a chemical company to accelerate its production and delivery of Agent Orange. (*Vertac*, *supra*, 46 F.3d at p. 807.) As a result, the chemical company devoted all of its efforts at its Jacksonville, Arkansas, facility to producing Agent Orange. (*Ibid*.) The production of Agent Orange produces hazardous waste, which the chemical company buried on-site. (*Ibid*.) Much later, the United States brought a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, 42 U.S.C. § 9601 et seq.) because of the disposal of waste at the Jacksonville facility. (*Vertac*, *supra*, at pp. 805-806.) Among other things, the District Court held as a matter of law that the chemical company was not entitled to immunity under the DPA. (*Id*. at p. 807.)
On appeal in *Vertac*, the chemical company argued that "the language of § 707 is clear and unambiguous and that nothing in its language supports an interpretation that would exclude [the chemical company's] CERCLA liability, or any other liability, arising out of its performance of the Agent Orange contracts. In response, the United States argues that the language of § 707 is not clear and unambiguous and that the interpretation advanced by [the chemical company] would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." (*Vertac*, *supra*, 46 F.3d at p. 812.)
The *Vertac* court agreed with *Hercules*, *supra*, that " 'the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA.' [Citation.]" (*Vertac*, *supra*, 46 F.3d at p. 812.) The *Vertac* court thus held that the immunity of section 707 did not shield the chemical

company from liability it may have under CERCLA arising out if its performance of the Agent Orange contracts because such immunity would exceed the risk imposed by section 101(a). (*Ibid*.)
In both *Hercules* and *Vertac*, the federal circuit courts held that the scope of immunity under current section 4557 only extends to the risk imposed by section 4511(a) in prioritizing contracts with the United States pursuant to a DPA order. Nothing in section 4511 or, by implication, in section 4557, permits a party subject to a DPA Order to violate other laws, especially including applicable other federal law. Moreover, the reasoning of *Hercules* and *Vertac* strongly implies that the DPA order, by itself, does not permit the violation of applicable state regulatory law—for example, no one suggests that Sable could steal materials or money to fulfill a DPA order without state law consequence under the section 4557 immunity.

There is now, albeit subject to pending proceedings, a binding federal judgment in the Federal Consent Decree which requires favorable action by the OSFM before Sable is permitted to restart the Las Flores Pipelines. As construed by the federal courts, a DPA Order does not by itself permit violation of other federal law to accomplish the goals of the DPA Order. Consequently, in the present procedural posture of the requirements binding on Sable, Sable continues to be obligated to the requirements of the Federal Consent Decree. The DPA Order therefore does not constitute a basis for dissolving or modifying the preliminary injunction.

> (E)    Mootness

Sable also argues that this matter, and the preliminary injunction in particular, is moot because Sable has voluntarily relinquished the State Waivers and the preliminary injunction is premised on the procedures involved with the State Waivers. This argument fails to persuade that the preliminary injunction should be dissolved for two reasons. First, Sable admittedly has not abandoned the project of restarting the Las Flores Pipelines. For the reasons explained above, under the Federal Consent Decree, Sable remains required to obtain approvals from the OSFM. In order to implement the restart project consistent with the Federal Consent Decree, the sufficiency of the OSFM's procedures remain at issue. (See *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 872-873 [absent abandonment of project, effective relief may still be awarded].) Sable's argument for mootness depends upon its argument that the OSFM can have no further involvement in the project. Under the current procedural posture of the project, the OSFM remains involved.

Second, in granting the preliminary injunction on a limited basis, the court partially agreed with Sable that much of the basis for petitioners' claims were premature because Sable remained engaged in obtaining authorization required under the Federal Consent Decree. Given the continuing requirements of the Federal Consent Decree and the voluntary relinquishment of the State Waivers by Sable, it is unclear that petitioners' other claims are now premature. Again, Sable's argument begins and ends with state law playing no further part in the project. Since the OSFM is bound by state law procedures, in the present circumstances, essential parts of state procedures are incorporated into the Federal Consent Decree. Sable has not persuasively shown that subsequent events make this matter moot and so warrant dissolution of the preliminary injunction.

> (F)    Conclusion

The court is mindful that there are many moving judicial and administrative parts relating to the restart of the Las Flores Pipelines. Sable has not persuaded the court that the DPA Order renders compliance with Federal Consent Decree unnecessary. The Federal Consent Decree requires approvals from the OSFM, which in turn must comply with state procedures in granting such approvals. Sable has not met its burden to show that the preliminary injunction should be dissolved or modified. Sable's motion will therefore be denied.

(3)    Application for Order to Show Cause re Contempt

---

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

As discussed above, the court makes its position clear as to the current vitality of the preliminary injunction in light of recent events. Considering this position, the court is deeply concerned with noncompliance with the preliminary injunction. At the same time, the court is again mindful of the pendency of numerous other proceedings bearing on the Las Flores Pipelines. The court concludes that the most reasonable approach to addressing compliance with the injunction is to continue the hearing on the application for the order to show cause to allow the parties to take whatever steps they deem appropriate based upon this court's conclusions on the status of the preliminary injunction.

*Future Scheduled Hearings:*
May 22, 2026 10:00 AM Ex Parte Hearing
Geck, Donna D- SB Dept 4

ANGELA BRAUN, EXECUTIVE OFFICER                    Minutes Prepared by:

                                                   _____Preston Frye_____ , Deputy

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

# Exhibit 10

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                                                Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**

P.O. Box 944246

Sacramento, California 94244-2460

(916) 568-3800

Website: www.fire.ca.gov



October 22, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:    STATE WAIVER REQUIREMENTS PRIOR TO RESTART OF LINES CA-324 AND CA-325A/B**

Dear Mr. Yearwood,

On December 17, 2024, the CAL FIRE - Office of the State Fire Marshal (OSFM) issued State Waivers for the above captioned pipelines. The Pipeline and Hazardous Materials Safety Administration (PHMSA) issued the concurrence with the terms of the State Waivers on February 11, 2025. Those State Waivers were issued in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

Sable sought the State Waivers to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection (CP) due to the shielding effects of the polyurethane foam and the polyethylene tape wrap surrounding the pipelines. It is critical to stress that a State Waiver prescribes alternative measures that provide an equal or greater level of safety than the required regulation. The OSFM granted the State Waivers on the condition that Sable complies with the specific requirements contained therein.

On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. OSFM's review of the restart plan is ongoing. During this process, OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. Pursuant to item 9 in the State Waivers, Sable must repair all immediate and 180-day repair conditions prior to restart. Those conditions are further clarified in the sections titled "Immediate Repair Conditions" and "180-Day Repair Conditions." Most pertinent here is the 180-day repair condition language (see Condition 35 in the CA-324 State Waiver and Condition 36 in the CA-325A/B State Waiver) that includes "anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth." Footnotes 7 and 9 further

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
October 22, 2025
Page 2

clarify that remediation means "a permanent repair method." The State Waivers require all such anomalies to be remediated, including tool tolerance. According to OSFM records, Sable has not satisfied this condition in the State Waivers.

The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law. The OSFM continues to review the restart plan submitted by Sable in September, and while OSFM is providing this initial notification of deficiency to Sable regarding the State Waiver requirements, OSFM may have further comment or requirements arising out of that review.

