ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013-1256
 Telephone:  (213) 269-6767
 Fax:  (213) 897-2638
 E-mail:  Jeremy.Brown@doj.ca.gov
 Alicia.Roessler@doj.ca.gov
 Rebecca.Hunter@doj.ca.gov

*Attorneys for Plaintiff
State of California*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>*Plaintiff,*<br><br>v.<br><br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br><br>*Defendants.* | Case No. 2:26-cv-3396-SVW-SSCx<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br><br>Date:          June 1, 2026<br>Time:          1:30 p.m.<br>Courtroom:   10A, 10th Floor<br>Judge:         Hon. Stephen V. Wilson<br>Trial Date:    Not Set<br>Action Filed: March 31, 2026 |

# TABLE OF CONTENTS

**Page**

Introduction...........................................................................................................1

Statement of Facts.................................................................................................3

    I.    The Refugio Oil Spill and Resulting Consent Decree, and Sable's Acquisition of the Pipelines Subject to the Consent Decree's Terms ...............................................................................3

        A.    Sable's Initial Attempts To Restart the Pipelines......................5

        B.    The DPA-Related Orders, and Sable's Restarting of Oil Flow ....................................................................................5

Legal Standard ......................................................................................................7

Argument ..............................................................................................................8

    I.    California Is Likely To Succeed on the Merits.....................................8

        A.    The Wright Order Exceeds the DPA's Grant of Authority........8

        B.    Defendants' Use of the Wright Order To Conscript State Land for Federal Use and Encourage Violations of Federal Court Orders Is Contrary to the DPA and Unconstitutional...................................................................12

        C.    The Wright Order Violates the Department's Own Regulations. ...................................................................15

        D.    The Wright Order Is Arbitrary and Capricious. ......................17

    II.    The Likelihood of Irreparable Harm and Equitable Factors Weigh in Favor of a Preliminary Injunction.....................................18

        A.    California Is Likely To Suffer Irreparable Harm. ....................19

        B.    The Public Interest and Balance of Equities Favor California. ...............................................................................21

Conclusion ..........................................................................................................21

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott v. Perez*
585 U.S. 579 (2018) ...................................................................................20

*Alabama v. U.S. Sec'y of Educ.*
2024 WL 3981994 (11th Cir. Aug. 22, 2024) .........................................20

*Ariz. Dream Act Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014) ..................................................................21

*Biden v. Texas*
597 U.S. 785 (2022) .....................................................................................8

*Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*
No. 2:26-cv-02946 (C.D. Cal., March 19, 2026) ...............................2, 14

*Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*
No. 26-cv-02946 (C.D. Cal. Apr. 23, 2026), Dkt. 38................................1

*California v. PHMSA*
No. 26-508 (9th Cir.) ...................................................................................5

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997) ....................................................................20

*Crowe & Dunlevy, P.C. v. Stidham*
640 F.3d 1140 (10th Cir. 2011) ................................................................19

*Ctr. for Biological Diversity, et al., v. Cal. Dep't of Forestry & Fire
Protection, et al.*
No. 25CV02244 (Santa Barbara Sup. Ct., July 29, 2025).....................2, 5

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*
532 F.2d 957 (5th Cir. 1976) ......................................................................8

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) ....................................................................19

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Envt'l Def. Ctr., et al. v. Pipeline & Hazardous Materials Safety
Admin., et al.*
No. 25-8059 (9th Cir., Dec. 24, 2025) ............................................................ 2, 5

*Hercules Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ................................................................. 9, 11, 13

*Hercules Inc. v. United States*
516 U.S. 417 (1996) ...................................................................................... 13

*Immigrant Defs. L. Ctr. v. Noem*
145 F.4th 972 (9th Cir. 2025) ....................................................................... 7, 8

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001) ...................................................................... 20

*Kearney & Trecker Corp. v. United States*
231 Ct. Cl. 571 (1982) .................................................................................. 10

*Kennedy v. Braidwood Mgmt., Inc.*
606 U.S. 748 (2025) ...................................................................................... 14

*Kentucky v. United States ex rel. Hagel*
759 F.3d 588 (6th Cir. 2014) .......................................................................... 19

*League of Women Voters of United States v. Newby*
838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 21

*Maryland v. King*
567 U.S. 1301 (2012) ..................................................................................... 20

*Meinecke v. City of Seattle*
99 F.4th 514 (9th Cir. 2024) ............................................................................. 7

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012) ............................................................................. 7

*Miller v. French*
530 U.S. 327 (2000) ...................................................................................... 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) ...............................................................................17, 18

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003)..................................................................15

*Nat'l Med. Enter. v. Bowen*
851 F.2d 291 (9th Cir. 1988)..................................................................17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
886 F.3d 803 (9th Cir. 2018)..................................................................19

*New York v. United States*
505 U.S. 144 (1992) ...............................................................................14

*Newsom v. Trump*
811 F.Supp.3d 1086 (N.D. Cal. 2025).....................................................18

*NRDC v. U.S. Dep't of Interior*
113 F.3d 1121 (9th Cir. 1997)................................................................17

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013)................................................................21

*Russello v. United States*
464 U.S. 16 (1983) .................................................................................12

*Sprietsma v. Mercury Marine*
537 U.S. 51 (2002) .................................................................................15

*Tennessee v. Dep't of Educ.*
104 F.4th 577 (6th Cir. 2024).................................................................20