Sincerely,

DANIEL BERLANT
State Fire Marshal

cc:     James Hosler, OSFM, Assistant Deputy Director
        Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
        Joshua Cleaver, CAL FIRE, Staff Counsel

# Exhibit 11

EX-99.1 2 sablelasflores_121725.htm EX-99.1



**U.S. Department
of Transportation**

**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue SE
Washington, D.C. 20590

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re: Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and 903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901 and 903 were considered interstate and regulated by PHMSA. The classification change in 2016 corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review included an on-site inspection on December 9 through December 11, 2025. OSFM representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written procedures and records and conducted field observations of the Las Flores facility, the pump stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

2

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

3

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL DAUGHERTY

Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.17
07:56:55 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety

cc:     James Hosler, Chief, Pipeline Safety Division, OSFM
        Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# Exhibit 12

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/26/2026 2:34 PM
By: Terri Chavez , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer@alston.com
Garrett.Stanton@alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore@paulhastings.com
benjaminhanelin@paulhastings.com
natalierogers@paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge@flasllp.com
vdiffenderfer@flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>  Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>  Respondents/Defendants. | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>**SECOND SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>Date:    February 27, 2026<br>Time:    10:00 a.m.<br>Dept.:    4<br><br>Complaint Filed: April 15, 2025<br><br>[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |

1

SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT!, a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

2
SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER

## SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER

I, Jeffrey D. Dintzer, declare as follows:

1.    I am an attorney duly licensed to practice law before all courts of the State of California and am a partner at Alston & Bird LLP, attorneys of record for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (hereinafter collectively referred to as "Sable"). I make this declaration in support of Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's Motion for Reconsideration of Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and if called as a witness, could and would testify competently to them.

2.    I am familiar with the case files for these matters. The files for these matters are kept at my shared direction in a secure electronic format at the offices of Alston & Bird LLP. Legal assistant Kim Niz and various associates maintain these files on a server at Alston & Bird.

3.    In preparing this declaration, others at my direction retrieved the true and correct copy of the documents described below and prepared them for inclusion in my declaration.

4.    On February 26, 2026, Sable sent a letter to Daniel Berlandt, State Fire Marshal, relinquishing, surrendering, and abandoning the State Waivers issued by the Office of the State Fire Marshal on December 17, 2024 with respect to Segments CA-324 and CA-325 of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325). A true and correct copy of Sable's February 26, 2026 letter is attached hereto as **Exhibit A**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 26th day of February, 2026, in Los Angeles, California.

By: _____

Jeffrey D. Dintzer

# EXHIBIT A



1(310) 620-5779
djmoore@paulhastings.com


February 26, 2026


Daniel Berlant, State Fire Marshal

California Department of Forestry and Fire Protection
715 P Street
Sacramento, CA 94244
calfire.statefiremarshal@fire.ca.gov

Re:  Sable – Relinquishment of State Waivers

Dear Fire Marshal Berlant:

As you know, our firm has represented Sable Offshore Corp. and Pacific Pipeline Company (collectively, Sable) in matters before the Office of the State Fire Marshal (OSFM) regarding Segments CA-324 (OSFM Line ID 0015) and CA-325 (OSFM Line ID 0001) of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325A/B).  On behalf of Sable, I am writing to you with regard to the "State Waivers" issued by OSFM on December 17, 2024, with respect to Segments CA-324 and CA-325.

Although Sable has complied with the terms of the State Waivers, Sable has not exercised any rights or privileges under the State Waivers since they were issued.  On December 17, 2025, the federal Pipeline & Hazardous Materials Safety Administration (PHMSA) notified Sable that it concurred in Sable's determination that the Santa Ynez Pipeline System—including Segments CA-324 and CA-325—is an interstate pipeline facility under the Pipeline Safety Act, and that the Santa Ynez Pipeline System is therefore "subject to the regulatory oversight of PHMSA" rather than that of OSFM.[1]  On December 23, 2025, PHMSA issued an emergency special permit with respect to Segments CA-324 and CA-325, which included conditions that are "substantially the same" as those included in OSFM's State Waivers, and reconfirmed that "PHMSA has exclusive pipeline safety regulatory authority" over Segments CA-324 and CA-325.[2]  PHMSA has since confirmed again that the "California [OSFM] issued [the State W]aivers before PHMSA assumed regulatory jurisdiction," and because "States cannot regulate interstate pipelines … Sable may not rely on [OSFM's State W]aivers."[3]

Because Segments CA-324 and CA-325 are now subject to PHMSA's exclusive jurisdiction under the federal Pipeline Safety Act, Sable has determined it is appropriate to relinquish its rights under OSFM's previously issued State Waivers.  Therefore, by this letter and effective immediately, Sable hereby relinquishes, surrenders and abandons the State Waivers.

//

---

[1] PHMSA, Letter to J. Caldwell Flores, "Determination of Interstate Classification" (Dec. 17, 2025).
[2] PHMSA, Docket No. PHMSA-2025-1502, Emergency Special Permit (Dec. 23, 2025).
[3] *Environmental Defense Center v. Pipeline & Hazardous Materials Safety Administration*, 9th Cir. Case No. 25-8059, Federal Respondents' Opposition to Emergency Stay Motion (Dec. 30, 2025), p. 18.



February 26, 2026
Page 2


Please do not hesitate to contact me with any questions.

Sincerely,

Duncan Joseph Moore
of PAUL HASTINGS LLP

CC:
James Hosler, Assistant Deputy Director, OSFM
Linda Gail Daugherty, Acting Associate Administrator for Pipeline Safety, PHMSA
Josh Cleaver, Staff Counsel, OSFM
J. Caldwell Flores, President, Sable Offshore Corp.
Anthony Duenner, General Counsel, Sable Offshore Corp.




LEGAL_US_W # 185921873.7

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On February 26, 2026, I served the document **SECOND SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION** on the interested parties in this action addressed as follows:  **See Attached Service List**

1.     ☒     BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 26, 2026, at Los Angeles, California.

_____
/s/ *Kim Niz*
Kim Niz

## SERVICE LIST

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

| Michael S. Dorsi, Esq. **CALIFORNIA ATTORNEY GENERAL'S OFFICE** 55 Golden Gate Ave, Ste 11000 San Francisco, CA 94102 Tel.: (415) 510-3802 Michael.dorsi@doj.ca.gov | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |
|---|---|

# Exhibit 13

(Slip Opinion)

## Preemptive Effect of Defense Production Act Order on State Law

Presidential orders issued as an exercise of congressionally delegated authority or the President's constitutional powers have the force of federal law under the Supremacy Clause and may preempt state law.

An order issued pursuant to the Defense Production Act may preempt state laws expressly or by conflict.

An order issued pursuant to the Defense Production Act may displace sanctions for non-compliance with a contrary consent decree, even if that consent decree rests on federal-law claims.

March 3, 2026

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF ENERGY

Sable Offshore Corp. ("Sable") is the lessee and operator of the Santa Ynez Unit ("SYU"), an offshore oil and gas unit located in federal waters off the coast of California. Sable and the Department of the Interior are updating a previously approved Development and Production Plan, which would allow for continuous production on the SYU to address energy vulnerabilities on the West Coast. But, according to Sable, the State of California has impeded it from operating the SYU and transporting production through the Santa Ynez Pipeline System.