*United States v. Plains All Am. Pipeline*
No. 2:20-cv-02415 (C.D. Cal., March 13, 2020) ................................2, 4, 11, 13

*United States v. Vertac Chemical Corp.*
46 F.3d 803 (8th Cir. 1995).................................................................9, 13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. Youssef*
   547 F.3d 1090 (9th Cir. 2008)..................................................................12

*Washington v. Trump*
   145 F.4th 1013 (9th Cir. 2025)................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .....................................................................................7

*Wolford v. Lopez*
   116 F.4th 959 (9th Cir. 2024)................................................................18

**STATUTES**

United States Code, Title 5
   § 551 ...........................................................................................................8
   § 705 ...........................................................................................................8
   § 706(2)(A) .......................................................................................7, 8, 17
   § 706(2)(C) .................................................................................................8

United States Code, Title 50
   § 4501 .........................................................................................................1
   § 4502(a)(3)(D)..........................................................................................10
   § 4511(a)......................................................................................................8
   § 4511(a)(1) .................................................................................................9
   § 4511(a)(2) ...............................................................................................10
   § 4511(b)...............................................................................................10, 11
   § 4511(c)...............................................................................................8, 11
   § 4511(c)(2) ..................................................................................11, 17, 18
   § 4533(b)....................................................................................................12
   § 4557 ........................................................................................................13
   § 4558(j) ....................................................................................................12

California Public Resources Code
   § 5012........................................................................................................20

**CONSTITUTIONAL PROVISIONS**

United States Constitution
   Tenth Amendment ......................................................................................14

## **TABLE OF AUTHORITIES**
### **(continued)**

**Page**

OTHER AUTHORITIES

Code of Federal Regulations, Title 10
§ 216.1 ...............................................................................................................18
§ 216.4 ...............................................................................................................17
§ 217.20 ........................................................................................................15, 16
§ 217.31(a).........................................................................................................16
§ 217.31(b).........................................................................................................16
§ 217.32 .............................................................................................................16
§ 217.32(b).........................................................................................................16
§ 217.52 .............................................................................................................16
§ 217.54 .............................................................................................................16

Executive Order
13603 ..................................................................................................................6
14156 ................................................................................................................18

**INTRODUCTION**

According to the federal government, when an Executive Branch official signs an order under the Defense Production Act (DPA) directing a company to prioritize certain activities, the company may disregard any state regulations or court orders that stand in its way.  That is not the law.  The DPA allows the federal government to direct a company to prioritize fulfilling some contracts over others, and immunizes such companies from claims for breach of contract.  But nothing in the DPA permits a federal official to order a company to act in defiance of generally applicable state laws—be they traffic laws, property laws, wage-and-hour laws, or safety and environmental regulations.  This Court should preliminarily enjoin recent action by the federal government that rests on its gravely mistaken understanding of the DPA and restore California's authority to enforce critical health and safety regulations applicable to a pipeline carrying hazardous liquids.

Under the purported authority of Title I of the DPA, 50 U.S.C. § 4501 et seq., Secretary of Energy Chris Wright issued a Secretarial Order last month targeting an onshore crude oil pipeline that had been dormant since its failure resulted in the catastrophic Refugio Oil Spill in Santa Barbara County in 2015.  *See Pipeline Capacity Prioritization and Allocation Order*, RJN, Exh. 1 [91 Fed. Reg. ___ (Mar. 13, 2026)] (the Wright Order).  The Wright Order directs a private company, Sable Offshore Corporation, to "immediately prioritize and allocate pipeline transportation services for hydrocarbons."  The federal government views this order as "directing the pipeline's owner to immediately resume the transport of oil through the pipeline."[1]  So does Sable, which had written Secretary Wright to request the order as part of a broader campaign to short-circuit state environmental protection requirements.  Sable relied on the order to immediately restart the flow of oil notwithstanding several State permits and approvals it had requested but not

---

[1] Statement of Interest of the United States, *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 26-cv-02946 (C.D. Cal. Apr. 23, 2026), Dkt. 38 at 1.

yet received.  Sable's action violated a federal court's consent decree, California law, and the State's property rights in Gaviota State Park (which part of the pipeline traverses)—violations being litigated in other pending cases against Sable.[2]

But in issuing the Wright Order, Defendants themselves violated the DPA, related regulations, the Administrative Procedure Act (APA), and the Constitution. Those violations are the subject of this lawsuit against Secretary Wright and the Department of Energy, and of this motion for a stay of the Wright Order and a preliminary injunction prohibiting the Secretary (and anyone operating as his agent or working in concert) from relying on the Wright Order and DPA to authorize or compel Sable's operation of the pipelines without having received necessary state-law approvals and without satisfying the terms of court orders.