You have asked whether an order issued under the Defense Production Act of 1950 ("DPA" or "Act"), Pub. L. No. 81-774, 64 Stat. 798 (codified as amended at 50 U.S.C. § 4501 *et seq.*), to Sable by the President or his delegee would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure. We conclude that it would. An order issued as an exercise of congressionally delegated authority or the President's constitutional powers has the force of federal law under the Supremacy Clause and may preempt contrary state law. Because the DPA authorizes the President to order certain actions that may otherwise be prohibited by state law, an order issued pursuant to the DPA could preempt those laws expressly or by conflict. That is true regardless of the form of the President's order, although we refer in this memorandum to executive orders for simplicity. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive*

1

50 Op. O.L.C. __ (Mar. 3, 2026)

*Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order.").[1]

## I.

## A.

On January 20, 2025, President Trump declared a national emergency related to the Nation's energy supply and infrastructure. *See generally* Exec. Order No. 14156. The President determined that the Nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Id.* § 1. "These numerous problems," the President emphasized, "are most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs." *Id.*

The President directed the heads of executive departments and agencies to wield "any lawful emergency authorities available to them" to bolster the "production, transportation, refining, and generation of domestic energy resources." *Id.* § 2(a). "If an agency assesses that use of either Federal eminent domain authorities or authorities afforded under the Defense Production Act are necessary to achieve this objective, the agency shall submit recommendations for a course of action to the

---

[1] President Obama delegated Title I authority under the DPA to the Secretary of Energy for all energy-related matters. *See* Exec. Order No. 13603 (2012). For convenience, we refer in this memorandum to determinations made, and orders given, by the President, even though that authority has been lawfully delegated to the Secretary. We note that an executive order issued by President Trump provides that if an agency seeks to invoke the DPA, it "shall submit recommendations for a course of action to the President." Exec. Order No. 14156 § 2(a) (2025). This language does not, however, impliedly limit the scope of the power delegated by the President to the Secretary. The provisions of each executive order are not "in irreconcilable conflict," nor is President Trump's order "clearly intended as a substitute" for President Obama's delegation. *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (cleaned up). Instead, President Trump's order provides only that the Secretary should submit a recommendation to the President before wielding delegated authority. *See* Exec. Order No. 14156 § 2(a). The Secretary could, for instance, recommend that the Secretary himself—rather than the President—issue a DPA order. And nothing in President Trump's executive order requires the President's affirmative approval of a recommendation before the Secretary acts. *See generally id.*

2

*Preemptive Effect of DPA Order*

President . . . ." *Id.* (internal citation omitted). The President also instructed agencies to expedite the completion of energy infrastructure, including by "facilitat[ing] the supply, refining, and transportation of energy in and through the West Coast of the United States." *Id.* § 3(b).

## B.

The SYU—which Sable leases and operates—is a critical energy resource on the West Coast. Located in federal waters in the Pacific Ocean, it is the largest known offshore oilfield in the United States. *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe, Partner, Holland & Knight LLP, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1 (Dec. 12, 2025) ("Sable Letter").[2] It has an estimated 904 million barrels in place, and from 1981 to 2014, it produced more than 670 million barrels of oil. *Id.*

For most of the SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California. *Id.* at 2. From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System. *Id.* This network of on- and offshore pipelines is known as the Santa Ynez Pipeline System. *Id.* Currently, Sable and the Department of the Interior are updating a previously approved Development and Production Plan to address West Coast energy vulnerabilities. *Id.* at 1–2.

But according to Sable, the State of California is impeding it from resuming transportation of SYU production through the Santa Ynez Pipeline System. Sable reports that "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations." *Id.* at 6.

---

[2] For purposes of this advice, we accept the veracity of the factual statements set forth in Sable's letter, although we are not presently in a position to verify their accuracy.

3

50 Op. O.L.C. __ (Mar. 3, 2026)

Sable has thus requested the Secretary of Energy ("Secretary") to make necessary findings under the DPA and issue an order "requiring Sable to operate the Santa Ynez Unit and the Santa Ynez Pipeline System to maximize domestic energy production." *Id.* at 9. In Sable's view, such an order would conflict with—and therefore preempt—California state law. *Id.* at 6.

## II.

Preemption doctrine derives from the constitutional hierarchy established by the Supremacy Clause. That clause provides that "the Laws of the United States," as well as the Constitution and treaties, "shall be the supreme Law of the Land," notwithstanding "any Thing in the Constitution or Laws of any State to the Contrary." U.S. Const. art. VI, cl. 2. The Supremacy Clause thus enshrines two principles into our legal system: It places federal law above state law in the constitutional hierarchy, and it establishes a choice-of-law rule that federal law must prevail whenever it conflicts with state law. The Supreme Court has "identified three different types of preemption—conflict, express, and field—but all of them work in the same way." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (cleaned up). Federal law typically "imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* At times, federal law "might appear to operate directly on the States," such as in the form of an express preemption provision, but such provisions operate "just like any other federal law with preemptive effect" by conferring on private entities "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 478–79.

We first explain that an executive order may preempt state law when the President is empowered by the Constitution or statute to regulate private parties or where state law would otherwise conflict with a lawful exercise of the President's official powers. We then describe the two primary ways in which executive orders might displace state law—expressly or by conflict.

4

*Preemptive Effect of DPA Order*

### A.

The Constitution vests the entire executive power in a single President, whose "duties are of 'unrivaled gravity and breadth.'" *Trump v. United States*, 144 S. Ct. 2312, 2327 (2024) (quoting *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020)). The President's authority to wield these powers "necessarily stems either from an act of Congress or from the Constitution itself." *Id.* (cleaned up) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The Constitution that the President must defend, and the federal laws that he must execute, are "the supreme Law[s] of the Land." U.S. Const. art. VI, cl. 2; *see also id.* art. II, § 1, cl. 8; *id.* art. II, § 3. Of course, "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926).

The power of executive agencies—literally, the Chief Executive's agents—to preempt state law is well understood. Congress may authorize executive agencies to promulgate regulations that "have the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979) (citation and internal quotation marks omitted). "This doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause." *Id.* at 295–96. Put simply, when agencies issue regulations implementing federal statutes, those regulations are fully clothed in "the Laws of the United States" for purposes of preemption and therefore can displace contrary state law. U.S. Const. art. VI, cl. 2. To be sure, an agency's power to preempt state law is not unlimited. "[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority, for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *New York v. FERC*, 535 U.S. 1, 18 (2002) (cleaned up). But within the confines of delegated authority, executive preemption of state law is an unremarkable feature of our governmental structure.

This logic applies *a fortiori* to the President, who is the head of the Executive Branch and wields independent constitutional powers that agencies lack on their own. Regardless of whether the President derives his authority from statute or directly from the Constitution, he wields a piece

50 Op. O.L.C. __ (Mar. 3, 2026)

of federal sovereignty itself, so long as he acts within the bounds of his authority. States thus lack the power to impede the exercise of the President's official powers, as to do so would be to interfere with the United States itself. *See, e.g.*, *Tarble's Case*, 80 U.S. (13 Wall.) 397, 403–04 (1872) (holding that this rule applies "whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal"); *see also In re Neagle*, 135 U.S. 1, 75 (1890) (holding that California murder law could not be applied to prosecute a federal officer "for an act which he was authorized to do by the law of the United States"). The Constitution's command that federal law prevails over contrary state law thus necessarily entails that valid presidential action preempts and displaces conflicting state law. *See In re Neagle*, 135 U.S. at 62 ("While [the federal government] is limited in the number of its powers, so far as its sovereignty extends[,] it is supreme."); *see, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416 (2003) (concluding that executive agreements, which do not require congressional approval, "are fit to preempt state law, just as treaties are").

Presidential preemption is most likely to arise when "the President acts pursuant to an express or implied authorization of Congress." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635 (Jackson, J., concurring). In such circumstances, the President's authority to regulate "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* That is, when Congress authorizes the President to act, the President may do so in a way that shunts aside conflicting state enactments, provided he acts within the scope of the congressional authorization or his independent constitutional authority.