The State has a strong likelihood of success on the merits of its claims that the Wright Order is unlawful.  Although the Wright Order purports to proceed under Sections 101(a) and (c) of the DPA, it exceeds the Secretary's authority under each. Under those provisions, the federal government may order a private actor to "prioritiz[e]" certain contracts over others and to honor a particular "allocat[ion]" of material and services among competing needs.  As interpreted by the federal government, the Wright Order does neither—nor does it include the findings that Section 101(a) orders require under Section 101(b).  The Wright Order is also unlawful because it violates the Secretary's own regulations governing DPA orders, which require specific prioritization procedures, categorizations, and findings that are absent here.  Beyond that, the Secretary ignored important factors—including the many detrimental effects of preempting state law and ordering violations of court orders—rendering the order arbitrary and capricious.  And if the DPA did

---

[2] *See, e.g., United States v. Plains All Am. Pipeline*, No. 2:20-cv-02415 (C.D. Cal., March 13, 2020); *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 2:26-cv-02946 (C.D. Cal., March 19, 2026); *Envt'l Def. Ctr., et al. v. Pipeline & Hazardous Materials Safety Admin., et al.*, No. 25-8059 (9th Cir., Dec. 24, 2025); *Ctr. for Biological Diversity, et al., v. Cal. Dep't of Forestry & Fire Protection, et al.*, No. 25CV02244 (Santa Barbara Sup. Ct., July 29, 2025).

2

allow a cabinet secretary to override state laws, state property rights, and court orders with the stroke of the Secretary's pen, it would be unconstitutional.

Given those violations of law, the equitable factors support a preliminary injunction and stay. The ongoing operation of the pipeline causes irreparable harm to California's sovereign and property interests, as well as to its environment and public safety—and the equities and public interest tilt strongly in favor of forcing the Secretary to respect statutory and constitutional limitations on executive action under the DPA.

## STATEMENT OF FACTS

Lines CA-324 and CA-325, which are located entirely onshore and within California, run along the Santa Barbara County coastline and inland to Kern County. *See* Consent Decree, RJN, Exh. 2 at 9-10, App. A. They transport treated petroleum products after they have been processed at the onshore Las Flores Canyon Processing Facility. *See* PHMSA Failure Investigation Report, RJN, Exh. 3 at 3. That facility receives a mix of crude oil and other hazardous liquids via separate undersea pipelines running to three drilling platforms off the Santa Barbara Coast, known as the Santa Ynez Unit. *See id.* at 4-5.

The undersea pipelines and onshore processing facility and pipelines, including Lines CA-324/325, are under the regulatory authority of several California agencies. *See infra* p. 20-21. Additionally, the undersea pipelines and Lines CA-324/325 cross land owned by the State of California, including tidelands, overseen by the California State Lands Commission, and Gaviota State Park, managed by the California Department of Parks and Recreation (State Parks). Bellman Decl., ¶ 3; CSLC Presentation, RJN, Exh. 4 at 1, 9.

I.   **THE REFUGIO OIL SPILL AND RESULTING CONSENT DECREE, AND SABLE'S ACQUISITION OF THE PIPELINES SUBJECT TO THE CONSENT DECREE'S TERMS**

In May 2015, Line CA-324 ruptured, releasing over 120,000 gallons of heavy crude oil along the Santa Barbara coast at Refugio State Beach. Final Damage

3

Assessment, RJN, Exh. 5 at 4. This catastrophic spill caused widespread damage to California's beaches and other natural resources and impeded commercial and recreational activities in coastal areas across Southern California. *Id*. Afterwards, Lines CA-324/325 were shut down by the companies who owned and operated the Pipelines at that time: Plains All American Pipeline, L.P. and Plains Pipeline, L.P. (together, Plains). An investigation conducted by the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) concluded that the cause of failure was external corrosion that thinned the pipe wall to a level where it ruptured and released oil. PHMSA Failure Investigation Report, RJN, Exh. 3 at 3.

After the Refugio Oil Spill, the United States and various California state agencies filed suit against Plains over the harms from the oil spill. *United States, et al., v. Plains All Am. Pipeline, L.P., et al*., No. 2:20-cv-02415 (C.D. Cal.). Based on the parties' agreement, the matter was resolved by the Court's entry of a consent decree in October 2020. *See* Consent Decree Order (Oct. 14, 2020), RJN, Exh. 6.

The Consent Decree assigns sole authority to approve a restart plan for Lines CA-324/325 to California's Office of the State Fire Marshal (OSFM). Consent Decree, RJN, Exh. 2 at App. D. It also provides that Line CA-324 can only be restarted if Plains first receives a State Waiver from OSFM to use anti-corrosion measures that differ from federally required technology. *Id.*, App. B. The Consent Decree's requirements are "binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree." *Id.* at ¶ 4.

In 2024, Sable acquired Lines CA-324/325, the offshore platforms, and the Las Flores Canyon Processing Facility. Assumption Agreement, RJN, Exh. 7 at Exh. E. In the acquisition of these lines, Sable agreed to be bound by the Consent Decree. *Id.*

/ / /

4

### A.  Sable's Initial Attempts To Restart the Pipelines

Shortly after acquiring the lines, Sable sought state permits and approvals necessary to restart transporting crude oil through the Pipelines for the first time in nearly a decade.  The Santa Barbara County Superior Court issued a preliminary injunction enjoining Sable from restarting the Pipelines "until 10 court days following the filing and service of notice . . . that Sable has received all necessary approvals and permits . . . and that Sable intends to commence such restart."  Order Re: Preliminary Injunction and Undertaking, *Ctr. for Biological Diversity, et al., v. Cal. Dep't of Forestry and Fire Prot., et al*., No. 25CV02244 (Santa Barbara Sup. Ct., July 29, 2025), RJN, Exh. 8 at Exh. A; *see also* Minute Order (Apr. 17, 2026), RJN, Exh. 9 at 1.  And in October 2025, OSFM responded to Sable's restart plan, by informing Sable that it had identified a requirement of the State Waivers that had not yet been met.  OSFM Letter to Sable (Oct. 22, 2025), RJN, Exh. 10.