Like regulations issued by agencies, executive orders authorized by the Constitution or a federal statute may preempt state law. As the Supreme Court has explained, executive orders "may create rights protected against inconsistent state laws through the Supremacy Clause," especially when such orders are issued pursuant to "congressional authorization." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974) (citing *Youngstown Sheet & Tube Co.*, 343 U.S. at 635–37 (Jackson, J., concurring)). Our Office, too, has long recognized an executive order "can of course have the force and effect of law," "particularly" if it "rests on specific statutory authority." Memorandum for Phyllis Coven, Deputy Associate Attorney General, Office of the

6

*Preemptive Effect of DPA Order*

Associate Attorney General, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Re:* Matter of Chu *and* Matter of Tsun at 17 n.15 (July 1, 1993). Thus, when an executive order is authorized by the Constitution or a federal statute (or both), "it can be enforced by the government against private parties and may preempt conflicting state law." Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539, 551 (2005) (footnotes omitted); *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 171 (D.D.C. 2025).

Importantly, Congress need not mention preemption by name when authorizing the President to displace state law. Rather, Congress may authorize the President to preempt state law simply by conferring upon him regulatory power. *See, e.g.*, *Letter Carriers*, 418 U.S. at 273 n.5. When determining whether Congress has delegated such authority to the Executive Branch, courts simply "interpret the statute," "without any presumption one way or the other" about preemption. *FERC*, 535 U.S. at 18. "In other words, we must interpret the statute to determine whether Congress has given [the Executive Branch] the power to act," using ordinary principles of statutory interpretation. *Id.* As with any statute authorizing the Executive Branch to regulate pursuant to flexible statutory terms, courts must identify "the best reading of [the] statute" and "effectuate the will of Congress" as expressed by the text. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

In sum, executive orders may preempt state law when the President's regulatory power stems from either congressional authorization or the Constitution itself.

## B.

Executive orders, like statutes, may preempt state law in one of two ways: expressly or by implication.

Start with express preemption, which operates "through express language" in a presidential order or statute declaring certain state laws preempted. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015); *see, e.g.*, *Preemption of State and Local Requirements Under a PREP Act Declaration*, 45 Op. O.L.C. __, at *4–10 (Jan. 19, 2021). In some prior cases, the Court would begin its preemption analysis "with the assumption

7

50 Op. O.L.C. __ (Mar. 3, 2026)

that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," especially when Congress "legislated in a field traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up). Today, however, at least when a "statute contains an express pre-emption clause," the Court does "not invoke any presumption against preemption but instead focus[es] on the plain wording of the clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up).[3] Of course, the existence of an express preemption clause "does not immediately end the inquiry" into a federal law's preemptive effect. *Altria Grp.*, 555 U.S. at 76. "[T]he question of the substance and scope of [the] displacement of state law still remains." *Id.* Determining the scope of an express preemption provision turns on "the plain wording of the clause." *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (citation omitted).

Although express preemption clauses often "appear to operate directly on the States," their preemptive effect in truth operates by conferring on private parties "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 478–79. Federal law regulating medical devices intended for human use, for example, expressly preempts state law by declaring that no state may establish "any requirement . . . which is different from, or in addition to, any requirement applicable under this chapter to the device." 21 U.S.C. § 360k(a). This provision appears to operate directly on states, but it actually confers on medical-device manufacturers a federal right to be free from requirements other than those imposed by the federal government.

Implied preemption operates in much the same way. "This mechanism is shown most clearly in cases involving 'conflict preemption.'" *Murphy*, 584 U.S. at 478. When federal law confers a right or imposes a restriction on regulated parties, "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Thus, "when a regulated party cannot comply with both federal

---

[3] *See also, e.g.*, *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024). *But see AbbVie, Inc. v. Fitch*, 152 F.4th 635, 645 (5th Cir. 2025) (per curiam) (continuing to apply the presumption); *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 767–68 (9th Cir. 2025) (same).

8

*Preemptive Effect of DPA Order*

and state directives, the Supremacy Clause tells us the state law must yield." *Martin v. United States*, 145 S. Ct. 1689, 1700 (2025); *see also Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019). The Supreme Court has found conflict preemption where, for example, it was impossible for a pharmaceutical company to "comply with both its state-law duty to strengthen the warnings" on the label for one of its drugs "and its federal-law duty not to alter" the label for that same drug. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

There are other forms of implied preemption, which we need not dwell on here. Field preemption, for instance, "occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 584 U.S. at 479 (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). And obstacle preemption contemplates the displacement of state law "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation and internal quotation marks omitted). But we need not address those theories today; when an executive order expressly or by conflict preempts state law, resort to these other theories of implied preemption is unnecessary.

### III.

The President may expressly or by conflict preempt certain state laws by issuing an order under the DPA. We first situate the DPA within the broader context of national-defense laws, explaining why it authorizes the President to preempt state law. We then identify the particular provisions that would most likely allow the President to preempt state law in the circumstances presented here.

### A.

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). "Recognizing this fact, the Framers listed 'providing for the common defence' as a motivating purpose for the Constitution," *Wayte v. United States*, 470 U.S. 598, 612 (1985) (cleaned up), conferring on the federal

50 Op. O.L.C. __ (Mar. 3, 2026)

government a "complete delegation of authority" to ensure the Nation's safety, *Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2463 (2022). This power is not "limited to the 'context of an actual war.'" *Id.* at 2465 (citation omitted). It also includes the authority to act prophylactically— the government may act to secure the national defense well before the country's safety is in peril. *Cf. Dennis v. United States*, 341 U.S. 494, 509 (1951) ("Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited." (emphasis omitted)). Because national defense is vested exclusively in the federal government, "the structure of the Constitution prevents States from frustrating national objectives in this field." *Torres*, 142 S. Ct. at 2464. Even legitimate state interests generally must yield to the common defense of the Nation, for the Constitution "is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

In providing for the common defense, Congress and the President have "time and again, as exigencies arose," taken actions that have displaced ordinary state laws, such as those pertaining to property or torts. *Bank Markazi v. Peterson*, 578 U.S. 212, 235 (2016). Following World War II, for example, the Renegotiation Act allowed the federal government "to recover excess profits" on wartime contracts—even with respect to contracts between two private parties rather than only those "made directly with the Government." *Lichter v. United States*, 334 U.S. 742, 788–89 (1948). The Court upheld "the right of the Government to recover excess profits on" such contracts, *id.* at 789, emphasizing the wartime exigencies that necessitated the legislation, *see id.* at 754–72. The Court subsequently sustained President Carter's decision to nullify attachments and liens on Iranian assets in the United States and to direct that those assets be transferred to Iran. *See Dames & Moore v. Regan*, 453 U.S. 654, 660, 674 (1981). In doing so, the Supreme Court emphasized that the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95-223, 91 Stat. 1626, "delegate[d] broad authority to the President to act in times of national emergency with respect to property of a foreign country." 453 U.S. at 677. And because IEEPA authorized the actions taken, the Court upheld the nullification of the attachments and the transfer of the assets, traditional property rules notwithstanding. *Id.* at 674.

10

*Preemptive Effect of DPA Order*

Modelled on "the First and Second War Powers Acts of 1941 and 1942, which gave the [E]xecutive [B]ranch broad authority to regulate industry during World War II," the DPA is yet another example of Congress delegating to the President powers to regulate domestic policy for the national defense. Alexandra G. Neenan, Cong. Rsch. Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* at 2 (updated Oct. 6, 2023), https://www.congress.gov/crs-product/R43767 [https://perma.cc/S6L9-UUJE]. The DPA differs from those earlier statutes, however, in one key respect: Although its predecessor statutes conferred sweeping authority upon the President during wartime, the DPA "is not an 'emergency' statute." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 Op. O.L.C. 644, 662 (1982) ("*Energy Supply Interruption*"). Instead, it includes power to act prophylactically. Congress recognized that "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense." 50 U.S.C. § 4502(a)(1). The Act thus vests "the President with an array of authorities," all designed "to maintain and enhance the domestic industrial base." *Id.* § 4502(a)(4). The President may use those authorities "whether or not an 'emergency' situation exists." *Energy Supply Interruption*, 6 Op. O.L.C. at 662.