In response, Sable began a campaign to circumvent state regulators altogether. At Sable's urging, in December 2025, PHMSA issued an order redesignating Lines CA-324/325 as interstate pipelines subject to federal regulation—a reversal of its longstanding position that the Pipelines are intrastate pipelines that fall under OSFM's regulatory authority.  *See* Federalization Order, RJN, Exh. 11.[3]  In February 2026, Sable confirmed that it was abandoning its State Waivers based on PHMSA's Federalization Order.  Second Supp. Decl. of Jeffrey D. Dintzer, RJN, Exh. 12 at ¶ 4.

### B.  The DPA-Related Orders, and Sable's Restarting of Oil Flow

While Sable was seeking to have PHMSA displace state regulation, it was also proceeding on another front.  In December 2025, Sable requested that the U.S. Department of Energy (DOE) authorize Sable to restart Lines CA-324/325 by invoking the DPA.  *See* Preemptive Effect of Defense Production Act Order on

---

[3] Challenges to that order are pending.  *See California v. PHMSA*, No. 26-508 (9th Cir.); *Envt'l Def. Ctr. v. PHMSA*, No. 25-8059 (9th Cir.).

State Law, 50 Op. O.L.C. __, (Mar. 3, 2026) (OLC Slip Opinion, RJN, Exh. 13 at 3). DOE turned to the United States Department of Justice's Office of Legal Counsel (OLC) for an opinion that could justify a DPA order directing Sable to proceed in violation of the Consent Decree and state requirements. *Id.* at 1. In response, OLC opined that if the Secretary issued a DPA order to Sable, that order "could preempt state law either expressly or by conflict" and might "displace certain provisions of the Consent Decree . . . including those vesting authority over resumption of transportation [of oil through Lines CA-324/325] with [OSFM]." *Id.* at 22.

On March 13, 2026, President Trump issued an Executive Order titled *Adjusting Certain Delegations Under the Defense Production Act* (Delegations EO). RJN, Exh. 14. The Delegations EO amended the March 2012 Executive Order 13603, titled *National Defense Resources Preparedness*, by adding the Secretary of Energy to a list of Executive department and agency heads with DPA authority. *Id.*

DOE issued the Wright Order the same day, claiming authority pursuant to Sections 101(a) and (c) of the DPA, related regulations, and EO 13603. Wright Order, RJN, Exh. 1 at 1. The Wright Order instructs Sable to immediately (1) "prioritize and allocate pipeline transportation services" for oil produced at the Santa Ynez Unit; (2) "commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought," for oil transportation through Lines CA-324/325; and (3) "comply with this order" until otherwise directed by DOE. *Id.* at 3. The Wright Order mentions Sable's dissatisfaction with California laws and regulations, including the Consent Decree, "block[ing] pipeline operations." *Id.* at 2. However, the Wright Order did not include statutory findings required by sections 101(a) and (b) of the DPA, nor did it contain numerous elements required by the DOE regulations governing various types of DPA orders. *See infra* pp. 10-11, 15-18. DOE's press release

characterized the Wright Order as requiring Sable to immediately "Restore the Santa Ynez Unit and Pipeline."  DOE Press Release (Mar. 13, 2026), RJN, Exh. 15.

On March 14—the day after the Wright Order—Sable began sending oil through the Pipelines.  Sable Press Release (Mar. 16, 2026), RJN, Exh. 16.  According to Sable, it had "immediately complied" with the Wright Order and restarted Lines CA-324/325 "at the direction of the United States Secretary of Energy."  *Id*.

California filed this suit, contending that the Wright Order should be set aside under the APA and declared unconstitutional, and that Secretary Wright, DOE, and anyone acting in concert be enjoined from relying on the Wright Order to operate Lines CA-324/325.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The likelihood of success on the merits is the "most important factor in the preliminary injunction analysis" and is "all the more critical when a plaintiff alleges a constitutional violation and injury."  *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (quotation marks omitted).  That is because "the deprivation of constitutional rights unquestionably constitutes irreparable injury."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted).

Under the APA, "[a] reviewing court shall 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]'"  *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 991 (9th Cir. 2025) (quoting 5 U.S.C. § 706(2)(A)).  A court may, pending the conclusion of judicial review, issue a stay of

an agency action "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id*. at 986 (quoting 5 U.S.C. § 705).

## ARGUMENT

### I.   CALIFORNIA IS LIKELY TO SUCCEED ON THE MERITS.

California has a strong likelihood of showing that the Wright Order should be set aside under the APA and deemed unconstitutional.[4]

### A.   The Wright Order Exceeds the DPA's Grant of Authority.

The Wright Order claims authority under sections 101(a) and (c) of the DPA, 50 U.S.C. § 4511(a), (c).  But it clearly exceeds the powers granted to the Secretary by those provisions.  Congress envisioned these provisions as means by which orders for military or national security purposes would "gain[] precedence over civilian production," *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 981 (5th Cir. 1976), by prioritizing certain contracts over other contracts.  The Wright Order is interpreted by Defendants to do something quite different.  It does not, for example, prioritize the production of oil over other activities Sable may want to pursue, nor does it prioritize sales of oil to some purchasers over others.  Rather, as interpreted and applied by the federal government, it directs and authorizes Sable to operate its pipelines without regard to contrary law or court orders.  Because nothing in the DPA grants the Executive that sweeping preemptive power, the Wright Order should be set aside.  *See* 5 U.S.C. § 706(2)(A), (C) (court should set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations").