The DPA confers "broad and flexible" authority on the President to regulate private parties and preempt contrary state law. *Id.* (quoting H.R. Rep. No. 81-2759, at 4 (1950)). In general terms, section 4511 authorizes the President to control the distribution of materials, services, and facilities, and to require entities to prioritize the performance of some contracts over others, as "necessary or appropriate to promote the national defense" or "to maximize domestic energy supplies." 50 U.S.C. § 4511(a), (c). And because the President may regulate and direct private conduct when exercising such authority, he may also necessarily displace contrary state law.

And lest there be any doubt, the DPA makes explicit that orders issued pursuant to the Act displace state-law liability. It provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." *Id.* § 4557. Such immunity

11

from liability exists even when the related DPA rule, regulation, or order is subsequently "declared by judicial or other competent authority to be invalid." *Id.* Section 4557 is an express preemption provision, even though it does not appear to operate directly on state law. *See Murphy*, 584 U.S. at 478. "It confers on private entities . . . a federal right to engage in certain conduct"—conduct required by a DPA order—"subject only to certain (federal) constraints," not constraints imposed by state law. *Id.* at 478–79.

The provisions in section 4511 authorizing the President to issue regulatory (and thus preemptive) orders are united by a central principle: necessity. At a high level, section 4511(a) allows the President to require the prioritized performance of certain contracts or to allocate materials and other resources as he considers "necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(1)–(2). Section 4511(c) similarly allows the President to require the priority performance of certain contracts or allocate materials and resources "in order to maximize domestic energy supplies." *Id.* § 4511(c)(1). Ensuring the availability of such energy supplies, the DPA makes clear, is "necessary and appropriate" to secure "national defense preparedness." *Id.* § 4502(a)(5).

Necessity has long functioned as a defense to private liability under state law. When an otherwise tortious action—like trespass or conversion—is necessary to avoid "public disaster," the actor will not be held liable under tort law. *See* Restatement (Second) of Torts § 196 (1965) (trespass); *id.* § 262 (conversion); *see also id.* § 892D (describing the emergency doctrine). Necessity similarly excuses contractual nonperformance when supervening events make performance impracticable or frustrate the contract's purpose. *See* Restatement (Second) of Contracts § 261 (1981) (discharge by supervening impracticability); *id.* § 265 (discharge by supervening frustration). And force majeure clauses typically "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 123 (2d Cir. 2022) (citation omitted). Necessity even may excuse liability for criminal conduct: "Every American jurisdiction, without exception, has adopted the necessity defense in its criminal jurisprudence." Shaun P. Martin, *The Radical Necessity Defense*, 73 U. Cin. L. Rev. 1527, 1535 (2005).

*Preemptive Effect of DPA Order*

The DPA operates on parallel logic to preempt state private law. When compliance with a presidential DPA order would otherwise violate state law—whether by causing tortious injury or breaching contractual obligations—the Act displaces that liability in the name of national defense. *See* 50 U.S.C. § 4557. Indeed, the DPA expressly contemplates reprioritizing contractual commitments for national-defense interests, notwithstanding that doing so may cause a party to breach its obligations under state contract law. *See id.* § 4511(a)(1), (c).

The DPA's displacement of state regulatory law follows from the same principle. State regulation often accomplishes *ex ante* what private law accomplishes *ex post*—the mitigation of social costs. *See* Susan Rose Ackerman, *Regulation and the Law of Torts*, 81 Am. Econ. Rev. 54, 54 (1991). The means are different, but the purpose is the same. For example, a state licensing regime and common-law negligence each address the risk of substandard professional conduct. Environmental regulations and common-law nuisance claims each address pollution and its harmful effects. *Cf.* Samuel Issacharoff, *Regulating After the Fact*, 56 DePaul L. Rev. 375, 380 (2007) ("The key is that both ex ante and ex post review are essential parts of the regulatory model—sometimes operating in tandem, sometimes as substitutes." (emphasis omitted)). The DPA contemplates the preemption of *ex ante* regulations much as it contemplates the preemption of *ex post* private-law remedies, all in the name of necessity. After all, although the interests protected by state regulation are doubtlessly important, "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte*, 470 U.S. at 611.

"Necessity" is not, of course, a constitutional prerequisite for Congress to confer on the President preemptive authority. But the Act functions as the Nation's necessity defense to state law. And under the DPA, the President possesses broad discretion to determine when to invoke that immunity, *see* 50 U.S.C. § 4511(a), (c), for it is the President who possesses the institutional competence to make such judgments on behalf of the Nation, *see id.* § 4502(a)(4); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010) (emphasizing the need to defer to the "evaluation of the facts by the Executive" in the national-security context).

13

50 Op. O.L.C. __ (Mar. 3, 2026)

Moreover, such a finding of necessity is likely immune from judicial review under the Administrative Procedure Act ("APA") and other statutes, even if the Secretary makes the determination by exercising delegated presidential power.[4] Under the APA, "agency action is not subject to judicial review to the extent that such action is committed to agency discretion by law." *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (citation and internal quotation marks omitted). Review of an agency determination "is not to be had in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191 (citation and internal quotation marks omitted). Section 4511(a) clearly commits action to the discretion of the President or his delegee, allowing the decisionmaker to allocate materials "to such extent as *he shall deem* necessary or appropriate." 50 U.S.C. § 4511(a)(2) (emphasis added); *see also id.* § 4511(a)(1). In *Webster v. Doe*, the Supreme Court construed similar language to preclude APA review. 486 U.S. 592 (1988). The provision at issue allowed "termination of [a Central Intelligence] Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600 (emphases in original). The Court concluded that this provision "foreclose[d] the application of any meaningful judicial standard of review." *Id.* So too here, especially given the national-security context, where the Executive Branch traditionally wields broad and often-unreviewable discretion. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527, 529–30 (1988); *Lee v. Garland*, 120 F.4th 880, 886 (D.C. Cir. 2024).

## B.

As we have emphasized, the DPA immunizes entities from liability "for damages or penalties" stemming from "any act or failure to act resulting directly or indirectly from compliance" with an order issued under the Act. 50 U.S.C. § 4557. Three provisions of 50 U.S.C. § 4511 authorize the President to direct that Sable resume production of the SYU and

---

[4] The APA does not apply to the President, although "the President's actions may still be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

14

operate the associated pipeline infrastructure. An order issued under one of these provisions could preempt state law either expressly or by conflict. We address these provisions in the order best suited to our analysis: We start with the President's allocation authority under section 4511(a)(2); we then discuss his prioritization authority under section 4511(a)(1); and we conclude with his energy-production authority under section 4511(c).

## 1.

We consider first the President's allocation authority under section 4511(a)(2). That provision authorizes the President "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The term "materials" encompasses "any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply," as well as "any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items." *Id.* § 4552(13). The term "services" includes "any effort that is needed for or incidental to": (A) "the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item"; (B) "the construction of facilities"; (C) "the movement of individuals and property by all modes of civil transportation"; or (D) "other national defense programs and activities." *Id.* § 4552(16).[5] And the "term 'facilities' includes all types of buildings, structures, or other improvements to real property . . . , and services relating to the use of any such building, structure, or other improvement." *Id.* § 4552(8). In the light of these broad definitions, we have previously opined that this section could "be used to facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense." *Energy Supply Interruption*, 6 Op. O.L.C. at 665.