**Section 101(a).**  Section 101(a) is not a blank check for the Executive to do

---

[4] The Wright Order is a final agency action under 5 U.S.C. § 551, because it "'marks' the 'consummation' of the agency's decisionmaking process'" and purports to "result[] in 'rights and obligations being determined.'" *Biden v. Texas*, 597 U.S. 785, 788 (2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (alterations omitted)).  Indeed, the federal government and Sable view the Wright Order as giving Sable the right and obligation to begin pumping oil through pipelines that were previously legally closed, and as displacing many of California's rights and Sable's obligations that would otherwise exist under court decrees and state and federal law.

whatever it wants.  Instead, it serves a specific purpose.  "The language of section 101(a) makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense."  *Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994), *aff'd on other grounds*, 516 U.S. 417 (1996).  "Indeed, section 101 is titled 'Priority in contracts and orders.'"  *Id.*  It requires that that the contracts designated by the government be given "priority over the performance of any other contract or order."  *United States v. Vertac Chemical Corp.*, 46 F.3d 803, 806 (8th Cir. 1995).

Section 101(a)(1) allows the President or his delegee to "require that performance under contracts or orders . . . which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order," and "for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders."  50 U.S.C. § 4511(a)(1).  The twice-repeated word "priority"—and the phrase "in preference to other contracts or orders"—makes plain what is meant: If an entity has multiple contracts or orders, section 101(a) allows the federal government to determine which should be fulfilled or accepted before others—for instance, by ordering Sable to fulfill orders for military suppliers before civilian suppliers.  *See* Priority, Merriam-Webster, ("superiority in rank, position, or privilege" or "legal precedence in exercise of rights over the same subject matter").[5]

Thus, "in complying with DPA section 101(a) a contractor may have to *re-prioritize its outstanding contracts* in order to give the required preference to a compelled DPA contract."  *Hercules*, 24 F.3d at 204.  That is an important power,

---

[5] *See* Webster's New Collegiate Dictionary (7th ed. 1963) (same), https://tinyurl.com/ynfcmuuh; *see also* Preference, Merriam-Webster, https://www.merriam-webster.com/dictionary/preference ("priority in the right to demand and receive satisfaction of an obligation"); Webster's New Collegiate Dictionary (7th ed. 1963) (same), https://tinyurl.com/3ddbjpdd.

9

since the national defense may sometimes require prioritizing defense consumption above non-defense consumption, notwithstanding existing private contracts. *See, e.g.*, *Kearney & Trecker Corp. v. United States*, 231 Ct. Cl. 571, 573-574 (1982) (DPA order required manufacturer to divert product to defense use, making company miss existing customer's contractual delivery date). The Wright Order thus contains language requiring Sable to grant "priority" for transport of certain hydrocarbons over others. Wright Order, RJN, Exh. 1 at 3. But granting "priority" to one thing over another is not what DOE says the Wright Order does. Instead, DOE purports to order Sable, under the Wright Order, to transport oil when it otherwise would have fulfilled *no contracts at all* because of prohibitions under court orders and state law. Sable is "directed to accept and perform such contracts" not in priority to other contracts, but as an absolute matter. *Id.*

Section 101(a)(2) similarly states that the President or his delegee may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). That is a similar power to "*apportion* for a specific purpose or to particular persons or things," Allocate, Merriam-Webster, https://www.merriam-webster.com/dictionary/allocate (emphasis added)—that is, to "divide and share out according to a plan," Apportion, Merriam-Webster, https://www.merriam-webster.com/dictionary/apportion; *see also* 50 U.S.C. § 4502(a)(3)(D) (congressional policy recognizing that defense preparedness sometimes requires "the diversion of certain materials and facilities *from ordinary use* to national defense purposes" (emphasis added)). This too is a power to decide how available resources should be *divided* between multiple potential counterparties—something that the Wright Order does not do.

Orders issued under section 101(a) also require adherence to section 101(b), which governs the "use[]" of all "powers granted in [section 101]." *Id.* § 4511(b). Accordingly, section 101(a) cannot be used to "control the general distribution of

10

any material in the civilian market" unless the President (or his delegee) finds that (1) the material is "a scarce and critical material essential to the national defense" and (2) "the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." 50 U.S.C. § 4511(b). The Wright Order is an order to "control the general distribution in the civilian market," *id.*, because it directs Sable to transport crude oil through Lines CA-324/325 "to market on mainland California." Wright Order, RJN, Exh. 1 at 2. But the Wright Order does not contain the section 101(b) findings that Congress required. (The order states that certain "materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation and maintenance or expansion of exploration." Wright Order, RJN, Exh. 1 at 3. But those are findings required to exercise authority under 101(c), 50 U.S.C. § 4511(c)(2), and do not substitute for section 101(b)'s required findings that the materials are "essential to the national defense," and that the "requirements of the national defense . . . cannot otherwise be met without creating a significant dislocation for the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship.") The Wright Order thus violates Congress's explicit command and is invalid under section 101(a).