---

[5] Moreover, the phrase "industrial resources" as used in the Act means "materials, services, processes, or manufacturing equipment (including the processes, technologies, and ancillary services for the use of such equipment) needed to establish or maintain an efficient and modern national defense industrial base." 50 U.S.C. § 4552(12).

50 Op. O.L.C. __ (Mar. 3, 2026)

The President could expressly preempt California law through an order issued under this section. Section 4511(a)(2) authorizes the President to allocate materials, services, and facilities "in such manner" and "to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). This sweeping language allows the President to preempt contrary state law by ordering Sable to produce the recoverable oil located on the SYU and transport such production to the California refinery complex using the Santa Ynez Pipeline System. That conclusion follows directly from the capacious definitions of "materials," "services," and "facilities." *See id.* § 4552(8), (13), (16). The production and transportation of such oil—a "material"—is plainly a "service" within the meaning of the Act. *See id.* § 4552(13), (16). The Santa Ynez Pipeline System is, in our view, a facility within the meaning of the DPA, because it is an "improvement[] to real property," and operation of the pipeline system is a service "relating to the use" of that improvement. *Id.* § 4552(8). A DPA order could thus declare on its face that particular California environmental regulations, permitting requirements, or other restrictions are preempted with respect to Sable's production on the SYU and operation of the Santa Ynez Pipeline System. Indeed, if the President were to find that Sable being noncompliant with particular state laws is "necessary" to promote the national defense, *id.* § 4511(a)(2), he could instruct Sable to disregard state laws that would otherwise frustrate its obligations under the order.

One might suggest that the word "allocate" in section 4511(a)(2) allows the President only to *distribute* resources, not to compel their production. But that reading ignores critical statutory language. Section 4511(a)(2) authorizes the President to allocate not just materials but also "services"—which the Act defines to include "any effort that is needed for or incidental to" the "development" or "production" of "an industrial resource." *Id.* § 4552(16). The President's power to allocate services thus includes the power to allocate productive capacity itself. Moreover, section 4511(a)(2) grants the President discretion to allocate services "in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate," *id.* § 4511(a)(2), making clear that the President may determine how and to what degree to allocate productive capacity. That discretion necessarily entails the authority to compel production, not just to allocate materials that already exist. *See, e.g.*,

16

*Preemptive Effect of DPA Order*

*Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 389 (N.D. Tex. 2022) (holding that the President's allocation authority under the DPA allowed him to require meat facilities to remain open during the COVID-19 pandemic and preempt state tort law); *see also Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, the state law must yield." (cleaned up)). Indeed, an allocation order can "require[] a person to take or refrain from taking certain actions," including with respect to production of a resource. 15 C.F.R. § 700.33(b).

Our reading is also consistent with the DPA's context and history. The Act was modeled on the War Powers Acts, which conferred on the President sweeping authority to regulate industry during wartime. *See* Neenan, *supra*, at 2. And a critical component of wartime authority is ensuring adequate productive capacity. The DPA supplies comparable authority but before the outbreak of any conflict. When enacting the DPA, Congress found "the development of domestic productive capacity" critical for ensuring the national defense, 50 U.S.C. § 4502(a)(3), and similarly found it necessary "to assure the availability of domestic energy supplies," *id.* § 4502(a)(5). These congressional findings would mean little if the President could only shuffle existing inventory rather than direct facilities to produce energy.[6]

We emphasize that the precise preemptive scope of a presidential order would depend upon the language employed in relation to the obligations imposed by state law. We cannot opine on the preemptive reach of an order not yet drafted. Moreover, because "hypothetical or potential conflict is insufficient" to preempt state law by conflict, the wording

---

[6] The President's authority to compel production is even more pronounced under section 4511(c), which allows the President to use the allocation power "in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). We discuss section 4511(c) in greater detail below, but the word "allocate" must be "given more precise content by the neighboring words with which it is associated," *Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (citation omitted), and "identical words and phrases within the same statute should normally be given the same meaning," *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).

17

50 Op. O.L.C. __ (Mar. 3, 2026)

of any DPA order will affect the scope of conflict preemption. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).[7] According to Sable, "California agencies have deployed an array of state measures . . . to block pipeline operations," including "[enforcement of California] SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, [and] excessive delay in granting a long-term easement through a state park for an existing pipeline." Sable Letter at 6. If such state measures make it impossible for Sable immediately to resume production and distribution of oil located on the SYU, they would be displaced as a matter of conflict preemption if a presidential order directed Sable to resume production immediately. Such an order would "irreconcilably conflict" with the terms of California state law. *Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1679 (cleaned up).

### 2.

The President's prioritization authority under section 4511(a)(1) also allows him to preempt state law. Section 4511(a)(1) authorizes the President "to require that performance under contracts or orders" that "he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a)(1). Recall that "[i]n executing a contract under the DPA, a contractor is not liable for actions taken to comply with" a presidential order issued pursuant to the Act. Neenan, *supra*, at 6. Moreover, the President can also "prioritize the performance of contracts between two private parties." *Id.*

The President could issue an order under section 4511(a)(1) to express-ly preempt certain state laws that, in the President's judgment, would impair or delay prioritized contract performance. *See E. Air Lines, Inc. v.*

---

[7] The DPA immunizes entities from liability for any act "resulting directly *or indirect-ly* from compliance" with an order issued under the Act. 50 U.S.C. § 4557 (emphasis added). It is thus possible that a DPA order might preempt state law to the extent that an entity's compliance with that order would result—even indirectly—in a breach of state law. Section 4557's immunity for acts resulting indirectly from compliance with a DPA order suggests that Congress anticipated that DPA orders might engender conflict with other legal obligations, even where dual compliance remains technically possible. But it is not necessary for us in answering your question to decide whether the DPA in effect lowers the standard for conflict preemption, so we do not decide it here.

18

*Preemptive Effect of DPA Order*

*McDonnell Douglas Corp.*, 532 F.2d 957, 993 (5th Cir. 1976) ("Congress intended to accord the Executive Branch great flexibility in molding its priorities policies to the frequently unanticipated exigencies of national defense."). The President could, for instance, instruct that Sable's contracts for oil production and transportation take priority over Sable's other contractual obligations and expressly preempt California environmental regulations insofar as they would impede that prioritized performance. By naming the preempted state laws on the face of the order, the President would eliminate any doubt about which legal requirements must give way to defense needs under the terms of the order.

An order issued under section 4511(a)(1) might also displace state contract law—which is often judge-made rather than statutory—by conflict. If the President requires that performance of certain contracts be prioritized over performance under any other contract or purchase order, state law rendering that prioritization impossible would be preempted. *Cf.* Memorandum for the Files, from Henry C. Whitaker, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Use of the Defense Production Act and the International Emergency Economic Powers Act to Regulate Industry During the Early Stages of the COVID-19 Pandemic* at 5–6 (Jan. 18, 2021). As we have explained, conflict preemption is a demanding standard; if Sable could prioritize the designated contracts while also complying with state law, state law would not necessarily be preempted. *But cf.* 50 U.S.C. § 4557 (shielding entities from liability for any act "resulting directly or indirectly from compliance" with a DPA order). But if state law would render Sable incapable of prioritizing the designated contracts, that state law would be displaced.