**Section 101(c).** Section 101(c) allows the President or his delegee to "require the *allocation of*, or the *priority performance under contracts or orders . . .* relating to[] materials, equipment, and services in order to maximize domestic energy supplies" upon making certain required findings. 50 U.S.C. § 4511(c) (emphasis added). As with section 101(a), the key concepts are *priority* and *allocation*–which envision satisfying certain uses above others—not authorizing activity which otherwise would not be permitted at all. And *all* of "Section 101 is titled 'Priority in contracts and orders.'" *Hercules*, 24 F.3d at 203. For the same

reasons that the Wright Order is not a valid prioritization and allocation order under section 101(a), it is not a lawful order under section 101(c).

### B. Defendants' Use of the Wright Order To Conscript State Land for Federal Use and Encourage Violations of Federal Court Orders Is Contrary to the DPA and Unconstitutional.

Based on the OLC Opinion, DOE apparently contends that section 101 of the DPA authorizes federal agencies to issue orders that broadly preempt state laws and authorize violations of court orders.  That is incorrect.

Another provision of the DPA contains express language preempting *antitrust* laws.  50 U.S.C. § 4558(j).  But nothing in the DPA references preemption of state laws pertaining to safety, environmental protection, or property rights over state-owned (or any other) land.  And Title III allows the government to use congressional funds to make loans and investments in several sectors (including energy) "without regard to the limitations of existing law."  50 U.S.C. § 4533(b).  But section 101, in Title I, has no such language.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted).  This principle applies to provisions enacted together or provisions enacted separately but addressing related statutory schemes. *See United States v. Youssef*, 547 F.3d 1090, 1095 (9th Cir. 2008).  The inclusion of preemptive language in some parts of the DPA but not this one is telling: Congress intended no general preemptive authority for DPA orders.  At most, when the DPA is used to require companies to prioritize some contracts over others, that implies preemption of the state *contract* laws that would ordinarily govern *competing contractual claims*.  But such a possibility is not at issue here:  The Wright Order does not instruct Sable on how to choose among competing contracts, as explained above.  Rather, DOE asserts that the Wright Order compels Sable to choose production activities over state laws and court orders that prohibit

those activities.

The limitless preemption asserted by DOE is not supported by the DPA's section 707, 50 U.S.C. § 4557. That provision states that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." But that immunity is tied to Congress's enactment of the DPA as a means to reprioritize competing contracts. "[T]he protection provided by DPA section 707 extends only to shield a contractor from *breach of contract* liability arising as a consequence of such re-prioritization," and goes no further. *Hercules*, 24 F.3d at 204 (emphasis added); *see Vertac*, 46 F.3d at 811-12 (similar). As *Hercules* explained, "the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed." *Id.* (collecting cases).

Although the March 2026 OLC opinion asserts that section 707 immunity preempts *all* state law that might frustrate performance under a DPA order, it fails to address the contrary holding in *Hercules*. OLC Slip Opinion, RJN, Exh. 13 at 11-12. And it marks a dramatic change from the federal government's longstanding disavowal of DPA interpretations that "would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." *Vertac*, 46 F.3d at 812; *see also, e.g.*, *Hercules Inc. v. United States*, 516 U.S. 417, 430 n.14 (1996) (noting United States' position that § 707 "only bar[s] liability to customers whose orders are delayed or displaced on account of the priority accorded Government orders under § 101 of the DPA").

Nor can the DPA be reasonably read as authorizing the Executive Branch to flout federal judicial orders. Certainly nothing in the *text* of the DPA hints at such a

power.  For Congress to grant such a power would be extraordinary—and for the Executive to exercise it would be unconstitutional.  *See Miller v. French*, 530 U.S. 327, 343 (2000) ("Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch.").  At most, Congress can alter the factors relevant to continuing relief, in ways that permit a party to request that *the court* modify an existing injunction.  *See id.* at 331 (discussing provision under Prison Litigation Reform Act, under which a defendant's motion to terminate prospective relief operated as an automatic stay until the court made certain findings).  Defendants, in contrast, believe that the Wright Order operates as a self-executing abridgment of this Court's consent decree, with no need to go to the Court at all.  No statutory language even hints at such an intent, and courts "'must of course avoid' reading [a] statute 'in a manner that would render it clearly unconstitutional' when 'there is another reasonable interpretation available.'"  *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 776 (2025).

The doctrine of constitutional avoidance similarly counsels against Defendants' belief that the statute authorizes the Secretary to simply order Sable to trespass on state-owned land by using the pipelines to transit oil through the park when the relevant easement expired years ago.  *See* Bellman Decl. ¶¶ 3-9.  The California agency that owns Gaviota State Park has brought a trespass action against Sable in a separate case, which Sable removed to this Court.  *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.,* No. 2:26-cv-02946 (C.D. Cal., March 19, 2026).  For purposes of this challenge to the Wright Order itself, it suffices to note that the Constitution's structural federalism principles, as well as the Tenth Amendment, forbid Congress from commandeering state resources to federal ends.  *See New York v. United States*, 505 U.S. 144, 175 (1992) (invalidating federal statute that offered States choice between accepting ownership of nuclear waste and regulating according to federal instructions).  Even if there were congressional permission, it would be unconstitutional to deploy the DPA to force States to

dedicate state land to the federal government's ends. But there is no indication that Congress intended that unconstitutional result—and the serious constitutional concerns that would arise from such a reading weigh heavily in favor of rejecting it.