### 3.

Finally, section 4511(c) allows the President to preempt state law by wielding the allocation and prioritization powers "to maximize domestic energy supplies"—even in the absence of a national-defense finding. *See Energy Supply Interruption*, 6 Op. O.L.C. at 668 (citation omitted).[8]

---

[8] When updating our 1982 advice about the DPA in 2021, we wrote that "the powers granted in" section 4511 are "limited by" section 4511(b). Memorandum for Stuart F. Delery, Deputy Counsel to the President, Executive Office of the President, from Martin S. Lederman, Deputy Assistant Attorney General, Office of Legal

50 Op. O.L.C. __ (Mar. 3, 2026)

Section 4511(c) allows the President, upon making certain other findings, to "require the allocation of, or the priority performance under contracts or orders . . . relating to, materials, equipment, and services in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). The words "materials" and "services" have the same capacious meanings as described above. *See id.* § 4552(13), (16).

The preemption analysis under section 4511(c) parallels that of the two provisions described above. In a directive requiring Sable to resume production and distribution of oil from the SYU, the President could exempt Sable from compliance with particular state laws, especially if the President were to find that compliance with such laws would threaten the ability to "maximize domestic energy supplies." *Id.* § 4511(c)(1). At minimum, an executive order would displace conflicting California law under traditional conflict-preemption principles, with the scope of preemption turning on the order's specific terms.

## IV.

State law, we have been advised, is not currently the only impediment to Sable's ability to resume production and transportation of oil. A consent decree entered in *United States v. Plains All American Pipeline L.P.*, No. 20-cv-02415 (C.D. Cal. Oct. 14, 2020), Dkt. 33 ("Consent Decree"), "currently vests authority over resumption of transportation through the onshore portions of the Santa Ynez Pipeline System with the California Office of the State Fire Marshal." Sable Letter at 9. We have been advised that Sable assumed by contract certain obligations under the Consent Decree.[*] Assuming for the sake of our analysis that provisions of the Consent Decree could be enforced against Sable, you have asked whether

---

Counsel, *Re: Preliminary Review of Possible Legal Authorities Related to the Cyberattack Targeting the Colonial Pipeline* at 10 (May 12, 2021). But section 4511(c)(1) applies "[n]otwithstanding any other provision of this chapter." 50 U.S.C. § 4511(c)(1). To the extent that our more recent advice inadvertently suggested that section 4511(b) would limit the President's authority under section 4511(c), we take this opportunity to disclaim that suggestion.

[*] Editor's note: As originally issued on March 3, 2026, this opinion mistakenly referred to Sable as a party to the Consent Decree. We have since confirmed that, although Sable assumed by contract certain obligations under the Consent Decree, it was not and is not party to the Consent Decree.

*Preemptive Effect of DPA Order*

an executive order under the DPA would displace these provisions of the Consent Decree, even though there are both federal- and state-law claims at issue in that case. For three reasons, we think it would.

*First*, section 4557 would likely immunize Sable from needing to satisfy these provisions of the Consent Decree if acting to comply with a DPA order. The Consent Decree includes a "stipulated penalties" provision for violations of its requirements. *See* Consent Decree at 27. But section 4557 provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." 50 U.S.C. § 4557. Thus, Sable would be immune from any penalties—including those imposed under the Consent Decree—for "any act or failure to act resulting directly or indirectly from compliance with" a DPA order. *Id.*

Section 4557 would also immunize Sable from liability for contempt under such circumstances. *See* Consent Decree at 39 (leaving "contempt" open as a sanction for violations). Civil contempt sanctions are "penalties designed to compel future compliance" with a consent decree. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see also Lackey v. Stinnie*, 145 S. Ct. 659, 671 (2025) ("Violation of a consent decree is enforceable by a citation for contempt."). Civil contempt sanctions can take the form of monetary fines or sentences of imprisonment. *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631–32 (1988). Monetary fines to compel future compliance with the Consent Decree here, of course, may not be imposed for any act or omission resulting from compliance with a DPA order. *See* 50 U.S.C. § 4557. So too for sentences of imprisonment imposed for the same reason. The word "penalty" meant "a punishment imposed or incurred for a violation of law or rule." *The American College Dictionary* 895 (1948 ed.); *see also Webster's New Collegiate Dictionary* 621 (2d ed. 1956) ("*Webster's*"); *The Oxford Universal Dictionary* 1462 (3d ed. 1955). Nor was the word "liable" limited to monetary liability. *See, e.g.*, *Webster's* at 484 ("Bound or obliged by law or submission to other forces; answerable"). And limiting the word "penalties" to only monetary fines would be incongruous with the rest of section 4557 and the DPA more broadly, which ensure that the President can displace impediments to productive capacity when necessary. Indeed,

21

50 Op. O.L.C. __ (Mar. 3, 2026)

it would be anomalous to think that section 4557 forbids the imposition of monetary fines but not the harsher penalty of imprisonment.

*Second*, a DPA order could constitute a force majeure under the Consent Decree. In particular, the Consent Decree defines a force majeure "as any event arising from causes beyond the control of Defendants . . . that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation." Consent Decree at 35. The issuance of a DPA order would likely constitute an "event" arising from causes beyond the control of Sable, and complying with the order might delay or prevent the performance of Sable's obligations under the Consent Decree.

*Third*, the issuance of a DPA order might also constitute changed circumstances sufficient to require modification of the Consent Decree. A consent decree "must" be modified if one of its obligations "has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992). And as we have explained, a DPA order has the force of federal law. If a DPA order requires Sable to take an action that is prohibited by the Consent Decree, the Consent Decree likely must be modified.

\* \* \* \* \*

The DPA authorizes the President to regulate private entities in ways that may be inconsistent with state law. An order issued under that authority could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree described above, including those vesting authority over resumption of transportation with the California Office of the State Fire Marshal.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*

22

# Exhibit 14

**13199**

Federal Register

Vol. 91, No. 52

Wednesday, March 18, 2026

# Presidential Documents

---

Title 3—

The President

Executive Order 14391 of March 13, 2026

## Adjusting Certain Delegations Under the Defense Production Act

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* This order amends Executive Order 13603 of March 16, 2012 (National Defense Resources Preparedness). Executive Order 13603 delegates certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 *et seq.*), to specified executive department and agency (agency) heads. This order also clarifies section 2(a) of Executive Order 14156 of January 20, 2025 (Declaring a National Energy Emergency).

**Sec. 2**. *Amendment to Executive Order 13603.* Section 203 of Executive Order 13603 is hereby amended by striking the phrase ''Secretary of Commerce'' and inserting, in lieu thereof, ''Secretary of Commerce and the Secretary of Energy, each of whom may exercise such delegated authority independently of the other''.

**Sec. 3**. *Clarifying Section 2(a) of Executive Order 14156.* For the avoidance of doubt, an agency head need only recommend action to the President under section 2(a) of Executive Order 14156 when the authority to take the recommended action is vested in the President alone and has not been delegated. Section 2(a) of Executive Order 14156 does not require an agency head to make a recommendation to the President when the agency head has authority to take the action by virtue of a delegation pursuant to Executive Order 13603 or other Presidential delegation.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Department of Energy.

THE WHITE HOUSE,
*March 13, 2026.*

[FR Doc. 2026–05382
Filed 3–17–26; 11:15 am]
Billing code 6450–01–P

# Exhibit 15

 An official website of the United States government  Here's how you know ˅

  **U.S. DEPARTMENT** *of* **ENERGY**

Energy.gov  >  Secretary Wright Directs Sable Offshore to Restore the Santa Ynez Unit and Pipeline

# Secretary Wright Directs Sable Offshore to Restore the Santa Ynez Unit and Pipeline

U.S. Secretary of Energy Chris Wright today directed Sable Offshore Corp. to restore operations of the Santa Ynez Unit and Santa Ynez Pipeline System to address supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil.