Finally, there is no "conflict preemption" here of the sort that occurs "'where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) (citation omitted). As described above, Congress's intent was to limit the commercial law principles that apply where there are competing contracts—not to create a state-law-free zone more broadly. And the first conflict to be resolved is the conflict between the Wright Order and the statutory requirements imposed by Congress, which respect rather than displace state law beyond questions of breach of contract. *See supra* pp. 8-11.

**C. The Wright Order Violates the Department's Own Regulations.**

The Wright Order is also invalid for failing to comply with DOE's own regulations. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) ("[h]aving chosen to promulgate the . . . Policy, the [agency] must follow that policy").

**Regulations Related to 101(a):** DOE's regulations pertaining to 101(a) describe various types of orders that the Secretary may issue under the DPA, including "allocation" orders and "rated" orders. 10 C.F.R. § 217.20. The regulations impose specific requirements on the content for each type of order. The Wright Order does not satisfy either set of requirements.

Allocation orders are defined as "official action[s] to control the distribution of materials, services, or facilities." *Id*. § 217.20. They must include "a detailed description of each required allocation action," "the specific start and end calendar dates for each required allocation action," a statement that it is an allocation order certified for national defense use, and a current copy of the regulations. 10 C.F.R.

15

§ 217.54.  The Wright Order fails to meet these requirements because it does not contain a statement certifying that it is an allocation order, does not contain specific start and end dates, and does not contain "a detailed description of each required allocation action."  And because the Wright Order seeks to "control the general distribution of a material in the civilian market," section 217.52 required the Secretary to submit to the President in writing the findings set forth in section 101(b)—which Defendants failed to do.

Rated orders are defined as a "prime contract, a subcontract, or a purchase order in support of an approved program issued in accordance with the provisions of this part."  10 C.F.R. § 217.20.  A rated order must assign one of three priority levels: "DX" rated orders are prioritized over "DO" rated orders, which are prioritized over "unrated" orders.  *Id.* § 217.31(a).  Additionally, rated orders must include a program identification symbol denoting which currently approved program the order supports, the required delivery date for the order, and a statement that it is a rated order certified for national defense use.  *Id.* §§ 217.31(b), 217.32.  The words "immediately" or "as soon as possible" are insufficient to satisfy the regulation's requirement of a required delivery date.  *Id.* § 217.32(b).  The Wright Order does not meet these requirements because it does not assign a priority rating, and does not contain the program identification symbol, required delivery date, or statement that it is a rated order.

**Regulations related to 101(c):**  These regulations require DOE to consider numerous factors related to a proposed energy project—including: (1) the quantity of energy involved, (2) the benefits of timely energy program furtherance or project completion, (3) socioeconomic impact, (4) the need for the end product for which the materials are allegedly required, (5) established national energy policies, (6) the availability and utility of substitute materials, and (7) the impact of the nonavailability of the specific materials on the furtherance or timely completion of the approved energy program or project—prior to issuing an order under section

16

101(c).  10 C.F.R. § 216.4.  There is no indication that DOE considered any of the required factors.

Because the Wright Order fails to comply with DOE's regulations, it should be set aside.  *See Nat'l Med. Enter. v. Bowen*, 851 F.2d 291, 293 (9th Cir. 1988) ("[a] regulation has the force of law; therefore, an agency's interpretation of a statute in a manner inconsistent with a regulation will not be enforced") (citing 5 U.S.C. § 706(2)(A)).

**D.  The Wright Order Is Arbitrary and Capricious.**

The Wright Order should also be set aside as arbitrary and capricious.  An agency action is "arbitrary and capricious" where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

As an exercise of power under section 101(c), the Wright Order must rest on findings that Sable's crude oil and pipelines are "scarce, critical, and essential (i) to maintain or expand exploration, production, refining, transportation; (ii) to conserve energy supplies; or (iii) to construct or maintain energy facilities," and that "maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities" cannot otherwise be reasonably accomplished.  50 U.S.C. § 4511(c)(2).

The Wright Order recites those findings (unlike the findings required to invoke section 101(a), *see supra* pp. 10-11).  But there is no evidence that Defendants in fact "considered the relevant factors and articulated a rational connection between the facts found and the choices made."  *NRDC v. U.S. Dep't of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997).  For instance, the Wright Order does not explain how and why Sable's crude oil and pipelines specifically are "scarce,

17

critical, and essential," or why the order is necessary to reasonably accomplish "maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities." 50 U.S.C. § 4511(c)(2). It also does not address the factors DOE is required to consider under its own regulations prior to issuing an order under 101(c). *See* 10 C.F.R. § 216.1. Finally, the Wright Order makes no reference to any consideration of actual data; it simply cites to the unsupported claims made in Executive Order 14156 and Sable's letter. Wright Order, RJN, Exh. 1 at 1-2. These are plainly not the types of sources Congress intended for consideration before exercising DPA power—ipse dixit from the President himself and a self-interested party.