Energy.gov

March 13, 2026

 3 min

────────

**WASHINGTON**—U.S. Secretary of Energy Chris Wright today directed Sable Offshore Corp. to restore operations of the Santa Ynez Unit and Santa Ynez Pipeline System to address supply disruption risks caused by California policies that have left the region and U.S. military forces

dependent on foreign oil. This action issued under authorities provided by the Defense Production Act and delegated through Executive Order, "National Defense Resources Preparedness," as amended by President Trump's Executive Order, "Adjusting Certain Delegations Under the Defense Production Act."

"The Trump Administration remains committed to putting all Americans and their energy security first," **Secretary Wright said**. "Unfortunately, some state leaders have not adhered to those same principles, with potentially disastrous consequences not just for their residents, but also our national security. Today's order will strengthen America's oil supply and restore a pipeline system vital to our national security and defense, ensuring that West Coast military installations have the reliable energy critical to military readiness."

Sable's facility can produce approximately 50,000 barrels of oil per day, a 15 percent increase to California's in-state oil production, that can replace nearly 1.5 million barrels of foreign crude each month.

California once supplied nearly 40 percent of U.S. oil production, but decades of radical state policies targeting reliable energy sources have driven a decline in domestic output while fuel demand remains among the highest in the nation. Today, more than 60 percent of the oil refined in California comes from overseas, with a significant share traveling through the Strait of Hormuz—presenting serious national security threats.

Unlike other regions of the country, California remains largely disconnected from interstate crude pipelines that move American oil to refineries across the United States. The action also prioritizes pipeline transportation capacity to ensure crude produced offshore California moves through the Las Flores Pipeline System to Pentland Station and into interstate pipelines, allowing American energy to reach domestic refineries more efficiently, while reducing California's reliance on foreign

oil vulnerable to geopolitical disruption.

Sable Offshore currently employs more than 100 workers and approximately 400 contractors in Santa Barbara County, and restoring operations is expected to create hundreds of additional American energy jobs while generating millions in local economic activity.

###

**View Previous**

Energy Department Announces $500 Million to Strengthen Domestic Critical Materials Processing and Manufacturing

March 13, 2026

**View Next**

Energy Department Initiates Strategic Petroleum Reserve Emergency Exchange to Stabilize Global Oil Supply

March 13, 2026

**Tags:**

PETROLEUM RESERVES

## Media Inquiries:

(202) 586-4940 or
DOENews@hq.doe.gov

## Read more at the energy.gov Newsroom



**U.S. DEPARTMENT** *of* **ENERGY**

**Committed to Restoring America's Energy Dominance.**

## Quick Links

Leadership & Offices                    Newsroom

Contact Us                              Careers

## Resources

Budget & Performance                    Directives, Delegations, &
                                        Requirements

Freedom of Information Act (FOIA)       Inspector General

Privacy Program

## Federal Government

USA.gov                                 The White House

## Follow Us

    

Open Gov       Accessibility       Privacy       Information Quality       No Fear Act

Web Policies       Vulnerability Disclosure Program       Whistleblower Protection

Equal Employment Opportunity       Notice of Court Orders

# Exhibit 16

EX-99.1 2 a991ex-sypspressrelease.htm EX-99.1

**Exhibit 99.1**

## Sable Resumes Oil Flow as Ordered by the Federal DPA with Expected Gross Oil Rate of 50,000 Bbls/d and Expects First Sales by April 1, 2026

**Houston, TX** – Sable Offshore Corp. ("Sable," or the "Company") (NYSE: SOC) today announced that on March 14, 2026, the Company resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit ("SYU") through the federally regulated and approved to operate Santa Ynez Pipeline System ("SYPS") from Las Flores Canyon ("LFC") to Pentland Station at the direction of the United States Secretary of Energy, Chris Wright.

On March 13, 2026, President of the United States, Donald J. Trump, signed an Executive Order to, among other things, delegate certain authorities under the Defense Production Act of 1950 ("DPA") to the United States Secretary of Energy. Subsequently on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued an order to Sable invoking the DPA (the "DPA Order") to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS in order to address the energy scarcity and supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil. Sable immediately complied with this federal DPA Order and began shipping hydrocarbons from LFC to Pentland Station on March 14, 2026, with federal safety regulators present in observance.

As stated in the DPA Order, all federally produced barrels from the SYU must flow through the SYPS, up to the existing pipeline capacity of 200,000 Bbls/d. Sable completed its onshore anomaly repair program and hydrotested all segments of the SYPS consistent with applicable requirements as of May 2025.

Prior to resuming hydrocarbon transportation from LFC to Sable's sales point at Pentland Station, Sable had approximately 540,000 barrels of processed crude oil in storage at LFC, representing more than the line fill volume for the SYPS between LFC and Pentland Station. Sable is fully staffed and will continue to implement the conditions of the Emergency Special Permit previously issued by the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration.

Sable is currently producing hydrocarbons from its Platform Harmony at the SYU and our wells continue to perform as expected. Production ramp-up is anticipated to proceed with full production resumption at Platforms Harmony and Heritage this month, in March 2026, and Platform Hondo in June 2026. The Company plans to commence first sales by April 1, 2026 at an expected gross oil rate of 50,000 Bbls/d.

Also on March 13, 2026, Sable and Pacific Pipeline Company ("PPC") sued California Department of Parks and Recreation ("State Parks") in a lawsuit styled Sable Offshore Corp. and Pacific Pipeline Company, Plaintiffs v. Armando Quitero, in his official capacity as Director of the California Department of Parks and Recreation, Defendant, Case, No. 2:26-cv-02739 in the United States District Court for the Central District of California. The lawsuit requests declaratory relief to confirm Sable and PPC's rights (and their ability to fulfill their obligations) under the DPA Order. Subsequently, on March 14, 2026, State Parks sent a letter to Sable contesting Sable's rights under the DPA Order.

As previously stated, Sable is pursuing all financing options, including federal credit support. The Company plans to refinance its Senior Secured Term Loan, deploy its commodity hedging program, and evaluate shareholder return options shortly after commencing first sales.

"Sable Offshore is putting California consumers first by increasing domestic supply of crude oil into the California market by approximately 17% and we look forward to continuing to execute as so ordered by the Defense Production Act executed on March 13, 2026" said Jim Flores, Sable's Chairman and Chief Executive Officer. Flores continued, "We look forward to working closely with the Department of Energy in fully complying with the DPA and working with the Trump administration to take all necessary steps to deliver the energy necessary for the security and defense of the country."

1

**About Sable**

Sable Offshore Corp. is an independent oil and gas company, headquartered in Houston, Texas, focused on responsibly developing the Santa Ynez Unit in federal waters offshore California. The Sable team has extensive experience safely operating in California.

**Forward-Looking Statements**

The information in this press release include "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward- looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence full production of the SYU assets; our ability to recommence sales of oil, the cost and time required therefor, and production levels once recommenced; availability of future financing; our financial performance; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2025, which is filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this press release.

**Disclaimers**

The Santa Ynez Unit restarted production in May 2025. Sable has not sold commercial quantities of hydrocarbons since the acquisition of the Santa Ynez Unit. The Santa Ynez Unit was shut in during June of 2015 when the only onshore pipeline transporting hydrocarbons produced from the Santa Ynez Unit to market ceased transportation.

**Contacts**

Investor Contact:
Harrison Breaud
Vice President, Finance & Investor Relations
IR@sableoffshore.com
713-579-8111