Moreover, the Wright Order "entirely failed to consider" "important aspect[s] of the problem," as the APA requires. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. It contains no examination of potential impacts on existing court orders, on the laws California has enacted under its sovereign power to protect its people and environment, or on California's rights as a landowner across whose property the oil would pass without an easement. *See infra* pp. 19-21. The availability of alternatives is also a relevant factor, under section 101(c)(2)'s requirement that "the maintenance [etc.] of energy supplies . . . cannot be accomplished without" a section 101(c) order. Yet the Wright Order's conclusory findings feature no analysis of alternatives.

## II. THE LIKELIHOOD OF IRREPARABLE HARM AND EQUITABLE FACTORS WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION.

The State faces irreparable harm, and the balance of equities and the public interest weigh in favor of immediate relief. *See Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024) (where the government is a party, the public interest and the balance of the equities factors "merge"); *Newsom v. Trump*, 811 F.Supp.3d 1086, 1115 (N.D. Cal. 2025) (merging public interest and balance of equities factors

where State sought preliminary injunction against federal government).

## A.  California Is Likely To Suffer Irreparable Harm.

DOE views the Wright Order as requiring Sable to immediately "[r]estore the Santa Ynez Unit and Pipeline," *see supra* p. 1, and absolutely immunizing Sable from liability for any ensuing harm.  The previous, catastrophic rupture of that pipeline caused immense environmental and economic damage, leading to substantial damages payments and to the federal Consent Decree's imposition of important safety requirements as preconditions for reopening.  *See* Consent Decree, RJN, Exh. 2 at 17-21, 23, App. B.  Defendants, however, treat the Wright Order as directing Sable to send oil through the pipeline now, without those requirements being met.   This constitutes irreparable harm—by violating the Constitution (*see supra* p. 12-15), and by forcing the State to bear the noncompliant pipeline's risks while immunizing Sable from the consequences, thus reducing Sable's incentive to invest in safe operations.  *See, e.g., Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) ("[i]mposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury"); *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014).  It also subjects California to the risk of harm to species protected under the California Endangered Species Act.  *See* Vance Decl., ¶¶ 3-12; *cf. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (irreparable harm for injunction under Endangered Species Act need not be based on "extinction-level threat").

Beyond that, "[i]ntangible injuries" may also establish irreparable harm.  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).  Under DOE's interpretation, the Wright Order divests the State of its regulatory authority.  *Supra* pp. 19-21; DOE Press Release (Mar. 13, 2026), RJN, Exh. 15.  The Wright Order explicitly noted Sable's dissatisfaction that California laws and regulations— as well as the federal judicial Consent Decree—had "block[ed]" use of its pipeline

for the time being, while Sable continued to pursue necessary state agency approvals. Wright Order, Exh. 1 at 2. Allowing the Wright Order to have effect during this litigation would cause irreparable harm by preventing the State from exercising its lawful jurisdiction and regulatory powers. *See, e.g.*, *Kansas v. United States*, 249 F.3d 1213, 1223-24 (10th Cir. 2001) (finding irreparable harm requirement met and upholding preliminary injunction, where federal government's designation of Indian Land was depriving Kansas of jurisdiction to enforce gaming limitations). That is because "[i]nvasions of state sovereignty ... likely cannot be economically quantified, and thus cannot be monetarily redressed, and as such constitute irreparable harm." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (internal quotation marks omitted) (finding irreparable harm requirement met and upholding preliminary injunction in challenge to federal government action where "the States with conflicting laws will be hampered in their ability to enforce their laws"); *Alabama v. U.S. Sec'y of Educ.*, 2024 WL 3981994, at *7 (11th Cir. Aug. 22, 2024) (same); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

The state regulatory powers that DOE purports to displace effectuate essential protections for public health and the State's natural resources. They include the California Geologic Energy Management (CalGEM) Division's testing, inspection, and maintenance duties, Sharma Decl., ¶¶ 5-11, and the California Department of Fish and Wildlife's duties to protect threatened and endangered species, Vance Decl., ¶¶ 2-12, 15. Additionally, the Wright Order purports to displace State Parks's rights and obligations as a property owner. *See, e.g.*, Cal. Pub. Res. Code § 5012 (State Parks' duties prior to encumbering property); *id.* §

20

21002 (State Parks' obligations to conduct an environmental review so it can fully understand and plan for the impacts of granting Sable a 30-year easement to flow oil through Gaviota State Park, including any attendant maintenance).

### B. The Public Interest and Balance of Equities Favor California.

When a plaintiff establishes a likelihood that a defendant's actions are unlawful, it has "established that both the public interest and the balance of the equities favor" preliminary injunctive relief. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). That is because it is neither equitable nor in the public interest for the government to violate federal law. *Id.* And the public has a strong "interest [in ensuring] that the laws enacted by their representatives are not imperiled by executive fiat." *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (internal quotation marks and citations omitted). In contrast, defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), and there "is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

### CONCLUSION

The Court should stay the Wright Order and preliminarily enjoin Defendants, and all those acting in concert with Defendants, from enforcing or relying on it.

Dated:  May 1, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY M. BROWN
Supervising Deputy Attorney General
REBECCA HUNTER
STACY LAU
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

22

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief contains 6,982 words, which:

_X_ complies with the word limit of L.R. 11-6.1.

Dated:  May 1, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
REBECCA HUNTER
STACY LAU
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

Memorandum iso Motion for Preliminary Injunction & Stay – (Case No. 2:26-cv-3396-SVW-SSCx)