LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
MARGARET M. HALL (Bar No. 293699)
mhall@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622
*Attorneys for Environmental Defense Center,
Get Oil Out!, Santa Barbara County Action
Network, Sierra Club, and Santa Barbara
Channelkeeper*

JULIE TEEL SIMMONDS (Bar No. 208202)
jteelsimmonds@biologicaldiversity.org
EMILY JEFFERS (Bar No. 274222)
ejeffers@biologicaldiversity.org
TALIA NIMMER (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin Street, Suite 375
Oakland, CA 94612
Phone: (510) 844-7100
*Attorneys for Center for Biological
Diversity and Wishtoyo Foundation*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>and<br><br>ENVIRONNMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, SANTA BARBARA CHANNELKEEPER, | Case No.: 2:26-cv-03396-SVW-SSCx<br><br>**DECLARATION OF LINDA KROP IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE**<br><br>Hon. Stephen V. Wilson<br><br>Hearing: June 8, 2026<br><br>Time: 1:30 p.m.<br>Place: Courtroom 10A |

CENTER FOR BIOLOGICAL DIVERSITY, and WISHTOYO FOUNDATION,

     Proposed Plaintiffs-Intervenors,

     v.

CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,

                        Defendants.

I, Linda Krop, hereby declare the following:

## I.  INTRODUCTION

1.  I am over eighteen years of age. I have personal knowledge of the matters stated herein and, if called as a witness, could and would competently testify thereto.

2.  I am Chief Counsel for the Environmental Defense Center (EDC). My business address and phone number are 906 Garden Street, Santa Barbara, CA 93101, (805) 963-1622.

3.  I have been a member of the EDC since the 1980s, when I served as a law clerk, volunteer, and eventually a part-time employee. I was hired as a staff attorney at EDC in 1989, and promoted to Chief Counsel in 1999. I have served as Chief Counsel continuously since 1999.

4.  In my capacity as EDC Chief Counsel I have the primary responsibility for the proposed intervention of EDC's clients: EDC, Get Oil Out! (GOO!), Santa Barbara County Action Network (SBCAN), Sierra Club, and Santa Barbara Channelkeeper (SBCK), alongside attorneys at the Center for Biological Diversity (CBD) who represent CBD and Wishtoyo Foundation in this joint effort to intervene in the above-captioned case.  I have personal knowledge of the following facts and if called as a witness, could testify to these facts under oath.

## II.  BACKGROUND

5.  I am knowledgeable about the operations of the Santa Ynez Unit (SYU), which consists of the three offshore platforms Harmony, Heritage, and Hondo. Oil and gas are produced at the offshore platforms and transported by undersea pipelines to the onshore Las Flores Canyon Processing Facility. The oil and gas are separated and treated before the oil is transported 120 miles inland to Kern County by Lines CA-324/325 (the "Onshore Pipelines").

6.  EDC played a very active role after Line CA-324 ruptured in May 2015 (the "Refugio Oil Spill"), working to ensure community access to information; proper response, cleanup, and restoration; and advocacy to ensure more safeguards are taken

going forward. I personally was at Refugio State Beach Park on the first day of the oil spill, and continued to visit the Park frequently, as well as other areas impacted by the spill. I was deeply disturbed by the magnitude of the spill and the impacts to the beach, wildlife, habitats, and ocean.

7. The spill affected me in other ways as well. I was not able to go to the beach or kayak in the ocean. I talked with many recreationalists who were similarly affected, as well as many businesses (including fishing and tourism businesses) who suffered disruptions and losses. I have read and am familiar with the Final Damage Assessment and Restoration Plan/Environmental Assessment (the "Damage Assessment") prepared following the oil spill, which estimated that 140,000 recreational user days were lost between Santa Barbara and Ventura Counties. A true and correct copy of the Damage Assessment is attached hereto as **Exhibit A**.

8. After the spill, the defective pipelines were idled, and the SYU was forced to suspend production. PHMSA began to investigate the cause of the spill and, during that process, executed a Memorandum of Understanding (MOU) with the Office of the State Fire Marshal (OSFM). I have read and am familiar with the MOU, which recognized that the Onshore Pipelines were intrastate and safety oversight should be transferred from PHMSA to OSFM. A true and correct copy of the MOU is attached hereto as **Exhibit B**.

9. I am familiar with the Failure Investigation Report prepared by the Pipeline and Hazardous Materials Safety Administration (PHMSA) after the oil spill. I reviewed the information in the report, including the discussion regarding the cause of the spill, which was pervasive corrosion throughout the 120-mile pipeline. According to the report, the corrosion was caused by the defective design on the pipeline that prevented the existing corrosion prevention system, cathodic protection, from functioning effectively. A true and correct copy of the Failure Investigation Report is attached hereto as **Exhibit C**.

10. I have read and am familiar with the terms of the 2020 Consent Decree (the "Consent Decree") signed by Plains All American Pipeline Company (Plains) (the owner of the Onshore Pipelines at the time) that resolved the ongoing litigation in *U.S. v. Plains*

*All American Pipeline*, Case No. 2:20-cv-02415 (March 13, 2020). The Consent Decree established the terms for any future restart of the Onshore Pipelines and charged the Office of the State Fire Marshal (OSFM) with sole regulatory oversight. A true and correct copy of the Consent Decree is attached hereto as **Exhibit D**.

11.     EDC has continued to monitor the situation regarding efforts to resume production from the SYU. We commented on Plains' proposal to construct a new pipeline to replace the corroded Onshore Pipelines.

12.     Following Sable Offshore Corp.'s ("Sable") acquisition of the SYU, EDC represented organizations in opposition to Sable's proposal to restart the damaged Onshore Pipelines.

**III.    ENGAGEMENT WITH DECISION-MAKING PROCESS**

13.     EDC and its clients have consistently engaged with the decision-making process related to the restart of the Onshore Pipelines, which has led to the litigation in the above-captioned case. During the decision-making process, EDC's interests and legal arguments did not always align with those of the State of California or its administrative agencies.

   *A.     OSFM*

14.     After it became clear that Sable was seeking a State Waiver from OSFM so it could operate the Onshore Pipelines without an effective cathodic protection system, GOO! and SBCAN hired EDC to represent them during OSFM's administrative process.

15.     On March 1, 2024, EDC and a coalition of environmental organizations sent a letter to OSFM requesting that OSFM provide more transparency and public engagement in evaluating the safety of restarting the Onshore Pipelines. Further, the letter expressed our concerns regarding the risks of restarting the Onshore Pipelines and our opinion that the Onshore Pipelines should be decommissioned.

16.     On September 10, 2024, EDC and a coalition of environmental organizations sent another letter to OSFM renewing our request that OSFM provide for

3

more transparency and public engagement in evaluating the safety of restarting the Onshore Pipelines.

17. On September 27, 2024, EDC sent a letter to OSFM on behalf of itself, GOO!, and SBCAN requesting environmental review and a public process. Additionally, the letter expressed our concern that the Onshore Pipelines cannot be safely restarted.

18. After we learned that OSFM had issued State Waivers to Sable for the operation of the Onshore Pipelines despite our concerns and providing no formal public process, EDC and CBD submitted a letter to PHMSA and OSFM on December 23, 2024, requesting that PHMSA object to the issuance of the State Waiver.

19. On April 15, 2025, EDC initiated a lawsuit in Santa Barbara County Superior Court against OSFM on behalf of itself, GOO!, SBCAN, Sierra Club, and SBCK. The lawsuit sought a writ of mandate directing OSFM to set aside and vacate its approval of the State Waivers, and injunctive relief to prevent the restart of the Onshore Pipelines pursuant to the State Waivers.

20. On July 18, 2025, Superior Court Judge Donna D. Geck issued an injunction prohibiting Sable from restarting the Onshore Pipelines until 10 court days after Sable has received all the approvals and permits necessary to restart the pipelines under the terms of the Consent Decree. That injunction remains in effect to this day.

### B. State Parks

21. EDC and its clients urged the California Department of Parks and Recreation ("State Parks") not to allow Sable to repair or operate Line 325 within Gaviota State Park. EDC argued that State Parks should not take action without first providing public and environmental review.

22. On April 2, 2025, EDC and a coalition of environmental organizations sent a letter to State Parks urging State Parks to enforce its requirement that Sable obtain a new easement (including for repairs) and conduct environmental review before deciding whether to approve such an easement. Further, we urged State Parks to seek injunctive relief to prevent Sable from repairing or restarting the pipeline before State Parks

4

completed its public and environmental review because we believed that, based on Sable's track record of violating State directives, Sable may choose to act before State Park's gave the company permission to do so.

23.    On May 8, 2025, I learned that State Parks had approved a Right of Entry (ROE) for Sable, using an exemption to avoid conducting environmental review. The ROE permitted the company to conduct repairs, including eighteen anomaly excavation digs, within Gaviota State Park. Before EDC could challenge the ROE, the repairs were completed.

24.    On July 26, 2025, EDC sent a letter to State Parks on behalf of itself, GOO!, SBCAN, Sierra Club, and SBCK, explaining that State Parks must conduct environmental review before deciding whether to approve an easement for Sable to operate Line 325 through Gaviota State Park.

25.    On August 14, 2025, EDC sent a letter to State Parks on behalf of itself, GOO!, SBCAN, Sierra Club, and SBCK, informing State Parks that Sable had violated the express terms and conditions of the ROE, and urging State Parks to consider this information when deciding whether to issue an easement for Sable's operation of Line 325 through Gaviota State Park.

26.    On October 15, 2025, EDC sent a letter to State Parks on behalf of itself, GOO!, SBCAN, Sierra Club, and SBCK, responding to Sable's application for an easement through Gaviota State Park and urging State Parks to conduct environmental review before considering whether to approve the application.

27.    On or about March 14, 2026, I learned that after learning that Sable intended to restart the Onshore Pipelines in reliance on an order issued by Energy Secretary Wright, State Parks denied Sable's application for an easement and directed Sable to remove the pipelines within Gaviota State Park.

### C.    California Coastal Commission

28.    EDC and its clients worked for many months to demand that the California Coastal Commission (CCC) enforce the requirement for a coastal development permit

(CDP) related to repairs of the Onshore Pipelines within the state's coastal zone. EDC supported the CCC's issuance of Notices of Violations, adoption of Cease-and-Desist Orders, and imposition of administrative penalties against Sable, including a $18 million dollar fine. In May 2025, the CCC obtained an injunction in state court preventing Sable from conducting further unpermitted repairs in the Coastal Zone.

29.     EDC also asked the CCC to require Sable to apply for and obtain a CDP before restarting the pipelines. We sponsored a state bill, SB 237, to clarify this requirement. SB 237 was enacted into law and went into effect on January 1, 2026. EDC and our clients have since advocated for enforcement of this law.

### D.     County of Santa Barbara

30.     EDC advocated for the County of Santa Barbara to deny Sable's request for the transfer of ExxonMobil's permits to Sable. The County Board of Supervisors denied Sable's application on December 16, 2026.

### E.     PHMSA

31.     EDC and its clients also challenged PHMSA's actions approving an Emergency Special Permit and Restart Plan for Sable after PHMSA claimed that it had exclusive jurisdiction over the Onshore Pipelines.

32.     On or about October 22, 2025, I learned that OSFM had sent a letter to Sable declining to approve its Restart Plan, stating that before Sable could restart the Onshore Pipelines under the State Waivers, Sable would need to repair various metal loss anomalies detected along the pipelines.

33.     On or about December 1, 2025, I learned that Sable had formally requested that PHMSA assume jurisdiction over the Onshore Pipelines by redesignating them as interstate pipelines. I learned on December 17, 2025, that PHMSA had decided that the Onshore Pipelines were interstate and had notified OSFM that it would be assuming jurisdiction over the Onshore Pipelines.

34.     I learned on December 22, 2025, that PHMSA had approved Sable's Restart Plan and learned on December 23, 2025, that PHMSA had issued an Emergency Special

Permit to Sable purporting to waive the requirement that the Onshore Pipelines have effective cathodic protection.

35.    In response to the issuance of these approvals by PHMSA on an emergency basis, on December 24, 2025, EDC, GOO!, SBCAN, Sierra Club, SBCK, CBD, and Wishtoyo Foundation petitioned the Ninth Circuit Court of Appeals for review of PHMSA's approvals. This legal challenge is ongoing and was consolidated with a similar challenge from the State of California.

36.    On April 3, 2026, EDC and a coalition of environmental organizations submitted a letter to PHMSA in response to the agency's request for public comment on whether it should issue a long-term Special Permit to Sable for the operation of its Onshore Pipelines. The letter urged that PHMSA reject Sable's application for a Special Permit and prepare an Environmental Impact Statement before making a decision regarding its application for a Special Permit. In support of that process, EDC retained an expert biologist, Lawrence Hunt, who evaluated the risks and impacts of operating the Onshore Pipelines with respect to wildlife and their habitats, and attached the expert's report to the letter it submitted to PHMSA. A true and correct copy of that letter is attached hereto as **Exhibit E**.

**IV.    THE EFFECT OF ENERGY SECRETARY CHRIS WRIGHT'S ORDER ON EDC'S AND OUR CLIENTS' INTERESTS.**

37.    On or about March 13, 2026, I learned that Energy Secretary Chris Wright issued a "Pipeline Capacity Prioritization and Allocation Order" (the "Wright Order"). The Wright Order was allegedly issued in reliance on an Executive Order delivered on the same day that authorized certain delegations under the Defense Production Act of 1950 ("DPA").

38.    I learned that Sable commenced restart of the Onshore Pipelines on or about March 14, 2026, in reliance on the Wright Order. I learned this information from a press release issued by Sable on March 16, 2026.

39. Sable and its counsel have raised the Wright Order and its reliance on the DPA in administrative and judicial proceedings involving EDC and our clients. The validity of the Wright Order is now at issue in these matters, and Sable's operation in reliance on the Wright Order impairs EDC's and our clients' interests in protecting the environment and communities from the risk of another catastrophic oil spill and in enforcing important state environmental and safety protection laws.

40. First, Sable continues to violate the existing injunction in our case challenging OSFM's State Waivers, alleging – in part – that the Wright Order preempts the State's authority regarding operation of the Onshore Pipelines. (*Center for Biological Diversity, et al., v. California Department of Forestry and Fire Protection, et al.*, County of Santa Barbara Superior Court, Case No. 25CV02244.) Sable's reliance on the Wright Order impairs EDC's and our clients' ability to enforce State laws regulating pipeline safety as well as a State court order.

41. Second, following the issuance of the Wright Order, Sable raised preemption as an issue in litigation regarding the County's denial of its application for the transfer of permits from ExxonMobil to Sable. After the County denied the transfer in December 2025, Sable sued the County, and EDC successfully intervened on behalf of our clients. (*Sable Offshore Corp., et al., v. County of Santa Barbara, et al.*, C.D. Case No. 2:25-cv-04165.) On March 16, 2026, Sable filed an *Amended and Supplemental Verified Petition for Writ of Mandate and Complaint for Declaratory Relief and Damages*, alleging that the Energy Secretary's Order preempts the County's authority to deny the permit transfers. Sable's argument that the Wright Order preempts the County's authority could impair our EDC's and our clients' ability to enforce County regulations protecting public health, safety, and welfare.

42. Third, the Wright Order will likely be raised by Sable and PHMSA as defenses in our lawsuit challenging PHMSA's December 2025 approvals. (*Environmental Defense Center, et al., v. U.S. Department of Transportation, et al.*, 9th Cir. Case No. 25-8059.) As such, PHMSA's and Sable's ability to rely on the Wright

8

Order will impair EDC's and our clients' ability to enforce State laws regarding pipeline safety and environmental protection.

43.    Fourth, on or about March 14, 2026, Sable commenced operations of the Onshore Pipelines within Gaviota State Park in reliance on the Wright Order, despite State Parks' denial of its easement application. These operations impair EDC's and our clients' interests in protecting the Park from environmental harm and ensuring a transparent, public and environmental review process.

44.    Fifth, Sable commenced operations of the Onshore Pipelines without first obtaining a CDP from the Coastal Commission, as required by SB 237, the law that EDC sponsored. Again, Sable is relying on the Wright Order to ignore its obligations under the California Coastal Act. Sable's violation of SB 237 impairs EDC's ability to ensure protection of our coastal resources, prevention of another oil spill, and compliance with a state law that our organization helped enact.

45.    In addition to sponsoring SB 237, EDC previously advocated for transferring authority over the Onshore Pipelines from PHMSA to the State of California. EDC also supported the passage of three new state laws following the Refugio Oil Spill that strengthen state oversight of oil pipelines. Sable's actions in reliance on the Wright Order undermines these efforts and EDC's interest in protecting the environment from another oil spill.

46.    Sixth, the effect of the Wright Order is relevant to our opposition to Sable's application for a Special Permit. EDC submitted comments regarding the Permit on April 3, 2026, in part arguing that only the OSFM has legal authority to waive pipeline safety requirements. The Wright Order impairs EDC's and our clients' ability to enforce state jurisdiction over pipeline safety and to protect the public from the risk of another massive oil spill, and the impacts associated with ongoing operations of the Onshore Pipelines.

48.    Thus, the outcome of the litigation in *California v. Wright* will affect EDC's and our clients' interests with respect to the administrative processes and litigation mentioned above, in addition to our organizations' interests in the environment

9

surrounding the Onshore Pipelines that face the threat of another oil disaster as well as impacts to the environment and species and their habitats associated with operating the Onshore Pipelines. *See* Exhibit E.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Santa Barbara, California, on May 6, 2026.

_____
Linda Krop
Chief Counsel
Environmental Defense Center

# EXHIBIT A



   

# Refugio Beach Oil Spill
## Final Damage Assessment and Restoration Plan/Environmental Assessment

Prepared by:
California Department of Fish and Wildlife
California State Lands Commission
California Department of Parks and Recreation
University of California
The Department of Interior, U.S. Fish and Wildlife Service
National Oceanic and Atmospheric Administration

      

Refugio Beach Oil Spill

FINAL

Damage Assessment and Restoration Plan/Environmental Assessment

June 2021

**On the Cover:**
Oiled Beach by U.S. Coast Guard
Oiled octopus and invertebrates by Natural Resource Damage Assessment Trustees
Dolphins by Natural Resource Damage Assessment Trustees
Pelicans by Natural Resource Damage Assessment Trustees
Harbor seal by Santa Barbara Channelkeeper

**Suggested Citation:**
Refugio Beach Oil Spill Trustees. 2021. *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment.* Prepared by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration.

2

# Refugio Beach Oil Spill Natural Resource Damage Assessment Summary:

## Shoreline Habitats
**$5.5 million**

**Injury:** Approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.

## Subtidal and Fish Habitats
**$6.1 million**

**Injury:** Approximately 2,200 acres of benthic subtidal habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, remove Ellwood seawall, restore sand dwelling kelp offshore of Goleta Beach.

## Birds
**$2.2 million**

**Injury:** 558 birds were estimated killed, representing over 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.

## Marine Mammals
**$2.3 million**

**Injury:** 156 pinnipeds and 76 cetaceans were estimated injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbra and Ventura County, and Increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

## Human Uses
**$3.9 million**

**Injury:** The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

**Restoration:**
Restoration funds (53%) will be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach.

Restoration funds (46%) will be administered by State Trustees for use on projects benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach.

Restoration funds (approximately 1%) will be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

## Restoration Planning, Implementation, and Oversight
**$2 million**

## Public Input

Full Document: https://go.usa.gov/xvWEg

Administrative Record: https://go.usa.gov/xvWEc

Submit Questions: RefugioRestoration@fws.gov

# Executive Summary

On May 19, 2015 a 24-inch diameter on-shore pipeline (Line 901) that extends approximately 10.7 miles along the Santa Barbara County coastline in California ruptured resulting in the release of approximately 2,934 barrels (123,228 gallons) of heavy crude oil (U.S. DOT 2016, hereafter referred to as "the spill"). Line 901 is a buried, insulated pipeline that transported heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. The pipeline is owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains). The Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that the cause of the Line 901 failure was external corrosion under insulation that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. Crude oil from the buried pipeline saturated the soil and flowed into a culvert that crosses under Highway 101 and railroad tracks, and ultimately discharged into the Pacific Ocean at Refugio State Beach.

The crude oil that entered the ocean posed a significant risk to and injured marine plants and wildlife, including seagrasses, kelp, invertebrates, fish, birds, and mammals. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend, resulting in losses for local businesses and lost opportunities for the public to visit and enjoy the shore and offshore areas. Tar balls attributable to the Line 901 release were carried by southerly ocean currents and eventually reached some beaches in Los Angeles County (California Department of Fish and Wildlife 2016).

The response (cleanup) to this significant spill brought together a number of federal, state, local agencies, and Native American tribes operating under a Unified Command. For the spill response, Incident Commanders consisted of representatives of the United States Coast Guard (USCG), California Department of Fish and Wildlife, Office of Spill Prevention and Response (CDFW-OSPR), Santa Barbara County, and Plains[1]. The Refugio Beach oil spill cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard, 2016). Phase III monitoring activities were largely concluded on May 26, 2016 and the Unified Command disestablished on March 10, 2017 (U.S. Coast Guard 2017).

In parallel with the response and cleanup effort, the natural resources trustee agencies (Trustees) conducted a Natural Resource Damage Assessment (NRDA) to quantify the injuries to natural resources from the spill and assess natural resource damages. In this case, the Trustees for the natural resources injured by the spill include the United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the United States Fish and Wildlife Service

---

[1] The National Contingency Plan calls for the Responsible Party to be a member of the Unified Command; ref. 40 CFR 300.135(d)

4

(USFWS), National Park Service (NPS) and Bureau of Land Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California (the Trustees). As a designated Trustee, each of these agencies is authorized to act on behalf of the public under state and/or federal laws to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

In accordance with the Oil Pollution Act (OPA) NRDA regulations (33 U.S.C. 2706(e)), the Trustees have cooperatively gathered information and prepared this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA). This document describes the injuries resulting from the spill and the restoration projects selected to compensate the public for those injuries. This document is also an Environmental Assessment intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the proposed restoration projects under the National Environmental Policy Act (NEPA) and is therefore called a DARP/EA. Prior to releasing this Final DARP/EA, the Trustees released a Draft DARP/EA for public review and comment.  After considering the public comments received, the Trustees prepared this Final DARP/EA.  A full environmental review would be premature for some of the selected projects in this Final DARP/EA, as well as projects that were deemed "second tier" or of lower priority. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

This document describes the restoration projects selected by the Trustees to address the various resources impacted by the spill, as well as a process to identify appropriate human use projects for funding. All of the selected projects are designed to restore, replace, or acquire the equivalent of the lost resources and/or their services through restorative on-the-ground actions. Furthermore, several of the projects address multiple resources. The projects were selected based upon the biological needs of the injured species and the feasibility of restoring the resources.

Under OPA, the responsible party is liable for the cost of implementing restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees settled their claim for natural resource damages with Plains. A summary of the injury to each resource category, the approximate allocation of damages and selected restoration projects are shown below. Web links to data used in the injury assessment can be found in Appendix B of the DARP/EA.

5

SHORELINE HABITATS                                                    $5.5 million

**Injury:** Trustees estimate that approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.



SUBTIDAL AND FISH HABITATS                                           $6.1 million

**Injury:** Trustees estimate that approximately 2,200 acres of benthic subtidal and fish habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, restore sand-dwelling kelp offshore of Goleta Beach, and remove Ellwood seawall.

6



BIRDS                                                                    $2.2 million

**Injury:** Trustees estimate 558 birds were killed, representing approximately 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.



MARINE MAMMALS                                                          $2.3 million

**Injury:** Trustees estimate 156 pinnipeds and 76 cetaceans were injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties, and increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

7



HUMAN USE                                                                    $3.9 million

**Injury:** Trustees estimate over 140,000 recreational user days were lost.

**Restoration:** Various projects to improve human recreation, to be administrated as follows - 53% to State Parks for projects benefitting camping or shore-based recreation including and upcoast of El Capitan State Beach; 46% for a grants program for projects downcoast of El Capitan State Beach, on non-State Parks lands benefitting coastal recreation as well as boating and off-shore recreation in Santa Barbara, Ventura, and Los Angeles Counties; and approximately 1% to Coal Oil Point Reserve for projects benefitting research, education, and outreach.



RESTORATION PLANNING, IMPLEMENTATION, AND OVERSIGHT                   $2.0 million

The Trustees have prepared this Final DARP/EA to inform the public about the natural resource damage assessment (NRDA) and restoration planning efforts that have been conducted following the spill. This document is also an Environmental Assessment (EA) intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects, and the alternatives considered, under NEPA.  As environmental review would be premature for some of the projects in the document, additional review may be required in some instances.  This will be determined once recreational use projects are identified and/or when more detailed engineering design work or operational plans for the selected projects are available.  To coordinate and oversee implementation of this DARP/EA, the Trustees have formed a Trustee Council comprised of representatives from each of the Trustee agencies.  To submit questions or contact the Trustee Council, please use the following contact information:

## Electronic Mail:

RefugioRestoration@fws.gov

## U.S. Mail:

Refugio Beach Oil Spill Natural Resource Trustees
C/O Ventura Fish and Wildlife Office
2493 Portola Road, Suite B
Ventura, California 93003

Attn:
Michael Anderson, California Department of Fish and Wildlife
Jennifer Boyce, National Oceanic and Atmospheric Administration
Colleen Grant, U.S. Fish and Wildlife Service

9

# Abbreviations

| | | | |
|---|---|---|---|
| BLM | Bureau of Land Management | RP | Responsible Party |
| CDFW | California Department of Fish and Wildlife | SCAT | Shoreline Cleanup and Assessment Team |
| CESA | California Endangered Species Act | USFWS | United States Fish and Wildlife Service |
| CEQA | California Environmental Quality Act | UV | Ultraviolet light |
| CFR | Code of Federal Regulations | | |
| CSLC | California State Lands Commission | | |
| CSSC | California Species of Special Concern | | |
| CWA | Clean Water Act | | |
| CZMA | Coastal Zone Management Act | | |
| DARP | Damage Assessment and Restoration Plan | | |
| DOC | United States Department of Commerce | | |
| DOI | United States Department of the Interior | | |
| EA | Environmental Assessment | | |
| EFH | Essential Fish Habitat | | |
| EIR | Environmental Impact Report | | |
| EIS | Environmental Impact Statement | | |
| ESA | Endangered Species Act | | |
| FLAT | Federal Lead Administrative Trustee | | |
| FONSI | Finding of No Significant Impact | | |
| FWCA | Fish and Wildlife Coordination Act | | |
| GNOME | General NOAA Operation Modeling Environment | | |
| HEA | Habitat Equivalency Analysis | | |
| IBA | Important Bird Area | | |
| IEc | Industrial Economics, Inc. | | |
| LAT | Lead Administrative Trustee | | |
| MBTA | Migratory Bird Treaty Act | | |
| MMPA | Marine Mammal Protection Act | | |
| NCP | National Contingency Plan | | |
| NEPA | National Environmental Policy Act | | |
| NMFS | National Marine Fisheries Service | | |
| NMSA | National Marine Sanctuaries Act | | |
| NOAA | National Oceanic and Atmospheric Administration | | |
| NOI | Notice of Intent | | |
| NPDES | National Pollution Discharge Elimination System | | |
| NPFC | National Pollution Funds Center | | |
| NPS | National Park Service | | |
| NRDA | Natural Resource Damage Assessment | | |
| NWR | National Wildlife Refuge | | |
| ONMS | Office of National Marine Sanctuaries | | |
| OPA | Oil Pollution Act of 1990 | | |
| OSPR | Office of Spill Prevention and Response | | |
| PAHs | Polycyclic aromatic hydrocarbons | | |
| REA | Resource Equivalency Analysis | | |
| RFP | Request for Proposals | | |

10

# Common and Scientific Names

**Mammals and Other Vertebrates**

Blue whale (*Balaenoptera musculus*)
California red-legged frog (*Rana draytonii*)
California sea lion (*Zalophus californianus*)
Common bottlenose dolphin (*Tursiops truncatus*)
Fin whale (*Balaenoptera physalus*)
Gray whale (*Eschrichtius robustus*)
Green turtle (*Chelonia mydas*)
Guadalupe fur seal (*Arctocephalus townsendi*)
Hawksbill turtle (*Eretmochelys imbricate*)
Humpback whale (*Megaptera novaeangliae*)
Leatherback turtle (*Dermochelys coriacea*)
Loggerhead turtle (*Dermochelys coriacea*)
Long-beaked common dolphin (*Delphinus capensis*)
Northern elephant seal (*Mirounga angustirostris*)
Northern fur seal (*Callorhinus ursinus*)
Pacific harbor seal (*Phoca vitulina*)
Pacific white-sided dolphin (*Lagenorhynchus obliquidens*)
Short-beaked common dolphin (*Delphinus delphis*)
Southern sea otter (*Enhydra lutris nereis*)
Steller sea lion (*Eumetopias jubatus*)

**Birds**

American pipit (*Anthus rubescens*)
Ashy storm-petrel (*Oceanodroma homochroa*)
Belding's savannah sparrow (*Passerculus sandwichensis beldingi*)
Black-bellied plover (*Pluvialis squatarola*)
Black-crowned night heron (*Nycticorax nycticorax*)
Black phoebe (*Sayornis nigricans*)
Brandt's cormorant (*Phalacrocorax penicillatus*)
Brown pelican (*Pelecanus occidentalis*)
California gull (*Larus californicus*)
California least tern (*Sterna antillarum browni*)
Common loon (*Gavia immer*)
Ducks (Anatidae)
Forster's tern (*Sterna forsteri*)
Glaucous-winged gull (*Larus glaucescens*)
Horned grebe (*Podiceps auritus*)
Horned lark (*Eremophila alpestris*)
Light-footed Ridgeway's rail (*Rallus obsoletus levipes*)
Long-billed curlew (*Numenius americanus*)
Long-billed dowitcher (*Limnodromus scolopaceus*)
Marbled godwit (*Limosa fedoa*)
Mew gull (*Larus brachyrynchus*)
Red-throated loon (*Gavia stellata*)
Ring-billed gull (*Larus delawarensis*)

Royal tern (*Thalasseus maximus*)
Sanderling (*Calidris alba*)
Say's phoebe (*Sayornis saya*)
Scripp's murrelet (*Synthliboramphus scrippsi*)
Short-billed dowitcher (*Limnodromus griseus*)
Surf scoter (*Melanitta perspicillata*)
Western grebe (*Aechmorphorus occidentalis*)
Western gull (*Larus occidentalis*)
Western snowy plover (*Charadrius nivosus nivosus*)
Whimbrel (*Numenius phaeopus*)
White-winged scoter (*Melanitta fusca*)
Willet (*Tringa semipalmata*)
Yellow-rumped warbler (*Setophaga coronate*)

**Fish**

Anchovy (Engraulidae)
Barred surfperch (*Amphistichus argenteus*)
Blenny (*Blennioidei*)
Broomtail grouper (*Mycteroperca xenarcha*)
Cabezon (*Scorpaenichthys marmoratus*)
California corbina (*Menticirrhus undulates*)
California grunion (*Leuresthes tenuis*)
California sheephead (*Semicossyphus pulcher*)
Chinook "King" salmon (*Oncorhynchus tshawytscha*)
Coho "Silver" salmon (*Oncorhynchus kisutch*)
Croaker (Sciaenidae)
Garibaldi (Hypsypops rubicundus)
Giant "Black" sea bass (*Stereolepis gigas*)
Giant kelpfish (Heterostichus rostratus)
Gopher rockfish (*Sebastes carnatus*)
Grass rockfish (*Sebastes rastrelliger*)
Guitarfish (Rhinobatidae)
Halfmoon fish (*Medialuna californiensis*)
Kelp bass (*Paralabrax clathratus*)
Kelp rockfish (*Sebastes atrovirens*)
Leopard shark (*Triakis semifasciata*)
Northern anchovy (*Engraulis mordax*)
Opaleye (*Girella nigricans*)
Pacific halibut (*Hippoglossus stenolepis*)
Painted greenling (*Oxylebius pictus*)
Plainfin midshipman (*Porichthys notatus*)
Ray (Batoidea)
Sandab (*Citharichthys* spp.)
Scorpion fish (Scorpaenidae)
Señorita (*Oxyjulis californica*)
Silverside (Atherinidae)
Skate (Rajidae)
Smooth-hound shark (*Mustelus* spp.)

11

Sole (Soleidae)
Starry flounder (*Platichthys stellatus*)
Steelhead trout (*Oncorhynchus mykiss*)
Surfperch (Embiotocidae)
Tidepool sculpin (*Oligocottus maculosus*)
Tidewater goby (*Eucyclogobius newberryi*)
Topsmelt (*Atherinops affinis*)
Walleye surfperch (*Hyperprosopon argentuem*)
White seabass (*Atractoscion nobilis*)
White shark (*Carcharodon carcharias*)

**Invertebrates**
Acorn barnacle (*Balanus* spp.)
Bat star (Patiria miniata)
Beach hopper (*Megalorchestia* spp.)
Bean clam (*Donax gouldii*)
Black abalone (*Haliotis cracherodii*)
Bloodworm (*Thoracophelia mucronata*)
Bryozoan (Bryozoa)
California mussel (*Mytilus californianus*)
California spiny lobster (*Panulirus interruptus*)
Chiton (Polyplacophora)
Clam (Bivalvia)
Cup coral (*Balanophyllia elegans*)
Decorator crab (Majoidea)
Feather duster worm (Sabellidae)
Gastropod (Gastropoda)
Globose dune beetle (*Coelus globosus*)
Gooseneck barnacle (*Pollicipes polymerus*)
Hermit crab (Paguroidea)
Inshore "Market" squid (*Loligo opalescens*)
Isopod (Alloniscus perconvexus and Tylos punctatus)
Kelp fly (Diptera)
Keyhole limpet (Fissurellidae)
Limpet (Gastropoda)
Lined shore crab (*Pachygrapsus crassipes*)
Mole crab (*Emerita* spp.)
Nemertean worm (Nemertea)
Nudibranch (Nudibranchia)
Ochre sea star (*Pisaster ochraceus*)
Octopus (Cephalopoda)
Olive snail (*Olivella biplicata*)
Opheliid polychaete worm (Ophelia)
Pacific purple sea urchin (*Strongylocentrotus purpuratus*)
Periwinkle snail (*Littorina littorea*)
Pismo clam (Tivela stultorum)
Polychaete worm (Polychaeta)
Red abalone (*Haliotis rufescens*)
Red sea urchin (*Mesocentrotus franciscanus*)
Rock crab (*Cancer productus*)

Rove beetle (Staphylinidae)
Salp (Salpidae)
Sand castle "Honeycomb" worm (*Phragmatopoma californica*)
Sand crab (*Emerita analoga*)
Sand dollar (Echinodermata)
Sea anemone (Actiniaria)
Sea cucumber (Holothuroidea)
Sea hare (Anaspidea)
Sheep crab (*Loxorhynchus grandis*)
Shrimp (Dendrobranchiata and Caridea)
Sponge (Porifera)
Talitrid amphipod (*Megalorchestia* spp.)
Top snail (Trochidae)
Tunicate (Tunicata)
Turban snail (*Tegula funebralis*)
Whelk (Gastropoda)
White abalone (*Haliotis sorenseni*)
Plants and algae
Bladder chain kelp (*Stephanocystis osmundacea*)
Bladder kelp (*Sargassum muticum*)
Cape ivy (*Delairea odorata*)
Coast live oak (*Quercus agrifolia*)
Coralline algae (Corallina/Bossiella/Calliarthron spp.)
Cordgrass (*Spartina alterniflora* and *Spartina densiflora*)
Eelgrass (*Zostera pacifica*)
Feather boa kelp (*Egregia menziesii*)
Gaviota tarplant (*Deinandra increscens ssp. villosa*)
Giant kelp (*Macrocystis pyrifera*)
Grapestone seaweed (*Mastocarpus papillatus*)
Nailbrush seaweed (*Endocladia muricata*)
Palm tree (Arecaceae)
Red algae (*Prionitis* spp. and *Porphyra* spp.)
Rockweed (*Fucus distichus* and *Silvetia compressa*)
Sea lettuce (*Ulva lactuca*)
Surfgrass (*Phyllospadix* spp.)
Turkish-towel seaweed (*Chondracanthus* spp.)
Western sycamore (*Platanus racemose*)

12

## Table of Contents

1.0      **Introduction and Purpose** ...................................................................................15

1.1    Overview of the Incident.................................................................................. 15

1.2    NRDA Overview .............................................................................................. 21

1.3    Summary of Natural Resource Injuries ...........................................................22

1.4    Summary of Selected Restoration Projects......................................................23

2.0      **Affected Environment** .................................................................................... 26

2.1    Physical Environment ...................................................................................... 26

2.2    Marine and Coastal Managed and Protected Areas ....................................... 29

2.3    Biological Resources ....................................................................................... 31

2.4    Archeological and Cultural Resources............................................................. 37

2.5    Recreational Services........................................................................................41

3.0      **Coordination and Compliance**........................................................................ 42

3.1    Federal and State Trustee Agencies..................................................................42

3.2    Coordination .................................................................................................... 42

3.3    Compliance with Environmental Laws, Regulations, and Policies ...............44

4.0      **Injury Quantification and Restoration Planning Methods**...................................... 57

4.1    Quantification of Damages .............................................................................. 57

4.2    Restoration Project Selection Criteria..............................................................59

5.0      **Injury Quantification and Restoration Alternatives** ..................................... 62

5.1    Shoreline Habitats............................................................................................ 64

5.2    Subtidal and Fish Habitats ...............................................................................94

5.3    Birds................................................................................................................ 116

5.4    Marine Mammals............................................................................................. 139

5.5    Human Uses..................................................................................................... 151

6.0      **NEPA Alternatives Analysis** ......................................................................... 162

6.1    Preferred Alternatives ....................................................................................162

6.2    Non-Preferred Alternatives..............................................................................164

6.3    No Action Alternative...................................................................................... 164

6.4    Cumulative Impacts ........................................................................................ 165

References................................................................................................................ 173

Preparers ................................................................................................................. 180

Acknowledgements................................................................................................. 181

13

# List of Appendices

Appendix A          Oil Fate and Transport
Appendix B          Data Management and Access
Appendix C          Resource Equivalency Analysis
Appendix D          Shoreline Exposure and Injury Evaluation Studies
Appendix E          Supplemental Bioassay Report Information
Appendix F          Shoreline Habitat Equivalency Analysis
Appendix G-1        Fish and Invertebrate Mortality Observations
Appendix G-2        Field and Laboratory Assessment of Injury to Grunion
Appendix G-3        Assessment of Surfperch Exposure
Appendix G-4        Oil Exposure and Potential Effects to Fish, Invertebrate Early Life Stages, and Kelp
Appendix G-5        Changes in the Condition of Surfgrass and Macroalgae
Appendix G-6        Field Assessment of Subtidal Exposure
Appendix G-7        Polycyclic Aromatic Hydrocarbons in Nearshore Fish and Invertebrate Tissues
Appendix H          Subtidal Injury Quantification and Habitat Equivalency Analysis
Appendix I          Bird Injury Assessment
Appendix J          Marine Mammal Exposure, Injury, and Restoration
Appendix K          Recreational Camping Damages
Appendix L          Recreational Shoreline Use Damages
Appendix M          Recreational Boating and Offshore Use Damages
Appendix N          Summary of Proposed Restoration Projects
Appendix O          Response to Public Comments on the Draft Damage Assessment and Restoration Plan/Environmental Assessment

# 1.0   Introduction and Purpose

The purpose of this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA) is to provide information to the public about the results of the Natural Resource Damage Assessment (NRDA) that was conducted to assess injuries to natural resources that were caused by the Refugio Beach Oil Spill. This document further describes the selected restoration projects to restore habitats and natural resources affected by the spill and compensate for interim losses of natural resources and their services from the date of the incident until recovery.  A list of second tier restoration projects are also identified, should any selected restoration projects become infeasible or funded by other entities. The document incorporates feedback provided through the public comment process. A full summary of public comments received on the Draft DARP/EA and the Trustees' responses to those comments can be found in Appendix O. The document also serves as an Environmental Assessment under the National Environmental Policy Act (NEPA) evaluating the potential effects to the environment from implementing the selected restoration projects.

## 1.1   Overview of the Incident

On May 19, 2015, a 24-inch diameter buried pipeline known as Line 901, owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains), ruptured in Santa Barbara County, California, in the vicinity of Refugio State Beach. Line 901 transported heated crude oil extracted from deep subsea formations at several offshore platforms. As a result of the rupture, an estimated 2,934 barrels (123,228 gallons) of heavy crude oil were released from the pipeline (U.S. DOT 2016). A significant portion of the oil reached the Pacific Ocean at Refugio State Beach after flowing through culverts and across several upland areas (Figure 1). The incident is referred to throughout this document as the Refugio Beach Oil Spill or the "spill."

Plains initially estimated that approximately 2,400 barrels (100,800 gallons), of crude oil were spilled and that 500 barrels (21,000 gallons) reached the ocean (U.S. DOT 2016). The total volume released from the pipeline was later revised to 2,934 barrels (123,228 gallons) (U.S. DOT 2016). Subsequently, consultants for Plains increased the estimate of oil reaching the ocean to 598 barrels (25,116 gallons). An analysis on behalf of the Trustees concluded that as much as 1,262 barrels (53,000 gallons) of oil reached the ocean (Baker 2018).

Within hours of the spill, based on recommendations from the California Office of Environmental Health Hazard Assessment (OEHHA), the California Department of Fish and Wildlife (CDFW) initiated a fishery closure in the vicinity of the spill. The following day, Governor Edmund G. Brown, Jr., declared a state of emergency for Santa Barbara County. Several beaches in Santa Barbara County were closed to the public, including Refugio and El Capitan State Beaches (described further in Section 5.5). On May 21, 2015, the fishery closure was expanded along the shore and offshore out to 6 miles, encompassing a total area of 138 square miles, based on aerial observations and National Oceanic and Atmospheric

15

Administration (NOAA) oil spill trajectory models of where the oil was likely to move (OEHHA 2015). The fishery closure ended on June 29, 2015 (OEHHA 2015).



**Figure 1.** Flow path of the Line 901 pipeline rupture into culverts under Highway 101 and railroad tracks and ultimately into the Pacific Ocean at Refugio State Beach. Credit: John Wiley (http://flickr.com/jw4pix)

The crude oil smothered and soaked into terrestrial areas along the pathway from the pipeline rupture to the site where the oil entered the ocean, a short distance west of Refugio Cove (Figure 1). The shorelines from the release point, within Refugio State Beach to El Capitan State Beach, received the heaviest coastal oiling. Shorelines downcoast as far as Long Beach were intermittently oiled with tarballs and subject to beach closures, with the level of oiling generally decreasing farther away from the release point. Subtidal habitats in the vicinity of the release point also experienced oil exposure.

In the days after the spill, ocean surface currents and strong afternoon winds carried oil mostly downcoast, although some oil was deposited on beaches upcoast of the release site.

Marine organisms, including plants, invertebrates, fish, birds, and mammals, were exposed to oil. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend resulting in lost opportunities for the public to visit and enjoy the shore and offshore areas after the spill. Floating oil attributed to Line 901 was identified 17 km southwest of the release site, and more than 8 miles offshore (Valentine 2017). Tarballs attributed to the Line 901 release were identified as far south as Los Angeles County, more than 100 miles from the release site, where there were additional beach closures.

### 1.1.1 Cleanup Operations

The spill brought together many federal, state, and local agencies for cleanup operating under a Unified Command. For the spill response, the Incident Commanders consisted of representatives

16

of the USCG, CDFW-OSPR, Santa Barbara County, and Plains[2]. Throughout the response, the incident received high interest from news media, legislators, non-governmental organizations, members of the public, and other stakeholders.

The Unified Command conducted a phased approach to oil spill cleanup, in accordance with the National Oceanic and Atmospheric Administration's Shoreline Assessment Manual that provides for defined cleanup processes and goals for each cleanup phase. The cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard 2016). Phase III monitoring activities were largely concluded on May 26, 2016, and the Unified Command was disestablished on March 10, 2017 (U.S. Coast Guard 2017).

The majority of the response effort was focused on minimizing environmental and cultural site damage and maximizing the recovery of discharged oil. Oil spill response operations were divided into three areas including an Inland Branch, Shoreline Branch, and On-water Branch.

The Inland Branch included the discharge site and pathway of oil to the Pacific Ocean. Inland branch response operations included oil recovery and removal, pipeline excavation, contaminated soil removal, contaminated vegetation removal, community and responder air monitoring, and oil sampling from the source of discharge.

The Shoreline Branch addressed oil in the path of discharge from the top of a cliff down to the beach and along 96 miles of affected shoreline. Response teams applied manual and mechanical recovery methods, primarily removal and disposal of oiled sand, wrack, and marine organisms. Removal of oil from rock was accomplished with scrapers or wire brushes. In some areas, dry ice was also used in conjunction with compressed air to freeze oil on rocks, allowing it to flake off more easily. In other areas, oiled cobble was placed in the surf zone to be scrubbed clean by wave action and tumbling amongst other cobble. Other operations included community and responder air monitoring, oil sampling, and wildlife recovery, rehabilitation, and release.

The On-water Branch addressed recoverable oil in offshore waters affected by the spill. On-water response operations included the use of oil containment and protection boom, skimmers, and oil recovery vessels. Local private vessels were also enlisted to assist with removal of oil from the marine environment.

---

[2] The National Contingency Plan calls for the Responsible Party, in this case Plains, to be a member of the Unified Command; ref. 40 CFR 300.135(d).

17

Staff responsible for conducting reconnaissance, recovery, and rehabilitation for wildlife exposed to Line 901 oil throughout the response area were organized and deployed through a Wildlife Branch that operated throughout the spill-affected area.

## 1.1.2   Transport and Fate of the spilled Oil

Line 901 oil coated shores predominantly downcoast for several miles from the release site within hours of the spill, primarily due to along-shore transport of the oil by currents, surge and surf action. While there are known active natural off-shore oil seeps in the spill vicinity, virtually all oil observed in the area from the release point to El Capitan in the days immediately after the spill, was from the Refugio Beach Oil Spill. Oil was also transported offshore by currents, surge action and wind drift and was observed during Unified Command overflights between May 20 and June 3 (Figure 3). Over time, oil from the spill spread farther offshore and downcoast, and in the days and weeks after the spill, light to moderate shoreline oiling, largely in the form of tarballs, occurred much farther away from the spill site. By May 28 unusually heavy tar ball stranding was reported in Ventura County near Oxnard. Soon after, unusually heavy depositions of tar balls were reported at several beaches near Redondo and Manhattan Beaches in Los Angeles County. The presence of stranded oil along some Los Angeles County beaches was heavy enough that several beach closures were declared by County officials, and a separate Unified Command was established in Los Angeles to respond to the oiling.



**Figure 2.** Results of hindcast modeling that shows the simulated oil transport trajectory based on the spill origin, winds, and currents that occurred between May 19, 2015 and May 29, 2015. The colors represent particle density, with red/orange being the highest density, yellow moderate density, and blue low density. See Appendix B for data associated with this figure.

To further understand and illustrate the transport and fate of spilled Line 901 oil, NOAA performed hindcast modeling using the General NOAA Operation Modeling Environment (GNOME). GNOME is an oil spill trajectory model in which the surface oil is divided into a

18

large number of small particles of equal mass that move under the influence of surface ocean currents, wind drift, and horizontal mixing from the time of the spill. GNOME also includes algorithms that simulate surface oil weathering, e.g., evaporation and dispersion. GNOME modeling snapshots (Figure 2) show Line 901 oil moving into the Santa Barbara Channel May 20, 2015 and May 21, 2015, transiting the waters of the Channel Islands National Marine Sanctuary, but no particles reached the Channel Island shores. Rather, the particles move east, making landfall on the Ventura coast about May 25, 2015 with subsequent deposition by May 29, 2015 in Los Angeles County. More information on the GNOME modeling can be found in Appendix A.



**Figure 3.** Map showing total U.S. Coast Guard overflight observations of surface oil over a 14 day period between May 21, 2015 and June 3, 2015. Note that the representations of sheen in this graphic are cumulative, i.e., oil was not in all of these locations at any given time. See Appendix B for data associated with this figure.

Line 901 oil was also transported downward through the water column due to mixing in the nearshore environment and the surf zone. Submerged oil was observed at several locations between May 22, 2015 and June 2, 2015 by UCSB and other entities. Of the oil observed, seven samples were collected and analyzed forensically, five of the samples matched Line 901 oil (Valentine 2019). The Unified Command undertook a submerged oil survey on May 29, 2015 through May 30, 2015 and reported no recoverable submerged oil. Oil may have been mixed with sediment through the surf action and was subsequently redistributed along the bottom and surface through sinking, tidal action, and surf transport. Based on general oceanographic conditions in the area vertical mixing of oil droplets and dissolved oils is estimated to occur to a depth of approximately 14 meters (Appendix A).

19

### 1.1.3  Forensic Identification of Line 901 Oil in the Environment

There are active, well-studied natural oil seeps in the region where the Refugio Beach Oil Spill occurred (Lorenson et al. 2009; Lorenson et al. 2011). These seafloor seeps release oil and gas that float to the ocean surface and periodically strand on regional shorelines, generally in the form of tar balls. Thus, not all of the oil evident in the region in the aftermath of the initial spill came from the Line 901 pipeline.

Spilled Line 901 oil can be distinguished from natural seep oil by using specialized chemical fingerprinting techniques[3]. In the days after the spill, hundreds of oil samples were collected from Santa Barbara, Ventura, Los Angeles, and Orange Counties. Selected samples were analyzed and forensically interpreted by experts working on behalf of the Natural Resource Trustees (Trustees), as well as by several other laboratories and experts engaged by the Unified Command and independently by Plains (Valentine 2015; Jeffrey 2016; Stout 2016; Stout et al. 2018). Oil samples collected from the ocean surface and from beaches were determined in some cases to be from Line 901, in other cases to be from known natural seeps, and in some cases to have characteristics of both, implying they were mixtures of natural seep and spilled oil.

After careful investigation, the Trustees concluded that oil from the Refugio Beach Oil Spill was deposited intermittently on shores from Gaviota State Park in Santa Barbara County to Los Angeles County (Figure 4). For purposes of the NRDA, the furthest southern extent of the spill was determined to be Long Beach based on beach closures.



**Figure 4.** Geographic extent of Line 901 oil. This Figure shows oil samples collected and analyzed on behalf of the Trustees through June 2, 2015 when the Trustees' trajectory modeling suggests that oil would have moved through the impacted area. This does not include samples collected by the response and analyzed for the criminal investigation. In People of the State of California v Plains All American Pipeline, L.P., Sup. Court of State of California, County of Santa Barbara, Case No. 1495091, People's Trial Exhibit 078.0001 oil was documented as far south as Seal Beach in Orange County. See Appendix B for data associated with this figure.

---

[3] Plains does not agree.

20

## 1.2 NRDA Overview

There are typically four types of claims that are made against responsible parties in an oil spill such as this one:

1. reimbursement for cleanup costs;
2. natural resource damages (including the costs of assessment);
3. fines and penalties under various laws; and
4. third-party claims (e.g. from non-government parties, such as commercial fisheries and affected businesses).

This document is only concerned with the second item, natural resource damages. This Damage Assessment and Restoration Plan and Environmental Assessment (DARP/EA) has been prepared by state and federal natural resource Trustee agencies responsible for restoring natural resources[4] and resource services[5] injured by the release of oil from the May 19, 2015, Refugio Beach Oil Spill. This document provides details regarding:

- Environment affected by the spill (Section 2);
- Coordination and compliance among the government agencies and responsible party (Section 3);
- Injury quantification and restoration planning methods (Section 4);
- Nature and scope of injuries and the quantification of those injuries (Section 5);
- Selected restoration projects to address the injuries (Section 5); and
- NEPA alternatives analysis (Section 6).

Consistent with the Oil Pollution Act (OPA) and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq., the purpose of restoration planning is to identify and evaluate restoration alternatives and to provide the public with an opportunity for review and comment on the proposed restoration alternatives. Restoration planning provides the link between injury and restoration. The purpose of restoration, as stated in this DARP/EA, is to make the environment and the public whole for injuries resulting from the spill by implementing restoration actions that return injured natural resources and services to baseline conditions and compensate for interim losses.

United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the U.S. Fish and Wildlife Service (USFWS), National Park Service (NPS), and Bureau of Land

---

[4] Natural resources are defined under the Oil Pollution Act as "land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any State or local government or Indian tribe, or any foreign government." 33 U.S.C. §2701(20).

[5] Services (or natural resources services) means the functions performed by a natural resource for the benefit of another natural resource and/or the public.

21

Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California are the Trustees who are addressing the natural resources injured by the spill. As a designated Trustee, each agency is authorized to act on behalf of the public under state and/or federal law to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured by a discharge of oil. For purposes of coordination and compliance with OPA and NEPA, NOAA is designated as the lead federal Trustee.

The Trustees have prepared this DARP/EA to inform the public about the NRDA and restoration planning efforts that have been conducted following the spill. This document is also an EA intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects under NEPA. As full environmental review would be premature for some of the selected projects in the document pending development of sufficient project-level detail. This will be determined once detailed engineering design work or operational plans are developed for those projects.

## 1.3 Summary of Natural Resource Injuries

The injuries from the oil spill can be divided into the following categories: shoreline habitats, subtidal and fish habitats, birds, marine mammals, and human uses. The injuries to each category are summarized here (Figure 5) and presented in greater detail in Section 5.

- **Shoreline Habitats**: The Trustees estimate approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.
- **Subtidal and Fish Habitats**: The Trustees estimate approximately 2,200 acres of benthic subtidal habitat were impacted.
- **Birds:** The Trustees estimate 558 birds were killed, representing over 28 different species. The primary species impacted were brown pelicans, representing 57% of the total estimated mortality. Western snowy plovers were also impacted through effects to reproduction the year after the spill, following oil exposure.
- **Marine Mammals**: The Trustees estimate that 156 pinnipeds (94% California sea lions, 5% northern elephant seals and 1% Pacific harbor seals) and 76 cetaceans (95% long-beaked common dolphins and 5% common bottlenose dolphins) were injured or killed by the spill.
- **Human Uses**: The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

22



**Figure 5.** Refugio Beach Oil Spill fingerprint matches (red circles) along with the habitats and resources that were injured by the spill. See Appendix B for data associated with this figure.

## 1.4   Summary of Selected Restoration Projects

The Trustees' mandate under OPA (see 33 U.S.C. 2706(b)) is to make the environment and the public whole for injuries to natural resources and natural resource services resulting from the discharge of oil. This requirement must be achieved through the restoration, rehabilitation, replacement, or acquisition of equivalent natural resources and/or services. Thus, for a project to be considered there must be a connection, or nexus, between the natural resource injuries and the proposed restoration actions.

Compensatory restoration is any action taken to compensate for interim losses of natural resources and services pending recovery to baseline conditions. The scale, or amount, of the required compensatory restoration will depend on the extent and severity of the initial resource injury and how quickly each resource and associated service returns to baseline. Primary restoration actions that speed resource recovery will reduce the amount of required compensatory restoration.

The Trustees considered restoration concepts and alternatives with the potential to provide compensatory restoration. These were evaluated based on selection criteria developed by the Trustees, consistent with the legal guidelines provided in the OPA regulations (15 C.F.R. 990.54(a)). Section 4.2 presents OPA-based selection criteria developed by the Trustees for the spill. Based on the Trustees' evaluation, and after considering public comments on the Draft DARP/EA, a suite of preferred restoration projects were selected and are summarized below.

23

Additional details on all projects that met the threshold screening criteria are presented in Section 5.

The Trustees have grouped the injuries into categories, sometimes combining impacts to similar species. In this way, one restoration project, benefiting a suite of species or one primary species, may address all injuries for that category. In accordance with OPA, all of the selected projects have been "scaled" in size, such that the benefits of the restoration offset the injuries caused by the spill. Summaries of the selected restoration projects are provided below. More details on the projects are provided in Section 5.

Under OPA, the responsible party is liable for the cost of the compensatory restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees have settled this claim for natural resource damages with the responsible party for $22.3 million. The following amounts are allocated to fund the projects described in this document:

**Shoreline Habitats**                                                    $5.5 million
- Remove the Ellwood seawall that is currently constraining natural functioning condition of sandy beach and subtidal habitats;
- Restore black abalone populations to enhance the overall health of rocky intertidal habitats; and
- Restore degraded sand dune habitats by removing invasive/non-native vegetation, and/or precluding disturbance to sensitive areas to allow native dune vegetation to regrow.

**Subtidal and Fish Habitats**                                           $6.1 million
- Restore abalone populations in Marine Protected Areas along the Gaviota coast to enhance the overall health of subtidal habitats;
- Restore eelgrass beds on the Gaviota Coast to enhance overall health of subtidal habitat; and
- Extend a pilot project for restoring sand-dwelling kelp offshore of Goleta Beach to determine the feasibility of this novel method for restoring kelp forests.

**Birds**                                                                $2.2 million
- Remove invasive plants from brown pelican nesting colonies on Anacapa Island to prevent these important breeding sites from becoming unsuitable for nesting;
- Reduce seabird injuries from recreational fishing; and
- Implement conservation actions for western snowy plovers at Coal Oil Point Reserve to protect and enhance breeding success.

24

**Marine Mammals**                                                      $2.3 million
- Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties to increase survivorship of pinnipeds; and
- Expand the capacity to respond to instances of cetacean entanglement in the Santa Barbara Channel to increase survivorship of entangled cetaceans.

**Human Use**                                                          $3.9 million
- Restoration funds (53%) to be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach;
- Restoration funds (46%) to be administered by State Trustees for use on projects outside of State Park property benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach; and
- Restoration funds (approximately 1%) to be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

The remaining funds will be used by the Trustees for restoration planning and oversight. Any unused funds will be allocated toward one or more projects described in this document, or identified through further project scoping.

25

## 2.0   Affected Environment

This section presents a brief description of the physical, biological, and cultural environment affected by the oil spill.

The physical environment considered in the NRDA encompasses approximately 155 miles of shoreline from Gaviota to Long Beach, as well as the Santa Barbara Channel, and supports a rich diversity of coastal and marine species[6]. Many areas within the affected environment are protected by state or federal designations to preserve the biological integrity of the habitat, while other areas are available to the public for recreation. The affected environment also is home to a wide variety of culturally and historically important resources.

This section also provides information on the affected environment for the preferred restoration projects which are located within the general spill-affected area. For restoration projects that occur outside of the spill-affected area, information on the affected environment is provided along with the project descriptions in Section 5.

## 2.1   Physical Environment

This subsection describes the physical setting of the coastal areas affected by the Refugio Beach Oil Spill, including areas where restoration projects are proposed. The geographical extent of the physical environment described herein extends from Gaviota to Long Beach.

### 2.1.1  Climate

The atmospheric climate in the region is generally, consistently mild and considered Mediterranean-like. Winters are rainy and summers are dry, and predominant coastal breezes suppress wide air temperature changes. Air temperatures generally range between the mid-60s and mid-70s (16-21$^{\circ}$C). The years 2015 and 2016 were characterized by El Niño conditions, officially beginning in March 2015. El Niño conditions in southern California typically mean increased precipitation in the winter and higher sea surface temperatures (NOAA 2016; SCCOOS 2019).

### 2.1.2  Land Use and Geology

The spill originated at Refugio State Beach, in an area known as the "Gaviota Coast" which is one of southern California's largest remaining continuous stretches of undeveloped rural coastline. As described in the Gaviota Coast Plan, the Gaviota Coast includes the shoreline between Vandenberg Air Force Base to the west and Coal Oil Point to the east (Figure 6). It is world renowned as a biodiversity hotspot and one of the most ecologically diverse regions on the planet. The Gaviota Coast Plan, developed by Santa Barbara County, describes natural resources in the area. The Plan is intended to preserve the rural character of Gaviota by protecting and

---

[6] Not all areas within this physical environment were impacted by the spill.

26

enhancing its varied and unique natural and cultural resources, agricultural productivity, and by enhancing public recreation and access consistent with the capacity of its resources. Downcoast from Gaviota, beginning with the cities of Goleta and Santa Barbara and extending into Ventura County, the majority of the land use is residential, light commercial, and agricultural, with areas of undeveloped open space. The spill-affected area extends into Los Angeles County, from Santa Monica to Long Beach, which is heavily populated, developed, and industrialized.

The coastal terrestrial landscapes are equally significant, diverse, and rare, representing a high degree of endemism. They include such diverse vegetation alliances as active coastal fore dunes, coastal terrace prairie, and northern coastal salt marsh. The shoreline and offshore physical environment are typically sandy beaches and submerged sandy seabed, but also include boulder cobble fields and rock bench platforms in the intertidal and subtidal rocky reefs in the nearshore area. The Gaviota Coast also includes tidally influenced lagoons, harbors, and jetties. Because of the range of habitats, the marine biodiversity in the region is high.



**Figure 6.** The location of the spill origin and various Trustee post-spill study sites along the Santa Barbara Coastline.

## 2.1.3  Ocean Waters

The waters offshore of the mainland comprise the Santa Barbara Channel with surface seawater temperatures typically ranging from about 54°F (12°C) in spring to about 66°F (19°C) in fall. The Channel is oriented east-west, extending from Point Conception to Ventura and bounded on the north side by the mainland coast and on the south side by the northern Channel Islands (San Miguel, Santa Rosa, Santa Cruz, Santa Barbara, and Anacapa). The Santa Barbara Channel is where the California Current of cold water flowing south meets and mixes with the warmer water of the Davidson Current flowing north. The convergence and mixing in the marine region tends to occur as a counterclockwise gyre or eddy in the Channel (Nishimoto and Washburn 2002). As a result, the Santa Barbara Channel is a transition zone where the composition of many groups of marine species (fishes, invertebrates, and algae) shifts from species typically associated with the cooler waters north of Point Conception to species typically associated with the warmer waters south of Point Conception. The Channel area can thus be recognized as a dividing line between two bioregions that represent geographically distinct

27

ecological systems, the Oregonian Province from Point Conception northward and the San Diegan Province from Point Conception southward (Stephens, et.al. 2016). The fact that the affected area overlaps with the transition region in the Santa Barbara Channel underscores the importance of this section of the California coastline being unique for its diversity and sensitivity to environmental changes.

Unusual ocean weather and climate patterns were observed throughout 2014 and 2015 across the North Pacific basin. An area of the North Pacific from Alaska into California was as much as 5°C (9° F) warmer than average. This atmospheric anomaly nicknamed "the blob," due to its amoeba-like form, impacted oceanic productivity and food availability for marine life in some areas. In addition, El Niño conditions, which strengthened in early March 2015, are also associated with warmer sea surface temperatures.

## 2.1.4  Petroleum Seeps

Natural oil seeps are common in the area (Hornafius et al. 1999; Lorenson et al. 2009). For example, the seep field just offshore from Coal Oil Point in Goleta extends over approximately one square mile. These seeps slowly release weathered oil from fractures in the ocean floor. Because of the slow nature of seep oil traveling through the ocean floor substrate before making its way into the water column, some of the volatile, more toxic, components of seep oil dissipate before the oil reaches the ocean surface. At the surface, the oil continues to weather, forming tarballs generally less than one centimeter (0.4 inches) in diameter that may be moved by winds and currents to strand on the shoreline (Del Sontro 2007). The weathered nature and pattern of slow release of seep oil poses a lower exposure risk to marine life and has a lower acute toxicity than fresh oil that contains more toxic fractions. In contrast, during an oil spill, the amount of more toxic fresh oil released from a point source in a short time can overwhelm an ecosystem (National Research Council 2003).

In 1969, an oil spill occurred five miles off the coast of Summerland from a blow-out at Union Oil Platform A. Over 3,000,000 gallons (11 million liters) of crude oil was released that mainly affected the area from Gaviota to Carpinteria. Some oil from the spill was detected as far north as Pismo Beach, located approximately 75 miles (121 km) north from the spill point (straight line distance), and as far south as Mexico located approximately 200 miles (322 km) south from the spill point (straight line distance). At that time, this was the largest oil spill in U.S. history, and is credited as having catalyzed the U.S. environmental movement.

28

## 2.2    Marine and Coastal Managed and Protected Areas

Several Marine Protected Areas (MPAs) occur near or within the general area affected by the spill from Point Conception to Ventura. MPAs are protected areas of ocean where human activity, such as fishing, is restricted for conservation purposes. MPAs come in a variety of forms that include National Marine Sanctuaries and State Marine Protected Areas. MPAs are a versatile management tool for helping to maintain biological diversity and productivity, rebuild fishery stocks, support sustainable fisheries, and conserve and protect historical and cultural artifacts. In addition, the Channel Islands National Park and portions of the California Coastal National Monument provide protected habitat for resources in the area. Finally, public beaches, including high use beaches were affected by the spill (Figure 7).



**Figure 7.** Public lands and protected areas in the vicinity of the Refugio Beach Oil Spill origin. Additional public lands managed by Counties and Cities occur in the area but are not shown on this map. See Appendix B for data associated with this figure.

### 2.2.1   County and City Beaches

Several County and City beaches were affected by the spill within Santa Barbara, Ventura, and Los Angeles Counties. For example, Goleta Beach Park is a day use facility managed by the Santa Barbara County Parks. It is located on a section of sand beach east of the University of California, Santa Barbara (UCSB). Amenities include a fishing pier, picnic tables, BBQs, trails, grass park, play areas, restaurant, and launch/hoist for small boats at the end of the pier. Isla Vista Beach at Isla Vista is used extensively by UCSB students and the community. Haskell's Beach (previously known as Tecolote Canyon Beach) is a high public use beach and surfing area in the City of Goleta. City and County beaches within Ventura and Los Angeles Counties are

29

frequently used as recreation access points for surfing, fishing, diving, boating, and general beach use.

### 2.2.2   University of California Santa Barbara Natural Reserve System

The Coal Oil Point Reserve is part of the University of California Natural Reserve System. The reserve protects coastal dune, estuarine, tidal lagoon, sandy beach, and rocky reef habitats to support research, education, outreach, and stewardship.

### 2.2.3   State Beaches

Within the spill-affected area, Gaviota State Park, Refugio, El Capitan, Carpinteria, Emma Wood and McGrath State Beaches are areas of high public use with amenities for overnight camping and shore access. The State Beaches along the Gaviota coast provide the public with unique camping and recreational opportunities that are highly sought after and are booked well in advance. Additionally, San Buenaventura and Mandalay State Beaches provide coastal day use access. The pier at Gaviota State Beach was closed in 2014 due to storm damage, so public use was precluded prior to the spill.

### 2.2.4   State Marine Protected Areas

In 1999, the State legislature enacted the Marine Life Protection Act. This directed the CDFW to restructure the state's MPA system to increase the ability to protect marine life, habitats, and ecosystems. In 2012, MPAs were designated along the Santa Barbara County coast south of Point Conception.

Seven state marine conservation areas occur in the spill-affected area with varying levels of resource protection ranging from no-take to limited take involving fishes, invertebrates, kelp, and restoration, maintenance, and operation of artificial structures; these are Kashtayit, Naples, Campus Point, Goleta Slough, Point Dume, and Point Vincente State Marine Conservation Areas (Figure 7). The Goleta Slough Ecological Reserve overlaps with a portion of the Goleta Slough State Marine Conservation Area where no human activities are allowed, except access on an established trail/bike path. Public access is limited because the airport is next to the Reserve. To the west of the spill-affected area is the Point Conception State Marine Reserve of no-take.

### 2.2.5   National Marine Sanctuary System

NOAA's Office of National Marine Sanctuaries serves as the trustee for a network of underwater parks encompassing more than 600,000 square miles of marine and Great Lakes waters. The network includes a system of 13 national marine sanctuaries and two marine national monuments. The program's function through the creation of National Marine Sanctuaries is to protect marine environments with special ecological, historical, cultural, archeological, scientific, educational, recreational, and aesthetic qualities.

There was no oil observed or collected matching Line 901 oil within the waters of the Channel Island National Marine Sanctuary (CINMS).  However according to the GNOME trajectory, it is

30

possible that scattered tarballs did travel through CINMS waters at some point in time. The CINMS, designated in 1980, warrants inclusion in this report for its importance with regards to environmental protection and public interest proximate to the spill. The CINMS (Figure 7) encompasses the waters surrounding five Channel Islands (San Miguel, Santa Rosa, Santa Cruz, Anacapa, and Santa Barbara) below the mean high tide level and out 6.9 miles (6 nautical miles, 11 km). Associated with the Channel Islands are 20 other MPAs. Within five Federal, and 11 State Marine Reserves, it is unlawful to injure, damage, take, or possess any living geological, or cultural marine resource. In another five State Marine Conservation Areas, limited take is allowed, and within two State Special Closure Areas boating activities are restricted in waters adjacent to sea bird rookeries and/or marine mammal haulout sites.

### 2.2.6  National Park System

The Channel Islands National Park consists of San Miguel, Santa Rosa, Santa Cruz, Anacapa, and Santa Barbara Islands (Figure 7) and the waters extending out one nautical mile around each island. Congress established the Channel Islands as a National Park in 1980 in order to protect their natural, scenic, wildlife, marine, ecological, archeological, cultural, and scientific values. The Islands are home to over 2,000 plant and animal species, of which 145 are found nowhere else in the world, and much of the terrestrial environment is managed as proposed or potential Wilderness Area. Important to this incident, West Anacapa and Santa Barbara Islands provide the only breeding colonies for the California Brown Pelican in the western United States. Tourism is allowed, and hiking, camping, and kayaking occur at varying levels on and around each island.

### 2.2.7  California Coastal National Monument

The California Coastal National Monument, managed by the Bureau of Land Management, consists of the rocky areas above the mean high tide level, including over 20,000 offshore rocks, islands, reefs, and pinnacles within 13.8 miles (12 nautical miles, 22 km) of the mainland shore. Sixty-two of these rocky features occur along the shore from the Gaviota Pier east to Campus Point at U.C. Santa Barbara. The monument provides untrammeled nesting habitat for breeding seabirds and protected haulout habitat for seals and sea lions.

## 2.3    Biological Resources

The affected area has one of the most diverse and abundant assemblages of marine organisms in the world. A rich array of habitats including the open ocean, rugged rocky shores, sandy beaches, lush kelp forests, and wetlands, support large numbers of seals and sea lions, whales, fish, otters, and seabirds. For many migratory species such as whales, seals, salmonids, and brown pelicans, the affected area is also an important link to other habitats. This section includes a broad description of all biological resources in areas that were affected by the spill, as well as resources that weren't affected by the spill but may be included in restoration projects. A description of resources that were injured is presented in Section 5.

31

### 2.3.1  Marine Mammals

The mainland coast of southern California that includes Santa Barbara County and the Channel Islands provides important breeding, pupping and resting areas for most of the pinniped species in the region. These include two species of sea lions (California sea lion and Stellar sea lion), four species of seals (northern elephant seal, Pacific harbor seal, northern fur seal, and the endangered Guadalupe fur seal). The threatened southern sea otter also occurs along the mainland coast of Santa Barbara County, primarily west of Gaviota.

California sea lions are the most abundant pinniped. Nearly all breeding and pupping occurs in the California Channel Islands area. Sea lions also haul out on offshore rocks and beaches on the mainland and Channel Islands.

Northern elephant seals breed in the winter months, molt in spring, and forage in offshore waters throughout the eastern North Pacific during summer and fall. Peak haul out abundances occur during spring when juveniles and females come ashore to molt.

Pacific harbor seals are year-round residents in the area. They haul out on several mainland beaches within the spill-affected area and on the Channel Islands. Mainland haulouts include near El Capitan State Beach, Naples, Haskell's, and a major rookery at Carpinteria, peaking in February-June when breeding, pupping and molting is occurring. Harbor seals typically forage relatively close to where they haul out.

More than 20 species of whales, dolphins, and porpoises occur regularly in the waters off Santa Barbara and Ventura Counties and the Channel Islands, but the following are the most common: gray, blue and humpback whales, long- and short-beaked common dolphins, common bottlenose dolphins, and Pacific white-sided dolphins. The whales are migratory and are most often sighted during spring and summer. Dolphins are considered year-round residents. The region is also the migratory pathway of gray whales (adult females and calves), which migrate within 1 km of shore as they travel north to their summer foraging grounds. Other large baleen whales also forage in the area. The coastal ecotype of common bottlenose dolphin, a distinct population, live within 1 km of shore, and both species of common dolphin can be regularly sighted from shore.

### 2.3.2  Seabirds

The spill-affected area is also within the Pacific Flyway, which is a major north-south flyway for migratory birds in America, extending from Alaska to Patagonia, South America. The spill-affected area includes several areas identified by the Audubon Society as Important Bird Areas (IBAs): Point Conception, Santa Barbara Basin, Point Mugu, Santa Cruz Basin, Northern Channel Islands, and Palos Verdes. The Goleta Coast IBA is also within the spill-affected area, and includes Coal Oil Point and Goleta Slough and the beaches between.

Seabirds characteristic of open water areas within the spill-affected area include surf and white-winged scoters; horned and western grebes; red-throated and common loons; brown pelicans;

32

Brandt's, double-crested, and pelagic cormorants; and many species of gulls and terns. Pelagic seabirds that were present in the area during the summer when the spill occurred include black-footed albatrosses, shearwaters, storm-petrels, phalaropes, jaegers, and several alcids including Scripp's murrelets.

Seabirds characteristic of rocky shores within the spill-affected area include black oystercatchers, Brandt's and pelagic cormorants, and pigeon guillemots. Rocky platforms exposed during low tide tend to be occupied by black and ruddy turnstones, great and snowy egrets, brown pelicans, black-crowned night-herons, shorebirds, and gulls. Western snowy plovers, California least terns, and horned larks all nest on sandy beaches and dune areas within the spill area; the same areas are also utilized by shorebirds that include black-bellied plovers, whimbrels, long-billed curlews, marbled godwits, sanderlings and willets, gulls (mew, ring-billed, western, California, glaucous-winged), and Forster's and royal terns. Beach wrack in the upper zones of sandy beaches are used by short-billed and long-billed dowitchers, black and Say's phoebes, American pipits, and yellow-rumped warblers.

### 2.3.3   Subtidal and Fish Habitats

Fish composition and abundance are both strongly associated with habitat type and structure, and each type of habitat generally supports its own characteristic assemblage of fishes. The Santa Barbara County nearshore coastal fish habitats described and defined here are the habitats inshore of the -66 ft (-20 m) depth contour relative to the mean lower low water (MLLW) tide level. This nearshore zone includes kelp forests, rocky reefs, sandy bottom, seagrass beds, and the pelagic water column.

Submerged rocky reefs support forests of giant kelp. Anchored by holdfasts to the rocky seafloor, the buoyant stipes and fronds rise through the water column and spread out on the sea surface. Kelp forests thus provide benthic (seafloor), mid-water, and surface habitats that are utilized by many fish species, many of which are residential in kelp forests (Schiel and Foster 2015). Fishes, such as kelp rockfish, surfperch, sheephead, opaleye, halfmoon, señorita, white seabass, and kelp bass tend to occur in the mid-water and swim about freely in the kelp forest. Kelp forests also provide habitat for certain sharks, such as leopard and smoothhound sharks.

In addition to kelp, submerged rocky reefs also support macroalgae and surfgrass species, often occurring as understory to giant kelp. Fish, such as gopher rockfish, grass rockfish, giant kelpfish, scorpion fish, cabezon, and painted greenlings are bottom-dwellers (demersal fishes) and are often associated with the foliose algal understory. Adult spiny lobsters inhabit cracks and crevices of the rocky reef, while juvenile spiny lobsters use surfgrass habitat in the shallow subtidal for refuge and feeding.

Along sand flats and in sand channels bisecting rocky reefs, rays, skates, and flat fishes (halibut, sandabs, flounders, soles) are more common. Seagrasses (eelgrass and surfgrass) occur as meadows of long grass-green leaves (blades) that provide refuge and foraging areas for many of

33

the same species of fish that occur in kelp forests and on sand flats. Eelgrass beds also provide spawning habitat for fish.

The pelagic water column habitat contains numerous species of plankton, or life forms that cannot swim against the current but rather move primarily by drifting. Many of these plankton are important food sources for fishes and other marine creatures, providing a foundation for the complex food webs that make up the marine environment in the marine region. The larvae and eggs of many fish and invertebrate species are also considered plankton, though their adult stages are sessile or free-swimming organisms. These marine larvae develop and grow while subject to the movement of ocean currents that can transport them many miles from their natal (spawning) habitat. Eventually, these planktonic larvae mature into their non-planktonic life stage and settle out in their adult habitats, which can include kelp forests, rocky reefs, seagrass beds, sand flats, and deep offshore water. The nearshore pelagic water column habitat is also the main habitat for many species of schooling fishes, such as anchovies, sardines, and topsmelt, and also includes mobile invertebrates (e.g., market squid). In turn, these forms are the basis food source for larger forms (e.g., predatory fishes, sharks, seabirds, and marine mammals).

The rocky intertidal zone, the shore between the high and low tidal levels, is also habitat for fishes. The fishes in this zone are characterized by a smaller group of species specially adapted for life in tidepools and in the spaces beneath and between cobbles and boulders. The most representative intertidal fish species are tidepool sculpins, juvenile opaleye, and blennies.

Sandy beaches are extensive along the Santa Barbara, Ventura, and Los Angeles County coasts, and many beaches in south Santa Barbara County are important spawning habitat for California grunion. A variety of other fish species, such as barred surfperch, walleye surfperch, and corbina, forage on the burrowing intertidal invertebrates in surf and swash zones.

Several fishes that occur in the area have special protections. The Southern California Coast Distinct Population Segment (DPS) of steelhead trout is a federally endangered species. Steelhead are rainbow trout that spend the majority of their life in the ocean and return to freshwater streams to spawn (anadromous species). However, unlike the closely related salmon that are also anadromous, adult steelhead return to spawn in freshwater several times, not just once. In addition to steelhead trout, coho (silver) salmon and Chinook (king) salmon can also occur in the marine region. The coho salmon is both a state and federally listed endangered species, and the Chinook (king) salmon is a federally threatened species in California coastal waters.

Giant (black) sea bass is a marine species prohibited from commercial and recreational fishery take, and the International Union for Conservation of Nature classifies giant (black) sea bass as a critically endangered species. However, one giant (black) sea bass may be taken incidentally per trip in gill or trammel nets in the commercial fisheries, which is not uncommon. Take of great white sharks is also prohibited, with exceptions for possible incidental and accidental take in

34

commercial fisheries. Broomtail grouper is another fully protected marine fish species with a large range (San Francisco-Peru, South America) that can occur along the Santa Barbara, Ventura, and Los Angeles County coasts. One of the more visible fishes is the garibaldi, a very recognizable, bright orange damselfish. California State Legislature designated the garibaldi as the state marine fish and prohibited from take in California coastal waters.

### 2.3.4   Shoreline Habitats

The richness and diversity of intertidal invertebrates in any given area is closely related to the composition, rugosity, and stability of the substrate, tidal level, depth, and exposure to waves. Much of the rocky intertidal habitat in the affected environment consists of low-lying shale or sandstone occurring as ridges parallel to shore with lower elevation portions heavily exposed to periodic sand burial and sand scour. Some intertidal areas near creek mouths can be characterized as being largely boulder fields. Mussel beds are limited to the areas of larger and harder rock substrate in areas above sand burial depths. Common intertidal invertebrates can also include sand castle (honeycomb) worms, acorn and gooseneck barnacles, sea anemones, purple sea urchins, bryozoans, tunicates, and sponges. Common mobile invertebrate species in the intertidal zone include ochre sea stars, bat stars, hermit crabs, turban snails, limpets, whelks, nudibranchs, chitons, lined shore crabs, polychaete and nemertean worms, and more. The high intertidal splash zone is inhabited by periwinkle snails and limpets. Many more invertebrates occur in the mid- and low-intertidal zone, and also in the subtidal zone. These include octopus, top snails, abalone, red sea urchins, clams, California spiny lobsters, shrimp, rock crabs, decorator crabs, cup corals, feather duster worms, and more.

Sandy beaches are the most common intertidal habitat in the spill-affected area, and support a diversity of invertebrates tolerant of the constantly shifting sands from wave action and strong directional longshore transport of sand. Bivalve mollusks, polychaete worms (including bloodworms), beach endemic insects, and crustaceans that include sand or mole crabs, and beach hoppers (i.e., talitrid amphipods) are the predominant invertebrates on sandy beaches. The accumulation of drift algae (wrack) that is stranded on sandy beaches provides food and habitat for many species of beach hoppers, terrestrial isopods, and insects. Insects include the kelp fly, flightless beetles such as the globose dune beetle (candidate for federal listing), and predatory rove beetles. The sand bottom of the surf zone and immediately beyond support sand dollars, clams, and gastropods such as the purple olive snail.

### 2.3.5   Algae and Seagrasses

Macroalgae such as kelp and marine grasses (discussed above in the Subtidal and Fish Habitats section) such as surfgrass and eelgrass are examples of foundational species for the nearshore environment along the Gaviota Coast. A foundational species is one where the organism itself creates ecological communities by providing habitat structure and primary productivity.

Intertidal algae tend to occur as bands parallel to shore and their distribution depends on exposure to waves, tidal height, and rock structure. The upper vertical range of an algal species

35

in the rocky intertidal is largely determined by its ability to withstand desiccation. Accordingly, the high intertidal zone that is only occasionally wetted by wave splash is sparsely populated with algae. The barren appearance of the splash zone disappears lower in the intertidal zone, below the +3 ft (1 m) Mean Low-Low Water (MLLW) tide level and lower, with algal cover being more prevalent and persistent. Algal forms can be blade/sheet-like, branch-like, turf, filamentous, and crustose. Some of the more conspicuous intertidal species include the turf-like nailbrush seaweed and the blade-like grapestone seaweed, which are perennial species. A species group characteristic of most mid-intertidal zones in California but conspicuously absent or in low abundances along the Santa Barbara, Ventura, and Los Angeles County coast are brown rockweed species of the order Fucales. In the low-intertidal, Turkish-towel seaweed can be abundant with articulated coralline algae. The lowest zones will include brown feather boa kelp, bladder kelp, and branched red alga.

Unlike algal species, seagrasses are true plants. They have vascular tissue to transport internal metabolites and nutrients, and they reproduce via flowers and seeds instead of spores, as is the case with algae. The plants are attached to the substrate by rhizomes, and the remaining structure consists of long narrow emerald green leaves (blades) up to 1.5 m long. Seagrasses are important primary producers, and they provide important habitat functions, including shelter and nursery grounds for invertebrates and fishes. Seagrasses also stabilize sand from shifting about. Surfgrass occurs on boulders and rocky reefs from the low-intertidal to as deep as approximately -23 ft (-7 m) MLLW with abundance declining with depth (Williams 1995). Along the south coast, eelgrass grows in soft sediments between depths of approximately -20 ft (-6 m) and -40 ft (-12 m) (J. Altstatt, personal communication, April 9, 2018). Seagrass habitat is classified as Essential Fish Habitat by NOAA, National Marine Fisheries Service (NMFS).

Subtidal algal composition is largely dependent on the stability of the substrate and available light based on water clarity and depth. Giant kelp are the predominant kelp along the coast, occurring as dense forests growing on rocky reefs from the low-intertidal to depths of approximately -18 m MLLW. Bladder chain kelp and feather boa kelp are common in shallower water along the inshore fringes of giant kelp forests. The algal understory is generally characterized by mostly red algal species of various sizes, morphology, distribution, and abundance.

The wrack created from the seasonal loss of these plants (e.g., beach-stranded drift algae and surf grass) through storms also fuels the productivity of local sand beach and nearshore sand bottom habitats. Loss of or damage to these plants, particularly in the spring and summer, have cascading consequences for multiple associated fish and invertebrate species in the affected area.

### 2.3.6  Threatened and Endangered Species

Federal and state levels of special-status designations include:

- Federally Endangered;
- Federally Threatened;

36

- State Endangered;
- State Threatened;
- State Fully Protected Species; and
- California Species of Special Concern (pursuant to the 2008 list).

The federal Endangered Species Act (ESA) of 1973 (16 USC Section 1531 et seq.) and the California Endangered Species Act (CESA) of 1970 (Ca. Fish and Game Code Section 2050 et seq.) require the protection and conservation of listed endangered and threatened fishes, plants, and wildlife. The habitat of endangered, threatened, and rare species also takes on special importance because of these laws, and the protection and conservation of these species requires diligent management. At least three state- and/or federally-listed species were exposed to Line 901 oil from the spill: the threatened western snowy plover, the endangered black abalone, and the endangered humpback whales.

Several other state- and federally-listed or protected species occur in areas exposed to the spill. However, these species are not thought to have been affected by the spill either because they were not present in the area at the time of the spill due to migration timing, low overall population density or scarcity, or because oil never reached their habitat. These species include the California red-legged frog, Gaviota tarplant, light-footed Ridgway rail, Belding's savannah sparrow, California least tern, southern sea otter, Steller sea lion, Guadalupe fur seal, blue whale and fin whale, green turtle, hawksbill turtle, leatherback turtle, and loggerhead turtle. For pelagic seabirds such as the Scripps's murrelet it is possible that these birds could have encountered oil from the spill, but there was no evidence of mortality.

Two federally endangered fish species, the tidewater goby and Southern California Coast Steelhead DPS, are known to occur in coastal watersheds along the Gaviota Coast (USFWS 2005; NMFS 2012). Following the spill, a visual assessment of the entrances to streams and estuaries was completed by USFWS and NOAA. It was determined that there were large natural berms or artificial booms in place at the entrances to the streams and estuaries in the spill-affected area, making exposure to oil unlikely. Thus, the Trustees did not pursue further studies in these watersheds.

## 2.4   Archeological and Cultural Resources

The affected environment along the Gaviota coast is home to a wide variety of culturally and historically important resources. A number of Federal and State laws, regulations, and policies govern the protection of cultural and historic resources during an emergency response and subsequent NRDA restoration, including the National Historic Preservation Act of 1966, The Native American Graves Protection and Repatriation Act of 1990, and California Executive Order B-10-11.

37

To protect cultural and archeological resources during the spill response, the Unified Command established a Cultural/Historic Group comprised of State, Federal and tribal representatives with knowledge and expertise of the cultural and historical resources in the area. The Unified Command invited California tribes listed by the Native American Heritage Commission, regardless of federal recognition status, to be a part of the response (CDFW 2016). The Cultural/Historic Group's participating tribes included:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareno Band of Chumash Indians; and
- Barbareno Ventureno Band of Mission Indians.

A report of cultural resource monitoring that occurred during the spill, along with a summary of impacts to cultural resources, was compiled by Nocerino et al. (2016) of Applied Earth Works. Because it contains archeological site information, it is confidential. The sections below are excerpted largely from Nocerino et al. (2016) and contain the non-confidential details summarizing the general nature of archeological and cultural resources in the spill-affected area, as well as impacts to those resources from the spill and response activities.

The Chumash Indians and their Native American ancestors have occupied the Santa Barbara Channel region for at least 13,000 years and thousands of their descendants live in the area today. Prior to European contact, the coastal Chumash had some of the highest population densities recorded for hunter-gatherers in North America. The Chumash people lived in villages along the California coast from Malibu to Morro Bay, and extended to the northern Channel Islands (McGinnis et al. 2004). Along the Santa Barbara Channel, the antiquity and density of Chumash occupation has led to a very large number of archeological sites ranging from historic Chumash coastal towns to ancient villages, cemeteries, campsites, and temporary locations. The density of Native American sites is particularly high within the central response area along the western Santa Barbara Channel, where the narrow coastal plain concentrated settlement within a thin band of land. The area also contains numerous historical sites dating to the Spanish, Mexican, and American periods, including shipwrecks, homesteads, ranching and fishing facilities, roads, railroads, oil facilities, and more. In some cases, historical facilities such as piers and seawalls extended into the intertidal zone and into nearshore waters. As was the case with Native American sites, coastal erosion has also resulted in the exposure or redeposition of historic artifacts or properties in the intertidal zone or on beaches of the Santa Barbara Coast.

The archeological sites along the Gaviota coast demonstrate an intimate use of coastal resources for subsistence of native people and their cultural traditions through time. Sites dating back to at least 13,000 years contain stemmed points and flaked stone crescents associated with remains of shellfish, fish, marine mammals, seabirds, and waterfowl, including a number of species closely associated with kelp forest habitats. The Channel Islands region is considered the place of origin for the Chumash people and is central to their cosmology (Office of National Marine Sanctuaries 2019). A Chumash creation story tells of the crossing of Chumash people from the Channel Islands to the mainland across a wištoyo (rainbow), during which some become dizzy and fall

38

from the bridge and are transformed into 'alolk'oy (dolphins) by Hutash (Earth Goddess) (Tumamait-Stenslie 2014). This story exemplifies the foundational importance of the Santa Barbara Channel and its natural resources to the Chumash people, and illustrates the cultural importance of key species, such as dolphins. Dolphins and abalone are regarded as Chumash brothers and sisters of the ocean (Office of National Marine Sanctuaries 2019).

Applied Earthworks initiated a records search on May 20, 2015, in order to identify the types of cultural resources that may be encountered in the response area. The records search encompassed the area within 0.5 mile of the shoreline between Point Conception and Rincon Point. A review of the records identified 99 archeological sites were within the "response envelope" between Gaviota and Rincon Point, from the low tideline to 0.25 mile inland. Only one other cultural resource (a row of historic palm trees at Refugio State Beach) is within the response envelope. Of the 99 archeological sites within the response envelope, 26 sites plus the row of palm trees were assessed for potential impacts resulting from response activities. The remaining 73 sites were not in or near response activities and were not assessed. Three previously unrecorded archeological sites, six previously unrecorded historic seawalls, and a historical culvert were identified within the response envelope during the cleanup monitoring and survey.

During beach and shoreline cleaning operations, the Cultural/Historical Group, led by a Cultural/Historical Technical Specialist from CDFW, coordinated tribal representatives and non-tribal archeologists to be present to identify bones, artifacts, and potential artifacts encountered. Additional details of this coordination are available in the Refugio Oil Spill Response Evaluation Report (CDFW 2016). In several areas, access to beaches necessitated foot travel by cleanup crews across archeological sites because no safe alternatives could be identified. Trail delineations, carpet anchored with sandbags, and all–terrain vehicle restrictions were implemented for these locations. In addition, archaeologists and tribal representatives were present to ensure crews remained on the paths and protective measures remained in place.

During cleaning operations, isolated redeposited artifacts were noted in the intertidal zone at Refugio State Beach and El Capitan State Beach, within the jurisdiction of California State Parks, beginning on the first day of the incident response. The majority of the items were ground stone fragments (e.g., bowl or mortar fragments). These artifacts were evaluated by the Cultural/Historical Group. Because their original context could not be identified, these items were considered ineligible for listing on the National Register of Historic Places and California Register of Historical Resources. Some tribal representatives expressed concerns regarding sensitive cultural values associated with these intertidal artifacts and their desire to avoid oiling or other disturbance of these items during response activities.

The incident's Historic Properties Treatment Plan called for leaving isolated intertidal artifacts in place unless there was an imminent risk of oiling or disturbance by incoming tides, in which case such artifacts were to be temporarily collected until such risk abated. During the spill, the Cultural/Historical Group collected 37 artifacts from the intertidal zone, as well as numerous other items that were inspected and determined not to be artifacts. Of the items collected, two

39

were redeposited at sea during the response, following consultation among the Cultural/Historical Group. The remaining artifacts were archived at the La Purisima Mission State Historic Park following discussion and consent among California State Parks and the involved tribes.

Nocerino et al. (2016) conclude that there were no significant impacts to potentially significant archeological deposits due to the oil release or resulting response operations, and that efforts made by the Unified Command, and the Cultural/Historical Group successfully avoided significant impacts to cultural resources.

## 2.4.1  Coordination with Native American Tribes

During the course of the NRDA, the Trustees coordinated with several tribes identified during the oil spill response with cultural and traditional affiliation to the area affected by the spill, including:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareño Band of Chumash Indians; and
- Barbareño/Ventureño Band of Mission Indians.

Most of these tribes participated in the oil spill response by providing monitors to protect historic sites during cleanup operations. Under OPA, federally-recognized tribes may designate tribal officials to act as trustee for their tribal natural resources and may make a claim for injuries to those resources, such as in cases where reservation lands or a treaty right has been injured by the spill. In this case, reservation lands of the Santa Ynez Band of Chumash Indians were not impacted, and no treaty rights were identified to have been injured by the spill. However, the natural resources that are the subject of the NRDA are culturally important to all of the affected tribes and, as such, the Trustees made efforts to communicate with the tribes throughout the NRDA process and to seek their input on restoration priorities.

While the other bands do not have trustee status under OPA, the trustees from the State of California communicated with as many tribes as possible throughout the process consistent with state law and policies. During the public comment period following the release of the Draft DARP/EA, the Trustees were informed that additional tribes, bands and clans may have an interest in some of the Tier 1 and 2 projects impact natural cultural resources important to the Chumash community and/or restore sensitive ecosystems critical to Chumash lifeways.

Following the public comment period, the Trustees contacted the Native American Heritage Commission to obtain an updated list of tribes with cultural and traditional affiliation to the area of impact.  In addition, through the public comment process the Trustees were provided the names of the additional tribes, bands and clans that may have an interest in some of the Tier 1 and 2 projects. Through these combined efforts, the following additional tribes were identified:

- Barbareño Chumash Tribal Council;

40

- Chumash Indian Council of Bakersfield of California;
- Northern Chumash Tribal Council;
- Salinan-Chumash Nation;
- San Luis Obispo County Chumash Council;
- Tejon Indian Tribe; and
- Yak Tityu Tityu Yak Tilhini Northern Chumash.

The Trustees conducted additional coordination with tribes following the public comment process and before finalizing the DARP/EA. We anticipate continued coordination with tribes throughout the implementation of restoration to ensure that restoration is conducted in a way that is protective of sacred sites and is respectful of cultural keystone species that have significance beyond their role in the ecosystem. This coordination will allow tribes to share traditional and local knowledge of managing the resources that were damaged as a result of the spill (Sea Grant Network 2018).

## 2.5   Recreational Services

The impacted beaches are some of the most popular in the state. Refugio and El Capitan State Beaches are among the few places on the California coast where one can camp immediately adjacent to the beach in the shade of coast live oaks, western sycamores, and in the case of Refugio, palm trees. These campgrounds are often full in the summer and require reservations made long in advance. In addition to these camping areas, there are numerous coastal access points where the public can enjoy beach access along undeveloped areas with a variety of recreation activities. The affected environment also supports boating and offshore recreation opportunities such as diving and fishing. There are significant recreational impacts from the spill that are described further in Section 5.5.

41

## 3.0  Coordination and Compliance

## 3.1  Federal and State Trustee Agencies

United States Department of Commerce represented by NOAA; the United States Department of the Interior represented by USFWS, NPS and BLM; the CDFW-OSPR; the CDPR; the CSLC; and the Regents of the University of California are the Trustees who are addressing the natural resources injured by the spill. NOAA and DOI are designated Trustees for natural resources pursuant to the Oil Pollution Act (33 U.S.C. §§ 2701–2762) and subpart G of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) (40 C.F.R § 300.600) and Executive Order 12580 (3 CFR, 1987 Comp., p. 193, 52 Fed. Reg. 2923 (January 23, 1987), as amended by Exec. Order No. 12777 (56 Fed. Reg. 54757 (October 22, 1991)). CDFW and CDPR have been designated as state trustees for natural resources pursuant to Section 1006(b)(3) of the OPA. In addition, CDFW has state natural resource trustee authority pursuant to Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (Government Code § 8670.1 et seq.). CDPR and UC Regents also have jurisdiction over natural resources within the state park system and the natural reserve system, respectively, which are held in trust for the people of the State of California. Finally, CSLC is participating as a Trustee pursuant to its jurisdiction under Public Resources Code §§ 6009 and 6301 over all state sovereign lands, including ungranted tidelands and submerged lands. As a designated Trustee, each agency is authorized to act on behalf of the public under state and/or federal law to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

## 3.2  Coordination

### 3.2.1  Coordination Among the Trustees

Federal regulations implementing OPA with respect to natural resource damages ("OPA NRDA regulations") provide that where an oil spill affects the interests of multiple Trustees, they should act jointly to ensure that full restoration is achieved without double recovery of damages (15 CFR § 990.14(a)). The Trustees in this matter have worked together closely in a shared effort to fully assess the nature and extent of injuries to natural resources and plan appropriate actions to restore the injured resources.

At the beginning of the NRDA, the Trustees jointly designated CDFW as the Lead Administrative Trustee (LAT) to act as coordinator pursuant to 15 CFR § 990.14(a)(1). The Trustees also designated NOAA as the Federal Lead Administrative Trustee (FLAT) to coordinate those activities, such as NEPA compliance, that must be undertaken by a Federal agency. In addition to coordinating amongst themselves, the Trustees also coordinated NRDA activities with other affected entities, including Santa Barbara County, the City of Goleta and others.

42

### 3.2.2  Coordination with Federally Recognized and Non-Federally Recognized Tribes

The Trustees coordinated with several American Indian tribes in the course of this NRDA. These included:

- Santa Ynez Band of the Chumash Indians (federally-recognized);
- Coastal Band of the Chumash Nation, including the Owl Clan;
- Barbareno Band of Chumash Indians; and
- Barbareno Ventureno Band of Mission Indians.

These tribes participated in the oil spill response by providing monitors to protect historic sites during cleanup operations. Under OPA, federally-recognized tribes may serve as natural resource trustees and make a claim for NRD. In this case, the Santa Ynez Band of Chumash Indians elected not to join the claim, but remain interested in the restoration process generally. For this reason, the Trustees continue to engage with Santa Ynez Band of Chumash regularly, simultaneously fulfilling the federal Trustees' tribal consultation obligations. While the non-federally recognized tribes are not eligible to be a natural resource trustee under OPA, the state Trustees have communicated with these tribes throughout the process, regardless of recognition status.

### 3.2.3  Coordination with the Responsible Party

The OPA NRDA regulations encourage natural resource trustees and responsible parties to cooperate in the assessment and restoration process, providing broad discretion to the parties to determine the nature and extent of participation (15 C.F.R. § 990.14(c)). However, the Trustees retain sole authority to make determinations regarding injury and restoration (15 C.F.R. § 990.14(c)(4)).

In accordance with the regulations, the Trustees extended an invitation to the responsible party, Plains, within days of the Incident, and Plains accepted (15 C.F.R. § 990.14(c)). Thereafter, the Parties established an active cooperative assessment process, by which Trustee representatives would coordinate studies and other technical activities in the injury determination and quantification stages of the assessment with representatives of Plains. The Trustees formed technical working groups that included biologists, economists, toxicologists, and other specialists, and developed work plans that were used to guide injury assessment activities. Plains commented on work plans and participated in some studies.

This DARP/EA, while prepared solely by the Trustees, reflects consideration of the input provided by Plains' representatives. Plains does not agree with certain conclusions presented in this document.

### 3.2.4  Coordination with the Public

Throughout the NRDA process, the Trustees have made information available to the public. The Trustees held a public meeting in Santa Barbara shortly after the oil spill on January 20, 2016,

43

and they published a series of newsletters to keep the public up to date on the progress of the NRDA.

The Trustees published a Notice of Intent (NOI) to Conduct Restoration Planning on March 8, 2019, pursuant to the OPA NRDA regulations (15 C.F.R § 990.44), and concurrently opened an administrative record (15 CFR § 990.45). The Record includes documents relied upon or considered by the Trustees during the assessment and restoration planning process.

A 45-day public review period was held for the Draft DARP/EA that began on April 22, 2020 and closed on June 8, 2020. During the public review period, the Trustees received extensive comments on the DARP/EA, which can be found with the Trustees' responses in Appendix O.

The Trustees held virtual public meetings on May 13, 2020 at 1:00 and 6:00 pm PDT. At these meetings, the Trustees presented an overview of the Draft DARP/EA, answered questions, and accept public comments.

The Administrative Record is available at: https://www.diver.orr.noaa.gov/web/guest/diver-admin-record/6104. The administrative record is also available upon request at:

> Ventura Fish and Wildlife Office
> U.S. Fish and Wildlife Service
> 2493 Portola Road, Suite B
> Ventura, California 93004
> (805) 644-1766.

## 3.3    Compliance with Environmental Laws, Regulations, and Policies

### 3.3.1  The Oil Pollution Act

The Oil Pollution Act (33 U.S.C. § 2701–2762) establishes a liability regime for oil spills into navigable waters or adjacent shorelines that injure or are likely to injure natural resources and the services that those resources provide to the ecosystem or humans. Pursuant to OPA, federal and state agencies and Indian tribes may act as Trustees on behalf of the public to assess the injuries, scale restoration to compensate for those injuries, and implement restoration. The DARP/EA has been prepared jointly by DOI, NOAA, CDFW, CSPR, CSLC, and UC Regents. As described above, each of these agencies is a designated Trustee for natural resources injured by the spill.

OPA defines "natural resources" to include land, fish, wildlife, water sources, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any State or local government or Indian tribe, or any foreign government (33 U.S.C. § 2701(20)). OPA authorizes the Trustees to assess damages for injured natural resources under their trusteeship, and develop and implement a plan for the restoration, rehabilitation,

44

replacement, or acquisition of the equivalent of those injured natural resources (33 U.S.C. § 2706(c)).

The regulations for natural resource damage assessments under OPA are found at 15 C.F.R Part 990. These regulations provide the Trustees with guidelines on processes and methodologies for carrying out an NRDA, including guidelines for conducting assessments cooperatively with the responsible parties. While the decision whether or not to follow the NRDA regulations is left to the discretion of the Trustees, OPA provides that if the Trustees conduct the NRDA in accordance with the regulations, their determination or assessment of damages to natural resources will have the force and effect of a rebuttable presumption in an administrative or judicial proceeding under OPA (33 U.S.C. § 2706(e)(2); 15 C.F.R. § 990.13). In this case, the Trustees elected to conduct the NRDA in accordance with the OPA NRDA regulations.

### 3.3.2  National Marine Sanctuaries Act, 16 USC. § 1431, et seq.

The National Marine Sanctuaries Act (NMSA) authorizes the Secretary of Commerce (Secretary) to designate and manage areas of the marine environment with special national significance due to their conservation, recreational, ecological, historical, scientific, cultural, archeological, educational, or esthetic qualities as national marine sanctuaries. Day-to-day management of national marine sanctuaries has been delegated by the Secretary to the Office of National Marine Sanctuaries (ONMS). The primary objective of the NMSA is to protect marine resources, such as coral reefs, sunken historical vessels or unique habitats.

The NMSA prohibits the destruction, loss of, or injury to any sanctuary resource. The Secretary is required to conduct such enforcement activities as are necessary and reasonable to carry out the Act. The Secretary may issue special use permits which authorize specific activities in a sanctuary to establish conditions of access to and use of any sanctuary resource or to promote public use and understanding of a sanctuary resource. The NMSA also establishes, similar to OPA, liability for response costs and natural resource damages for injury to sanctuary natural resources.

In this case, the ONMS participated because of potential injury to the Channel Islands Marine Sanctuary (CINMS). CINMS staff participated as part of the Trustee group early on to identify potential injury to Sanctuary resources concurrently with similar work being conducted under OPA. However, no injuries were assessed within Sanctuary boundaries, although oiled marine mammals and birds use marine sanctuaries as part of their habitats.

The CINMS also participated in restoration planning, identifying appropriate restoration projects occurring within the CINMS. This coordination will continue for restoration projects that have the potential to affect resources within a sanctuary.

45

### 3.3.3   The National Environmental Policy Act

The National Environmental Policy Act (NEPA) is the basic national charter for the protection of the environment, and it sets forth a specific process of impact analysis and public review for federal agency actions that may significantly affect the environment (42 U.S.C. §§ 4321–4335; 40 C.F.R. § 1500.1). Its purposes are to "encourage productive and enjoyable harmony between man and the environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; and to enrich the understanding of the ecological systems and natural resources important to the Nation" 42 U.S.C. §4321. NEPA provides a mandate and a framework for federal agencies to consider all reasonably foreseeable environmental effects of their proposed actions and to potentially involve and inform the public in their process. NEPA also established the Council on Environmental Quality (CEQ) in the Executive Office of the President to formulate and recommend national policies which ensure that the programs of the federal government promote improvement of the quality of the environment. CEQ also promulgated regulations to provide Federal agencies with procedures to comply with NEPA (40 C.F.R. § 1500.1(a)).

Where potential environmental impacts are unknown or considered not likely to be significant, federal agencies will prepare an environmental assessment (EA). The EA may undergo a public review and comment period, and the process concludes with either a finding by the action agency of no significant impact (FONSI) or a determination that an Environmental Impact Statement (EIS) should be prepared. An EIS is prepared for actions considered to have significant effects on the environment, and after public review and comment, findings are documented in a record of decision (ROD).

In accordance with the regulations implementing the OPA NRDA process, the Trustees have integrated OPA restoration planning with the NEPA process (15 C.F.R. § 990.23). Accordingly, the DARP/EA serves as both an OPA restoration plan and a NEPA EA document. The Trustees anticipate that this DARP/EA will meet NEPA requirements for most of the restoration projects described herein. However, subsequent NEPA compliance may be required prior to implementation of some of the restoration actions pending development of sufficient project-level detail. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

### 3.3.4   Other Federal and State Laws, Regulations, and Policies

As described above, OPA, NMSA, and NEPA, and federal regulations implementing these laws are the major federal laws and regulations guiding the development of this DARP/EA for restoration of injured resources and services resulting from the spill. However, there are other federal and state laws, regulations or policies that may be pertinent to this DARP/EA or to implementation of the specific restoration actions described herein. Potentially relevant laws, regulations, and policies are set forth below.

46

*Clean Water Act*

The federal Water Pollution Control Act (commonly referred to as the Clean Water Act or CWA) is the principal federal statute governing water quality (33 U.S.C. §§ 1257–1387). The CWA's objective is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. The CWA regulates both the direct (point source) and indirect (non-point source) discharge of pollutants into the Nation's waters.

Section 402 of the CWA established the National Pollution Discharge Elimination System (NPDES) program. The CWA allows EPA to authorize state governments to implement the NPDES program. Section 301 of the CWA prohibits the discharge into navigable waters of any pollutant by any person from a point source unless it is in compliance with a National Pollution Discharge Elimination System (NPDES) permit. Section 319 of the CWA directs states to identify best management practices and measures to reduce non-point source pollution.

Section 311 of the CWA regulates, among other things, the discharge of oil and other hazardous substances into navigable waters, adjoining shorelines, and waters of the contiguous zone. The CWA allows the federal government to remove the discharges and assess the removal costs against the responsible party. The CWA defines removal costs to include costs for the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance.

Section 404 of the CWA authorizes the U.S. Army Corps of Engineers (the Corps) to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the waters of the United States. Section 401 of the CWA provides that any applicant for a federal permit or license to conduct any activity which may result in any discharge into navigable waters must obtain certification of compliance with state water quality standards.

The Trustees anticipate that some restoration projects may trigger CWA permitting requirements. For those projects, such as the Ellwood seawall removal, the implementing entity will be required, as a condition of receiving restoration funds, to obtain the appropriate permits prior to project implementation.

*Rivers and Harbors Appropriation Act of 1899*

The Rivers and Harbors Appropriation Act of 1899 regulates the development and use of the nation's navigable waterways (33 USC. §§ 401–427). Section 10 of the Act prohibits unauthorized obstruction or alteration of navigable waters and vests the U.S. Army Corps of Engineers with authority to regulate discharges of fill and other materials into such waters.

The Trustees do not believe that any of the restoration projects set forth in this DARP/EA have the potential to negatively affect navigable waters because none of the projects will result in the obstruction or alteration of navigable waters.

47

*Coastal Zone Management Act*

The goal of the Coastal Zone Management Act (CZMA) is to encourage and assist states to preserve, protect, develop and, where possible, restore and enhance valuable natural coastal resources (16 U.S.C. §§ 1451–1466). Participation by states is voluntary. California developed the California Coastal Management Program pursuant to the requirements of the federal CZMA, and NOAA approved the program in 1977. The State has also enacted the federally approved California Coastal Act.

Section 1456 of the CZMA requires that any federal action inside or outside of the coastal zone that affects any land or water use or natural resources of the coastal zone shall be consistent to the maximum extent practicable with the enforceable policies of approved state management programs. It states that no federal license or permit may be granted without giving the State the opportunity to concur that the project is consistent with the state's coastal policies. The regulations implementing the CZMA outline the consistency procedures.

The California Coastal Commission (CCC) is designated under California's federally approved Coastal Management Program as the state agency responsible for reviewing all consistency documents concerning most coastal lands in California. Under the California Coastal Management Program, the CCC is empowered to use the authority of the federal CZMA to ensure that federal projects and activities within the coastal zone are consistent with the policies of the California Coastal Management Program and state law.

The Trustees believe that the projects set forth in this DARP/EA can be implemented in a manner that will either have no adverse effect on coastal resources or uses or will be consistent to the maximum extent practicable with the CZMA, the California Coastal Act (California Public Resources Code Sections 30000, et seq.), and the California Coastal Management Program. Prior to implementation, the Trustees and/or the project implementers, as appropriate, will seek concurrence from the CCC for these projects.

*Endangered Species Act*

The purpose of the Endangered Species Act (ESA) is to conserve endangered and threatened species and the ecosystems upon which they depend (16 U.S.C. §§ 1531–1544). The ESA, among other things, directs all federal agencies to utilize their authorities to further these purposes. Pursuant to Section 7 of the ESA, federal agencies shall, in consultation with the Secretaries of the Interior and/or Commerce, ensure that any action that they authorize, fund, or carry out is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of designated critical habitat.

Under the ESA, the National Marine Fisheries Service (NFMS) and the USFWS publish lists of endangered and threatened species. Before initiating an action, the federal action agency (i.e., the federal agency authorizing, funding, or carrying out a discretionary activity or program), or its

48

non-federal permit applicant, must ask the USFWS and/or NMFS to provide a list of threatened, endangered, proposed, and candidate species and designated critical habitat that may be present in the project area. If no species or critical habitats are known to occur in the action area[7], the federal action agency has no further ESA obligations under Section 7. If the federal action agency determines that a project may affect a listed species or designated critical habitat, consultation is required.

If the federal action agency concludes that the project will not adversely affect listed species or critical habitat, the agency submits a "not likely to adversely affect" determination to the USFWS and/or NMFS. If the USFWS and/or NMFS concur with the federal action agency's determination of "not likely to adversely affect," then the consultation (informal to this point) is completed and the decision is put in writing.

If the federal action agency determines that the project is likely to adversely affect either a listed species or its critical habitat, then more formal consultation procedures are required. There is a designated period in which to consult (90 days), and beyond that, another set period for the USFWS and/or NMFS to prepare a biological opinion (45 days). The determination of whether or not the proposed action would be likely to jeopardize the species or adversely modify its critical habitat is contained in the biological opinion. If a jeopardy or adverse modification determination is made, the biological opinion must identify any reasonable and prudent alternatives that could allow the project to move forward.

Several federally-listed species occur in the project areas for this DARP/EA. For each selected project described in this Final DARP/EA, the Trustees and/or the project implementer, as appropriate, will evaluate the potential effects of the project on listed species and critical habitat. Based on this analysis, the Trustees and/or project implementer will perform the appropriate level of consultation with the USFWS and/or NMFS pursuant to Section 7 of the ESA.

***Magnuson-Stevens Fishery Conservation and Management Act***
The federal Magnuson-Stevens Fishery Conservation and Management Act, as amended and reauthorized by the Sustainable Fisheries Act of 1996, establishes a program to promote the protection of essential fish habitat (EFH) in the review of projects conducted under federal permits, licenses, or other authorities that affect or have the potential to affect such habitat (16 U.S.C. §§ 1801–1869). After EFH has been described and identified in fishery management plans by the regional fishery management councils, federal agencies are obligated to consult with the Secretary of Commerce with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any EFH.

---

[7] An "action area" consists of all areas that may be affected directly or indirectly by the proposed action and not merely the immediate area involved in the action.

49

EFH occurs within the project areas for this DARP/EA. For each selected project in this Final DARP/EA, the Trustees and/or the project implementer, as appropriate, will evaluate the potential effects of the project on EFH. Based on this analysis, the Trustees and/or project implementer will perform the appropriate level of consultation with NMFS.

*Fish and Wildlife Coordination Act*

The Fish and Wildlife Coordination Act (FWCA) provides the basic authority for the USFWS involvement in the evaluation of impacts to fish and wildlife from proposed water resource development projects (16 U.S.C. §§ 661–667d). The FWCA requires that federal agencies consult with the USFWS (and/or NMFS as may be appropriate) and state wildlife agencies for activities that affect, control or modify waters of any stream or other bodies of water, in order to minimize the adverse impacts of such actions on fish and wildlife resources and habitat. This consultation is generally incorporated into the process of complying with Section 404 of the Clean Water Act, NEPA or other federal permit, license or review requirements.

The Trustees or the project implementer, as appropriate, will consult with the necessary agencies on any of the selected restoration projects that involve activities that affect, control, or modify streams or other bodies of water.

*Marine Mammal Protection Act*

The Marine Mammal Protection Act (MMPA) prohibits, with certain exceptions, the take of marine mammals in US waters and by US citizens on the high seas, and the importation of marine mammals and marine mammal products into the United States. (16 U.S.C. §§ 1361–1423h). Under the MMPA, the Secretary of Commerce, through NMFS, is responsible for the conservation and management of pinnipeds (other than walruses) and cetaceans, and the Secretary of the Interior, through USFWS, is responsible for walruses, sea and marine otters, polar bears, manatees, and dugongs. Title II of the MMPA established an independent Marine Mammal Commission which provides independent oversight of the marine mammal conservation policies and programs being carried out by federal regulatory agencies. The Commission is charged with developing, reviewing, and making recommendations on domestic and international actions and policies of all federal agencies with respect to marine mammal protection and conservation. The MMPA provides for several exceptions to the moratorium on taking and importing marine mammals and marine mammal products. NMFS and USFWS may issue permits for take or importation for purposes of scientific research, public display, photography for educational or commercial purposes, enhancing the survival or recovery of a species or stock, importation of certain polar bear parts taken in sports hunting in Canada, and incidental taking in the course of commercial fishing operations.

The restoration actions set forth by the Trustees in this DARP/EA are permitted actions under the MMPA. The Trustees will consult with NMFS and/or USFWS to ensure the selected restoration projects do not violate the MMPA.

50

*Migratory Bird Treaty Act of 1918*

The Migratory Bird Treaty Act (MBTA) implements four international treaties involving protection of migratory birds, including all marine birds, and is one of the earliest statutes to provide for avian protection by the federal government (16 U.S.C. §§ 703–712). The MBTA generally prohibits actions to "pursue, hunt, take, capture, kill, attempt to take, kill, possess, offer for sale, sell, offer to purchase, deliver for shipment, ship, cause to be shipped, deliver for transportation, transport, cause to be transported, carry, or cause to be carried by any means whatever, receive for shipment, transportation or carriage, or export, at any time, or in any manner, any migratory bird...or any part, nest, or egg of such bird." Exceptions to these prohibitions are only allowed under regulations or permits issued by the USFWS. Hunting of migratory game birds is regulated annually through a process in which the USFWS sets "framework regulations" and "special regulations" designed to maintain sustainable hunting levels. All other actions prohibited by the MBTA are only allowed under specific permits issued by the USFWS Regional Bird Permit Offices.

Implementation of restoration projects selected in this Final DARP/EA will be conducted in full compliance with the MBTA.

*Executive Order 11988 – Construction in Flood Plains*

The 1977 Executive Order 11988 seeks to avoid, to the extent possible, the long-and short-term adverse impacts associated with the occupancy and modification of flood plains and to avoid direct or indirect support of development in flood plains wherever there is a practicable alternative. Each federal agency is responsible for evaluating the potential effects of any action it may take in a flood plain. Before taking an action, the federal agency should determine whether the proposed action would occur in a flood plain. For any major federal action significantly affecting the quality of the human environment, the evaluation would be included in the agency's environmental impact statement prepared pursuant to NEPA. The agency should consider alternatives to avoid adverse effects and incompatible development in flood plains. If the only practicable alternative requires siting in a flood plain, the agency should: (1) design or modify the action to minimize potential harm, and (2) prepare and circulate a notice containing an explanation of why the action is proposed to be located in the flood plain.

None of the restoration projects set forth in this DARP/EA involve construction in a floodplain.

*Executive Order 13112 – Invasive Species*

The 1999 Executive Order 13112 requires that all federal agencies whose actions may affect the status of invasive species shall, to the extent practicable and permitted by law, (1) identify such actions, and (2) take actions specified in the Order to address the problem consistent with their authorities and budgetary resources; and (3) not authorize, fund, or carry out actions that they believe are likely to cause or promote the introduction or spread of invasive species in the United States or elsewhere unless, "pursuant to guidelines that it has prescribed, the agency has determined and made public its determination that the benefits of such actions clearly outweigh

51

the potential harm caused by invasive species; and that all feasible and prudent measures to minimize risk of harm will be taken in conjunction with the actions."

The Trustees do not believe that any of the restoration projects set forth in this DARP/EA have the potential to cause or promote the introduction or spread of invasive species. However, some of the restoration projects considered in this DARP/EA are aimed at the removal or control of non-native species.

### *Executive Order 12898 – Environmental Justice*

The 1994 Executive Order 12898 requires each federal agency to identify and address, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority and low-income populations. In the memorandum to heads of departments and agencies that accompanied executive Order 12898, the President specifically recognized the importance of procedures under NEPA for identifying and addressing environmental justice concerns. The memorandum states that "each federal agency shall analyze the environmental effects, including human health, economic and social effects, of federal actions, including effects on minority communities and low-income communities, when such analysis is required by [NEPA]." The memorandum particularly emphasizes the importance of NEPA's public participation process, directing that "each federal agency shall provide opportunities for community input in the NEPA process." Agencies are further directed to "identify potential effects and mitigation measures in consultation with affected communities, and improve the accessibility of meetings, crucial documents, and notices." The CEQ has oversight of the federal government's compliance with Executive Order 12898 and NEPA.

The Trustees have involved the affected communities by providing notice to the public, seeking public comments, holding public meetings and providing public access to the Administrative Record. In addition, all selected actions described in this Final DARP/EA are expected to have positive environmental impacts and not to impose any adverse impacts on any community.

### *Information Quality Act, Public Law 106-554, Section 515*

Information disseminated by federal agencies to the public after October 1, 2002, is subject to information quality guidelines developed by each agency pursuant to Section 515 of Public Law 106-554 that are intended to ensure and maximize the quality of the objectivity, utility and integrity of such information. This DARP/EA is an information product covered by information quality guidelines established by NOAA and DOI for this purpose. The quality of the information contained herein is consistent with the applicable parts of these guidelines.

## 3.3.5   State Laws, Regulations, and Policies

### *California Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code § 9574.1, et seq.*

The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act became effective on September 24, 1990. This legislation and subsequent amendments are the key state compensatory

52

mechanism for oil spills and establishes a comprehensive liability scheme for damages resulting from oil spills into waters of the state, excluding groundwater. The legislation also established an Administrator for oil spill response, appointed by the Governor, and the Office of Spill Prevention and Response (OSPR) within the CDFW. The Administrator is required to ensure that, as part of the response to any significant spill, damages to natural resource are assessed. Recoverable damages include damages for the injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss, the cost of rehabilitating wildlife, habitat, and other resources, and the loss of use and enjoyment of natural resources, public beaches, and other public resources.

The Administrator, a chief deputy director of CDFW, must coordinate all actions required by state or local agencies to assess injury to, and provide full mitigation for injury to, or to restore, rehabilitate, or replace, natural resources, including wildlife, fisheries, wildlife or fisheries habitat, and beaches and other coastal areas, that are damaged by an oil spill. Such actions include actions required by state trustees under Section 1006 of OPA (requiring state trustees to assess natural resource damages under their trusteeship and to develop and implement a plan for restoration of natural resources).

In this case, the state Trustees participated as part of the Trustee group to identify and quantify injuries to natural resources, including wildlife, fisheries, wildlife or fisheries habitat, and beaches and other coastal areas, and the loss of their use, under the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act concurrently with similar work being conducted under OPA.

The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act does not contain public participation requirements like OPA; however, since the natural resources belonging to, managed by, controlled by, or appertaining to the State of California or political subdivision thereof that were injured by the spill are also compensable under OPA, they are dealt with concurrently in this document.

### *California Environmental Quality Act, Pub. Res. Code 21000-21178.1*

The California Environmental Quality Act (CEQA) was adopted in 1970. Its basic purposes are to inform California governmental agencies and the public about the potentially significant effects of proposed activities, to identify ways that environmental damage can be avoided or significantly reduced, to prevent significant avoidable damage to the environment through adoption of feasible alternatives or mitigation measures, and to disclose the reasons for agency approval of a project resulting in significant environmental effects.

The CEQA process begins with a preliminary review as to whether CEQA applies to the project in question. Generally, a project is subject to CEQA if it involves a discretionary action that is carried out, funded or authorized by an agency (i.e., the lead agency), and has the potential to impact the environment, including tribal cultural resources. Once the lead agency determines that the project is subject to CEQA, the lead agency must then determine whether the action is

53

exempt from CEQA compliance under either a statutory or categorical exemption. Examples of categorical exemptions include actions taken by regulatory agencies for protection of natural resources and actions by regulatory agencies for protection of the environment (Title 14 CCR, Chapter 3, §§ 15307-15308).

If the lead agency determines that the project is not exempt, then an Initial Study is generally prepared to determine whether the project may have a significant effect on the environment. Based on the results of the Initial Study, the lead agency determines whether to prepare a Negative Declaration (i.e., the project will not result in significant adverse effects to the environment) or an Environmental Impact Report (EIR). The test for determining whether an EIR or negative declaration must be prepared is whether a fair argument can be made based on substantial evidence that the project may have a significant adverse effect on the environment. Lead agencies must also provide notice to tribes that are traditionally and culturally affiliated with the geographic area of a proposed project and who have requested notice of projects proposed within that area. If the tribe requests consultation, the lead agency must consult with the tribe and consider any alternatives or mitigation measures recommended by the tribe.

CEQA encourages the use of a federal EIS or FONSI prepared pursuant to NEPA when such documents are available, or the preparation of joint state/federal documents, in lieu of preparing a separate EIR or negative declaration under CEQA. Accordingly, this DARP/EA and subsequent FONSI, if issued, may be relied upon by the lead agency towards compliance with CEQA as required for discretionary projects that are authorized, funded or carried out by California state or local agencies. Toward this end, the state Trustees will coordinate with the federal Trustees to ensure the Final DARP/EA and FONSI (if issued) are consistent with the provisions of CEQA Guidelines including state public review requirements. (Title 14 CCR, Chapter 3, § 15220 *et seq*.).

The Trustees anticipate that this DARP/EA and subsequent FONSI, if issued, will comply with the CEQA guidelines for most of the restoration projects described herein. However, subsequent CEQA compliance may be required prior to implementation of some of the restoration actions that are conceptual at this stage, pending development of sufficient project-level detail. This will be determined once detailed engineering design work or operational plans are developed for the selected projects, and once human use projects have been defined.

***California Coastal Act, California Public Resources Code § 30000, et seq.***
The California Coastal Act was enacted by the California State Legislature in 1976 to provide long-term protection of California's 1,100-mile coastline for the benefit of current and future generations. The Coastal Act created a partnership between the state (acting through the California Coastal Commission [Commission]) and coastal cities and counties to manage the conservation and development of land and water in the coastal zone through a comprehensive planning and regulatory program. New development in the coastal zone may require a permit from the Commission or the appropriate local governmental agency. Development activities are

54

broadly defined to include construction projects, divisions of land, and activities that change the intensity of use of land or public access to coastal waters. The Commission also reviews and approves Local Coastal Programs, which are the basic planning tools used by local governments to guide development in the coastal zone. The coastal zone established by the Coastal Act does not include San Francisco Bay which is regulated by the BCDC pursuant to the McAteer-Petris Act (California Government Code Sections 66690, et seq.).

While the Trustees do not anticipate that any of the restoration projects will adversely affect coastal resources, some of the projects may meet the definition of development under the California Coastal Act, such as the Ellwood seawall removal project. The implementing entity for each selected project will be required to apply for any necessary permits and approvals, including any required coastal development permit. In addition, the federal Trustees or the implementing entity, as appropriate, will conduct consultation with the CCC, as discussed above under the CZMA.

### *California Endangered Species Act, Fish and Game Code 2050 et seq.*

Pursuant to CESA (California Fish and Game Code Sections 2050 et seq.), it is the policy of the State of California that state agencies should not approve projects that would jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat essential to the continued existence of those species if there are reasonable and prudent alternatives available. However, if reasonable alternatives are infeasible, individual projects may be approved if appropriate mitigation and enhancement measures are provided.

Pursuant to the CESA, the Fish and Game Commission has established a list of threatened and endangered species based on criteria recommended by the California Department of Fish and Game. Section 2080 of the California Fish and Game Code prohibits "take" of any species that the Commission determines to be an endangered species or a threatened species. Take is defined in Section 86 of the Fish and Game Code as "hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill." The CESA allows for take incidental to otherwise lawful development projects. The CESA emphasizes early consultation to avoid potential impacts to rare, endangered, or threatened species and to develop appropriate mitigation planning to offset project-caused losses of populations of listed species and their essential habitats.

Several state-listed species occur in the spill-affected area. While the Trustees do not believe the restoration projects set forth in this DARP/EA will result in the take of any state-listed species, the Trustees will evaluate the potential effects of the projects on these species and consult with the CDFW as may be appropriate pursuant to the requirements of the CESA.

55

***Public Resources Code, Division 6, § 6001, et seq.***

The Public Resources Code, Division 6, gives the California State Lands Commission trustee ownership over State sovereign tide and submerged lands. Permits or leases may be required from the State Lands Commission if a restoration project is located on such lands.

### 3.3.6  Other Potentially Applicable Statues and Regulations

Additional legal requirements may be applicable to NRDA restoration planning activities. The statutes listed below, or their implementing regulations, may require permits from federal or state permitting authorities:

- National Park Service Organic Act of 1916, 54 U.S.C. 100101-104907;
- Archaeological Resources Protection Act, 16 USC 460, et seq.;
- National Historic Preservation Act of 1966 as amended (16 USC 470-470t, 110);
- Clean Air Act, 42 USC 7401, et seq.; and
- Porter-Cologne Water Quality Control Act, Water Code Sections 13000 et seq.

56

# 4.0  Injury Quantification and Restoration Planning Methods

The Oil Pollution Act NRDA regulations define injury as "an observable or measurable adverse change in a natural resource or impairment of a natural resource service." The goal of an injury assessment is to determine the nature, extent and severity of injuries to natural resources, thus providing the technical basis for evaluating and properly scaling potential restoration actions to compensate for resource injuries. An impairment or loss of human uses of the natural resources, e.g., lost recreation, is compensable under the OPA NRDA regulations, as well. In contrast, natural resource damages are the monetary damages recoverable by natural resource trustees to compensate the public for the injuries to natural resources and the loss or impairment of human uses of natural resources resulting from an oil spill. Such damages include the cost to restore the injured natural resources, the monetary value of spill-related human use impacts, as well as the reasonable cost of the assessment.

For each of the injury categories evaluated following the spill and discussed in this DARP/EA, the Trustees, informed in part by the contributions of the responsible party, selected assessment procedures based on (1) the range of procedures available under section 990.27(b) of the OPA regulations; (2) the time and cost necessary to implement the procedures, and considering whether the additional cost of more complex procedures were related to the expected increase in the quantity and/or quality of the information to be acquired; (3) the potential nature, degree, and spatial and temporal extent of the injury; (4) potential restoration actions for the injury; (5) the relevance and adequacy of information generated by the procedures to meet information requirements of planning appropriate restoration actions; and (6) input from scientific experts. (15 C.F.R. § 990.27(c)).

## 4.1   Quantification of Damages

Each injury assessment focused on determining both the magnitude of the injury to a resource or a natural resource service (e.g., number of animals killed, acres impacted, or days of lost recreational opportunity) and the time to full recovery. This produced an estimate of the initial and interim (from the time of injury until full recovery) losses resulting from the oil spill.

The Trustees' next task is to determine the scale of restoration actions that adequately compensate the public for the injuries resulting from the spill. For wildlife and habitat, the Trustees have used Resource Equivalency Analysis (REA) or Habitat Equivalency Analysis (HEA), an approach that quantifies both the injury from the spill and the benefits of potential restoration projects, such that they may be compared with each other. For human recreational losses, the Trustees have used a valuation approach, estimating the number of lost user days for various activities and locations, and then calculating the lost value, in dollars, of that lost use. These methods are further described below.

57

### 4.1.1  Equivalency Analysis

For the quantification of injuries to wildlife and habitat, the Trustees have relied on a service-to-service restoration-based approach, in accordance with 990.53(d)(2). In other words, the Trustees have sought appropriate restoration projects to both restore the injured resources and compensate for the interim losses between the time of the spill and full recovery to the conditions that would have existed had the spill not occurred (see NOAA 1997). Restoration scaling is the process of determining the appropriate size of a restoration project, so as to compensate for the injuries and lost services. These projects, because of their compensatory nature, are intended to restore, replace, rehabilitate, or acquire the equivalent resources "of the same type and quality, and of comparable value" as those injured (NOAA 1995). For this task, the Trustees relied upon equivalency methods, sometimes specified as HEA when applied to habitat injuries or REA when applied to resources in general. These methods are described in greater detail in Appendix C.

### 4.1.2  Value of Lost Human Uses

To quantify lost and impaired human uses resulting from the Incident, the Trustees, partially in cooperation with the responsible party, have gathered data regarding visitor use of impacted sites and associated activities. To value those lost uses the Trustees used a travel cost model for beach camping and are employing the benefits transfer method for other shoreline and offshore uses. In other words, the Trustees determined the lost monetary value of each lost trip, and multiplied the resulting value by the number of lost trips. To compensate for the lost and diminished human uses arising from the spill, the Trustees intend to solicit project ideas from public agencies, non-governmental organizations, as well as from the general public. The Trustees will then select restoration actions using a value to cost approach, by which the cost of the restoration actions is equivalent to the lost monetary value of human uses.

For a number of reasons, the value-to-cost method is the most commonly used approach to address lost recreational use in NRD cases across the nation. The Trustees' determined that a value-to-value or service-to-service approach, which attempts to compare the value or benefits of specific restoration actions to the injury, would be impractical as the scope and/or number of studies required to implement either approach would be prohibitively time-consuming and expensive, and therefore less desirable under the assessment procedure criteria laid out in 990.27(c) and listed above.

A wide variety of recreational activities were affected by the spill. Examples include camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, and dog-walking, as well as more specialized activities such as fishing, diving, boating, and surfing. Additionally, a wide variety of shoreline locations in Santa Barbara, Ventura, and Los Angeles Counties were impacted. The Trustees anticipate implementing a suite of restoration projects to compensate for impacts to various types of activities across the spill-affected area. The Trustees' anticipate that multiple projects will compensate for recreational use impacts. Each project will require significant coordination among the landowner or manager where the projects will be

58

implemented, the local governments and the public. To properly implement a value-to-value or service-to-service approach in these circumstances would have required the Trustees to separately study, evaluate and determine the value and benefits of each individual proposed project in a range of locales. Such studies of the potential benefits of the proposed projects could easily take several years and cost several times more than the value-to-cost method employed by the Trustees.

## 4.2   Restoration Project Selection Criteria

The Trustees considered numerous restoration alternatives to compensate the public for spill-related injuries. Each restoration alternative presented in this plan was evaluated using the factors outlined in section 990.54 of the OPA regulations, as well as additional criteria deemed necessary to identify the optimal suite of restoration projects. The criteria are described below. Applying these criteria to the restoration project concepts received to date resulted in the Trustees' selection of preferred restoration alternatives described in this Final DARP/EA. All restoration alternatives submitted by the public or developed by the Trustees, other than Human Use projects, are presented in Section 5 and/or Appendix N. Appendix N includes both selected projects and second tier projects (that may be implemented if funding allows), as well as projects that did not meet the Threshold Criteria and were not further evaluated.

| Threshold Criteria | If a project does not meet these criteria, it will not be considered further per OPA 990.53(a)(2). |
|---|---|
| 1. Consistency with Trustees' Restoration Goals | • Does the project provide tangible benefits to plants, animals, and their habitats that were affected by the spill (e.g., shoreline habitats and resources, subtidal and fish habitats and resources, birds, marine mammals)? <br> • Does the project provide tangible benefits for enhancing recreational opportunities that were affected by the spill? |
| 2. Technical Feasibility | • Is the project technically and procedurally sound, and not already been funded or completed? |
| **Evaluation Criteria** | |
| 1. Nexus between the Restoration Project and the Impacts of the spill on Natural Resources | • To what extent does the project benefit shoreline habitats and resources, subtidal habitats and resources, birds, marine mammals, or recreational opportunities and users that were affected by the spill? <br> • To what extent does the project location or geographic scope of project benefits correspond to areas impacted by the spill? |
| 2. Compliance with Applicable Laws | • Will the potential project implementer have the legal right to access the project site and conduct the project, including all necessary long-term maintenance? <br> • Are there willing landowners who support the project? |

59

| | | |
|---|---|---|
| | | • How difficult and complex are the permitting processes required to implement the project?<br>• How readily will the likely project implementer be able to meet all applicable laws and obtain all relevant permits. |
| 3. | Cost-Effectiveness | • Projects that deliver greater benefits relative to their costs will be preferred over projects that provide fewer benefits relative to their costs. |
| 4. | Range of Restoration Project Benefits | • Will the project benefit more than one natural resource and/or service?<br>• Does the project fit within a total suite of selected restoration projects that address the geographic distribution and types of injuries or recreation impacts associated with the spill?<br>• The Trustees consider the extent to which a project contributes to the overall restoration plan. This includes the degree to which a project may benefit any otherwise uncompensated spill injuries. |
| 5. | Time to Provide Benefits | • Projects that begin providing benefits to the target resource or public sooner are preferred to projects where the onset of benefits is not expected until far into the future.<br>• For capital improvements, projects that are "shovel ready" will be preferred over those projects that are in the design or pre-design phases. Projects where permitting is completed (or otherwise straightforward) will be preferred to projects that require complex permitting processes that will take significant time.<br>• For projects in general, those projects that can articulate how target resource benefits or public benefits will begin in the near future will be preferred to projects that cannot. |
| 6. | Duration of Project Benefits, and Maintenance Requirements | • Projects expected to have longer term benefits are favored over those that have shorter term benefits.<br>• If long term benefits are expected, is there a mechanism in place to ensure that those benefits are realized and maintained through time?<br>• Is there an entity that will be responsible for maintaining the project over time? |
| 7. | Avoidance of Collateral Injury from Project Implementation | • Project should not benefit one natural resource to the detriment of others.<br>• A project that addresses ongoing diminishment of natural resources that resulted from the spill will be preferred. |
| 8. | Likelihood of Project Success | • Projects with a higher likelihood of successful implementation (e.g., obtaining necessary permits, constructing improvements, carrying out project-related activities), and that are otherwise more technically feasible are preferred. |

60

| | |
|---|---|
| | • Will there be objective indicators to measure project success and demonstrate that the project has provided natural resource benefits? |
| 9. Total Project Cost and Accuracy of Estimate | • Trustees prefer the least costly project of otherwise equivalent alternatives<br>• Projects with greater certainty of the costs related to successful implementation will be preferred over projects with high budget uncertainty. |
| 10. Effect of Project on Public Health and Safety | • Projects that enhance public health and safety are preferred. |
| 11. Opportunities for Collaboration | • Projects with matching funds are preferred to projects without matching funds. |
| 12. Non-Duplication | • Projects funded through damages should not displace other funds.<br>• Project should not duplicate other efforts already ongoing at the same location. |
| 13. Education/Research Value | • Does the project have the potential for public education and outreach or to advance scientific knowledge for the benefit of natural resources management? |
| 14. Cultural Value | • Does the project have the potential for cultural resources conservation and/or education? |
| 15. Ability to Document Benefits to the Public | • The Trustees consider the ability to document receipt or delivery of benefits to the public as a result of a project or other use of funds. |

61

# 5.0  Injury Quantification and Restoration Alternatives

This section describes the nature, extent, and severity of injuries to natural resources and human uses resulting from the spill, as well as potential restoration alternatives, including selected alternatives, to compensate for these injuries. This section is divided into the following resource categories:

- Shoreline Habitats;
- Subtidal and Fish Habitats;
- Birds;
- Marine Mammals; and
- Human Uses.

At the time of the spill, the Trustees created these categories to organize the assessment of injuries to natural resources. The Trustees used available information, field data, focused studies, and expert scientific judgment to arrive at their best estimate of the injuries. Scientific investigators included state and federal scientists, academic research scientists, consultants with damage assessment experience, and recognized experts within each resource category. During, and for some time following the spill, field teams were organized that included the investigators above, as well as one or more representatives of Plains (see Section 3.2.3).

In addition, the Trustees divided the spill footprint into four geographic zones (Zones A, B, C, and D) based on level of oiling (Figure 8). This was primarily done for purposes of assessing injury to shoreline and subtidal habitat.

**Zone A**
- Location: Gaviota State Park to Arroyo Hondo (approximately 6 miles of coastline)
- Level of oiling: moderately to lightly oiled

**Zone B**
- Location: Arroyo Hondo to Coal Oil Point (approximately 18 miles of coastline)
- Level of oiling: heavy to moderately oiled

**Zone C**
- Location: Coal Oil Point to the Santa Barbara Harbor (approximately 18 miles of coastline)
- Level of oiling: moderately to lightly oiled

**Zone D**
- Location: Santa Barbara Harbor to Long Beach (approximately 296 miles of coastline)
- Level of oiling: intermittent oil, characterized as moderate to no observed oil.



**Figure 8.** Exposure zones A-D defined for the Refugio Beach Oil Spill NRDA (black lines) with shoreline oiling categories documented during Shoreline Cleanup Assessment Technique surveys conducted by the Unified Command. See Appendix B for data associated with this figure.

The Trustees assessed injury by comparing oiled areas to "baseline" conditions, as that term is used in the OPA regulations. Baseline describes the ecological services that are present "but for" the oil spill, including factors such as the abundance, biomass, diversity, age classes of characteristic plants and animals, the availability of suitable habitat for shelter, foraging, and reproduction, and the availability of food items for fish and wildlife.

As discussed throughout this section, the Trustees concluded that the magnitude of the injuries caused by the spill has been sufficiently delineated through the various studies described herein to enable the Trustees to identify and scale appropriate restoration. While there is some uncertainty inherent in the assessment of impacts from oil spills, and while collecting more information may increase the precision of the estimate of the impacts, the Trustees believe that the type and scale of potential restoration actions would not substantially change as a result of more studies. Therefore, the Trustees sought to balance the desire for more information with the reality that further research would be costly and would delay the implementation of the restoration projects.

Each resource category section below begins with an overview of the studies conducted during the assessment and the results of those studies. The pathway of the oil and exposure are discussed and the conclusions of the injury assessment are then summarized, and the injury is quantified. Finally, the potential restoration alternatives are described, with the selected projects described in greater detail. The project descriptions include a discussion of the anticipated environmental impacts, or consequences, of the selected projects. The second tier projects are also listed and described, in lesser detail, as well (Appendix N). These projects may be

63

reconsidered and selected for implementation if funds become available or if selected projects prove to be infeasible. Potential cumulative impacts of implementing restoration projects are summarized in Section 6.0.

## 5.1    Shoreline Habitats

After the release, Line 901 oil mixed into the surf and coated Refugio State Beach and nearby beaches. Oil was also carried offshore and down shore by wave action, currents and winds. The oil spread along the Gaviota coastline and then stranded intermittently downcoast for over 155 miles, depositing oil from Gaviota State Park to the north-west, along Santa Barbara County, and intermittently throughout Ventura and Los Angeles Counties to the southeast. Affected shorelines were assessed for injuries and losses to natural resource services that they provide. For the purposes of the shoreline injury assessment, separate analyses were conducted for sand beach and rocky intertidal habitats. Each habitat assessment relied upon field data and a variety of literature sources to examine effects of the spill on shoreline biota and document the effects of oil on beaches and intertidal flora and fauna. Injuries occurring within each habitat type were quantified within distinct exposure zones (Figure 8) based upon proximity to the oil release point and oiling characteristics. Potential restoration projects also were identified and scaled appropriately based on injuries quantified within each exposure zone.

### 5.1.1   Overview of Data Collection and Studies

The list below summarizes various field studies, data collection tasks, and analyses used by the Trustees to assess shoreline habitat injuries.

***Response Information - Compilation of Oiled Shoreline Data***
Immediately after and throughout the duration of the spill, Shoreline Cleanup and Assessment Technique (SCAT) Teams were dispatched to document the location and severity of shoreline oiling and to develop cleanup recommendations. These response teams reported on details concerning the approximate location, thickness, and percent cover of oil on intertidal habitats throughout the spill-affected shorelines. This information is primarily collected to assist response crews in prioritizing cleanup decisions. Along with NRDA team member observations, the Trustees used SCAT information during their injury assessment to gain an understanding of the severity of oiling along the affected shoreline segments over time.

***Extent of Oiling Quantification and Mapping***
The SCAT data and supplemental information described below were compiled to create maps showing the geographical extent and maximum observed degree of oiling along each shoreline segment. The oiling of shoreline habitats was quantified in terms of area in acres and degree of oiling using SCAT descriptions (e.g. heavy, moderate, light, very light) and mapped according to shoreline type (rocky intertidal, sandy beach, mixed rocky sandy shoreline, etc.). The area of affected shoreline, in acres, was calculated for each oiling category and each habitat type (Nixon

64

2018). The Trustees used the compilation from this effort to define the exposure zones discussed above (Figure 8).

### Oil Sample Collection and Analysis

Polycyclic aromatic hydrocarbons (PAHs) are a suite of chemical components found in petroleum products, and all oil sources display a "fingerprint" of the unique proportions of the different PAHs and other chemical markers. This enables forensic evaluation of the source(s). Forensic analyses were conducted on oil, tarballs, and tissues to confirm the shorelines affected by Line 901 oil (Stout et al. 2018).

### Environmental Sample Collection and Chemical Analysis

The Trustees collected invertebrate samples (i.e., mussels, sand crabs, beach hoppers, sand-associated polychaete worms, see Section 2.3.4) and water samples (surf zone, sediment pore water, Figure 9) from a wide variety of intertidal locations within the spill-affected area and analyzed for PAHs and other components of oil. Samples were collected before and after Line 901 oil impacted the shoreline to confirm and provide estimates of degree and duration of exposure to shoreline fauna. PAHs are toxic to organisms, and some of the animal body burden concentrations were compared to toxicology literature values as an indicator for potential health effects to marine invertebrates. PAHs were elevated in all media collected at locations oiled by Line 901 compared to reference locations. Chemistry data are provided in Appendix B and results are further discussed herein, in Appendix D, and in "Shoreline data summary" (Donohoe and Joab 2018).



**Figure 9.** Sediment porewater sample location showing oil sheen on the surface. Photo Credit: Natural Resource Damage Assessment Trustees.

65

*Sandy Beach Intertidal Invertebrate Population Surveys*
Study sites were established by the Trustees to monitor changes in populations of beach hoppers. Sites were surveyed approximately 1 month after the oil spill, 4 months after the spill and again two years later to document changes in population abundance, biomass and size structure of these indicator animals. Data from previous surveys of populations of beach hoppers at a subset of the sites were also compared to post spill data. Study sites within the spill area showed reductions in population numbers, when compared to unoiled sites, indicative of oil spill-related impacts. For further information, see the report "Population survey results on talitrid amphipods for the Refugio Beach Oil Spill NRDA" (Dugan 2018).

*Rocky Intertidal Habitat Photo Transect*
The Trustees conducted Rocky Intertidal substrate surveys to monitor changes in abundances of sessile organisms, substrate, and "condition" (oil/tar presence, bleaching), within fixed plots established along vertical or horizontal shoreline transects over time (post spill and six/twelve months post-spill). Assessment sites were selected throughout the primary spill area, using a survey protocol developed for oil spills. Additionally, teams visited permanent Long Term Monitoring plots (https://www.eeb.ucsc.edu/pacificrockyintertidal/index.html) that occur within the approximate spill area footprint for comparison to historical data. Photos were collected at fixed plots along the transects, i.e., photoplots, and were then scored and analyzed for substrate, condition (oiling/bleaching), species composition and proportion within the photo plot. Sites were re-visited in Fall 2015, and Spring 2016, to examine for community differences, presence/absence, or proportional changes to communities or substrate. Study sites within the Zone B showed most of the species examined were more common in sites that did not experience oiling, with the exception of Ulva and Porphyra, shorter lived opportunistic seaweeds that are often associated with disturbance. For further information, see the report "Assessment of potential impacts to rocky intertidal community following the Refugio Beach Oil Spill, Santa Barbara County" (Raimondi, 2019).

*Laboratory Tests with Shoreline Species*
The Trustees performed laboratory studies (i.e., bioassays) with mussels and sand crabs to determine the aquatic toxicity of the Line 901 oil and its constituents. Results were then compared to the measured concentration of oil constituents in the surf zone and sediment porewater on sandy beaches. Toxicity of Line 901 oil was observed in juvenile sand crabs, mussel larvae, and larval silversides. Appendix E provides an overview of the Line 901 bioassays performed. Appendix D includes an evaluation of the toxic impacts of Line 901 oil on these organisms based on measured concentrations of PAHs in surf and pore water following the spill.

*Shoreline Clean Up Data*
Clean up activities, primarily beach trampling and wrack (kelp/seaweed) removal, contributed to shoreline injuries caused by the spill. The Trustees compiled information on effort, such as number of days of cleaning, mass of materials removed by cleaning teams, and the types of

66

cleaning expected to affect shoreline organisms as summarized in the report "Refugio Beach Oil Spill shoreline cleanup effort data report 30 Aug 2016" (Hubbard 2016)

## 5.1.2   Shoreline Injury

As mentioned in Section 4.1.1, the Trustees used the HEA method to estimate injury for each of the shoreline habit types[8]. Inputs to the HEA include the area of shoreline habitat impacted, the reduction in ecological services because of the spill, and time and trajectory for recovery of the affected environment. The degree of injury was related to the degree of oiling and quantified by zones (Figure 8). All rocky intertidal, sandy beach and mixed rocky sandy shorelines within the spill area were quantified in terms of acreages impacted by the spill. Degree of injury to the ecological services provided by each habitat and duration of injury until full recovery were estimated based on evidence from collected data including chemical, biological, and toxicological studies, inputs from scientific literature, and consultation with regional ecologists. Benefits of potential restoration projects were estimated and quantified in terms of their likely long-term ecological benefits. In this way, each project was "scaled" to be appropriate in size to the injury that incurred in each habitat type. Details are provided below and in Appendix F.

## 5.1.3   Sandy Beach Habitat Injury

*Background*

Much of the sandy shoreline affected by the spill is a mixture of cobble, sand, and boulders. For sandy beach environments, the Trustees chose to focus the assessment largely on invertebrates that dwell on and in sand and serve as prey items for both fish and birds, and to use these invertebrates as indicators of both exposure to and injury from the oil and its chemical components.

Line 901 oil from the release site at Refugio State Beach washed over and stranded along the Gaviota coast, and also stranded sporadically in Ventura County and some Los Angeles County beaches. Services provided by the sandy beach habitat to fish, birds and other wildlife were affected. In the most heavily oiled areas, there was smothering and fouling of invertebrates and other fauna. In areas of oil deposition, the entire intertidal zone was exposed to the oil, as it traveled back and forth with individual waves throughout the tidal cycle, until it either washed back out to sea, was stranded on the shore by the receding tides, or was buried by cycles of sand accumulation on the beach. Oil moved into the substrate as droplets, tarballs or dissolved liquid into sediment pore water as wave run-up percolated into pore spaces during higher tides. Larger oil deposits formed and persisted for long periods during periods of sand accumulation following the spill. Injuries resulting from the spill were attributed to direct contact (i.e., fouling) with oil, as well as the toxic effects of oil, including those attributed to PAHs.

In addition, shoreline cleanup efforts extended for many months and caused impacts to intertidal habitats and organisms over an extended period. In heavily oiled areas, the macrophyte wrack

---

[8] Plains disagrees with the extent of shoreline injury assessed by the Trustees and asserts shoreline injury is materially lower than the Trustee's estimate.

67

(stranded drift algae and surfgrass) was often oiled, and initially wrack was removed as part of cleanup operations. Wrack is of prime importance as food and habitat for a variety of invertebrate species that are a critical food source for higher trophic level organisms, including birds, fish, and crabs. Suspended detritus is another major food source for the masses of invertebrates living in the intertidal zone, and can be fouled by adhesion to oil particles or film. Conceptual diagrams shown in Figure 10 illustrate the movement of beach invertebrates and predators with tidal flux, as well as sediment porewater flow with oiling.



**Figure 10.** Conceptual diagrams of Refugio coast shoreline, sandy beach environments at high tide (top) and low tide (bottom). Sand crabs, polychaete worms, and beach hoppers are prey for birds and fish. Porewater flow down the beach profile is shown at low tide.

68

### Sandy Beach Habitat Injury Assessment

*Area of Impact*

The Trustees split the area of impact into four geographic zones (Zones A through D, Figure 8) that covered the spill-affected area from west to east. Most data were collected in Zone B, the most heavily oiled zone. The area of affected shorelines within Zones A-D, in acres, was calculated based on beach width, tidal swell, and run-up data available during the oiling period. A summary of the shoreline acres affected and the duration of the injury is further discussed below and in Appendix F.

*Baseline Conditions*

The Trustees assessed injury by comparing oiled areas to baseline conditions, per the OPA regulations. The Trustees estimated those baseline conditions from the collection and chemical analysis of water and shoreline invertebrate samples, data on beach hopper populations from earlier studies, and other data and scientific literature pertinent to the occurrence and abundance of organisms by habitat type and location. These data were collected either before the spill, outside of the spill area or up to two years after the incident when the Trustees assumed continued exposure to Line 901 oil would have been eliminated or greatly reduced. For example, monthly to yearly sampling of sediment porewater and invertebrate tissues for chemical analysis over a two-year period in the spill area was used to estimate baseline conditions. See Appendix D for further details.



**Figure 11.** Oil on the shoreline at Refugio State Beach, May 19, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.

69

*Injury*

The initial acute injury to sandy beach resources (direct smothering/fouling and toxicity) from the spill occurred over a period of many days. The incident started on May 19, 2015, at Refugio State Beach in Santa Barbara County, California, and the oil was transported up and down the coastline by winds and currents and deposited along the shoreline (Figure 11).

Near the end of May 2015, Line 901 oil from the spill eventually reached beaches in Ventura County and some beaches in Los Angeles County (i.e., Manhattan Beach and Redondo Beach). Spill impacts including impacts from cleanup were most severe and continued for months near the release site to El Capitan and then decreased downcoast. Mortality caused by the oil fouling and smothering of intertidal-associated organisms such as sand crabs and beach hoppers was also highest in areas near the release point to El Capitan and decreased downcoast (Figure 12; Figure 13).



**Figure 12.** Oiled young sand crabs on Refugio State Beach, May 19, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.



**Figure 13.** Oiled beach hoppers (talitrid amphipods) on Refugio State Beach, May 22, 2015. Photo Credit: Natural Resource Damage Assessment Trustees.

70



**Figure 14.** Total PAH concentrations in sediment porewater measured at several locations over time. 2017 values indicated by the red circle are representative of baseline conditions. See Appendix B for data associated with this figure.

Sediment porewater concentrations of PAHs between Gaviota and Haskell's along the Gaviota Coast became elevated soon after the spill and remained elevated months later, as shown in Figure 14. While seep oil is known to occur on shorelines in this area, the porewater data demonstrated a pattern over space and time that shows the spilled Line 901 oil increased the amount of PAHs in the porewater to an appreciable extent in May of 2015 and beyond. Initial PAH concentrations were highest at the locations closest to the release site and decreased as distance from the spill site increased. For example, porewater PAH concentrations decreased at locations between June and September of 2015, and by 2017, all locations were found to have very low (baseline) PAH concentrations (Figure 14). These trends suggest that the peak concentrations at the sampling sites were immediately following the spill, and then they began to decrease over time. Following a similar trend as porewater, Figure 15 shows elevated tissue concentrations of PAHs in beach hopper tissues immediately after the spill, with lower concentrations in 2016 and 2017 when compared to 2015.

71



**Figure 15**. Total PAH concentrations in beach hopper tissue measured at several locations over time. See Appendix B for data associated with this figure.

Tissues of other shoreline organisms, including mussels, sand crabs, and sand-associated polychaete worms, also showed significant increases in tissue PAH concentrations (Appendix D, Donohoe and Joab 2018).

Sand crab toxicity thresholds for PAHs were exceeded in surf water, based on Line 901 bioassay results (Appendix D, Appendix E). Studies have shown that ultraviolet light (UV) from sunlight can enhance the toxicity of PAHs by a factor from 2-1000 (Barron 2017). Some PAHs in fish and invertebrate tissues are photo-activated by UV forming reactive products that cause oxidative damage. For the purpose of this evaluation, the Trustees adjusted $LC_{50}$ values by a 10-fold factor to estimate photo-enhanced toxicity.

72



**Figure 16.** Mean values (+1 standard error) for population abundance of talitrid amphipods in June 1999-2001 and June 2015 at four sites on the spill-affected shoreline including three sites in Zone B, and one site in Zone D.

The shoreline assessment focused on two categories of impacts: 1) fouling and removal of beach wrack as well as other cleanup impacts and 2) oil exposure to intertidal invertebrate populations. Treatment or cleaning options for oiled wrack or stranded seaweed were limited. Oiling of wrack results in invertebrate contamination and mortality, leading to lessened and contaminated prey resources for birds. The removal of wrack material from the beach removes an exposure mechanism to the oil, but also removes the associated invertebrates and has long-term effects on foraging options for birds due to reduced invertebrate community abundance and biomass (Dugan et al. 2003; Beeler 2009). Both of these occurred in the aftermath of the spill as oiled wrack was collected and removed from heavily oiled beaches, but remained in place on more lightly oiled or unvisited stretches.

Sand crabs and beach hoppers dominate the invertebrate biomass on southern California sandy beaches (Dugan et al. 2003). As a defining ecological characteristic of lower intertidal communities, sand crabs were used to estimate and describe injury to lower intertidal habitats. Beach hoppers were selected as a proxy for assessing impacts to the upper intertidal community, as they are an important part of the sandy beach ecosystem. Beach hoppers process organic matter such as wrack. In addition, they make up a significant portion of the diet for several shorebird and other bird species. Finally, because they dominate the upper-intertidal invertebrate community it was relatively easy to assess their populations through field sampling.

73

Large decreases in the abundance of beach hoppers (talitrid amphipods) were documented in Zone B as well, as can be seen in Figure 16. A similar trend was apparent with biomass measurements of these organism (Dugan 2018).

The degree of injury resulting from fouling, toxicity and cleanup was estimated by the Trustees within subzones (i.e., further described as "micro-zones" in Appendix F) of Zone B. The Trustees focused on Zone B for logistical reasons and because this was the zone where oiling was the heaviest and cleanup activities were the most intense. Injury was estimated separately for lower intertidal fauna and for upper intertidal fauna. Upper and lower intertidal results were then averaged to estimate 'whole-beach' injury for a given zone. The sandy beach injury and much of the resulting HEA details are shown in Figure 17 and in Table 1. In Zones A and C, injury per acre was estimated as a fixed percent of the average per-acre injury found in Zone B: 20% in Zone A and 25% in Zone C. Those percentages approximate impacts associated with a lesser amount of oiling in Zones A and C when compared to Zone B. Zone D was estimated to be 5% injured in year one only, with no injury in subsequent years. Impacts in Zone D were lower because they were primarily based on removal of organisms by direct contact with oil or tarballs and other cleanup activities, along with the removal of a portion of the wrack material during cleanup activities.

*Recovery*

The Trustees estimates of recovery time for injured sandy beach communities were based on literature values and life history patterns of California sandy beach species, as well as monitoring data. First consideration was given to recovery of heavily disturbed sites in which there was evidence that representative fauna (sand crabs and beach hoppers) had been substantially impacted (a large percentage of mortality in several age classes). Cleanup and driving impacted some sandy beaches through at least January 2016, approximately eight months after the spill. The animals on sandy beaches have highly seasonal reproduction and will take several years to re-establish populations with full size and age structures and biomass. In addition, some sandy beach animals are more sensitive to disturbance and can take much longer to recover from severe disturbances (i.e., Pismo clams, olive snails, upper beach isopods).

Recovery to baseline is the attainment of 100% of the ecological services that would be present but for the spill, including abundance, biomass, diversity, and age classes of organisms in the affected habitats. Time to recovery was based on monitoring data, observations, and the life histories of the specific flora and fauna present in each habitat type, and relative to the degree of initial acute injury.

Sand crabs lost substantial proportions of three age classes during the Refugio Beach Oil Spill incident, and because recruitment is seasonal and episodic, recovery time for lower intertidal portion of sandy beaches was assessed as approximately three years in Zone B.

Most of the upper beach species have life histories that do not include planktonic larval stages (i.e., beach hoppers, beetles, isopods). This means there is no recruitment from planktonic

74

sources to replenish their populations. These species rely exclusively on the reproduction of resident individuals for population replenishment. If local populations of these taxa are extinguished or severely depressed, population recovery will be protracted. Recovery time for upper beach species (i.e., beach hoppers) was therefore assessed as approximately four years in Zone B.

*Habitat Equivalency Analysis Results*

As previously described, injury in Zones A and C was estimated to be a percentage or fraction of the injury determined in Zone B, since the same mechanisms of injury were present, just with lesser amounts of oil and generally less severe impacts present. In Zone D, farthest from the spill location, injury resulted from contact with oil and the resulting fouling of organisms, as well as the cleanup activities, and was much more limited (Table 1, Figure 17).

**Table 1.** Summary of Sandy and Mixed Sand/Rocky Substrate Injury (losses) and Habitat Equivalency Analysis results by zone.

| Zone - Predominant max. oiling category | Acres exposed | Fraction of Zone B | dSAY[1] lost/ acre | Acre – years for compensation (dSAYs) |
|---|---|---|---|---|
| Zone A – Moderate/Lightly Oiled | 63.2 | 0.2 | 0.2954 | 18.66 |
| Zone B – Heavily Oiled | 345.8 | 1 | 1.4771 | 510.70 |
| Zone C – Moderately Oiled | 191.3 | 0.25 | 0.3693 | 70.64 |
| Zone D – Lightly Oiled | 888.0 | 0.034 | 0.0500 | 44.40 |
| Total | 1488 | --- | --- | **644.4** |

[1]dSAY = discounted service acre-year. See Appendix C.



**Figure 17.** Map showing the summary of shoreline injury by zones. See Appendix B for data associated with this figure.

75

A total of 1,488 acres of sandy beach habitat was exposed to and injured by the oil spill and is expected to recover within approximately four years, depending on oiling level. Appendix D provides additional information on the injury assessment and quantification of sandy beach habitat injuries, and the scaling details are further described in Appendix F.

## 5.1.4   Rocky Intertidal Habitat Injury

**Background**

The shoreline habitat within the area affected by the Refugio Beach Oil Spill includes a variety of rocky and mixed rocky/sand substrates, ranging from artificial to natural and an approximately six-foot tidal range. Substrates investigated by the Trustees included bedrock, boulder, cobble, and some man-made riprap and seawall. The habitat used by biota is three dimensional, with organisms on the surfaces of rocks, as well as along the sides, undersides, and between substrates. The biota present on these substrates vary depending upon tidal elevation. Figure 18 shows the conceptual diagrams of the rocky intertidal habitats and some of the immediate and longer-term impacts of oil exposure.

**Rocky Intertidal Habitat Injury Assessment**

*Area of Impact*

The Trustees quantified the number of impacted acres by using SCAT data, as described above. Injury categories were subdivided based on regional differences in biota and exposure and by differences between more natural rocky substrates and rip-rap as described below. The Gaviota Coast shoreline includes a mixture of sandy and rocky intertidal habitat. Sand migrates significantly throughout the year, burying boulders and rock outcroppings, a process that tends to scour any sessile organisms and prevent them from forming significant communities. The Trustees assessed that a total of 5.4 acres of pure rocky intertidal habitat was injured in the HEA (Appendix F), with the remainder of the shoreline (mixed rocky/sandy and sandy beach) included in the sandy beach assessment and quantification.

*Baseline Conditions*

The Trustees evaluated pre-spill data that provides a quantitative description of rocky intertidal biota within the spill-affected area. Historical long-term monitoring data, generated by the Multi-Agency Rocky Intertidal Network (MARINe) program, were used to determine general "pre-spill" conditions. Historical data are located at https://www.eeb.ucsc.edu/pacificrockyintertidal/index.html.

**Figure 18.** Conceptual model of oil immediate effects (top) and long-term effects (bottom) of oil in rocky intertidal habitats.

77

**Figure 19.** Photographs of oiled rocky habitat and organisms following the spill. Photo Credit: Natural Resource Damage Assessment Trustees.

*Injury*

The Trustees determined that the degree of impacts varied with the amount of oiling. The most significant fouling was noted in locations directly adjacent to the release site (rocky outcrops adjacent to Refugio, Corral Canyon, and El Capitan, Figure 19). Impacts to rocky intertidal habitat were assessed through a number of field-based studies. Similar to the sandy beach habitat, the degree of oiling was classified in rocky intertidal habitat based on descriptors used in the SCAT data. In additional to the field studies conducted after the oil spill, the Trustees also relied on other monitoring programs (e.g., MARINe) that had pre-existing, long-term monitoring data in locations affected by the spill. The Trustees determined that the initial acute injury was caused by direct smothering/fouling and toxicity of individual organisms and habitats at those

78

locations nearest to the oil release site. Subsequent injury was the result of tissue necrosis/bleaching of the sessile organisms populating these habitats within the same locations. Furthermore, injury due to trampling (from spill assessment and cleanup activities), physical cleaning of rocky intertidal habitats, and sublethal effects from exposure to PAHs were evaluated.

The Trustees collected mussels from intertidal habitats throughout the spill-affected area for PAH analysis, both immediately after the release and several weeks later. This provided an indication of those shorelines most significantly fouled by the oil, as well as the duration of exposure. Mussels collected soon after the spill from rocky shores adjacent to Refugio beach and El Capitan contained the highest PAH concentrations of all samples and continued to contain the highest concentrations two weeks later (Appendix B).

The Trustees conducted rocky intertidal photo-plot surveys to monitor changes within fixed plots over time. These were conducted at nearby long-term monitoring sites and compared to sites selected in the spill-affected area. The sites were re-visited in Fall 2015, and Spring 2016, to survey for community differences or proportional changes to communities or substrate. Study sites within the heaviest oiling areas (Refugio, El Capitan, and Coal Oil Point) documented oiled organisms and substrate after the spill. Further, community changes in follow-up surveys, potentially indicative of oil-related impacts, were noted when compared to less impacted sites away from the heaviest oiling area (Raimondi et. al., 2019).

*Recovery*
The Trustees based recovery on the life histories of affected biota and on notable increases of "disturbance indicator" species (sea lettuce and the red algae, *Porphyra*) quantified during anniversary surveys at the most impacted sites. In addition, recovery estimates were based upon the recovery time of key intertidal assemblages (fucoid, barnacle, mussel, and mid-intertidal red algae) following disturbance. Recovery was also estimated based upon key intertidal assemblages (fucoid, barnacle, mussel, and mid-intertidal red algae) as summarized in a UC Santa Cruz disturbance study (Conway-Cranos 2012).

*Habitat Equivalency Analysis Results*
 The Trustees estimated that a total of 5.4 acres of rocky intertidal habitat was exposed to and injured by the oil spill and is expected to have recovered after two years (Table 2). Appendix F provides additional information on the injury assessment and quantification of these habitat injuries.

79

**Table 2.** Summary of Rocky Intertidal Injury (losses) and Habitat Equivalency Analysis results

| Zone - Predominant max. oiling category | Acres exposed | dSAY[1] lost/acre | Acre – years for compensation (dSAYs) |
|---|---|---|---|
| Zone B– Heavily oiled | 5.4 | 0.34 | 1.83 |
| Total | 5.4 | --- | **1.83** |

[1]dSAY = discounted service acre-year. See Appendix C.

### 5.1.5  Summary of Injury

Shoreline habitats were subject to heavy oiling near the spill site in the days following the oil spill on May 19, 2015. Rocky (bedrock and cobble), sandy beach, and mixed shores received heavy coatings of liquid oil that were transported up and down the shore by waves and spring high tides. In the splash zone, oil was deposited much higher than the reach of the tides.

The oil remained in the environment in the weeks and months after the spill, attaching to rocky habitat, settling into intertidal cobble beds, and percolating into, or being buried by, accumulating sand on sandy beaches. As a result, beach porewater retained elevated concentrations of PAHs much longer than the surf zone water, with elevated values continuing for weeks and months after the spill.

Shoreline plants and animals at all intertidal levels were exposed to Line 901 oil and were fouled by it. Toxic effects on a variety of intertidal marine species were evident in field observations as well as in toxicity tests run in the laboratory with shoreline invertebrates.

Shoreline animal tissues sampled before the spill had low concentrations of PAHs. These concentrations increased dramatically after exposure to Line 901 oil and then declined over weeks to months.

Some elements of the shoreline cleanup continued until January 2016. Clean up involved removing oil, sand, and wrack from the shoreline, scraping, blasting, shoveling, sifting and driving on shoreline habitats. Two of these activities, removing wrack and driving, have significant impacts on beach ecosystems.

As the spill spread more than 155 miles east and southward, the character of the oil changed. The oil that landed on Los Angeles County beaches[9] was less liquid but still sticky and buoyant. It was deposited with kelp and other wrack in the intertidal zone where abundant beach organisms live. The decision was made that it should be removed from the shoreline. This cleanup effort removed oil, wrack, and the animals associated with that material.

---

[9] Tarballs matching Line 901 oil landed on two South Los Angeles County beaches – Manhattan Beach and Redondo Beach.

80

Recovery of the impacted shoreline zones is expected to vary from one to four years, varying by zone, and based on the severity of the initial acute injury.

## 5.1.6  Selected Restoration Projects

The Trustees selected four projects described below to compensate for injuries to sandy beach and rocky intertidal habitats caused by the oil spill (Table 3).

For the shoreline habitats, no single preferred restoration project was able to compensate for all the injury. For this reason, four restoration projects were selected. These projects ranked as providing the greatest benefits to the injured ecosystem.

**Table 3.** Four selected projects to compensate for shoreline injury

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| SHORE-1 | Ellwood Seawall Removal | shoreline habitats, sandy beach |
| SHORE-2 | Ventura County Dunes Restoration | shoreline habitats, sandy beach |
| SHORE-3 | Santa Monica Dune and Beach | shoreline habitats, sandy beach |
| SHORE-4 | Black Abalone Restoration and Relocation | shoreline habitats, rocky intertidal |

***Ellwood Seawall Removal (SHORE-1)***

The goal of this project is to restore sandy beach and mixed shoreline ecosystems and dynamics in Zone B, the area where the greatest impacts of the spill were realized. This project will also benefit subtidal and fish habitats offshore of the seawall (section 5.2.3). The project site is Ellwood Beach in Goleta, CA (Santa Barbara County). A wooden seawall currently constrains natural functioning of the ecosystem as well as lateral access along the shoreline at high tide.

*Affected Environment*

The project will have impacts to intertidal shoreline (currently sandy beach, mixed rocky habitat, sandy shore, artificial structures, creosote preserved timber bulkhead, and rock/concrete rubble revetments), coastal bluff and shallow subtidal habitats.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* – The removal of the armoring structure will allow overall intertidal habitat to increase in width, functions and diversity, specifically restoring upper beach and supralittoral zone habitats that are currently absent from the armored coastline. Intertidal zones that have been lost will be restored along with ecosystem functions and biota dependent on those zones, including wrack deposition and processing, invertebrate abundance and diversity, bird abundance and diversity, and grunion spawning habitat.

81

There is potential adverse biological impact to vegetation and habitat established on the bluff faces and tops during the removal activities and from the removal activities and the expected erosion that takes place once the intact portions of the seawall are removed. During the removal activity there will be crushing of some of the sandy beach organisms, such as invertebrates in and under the surface of the sand, from the machinery used in the processes of removal. Birds are expected to temporarily be disturbed on the affected shoreline while removal activities are undertaken. These impacts are anticipated to affect a small number of organisms for a limited amount of time, and will have long-term beneficial effects for these biological resources.

2. *Physical Impacts* – Longer term, post removal, the beach is expected to be wider than it is currently where the seawall is intact, and there will be a reduction of reflective processes that remove sand from the beach. Removal will also eliminate the source for creosote-contaminated debris along the shoreline as the wall deteriorates and is broken up by wave action. Movement of equipment and machinery needed to remove the seawall is expected to temporarily block some portions of this shoreline and temporarily compact the substrate. Noise from this activity will be present in the short term, until the removals are completed. Short-term adverse effects from construction activities (potentially higher turbidity, sediment transport) are expected to be minimal but may occur. Longer term impacts will include a return to natural bluff erosion rates and mobilization of loose material at the bluff toe during extreme high tides.

3. *Human Impacts* – Lateral access to people along the shoreline at high tide is expected to increase where the seawall is currently intact. Temporary disturbance to recreation in the demolition area will occur during removal activities. Human uses of any land on the slope to and on top of the bluff, near the edge that is expected to erode, will be changed as erosion occurs; however, the removal of the seawall allows for the potential future installation of pathways to access the beach from the bluff. Overall, there will be a small temporary loss of beach use by the public during the construction, but an overall long-term increase in public access in the area where the seawall will be removed. Overall, there will be a small temporary loss of beach use by the public during the construction, but an overall increase in public access to the beach in the area where the seawall will be removed.

*Probability of Success*

Project success is likely as the implementation actions will lead to immediate adjustments in the physical properties of the shoreline. Project implementation will require a high level of planning and coordination to work within short tidal periods; however these factors have been considered and planned for, and the probability of success is high. Ecological services should respond within a few years of the physical changes. Longer term responses will depend on the balancing of sediment supply, bluff erosion and sea level rise. While the exact progression of bluff erosion is uncertain over the long term, this project removes a barrier that is interfering with natural coastal dynamics in the area, and removing that barrier is anticipated to benefit ecological resources.

82

*Performance Criteria and Monitoring*

The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. The restoration of natural coastal dynamics at the restoration project site should allow for recovery of physical and ecological functions and services over time. Monitoring efforts should track indicators associated with the structure and function of the restored ecosystem. In addition, the responses of bluff topography, profile and vegetation should be monitored to document shoreline evolution at the site. Key physical and ecological indicators will be measured and monitored regularly at the project and reference site or sites for five years.

Performance criteria may include:
- Intertidal beach habitat area: area and distribution of ecological habitat zones;
- Marine subsidies: standing crop of marine macrophyte wrack;
- Sandy intertidal invertebrates: diversity, biomass and abundance of key taxa by intertidal zone; and
- Bird use: use of beach zones by shorebirds, gulls, roosting seabirds, other species.

Performance criteria will be calculated based on multiple surveys at an appropriate reference site or sites or multiple transects within the site.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. This type and scale of project will effectively provide appropriate compensation for injured sandy intertidal habitat because of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

### Ventura County Dune Restoration (SHORE-2)

Three dune enhancement projects at Ormond Beach, San Buenaventura and McGrath State Beaches in Ventura County will reduce invasive plant abundance and restore native plants, dune forms and processes that will support rare coastal species. These projects are all located in Zone D.

*Affected Environment*

The project site will include intertidal sandy beach and degraded (trampled and invaded by non-native plants) dune habitat. Portions of the three project sites are nesting and brood-rearing areas for special status birds: western snowy plovers and California least terns.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

83

1. *Biological Impacts* – The project will restore a higher level of ecological functioning to degraded dune habitat. The current ecosystem services of the degraded dune area are reduced by high cover of non-native plants, altered physical processes and trampling in un-fenced areas. Removal of invasive plants will increase the amount of useable nesting areas for the western snowy plover (threatened) and, in some locations, the California least tern (endangered) and reduce cover for predators of eggs, chicks and adult birds. The presence of workers to implement the non-native plant removal in the dunes, along with their equipment, may temporarily disturb or displace birds and other wildlife. These temporary adverse effects are anticipated to be minor, and the overall long-term biological impacts are anticipated to be make a tangible improvement in the habitat quality for listed birds and other coastal wildlife.

2. *Physical Impacts* – Enhancement of native vegetation also permits the development of more natural dune dynamics that promotes the maintenance of more suitable slope faces and important material exchanges between the dunes and the intertidal sandy beach that can buffer erosion on beaches. This allows the dunes to provide a physical benefit to the intertidal sandy beach. Any adverse physical impacts during the implementation of the project are expected to be negligible, and long term benefits to the physical environment are anticipated upon completion of the project through restoration of dune habitats and processes.

3. *Human Impacts* **–** The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. Increased bird use, such as by western snowy plover or California least tern could be expected to increase birdwatching interest in the restored dune areas. Dunes could become somewhat less stable and allow for movement to a greater extent than this sand currently does. If such movement affects parking, driving, or other developed areas, this may be undesired.

*Probability of Success*

The project is very likely to succeed in all three project sites. The proposed restoration methods—weed control and fencing to reduce trampling disturbance—have been shown to be effective in nearby sites and elsewhere in southern California as well as throughout the State.

*Performance Criteria and Monitoring*

The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. Key ecological indicators to be measured and monitored include cover of native and non-native vegetation, as well as nest monitoring of western snowy plovers and California least terns. These efforts will be compatible and complementary with existing monitoring programs and continue for a period of up to five years to evaluate the ecological integrity of the site following implementation of restoration.

84

- For dunes, the target goals may include but are not limited to:
  - o Restoring and increasing resiliency of dune habitat;
  - o Reducing non-native vegetation cover to <99% in project area during lifetime of project; non-native vegetation cover should remain at <1% throughout project monitoring phase; and
  - o Increasing native dune vegetation in areas where non-natives have been removed; native vegetation should persist into project monitoring phase.
- For bird use, the project will include monitoring the following attributes up to a period of five years:
  - o Number of nests per year;
  - o Number of fledglings per year; and
  - o Comparison with baseline assessment.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The dune restoration projects in Ventura County are located within the spill-affected area, and are the closest option that the Trustees have identified for this type of restoration. This type and scale of project will effectively provide appropriate compensation for sandy beach habitat injured as a result of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

### Santa Monica Bay Beach and Dune Restoration (SHORE-3)

The goal of this project is to restore sandy beach and coastal dune habitat that has been degraded by intensive mechanical grooming. The project site is a public beach in Santa Monica Bay in Zone D (Los Angeles County).

*Affected Environment*

The project site will include intertidal sandy beach and degraded (unvegetated) coastal strand and dune habitat.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

The project will restore ecosystem function of sandy beach, coastal strand and dune habitats by protecting approximately five acres from the daily disturbance caused by mechanical beach grooming with heavy equipment and vehicle traffic and by planting upland portions of the site with native dune plants. The project will restore a high level of ecological functioning to degraded beach and dune habitat. The current ecosystem services of the degraded dune area is close to zero due to mechanical grooming activities, and those of the beach habitat is severely depressed.

85

1. *Biological Impacts* **–** By eliminating intense regular disturbance with heavy equipment, this restoration project will allow natural coastal processes to reshape the topography and ecology of the site, promoting the recovery of natural biodiversity and function. With appropriate stewardship, hummocks and vegetation will develop on the shoreline supporting native plants, birds and invertebrates that are currently extirpated at the site. The restored habitat will retain macrophyte wrack subsidies, increase intertidal and invertebrate abundance and diversity, increase the abundance and diversity of birds and will be more suitable for grunion spawning. No adverse biological impacts are anticipated, as the restoration area has very low sandy beach ecological services currently. Following restoration, the area is expected to increase in ecological functionality due to the foundational habitat that will be replaced where none currently exists.

2. *Physical Impacts* – The topography is expected to change at the restored site, with the formation of natural hummocks which is consistent with increased resilience to sea level rise. Fencing around the site will be present once the restoration is underway. Any adverse physical impacts during the implementation of the project are expected to be negligible, and long term benefits to the physical environment are anticipated upon completion of the project.

3. *Human Impacts* – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. Fencing will restrict the access through and around the restored site to some extent, but human access will continue on the site, although the types of recreational activities may change somewhat toward wildlife viewing. Increased plant, floral, and wildlife activity on the site may attract increase interest from bird watchers and others interested in the flora and fauna that will repopulate the site.

*Probability of Success*
The project is very likely to succeed in both of the target habitat zones. Cessation of grooming has been shown to be an effective beach restoration technique. The dune restoration plan will be based on a pilot project currently underway in Santa Monica. This model has been effective through planning and early implementation phases.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. Project site selection will likely be based on very low initial function level (mechanically groomed with no vegetation or dunes, low nutrient beach sand). Ecological responses to restoration actions will likely begin slowly and increase over the five-year monitoring period. Performance criteria may be expressed as trajectories of increasing function over time and divergence from groomed reference sites.

86

Performance Criteria may include the following key physical and ecological indicators:
- Project Area: acres measured each year to ensure project is not encroached upon.
- Topography/elevation/profile:
  - Dune and hummock building (sand storage, increased topography and resilience);
  - Increased elevations of topography and sand storage;
  - Altered profile (formation of foredune); and
  - Criterion: maximum elevation of dune features to increase across the site to increase at 0.1 m per year in the first five years.
- Vegetation:
  - Absolute cover of native dune plant species;
  - Absolute cover of non-native plant species (less than 1%); and
  - Native dune plant species richness.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The Santa Monica Bay beach and dune restoration project is conceived to be implemented within Los Angeles (LA) County. Since shoreline resources were the largest area of habitat impacted by the oil spill, implementing this restoration in LA County offers an opportunity to compensate for injured resources near the ends of the spill-impacted area. This type and scale of project will effectively provide appropriate compensation for sandy intertidal habitat injured as a result of the spill, and the Trustees have therefore selected this project as one of four preferred alternatives.

### Black Abalone Restoration and Relocation (SHORE-4)

The goal of this project is to aid in restoration of intertidal black abalone populations in areas affected by the spill. The project is comprised of four tasks: (1) characterization of the genetic structure of the donor and recipient population, (2) clearing areas of fouling organisms and placing recruitment modules to make habitat suitable for transplanted post-emergent black abalone and for settlement of larval black abalone, (3) transplantation of post-emergent black abalone from a donor population, and (4) adaptive assessment and management of transplants.

*Affected Environment*

Locations will be identified throughout the Gaviota coast, which are suitable for abalone. These will have the specific habitat attributes associated with abalone occupation (in general, deep cracks and crevices within the tidal range of black abalone).

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

87

1. *Biological Impacts –*This project seeks to ameliorate current conditions in suitable intertidal habitat, by preparing the substrate for better recruitment, while also transplanting adults to augment the likelihood of future recruitment. Recovery of a species from massive decline requires successful recruitment of new individuals into areas where local populations were impacted. Recruitment is dependent on both an available supply of new individuals and specific environmental conditions required to induce settlement. The goal is to restore a viable population of black abalone in suitable intertidal locations that are selected. Areas will be cleared of fouling organisms, leaving clean surfaces in the cracks and will be maintained until donor individuals are transplanted. The impacts of clearing the fouling organisms from the transplant areas are anticipated to be negligible to the ecosystem function, and will result in long term ecological benefits when viable populations of black abalone are reestablished.

2. *Physical Impacts –* The Trustees do not anticipate major impacts to the physical environment, such as water, air, sediment, etc. Any adverse physical impacts are expected to be negligible. Areas will be cleared of fouling organisms, leaving clean surfaces in the cracks and will be maintained until donor individuals are transplanted.

3. *Human Impacts –* The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc.

*Probability of Success*
Project implementers have been monitoring regional black abalone populations for nearly 25 years, and have been assessing the recruitment of new individuals and the biogenic habitats required for successful recruitment. The project implementers will strive to maximize the probability of success based on their knowledge and experience with black abalone.

*Performance Criteria and Monitoring*
The success of the project will be evaluated by assessing metrics associated with natural resource services. An important step towards recovery is the aggregation of abalone at densities high enough for successful fertilization, through both success of transplantation and aggregation of individuals, and recruitment of new juveniles. Because black abalone larvae have never been reared successfully in the lab to settlement stage, a field approach is required. Metrics for success include maintenance of an appropriate density of adult individuals (approximately 2 individuals per square meter), and the other is the recruitment of new juveniles. Based on previous studies, recruitment modules, consisting of small stacked tiles that mimic small crevice features of boulder fields, may be used to effectively attract new recruits. These modules may then be used to attract larvae to restored habitat areas, or move newly settled juveniles from sites with recruitment, to areas where recruits are absent. These modules will allow easy monitoring of recruitment and growth, for up to 10 years, to determine success of the project.

Success may be assessed relative to controls. Should greater recruitment occur in areas subjected to restoration via translocation of adults than in control areas, we would conclude the

88

translocation enhanced repopulation of black abalone. The ratio of recruitment in restored areas relative to controls could be a quantitative metric of enhancement value. Should no recruitment occur in either control or restoration areas we will compare results to other areas not demographically affected by withering disease. If recruitment occurred over the 10-year period in the unaffected sites but not in the restored areas, then the effectiveness of the restoration will be called into question and methods for future restoration efforts will be modified accordingly.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project aligns favorably with these criteria. The Trustees believe that this type and scale of project will effectively provide appropriate compensation for rocky intertidal habitat injured because of the spill and have therefore selected this project as a preferred alternative.

## 5.1.7 Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 4), and determined that many are valid projects that would provide benefits to shoreline habitat. However, these projects were not selected as preferred for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

**Table 4.** Second tier shoreline restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| SHORE-5 | Surfer's Point Phase II | Sandy beach |
| SHORE-6 | Matilija Dam removal | Sandy beach, riparian |
| SHORE-7 | Gaviota Creek Watershed Restoration | Riparian, lagoon, sandy beach |
| SHORE-8 | El Capitan State Park Concrete Removal Project/Bike Path and Rip Rap Removal | Sandy beach |
| SHORE-9 | Santa Barbara County Seawall Removals | Sandy beach |
| SHORE-10 | Coastal Hazards Removal, Goleta Beaches from hazards removal, Arroyo Hondo to Coal Oil Point | Not clear. Sandy beach |
| SHORE-11 | Coal Oil Point Research and Education | Coal Oil Point Preserve |
| SHORE-12 | Devereux Slough Restoration | Slough and meadow |
| SHORE-13 | Funding a Quick Reaction Cleanup Crew for Tar Found on Beaches | Sandy and rocky shoreline |
| SHORE-14 | BEACON, San Ysidro and Cold Springs/Montecito Creek, and San Antonio Creek Debris Basin Removal Projects to Improve Sediment Transport for Beach Nourishment. Removal of Unnecessary Sediment Basins from the Gaviota Coast | Sandy beach |

89

| SHORE-15 | Refugio and Gaviota Coast Human Impact Mitigation and Protection Program (Tajiguas, Mariposa Reina South, and Vista) Human Impact Mitigation | Sanitation, recreational |
|---|---|---|
| SHORE-16 | Other Dune Restoration Projects, including but not limited to, Hollywood Beach, Ellwood Invasive Plant Restoration, Ventura City Beaches, Vandenberg AFB | Sandy beach |
| SHORE-17 | Coal Oil Point Pilings and Debris Removal | Lagoon, human safety, possible sandy beach |
| SHORE-18 | Classroom Education and Outreach | Rocky intertidal |
| SHORE-19 | Refugio and El Capitan Rocky Intertidal Docent Program | Rocky intertidal |
| SHORE-20 | Increase Substrates for Rocky Intertidal Species | Rocky intertidal |
| SHORE-21 | Cessation of Beachgrooming | Sandy beach |
| SHORE-22 | Rindge Dam Removal | Sandy beach, riparian |

### Surfer's Point Phase II (SHORE-5)

This project includes infrastructure and habitat enhancements to the Surfer's Point shoreline area in Ventura. It is not currently among the preferred projects as its focus is on recreational use rather than ecological benefit. Therefore, it does not appear feasible at the time of this plan, unless it receives support from recreational use funding from the Trustees or other sources. Ecological restoration costs would be expected to be a small part of the total project.

### Matilija Dam Removal (SHORE-6)

This project is the removal of Matilija Dam, which is full of sediment and does not function as a drinking water reservoir which was its intended purpose. Removal of the dam would restore natural sediment flows, which enrich beaches through sand deposition. This project was not selected, as it is not yet clear if it is technically feasible, and due to the very high cost associated with the project (estimates over $100 million). Also, this project is too early in the planning and environmental review phase to be properly evaluated at the time this restoration plan was prepared.

### Gaviota Creek Watershed Restoration (SHORE-7)

This project includes the relocation of the Gaviota State Park entrance road along with riparian/estuarine enhancements. The relationship to injured resources directly on the shoreline is more tenuous, though it may have recreational benefits to human uses. The time to provide benefits to sandy beach resources is potentially distant. Also, while this project meets some sandy shore restoration goals as a beach nourishment project, it is not a preferred approach to achieving these benefits. The duration of benefits is projected to be short for the sandy beaches and the costs are relatively high (estimated at approximately $10 million). This project was not selected to be carried forward for implementation at this time because the project does not

90

contain sufficient information for the Trustees to understand the benefits to shoreline resources injured by the spill.

***El Capitan State Park Concrete Removal Project/Bike Path and Rip Rap Removal (SHORE-8)***
This project involves the removal of large rip-rap boulders and concrete that are located at the base of a portion of the bicycle trail between Refugio and El Capitan State Parks. The concept is to remove legacy rip-rap (currently serving no purpose) outside of the area where riprap currently exists to protect the Exxon-owned pipeline located there. Removal of legacy rip-rap may partially restore a segment of this shoreline to a more natural and unarmored condition. Feasibility and cost-benefit of this project has not been fully assessed.

***Santa Barbara County Seawall Removals (SHORE-9)***
This project would involve the removal of concrete seawall structures located in Santa Barbara County to restore the shoreline to a less armored condition. The Trustees evaluated selected sites proposed by the County and determined that seawall removal could cause structural compromises to the railroad infrastructure. As of the release of this plan, no formal written proposal has been submitted or reviewed on this effort, so it is not clear if this is a fully developed plan or project.

***Coastal Hazards Removal, Goleta Beaches Extending From Arroyo Hondo To Coal Oil Point (SHORE-10)***
This project would involve removal of coastal hazards other than the Ellwood seawall. The elements evaluated to date by the Trustees, such as iron material protruding from the shoreline surface, would not provide any tangible benefits to plants, animals, and their habitats that were affected by the spill. The State Lands Commission, the proponent of this project, has successfully pursued other funding sources for this work, primarily as an effort to reduce hazards to humans. The nexus to restoring shoreline resource services that were injured during the spill event is unclear, so this project is not currently among the selected projects.

***Coil Oil Point Research and Education (SHORE-11)***
This is a proposal to fund staff to provide research and education at the Coal Oil Point Preserve. The elements evaluated to date by the Trustees, such as funding an endowment for the education coordinator at Coal Oil Point Preserve, would not provide any direct benefits to plants, animals, and their habitats that were affected by the spill. Any identified benefits to the impacted resources would be indirect.

***Devereux Slough Restoration (SHORE-12)***
This is a proposal to restore Devereux Slough through acquisition of a former golf course to expand the slough to a greater portion of its historical extent. The elements evaluated to date by the Trustees, such as habitat enhancement and monitoring in the former golf course, while beneficial to some natural resources, would not provide any tangible benefits to the shoreline natural resources that were affected by the spill. While no slough or meadow habitats were injured by the spill, this project may, however, provide broad ecosystem benefits for multiple

91

species that utilize shoreline habitats and its proximity to shoreline habitats creates ecosystem connectivity that may benefit coastal resources that were affected by the spill.

### Funding a Quick Reaction Cleanup Crew for Tar found on Beaches (SHORE-13)

This proposal is to fund a personnel that would respond quickly to perform cleanup duties on the shoreline when tar is found. The Trustees have concerns that the likelihood of success for this would be very difficult to determine. Cost effectiveness is likely to be low, and benefits to the public would be challenging to quantify. Duplication would also be high in the event of an oil spill incident, given that the spill response effort oversees the task of oil removal and cleanup. Hazardous material handling and disposal cost and liability questions are also significant considerations.

### Removal of unnecessary sediment basins from the Gaviota coast (SHORE-14)

This is a proposal to remove sedimentation basins to allow more natural transport of materials to the shorelines for the purposes of beach nourishment. Only basins that are deemed no longer necessary to protect public safety and property would be considered for removal. Recent fire and flow events call into question the viability of removing sediment basins along the Gaviota coast.

### Refugio and Gaviota Coast Human Impact Mitigation (SHORE-15)

This proposal aims to reduce human waste material on the Refugio and Gaviota shoreline by providing portable toilet facilities. The Trustees considered this to be less a sandy beach or shoreline restoration project and more of a sanitation project, given that it that would install restroom services. It does not provide significant tangible benefits to plants, animals, and their habitats that were affected by the spill. Any benefits that might exist would be challenging to quantify and primarily human sanitation and recreational in nature.

### Other Dune Restoration Projects (SHORE-16)

These are dune restoration projects similar to the other ones listed in the selected project section, but in different locations. Some of these projects lack owner consent, have a need for partner funding, or are not proximal to the spill area. Those with owner consent, funding resources, permitting in place, long term stewardship, and well described costs within the spill area have been selected as preferred. The remaining dune restoration projects would require more details to be better understood, or need more clarification regarding technical feasibility before being considered preferred projects. However, these projects may be considered at a later time, as more information on these projects is gathered or if the selected dune restoration projects become infeasible.

### Coal Oil Point Pilings and Debris Removal (SHORE-17)

This project involves removal of pilings and debris from a lagoon area. However, it appears to have benefits associated with human use and safety rather than the injured shoreline resources. There also appears to be some permitting issues associated with the removal effort that may disturb sensitive natural resources located at or near the lagoon. Much of the identified debris is associated with the lagoon habitat rather than shoreline, making the nexus to the injured

92

resources weaker. Benefits would be challenging to quantify and scale for the injured resources. Both ecological benefits and the cost benefit need to be more clearly understood before the Trustees would reconsider funding this project.

### *Outdoor Classroom Education and Outreach (SHORE-18)*
Building on the successful implementation of the Channel Islands Marine Sanctuary's Rocky Intertidal Protection Program, students from local schools would be engaged to learn about the ecology of rocky intertidal habitats, including hands-on implementation of rocky intertidal monitoring. Students would also be engaged in docent programs to share their knowledge of rocky intertidal habitats with the public at popular tidepool areas. Benefits would be less direct, as they would rely on an overall change in behavior and attitudes by users of rocky intertidal areas.

### *Refugio and El Capitan State Beach Rocky Intertidal Docent Programs (SHORE-19)*
This project involves the development and implementation of a docent program at rocky intertidal sites at Refugio and El Capitan State Beaches to educate and oversee visitors and contact law enforcement personnel, if needed. Benefits would be less direct and would rely on an overall change in behavior and attitudes by users of rocky intertidal areas.

### *Increase Substrate for Rocky Intertidal Species (SHORE-20)*
This project involves the creation of new shoreline habitat or modification of existing habitat to increase substrate for rocky intertidal species. Examples include wrapping pier pilings, or creating "living walls" at hardened shoreline structures such as breakwaters. No viable locations or methods were identified as of the drafting of this plan, but the concept may be viable in the future.

### *Cessation of Beachgrooming (SHORE-21)*
This project involves the cessation of beach grooming along beaches in Los Angeles and Ventura Counties. No specific locations identified as of the drafting of this plan. There is a need for a project proponent and partnerships that do not currently exist.

### *Rindge Dam Removal (SHORE-22)*
This project is the removal of the Rindge Dam and/or dams upstream. The Rindge Dam is full of sediment and does not function as a water reservoir which was its intended purpose. Removal of the dam would restore natural sediment flows, which enrich beaches through sand deposition. This has a very high cost associated with the project (estimates over $100 million) and is too early in the planning and environmental review phase to be properly evaluated at the time this restoration plan was prepared.

93

## 5.2    Subtidal and Fish Habitats

In the initial days and weeks after the Refugio Beach Oil Spill, the Trustees investigated the potential for injuries to subtidal fish, invertebrates, and aquatic vegetation. Animals and plants may be harmed by oil spills if they are exposed directly to the oil, to the fraction of the oil that dissolves into the water, or if they eat oil-contaminated prey. When the Line 901 oil reached the ocean, wave action actively mixed the oil throughout the water column within the surf zone. In addition, the oil was transported offshore and along shore by wind and currents (Figure 2). Offshore, much of the oil floating on the surface was mixed into the water column as oil droplets or particulates, some fraction of the oil dissolved into the water column, and some was taken up into the food chain (Figure 20).



**Figure 20.** Oil exposure in subtidal habitats.

As discussed in Section 2, the spill occurred along the Gaviota coast. Ocean waters in this area are generally in a transition zone where warmer waters off southern California mix with cooler waters off northern and central California. The Gaviota Coast subtidal habitats include sensitive rocky reefs where plants, such as kelp and surfgrass, provide a physical structure that connects the ocean floor to the sea surface. These habitats support diverse communities of plants and animals, and several are designated as Essential Fish Habitat (EFH) under the Magnuson-Stevens Fishery Conservation and Management Act. Other subtidal habitats include eelgrass beds and sand bottom. Given the ecological importance of rocky reef habitats, the Trustees conducted an in-depth assessment of the potential for injuries to coastal subtidal habitats.

Aquatic vegetation was used as a proxy for determining the health of subtidal habitats[10]. Surfgrass, eelgrass, and kelp provide essential food and habitat for a diverse group of fish and

---

[10] Plains does not agree with a number of Trustee interpretations in the subtidal and fish habitats section. In particular, Plains does not agree with Trustees use of a seagrass proxy for the deeper water column injury and does not agree that grunion are a valid indicator species for determining subtidal injury since grunion eggs are exposed on the beach.

94

invertebrate species. Fish in these habitats include California sheephead, kelp bass, rockfishes, red urchins, California spiny lobster, and sea cucumbers. These rocky reef habitats also serve as spawning and nursery grounds for fish and invertebrates. Early life stages of many species were present during the time of the spill and are expected to be sensitive to the effects of oil.



**Figure 21.** Exposure Zones defined for the Refugio Oil Spill NRDA showing shoreline tarball fingerprint matches (red circles). Zone B is the area of heaviest oiling and the extent of subtidal habitat injuries assessed. The inset shows the subtidal assessment area identifying the 10 m depth offshore extent of injury (red polygon). See Appendix B for data associated with this figure.

In the shallower, nearshore environment (0-3 m depth interval) within Zone B (Figure 21), surfgrass and many algal species were visibly coated with oil. Farther offshore (3-10 m depth interval) within Zone B, eelgrass beds and giant kelp attached to rocky reefs were exposed to oil in the water column, and there was documentation that the surface of the kelp forest canopy was oiled.

## 5.2.1 Overview of Data Collection and Studies

The list below summarizes the various field studies, data collection tasks, and analyses used to assess subtidal and fish habitat injuries.

*Fish and Invertebrate Mortality Observations*

Immediately following the spill, and for several days after, dead fish and invertebrates were observed on the beaches along the Gaviota coast within Zone B. From May 19 to June 19, 2015, the Trustees deployed boxes as repositories for response crews to deposit dead animals during beach cleanup operations. Thereafter, on a daily basis, the Trustees photo-documented, counted, and identified the dead animals in the boxes (Figure 22). Dead fish and invertebrates were also recorded, when feasible, on wildlife search effort log forms and NRDA daily field forms. Fish and invertebrate species comprising well over 30 taxa that inhabit surfgrass, eelgrass, kelp and

95

open sand habitats were found dead on the beaches, primarily during the first week after the spill from Refugio State Beach to El Capitan State Beach. These dead animals indicate that subtidal fish and invertebrates were injured as a result of the spill, but the relatively opportunistic collection method and the limited number of collection times and locations prevented rigorous injury quantification from these data.

**Table 5.** Dead fish and invertebrates found in 2015 during the spill, and one year later in 2016.

| Dead Fish and Invertebrates (abridged) | 2015 | 2016 |
|---|---|---|
| Sand crabs | Y | N |
| Rock crabs | Y | Y |
| Shore crabs | Y | N |
| Kelp crabs | Y | Y |
| Spiny lobster | Y | Y* |
| Beach hopper | Y | N |
| Urchins | Y | N |
| Starfish | Y | N |
| Octopus | Y | N |
| Limpets | Y | N |
| Sea Hare | Y | Y |
| Skate/rays | Y | Y |
| Rockfish | Y | N |
| Kelp greenling | Y | N |
| Surfperch | Y | N |

*One lobster was identified that may or may not be a molt, all others were molts.*

In June 2016, the Trustees conducted a follow-up survey of dead organisms along the Gaviota Coast. While direct comparisons using statistical methods (comparing 2015 to 2016 data) were not possible due to differences in study designs, it appears that the species composition and apparent abundance of dead fish and invertebrates found on the beaches was substantially lower in 2016 than in 2015, supporting the conclusion that the oil spill caused acute mortality of fish and invertebrates (Table 5). For example, intact dead lobsters were frequently found during the 2015 collections; however, only one dead lobster was found in the 2016 survey, and may or may not have been a molt (see Table 5). A more detailed summary of the findings is presented in Appendix G-1.

96



**Figure 22.** Examples of unprecedented diversity of dead, oiled fish and invertebrates from diverse subtidal habitats found in the days immediately following the Line 901 spill (clockwise): a. spiny lobster; b. rockfish; c. guitarfish; d. octopus; e. midshipman. Photo Credit: Natural Resource Damage Assessment Trustees.

### *California Grunion Assessment*

California grunion were spawning on some beaches in the spill-affected area during and after the spill (May – September). During semi-lunar high tides these fish bury their eggs in the sand where they incubate until hatching approximately two weeks later during the next semi-lunar high tide (Martin, 2015) (Figure 23). Following the spill, adults and newly hatched larvae would have been exposed to oil in the surf zone, and the incubating eggs may have been adversely impacted by oil stranded on the beach or by cleanup activities (such as raking, machinery, trampling) disturbing nests. In addition to observing and evaluating direct impacts of Line 901 oil on grunion, the life history and accessibility of grunion early life stages make them an ideal model for evaluating the impacts of Line 901 oil on marine fish early life stages in field conditions. Accordingly, the Trustees studied grunion as an indicator of injury.

Grunion spawning was observed at oiled beaches (Refugio State Beach and El Capitan State Beach) and relatively unoiled beaches (East Beach and Topanga Beach) during 2015 and 2016. Based on predator behavior during the days of and immediately following the spill, adult grunion were staging for spawning runs at Refugio State Beach on those evenings. However, the Trustees were not able to access the beach to collect samples of eggs prior to shoreline oiling and/or cleanup activities, therefore, when the trustees attempted to collect eggs, none were found and were presumed to have been removed by cleanup activities. In areas were the Trustees were able to collect eggs from the observed spawning locations, eggs were incubated in the laboratory (Figure 23).

97

Following the two-week incubation period, hatching was triggered by agitation in seawater and hatching rates and larval survival were recorded. Grunion collected from oil-exposed beaches had a higher rate of mortality than those collected from relatively unoiled beaches. Study results are detailed in Appendix G-2.



**Figure 23.** Grunion sampling and analysis from June 2015 (clockwise): a. grunion spawning on beach in Zone B; b. sands collected around grunion eggs; c. developing grunion eggs under magnification; d. grunion eggs in the field.

### *Surfperch Assessment*

The surf zone in the spill-affected area supports relatively large populations of fish such as silversides, surfperches, croakers, flatfishes, and rays. The Trustees selected surfperches as a representative fish group to study due to their abundance in the area and because mature females give birth to live young during the time of year that the spill occurred. As such, sensitive early life stages of fish may have been exposed to oil. Surfperch were sampled five days after the spill and one year later at Gaviota State Park, Refugio State Beach, and Campus Point Beach. Fish rapidly take up and metabolize oil in their food and environment, then excrete that oil in their bile. Surfperch bile samples were collected and analyzed for PAH metabolites to quantify exposure. Significantly higher levels of PAH biliary metabolites were found in surfperch collected from Refugio State Beach in 2015 (heavily oiled), compared to Gaviota (not yet oiled at time of sampling) and Campus Point (lesser oiled) beaches. Mean concentrations in bile were higher than reported in other large oil spills. One year after the oil spill, there was no spatial

98

***Water Chemistry and Effects to Fish and Invertebrate Early Life Stages***
In order to evaluate the toxicity of the spilled oil, the Trustees conducted bioassays using early life stages of inland silversides and sand crabs and exposed them to different concentrations of Line 901 oil. The bioassay was a seven-day exposure study for fish or a six-day exposure study for sand crabs to evaluate survival and growth (Appendix E). The inland silverside is representative of nearshore fish in the spill-affected area. It is in the same family as grunion and topsmelt, both common surf zone fish in the Santa Barbara area. Sand crabs are prey species of surfperch and other fish and birds in the Santa Barbara area. The bioassay studies quantified the relationships between PAH water concentrations and mortality for both juvenile fish and early life stage invertebrates. Bioassay results also were compared to PAH concentrations measured in surf water during the first two months after the spill. Surf water chemistry results were compared to crude oil bioassay results with other fish and invertebrate species that have been reported in the scientific literature. Surf water concentrations following the spill exceeded lethal PAH concentrations for fish and invertebrate early life stages. See Appendices D, E and G for more information.

As discussed previously, the Trustees also considered the potential for enhanced toxicity caused by exposure to UV light. Studies have shown that ultraviolet light (UV) from sunlight can enhance the toxicity of PAHs by a factor from 2-1000 (Barron 2017). Some PAHs in fish and invertebrate tissues are photo-activated by UV forming reactive products that cause oxidative damage. Oil sheen exposure was documented throughout the spill-affected area and is known to cause toxicity to fish and invertebrate early life stages. A summary of the evaluation is provided in Appendix G-4.

***Subtidal Habitat Exposure Assessment***
Divers from the University of California at Santa Barbara (UCSB) reported patches of oil and heavily oiled wrack on the seafloor in Refugio Bay four days after the spill occurred (Michel 2015). In response to this reported sighting of sunken oil, the Unified Command conducted a sunken oil assessment in Refugio Bay between 11 and 13 days after the spill. Methods included multi-beam sonar surveys, side scan sonar surveys, videos and photographs from a remotely operated vehicle and diver inspections at priority sites. The area surveyed was from near the shoreline to depths of 10m from the spill origin, north of Refugio State Beach, to El Capitan State Beach. Thirteen days after the spill, the divers only observed small tarballs near El Capitan Beach (Michel 2015). The Trustees also sent a team of divers to Refugio Bay 13 days after the spill to collect sediment, vegetation, and invertebrates from three habitat types: kelp bed habitat, eelgrass habitat, and surfgrass habitat in the bay. Tissues samples were analyzed for PAHs, and fingerprinting analyses were conducted (Stout, 2018). In each habitat type, oil (as PAHs) was detected in vegetation and fingerprinted to Line 901 oil. A variety of invertebrate species in the kelp and surfgrass habitats had detectable oil (as PAHs) that was consistent with Line 901 oil. Additionally, NOAA modelers estimated that, based on wave, wind and temperature conditions, dissolved oil and oil droplets likely mixed to a depth of approximately 14 m in this area. Overall,

99

the study showed that these subtidal habitats were exposed to Line 901 oil. A summary of the results is presented in Appendix G-6.

### PAHs in Nearshore Fish and Invertebrate Tissues

On May 19, 2015, the California Office of Environmental Health Hazard Assessment (OEHHA) recommended that CDFW initiate a fishing and shellfish harvesting closure for the coastal area near Refugio Beach. A closure was therefore initiated by CDFW on May 19, 2015, extending from approximately 1 mile upcoast of Refugio Beach to 1 mile downcoast of the beach, from the shoreline to one quarter mile offshore. The closure area was expanded on May 21, 2015, based on aerial observations and oil trajectory models, to include the coastal areas from Canada de Alegria downcoast to Coal Oil Point, and extending from the shoreline to 6 miles offshore (approximately 138 square miles). Between May 24 and June 18, 2015, OEHHA collected and analyzed several species of commonly caught fish and invertebrates, as well as kelp, to determine levels of contamination and safety for human consumption. After the last sampling period, benzo(a)pyrene PAH carcinogenic equivalents had fallen below the limit of concern for human health, and the closure was lifted on June 29, 2015 (OEHHA 2015). For the purposes of evaluating exposure of fish and invertebrates in the spill-affected area, the sum of 45 PAHs in the sampled tissues were evaluated. Elevated PAH concentrations were detected in drift kelp consumers (urchins and sea cucumbers) that were collected from fishing blocks close to the release point. PAH concentrations in tissue samples from animals collected from less than 10 m depth were higher than tissue samples collected from animals greater than 10 meters depth, supporting the conclusion that exposure was highest in the 0-10 m subtidal habitats near the spill origin. The analysis is provided in Appendix G-7.

### Surfgrass and Algae Surveys

Approximately two months after the spill, discolored and dead surfgrass was observed at Refugio State Beach and El Capitan State Beach—both areas of heavy oiling (Figure 8). Based on these



**Figure 24.** Surfgrass injury studies (left to right). The first two pictures show an example of how brown and necrotic surfgrass looked in the field. Middle picture shows an injured experimental plot. Far right shows a reference plot with bright green, healthy plants. Photo Credit: Natural Resource Damage Assessment Trustees.

100

observations, additional intertidal and subtidal surveys were initiated to quantify the extent of discolored surfgrass and algae. Condition and abundance of surfgrass and algae were assessed at eight sampling sites over several dates from July 2015 to June 2016. Oil-related injuries, including bleaching, necrosis, loss of biomass, cellular death and loss of surfgrass leaf tensile strength, occurred throughout the range of surfgrass habitats within Zone B (Figure 24). During the August 2015 survey, the proportion of dying surfgrass ranged from 37.4% at Arroyo Hondo to 82% at Corral Canyon, compared to 2.2% at the reference site (Mussel Shoals located in Zone D where shoreline oiling was absent, sporadic or light-to-moderate). For algae, the cover of dead and dying plants ranged from 86.1% at Coal Oil Point to 99.2% at Corral Canyon, compared to 6.1% at the reference site. An area-weighted average of the percent area of dead and dying plants was used to quantify injury for subtidal habitats. By the 2016 field season, surfgrass was not fully recovered at the heavily oiled Arroyo Hondo site. Survey methods and results are detailed in Appendix G-5.

## 5.2.2   Subtidal and Fish Habitat Injury

### *Area of Impact*

Due to the nature of the Refugio oil release into the surf zone, the nearshore coastal processes and the physical properties of the oil, the Trustees concluded that exposure of aquatic organisms was likely to be highest in nearshore, relatively shallow subtidal habitats[11]. Therefore, the Trustees focused the subtidal injury assessment within Zone B where oiling was heaviest, for depths of up to 10 meters (m) (Figure 21). The Trustees selected 10 m depth as the outer boundary for subtidal resources within Zone B based upon the following considerations:

1. Submerged oil droplets and masses were observed within Zone B to 10 m depth;
2. Ten meters is the depth at which there was fairly high confidence that oil would mix throughout the water column to the bottom (Appendix A);
3. There was direct evidence that animals and plants in the near shore environment within Zone B were injured and/or exposed to oil (Appendix G), and
4. Aquatic vegetation such as kelp or seagrass provide critical foundational subtidal habitat, and rarely extends beyond 10 m deep.

### *Baseline Condition*

The Trustees assessed injury by comparing oiled areas to baseline conditions, per the OPA regulations. The Trustees estimated those baseline conditions by using unoiled reference sites in 2015 (for grunion studies, surfgrass studies and surfperch exposure studies) and by repeating one-year, post-spill anniversary studies (grunion studies, surfperch studies and mortality observation studies), when the Trustees assumed continued exposure to Line 901 oil would have been eliminated or greatly reduced.

---

[11] Plains disagrees with the extent of subtidal injury assessed by the Trustees and asserts subtidal injury is materially lower than the Trustee's estimate.

101

### *Injury Determination and Quantification*

For injury determination, the Trustees considered the presence and species composition of dead, oiled fish and invertebrates in mortality observation studies, the observed reduction in hatching success in grunion, the poor health of oiled macroalgae and seagrass, and a large number of recent toxicity studies on the effects of crude oil to early life stages of fish and macroinvertebrates. These provided, at a minimum, qualitative evidence for the Trustees to conclude that there was injury to natural resources in the shallow subtidal (0-10 m depth) area in Zone B.

For injury quantification, the Trustees used injury observed from surfgrass and algae studies as a proxy for general injuries to subtidal benthic[12] and water column habitats, and their associated biota. The Trustees determined that surfgrass/algal habitat (surfgrass habitat) was a reasonable proxy for other similar vegetated subtidal benthic habitats (e.g., kelp and eelgrass) because: (1) surfgrass is a foundational habitat for a highly diverse group of fish and invertebrates species that occupy the 0-10 m depth interval; (2) surfgrass habitat includes all of the major taxa found in other subtidal habitats (vascular plants, red and brown algae); and (3) surfgrass habitat is more accessible for the comprehensive surveys needed to quantify injury.

Surfgrass and algae surveys were conducted throughout Zone B (Figure 8) to identify the percent cover of discolored, dead, and dying surfgrass and algae (Figure 24). Injury was defined as the area-weighted average across all study sites, representing a maximum injury of 54%. This was used as the basis for the injury assessment for subtidal habitat (Figure 25), with weighting factors for relative habitat types and depth strata (i.e., 0-3 m versus 3-10 m depth interval):

### *0-3 m Depth interval*

For the 0-3 m depths, the Trustees applied the weighted average 54% injury to all eelgrass, rocky reef, kelp, and surfgrass habitats within Zone B. Because sand bottom habitats are less biologically productive, the Trustees applied an ecological injury of 5.4%, representing one tenth of the injury of vegetated and rocky reef habitat (Appendix H).

### *3-10m Depth interval*

For the 3-10 m depth interval, the Trustees assessed injury separately for benthic habitats, for surface water (top 2 m of water column), and for midwater (2-10 m depth interval) (Figure 26).

---

[12] Benthic means relating to the bottom of the ocean and to the organisms that live there.

102



**Figure 25.** The surfgrass and algal injury quantification was driven by studies where the area of discolored, dead and dying plants were assessed. Injury was defined as the percent cover of discolored, dead and dying surfgrass and algae at a study site. The overall area-weighted average percent injury was 54%. Green dots are sampling sites.

For the benthic habitat the Trustees calculated losses based on areal dispersion of submerged oil across the benthic footprint of Zone B to a depth of 10 m. Sunken oil would not necessarily dilute out into the water column, but would persist as small sediment-laden oil particles and droplets and spread across the sea bottom due to wave action and currents. Sunken oil also has a high likelihood of being trapped in or slowed by the bottom vegetation. The Trustees considered that injury to the benthic community would decrease linearly with distance from the shore. This would range from an 54% injury in the nearshore (0-3 m depth) to 0% injury at the 10 m depth, after calculating average offshore distances to the 10 m depth stratum. This resulted in the application of a 13% injury across the 3-10 depth range for benthic rocky reef, surfgrass, kelp, and eelgrass habitats. As with the 0-3 m zone, for sand bottom habitats in this depth stratum the Trustees are claiming one tenth of that loss due to lower productivity/services associated with sand bottom habitats. This resulted in a 1.3% loss for sand bottom habitats (Table 6). More detailed discussion of the injury quantification is presented in Appendix H.

For the top 2 m of the water column in the 3-10 m depth interval (Figure 26, light blue area), exposure would have primarily come from the short term exposure of surface oil in the approximately 2 weeks post spill. The Trustees determined there were short-term losses to the biota in the water column, ranging from 54% loss (determined by using surfgrass as a proxy) to 80% loss (based on literature). Studies in recent years have demonstrated high mortality (approximately 80%) to fish early life stages and planktonic organisms at low levels of PAH exposure, especially when exposed to UV light (Morris et al. 2015). The Trustees also assessed injuries to fish and planktonic organisms in the mid-water column of the 3-10 m depth stratum, at a 5% loss (Figure 26, dark blue area). The midwater injuries are based on the concept of oil

103

mixing from the surface and from the bottom, but with a recognition that dilution, weathering and dispersion will greatly reduce exposure, and thus, the level of injury (Table 6).



**Figure 26.** Summary of subtidal injury quantification. The average distance offshore from the 0 to 3 m depth range is 76 m. The average distance from 3 m to 10 m depth range is 232 m. The benthic habitat injury of 13% in the 3-10 m depth range was calculated by multiplying the injury in the 0-3 m depth range (54%) by the proportion of the offshore linear distance 0-3m depth compared to the total offshore linear distance of 0-10 m depth.

### *Habitat Equivalency Analysis Results*

The Trustees used HEA (Appendix C) to scale compensatory restoration for the subtidal benthic injury. The HEA was based on the percent injury for the various components of the subtidal environment, which in turn were based on the documented injury to surfgrass and algae. For the recovery component, the HEA calculations take into account the rapid initial loss that occurred in the first 6 months of the spill. This was evidenced by a high percentage of discolored, dying surfgrass and algae in August of 2015 and January 2016. Recovery was assumed to be rapid, - 88% recovered after a year (consistent with 2016 study observations), 94% after two years, and 100% after 5 years. Applying the injury levels discussed above, this analysis resulted in a loss of 178.5 acre-years in the 0-3 m depth interval and 117.4 acre-years in the 3-10 m depth interval (Appendix H).

The Trustees considered how to address injuries to the upper- and mid-water zones of the 3-10 m depth interval and ultimately chose not scale restoration for these areas because the restoration projects selected to benefit benthic resources will likely provide significant benefits to water column resources as well. In addition, the injury to fish early life stages, while significant, would also have been ephemeral and the Trustees were unable to readily identify restoration projects that were both targeted to water column species and highly scalable to the estimated injury. Given these facts, the Trustees decided to defer until later a determination on how best to compensate for any remaining injury to water column species. The Trustees anticipate having subtidal restoration funds available after the completion of the projects discussed below. If selected, these projects should yield additional information on their beneficial impacts. The Trustees will then decide whether remaining funds should be spent to augment an existing subtidal project or implement a new water column-focused project.

104

**Table 6.** Subtidal injury (losses) and Habitat Equivalency Analysis results.

| Depth Zone | Habitat type | Max injury (% Loss) | Recovery time (years) | Habitat area (acres) | Acre – years for compensation (dSAY[1]) |
|---|---|---|---|---|---|
| Nearshore Benthic Habitats (0-3 m depth zone) | Rocky reef, kelp canopy, seagrass, and sand bottom | 54% | 5 | 514 | 178.5 |
| Offshore Benthic Habitats (3-10 m depth zone) | Rocky reef, kelp canopy, seagrass, and sand bottom | 13% | 5 | 1657 | 117.4 |

[1]dSAY = discounted service acre-year. See Appendix C.

## 5.2.3  Selected Restoration Projects

The Trustees identified four categories of restoration activities (abalone restoration, eelgrass restoration, kelp restoration, and seawall removal) to compensate for losses to subtidal habitats caused by the release of Line 901 oil. Subtidal projects were selected and prioritized by their ability to enhance and restore subtidal habitats in the region affected by the spill. Projects within Zone B were heavily prioritized over other projects that were located in the region affected by the spill but outside Zone B. These projects are discussed below in order of priority (Table 7).

**Table 7.** Subtidal selected restoration projects.

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| SubT-1 | Abalone Restoration | Rocky reef habitats and associated fish and invertebrates |
| SubT-2 | Coastal Eelgrass Restoration | Eelgrass habitats and associated fish and invertebrates |
| SubT-3 | Sand-dwelling Kelp Project | Kelp habitats, and associated fish and invertebrates |
| SubT-4 | Ellwood Seawall Removal | Rocky reef habitats |

***Abalone Restoration in Naples Reef and Campus Point MPAs (SubT-1)***
The goal of this project is to enhance the function of rocky reef habitats within the two Marine Protected Areas (Campus Point and Naples Reef) off the Gaviota Coast that were directly affected by the spill. This project would supplement abalone populations through outplanting of juvenile abalone and translocating adult abalone from a nearby system.

To maximize success, the Trustees propose applying multiple approaches when possible (e.g., adult translocation and juvenile captive propagation and outplanting) over a multi-year period, with repeated outplanting and translocation events. The Trustees propose a 10-acre restoration project (5 acres within each of the Marine Reserves) that will be implemented over a 5-year period and subsequently monitored for an additional 5 years.

*Affected Environment*

105

The restoration sites to which abalone will be translocated or outplanted comprise over 5 acres at each of the Naples Reef and Campus Point Marine Protected Areas. The donor population for adult abalone translocation is from San Miguel Island or another similarly robust southern California population. The Trustees will work with the appropriate local, state, and federal agencies, as well as abalone experts and NGOs to identify appropriate commercial or research abalone farm(s) for juvenile abalone outplants.

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* - The long term biological impacts of this project to the marine protected areas are highly beneficial to the public, as abalone become re-established. Red abalone are an iconic resident of California kelp forests. Ecologically, abalone are grazers that keep rocky habitat available for diverse algal and benthic invertebrate occupants of rocky reefs. Abalone are competitors with sea urchins, but are less destructive grazers than sea urchins, thus abalone promote a healthy rocky reef system. There is the potential for minor adverse biological impacts to the abalone population of San Miguel Island or other selected donor population through the removal of abalone adults. In addition, there is the potential for injury to the translocated abalone. However, any removal will be done under permit, using best practices, and carefully planned to avoid any injury to translocated abalone or adverse reduction to the donor population or associated habitats. In addition, the project proponents are fully aware of the potential for disease in abalone populations and will use local abalone experts to screen and test outplants and transplants to avoid any chance of introducing disease into a wild population.

2. *Physical Impacts* – The Trustees do not anticipate major impacts to the physical environment, such as water, air, sediments, etc. Any negative physical impacts (e.g., harm to reef structure) would be unlikely and, at worst, would likely be mitigated by the use of best practices. Ultimately, any adverse physical impacts are expected to be negligible.

3. *Human Impacts* - The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. There is likely a benefit to human recreational use as the presence of abalone and a more robust rocky reef/kelp habitat create a more diverse, healthy ecosystem, which will benefit divers and other recreational users of the MPAs.

*Probability of Success*
This project has high likelihood of success if implemented at this scale. In addition, abalone outplanting and translocation presents few environmental risks that are easily mitigated through established best management practices (BMPs). The CDFW has already developed many of

106

these BMPs as part of the red abalone outplanting work they have initiated in Los Angeles and San Diego Counties. Furthermore, abalone outplanting and translocation require no on site construction or physical modification of the sea floor, so permitting requirements will be limited to scientific collection and stocking permits, which will allow for a streamlined implementation process.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. The success of this project will be measured through up to 10 years of post-transplant/outplant monitoring of abalone population density and size structure, as well as an evaluation of rocky reef ecosystem for success.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:
- Number and size of abalone deployed to site per outplanting event as compared to pre-project levels pre-outplanting;
- Density of abalone present on site over time as compared to pre-project levels pre-outplanting; and
- Rocky reef ecosystem response will be measured through kelp density and stipe counts and fish, invertebrate and algae and habitat characterization surveys.

*Evaluation*
The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

### Refugio Bay Eelgrass Restoration (SubT-2)
The goal of this project is to enhance habitat services within Zone B through the restoration of eelgrass. There are limited opportunities for coastal eelgrass restoration within Zone B because of depth, substrate and wave energy limitations. However, the Trustees have identified a subtidal site where the substrate, depth and wave energy are likely to support eelgrass, but which is far enough from existing beds that natural recruitment is unlikely (Altstatt, personal communication).

*Affected Environment*
The project includes creating additional eelgrass habitat in areas in or adjacent to Refugio Bay, including the southeastern portion of the Gaviota Coast, an area that was directly and heavily impacted by Line 901 oil. This would be accomplished through harvesting of plants from a donor site and transplanting them to the project site.

107

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* – This project would provide long-term beneficial biological impacts to the environment. Eelgrass habitat provides unique and critical ecosystem services to the shallow subtidal component of the California coastal shelf. Eelgrass beds are an important source of primary productivity and create 3-dimensional biogenic habitat that is used by a diverse assemblage of fish and invertebrates as nursery and foraging habitat. Eelgrass habitat is also identified by NOAA as a Habitat of Particular Concern under the Magnuson-Stevens Fishery Conservation and Management Act. There is a slight possibility of adverse biological impacts if the project implementer takes too much eelgrass from donor sites. However, given the Trustees' experience and expertise in eelgrass restoration, this risk is extremely small. The Trustees, in addition to having implemented similar projects successfully in the past, would draw on the expertise of local experts in implementing this project.

2. *Physical Impacts* – The Trustees anticipate only minor impacts to the physical environment. The project will likely create beneficial impacts because eelgrass provides a three-dimensional habitat for fish and invertebrate species and stabilizes sediments, reducing scour and enhancing light penetration in the water column. Any adverse impacts would be associated with implementation (i.e., project implementers moving in and around the donor and transplant sites) and are expected to be negligible.

3. *Human Impacts* – The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc.

*Probability of Success*
Eelgrass restoration in southern California has proven successful in many coastal locations. However, most of these projects were conducted with estuarine species. Because this project focuses on the coastal species, the Trustees are proposing to implement the restoration based on the successful methods used by Altstatt (2014). Based on that work, it is expected that full maturation of the restored eelgrass bed may take 7-10 years.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. The project includes up to 10 years of monitoring for restoration success. The specific details of the monitoring actions will be  outlined in the project monitoring plan

108

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Acres restored;
- Density of eelgrass shoots, cover, and blade length before and after; and
- Ecosystem response measured through fish and invertebrate and habitat characterization surveys.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

### Sand-Dwelling Kelp Restoration (SubT-3)

The goal of this project is to support an existing effort to re-establish sand-dwelling kelp canopy to the Goleta Beach area. There are no other opportunities for direct kelp forest restoration within Zone B. The existing project is currently underway under separate funding, initiated by a small group of dedicated citizen scientists who are attempting to restore the kelp forest that once existed in Goleta Bay. While there is no rocky reef habitat in the bay that typically supports kelp forests, it has been speculated that the kelp had once established itself on tube-forming worm colonies that frequent open sand habitats (e.g., colonies of the tube worms belonging to the genus *Diopatra*). The project aims to restore these "sand-dwelling" kelp plants by inserting small granite columns into the sediment, exposing the top 10-20 cm of the column to kelp recruitment. The ultimate goal of this project is that kelp holdfasts will spread beyond the area occupied by the granite column and form a kelp forest of sufficient density to support kelp canopy.

The scope of the NRDA project is to extend the existing project by expanding the permits associated with the current one-acre project and to implement a systematic monitoring program. At this time, the Trustees are not proposing a larger scale buildout of this project because the results are still preliminary, and the longer-term viability of the approach is unknown. However, if the project continues to show success, the Trustees will consider expansion, subject to permits and other considerations.

*Affected Environment*

The location of the project currently encompasses sand bottom offshore of Goleta Beach, just outside of Zone B, the heaviest oiled area. The project would re-introduce sand-dwelling kelp to the area. There are limited opportunities for other kinds of kelp restoration due to lack of rocky reef habitat.

109

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1.  *Biological Impacts* - The Trustees' proposal regarding this project does not include any additional active restoration work. Rather, it covers only an extension in the duration of the existing project and associated monitoring activities. Extending the current project will have no negative effects to the environment and may have beneficial effects, as the project currently provides some ecosystem benefits to fish and invertebrates. Kelp also provides food to subtidal, intertidal and beach communities (e.g., a large component of beach wrack is produced by giant kelp). If the Trustees extend the time period of the project, the beneficial impacts will increase accordingly. As the monitoring activities would be the Trustees' only physical interaction with the project, any adverse impacts are expected to be negligible.

2.  *Physical Impacts* – As with biological impacts, the Trustees expect any physical impacts from this project to be negligible.

3.  *Human Impacts* - The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc.

*Probability of Success*

The project was implemented as a pilot project, and to date has shown some success, in that kelp plants have recruited to a number of the granite columns. Longer-term monitoring of the existing project will help the trustees evaluate success, especially from consequences of large storm events.

*Performance Criteria and Monitoring*

The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. This time series of metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites. This proposal calls for 5 years or more of monitoring for success of the pilot project. The specific details of the monitoring actions will be outlined in the project monitoring plan.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Density of kelp plants as compared to pre-project conditions;
- Kelp stipe counts and canopy cover compared to pre-project conditions; and
- Ecosystem response will be measured through fish and invertebrate and habitat characterization surveys.

110

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

**Ellwood Seawall Removal (SubT-4)**

This project will benefit shoreline (sandy beach) resources and is discussed in Section 5.1.6 (Shoreline) above. However, the Trustees agree that there are likely benefits to subtidal resources offshore of the existing structure. The subtidal component of this project consists of pre- and post-removal monitoring to confirm and document benefits.

*Affected Environment*

The project site is Ellwood Beach in Goleta, CA. A wooden seawall currently constrains natural functioning of the ecosystem as well as lateral access along the shoreline at high tide.

*Environmental Consequences (Beneficial and Adverse) (to the subtidal environment)*

This project will only be undertaken if it is ultimately selected to compensate for sandy beach injuries, as discussed in Section 5.1.6 above. Accordingly, its status as a preferred alternative to compensate for subtidal injuries will have no impact on the potential environmental impacts described above. The only additional activity associated with the subtidal "component" is non-invasive monitoring, which the Trustees anticipate will have negligible, if any, environmental impacts.

1. *Biological Impacts* – The project is expected to benefit the environment by reducing scour and turbidity to the nearshore environments (due to the reduction in reflective wave energy after removal of the seawall). Scour inhibits settlement and success of algal and seagrass species, as well as benthic invertebrates. Turbidity inhibits algal and seagrass growth. Reduction in scour is expected to increase species diversity and habitat function in the affected offshore area. Short-term adverse effects from construction are expected to be negligible with respect to the existing offshore environment.

2. *Physical Impacts* – The benefits to subtidal habitats include an expected reduction in turbidity and scour in the offshore habitats resulting from the reduction in reflective wave energy that will occur after the seawall has been removed. Short term adverse effects from construction activities (potentially higher turbidity, sediment transport) are expected to be negligible.

3. *Human Impacts* - The Trustees do not anticipate any impacts from this project on socio-economics, aesthetics, health and safety, historical properties, recreational use, etc. in the offshore environment.

111

*Probability of Success*
The Trustees consider this project to have a good likelihood of success in providing benefits to the nearshore subtidal habitats because wave reflectivity and scour will be significantly reduced compared to current conditions.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and 2) conditions at an appropriate a nearby natural reference site or sites.  The project envisions up to 10 monitoring events, pre- and post-removal over a five-year period. The specific details of the monitoring actions will be  outlined in the project monitoring plan

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:
- Presence of sessile macrofauna and macroalgae sensitive to scour relative to pre-project conditions; and
- Decrease in turbidity relative to pre-project conditions.

*Evaluation*
The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for injured subtidal habitat as a result of the spill, and the Trustees have therefore identified this project as a preferred alternative.

## 5.2.4  Second Tier Restoration Projects Considered
The Trustees also considered the following projects (Table 8) and determined that many are valid projects that would provide benefits to subtidal and fish habitat. However, these projects were not selected for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

112

**Table 8.** Second tier subtidal restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| SubT-5 | Net and Trap Removal (marine debris) | Fish, some benefit to benthic invertebrates |
| SubT-6 | Artificial Reef | Fish and subtidal habitats |
| SubT-7 | *Undaria* Removal at Anacapa Island | Subtidal habitat |
| SubT-8 | Marine Protected Area Management and Stewardship Program | Subtidal habitat |
| SubT-9 | Grunion Habitat Restoration and Education | Beach, subtidal and fish |
| SubT-10 | Slough and Salt Marsh Restoration | Early lifestage fish |
| SubT-11 | Kelp Restoration in Santa Barbara Channel Area | Subtidal habitat |
| SubT-12 | Sargassum Removal | Early lifestage fish |
| SubT-13 | Lobster Restoration | Lobster |
| SubT-14 | Boater Outreach to Reduce the Spread of Invasive Algae | Subtidal habitat |
| SubT-15 | Gaviota Creek Fish Barrier Removal | Fish |

*Net and Trap Removal (marine debris) (SubT-5)*

This project was considered because marine debris removal, particularly derelict fishing gear, can have some benefits to marine habitats and can also reduce mortality of marine fish, birds, invertebrates and mammals. Marine debris removal is identified as a lower priority for a number of reasons. The degree of benefit that fishing gear removal has to each of these resources depends greatly on the location and habitat from which the gear is removed, and the nature of the items removed. While there are some opportunities to remove fishing gear from the greater southern California Bight, opportunities to remove gear from Zone B have proven to be limited. Thus, direct benefits of gear removal to the benthic marine habitats that were injured by the spill are also limited. Gear removal would be more likely to address injuries to water column species, so the Trustees may reconsider this project if they determine later that it is appropriate to conduct water column species-specific restoration (as opposed to using remaining funds to expand habitat projects with water column species benefits).

*Artificial Reef (SubT-6)*

The Trustees considered proposed artificial reef creation via reef balls or imported rock near Bird Island. Artificial reef creates new hard structure, promoting rocky reef habitat enhancement, potentially including kelp establishment. However, for the purposes of NRDA, the Trustees determined that significant barriers, such as permitting and maintenance issues, exist. These barriers will lessen the likelihood of timely implementation of the project. Therefore, the Trustees dropped this project from further consideration at this time.

*Undaria Removal at Anacapa Island (SubT-7)*

*Undaria pinnatifida* is an Asian seaweed of the intertidal and shallow subtidal zone, which was first discovered invading Anacapa Island in 2016. Invasive seaweeds crowd out native seaweeds

113

and potentially introduce co-occurring invertebrates, with potential for cascading effects to the ecosystem. The proposed project would implement an *Undaria* removal program in subtidal areas around the Channel Islands. Although the Trustees consider this a beneficial project, in general, there was concern that the project had high costs that may not achieve lasting benefits to subtidal habitats. Further, the habitat and ecosystem benefits occur outside of the subtidal area affected by the spill.

### Marine Protected Area Management and Stewardship Program (SubT-8)

This project focuses on ecological and human use monitoring to support adaptive management and agency enforcement of MPA regulations. This project may include cleanup of marine debris identified within MPAs, removal of invasive kelps, and education and outreach to promote awareness, compliance, and stewardship of MPAs. The project is heavily focused on monitoring, and the tangible subtidal benefits are undefined, making it a less attractive project for implementation than those listed as "preferred" in Table 7. The Trustees will consider whether this project can be combined with the abalone restoration project that is also focused within MPAs.

### Grunion Habitat Restoration and Education (SubT-9)

This project focuses on developing management practices that restrict grunion capture and other impacts to Grunion until after the first 2-3 days of spawning. Public outreach to raise awareness would be a necessary component of the project. Also, increased public awareness of this species' presence at Refugio and El Capitan State Beaches is directly attributed to the Refugio Beach Oil Spill cleanup, and an interpretive program would help to mitigate expected increased fishing pressure for grunion at these locations. Also, increasing the number of grunion greeters and/or increased CDFW enforcement would help protect grunion. The Trustees consider these measures to be beneficial to grunion. However, there are several other projects targeting shoreline restoration that provide significant benefits to grunion spawning habitat. This project would require a change in the current regulatory framework by the Fish and Game Commission, which is outside the authority of the Trustees. Thus, a specific grunion shoreline project is not preferred at this time.

### West Goleta, Carpinteria and Devereux Slough Restoration Projects (SubT-10)

These are three separate projects considered for wetland, tidal marsh and upland restoration to benefit estuarine and marsh habitats. These habitats benefit early life stage fish and crab species by serving as refugia and feeding habitat. While the habitat injured by the oil spill was marine, shallow subtidal habitats, these projects may provide broad ecosystem benefits and contribute to subtidal health by supporting early life stages of subtidal species and through indirect effects to subtidal habitats such as water quality improvement.

### Kelp Restoration in the Santa Barbara Channel Area (SubT-11)

Restoration of kelp could lend to protection of shoreline habitats from storms, provide habitat for prey of marine mammals and birds, provide additional habitat for fish, provide wrack for sandy beach, and improve recreational diving. However, the project lacked specific descriptions,

114

locations, and timelines to gauge its feasibility. The Trustees believe that the abalone project and the sand kelp project (identified as "selected" projects) meet the goals of restoring kelp habitat. The Trustees will continue to monitor opportunities and feasibility for such projects for the future.

### *Sargassum Removal (SubT-12)*

*Sargassum* is an invasive, floating kelp that has recently invaded southern California. Invasive seaweeds crowd out native seaweeds and potentially introduce co-occurring invasive invertebrates, with potential for cascading effects to the ecosystem. The Trustees agree that *Sargassum* establishment and dispersal in Santa Barbara Channel is a concern, but there was no project proposed that specified activities, timeframe, locations or scope to gauge feasibility for a *Sargassum* removal project. This project was not selected to be carried forward for implementation at this time because the project does not contain sufficient information for the Trustees to understand the benefits to subtidal resources injured by the spill.

### *Lobster Restoration (SubT-13)*

This project concept involves multiple methods for conducting lobster restoration including various studies, purchasing Global Positioning System units for permit holders, fishermen surveys, enforcement assistance, and education programs. The benefits of these projects are indirect to subtidal habitats and to lobsters. The ecosystem-level benefits from the projects listed as "selected" in Table 7 are anticipated to also provide benefits to lobsters.

### *Boater Outreach to Reduce the Spread of Invasive Algae (SubT-14)*

This project involves educating boaters about reducing the spread of invasive algae by sending educational materials to boaters along with their registration information, and providing resources for removing algae from boats at launch locations. The benefits of this project are anticipated to be less than would be achieved through direct restoration of habitat, and the effectiveness of education in reducing the spread of invasive algae is uncertain.

### *Gaviota Creek fish barrier removal (SubT-15)*

This project involves removing numerous fish barriers along the Gaviota Creek watershed. Some of these barriers restrict the ability of fish to migrate upstream while others interfere with the creek's natural functions. This project will benefit Southern California steelhead and other aquatic organisms that live within the Gaviota Creek Watershed. The removal of steelhead barriers is focused on one species that was not documented to be injured by the spill, therefore it did not rise to the level of a "selected" project. Furthermore the commencement of watershed-wide restoration is contingent on the relocation of the access road to Gaviota State Beach and Hollister Ranch, and removal of the current road that comprises a substantial impediment in the watershed. The scale of this project exceeds the resources that could be provided through NRDA settlement funds; however, the Trustees have included this as a second tier project.

115

## 5.3   Birds

Birds are especially vulnerable to oil spills, as the oil compromises the ability of their feathers to keep them warm in the cold ocean water (Moskoff 2000). For a species that forages in the water, even a relatively small amount of oil (e.g., the size of a nickel) may result in death. Like a hole in a wetsuit, the oil destroys the feathers' ability to insulate the bird, thus allowing cold ocean water to spread against the bird's skin. Birds which contact oil typically die of hypothermia. With their rapid metabolism, birds also suffer starvation when they cannot forage for a few days (Oka and Okuyama 2000). They can also ingest toxic amounts of oil while preening, as they attempt to clean themselves. Finally, larger amounts of oil can smother birds, affecting their mobility and ability to survive.

A total of 269 birds were collected live and dead after the oil spill, encompassing at least 28 species. The Trustees structured our assessment of bird injury into three injury categories based on the birds' behavior patterns and location of the affected species. These categories are:
- Brown pelicans;
- Western snowy plovers; and
- All other bird species.



**Figure 27.** Location of live and dead birds recovered during wildlife operations. The back lines show the NRDA Exposure Zone boundaries for reference; however these boundaries were not used in the quantification of injury to birds.

### 5.3.1   Overview of Data Collection and Studies

This section describes the data that were collected or analyzed by the Trustees in order to assess injury to birds resulting from the spill. These data were generated by several efforts, including studies that were conducted by the spill cleanup, data collected by the NRDA team, and studies that were not specifically developed for the spill but that provide relevant information for

116

understanding and determining injuries to birds resulting from the spill. These studies are listed below and described in more detail in Appendix I.

*Wildlife Reconnaissance Aerial Surveys*

On May 21, 2015, aerial surveys for pelagic birds were conducted roughly between Point Conception and the City of Goleta. The objective of these surveys was to understand the general location and quantity of seabirds in the vicinity of the spill-affected area in order to inform spill response activities. These surveys, conducted by the Unified Command, documented at least 13 unique pelagic bird species in groups ranging in size from a single individual to 120 individuals.

*Live and Dead Bird Intake Data*

Documentation of live and dead birds was collected as a normal part of the spill response. These data describe the collection of each bird, with such information as date, location, species, condition of bird, degree of oiling, etc. Locations of live and dead birds collected are shown in Figure 27, and the species collected are identified in Table 9. During spill response operations all live distressed birds were taken to rehabilitation centers for further care. All dead birds encountered within the spill area were collected. A total of 66 live birds and 203 dead bids comprised of over 28 species were collected between May 20, 2015 and June 24, 2015 (OWCN 2015).

**Table 9.** All birds collected live and dead by species (or closest known taxon).

| Species | Collected Live | Collected Dead | Total |
|---|---|---|---|
| Black storm-petrel | 0 | 1 | 1 |
| Barn owl | 0 | 1 | 1 |
| Black skimmer | 0 | 1 | 1 |
| Brandt's cormorant | 2 | 11 | 13 |
| Masked/Nazca booby | 0 | 1 | 1 |
| Brown pelican | 47 | 26 | 73 |
| California gull | 1 | 5 | 6 |
| Cassin's auklet | 0 | 1 | 1 |
| Clark's grebe | 0 | 2 | 2 |
| Common loon | 0 | 3 | 3 |
| Common murre | 5 | 33 | 38 |
| Cormorant sp. | 0 | 4 | 4 |
| Double-crested cormorant | 0 | 14 | 14 |
| Domestic duck sp. | 0 | 2 | 2 |
| Eared grebe | 0 | 1 | 1 |
| Elegant tern | 0 | 1 | 1 |
| Forster's tern | 0 | 1 | 1 |
| Grebe sp. | 0 | 3 | 3 |
| Heermann's gull | 0 | 3 | 3 |
| Loon sp. | 0 | 5 | 5 |
| Mew gull | 0 | 1 | 1 |
| Northern fulmar | 0 | 5 | 5 |

117

| | | | |
|---|---|---|---|
| Pacific loon | 6 | 17 | 23 |
| Pelagic cormorant | 0 | 2 | 2 |
| Pigeon guillemot | 0 | 1 | 1 |
| Rhinoceros auklet | 0 | 2 | 2 |
| Rock pigeon (feral) | 0 | 1 | 1 |
| Red-throated loon | 1 | 12 | 13 |
| California scrub-jay | 0 | 1 | 1 |
| Shorebird sp. | 0 | 1 | 1 |
| Sooty shearwater | 0 | 16 | 16 |
| Surf scoter | 1 | 2 | 3 |
| Western grebe | 1 | 8 | 9 |
| Western gull | 2 | 9 | 11 |
| Unknown | 0 | 6 | 6 |
| TOTAL | **66** | **203** | **269** |

### *Search Effort Data Compilation*

Understanding how well beaches within the spill area were searched is important to estimating how many carcasses may have been missed. The Trustees compiled and analyzed records from SCAT teams, wildlife reconnaissance teams, cleanup crews, and NRDA operations to understand the geographic extent and frequency of beach searches that would have had the potential to identify live and dead birds during the cleanup period.

118



**Figure 28.** Western snowy plover at Coal Oil Point during cleanup operations. Photo Credit: Coal Oil Point Reserve, UCSB.

### *Western Snowy Plover Studies*

Western snowy plovers utilize several sandy beaches within Santa Barbara and Ventura Counties for nesting, including Coal Oil Point Reserve, San Buenaventura State Beach, McGrath State Beach, Mandalay State Beach, Ormond Beach, Hollywood Beach, and on Naval Base Ventura County at Point Mugu. Routine monitoring of plovers nest numbers and nest success were conducted at each of these beaches during the 2015 nesting season (Coal Oil Point Reserve 2015; Hartley 2015; Barringer 2015; Frangis and Cox 2015). All nesting beaches are located in Ventura County, with the exception of Coal Oil Point Reserve in Santa Barbara County, which was subject to elevated oil exposure and extensive cleanup operations (Figure 28).

### *Anacapa Island Brown Pelican Surveys*

Anacapa Island is home to the largest breeding colony of California brown pelicans in the United States. The only other significant U.S. breeding colony is located on Santa Barbara Island, which is much farther from the mainland and was unlikely to be heavily impacted by the spill. A much larger number of pelicans breed in Baja California, Mexico. After breeding, many of these birds migrate north and make up the majority of pelicans in the state in summer and fall. During the oil spill, many of the Baja pelicans were already migrating north, due to a failed breeding season in Mexico, and were passing through the spill-affected area. A reconnaissance level, boat-based survey of the nesting colony on Anacapa was conducted by Channel Islands National Park staff on June 5, 2015 during the initial cleanup effort, and no oiled pelicans were observed (Larramendy et al. 2018); however, the survey did not include direct, on-island access. Ground

119

surveys were conducted later on September 20 and 21, 2015 (following the end of the nesting season).

Hundreds of nests were inspected for oiling. Evidence of oiling was limited to one juvenile brown pelican carcass on Middle Anacapa Island, in which a small amount of weathered oil was found on several wing tips, and a few specks on the downy feathers around its shoulder (Larramendy et al. 2018). The survey team estimated the bird was about 6 weeks of age at the time of death, which is essentially full grown.

### *Brown Pelican Roost Surveys*

Due to their large size, pelicans can survive for many days after oiling. In order to assess the extent of oiling of brown pelicans, surveys of known pelican roost sites on the mainland from Morro Bay to Los Angeles were performed in the days immediately after the spill (Jaques et al. 2015). Surveys were conducted by ground and by boat to evaluate the proportion of pelicans at each roost site that showed visible oiling. An aerial survey of pelican roosts were conducted on May 27, 2015 (Jaques et al. 2015). Aerial surveys are ideal for documenting the total number of individuals at each roost by taking photographs and counting brown pelicans (which are easily distinguishable from other birds due to their body size) at each roost. Because no single survey method is able to detect both the proportion of oiled individuals at any given roost and the total number of individuals at the roost, the Trustees analyzed these datasets together to estimate the total number of oiled pelicans at each roost site.

### *Brown Pelican Rehabilitation Survival Studies*

The Oiled Wildlife Care Network (OWCN) assisted with wildlife operations during the spill, including rehabilitation of oiled birds. In order to understand the survival rate of rehabilitated oiled wildlife, the OWCN and other collaborators tracked rehabilitated pelicans to determine their survival and distribution relative to birds that were not oiled and rehabilitated during the spill (Fiorello et al. 2017). Several individuals traveled >5000 km, migrating to northern California or central Oregon in late summer and early fall. In the spring, most birds traveled south, some as far as Baja California. It appeared that both pelicans from Anacapa and Baja were impacted because they flew to those locations after being released. Mortality was documented among both rehabilitated and control birds.

120

### *Sandpiper Pier Cormorant Colony Surveys*

Brandt's cormorants in the spill-affected area nest in a single colony on four nesting platforms that were constructed offshore of Ellwood Beach in Santa Barbara County. Surveys were conducted from the shore to assess the number and status of nests throughout the 2015 breeding season (Figure 29). Based on these observation, the Trustees concluded that nests were not abandoned and chicks successfully hatched during the spill period at a normal rate. Adverse effects from exposure to oil were not visibly apparent during these surveys. However, health effects from ingestion of oil may not have culminated during the survey period, and cannot be easily assessed based on a visual survey.



**Figure 29.** Cormorant nests on platform 1 during a May 22, 2015 survey. Red circles indicate nests that were monitored during the May and June surveys. Photo Credit: Natural Resource Damage Assessment Trustees.

### *Baseline Carcass Deposition Surveys*

Information about the baseline rate of bird deposition on beaches throughout the spill-affected area is available from information collected through the Beach Coastal Ocean Mammal and Bird Education & Research Surveys (BeachCOMBERS) program. The program utilizes highly trained citizen scientists to conduct monthly beach surveys using a dedicated protocol for documenting the number and status of beached birds and mammals within each survey segment. Data collected includes species identification, decomposition state, observations of carcass scavenging, observations of carcass oiling, and other factors. All carcasses encountered during a survey are marked to identify whether the carcass has been observed on previous surveys (a new mark is made each month). The goal of the BeachCOMBERS program is to establish long-term data on baseline bird and mammal stranding rates, so that when unusual mortality events occur (e.g., oil spills, disease events, etc.), resource managers can understand and explore the magnitude and cause of the bird and/or mammal mortality. The spill occurred within the South Coast Chapter of BeachCOMBERS which began collecting monthly data in January 2013.

121

### 5.3.2   Brown Pelican injury analysis

*Background*

The California brown pelican is a subspecies of brown pelican that ranges throughout the west coast of North America. It nests in Mexico and on the Channel Islands. The brown pelican was delisted as a protected species by the State in June 2009 and by the federal government in December 2009. During the spill, brown pelicans were nesting on the Channel Islands, and many were migrating north through the spill area following breeding failure in Mexico. Brown pelicans typically forage in relatively shallow coastal waters, feeding almost entirely on surface-schooling fish caught by plunge diving. Brown pelicans are rarely found away from salt water and do not normally venture more than 32 kilometers (20 miles) out to sea. During the non-breeding season, brown pelicans roost communally on offshore rocks and structures such as piers and wharfs. Brown pelicans have wettable plumage so they must have roost sites to dry after feeding or swimming (Jaques and Anderson 1987). Roost sites are also important for resting and preening. The essential characteristics of roosts include: nearness to adequate food supplies; presence of physical barriers to protect the bird from predation and disturbance; sufficient surface space for individuals to interact normally; and adequate protection from adverse environmental factors such as wind and surf (Jaques and Anderson 1987).

**Brown Pelican Injury Assessment**

Brown pelicans were the most numerous bird species to be found alive and dead during the spill period. Of the birds collected during the spill, 72% of the live birds (n=47), and 13% of the dead birds (n=26) were brown pelicans. Not all of the live and dead brown pelicans affected by the spill were captured or collected. Brown pelicans are capable of long-distance flights and oiled individuals can survive for several days to weeks before becoming weak and either succumb to their exposure or become lethargic enough to be captured. To estimate the total number of brown pelicans injured by the spill, the Trustees applied the following methodology which is discussed in detail in Appendix I.

1) Determine brown pelican distribution during the spill;
2) Determine brown pelican oiling rate;
3) Calculate brown pelicans injured within the cleanup zone;
4) Calculate brown pelicans injured outside the spill cleanup zone;
5) Adjust for rehabilitated birds; and
6) Calculate total number of brown pelicans injured.

*Summary of Brown Pelican Injury*

Based on the number of brown pelicans recovered live and collected dead during the cleanup, the estimated number injured by the spill but missed by the cleanup, and the rehabilitation success of pelicans that were treated and released, the Trustees estimate that a total of 319 brown pelicans were injured by the spill (Table 10)[13].

---

[13] Plains disagrees with the Trustee estimate of brown pelicans injured by the spill.

122

**Table 10.** Total Brown Pelican injury from the Refugio Beach Oil Spill.

| | |
|---|---|
| Brown pelicans injured within the spill cleanup zone | 72 |
| Brown pelicans missed by the spill cleanup | + 279 |
| Rehabilitation credit | - 32 |
| **TOTAL Brown Pelican Injury** | **319** |

## 5.3.3 Western snowy plover injury analysis

*Background*

When the spill occurred, federally threatened western snowy plovers, were in the midst of their breeding season, with many chicks recently hatched and foraging on sandy beaches. Western snowy plovers are among very few species that nest directly on sandy beaches, which makes them vulnerable to conflicts with human activities. In the spill-affected area, there are several locations where plovers nest: Coal Oil Point Reserve (COPR) at University of California Santa Barbara, San Buenaventura State Beach, McGrath State Beach, Mandalay State Beach, Hollywood Beach, Ormond Beach, and Point Mugu (Figure 30). All of the beaches shown in Figure 30 received oiling and/or tar balls in varying degrees during the spill. The maximum amount of oil observed by SCAT teams ranged from heavy at COPR to very light at Ormond Beach. The presence of cleanup crews corresponded to the degree of oiling.

As COPR was exposed to the greatest oiling and most intense cleanup activities of any western snowy plover breeding sites within the spill-affected area, it was also the most intensively studied to determine injury to plovers from oil exposure and cleanup actions. Injury to plovers from cleanup actions, wrack removal, and food web impacts at McGrath Beach, Hollywood Beach, and Ormond Beach are incorporated into the assessment of shoreline habitat injury described in Section 5.1 of the DARP/EA.

*Western Snowy Plover Injury Assessment*

Effects of the spill on western snowy plovers were assessed using the following methodology, which is described further in Appendix I.

1) Determine effect of the spill on western snowy plover population size at COPR;
2) Determine effect of the spill on behaviors and breeding success at COPR in 2015;
3) Determine amount of body oiling on western snowy plovers at COPR during the spill;
4) Conduct a literature review to identify risk of toxicity from oil ingestion;
5) Determine effects of the spill on western snowy plover fertility at COPR; and
6) Estimate western snowy plover injury.

123



**Figure 30.** Refugio oil spill release location relative to nesting western snowy plover nesting sites.

*Estimate of Western Snowy Plover Injury*

Western snowy plovers at Coal Oil Point Reserve in Santa Barbara County, and various locations within Ventura County, were exposed to Line 901 oil during the Refugio Beach Oil Spill. The spill occurred during the breeding season, and at the time of the spill many nests had been formed and eggs had been laid. COPR was exposed to heavy oiling and extensive cleanup actions, and the Trustees determined that an assessment of injury to this population was warranted.

All western snowy plover populations in Ventura County were also exposed to some level of tarball oiling and disturbance from cleanup actions. Due to the relatively low injury expected from this oiling and disturbance, these effects are captured as part of the shoreline habitat injury assessment which considers impacts to western snowy plover's prey base and disturbances to their habitat from cleanup actions.

Cleanup workers and land managers at COPR worked closely together to minimize impacts to western snowy plovers from oil spill cleanup actions. Managers documented oiling on western snowy plovers at COPR and disturbances to the birds from the presence of cleanup crews; however, no mortality was recorded and hatching and fledging rates met or exceeded long term averages. Therefore no injury to western snowy plovers at COPR was estimated in 2015, above impacts to food webs (through depressed beach invertebrate populations) and cleanup impacts that are quantified as part of the shoreline injury assessment.

The year following the spill (2016), western snowy plover infertility substantially increased compared to the long term average, with a total of 12 infertile eggs, none of which contained embryos. Background infertility under normal conditions is around 2%, therefore, of the 12

124

infertile eggs, two would be expected to occur without the effects of the spill. The additional 10 infertile eggs cannot be explained by background infertility rates. These infertilities were likely caused by oil exposure to western snowy plover adults during the 2015 breeding season. Adults were observed with oil on their plumage and beaks, which they preened and ingested. Adults were also observed foraging within oiled wrack, and their prey species (e.g., sandy beach invertebrates such as sand crabs) were documented to have increased hydrocarbons in their tissue. In 2017, the infertility rate reduced to a level that is within the range of normal variation. Based on typical hatching and fledging rates at COPR, the Trustees anticipate that of the 10 infertile eggs documented at COPR in 2016, four would have hatched and fledged. Therefore, we assert that at least four western snowy plovers at COPR were injured through reproductive injury from the Refugio Beach Oil Spill. Additional injury to western snowy plovers may have occurred from direct oil exposure, prey reduction, and impacts from cleanup operations. Effects to plovers from injuries to their habitat are captured in the shoreline injury analysis.

### 5.3.4  Other Bird Injury Analysis

***Background***

This category includes all birds other than brown pelicans and western snowy plovers that were impacted by the spill. This category includes at least 29 species of seabirds, shorebirds, and landbirds. Table 9 lists all the birds by species collected alive and dead during the spill cleanup. Figure 31 groups the species into related categories. After pelicans, impacts were spread among a variety of marine waterbirds. Because the spill occurred during the nesting season for most North American birds, and most affected species do not nest locally, the impacts to other birds were largely limited to non-nesting individuals, such as sub-adults that were likely over-summering in the area. Had the spill occurred in winter, many more individuals from these species groups would have been impacted.

125



**Figure 31.** Total live and dead birds captured and collected following the spill.

### *Other Bird Injury Assessment*

In order to estimate mortality for these species, the Trustees applied the following methodology, which is described in Appendix I.

1) Determine which of the collected birds were related to the spill:
   a. Identify species and numbers of birds collected;
   b. Identify number of oiled and non-visibly oiled birds;
   c. Oiled dead birds – adjust for baseline oiling from natural seeps; and
   d. Non-visibly oiled dead birds – adjust for background deposition.
2) Use the Beached Bird Model to identify how many birds were missed:
   a. Determine carcass persistence on beaches;
   b. Determine search effort and efficiency; and
   c. Calculate total injury.

### *Beached Bird Model*

As with the pelican assessment above, it is very likely that the actual number of other species impacted by the spill exceeds the number collected and attributed to the spill. Birds impacted by an oil spill may not be collected for a variety of reasons:

1. They may travel outside of the response area. As described above, this occurred with the large number of pelicans migrating north.
2. They may die at sea, sink, or be carried away from beaches that were searched.
3. They may come ashore on inaccessible beaches that cannot be searched.
4. Once on the beach, they may be removed by other animals scavenging on the beach.

126

5. For carcasses that do make it to accessible beaches and are not removed by scavengers, searchers may miss them.

In this case, with the non-pelican species, it is difficult to assess the first two reasons. Some species, such as loons, were migrating north, but most non-pelican species may have been more acutely debilitated by the oil, limiting their dispersal distance. Because the spill was nearshore, substantial loss of birds at sea was unlikely. Given these caveats, we did not specifically apply any correction factors for these first two reasons for non-pelican bird species.

The remaining three factors, inaccessible beaches, carcass removal, and search efficiency, can be incorporated into a Beached Bird Model in order to estimate total mortality. The model is based on the number of birds recovered, the probability of a beached bird persisting over a given time interval, and the likelihood that searchers will detect a beached bird. Derivation of the basic equation is from Ford et al. (1996) and Page et al. (1990). This approach has been used for most major oil spill bird mortality events for several decades. Using a simplified example, if the probability of a bird being removed by a scavenger in the course of a day is 50 percent, and the probability of it being overlooked by a searcher is 50 percent, then the probability of it being recovered is 25 percent. This would imply that, for every one bird found, three more are missed. This would result in a "beached bird multiplier" of four. That is, one bird found implies that four birds were impacted.

### *Estimated Injury to Other Birds*
The final results of the Beached Bird Model, incorporating scavenging, search efficiency, and unsearched areas, were that 236 birds, not including pelicans and western snowy plovers, were killed by the spill (Table 11).

**Table 11.** Summary of estimated mortality of "other birds" based on the results of the Beached Bird Model.

| Bird Taxon | Total Carcasses Collected[1] | Total Estimated Mortality |
|---|---|---|
| Alcids | 42 | 56 |
| Loons | 44 | 53 |
| Procellarids/Boobies | 23 | 35 |
| Gulls/Terns/Skimmer | 24 | 33 |
| Cormorants | 33 | 24 |
| Grebes | 15 | 21 |
| Surf Scoter | 3 | 6 |
| Other/Unknown | 9 | 8 |
| **TOTAL** | **193** | **236** |

[1] Not including pelicans, domestic ducks, rock pigeons, and three birds collected live, rehabilitated and released. Note that a proportion of these carcasses were found to not be spill-related.

127

### 5.3.5  Summary of Bird Injury

In summary, the assessment of injury to birds from the Refugio Beach Oil Spill was conducted by dividing all affected birds into three categories: brown pelicans, western snowy plovers, and all other birds. The assessment methods for each category were designed around the species' life history strategy and feasible methods for quantifying injury. Table 12 shows the overall summary of estimated bird mortality by species group.

**Table 12.** Summary of total estimated bird mortality caused by the Refugio Beach Oil Spill.

| Bird Taxon | Total Estimated Mortality |
|---|---|
| Brown Pelicans | 319 |
| Western Snowy Plovers | 4 |
| Alcids | 56 |
| Loons | 53 |
| Procellarids/Boobies | 35 |
| Gulls/Terns/Skimmer | 33 |
| Cormorants | 23 |
| Grebes | 21 |
| Surf Scoter | 6 |
| Other/Unknown | 8 |
| **TOTAL** | **558** |

### 5.3.6  Selected Restoration Projects

Restoration alternatives for brown pelicans fall into two broad categories: improvement or protection of nesting habitat, and reduction of human-caused mortality during the non-breeding season. Selected projects that benefit brown pelicans are listed in Table 13 below.

The Trustees selected brown pelican colony protection at Anacapa Island as the primary restoration project for brown pelicans. The Trustees also selected a project to reduce or prevent injury to seabirds from recreational fishing to restore brown pelicans. This project will also benefit other seabird species, and is the restoration project selected for other birds. To address injury to western snowy plovers, the Trustees selected a project to fund management actions at Coal Oil Point Reserve that protect western snowy plovers from human activities and predators during their nesting season. Each of these projects are described further below. Other proposed second tier projects (Table 14) were not selected due to concerns over feasibility or lower anticipated benefits, but could be implemented if funds allow.

**Table 13.** Selected restoration projects for birds

| ID# | SELECTED PROJECTS | SPECIES BENEFITS |
|---|---|---|
| BIRD-1 | Brown Pelican Colony Protection at Anacapa Island | Brown Pelican |
| BIRD-2 | Prevention of Injury to Seabirds Related to Recreational Fishing | Seabirds |
| BIRD-3 | Western Snowy Plover Management at Coal Oil Point Reserve | Western snowy plovers |

128

***Brown Pelican Colony Protection at Anacapa Island (BIRD-1)***

This project is intended to protect the largest United States breeding colony of California brown pelicans, on Anacapa Island, from nest displacement and loss caused by invasive Cape ivy.

The goal of this project is to eradicate the Cape ivy infestation on West Anacapa Island. Methods will include: 1) initial assessment of infested areas and baseline vegetation, along with pelican surveys, 2) two initial herbicide treatments to infested areas via helicopter and hand application in the first year, 3) follow-up treatment for the following 4 years, and 4) follow-up vegetation and pelican surveys. As part of the project, a water cache will be installed to allow for follow-up treatments over a longer timeframe. Treatments will occur outside the pelican breeding season, during fall/early winter when native vegetation is dormant and before winter rains.

*Affected Environment*

Anacapa Island is composed of a series of narrow islets, with the three main islets being East, Middle and West Anacapa. Despite its small size, Anacapa Island supports nearly 200 types of native plants from 50 plant families (Junak and Philbrick 2018). There are several infestations of Cape ivy on the north side of West Anacapa Island. This invasive plant displaces native vegetation and reduces the amount of available nesting and roosting habitat for pelicans. The largest infestation is in Summit Canyon (Figure 32). Anacapa Island has the largest breeding colony of the California brown pelican in the United States, and one of the only three in California. Middle and West Anacapa Islands serve as critical breeding and roosting habitat for the California brown pelican. Anacapa Island also supports the largest western gull (*Larus occidentalis*) colonies in the Channel Islands. A total of 17 landbird species are also known to breed on Anacapa Island (Davidson et al. 2014).



**Figure 32.** Project location for the brown pelican colony protection at Anacapa Island, the grey outline indicates a nesting area where Cape ivy is expanding and may decrease habitat suitability.

129

*Environmental Consequences (Beneficial and Adverse)*
Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts* –This project will benefit brown pelicans by enhancing nesting and roosting habitat through controlling invasive Cape ivy. By targeting active areas of infestation, the project will reduce the non-native cover and allow for native vegetation recovery and use by brown pelicans. The eradication of this species will protect nesting habitat and the native plant community which brown pelicans use to construct and support its nests. An increase in suitable habitat will allow for an increase in the number of nesting birds and subsequent fledglings on Anacapa Island.

   In addition, control of this invasive plant at its current locations will prevent its spread and additional loss of adjacent occupied habitat for brown pelicans. Additionally, the eradication of Cape ivy will protect the native flora and fauna on West Anacapa Island, and will also help prevent the introduction to the other Anacapa islets, as well as the other northern Channel Islands where Cape ivy is currently not found. The eradication of Cape ivy on West Anacapa Island will also protect rare plants found throughout the islets, which are currently outcompeted by this invasive plant. Overall, a diverse assemblage of native flora and fauna depend on intact vegetation communities. This project will benefit a range of species, including nesting seabirds (in particular the brown pelican and western gull), terrestrial songbirds, migratory birds, rare plants, and invertebrates that depend on the native vegetation communities.

   Herbicide applications for invasive plant treatments are covered under a NPS Categorical Exclusion (NPS 2019). Herbicide treatments can have impacts to non-target native vegetation within the treatment area. To reduce potential impacts, efforts will be made to minimize over spray and drift onto non-target species, including spot treatment of invasive plants adjacent to intact native vegetation. Herbicides will be applied by a certified applicator and in accordance with application guidelines and the manufacturer label. Although there may be short-term impacts to native plants within the treatment area, the long-term, negative consequences of not treating the Cape ivy or other invasive plant species far outweigh impacts to individual plants. Another potential adverse consequence of this project could be the unintentional spread of invasive plants from the treatment sites to other parts of the island via due to foot traffic. In order to reduce this potential, extreme caution will be used to reduce the spread of seeds via clothing and footwear by implementing existing biosecurity protocols for the Channel Islands. Also, in order to avoid impacts to nesting birds, including seabirds and resident terrestrial birds, herbicide treatment and vegetation monitoring will occur in fall/early winter, well before nesting season begins. Overall, any biological impacts from the implementation of the project are anticipated to be

130

minor in comparison to the overall long-term beneficial impacts from restoring the native plant community to protect brown pelican nesting habitat.

2. *Physical Impacts* – The Trustees do not anticipate major adverse impacts to the physical environment, such as water, air, sediments, etc. Any negative physical impacts would be unlikely and, at worst, would likely be mitigated by the use of best practices. Ultimately, any adverse physical impacts are expected to be negligible.

3. *Human Impacts* – The Trustees do not anticipate adverse impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. There is likely a benefit to the public as the sustained or increased presence of brown pelicans would create more opportunities for wildlife viewing.

*Probability of Success*
With the relatively small footprint of Cape ivy on West Anacapa Island (1-2 acres as of September 2018), the probability of successfully eradicating this species from this location is high. This multi-year, sustained effort would enable successive treatments over a six-year period as needed. This continued follow-up after initial treatment is critical to retreating any sprouts and ensuring success.

The control of other invasive species (Russian thistle, ice plant, etc.) in the project area also has a high probability of success. Herbicide treatment and manual removal are proven techniques to help control populations and limit the spread of invasive weeds. The eradication and control methodologies proposed have been tested and utilized successfully on the Channel Islands.

*Performance Criteria and Monitoring*
The success of the restoration project will be evaluated by assessing metrics associated with natural resource functions and services. Metrics will be compared with: 1) initial conditions at the project site and/or 2) conditions at an appropriate nearby natural reference site or sites. The success of this project will be measured with a minimum of three monitoring events are proposed which will be outlined in project monitoring plan. Additional monitoring of brown pelicans will continue post project as part of Channel Islands National Park's Inventory and Monitoring Program. Specifically, monitoring may include, but is not limited to:
- Documenting brown pelican abundance, distribution, phenology, and reproductive success in and adjacent to the treatment areas.
- Monitoring annual vegetation during all six years of the project within the project area. Monitoring will follow established protocols and will document treatment area, efficacy of treatments, and recovery of native vegetation communities.
- Analyzing treatment efficacy though post treatment monitoring. Post treatment monitoring will include both visual estimates of percent cover of Cape ivy and counts of stem number within permanent quadrats.
- Establishing photo points to document the progression of the treatment areas.

131

- Eradicating Cape ivy from Summit Canyon. Efforts to control other invasive weeds within the scope of this project will be prioritized upon initial assessments. Additional control efforts on Anacapa Island will be documented and mapped each year.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for brown pelicans injured as a result of the spill, and the Trustees have therefore selected this project as a preferred alternative.

### Birds and Fishing Conflict Reduction (BIRD-2)

In an analysis of all seabirds brought to International Bird Rescue rehabilitation centers in Los Angeles and San Francisco between 2002 and 2015, fishing hook and line injuries were by far the most common anthropogenic injury, totaling 2,957 birds (Duerr 2016). Brown pelicans and other seabirds, including cormorants and gulls, are often attracted to nearshore areas where schooling bait fish are abundant. If anglers are fishing in these areas (e.g., from coastal piers), seabirds can be inadvertently hooked or entangled in fishing line. In addition, discarded waste fishing line can entangle seabirds. This project would use outreach to raise public awareness and educate anglers about ways to reduce their chances of hooking birds and what to do if one is hooked. Outreach could include printed materials and/or training of docents. This project may also provide support to bird rehabilitation centers to help recover and rehabilitate seabirds with fishing hook and line injuries.

This project is also intended to reduce seabird injury in areas where birds are attracted to fishing waste disposal areas. Brown pelicans and various gull species are often attracted to commercial fishing vessels off-loading small fish (e.g., sardines and anchovies) and squid, and to fish waste receptacles used by recreational anglers. These birds may attempt to dive into open bins of fish and may get injured by off-loading machinery and vehicles. In addition, repeated bodily contact with fish and fish oil can lead to a loss of waterproofing on the birds, resulting in hypothermia and other health issues.

*Affected Environment*

This project will be located in various locations along the Santa Barbara, Ventura, and Los Angeles County coastlines where recreational and commercial fishing activities are causing injuries to seabirds. Locations with fishing piers, harbors, and other fishing facilities will be targeted. This project may also focus on offshore fishing activities, if needed.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

132

1. Biological Impacts – The Trustees do not anticipate any adverse effects to biological resources. Beneficial effects to seabirds are anticipated to be achieved by providing resources and training to recreational and commercial fishermen to reduce entanglements by implementing best practices, and being trained to capture and disentangle birds or transport birds to rehabilitation centers for professional treatment.

2. Physical Impacts – The Trustees do not anticipate any adverse impacts to the physical environment, such as water, air, sediments, etc. Beneficial effects to the physical environment are anticipated from reduced fishing line and fishing waste from entering coastal habitats.

3. Human Impacts – The Trustees do not anticipate adverse impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. This project is not intended to reduce any recreational and commercial fishing opportunities, rather it is focused on working with willing recreational and commercial fishermen and fisherwomen to allow them to continue fishing while reducing their impact on seabirds.

*Probability of Success*

The probability of success of implementing the project is high. The effectiveness of the project in reducing seabird entanglements, however is dependent on the willingness and ability of the target audience to effectively implement what they learn. In order to maximize the probability that the outreach efforts implemented are successful in reducing entanglements, the project will be implemented by people that are knowledgeable about seabird handling/rehabilitation and will seek to create opportunities for anglers to participate in the program in a way that is convenient and approachable for them. For example, trainings may be held at piers, or tackle shops.

*Performance Criteria and Monitoring*

The performance of this project will be measured by evaluating incidence of birds with fishing hook and line injuries that enter rehabilitation centers after the program is implemented. The goal of the project is to reduce 60 bird deaths per year from fishing hook and line entanglement. It is not possible to measure the performance of the project in terms of the exact number of birds saved; however, evaluating the instances of birds with fishing hook and line injuries being admitted to rehabilitation centers will be a proxy for estimating whether the program is successful.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for seabirds injured by the spill, and the Trustees have therefore selected this project as a preferred alternative.

133

***Western Snowy Plover Management at Coal Oil Point Reserve (BIRD-3)***

The goal of this project is to protect a breeding colony of threatened western snowy plovers from predation and human disturbance. The focal colony, one of the largest in the region, is located in UC Santa Barbara's Coal Oil Point Reserve and became established largely due to species management efforts. The project aims to compensate for lost fledges due to infertility, as well as for additional unquantified injuries resulting from the oil spill, such as low over-winter survival and decreased breeding effort. Activities may include: predator control, upgraded signage and fences, outreach to reduce disturbances, leashes to lend for pets, and eradication of iceplant in areas of nesting habitat on Ellwood Beach.

*Affected Environment*

Coal Oil Point Reserve is part of the University of California Natural Reserve system, and protects a variety of coastal and estuarine habitats and fauna, including the threatened western snowy plover. Specifically, this reserve protects coastal dune, estuarine, tidal lagoon, sandy beach, and rocky reef habitats. Coal Oil Point Reserve, which is utilized by western snowy plovers for nesting, was exposed to the greatest oiling and most intense cleanup activities of any plover breeding sites within the spill-affected area.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only minimal adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1.  Biological Impacts – This project benefits the population of western snowy plovers that was directly impacted by the spill. Management actions at Coal Oil Point Reserve aim to protect the plovers from predators and human activities during their nesting season. Benefits include maintaining the current colony of snowy plovers at COPR, along with preventing its displacement and loss. Many of the potential proposed activities will also be beneficial to other bird species and native plants in the area.

2.  Physical Impacts – The Trustees do not anticipate any major or minor impacts to the physical environment, such as water, air, sediments, etc. Any physical impacts from activities such as installing symbolic fencing are temporary and negligible to the physical environment.

3.  Human Impacts – The Trustees do not anticipate noteworthy impacts from this project on socio-economics, aesthetics, health and safety, historical properties, etc. COPR has struck a balance between human recreation and access to the coastal environment, while protecting western snowy plovers and other wildlife species and their habitats. This project will seek to continue and expand that dual mission of allowing recreation and protecting natural resources.

134

*Probability of Success*

The probability of success is high. Western snowy plover breeding was extirpated at COPR in the 1980s due to high human use of the coastal environment in close proximity to UC Santa Barbara. Due to targeted protective measures, Coal Oil Point Reserve has established a robust nesting population that continues to thrive today. This project has a high probability of success due to the knowledge and expertise of staff at Coal Oil Point Reserve that will be implementing the project.

*Performance Criteria and Monitoring*

Metrics such as nest success will be compared to initial conditions at the project site. Staff at Coal Oil Point Reserve monitor the western snowy plover population annually to track the number of pairs, nest success, and other parameters. This monitoring will continue throughout the implementation of this project and will be used to determine the success of the project.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for western snowy plovers injured as a result of the spill, and the Trustees have therefore selected this project as a preferred alternative.

## 5.3.7   Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 14), and determined that many are valid projects that would provide benefits to seabirds. However, these projects were not selected for various reasons described below. These projects may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

**Table 14.** Second tier bird restoration projects that may be implemented if funds allow.

| ID# | OTHER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| BIRD-4 | Social Attraction for Brown Pelicans at Alcatraz Island | Brown pelicans |
| BIRD-5 | Enhancement of Brown Pelican Nesting Habitat at San Clemente Island | Brown pelicans |
| BIRD-6 | Continue Revegetation Projects on Santa Barbara Island to Promote and Expand Suitable Brown Pelican Nesting Habitat. | Brown pelicans |
| BIRD-7 | Western Snowy Plover Predator Control | Western snowy plovers |
| BIRD-8 | Raven Exclusion Devices for Nesting Ashy-storm Petrels on Channel Islands | Ashy-storm petrels |

135

| BIRD-9 | Western Snowy Plover Monitoring and Habitat Protection at McGrath, Mandalay, and San Buenaventura State Beaches | Western snowy plovers |
|---|---|---|
| BIRD-10 | Dune Restoration | Western snowy plovers |
| BIRD-11 | Reduction of Disturbances to Seabirds at the Channel Islands (Seabird Protection Network Channel Islands Chapter) | Various seabirds |
| BIRD-12 | Andre Clark Bird Refuge | Various seabirds |
| BIRD-13 | Protection of Nesting Grebes | Grebe species |
| BIRD-14 | Artificial Nest Habitat Creation at Anacapa, Santa Barbara, and/or San Clemente Island | Scripps's murrelets |
| BIRD-15 | Restore and Increase Artificial Nest Habitat at San Miguel Island | Scripps's murrelets, Cassin's auklets |
| BIRD-16 | Restore Native Habitat at Anacapa Island | Scripps's murrelets, western gulls |
| BIRD-17 | Establishment of Bird and Marine Mammal Rescue and Rehabilitation Facility | Various seabirds, marine mammals |

***Brown pelican restoration at Alcatraz Island (BIRD-4)***

This project involves restoring habitat and using social attraction to try and establish brown pelican breeding on Alcatraz Island. This project could be considered as a second tier project and social attraction could potentially result in recolonization of Alacatraz Island by breeding brown pelicans, but the feasibility of this project is unknown. Alcatraz Island is outside of the current breeding range for brown pelicans, and is substantially distant from the spill-affected area.

***Brown pelican restoration on San Clemente Island (BIRD-5)***

Brown pelicans have nested on San Clemente Island in the recent past and could benefit from protection actions such as the establishment of exclusion zones from cats, fox, and rats. This action may benefit other seabirds as well. The feasibility of this project is unknown at this time, and would require additional planning. Greater benefits to brown pelicans would be achieved where nesting densities are greater.

***Restoration through revegetation on Santa Barbara Island (BIRD-6)***

Building on restoration that has begun on Santa Barbara Island, this project would involve promoting suitable brown pelican nesting habitat by revegetating habitat areas. Currently access to Santa Barbara Island is limited due to a damaged boat landing. Upon repair of landing facilities at Santa Barbara Island, this project may become cost effective.

***Western snowy plover predator control (BIRD-7)***

Provide funding for control of ravens and other predators that kill nesting western snowy plovers in FWS recovery unit 5 (including the spill-affected area) and unit 4 (north of the spill-affected area). Predator control at COPR is listed as a preferred project because that is the location where

136

western snowy plovers were injured by the Refugio Beach Oil Spill. Predator control efforts could be expanded to other areas, if funds allow.

### Raven Exclusion Devices for Nesting Ashy-Storm Petrels on the Channel Islands (BIRD-8)

This project involves providing enhanced protection for nesting Ashy-storm petrels that are preyed upon by common ravens. This project may be funded as a second tier project if funds allow, as the impact of the spill on this species was low compared to other seabirds.

### Western Snowy Plover Monitoring and Habitat Protection at McGrath, Mandalay, and San Buenaventura State Beaches (BIRD-9)

Much of the suitable habitat for western snowy plovers and California least terns is within California State Parks ownership. This project would include monitoring and protecting western snowy plovers and California least terns in State Parks through installation of symbolic fencing, signage, docent programs, predator control, and other measures necessary to monitor and protect nesting shorebirds. These sites have been identified as secondary priorities, and could be implemented if preferred locations become infeasible.

### Dune restoration (BIRD-10)

By removing invasive non-native plants that degrade dune ecosystems, these projects will restore dune habitats, native species and landscapes, and enhance ecosystem functions. Removal of invasive plants will increase the amount of useable nesting areas for the western snowy plover and, in some locations, the California least tern. It will also reduce cover for predators of eggs, chicks and adult birds. This project is a selected project in the Shoreline Restoration section of this plan. Additional project locations could be funded if birds would benefit, and if funds allow.

### Seabird Protection Network – Channel Islands (BIRD-11)

This project would implement tasks identified by the Channel Islands Seabird Protection Network that are aimed at reducing human disturbances to seabirds at the Channel Islands. This is a second tier project, as the anthropogenic threats to seabirds are greater along the mainland coastline where the human population is greater. If funds allow, this project would be implemented.

### Andre Clark Bird Refuge Restoration (BIRD-12)

Located near the Santa Barbara Zoo, this project is designed to improve water quality and habitat for both bird and aquatic species, and to allow the bird refuge to function as nursery habitat for ocean going fish. The proposed project includes five primary components: 1) restoration of 1.5 acres of coastal dune habitat; 2) restoration of 5 acres of coastal salt marsh habitat; 3) construction of a new multi-use recreational loop trail around the restored lagoon; 4) dredging of flow channels and deep pools to improve circulation and provide refuge for fish and other aquatic organisms; and 5) removal of flow barriers to improve flushing between the ocean and the lagoon in order to improve water quality, bird, and fish habitat. The benefits of this project to bird species impacted by the spill are unclear. The existing habitat at the Andre Clark Bird

137

Refuge serves as resting habitat for seabirds, and the improvements from the project to seabirds are unclear.

### Protection of nesting grebes (BIRD-13)

Western and Clark's grebes have historically nested at Cachuma Lake in Santa Barbara County and Lake Casitas in Ventura County. This project would improve nesting success of grebes at these lakes. Restoration projects to improve grebe nesting success have been successfully implemented in northern California, focused primarily on outreach to reduce human disturbance at nesting colonies. No specific project has been proposed for lakes in Santa Barbara or Ventura Counties, and it is not known what management actions at these lakes would result in greater nesting success.

### Artificial nest habitat creation at Anacapa, Santa Barbara, and/or San Clemente Islands (BIRD-14)

This project would improve nesting success of Scripps's murrelets at Anacapa, Santa Barbara, and/or San Clemente Islands. On Anacapa Island, the project would benefit murrelet populations by placing structures in the habitat adjacent to traditional nesting areas in Landing Cove and newly restored upland habitat. Scripps's murrelets have been utilizing artificial nest burrows placed within the habitat restoration area near Landing Cove at Santa Barbara Island. Additional artificial modules placed in other restored areas on this island would enhance murrelet populations by providing additional nest sites that typically have high nest success. Scripps's murrelet populations are severely limited by nest sites on San Clemente Islands. Several areas occur at San Clemente Island within the Seal Cove area where artificial nest sites could be installed and significantly increase the size of the nesting population at this island. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

### Restore and increase artificial nest habitat at San Miguel Island (BIRD-15)

Increase the number of nesting boxes and improve older auklet boxes to protect the continued existence of this colony well into the future. Both Scripps's murrelet and Cassin's auklets could utilize artificial nests. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

### Restore native habitat at Anacapa Island (BIRD-16)

The project would benefits Scripps's murrelets, western gulls, as well as many other native birds, insects, amphibians, reptiles, and restores ecosystem functions. The project could contribute to ongoing efforts to restore native habitat at Anacapa Island and help restore additional nesting habitat for both Scripps's murrelets and western gulls. This project is a second tier project as there was no evidence of injury to Scripp's murrelets and other alcids by the spill and the damages were not quantified.

138

***Establishment of bird and marine mammal rescue and rehabilitation facility (BIRD-17)***

This project would facilitate the establishment of a bird and marine mammal rescue and rehabilitation facility in Ventura County. This project is a second tier project because establishing a new bird and mammal rescue is beyond the Trustees' ability to implement.

## 5.4    Marine Mammals

Marine mammal species exposed to oil may suffer immediate or long-term health problems, leading to death or reproductive impairment. Small doses of oil may impact and animal's physiology or behavior by causing skin or gastrointestinal irritation, impairing reproduction, and compromising its immune system. Marine mammals can be exposed to oil through ingestion of contaminated food and water, grooming, absorption through wounds or eyes, inhalation of oil-derived volatiles, and aspiration of oil droplets directly to the lungs.

Most marine mammal species of California occur in the waters adjacent to the Gaviota coast, some transitory, some resident. These include pinnipeds, such as California sea lions, harbor seals, Guadalupe fur seals, and northern elephant seals; mustelids, such as southern sea otters; and cetaceans, such as bottlenose dolphins, long beaked common dolphins, gray whales, and humpback whales.

Marine mammals are generally difficult to study because of their wide-ranging pelagic life styles. Accordingly, comprehensive marine mammal surveys and studies can be logistically prohibitive to conduct and may last years. Therefore, the Trustees relied heavily on mammal stranding[14] data in conducting their assessment because visible and easily-tracked strandings can provide an index to what is happening in the marine mammals' environment. Records of strandings from May 19, 2015, through July 7, 2015, formed the basis of the Trustees' assessment and quantification of injuries to marine mammals (Figure 33)[15].

---

[14] A stranding can be defined as (1) a dead marine mammal on the beach or in the water, (2) a live marine mammal on the beach and unable to return to the water, or (3) a live mammal in the water that is unable to function normally due to sickness or injury.

[15] Plains disagrees with the Trustees' injury quantification, scaling, and restoration projects for marine mammals.

139



**Figure 33.** Location of marine mammal strandings, live and dead, collected during the spill cleanup period. The back lines show the NRDA Exposure Zone boundaries for reference; however these boundaries were not used in the quantification of injury to marine mammals.

## 5.4.1  Overview of Data Collection and Studies

This list below summarizes field surveys, data collection tasks, and analyses for the assessment of marine mammal exposure and injuries.

### *Live and Dead Marine Mammal Intake Data—Unified Command*

Documentation of oiled live and dead animals is performed as a normal part of the spill response through the Unified Command. Intake logs describe the collection of each mammal, including the date, location, species, sex, condition (*e.g.* live or dead), and degree of oiling at the time of collection. These data provided the foundation for estimating mammal injury. Oiled wildlife were collected from May 19 through June 24, 2015.

### *California Marine Mammal Stranding Network Data*

In addition to the intake logs for the marine mammals collected as part of the spill response (including date, location, species, sex, and condition), data on stranded, or beached marine mammals are routinely collected along the Santa Barbara and Ventura County coast lines through NOAA's Marine Mammal Health and Stranding Response Program. These data collected by the stranding network from 2000-2015 provided key information for estimating total marine mammal mortality for this assessment. A total of 264 marine mammals were recovered between May 19 and July 7, 2015, the period considered for this assessment.

140



**Figure 34.** Oiled California sea lion recovered during cleanup operations. Photo Credit: Santa Barbara Channelkeeper.

## *Wildlife Response Reconnaissance surveys*

The Unified Command conducted aerial surveys on May 21, 2015, between Point Conception and Goleta to document wildlife in the area and search for oiled animals. Additional surveys were performed on May 24 and May 26, 2015. Marine mammal sightings included California sea lions (Figure 34), harbor seals and unidentified whales and dolphins. No sea otters were observed during the survey. One additional aerial survey was conducted on May 28, 2015, to document presence or exposure of southern sea otters in the area. During this survey, no southern sea otters were detected in the cleanup area, and were therefore not considered further for the NRDA.

**Table 15.** Daily summary of marine mammal sightings (and average group size per sighting) during boat-based surveys in 2015.

| Species | 6/2 | 6/3 | 6/4 | 6/5 | 6/6 | 6/7 | Total sighting |
|---|---|---|---|---|---|---|---|
| Dolphin, Coastal Bottlenose | 0 | 2 (5) | 3 (3) | 2 (6) | 2 (7) | 4 (4) | 13 |
| Dolphin, Long-beaked Common | 1 (1050) | 3 (42) | 0 | 1 (70) | 0 | 6 (205) | 11 |
| Dolphin, Common, unidentified to species | 1 (41) | 0 | 0 | 0 | 0 | 0 | 1 |
| Pinniped, California Sea Lion | 6 (7) | 3 (7) | 4 (1) | 3(1) | 8 (1) | 5(7) | 29 |
| Pinniped, Harbor Seal | 1 (1) | 1 (1) | 4 (1) | 0 | 6 (1) | 4 (2) | 16 |
| Whale, Gray | 1 (2) | 0 | 1 (2) | 0 | 0 | 1 (2) | 3 |
| Whale, Humpback | 0 | 1 (2) | 0 | 2(1) | 0 | 1 (14) | 4 |

## *Pre-Assessment Marine Mammal Surveys*

To estimate the number of common bottlenose dolphins in the affected area and to document exposure of marine mammals to oil, photo-identification surveys were conducted from small boats and from shore along the Santa Barbara and Ventura County coastline from May 24 to June 7, 2015. Figure 35 gives an example trackline of one of the survey days. Dolphins, whales

141

and pinnipeds were sighted on all days of the survey. Table 15 shows sightings from the boat-based surveys, which include group size estimates.



**Figure 35.** Tracklines of one day of NRDA mammal surveys, including sightings for that day. See Appendix B for data associated with this figure.

## 5.4.2  Pinniped Injury Analysis

### Background

California sea lions are the most frequently stranded marine mammal in California. The stranding numbers vary seasonally by age class and stranding patterns are correlated with the reproductive cycle. Pups strand in the highest numbers during the spring, when they are being weaned. The spill year, 2015, was an anomalous stranding year[16] for California sea lion pups, with unusually high numbers stranding much earlier in the year than usual. By the time of the oil spill, after this surge of unusual strandings, pup stranding rates had lowered. Typically, fewer older animals, i.e., non-pups, strand throughout the year although, reproductive females frequently strand in the spring, just prior to the annual birth pulse.

Northern elephant seals and Pacific harbor seals strand in much lower numbers than California sea lions, which largely reflects their relative population sizes. However, like the California sea lions, strandings vary seasonally and are correlated with the reproductive cycle. Stranding numbers are highest when pups are weaning, which is in late winter/early spring in the cleanup area. The Guadalupe fur seal, an endangered species, was not observed either stranded or at-sea during any NRDA post-spill surveys and so were not considered further for the assessment. Similarly, the northern fur seal, a depleted species, was not observed and therefore not considered for the assessment.

---

[16] This was the third year of an unusual mortality event for California sea lions, declared January 1, 2013. The unusual mortality event was in part attributed to reduced prey availability (McClatchie et al. 2016).

142

*Injury assessment*

The Trustees assessed injuries to California sea lions, northern elephant seals and harbor seals by determining the number of strandings that occurred in the spill-affected area (Santa Barbara and Ventura Counties) from May 19 through July 7, 2015, and comparing that number to the baseline stranding patterns for the region. This provided a framework for the Trustees' injury assessment by providing insight into how many strandings would be expected "but for" the oil spill.

In addition to quantifying stranding baseline numbers for each species, the Trustees reviewed the available data for individual strandings recorded during the assessment period to determine whether the recovered strandings could be attributed to non-spill related causes (e.g. fishery related deaths). The Trustees also reviewed carcass decomposition information to remove strandings that likely occurred before the spill (i.e., dead, highly decomposed animals). Once it was determined how many documented strandings were likely due to the spill, they applied a correction factor for animals that would likely have died from the spill but were not found due to drift, sinking, scavenging or other factors. No correction factor was applied to live stranding numbers to account for animals that might have been exposed to oil and moved out of the area. The number of observed strandings attributed to the spill are given in Table 16.

For harbor seals and northern elephant seals, past stranding numbers during the time of year in which the cleanup occurred were low (i.e., fewer than 5 per year) and often zero. Because of this and the highly unusual fact that the strandings of these species were alive and oiled and died during rehabilitation, no baseline correction was applied to the stranding numbers. That is, the observed number of strandings for both species were considered spill-related injuries after removing any pre-spill and fishery-related strandings.

**Table 16.** Strandings of pinnipeds recorded in Santa Barbara and Ventura Counties after the spill. Records for each stranding were reviewed to determine whether they likely died before the spill (i.e., "pre-spill") or had injuries consistent with fishery entanglement (i.e., "fishery related"). "Pre-spill" animals were removed prior to adjusting for stranding baseline.

| Species | Total Stranded May 19-July 7 | Stranded | | | |
|---|---|---|---|---|---|
| | | Pre-spill | Fishery-related | Baseline | Spill Period |
| California sea lion | 221 (89 live, 132 dead) | -40 | 0 | -87 | 94 |
| Northern elephant seal | 9 (8 live, 1 dead) | -1 | 0 | 0 | 8 |
| Harbor seal | 2 | 0 | 0 | 0 | 2 |

## 5.4.3  Cetaceans

*Background*

Long-beaked common dolphins (LBCO) are the most frequently stranded cetacean (whales, dolphins and porpoises) in the affected area and throughout southern California. Strandings of common bottlenose dolphins are rare, in part because their population off the California coast is

143

small (~500 individuals) and mobile, with dolphins ranging from Ensenada, Mexico, to San Francisco, California. From the pre-assessment survey, approximately 20% of the common bottlenose dolphin coastal ecotype population was estimated to be present in the area in the weeks following the spill. Dolphins of both species as well as other cetaceans were observed from shore and at sea in the weeks following the spill (Figure 36; Table 17)

No large whales stranded during the spill period, but several were observed (including a mother/calf pair) in the spill area both by local news agencies in the first days of the spill and during NRDA marine mammal boat surveys between May 27 and June 6, 2015 (see Figure 36).

*Injury assessment*
Similar to pinnipeds, the Trustees assessed injuries to long-beaked common dolphins and bottlenose dolphins by comparing strandings observed during the assessment period to a baseline of strandings for the area, after removing records of strandings that likely occurred prior to the spill. A correction factor was applied to the strandings deemed to be likely spill related to account for animals that likely died but were not been found due to drift, sinking, scavenging or other factors

The number of observed strandings attributed to the spill is given in Table 17. For both dolphin species considered for the injury assessment, previous years' strandings are variable, and for the LBCO have been tied to episodic algal blooms. While algal blooms were present during the spill period, principally north of Point Conception, there were no data that tied dolphin deaths to algal blooms in the oil spill-affected area. The Trustees concluded that oil was the more likely causal factor in the dolphin strandings in Santa Barbara and Ventura Counties during the timeframe considered.

**Table 17.** Dead dolphin strandings collected after the spill. Records were reviewed and dolphins were not considered potential spill-related injuries if they were determined to have stranded before the spill (i.e., "pre-spill") or had injuries consistent with fishery entanglement (i.e., "fishery related"). Baseline refers to the expected "natural" deposition that would occur under non-spill conditions.

| Species | Total Stranded May 19-July 7, 2015 | Stranded | | | |
|---|---|---|---|---|---|
| | | Pre-spill | Fishery-related | Baseline | Spill period |
| Dolphin, long-beaked common | 22 | -2 | -2 | 0 | 18 |
| Dolphin, bottlenose | 1 | 0 | 0 | 0 | 1 |

144



**Figure 36.** Top - gray whale observed on June 7, 2015, near Gaviota State Beach during boat-based surveys. Bottom - long-beak common dolphins swimming in an oil slick during NRDA boat surveys. Photo Credit: Natural Resource Damage Assessment Trustees.

145

## 5.4.4 Final Injury Determination

The final step in quantifying marine mammal injuries for both pinnipeds and cetaceans was to account for animals that died but were not observed. The Trustees assumed that for mammals, all carcasses that reached the beach were found. However, the Trustees could not account for animals that died at sea and either sank, floated, or were scavenged before being observed and counted. Therefore, the Trustees applied a correction factor ('lost at sea factor') to the observed dead, spill-related strandings based on a study by local marine mammal scientists on common bottlenose dolphin carcass recovery off the southern California coastline (Table 17) (Carretta et al. 2016). The final injury numbers are given in Table 18[17].

**Table 18.** Final injury numbers for marine mammals affected by the Refugio Beach Oil Spill.

| Species | Dead | Live | Observed spill related strandings | Lost-at-sea factor (for dead animals) | Estimated number injured |
|---|---|---|---|---|---|
| California sea lion | 52 | 42 | 94 | 2 | 146 |
| Northern elephant seal | 0 | 8 | 8 | NA | 8 |
| Harbor seal | 0 | 2 | 2 | NA | 2 |
| Long-beaked common dolphin | 18 | 0 | 18 | 4 | 72 |
| Bottlenose dolphin | 1 | 0 | 1 | 4 | 4 |

## 5.4.5 Selected Restoration Projects

The Trustees are proposing the projects described below to compensate for injuries to marine mammals caused by the oil spill (Table 19). The two selected projects benefit pinnipeds (MAMM-1) and cetaceans (MAMM-2).

**Table 19.** Selected projects for marine mammals

| ID# | SELECTED PROJECTS | BENEFITS |
|---|---|---|
| MAMM-1 | Pinniped rehabilitation survival improvement | Pinnipeds |
| MAMM-2 | Cetacean entanglement response | Cetaceans |

***Pinniped Rehabilitation Survival Improvement (MAMM-1)***

The goal of this project is to supplement and improve stranding response capabilities in Santa Barbara and Ventura Counties by providing enhanced rehabilitation capacities and veterinary facilities for stranded marine mammals. The program will augment the stranding cleanup and treatment activities of an existing, local facility which is authorized and permitted to respond to and treat stranded marine mammals. The project includes labor and supplies to treat sick and injured pinnipeds, including food, medical evaluations and treatments.

---

[17] Plains does not agree with the Trustees' final injury numbers for marine mammals.

146

*Affected Environment*

The project area is mainland Santa Barbara and Ventura Counties. Sick or injured pinnipeds are rarely rescued at sea. Stranding response most often takes place on beaches and rehabilitation centers.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only negligible, if any, adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts.* Stranding response removes sick and injured live pinnipeds from beaches, potentially reducing the spread of disease amongst other populations. Treatment of diseased and injured marine mammals improves animal health, and thus the biological environment. Because the activities will be carried out by personnel trained and experienced in marine mammal recovery, no adverse biological impacts are anticipated, as most outdoor project activities will occur on beaches, which are already heavily-trafficked by humans. There will be minimal, if any, interaction with particularly sensitive habitats. No adverse biological impacts are anticipated

2. *Physical Impacts.* This project involves trained personnel removing stranded mammals from beaches and treating them. The project is expected to have negligible adverse or beneficial impacts to the physical environment.

3. *Human Impact.* Removal of sick and injured live pinnipeds from beaches and rocky coast will reduce the risk of spread of disease and other adverse interactions with humans. Humans should experience improved beach experience with the removal and treatment of diseased animals. No adverse effects to humans are expected.

*Probability of Success*

This project will expand the rehabilitation facility's capacity to treat live pinnipeds and increase the number of healthy animals released, approximately 30% of animals treated. Rescue and rehabilitation/ treatment of pinnipeds under veterinary care has a successful track record. Increasing capabilities are expected to further improve the success rate.

*Performance Criteria and Monitoring*

This project will expand the rehabilitation facility's capacity to treat live pinnipeds and increase the number of healthy animals released, approximately 30% of animals treated. Rescue and rehabilitation/ treatment of pinnipeds under veterinary care has a successful track record. Increasing capabilities are expected to further improve the success rate.  The proposed time period of the project is three to seven years, depending on the need of the program with a goal of a total of 150 additional marine mammals successfully responded to and/or treated through the program.

147

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration. Based on responses and outcomes from before implementation of the project, we will monitor:

- The number of animals (and species) taken in per year for treatment/rehabilitation;
- The number of live and dead animals responded to per year; and
- Outcomes from live strandings, including from treatment at the facility or in the field.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for pinnipeds injured as a result of the spill, and the Trustees have therefore selected this project.

**Cetacean Entanglement Response (MAMM-2)**

Entanglement in fishing gear is a source of mortality to whales and dolphins off the California coast and nearly all entangled animals die. The program will augment an existing permitted and authorized program by providing additional gear and personnel to disentangle cetaceans in areas not currently covered off the southern California coast.

*Affected Environment*

This project will operate within the southern California to respond to entangled cetaceans reported off Santa Barbara, Ventura, Los Angeles and Orange County coastlines.

*Environmental Consequences (Beneficial and Adverse)*

Overall, this project is anticipated to have only negligible, if any, adverse environmental consequences and multiple beneficial impacts. In reaching this conclusion, the Trustees evaluated several types of potential impacts, as described below.

1. *Biological Impacts.* Increased preparedness for entanglement response will provide a beneficial biological impact by reducing fishing gear-related mortality to whales and dolphins. Personnel implementing this this project would be trained and experienced in entanglement response and would operate using best practices to avoid adverse impacts to the environment. Therefore, no adverse biological effects are anticipated.

2. *Physical Impacts.* This activity will minimally increase boat use because of increased response capabilities. Personnel implementing this this project would be trained and experienced in entanglement response and would operate using best practices to avoid adverse impacts to the environment. Therefore, no adverse physical effects are anticipated.

148

3.  *Human Impacts.* Human enjoyment of wildlife viewing will be enhanced by (1) encountering fewer dead cetaceans floating in the water or beached and (2) seeing fewer animals in distress due to gear entanglements. For larger whales, a dead whale can be a hazard to navigation, so reducing mortality will reduce the number of potential hazards. While this project will minimally increase boat use, the Trustees anticipate that this will have negligible adverse impacts to boaters.

*Probability of Success*

This Project is anticipated to double the response capacity of the current cetacean disentanglement program operating off California's coast, which has a proven record of success. For this reason, the probability of success for the project is very high.

*Performance Criteria and Monitoring*

The number of whales with gear successfully removed compared to the number of entangled whales reported will be the criteria used to measure success. These data will be available to the Trustees because entangled whales are reported to the NMFS, which authorizes and coordinates entanglement response activities. Disentanglement response meet the guidelines and protocols of the MMPA and Animal Welfare statutes.

Specifically, the Trustees may use the following measures to determine the effectiveness of the restoration:

- Increased capacity to respond to entanglement events, measured by numbers of responses during the funding period compared to past performance; and
- Outcomes from entanglement response, by species.

*Evaluation*

The Trustees have evaluated this project using the threshold and additional screening criteria developed to select restoration projects and concluded that this project is consistent with and meets the objectives of these selection factors. This type and scale of project will effectively provide appropriate compensation for cetaceans injured as a result of the spill, and the Trustees have therefore selected this project.

## 5.4.6  Second Tier Restoration Projects Considered

The Trustees also considered the following projects (Table 20), and determined they are valid projects that would provide benefits to marine mammals. However, these projects were not selected for various reasons described below. They may be reconsidered if a selected project cannot be implemented or if remaining funds allow.

149

**Table 20.** Second tier marine mammal restoration projects that may be implemented if funds allow

| ID# | SECOND TIER PROJECTS CONSIDERED | BENEFITS |
|---|---|---|
| MAMM-3 | Reduce California Sea Lion Entanglement Mortality on San Miguel Island | Pinnipeds |
| MAMM-4 | Mitigate Entanglement Risk for Pinnipeds | Pinnipeds |
| MAMM-5 | Protect Marine Mammal Haulouts and Rookeries | Pinnipeds |
| MAMM-6 | Mitigate Cetacean Ship Strikes | Cetaceans |
| MAMM-7 | Remove Derelict Fishing Gear | Cetaceans/pinnipeds |
| MAMM-8 | Establish a Bottlenose Dolphin Protection Area | Cetaceans |

*Reduce California sea lion entanglement mortality on San Miguel Island (MAMM-3)*
The goal of this project is to remove fishing gear from live pinnipeds on San Miguel Island and identify the source fishery from the recovered gear. Individual pinnipeds would be branded and tagged to monitor their survival after gear removal. The project benefits pinnipeds by directly removing entangled gear, a known source of mortality. A secondary, unquantified benefit to all marine mammals is identifying the source fishery causing the entanglements and likely bycatch. The Trustees are satisfied with the feasibility of this project and consider it a potential alternative to the selected pinniped project, if necessary.

*Mitigate Entanglement Risk for Pinnipeds (MAMM-4)*
The goal of this project is to remove fishing gear from live pinnipeds that come ashore on mainland beaches in Orange, Los Angeles, Ventura and Santa Barbara Counties. The project was not selected because it did not specify how success would be measured, and it would be implementing new, unproven technology. This project could be reconsidered if the selected pinniped project is not feasible.

*Protect Mammal Haulouts and Rookeries (MAMM-5)*
The goal of this project is to further protect the Pacific harbor seal rookery and haulout areas at various areas throughout Santa Barbara and Ventura Counties. Other than Carpinteria, no specific locations or actions were identified.

A specific project at Carpinteria proposed to enhance protection by purchasing conservation easements at Carpinteria Beach to provide further buffers for the rookery. It would also consider other areas that that could provide additional protected rookery habitat. This proposal includes an outreach component to reduce human disturbance to marine mammals at rookeries. The rookery is already protected under the MMPA, and the proposed additional conservation easements would increase existing buffers to reduce risk of harassment. Routine monitoring of the rookery would provide data to estimate pupping success, but it would be difficult to specifically quantify the beneficial effects of the project separate from those protections already provided by the MMPA. This project was not selected to be carried forward for implementation at this time because the project does not contain sufficient information for the Trustees to understand the benefits to marine mammals injured by this spill.

150

*Mitigate Cetacean Ships Strikes (MAMM-6)*

The goal of this project is to quantify ship strike risk to large whales attributable to a voluntary vessel speed reduction program in the Santa Barbara Channel shipping lane. This project would monitor ship speed and ship strike rate of large cetaceans to compare to historic data. This project may provide data to evaluate how much the vessel reduction program would reduce large ship-strike cetacean mortality. However, the program's methods to estimate and monitor ship strike risk are unclear, the voluntary nature of the program makes implementation uncertain, and metrics for measuring success in terms of whales saved are currently unavailable. The Trustees determined that this could be reconsidered as a pilot project if other preferred projects became infeasible.

*Remove Derelict Fishing Gear (MAMM-7)*

The goal of this project is to reduce entanglement risk of lost fishing gear for marine mammals by removing large nets and traps. Based on recent past gear removal projects conducted in southern California, there appear to be a low number of marine mammals entangled in lost nets. The Trustees concluded that this program could be beneficial to both cetaceans and pinnipeds, but the benefits would be difficult to quantify. Other projects proposed and evaluated in this Plan provide more direct benefits to marine mammals. The Trustees could reconsider this project if the selected projects became infeasible.

*Establish a Bottlenose Dolphin Protection Area (MAMM-8)*

The goal of this project is to improve habitat for the coastal population of bottlenose dolphin by establishing a bottlenose dolphin protection area along the Santa Barbara county coastline. The protection area would regulate chemical contamination and anthropogenic noise. The proposal did not identify a specific area, provide criteria to identify one, or indicate how success would be measured. This project would also be challenging, as it involves complex legal and regulatory issues that are not within the direct control of the Trustee agencies. The Trustees would consider this project if other projects to benefit cetaceans are not possible.

## 5.5  Human Uses

In the wake of an oil spill, some people may decide not to visit the shoreline. Others choose to visit alternative sites. Some visit affected shorelines but experience reduced enjoyment due to the spill. These all represent spill impacts.

The Trustees quantified impacts to selected human uses resulting from the Refugio Beach Oil Spill. Effects were identified from as far north as Gaviota State Beach to as far south as Long Beach. This stretch of coastline includes a range of public access points with rich natural resources and scenic vistas that provide exceptional recreational opportunities. People in the region engage in a variety of recreational activities. Examples include camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, and dog-walking, as well as more

151

specialized activities such as fishing, diving, boating, and surfing. Trustees did not quantify impacts from third-party claims (e.g., from non-government parties, such as commercial fisheries and affected businesses), pursuant to NRDA regulations.

The Refugio Beach Oil Spill entered the ocean in Santa Barbara County just west of Refugio State Beach. Spill impacts on human recreation were highest in this area. Refugio and El Capitan State Beaches, popular state campgrounds and day use areas, were closed for 59 and 37 days, respectively. Access to adjacent small pocket beaches was restricted through August 28, 2015. There was significant oiling along the Gaviota Coast down to the University of California Coal Oil Point Reserve, where cleanup operations and closures disrupted normal reserve operations. Recreational fishing in this region was closed for 41 days (see Figure 37).

Spill impacts on recreation were less severe south of Coal Oil Point Reserve. Although spill-related oiling, advisories, and significant media coverage of the incident occurred, no closures were identified along the remaining sections of the Santa Barbara and Ventura County coastlines. This stretch includes several incorporated cities (Santa Barbara, Carpinteria, Ventura, Oxnard), county properties, and additional State Park holdings. While the impacts were not as prominent as those found along the Gaviota Coast to the north, many of the affected beaches have significant visitation, particularly during and after Memorial Day weekend. Thus, even a small percentage decrease in use can translate into a sizeable reduction in the number of trips taken.

In Los Angeles County, there were two separate beach closures after an unusual amount of tar balls washed up on beaches. The first occurred in southern Santa Monica Bay from May 27 to 29, 2015. The second occurred in Long Beach (June 3 to 5, 2015). Both events triggered cleanup operations and resulted in closures of the beach seaward of the lifeguard towers.

This assessment and restoration plan focuses primarily on impacts to public recreational use and does not include private claims for losses to commercial fishing or recreation-based concessionaires. Impacts to commercial activities and other private party claims may be addressed through third party claims procedures under OPA or in private civil litigation.

152



**Figure 37.** Overview of posted Closures and Advisories after the Refugio Beach Oil Spill.

## 5.5.1  Scaling Approach

The natural resource damages for human uses are based on the monetary value of spill-related human use impacts. Monetary value is measured using the economic concept of "consumer surplus". For recreation, consumer surplus is the value that an individual places on their recreational activities above and beyond the cost they incur to engage in those activities. It is not a calculation of the cost of participating in various recreational activities, nor is it the resulting economic impact in the community. Lost income to recreational businesses, lost tax revenue to municipalities, and lost user fees to public parks, while related to lost public use, are third-party claims that are not compensable under NOAA's NRDA regulations under OPA. However, these losses are indicative of loss of public recreation.

For calculating lost value, human uses were broken up into four general categories. These categories were delineated based upon the qualitative character of the use and the inherent separability of the relevant data available to identify losses:

***Coastal Camping***
Coastal camping includes overnight stays at campgrounds that are within relatively short walking distance to the beach or shoreline. In addition to camping, these users typically engage in a range of related day use activities (e.g., general beach use, bike riding, swimming, fishing, picnicking). Coastal camping impacts were measured in camping nights at identified camping areas.

***Non-Camping Shoreline Recreation***
Non-camping shoreline recreation captures a broad range of day use activities pursued by non-campers. It includes traditional beach use activities, such as sunbathing, walking, exercising, picnicking, beach combing, wildlife viewing, swimming, and surfing. However, it also includes diving, kayaking, standup paddle boarding and similar activities that originate from the adjacent

153

shoreline, rather than from a marina or specified boat launch. Different quantification methods were used for (1) Santa Barbara and Ventura Counties (Section 5.5.4) and (2) Los Angeles County (Section 5.5.5). Impacts to non-camping shoreline use were measured in user days for the northern two counties and in direct lost value for Los Angeles County.

### *Boating and Offshore Recreation*

Boating and offshore recreation includes motor boating, sail boating, and use of the Channel Islands National Park, as well as non-motorized boating originating from harbor marinas or identified boat launches that are not associated with specific recreational day use shoreline areas. Non-motorized boating includes activities such as kayaking, standup paddle boarding, and canoeing, as long as they originate from a marina or specified boat launch. Launches associated with data connected to "Non-Camping Shoreline Recreation" are addressed under that category of use (Sections 5.5.4 and 5.5.5). Motorized boating includes charter fishing trips, charter dives, and charter boat-based wildlife viewing. Lost use for these activities was measured in user days.

### *Research, Education, and Outreach*

Research, Education, and Outreach refers to trips to the University of California Coal Oil Point Reserve for the purpose of conducting research, participating in university-level classes, and reserve related outreach activities. Lost use for these activities was measured in user days.

Our quantification of lost value incorporates measures of affected human use activity (e.g., lost, diminished, and substituted trips). Total lost value is further adjusted by a three-percent annual percentage rate (compounded monthly) to reflect the change in value associated with delaying compensation.

## 5.5.2  Overview of Data Collection and Studies

The list below summarizes various field studies, data collection tasks, and analyses used for the assessment of human use impacts.

### *Documentation of Closures, Advisories, and Spill-related Notifications*

The Trustees tracked site closures and posted advisories by location and date. The Trustees also evaluated conventional media coverage of the spill along with social media posts and public announcements from selected organizations (e.g., public agencies).

### *Data Collection around the Time of the Spill*

The Trustees conducted systematic counts of people on the beach in selected locations in Santa Barbara and Ventura Counties. The Trustees also tracked foot and bike entries to El Capitan State Beach and conducted daily monitoring of automatic car counters at Goleta Beach and Arroyo Burro County Parks. Finally, the Trustees contacted water- and shore-oriented recreation businesses regarding impacts to their customers.

154

*Compilation and Evaluation of Existing Data Related to Spill-Effects or Baseline Use*

The Trustees compiled historical data related to the public use of various sites, and then assessed these data for their relevance and efficacy for estimating spill-effects and baseline use. The data sources compiled and evaluated included:

- o Paid vehicles at State Park properties from Gaviota to Point Mugu;
- o Overnight stays at State Park properties from Gaviota to Point Mugu;
- o Parking fee data from select coastal lots between Santa Barbara and Malibu;
- o Historic records of automated car counters at Santa Barbara County Parks;
- o Marine Protected Area (MPA) Watch shoreline user counts;
- o South Coast MPA Baseline Program survey data, collected by researchers at Point 97/Ecotrust and Natural Equity;
- o Jalama County Park Camping Occupancy;
- o Commercial Passenger Fishing Vessel (CPFV) log summaries;
- o California Recreational Fisheries Survey (CRFS) angler estimates;
- o Fuel Sales at Santa Barbara Harbor fuel dock;
- o Channel Islands National Park visitation;
- o University of California, Santa Barbara (UCSB) Coal Oil Point spot counts;
- o USCB Coal Oil Point Reserve annual estimates of research, education, and outreach use;
- o Long Beach lifeguard beach user estimates; and
- o Los Angeles County lifeguard beach user estimates.

*Data Collection on the First Anniversary of the Spill*

The Trustees evaluated gaps in the assessment data listed above. These gaps guided the prioritization and research design of data collection around the first anniversary of the spill. The Trustees conducted interviews and user counts to estimate baseline use and augment existing data to estimate spill-related changes in use at selected sites.

*Analysis of Camping Losses*

The Trustees evaluated data and other information on coastal camping in Santa Barbara and Ventura Counties. Data from the spillthe spill period were compared to historical information. Camping impacts were identified at Refugio State Beach, El Capitan State Beach, and Gaviota State Park. Site-specific economic models were developed from existing data on camping reservations to estimate the value of a camping night. See Appendix K.

*Analysis of Non-Camping Shoreline Recreation Losses in Santa Barbara and Ventura Counties*

The Trustees examined data on recreational use along the Santa Barbara and Ventura County coast. In general, data from outside the spill period were used to create statistical predictions of recreational use had the spill not occurred. These predictions accounted for weather, day-of-the-week, and other site-specific factors. Where reductions in recreation were identified, the trustees translated these reductions into estimates of lost user days. Lost value was calculated by

155

multiplying the number of lost user days by an estimated dollar value per user day derived from economic research on shoreline recreation in California (English 2010). See Appendix L.

### *Analysis of Shoreline Recreation Losses in Los Angeles County*

The Trustees' estimate of lost value in Los Angeles County focuses on the relatively short periods where shoreline areas were closed in southern Santa Monica Bay and in Long Beach. The estimate of lost value was determined utilizing the southern California Beach Recreation Valuation Model (Hanemann et al. 2004), a state of the art recreation demand model designed specifically for the Los Angeles County beaches affected by the spill. See Appendix L.

### *Analysis of Boating and Offshore Recreation Losses*

The Trustees considered a range of data sources for evaluating losses to boating and offshore recreation. The estimate of offshore recreation losses was based upon a series of phone contacts to recreational businesses that collected information on the reduction in passenger trips that these businesses experienced following the spill. The estimate of lost value per trip was based on a study of the consumer surplus value of boating trips to the Channel Islands (Gornik et al. 2013). See Appendix M.

## 5.5.3   Coastal Camping

The trustees identified spill impacts at Refugio State Beach, El Capitan State Beach, and Gaviota State Park campgrounds. The Refugio State Beach campground was closed for the longest time period (59 days). El Capitan State Beach experienced a shorter closure period (37 days), but it has more campsites and therefore more users were affected per day of closure. Both of these campgrounds are popular and reach capacity in summer months. Once the closures were lifted, the campsite occupancy recovered to near baseline conditions rather quickly at both locations (i.e., within a few weeks). Thereafter, small trailing reductions in use occurred over the entire summer. Gaviota State Park did not experience a closure. However, reductions in camping use were identified during the first two weeks after the spill. A total of 49,188 camping nights were lost across all three sites.

Data on the origin of visitors (by zip code) was combined with census data to create an economic model to estimate the value per camping night. This analysis resulted in an estimate of $29.57 (July 2018 dollars) per camping night lost. The total undiscounted damages are therefore $1,454,663, and the resulting total lost value is $1,593,571 (July 2018 dollars and present value). The model, along with the analysis of lost camping nights, is described in more detail in Appendix K.

## 5.5.4   Non-Camping Shoreline Recreation Use: Santa Barbara and Ventura Counties

The Trustees identified impacts to recreational shoreline users at multiple locations along the Santa Barbara and Ventura County coastlines (Table 21). Reductions in recreational use were assessed through quantitative analyses of a range of data indicators related to shoreline recreation (see Appendix L).

156

The observed impacts were greatest upcoast of Coal Oil Point Reserve, where sections of shoreline were subject to relatively long access and recreational fishing restrictions. Refugio and El Capitan State Beaches, and associated day use recreation opportunities, were officially closed for extended periods (59 and 37 days, respectively). Access to pocket beaches at Tajiguas, Venadito, and Las Flores were limited through August 28, 2015 by spill-related restrictions to roadside parking at historic highway pull offs. After the closures, recreational use at most of the sites returned to expected levels relatively quickly, within two to four weeks. The only exception was Refugio State Beach, where recreational use did not return to baseline until 8 weeks after the park reopened.

Shoreline recreation impacts on the Santa Barbara and Ventura Coastlines downcoast of Coal Oil Point were less severe. These locations were subject to a range of posted advisories, oilings, and media coverage about the "Santa Barbara spill". However, relative reductions in recreational use were generally modest, returning to baseline within two to four weeks after the initial spill. The only exception to this was at Leadbetter Beach on the Santa Barbara Waterfront, where lower levels of recreational use were observed in the data for 12 weeks.

A total of 89,380 shoreline recreation user days in Santa Barbara and Ventura Counties were estimated as lost due to the spill. Each user day was assigned a value of $21.45 (July 2018 dollars) based on an evaluation of economic research of shoreline recreation in California. Associated undiscounted damages are $1,917,317, and total lost value is $2,101,467 (July 2018 dollars and present value) This analysis is described in detail in Appendix L.

**Table 21.** Non-Camping Shoreline Losses in Santa Barbara and Ventura Counties

| Section of Coastline | Estimate of Lost Value (July 2018 dollars) |
|---|---|
| Gaviota State Park through El Capitan State Beach | $ 723,987 |
| El Capitan to Coal Oil Point | $ 295,335 |
| Coal Oil Point to Santa Barbara Waterfront | $185,783 |
| Santa Barbara Waterfront | $297,957 |
| Santa Barbara Waterfront to Ventura County Line | $43,006 |
| Ventura County Line through Emma Wood State Beach | $21,635 |
| Surfers' Point/San Buenaventura to Pt. Mugu | $349,614 |
| Total Undiscounted Damages | $1,917,317 |
| **Total Value Lost** | **$2,101,467** |

## 5.5.5  Non-Camping Shoreline Recreation Use: Los Angeles County

The Trustees quantified spill-related losses in Los Angeles County based on the number of days with oil-related beach closures following the spill (Table 22). Closures in south Santa Monica Bay began on May 27 and ended on May 29. Closures at Long Beach City Beach were initiated

157

on June 3 and ended on June 5. The affected beaches were closed seaward of the lifeguard towers.

Damages for the Los Angeles County closures were based upon the southern California Beach Recreation Valuation Model (Hanemann et al. 2004), an economic model that was constructed to evaluate the impact of closures and water quality changes to recreational use on southern California beaches. Specific sites affected by the closures are included in the model (Manhattan Beach, Hermosa Beach, Redondo Beach, Long Beach, and Belmont Shore). See Appendix L.

**Table 22.** Non-camping shoreline recreation losses in Los Angeles County

| Section of Coastline | Estimate of Lost Value (July 2018 dollars) |
|---|---|
| South Santa Monica Bay (Manhattan Beach to Redondo Beach), May 27-29 | $445,125 |
| Long Beach (1st Place to 72nd Place), June 3-5 | $92,444 |
| Total Undiscounted Damages | $537,568 |
| **Total Lost Value** | **$590,067** |

## 5.5.6  Boating and Offshore Recreation

The spill closed an area of fishing off the Gaviota Coast for 41 days. Cleanup vessels conducted cleanup operations in the cove at Refugio State Beach and elsewhere in the days following the spill. Information about the spill was reported in the media throughout the summer. Businesses that provide boat transport and other services to recreational users reported a total loss of 2,379 client trips (See Appendix M). These trips originated from marinas along the Santa Barbara, Ventura, and Los Angeles County coastline. These trips do not include launches of non-motorized boats (e.g., canoes, kayaks, standup paddle boards) that occurred from shoreline areas covered in the estimated loss of "Non-Camping Shoreline Recreational Use". These trips were assigned a value of $59.01 (July 2018 dollars) based upon Gornik et al. (2013). Total undiscounted damages are $140,384. Total lost value for this category of human use is $153,867 (July 2018 dollars and present value).

## 5.5.7  Research, Education, and Outreach

The Coal Oil Point Reserve at the University of California, Santa Barbara was closed for 26 days. In addition to providing opportunities for traditional beach recreation (e.g., sunbathing, beach combing, exercising, and swimming, which are covered above), the University of California operates the reserve to benefit its mission to provide high quality educational opportunities and conduct research. The Coal Oil Point Reserve provides a real world laboratory in which these activities can occur.

The University of California Natural Reserve System reports 7,521 research, education, and outreach user days for the 339 days that the Coal Oil Point Reserve was open between July 1, 2014 to June 30, 2015. Staff at the reserve system believe that the amount of research, education,

158

and outreach activities on the days that the reserve was open provides a reasonable basis for estimating use over the 26 days that the reserve was closed. Applying the resulting overall rate of 22.2 users per day to the 26 days of closure yields a user day loss estimate of 577 user days.

A value of $47.00 (July 2018 dollars) was attached to each of these user days. The Trustees were not able to identify a direct measure of consumer surplus for research, education, and outreach. This estimate is based upon the approximate tuition and fee cost of a course-day of instruction at the University of California, Santa Barbara, accounting for the proportion of undergraduate versus graduate and in-state versus out-of-state students. This results in a $27,116 estimate of undiscounted damage, and a total lost value estimate of $29,735 for this category (July 2018 dollars and present value).

## 5.5.8  Summary of Injury

The lost recreation use value estimated by the Trustees (July 2018 dollars and present value) is summarized in Table 23 by general geography and type of use.

159

**Table 23.** Total lost value by section of shoreline and quantified human uses.

| Section of Shoreline | Camping | Non-Camping Shoreline | Boating, Offshore | Research, Education, Outreach | All Activities Combined |
|---|---|---|---|---|---|
| Gaviota SP to El Capitan SB | $1,593,571 | $792,815 | | | $2,386,385 |
| El Capitan to Ellwood | | $285,425 | | | $285,425 |
| Sands Beach / Coal Oil Point Reserve | | $38,392 | | $29,735 | $68,126 |
| Santa Barbara Waterfront | | $326,364 | $127,592 | | $453,956 |
| Santa Barbara County (Other)* | | $250,795 | | | $250,795 |
| Ventura County | | $407,677 | $1,580 | | $409,258 |
| Los Angeles County | | $590,067 | $24,695 | | $614,762 |
| **Total Lost Value** | **$1,593,571** | **$2,691,534** | **$153,867** | **$29,735** | **$4,468,707** |

*This includes sections of coastline both upcoast and downcoast of Santa Barbara Waterfront.

As explained above, the lost use value represents the lost consumer surplus value to the public. It does not represent the cost of participating in these activities, nor the sum of their travel expenditures and resulting economic impact in the community. Table 23 represents the Trustees' best estimate of lost value, i.e., $4.47 million[18].

### 5.5.9  Proposed Restoration

The Trustees (including the University of California) intend to select a suite of restoration projects to compensate the public for lost use of the recreational resources caused by the spill. The Trustees will work cooperatively with local government agencies and non-governmental organizations to identify a suite of potential restoration projects according to the relative magnitude of spill impacts. These projects may include improvements or enhancements to public piers, parks, bike paths, boat ramps, fishing areas, or other infrastructure in order to increase the value of recreational experiences involving beach use, boating, and/or fishing. Specific examples include, but are not limited to: beach and waterfront access; boardwalk construction and improvements; fishing pier and dock improvements; beach sand management and replacement; beach fire rings; beach shower and restroom improvements; picnic facilities; Coastal Trail improvements; public access components of large ecological restoration projects; interpretive, educational, and wildlife viewing facilities.

---

[18] This is less than the amount to be recovered for lost recreation through the pending settlement process, i.e., $3.90 million. However, the Trustees believe the amount to be recovered through the settlement is adequate based on the following considerations: the amount is within the range of values the Trustees deem plausible given the uncertainties in some of the data; the Trustees' desire to reach a settlement and commence restoration more quickly; and the inherent risks involved in litigation if a settlement is not reached.

160

It is a goal of the Trustees to select projects spanning the geographic area of the spill and to address the various types of activities (e.g. camping, fishing, day use, other uses) that were impacted by the spill. To that end, and to the extent feasible, funds will be allocated among the regions affected by the spill according to the relative magnitude of the spill impacts, as described in Table 24.

**Table 24.** Geographic distribution of lost value across all quantified human uses.

| Section of Shoreline | Share of Total Lost Value |
|---|---|
| Gaviota SP to El Capitan SB | 53.40% |
| El Capitan to Coal Oil Point (excluding Research, Education, Outreach) | 7.25% |
| Coal Oil Point Reserve (Research, Education, Outreach only) | 0.67% |
| Santa Barbara Waterfront | 10.16% |
| Santa Barbara County (Other)* | 5.61% |
| Ventura County | 9.16% |
| Los Angeles County | 13.76% |

*This includes sections of coastline both upcoast and downcoast of Santa Barbara Waterfront.

These percentages reflect the approximate estimated distribution of losses across the spill area. In the event funds allocated to one or more geographic area(s) remain, and such funds are insufficient to implement additional recreation project(s) and/or insufficient feasible recreation projects are identified for one or more geographic areas, the Trustees shall have discretion to spend the money in another geographic area identified in Table 23. Compliance with environmental and other applicable laws will be the responsibility of the implementing agency for each selected project.

The distribution of the $3.9 million in damages recovered for lost recreational value will be administered as follows:

*State Parks*
State Parks will administer 53.4% ($2.08 Million) of the restoration funds for projects to be selected by State Parks with the approval of the Trustee Council. State Parks will work cooperatively with Santa Barbara County and other local government and non-government organizations to identify appropriate projects located within State Parks' property. These projects are to benefit recreational activities associated with units of CDPR from Gaviota to El Capitan. Funds are intended to compensate for all shore-based recreation losses, with approximately two-thirds being directed to camping and approximately one-third being directed other shoreline uses (including non-camping day use, shore-based fishing, diving, etc.).

161

***South Coast Shoreline Parks and Outdoor Recreation Grants Program – Other Coastal Areas***
The State Trustees (including University of California) will administer 45.93% ($1.79 Million)
of the restoration funds for projects to be selected by the Trustees to primarily benefit
recreational activities to compensate for recreational losses downcoast of El Capitan State Beach.
The Trustees will work cooperatively with Santa Barbara, Ventura, and Los Angeles Counties,
local cities, and other public and private organizations to identify a suite of potential projects
according to the relative magnitude of the spill impacts, considering the availability of viable
projects and types of affected uses. Projects will then be selected for funding using a competitive
grant process, until all funds are spent.

***University of California***
The University of California Natural Reserve System will administer 0.67% ($26,000) to fund
projects selected by University of California in coordination with the Trustee Council and with
input from the public. These will address the research, education, and outreach missions of the
University of California at Coal Oil Point Reserve.

# 6.0  NEPA Alternatives Analysis

## 6.1  Preferred Alternatives

The preferred alternative involves the implementation of the projects listed in Table 25.
Anticipated impacts to the environment from implementation of each of these projects is
described in Section 5. In the event any of these projects cannot be implemented, the Trustees
will look at second tier projects also described in Section 5. Recreation projects to compensate
for oil impacts to human uses will be administered by State Parks or handled under a grants
program, administered by the State Trustees, and may undergo additional environmental
analyses in subsequent NEPA reviews as needed. Project ideas submitted by the public will be
considered by State Parks or through this grants program. Appendix N lists all projects submitted
by the public and considered by the Trustees.

**Table 25.** Restoration projects that would be implemented under the preferred alternative.

| Shoreline Habitat Restoration | | |
|---|---|---|
| Shore-1 | Ellwood Seawall Removal | Restore sandy beach and mixed shoreline ecosystems and dynamics by removing a wooden seawall at Ellwood Beach that is currently constraining natural functioning condition of the sandy beach ecosystem as well as lateral access along the shoreline at high tide. |
| Shore-2 | Ventura County Dunes Restoration | Remove invasive dune species, protect sensitive bird populations, and enhance public access routes. |
| Shore-3 | Santa Monica Beach Restoration Pilot Project | Restoration of a highly impacted beach system in Santa Monica by stopping beach grooming and |

162

|  |  | restoring a diverse, endemic-rich, coastal plant and wildlife community. |
|---|---|---|
| Shore-4 | Black Abalone Restoration and Relocation | Transplant black abalone into specific locations within rocky intertidal habitat to enhance the overall health of the rocky intertidal ecosystem by returning this important grazer to the community. |
| **Subtidal and Fish Habitat Restoration** | | |
| SubT-1 | Abalone Restoration | Transplant abalone from donor sites and cultivated populations to a target population within MPAs, in order to bolster the abalone population within MPAs that serve an important ecological role as benthic grazers. |
| SubT-2 | Eelgrass Restoration | Eelgrass restoration in Refugio Cove. |
| SubT-3 | Sand-Dwelling Kelp Restoration Offshore of Goleta Beach | Funding for this project would extend monitoring of the existing pilot project to assess long-term benefits of the project, and viability of the restoration design. |
| SubT-4 | Ellwood Seawall Removal | Removing the Ellwood seawall primarily benefits sandy beach ecosystems, but subtidal habitats adjacent to the seawall are also projected to improve. |
| **Bird Restoration** | | |
| Bird-1 | BRPE Colony Enhancement on Anacapa Island | Enhance brown pelican breeding habitat on Anacapa Island by removing invasive plants or taking other actions to improve breeding attempts and success. |
| Bird-2 | Prevention of Injury to Seabirds Related to Recreational Fishing | This project would use outreach to raise public awareness and educate anglers about ways to reduce their chances of hooking birds and what to do if one is hooked, and to make improvements to fishing areas to prevent fishing waste from entering the environment. |
| Bird-3 | Coal Oil Point Western Snowy Plover Protection | This may include: predator control; upgraded signage and fences; outreach to reduce disturbances at COPR; leashes to lend; and eradicate iceplant over nesting habitat on Ellwood Beach. |
| **Marine Mammal Restoration** | | |
| Mamm-1 | Improve Pinniped Rehabilitation Survival | Increase survival rates for live stranded pinnipeds recovered in Santa Barbara and Ventura Counties. |
| Mamm-2 | Cetacean Entanglement Response | Expand response capacity for cetacean entanglement response program to increase survival rates of cetaceans entangled in fishing gear by staging gear in additional locations for quick response to reports of entangled whales in the Santa Barbara Channel. |

163

## 6.2    Non-Preferred Alternatives

This alternative includes consideration of second tier projects. These projects are discussed in Section 5, and listed in Appendix N. The Trustees may consider these projects for implementation in the event that the preferred projects are no longer available or are infeasible due to unforeseen circumstances. A full environmental review in this DARP/EA was premature for second tier projects considered non-preferred, as they are not yet ready for NEPA analyses for various reasons (e.g., project details and feasibility unknown at this time). Should the Trustees consider these projects for implementation in the future, additional review may be required as project-specific details become available, in which case any subsequent NEPA analyses needed would tier from this DARP/EA.

## 6.3    No Action Alternative

NEPA requires the Trustees to consider a "no action" alternative, and the OPA regulations require consideration of a roughly equivalent "natural recovery" alternative. Under this alternative, the Trustees would take no direct action to restore injured natural resources or to compensate for lost services. Instead, the Trustees would rely on natural processes for recovery of the injured natural resources.

The principal advantages of the natural recovery approach are the ease of implementation and the absence of monetary costs. However, while natural recovery may occur over time for many of the injured resources, the public would not be compensated for interim losses under the "no action" alternative. In some cases, changing environmental conditions may prevent the environment from recovering to baseline. For example, native kelp species that were killed by the spill may be replaced by invasive kelp that do not support the same ecosystem functions as native species. OPA clearly establishes Trustee responsibility to seek compensation for interim losses pending recovery of natural resources. Losses were, and continue to be, suffered during the period of recovery from the spill, including the loss of an estimated 558 birds, 232 marine mammals, degradation of nearly 1,500 acres of shoreline habitat, degradation of over 2,200 acres of benthic subtidal habitat, and the loss of human uses estimated at 49,000 camping nights and over 80,000 other user days (i.e., general beach use, surfing, boating, fishing, research, etc.). Technically feasible project alternatives exist to compensate for these losses. Thus, the Trustees reject the "no action" alternative and instead have selected the appropriately scaled restoration projects described above as the preferred alternatives.

By definition, the no action alternative lacks physical interaction with the environment. Accordingly, the no action alternative would cause no direct biological, physical, or human impacts to the environment. However, if the Trustees undertook no action, the environment would not benefit from the ecological uplift created by active restoration. Active restoration would restore injured areas and resources, and potentially prevent further injury. The no action

164

alternative may have minor to moderate short or long-term adverse indirect effects on the environment.

## 6.4   Cumulative Impacts

The Trustees examined a variety of alternatives to restore resources and/or services lost because of the Refugio Beach Oil Spill. Anticipated environmental consequences arising from each of the selected projects are provided in Section 5. As required by NEPA, this section addresses the potential overall cumulative impacts of implementing the projects selected in this restoration plan.

Cumulative impacts are impacts that result from an action along with other past, present, and reasonably foreseeable near-term future actions taken together. Significant cumulative impacts can result from a combination of actions that do not have significant impacts individually. Taken collectively, the effects of several actions may be additive, countervailing, or synergistic. Impacts are considered regardless of the agencies or parties involved. Thus, in considering cumulative impacts, this analysis is not limited to the impacts of restoration projects detailed herein, but also considers other significant activities and anthropogenic impacts throughout the region.

Overall, the Trustees' selected restoration projects for the Refugio NRDA will result in long-term net improvement in fish and wildlife habitat, restored ecological balance in areas where disturbances have led to adverse impacts on sensitive native species, and improved natural resource services provided to and by fish and wildlife in the region. The Trustees evaluated the restoration projects selected in this DARP/EA in conjunction with other known past, proposed, or foreseeable closely related projects, activities, and anthropogenic impacts that could potentially add to or interact with these projects within the spill-affected area to determine whether significant cumulative impacts may occur. Each resource category is quite different regarding the geographic scope of restoration projects, so cumulative impacts for each category are first treated separately followed by a summary statement regarding aggregate cumulative impacts.

Cumulatively, it is anticipated that there would be a long-term adverse effect to the biological, physical, and cultural environment were the no action/natural recovery alternative selected because no active restoration would occur. However, relative to the magnitude of adverse ecological impacts that currently exist in the project area, the adverse cumulative effect of the no action alternative is not expected to be significant as defined under NEPA.

### 6.4.1   Shoreline

All shoreline restoration projects are proposed to occur within the habitats formed at the interface of the land and Pacific Ocean, including sandy beaches, rocky intertidal habitats, and rocky-sandy mixed habitats. Within Santa Barbara, Ventura, and Los Angeles Counties, the condition

165

of these habitats is influenced by a variety of anthropogenic activities including coastal armoring, sediment diversion/stabilization, beach nourishment, and beach grooming, as described further below.

### *Cumulative Impacts Issues*
Some projects may have minor, short-term adverse effects, such as heavy equipment use on the beaches adjacent to the Ellwood seawall removal area; however, the cumulative effects of any short-term effects are anticipated to be negligible to the overall shoreline environment.

### *Geographic Scope of Restoration Projects*
The geographic scope of the shoreline restoration projects includes sandy beach and rocky intertidal habitats in Santa Barbara, Ventura, and Los Angeles County.

### *Timeframe for Project Implementation*
After the DARP/EA is finalized, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

### *Other actions affecting the resources, ecosystems, and human communities of concern*
Major anthropogenic stressors that affect the shoreline environment can be grouped into five categories:

1. *Sediment deficit*. Southern California beaches are now receiving less than 50% of their historical sand budgets. This loss of sediment has a significant negative affect on the extent of shoreline habitat, the ecosystem services provided by shoreline habitats, and the amount and intensity of coastal erosion.
2. *Coastal armoring*. Approximately 27% of the southern California coast is armored and shoreline armoring associated with sea level rise is increasing every year. This removes habitat directly from a finite and shrinking resource, and further diminishes ecological and public uses.
3. *Beach nourishment.* Nourishment is an expensive, and as practiced in southern California, only a short-term approach to address sand deficits. Unless nourishment is implemented with great skill and consideration, it can have negative impacts on beach and other coastal environments.
4. *Beach grooming*. Beach cleaning or grooming includes removing trash and kelp wrack with heavy equipment and causes substantial disturbance, loss of productivity, and reduction in species diversity to the shoreline ecosystem.
5. *Invasive species*. Invasive, non-native, plant species such as iceplant and European beach grass have been planted or introduced into the shoreline environment and have spread and out-competed native plant species. In some instances, the spread of these invasive plant species have degraded the diversity and quality of sand dune ecosystems, and precluded species such as the western snowy plover from using these habitats for breeding.

166

6. *Changing environmental conditions (e.g., sea level rise, ocean acidification, etc.)* Future climate scenarios predict rising sea levels, which results in increased overall coastal erosion. Ocean acidification is projected to cause impacts to animals with calcium-carbonate shells (oysters, abalone, sand crabs, etc.), which are a major component of shoreline habitats. Larger storms may also impact coastal areas in the future, causing shoreline habitat degradation and loss.

Individually and in aggregate, all of these stressors have reduced the environmental quality of the shoreline ecosystem. The shoreline restoration projects selected by the Trustees, aim to reverse a portion of the negative effects that these stressors have had. For example, the Ellwood seawall project will remove a section of unnecessary coastal armoring in the City of Goleta, the Santa Monica dune and beach restoration project will discontinue beach grooming in an area of high potential for ecological recovery, and the Ventura County dune restoration project will remove invasive non-native plants from dunes that can be used by rare birds. All selected shoreline restoration projects are anticipated to have long-term beneficial effects.

## 6.4.2  Subtidal and Fish Habitats

The Trustees believe that the projects selected in this restoration plan that address injuries to subtidal habitats, in conjunction with other existing and anticipated coastal restoration projects, including those funded from damage recoveries from other OPA and CERCLA cases, will have a local and regional, long term, moderate beneficial impact on the extent and productivity of subtidal habitats within the geographic scope of the project implementation footprint. The majority of projects are geared toward restoring or enhancing subtidal rocky reef, kelp forest and eelgrass habitats. All three of these habitats provide ecosystem benefits to a diverse community of fish and invertebrates. As an example, kelp forests provide food to subtidal, intertidal and beach communities (e.g., a large component of beach wrack is produced by giant kelp). Southern California kelp forests have experience profound losses in area coverage and in some cases losses in diversity and abundance of the key species that serve to regulate the complex community of algae and invertebrates that are foundational to the habitat.

### *Cumulative Impacts Issues*

Some projects may have minor, short-term adverse effects, such as minor air quality impacts via the use of boats to transport divers and equipment to restoration sites and heavy equipment use on the beaches adjacent to the Ellwood seawall removal area; however, the cumulative effects of any short-term effects are anticipated to be negligible to the overall subtidal environment.

### *Geographic Scope of Restoration Projects*

The geographic scope of the subtidal restoration projects is subtidal habitats within three miles of the Santa Barbara County coast.

167

*Timeframe for project Implementation*
After the DARP/EA is finalized, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

*Other actions affecting the resources, ecosystems, and human communities of concern*
Major processes or anthropogenic stressors that affect the nearshore subtidal environment can be grouped into six categories:

1. *Loss of kelp forest substrate*. The Santa Barbara coast has experienced a loss of approximately 215 acres of productive kelp forest habitat due to the loss of appropriate structure for kelp holdfasts to attach.
2. *Loss of coastal marine eelgrass habitat*. Eelgrass habitat provides unique and critical ecosystem services to the shallow subtidal component of the California coastal shelf. Eel grass beds are an important source of primary productivity and create 3-dimensional biogenic habitat that is used by a diverse assemblage of fish and invertebrates as nursery and foraging habitat. Eelgrass habitat is also identified by NOAA as a Habitat of Particular Concern under the Magnuson-Stevens Fishery Conservation and Management Act.
3. *Invasive species.* Invasive, non-native, species such as *Sargassum horneri* and *Undaria pinnatifida* have been introduced into the southern California bight and have spread and out-competed native species. The spread of these invasive plant species have degraded the diversity and quality of giant kelp and other subtidal vegetated habitat, making restoration of native habitat critically important.
4. *Coastal erosion and associated turbidity and scour.* A variety of coastal activities (seawall armoring, excessive irrigation practices, beach nourishment, etc) have been shown to reduce productivity of subtidal habitats due to the impacts of sedimentation (leading to burial of structured habitats), chronic turbidity (leading to reductions in primary production and growth of algae and plants that create three dimensional habitat), and scour (sediment washing over hard substrate and removing algae, attached invertebrates and other living habitat elements).
5. *On-going activities associated with oil extraction*. Numerous activities associated with oil extraction can have significant cumulative impacts on subtidal habitats. Clearly pipeline ruptures and spills from other sources have catastrophic impacts, but ongoing impacts associated with establishing and maintenance of the infrastructure needed to support oil extraction (e.g., pipeline construction and maintenance) can result in impacts to marine habitats.
6. *Changing environmental conditions (e.g., warming temperatures, ocean acidification, altered circulation)*. Future climate scenarios predict rising sea levels, which results in increased overall coastal erosion. Ocean acidification is projected to cause impacts to animals with calcium-carbonate shells (oysters, abalone, sand crabs, etc.), which are a major component of shoreline habitats. Larger storms may also impact coastal areas in the future, causing shoreline habitat degradation and loss.

168

Individually and in aggregate, these processes or anthropogenic stressors have reduced the environmental quality of the subtidal ecosystem. The subtidal restoration projects selected by the Trustees, aim to reverse a portion of these negative effects. Projects were selected with the primary goal of creating positive benefits in the face of the numerous anthropogenic stressors described above. All selected and second tier subtidal restoration projects are anticipated to have beneficial effects. Any adverse effects would be temporary and minor, and are not anticipated to cumulatively have any substantial adverse effects on subtidal resources within the project area.

### 6.4.3  Bird and Marine Mammal Projects

Unlike shoreline and subtidal habitats, birds and marine mammals travel widely within and outside of the spill-affected area, and the restoration projects selected to benefit these species are likewise located both within and outside of the spill-affected area, in places where the projects can have the greatest benefits. The selected projects will create positive benefits to birds and mammals in the face of anthropogenic effects, such as the ones described above. In many cases, restoration projects were selected to counter-act negative effects that existing human activities are having on bird and mammal resources.

***Cumulative Impacts Issues***

All selected bird and mammal restoration projects are anticipated to have beneficial effects. Any adverse effects would be temporary and minor, and are not anticipated to cumulatively have any substantial adverse effects on bird and mammal resources within the project area.

***Geographic Scope of Restoration Projects***

Projects are proposed to occur along the California mainland coast of Santa Barbara, Ventura, and Los Angeles Counties, and on the Channel Islands.

***Timeframe for project Implementation***

After the Final DARP/EA is released, projects are anticipated to begin within one year, and will be implemented for a period between five and ten years.

Other actions affecting the resources, ecosystems, and human communities of concern: Environmental quality in the project areas has been affected by a number of anthropogenic stressors grouped into four categories as follows:

1.  *Modification of the coastline.* Extensive modification and human use of the shoreline has drastically changed the use of the coastline by birds and marine mammals. Bird and mammal breeding activities are not well-tolerated by human disturbance, and so many birds and mammals have adjusted the location of breeding to move away for areas that humans have modified and inhabited.

169

2. *Fishing gear entanglement.* As described elsewhere in this document, fishing hook and line injuries are by far the leading source of anthropogenic injury to seabirds brought to rehabilitation centers in Los Angeles and San Francisco.

3. *Harmful algal blooms.* Harmful algal blooms, such as the acute proliferation of plankton that produce the neurotoxin domoic acid, are becoming somewhat more frequent in southern California. These acute harmful algal blooms affect birds and mammals, often lethally.

4. *Changing environmental conditions.* Warmer ocean waters in the southern California area in the past decade have effects on upwelling and primary productivity, which has cascading effects up the food chain. Low prey availability for birds and mammals has caused increased mortality due to starvation.

The selected projects aim to to create positive benefits to birds and mammals in the face of anthropogenic effects, such as the ones described above. In many cases, restoration projects were selected to counter-act negative effects that existing human activities are having on bird and mammal resources.

## 6.4.4  Human Uses

Human uses along the shoreline are comprised of a variety of activities including boating, camping, surfing, general beach use, and other forms of recreation. The Trustees believe that, overall, the alternatives selected in this restoration plan, when considered along with past and reasonably foreseeable future projects, will have long term local and regional beneficial impacts to natural resources and recreation. Any negative impacts are anticipated to be short term, and minor.

### Cumulative Impacts Issues

The proposed projects to improve human uses have not yet been selected and will be the subject of a future decision process. However, we anticipate that the benefits of these projects will significantly enhance recreational opportunities along the shoreline. Some projects may create a temporary closure or re-routing of coastal access. For example, one possible project is improved beach access from Ellwood Mesa to Ellwood Beach. Currently, there is a steep dirt trail, which could be improved by the installation of a ramp or staircase to provide safe public access. While the construction of this project may create a month or longer temporary closure of the trail, the completed project will ultimately improve coastal access and provide recreational benefits for many years to come.

### Geographic Scope of Restoration Projects

Projects are proposed to occur along the California coast of Santa Barbara, Ventura, and Los Angeles Counties.

**Timeframe for project Implementation:** CDPR will select projects that will enhance camping and/other shoreline recreational activities associated with units of CDPR from Gaviota to El

170

Capitan at State Beaches. A grants program will be initiated to solicit and select proposals for remaining projects to compensate for lost recreation. The Trustees anticipate that projects would be implemented for a period between one and eight years after the grant program has begun.

***Other actions affecting the resources, ecosystems, and human communities of concern***

In many areas of the coastline within Santa Barbara, Ventura, and Los Angeles Counties, access to the coastline for recreation is precluded or curtailed due to private ownership of coastal property and potential access points. As part of the restoration project selection criteria [in Section 4.2], recreational use projects will be selected and prioritized based on the degree to which they provide positive benefits to recreation in the face of numerous conflicting private and public interests. For example, projects will be selected to ameliorate limitations that exist for public access due to private ownership or limited beach access points. All proposed projects are anticipated to have beneficial effects for human uses within the affected area. Any adverse effects would be temporary and minor, and would not be anticipated to have any substantial adverse cumulative effects. The types of human use projects that are anticipated to be implemented through this plan are generally described by the categories below. When specific projects are selected for implementation, project-specific environmental reviews will be completed and assess the impacts of each project to the environment. Types of projects being considered to be selected by the Trustees may be grouped into the following four categories:

1. Shoreline Access and Amenity Improvements. Create, improve, and maintain access or otherwise improve recreational enjoyment of a day use recreation sites and public amenities that are both adjacent to land along the coast or and on the water. This includes, but is not limited to:
   - Trail improvement;
   - Pier repair, construction and accessibility improvements;
   - Boardwalk repair, construction, and accessibility improvements;
   - Boat launch repair, construction, and accessibility improvements;
   - Beach sand management;
   - Parking improvements at day use recreation sites
   - General infrastructure upgrades that can facilitate access;
   - Signage designed to enhance recreational experience; and
   - Infrastructure upgrades that improve recreational enjoyment of shoreline recreation sites, including locations where on-water recreation is initiated (e.g., dive sites, boat launches, harbors, marinas).

2. Camping. Add, improve, and maintain camping amenities and associated day use amenities at campgrounds. This includes, but is not limited to:
   - Benches and/or picnic facilities;
   - Fire rings;
   - Restrooms/showers;
   - Parking lot improvements;

171

- Fish/bait cleaning stations, fishing rod holders;
- Interpretive programs and/or signage;
- Shoreline access improvements at campground sites; and
- General infrastructure improvements that increase the efficiency, utilization, or enjoyment of campground amenities.

3. Recreational Programs. Programs including but not limited to:
- Guided trips;
- Education aimed at increasing public utilization of shoreline and on-water recreation resources; and
- Equipment that supports recreation programs (e.g., kayaks, fishing gear).

4. Research, Education, and Outreach at University of California, Santa Barbara property.

The Trustees believe that, overall, the alternatives selected in this restoration plan, when considered along with past and reasonably foreseeable future projects, will have long term local and regional beneficial impacts to natural resources, as well as short term, minor negative impacts to human uses.

172

# References

*Documents that are in the Refugio Beach Oil Spill Natural Resource Damage Assessment
Administrative Record  (RBOS NRDA AR) can be accessed here:*
[https://www.diver.orr.noaa.gov/web/guest/diver-admin-record?diverWorkspaceSiteId=6104](https://www.diver.orr.noaa.gov/web/guest/diver-admin-record?diverWorkspaceSiteId=6104)

Altstatt, J., R. Ambrose, J. Carroll, J. Coyer, J. Wible, and J. Engle. 2014. Eelgrass meadows
return to Frenchy's Cove, Anacapa Island: recovery ten years after successful transplantation.
Monographs of the Western North American Naturalist 7:500-517.

Barron M.G. 2017. Photoenhanced toxicity of petroleum to aquatic invertebrates and
fish. Archives of Environmental Contamination and Toxicology 73:40–46.

Baker G. 2018. Summary of the Trustees' Analysis of the Volume of Line 901 Oil Released to
the Ocean. National Oceanic and Atmospheric Administration. Refugio Beach Oil Spill NRDA
Administrative Record.

Barringer, D. 2015. Final 2015 breeding season monitoring report for Western Snowy Plover and
California Least Tern. Submitted to U.S. Fish and Wildlife Service, Region 8, Ventura,
California. Refugio Beach Oil Spill NRDA Administrative Record.

Beeler, H. 2009. Community succession in macroalgal wrack: implications for prey resources of
breeding western snowy plovers (*Charadrius alexandrines nivosus*) on Northern California
beaches. Thesis presented to Humboldt State University, Arcata, California.

California Department of Fish and Wildlife. 2016. Refugio oil spill response evaluation report:
summary and recommendations from the Office of Spill Prevention and Response. Office of
Spill Prevention and Response, Sacramento, California. Refugio Beach Oil Spill NRDA
Administrative Record

Carretta, J.V., K. Danil, S. J. Chivers, D.W. Weller, D.S. Janiger, M. Berman-Kowalewski, K.M.
Hernandez, J.T. Harvey, R.C. Dunkin, D.R. Casper, S. Stoudt, M. Flannery, K. Wilkinson, J.
Huggins, and D.M. Lambourn. 2015. Carcass recovery rates of California coastal bottlenose
dolphins. Marine Mammal Science 32:349-362.

Conway-Cranos, L.L. 2012. Geographic variation in resilience: an experimental evaluation of
four rocky intertidal assemblages. Marine Ecology Progress Series 457:67-83.

Coal Oil Point Reserve. 2015. Final Report on the Western Snowy Plovers. University of
California Natural Reserve System, Santa Barbara, California. Refugio Beach Oil Spill NRDA
Administrative Record.

Davidson, A.D., A.K. McEachern, T.J. Coonan, W.T. Bean, A.J. Armstrong, and B.R. Hudgens.
2014. Channel Islands National Park: natural resource condition assessment. Natural Resource

173

Technical Report NPS/CHIS/NRTR—2014. National Park Service, Fort Collins, Colorado. Refugio Beach Oil Spill NRDA Administrative Record.

Del Sontro, T.S., I. Leifer, B.P. Luyendyk, and B.R. Broitman. 2007. Beach tar accumulation, transport mechanisms, and sources of variability at Coal Oil Point, California. Marine Pollution Bulletin 544:1461-1471.

Donohoe, R., and B. Joab. 2018. Shoreline assessment data summary. Prepared by the California Department of Fish and Wildlife, Office of Spill Prevention and Response, Sacremento, California. Refugio Beach Oil Spill NRDA Administrative Record.

Duerr, R. 2016. Assessment of anthropogenic injuries to California brown pelicans and other seabirds received by International Bird Rescue's Los Angeles and San Francisco Bay Wildlife Centers 2002-2015. International Bird Rescue, Fairfield, California. Prepared for California Department of Fish and Wildlife, Office of Spill Prevention and Response. Refugio Beach Oil Spill NRDA Administrative Record.

Dugan, J.E. 2018. Population survey results on intertidal talitrid amphipods for the Refugio Beach Oil Spill NRDA. Prepared for Refugio NRDA. Refugio Beach Oil Spill NRDA Administrative Record.

Dugan, J.E., D.M. Hubbard, M.D. McCrary, and M.O. Pierson. 2003. The response of macrofauna communities and shorebirds to macrophyte wrack subsidies on exposed sandy beaches of southern California. Estuarine, Coastal, and Shelf Science 2003:25-40.

English, E. 2010. Damage Estimate for Shoreline Recreation. Report prepared for Cosco Busan NRDA. Refugio Beach Oil Spill NRDA Administrative Record.

Fiorello, C., P. Jodice, J. Lamb, Y. Satge, K. Mills-Parker, D. Jaques, L. Henkel, R. Golightly, and M. Ziccardi. 2017. Post-release monitoring of oiled brown pelicans from the 2015 Refugio oil spill. International Oil Spill Conference Proceedings 2017:605-617.

Ford, R.G., M.L. Bonnell, D.H. Varoujean, G.W. Page, H.R. Carter, B.E. Sharp, D. Heinmann and J.L. Casey. 1996. Total direct mortality of seabirds from the Exxon Valdez oil spill. American Fisheries Society Symposium 18:684-711.

Frangis, A., and N. Cox. 2015. Western snowy plover annual report 2015. California State Parks, Channel Coast District, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Gornik, K., T. Lin, G. McDonald, N. Ng, C. Quigley, and D. Viana. 2013. The non-market value of private recreational boating in the Channel Islands National Marine Sanctuary. Bren School of Environmental Science & Management, University of California, Santa Barbara.

174

Hanemann, M., L. Pendleton, C. Mohn, J. Hilger, K. Kurisawa, D. Layton, and F. Vasquez. 2004. Using revealed preference models to estimate the effect of coastal water quality on beach choice in Southern California. University of California, Berkeley. Prepared for the U.S. National Oceanic and Atmospheric Administration.

Hartley, C. 2015. Western snowy plover and California least tern breeding survey. Submitted to U.S. Fish and Wildlife Service, Region 8, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Hornafius, J.S., D. Quigley, B.P. Luyendyk. 1999. The world's most spectacular marine hydrocarbon seeps (Coal Oil Point, Santa Barbara Channel, California): quantification of emissions. Journal of Geophysical Research 104:20703-20711.

Hubbard, D. and J. Dugan. 2016. Refugio Beach Oil Spill Shoreline Clean Up Effort Data Report 30 Aug 2016. Refugio Beach Oil Spill NRDA Administrative Record.

Jaques, D.L. and D.W. Anderson. 1987. Conservation implications of habitat use and behavior of wintering Brown Pelicans. Page 49. Unpublished report. PSRDP program, University of California Davis, Davis, California

Jaques, D. L., P. J. Capitolo, and J. N. Davis. 2015. Brown pelican roost aerial photographic survey report.. Prepared by Pacific EcoLogic, Astoria Oregon, and Colibri Ecological Consulting, Fresno, California. Refugio Beach Oil Spill NRDA Administrative Record.

Jeffrey, A. 2016. Refugio Incident—Goleta CA. Page 19. Responsible Party Technical Report for Response. Prepared for CTEH, Arvada, Colorado. Refugio Beach Oil Spill NRDA Administrative Record.

Junak, S. and R. Philbrick. 2018. The flowering plants and ferns of Anacapa Island, California. Western North American Naturalist 78:652-673.

Larramendy, P.T., J.A. Howard, A.J. Duvall, D.M. Maxurkiewicz, M.W. Parker, C. Carter, F. Gress, and D.W. Anderson. 2018. Breeding status of the California brown pelican on Anacapa and Santa Barbara Islands, California, in 2015 and 2016. Unpublished report. Prepared byCalifornia Institute of Environmental Studies, Ventura, California. Refugio Beach Oil Spill NRDA Administrative Record.

Lorenson, T.D, F.D. Hostettler, R.J. Rosenbauer, K.E. Peters, K.A. Kvenvolden, J.A. Dougherty, C.E. Gutmacher, F.L. Wong, and W.R. Normark. 2009. Natural offshore seepage and related tarball accumulation on the California coastline; Santa Barbara Channel and the southern Santa Maria Basin; source identification and inventory. Page 116 and spreadsheets. U.S. Geological Survey Open-File Report 2009-1225 and MMS report 2009-030. U.S. Geological Survey, Menlo Park, California. Refugio Beach Oil Spill NRDA Administrative Record.

Lorenson, T.D., I. Leifer, F.L. Wong, R.J. Rosenbauer, P.L. Campbell, A. Lam, F.D. Hostettler, J. Greinert, D.P. Finlayson, E.S. Bradley, and B.P. Luyendyk. 2011. Biomarker chemistry and flux quantification methods for natural petroleum seeps and produced oils, offshore southern California. Page 45. U.S. Geological Survey Scientific Investigations Report 2011-5210 and Bureau of Ocean Energy Management OCS Study BOEM 2011-016. Pacific Coastal Marine Science Center, Santa Cruz, California. Available at https://pubs.usgs.gov/sir/2011/5210/

Martin, K.L. 2015. Beach-spawning fishes, reproduction in an endangered ecosystem. CRC Press, Boca Raton, Florida.

McClatchie, S., J. Field, A.R. Thompson, T. Gerrodette, M. Lowry, P.C. Fiedler, W. Watson, K.M. Nieto, and R.D. Vetter. 2016. Food limitation of sea lion pups and the decline of forage off central and sourthern California. Royal Society Open Science 3: 2-9.

McGinnis, M. V., R.R. Cordero, and M. Stadler. 2004. Tribal Marine Protected Areas: Protecting Maritime Ways and Practice, A Special White Paper for the Wishtoyo Foundation. Bioregional Planning Associates, Santa Barbara, California

Michel, J. 2015. Sunken oil assessment survey results: Refugio incident. Report prepared for the Incident Command, Santa Barbara, California.  Refugio Beach Oil Spill NRDA Administrative Record

Morris, J.M., H.P. Forth, C.R. Lay, R. Takeshita, and J. Lipton. 2015. Toxicity of thin floating oil slicks to fish and invertebrates. DWH-AR0280221. Technical Report for Deepwater Horizon Trustees. Prepared for National Oceanic and Atmospheric Administration, Washington, D.C.

Moskoff, W. 2000. The impact of oil spills on birds: Looking back at the Exxon Valdez. Birding February 2000: 44-49.

National Marine Fisheries Service. 2012. Southern California Steelhead Recovery Plan. Southwest Region, Protected Resources Division, Long Beach, California.

National Park Service 2019. Invasive Plant Treatments. Categorical Exclusion Form, issued February 22, 2019. Channel Islands National Park, Ventura, California.  Refugio Beach Oil Spill NRDA Administrative Record

National Oceanic Atmospheric Administration. 2016. 2015 state of the climate: El Niño came, saw, and conquered. Climate.gov, National Oceanic Atmospheric Administration, 2 August 2016. Available: <https://www.climate.gov/news-features/understanding-climate/2015-state-climate-el-ni%C3%B1o-came-saw-and-conquered>

176

Nishimoto, M.M., L. Washburn. 2002. Patterns of coastal eddy circulation and abundance of pelagic juvenile fish in the Santa Barbara Channel, California, USA. Marine Ecology Progress Series 241: 183-199.

Nixon, Z. 2018. Refugio Beach oil spill shoreline oil exposure quantification technical report. Prepared for California Department of Fish and Wildlife, Oil Spill Prevention and Response, Santa Barbara, California. Refugio Beach Oil Spill Administrative Record

Nocerino, E., J. M. Erlandson, J. Smallwood, C. G. Lebow, and A. M. Muns. 2016. Cultural resource monitoring and impact assessment Plains All American pipeline Refugio oil spill response, Santa Barbara County, California. Prepared for Plains All American Group LLC., Bakersfield, California.

Office of Environmental Health Hazard Assessment. 2015. Risk assessment of seafood consumption following the Refugio Beach Oil spill incident in Santa Barbara County, California. Page 44. Office of Environmental Health Hazard Assessment, California Environmental Protection Agency, Sacramento, California,Refugio Beach Oil Spill NRDA Administrative Record

Office of National Marine Sanctuaries. 2019. Channel Islands National Marine Sanctuary 2016 Condition Report. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Office of National Marine Sanctuaries, Silver Spring, MD. pp. 182-203

Oka, N. and M. Okuyama. 2000. Nutritional status of dead oiled rhinoceros auklets (*Cerorhinca monocerata*) in the Southern Japan Sea. Marine Pollution Bulletin 40:340-347.

Oiled Wildlife Care Network. 2015. OWCN oiled animal data log for the Refugio Beach oil spill. OWCN, Davis, California. Refugio Beach Oil Spill NRDA Administrative Record.

Page, G.W., H.R. Carter, R.G. Ford. Numbers of seabirds killed or debilitated in the 1986 Apex Houston oil spill in central California. 1990. Studies in Avian Biology 14:164-174.

Planning and Development Department, County of Santa Barbara. 2016. Gaviota Coast Plan. Available: < https://www.countyofsb.org/plndev/policy/communityplans/gaviota.sbc>

Raimondi, P., C. Bell, K. Ammann, R. Gaddam, D. Lohse, M. Douglas, M. George, N. Fletcher, L. Anderson, M. Miner. 2019. Assessment of potential impacts to rock intertidal community following the Refugio Beach Oil Spill, Santa Barbara County. Report prepared for California Department of Fish and Wildlife, Oil Spill Prevention and Response, Santa Barbara, California. Refugio Beach Oil Spill NRDA Administrative Record.

Southern California Coastal Ocean Observing System. 2019. El Niño. Southern California Coastal Ocean Observing System, La Jolla, California. Available: <http://sccoos.org/data/el-nino/>

177

Schiel, D.R. and M.S. Foster. 2015. The biology and ecology of giant kelp forests. University of California Press, Oakland, California.

Schulhof, M. and Grifman, P. 2019. Workshop report: Improving oil spill preparedness and response in Santa Barbara, CA. USCSG-TR-01-2019.

Sea Grant Network. 2018. Traditional and Local Knowledge: A Vision for the Sea Grant Network. NOAA.

Stephens J., D. Pondella, J. Steinbeck , J. Carrol, M. Love. 2016. Biography of the trawl-caught fishes of California and an examination of the point conception faunal break. CalCOFI Report 57:89-108.

Stout, S.A. 2016. Refugio Beach oil spill NRDA investigation: trustees forensic oil source analyses. Page 61. Refugio Beach Oil Spill NRDA Administrative Record.

Stout, S.A., D.L. Valentine, and C.M. Reddy. 2018. Refugio Beach oil spill NRDA investigation: supplemental chemical fingerprinting assessment. Page 83Refugio Beach Oil Spill NRDA Administrative Record.

Tumamait-Stenslie, J. 2014. Chumash story: the rainbow bridge. WilderUtopia, Los Angeles, California. Available: <https://www.youtube.com/watch?v=w0iyd68oBok>

U.S. Coast Guard. 2016. Refugio Beach Oil Spill Santa Barbara County, California Federal On-scene Coordinator's After Action Report. Page 47. U.S. Coast Guard, Sector Los Angeles, California.  Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Coast Guard. 2017. Refugio Incident Closeout and Disestablishment of Unified Command memo. U.S. Coast Guard, Sector Los Angeles, California. Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Department of Transportation. 2016. Plains Pipeline, LP, Line 901 Crude Oil Release, May 19, 2015, Santa Barbara County, California. Failure Investigation Report. Refugio Beach Oil Spill NRDA Administrative Record.

U.S. Fish and Wildlife Service. 2005. Recovery plan for the tidewater goby (*Eucyclogobius newberryi*). U.S. Fish and Wildlife Service, Pacific Region 1, Portland, Oregon.

Valentine, D.L. 2015.  Forensic hydrocarbon analysis conducted in response to the Line 901 rupture at Refugio. Unified Command report. Prepared by Valentine Scientific and Consulting Services, Inc., Goleta, California. Refugio Beach Oil Spill NRDA Administrative Record.

178

Valentine, D.L. 2017. Latent transport of floating oil aggregates to California offshore waters, from the Line 901 rupture at Refugio: a compilation of evidence. Page 18. NRDA Technical Report.Refugio Beach Oil Spill NRDA Administrative Record.

Valentine, D.L. 2019. Benthic oiling from the 19 May 2015 Line 901 rupture at Refugio: a compilation of evidence. Page 14. NRDA Technical report. Refugio Beach Oil Spill NRDA Administrative Record.

Williams, S.L. 1995. Surfgrass (*Phyllospadix torreyi*) reproduction: reproductive phenology, resource allocation, and male rarity. Ecology Society of America 76:1953-1970.

Personal Communications
Altstatt, J. 2018. Long-term Monitoring Program and Experiential Training for Students Coordinator, National Marine Sanctuaries, Santa Barbara, California.

179

# Preparers

The following Trustees participated in the development of this DARP/EA:

**California Department of Fish and Wildlife, Office of Spill Prevention and Response**

Michael Anderson

Bruce Joab

Regina Donohoe

Matthew Zafonte

Bryand Duke

Steve Hampton

Katherine Verrue-Slater

**National Oceanic and Atmospheric Administration**

Laurie Sullivan

Robert Ricker

Mathew Dorsey

David Witting

Gregory Baker

Natalie Cosentino-Manning

Jennifer Boyce

Christopher Plaisted

**US Department of the Interior**

Clare Cragan

**US Fish and Wildlife Service**

Jenny Marek

Tobias McBride

Damian Higgins

Colleen Grant

**University of California State Barbara**

David Hubbard

Jenifer Dugan

Cristina Sandoval

Barton Lounsbury

**California State Parks**

Nathaniel Cox

Laura Reimche

180

# Acknowledgements

The Trustees acknowledge and thank the following individuals for providing expertise during injury assessment and restoration planning:

**GOVERNMENT AGENCIES:**

**California Department of Fish and Wildlife**
Laird Henkel
April DaSilva
Julia Coates
Kenneth Oda
Kimberly Walker
Ryan Denton
Heather Gliniak
Otis Horning
Carlos Mireles
Marsa Morse
Derek Stein
Rebecca Flores-Miller
Michael Prall
Steven Gibson

**California Office of Environmental Health Hazard Assessment**
Beckye Stanton
Susan Klasing

**California State Lands Commission**
Sara Mongano

**California State Parks**
Alexis Frangis
Brooke Sheridan

**National Oceanic and Atmospheric Administration**
Amy MacFadyen
Stacie Smith
Bernadita Anulacion
Chris Barker
Gina Ylitalo
John Incardona
Adam Domanski

**National Oceanic and Atmospheric Administration**
Ben Shorr
Sarah Wilkin
Nick Kellar

**U.S. Fish and Wildlife Service**
Lena Chang
Colleen Draguesku
Kendra Chan
Cathy Johnson
Carolyn Marn
Janet Whitlock
Jeff Phillips
Lilian Carswell
Cat Darst
Chris Kofron
Eric Morrissette
Mary Root
Roger Root
Ashley Spratt
Hazel Rodriguez
Carol Roberts
Katie Zeeman
Annie Little

**Bureau of Land Management**
Dave Ledig
Bill Standley
Jim Weigand

**National Park Service**
Russell Galipeau
David Kushner
Joshua Sprague
Stephen Whitaker
Ken Convery
David Mazurkiewicz

181

**County of Santa Barbara**
Dianne Black
Kathryn Lehr

**City of Goleta**
Anne Wells
Andy Newkirk

**TRIBES:**
*Santa Ynez Band of Chumash Indians*
Freddie Romero
Armenta Rose

**UNIVERSITIES:**
**University of California Davis,**
**Oiled Wildlife Care Network**
Mike Ziccardi
Kirsten Gilardi

**University of California Santa Cruz**
Pete Raimondi

**Pepperdine University**
Karen Martin

**PRIVATE ORGANIZATIONS:**
**Environmental Defense Center**
Linda Krop
Kristen Hislop

**Santa Barbara Channelkeepers**
Kira Redmond
Ben Pitterle
Jenna Driscoll

**NewFields Government Services**
Scott Stout

**Makepeace Environmental Solutions**
Chris Reddy

**Valentine Scientific and Consulting Services**
David Valentine

**Tenera Environmental Services**
Scott Kimura
Jessie Altstatt

**Industrial Economics**
Chris Leggett
Eric Horsch
Mark Curry

182

**Appendix A.   Oil Fate and Transport**

**Appendix B.   Data Management and Access**

**Appendix C.   Resource Equivalency Analysis**

**Appendix D.   Shoreline Exposure and Injury Evaluation Studies**

**Appendix E.   Supplemental Bioassay Report Information**

**Appendix F.   Shoreline Habitat Equivalency Analysis**

**Appendix G-1. Fish, Invertebrate, and Other Mortality Observations**

**Appendix G-2. Field and Laboratory Assessment of Injury to Grunion**

**Appendix G-3. Assessment of Surfperch Exposure**

**Appendix G-4: Oil Exposure and Potential Effects to Fish, Invertebrate Early Life Stages, and Kelp**

**Appendix G-5: Changes in the Condition of Surfgrass and Macroalgae**

**Appendix G-6: Field Assessment of Subtidal Exposure**

**Appendix G-7: Polycyclic Aromatic Hydrocarbons in Nearshore Fish and Invertebrate Tissues**

**Appendix H.   Subtidal Injury Quantification and Habitat Equivalency Analysis**

**Appendix I.   Bird Injury Assessment**

**Appendix J.   Marine Mammal Exposure, Injury, and Restoration**

**Appendix K.   Recreational Camping Damages**

**Appendix L.   Recreational Shoreline Use Damages**

**Appendix M.   Recreational Boating and Offshore Use Damages**

**Appendix N.   Summary of Proposed Restoration Projects**

**Appendix O.   Response to Public Comments on the Draft Damage Assessment and Restoration Plan/Environmental Assessment (DARP/EA)**

183

# EXHIBIT B



U.S. Department
Of Transportation

**Pipeline and
Hazardous Materials
Safety Administration**

1200 New Jersey Ave., SE
Washington, DC 20590

May 18, 2016

Mr. Bob Gorham
Program Manager/Supervising Pipeline Safety Engineer
Pipeline Safety Division
California State Fire Marshal
3500 Paramount Boulevard, Suite 210
Lakewood, CA 90712

Dear Mr. Gorham:

This letter serves to memorialize the understanding between the Pipeline and Hazardous
Materials Safety Administration (PHMSA) and the California State Fire Marshal (CASFM) with
respect to the transfer or regulatory oversight over Plains Pipeline, LP's (Plains) Lines 901 and
903 located in Santa Barbara County, California.

On May 19, 2015, Plains' Line 901 pipeline ruptured, releasing approximately 2,934 barrels of
heavy crude oil into the environment (Failure). As a result, Line 901 and Line 903, which carries
all of Line 901's crude oil throughput, were shut down.[1] Two days later, on May 21, 2015,
PHMSA issued a Corrective Action Order (CAO) shutting down Line 901 and requiring
immediate remedial actions. PHMSA has since amended the CAO twice,[2] requiring, among
other actions, a shutdown of Line 903 between Gaviota and Pentland Station. Both lines remain
shut down as of the date of this letter. PHMSA is currently conducting an investigation into the
cause of the Failure.

Prior to the accident, Plains operated Lines 901 and 903 as interstate pipelines under Federal
Energy Regulatory Commission (FERC) tariffs and were subject to PHMSA's regulatory,
inspection and enforcement jurisdiction. After the Failure, Plains cancelled its FERC tariffs on
Line 901 and Line 903. Specifically, it cancelled its FERC tariff on Line 901 on February 12,
2016, and Line 903 on April 29, 2016 (collectively, Transfer Dates). Effective as of the Transfer
Dates, Lines 901 and 903 are now considered intrastate hazardous liquid pipelines subject to the
regulatory and enforcement jurisdiction of CASFM, pursuant to state certification from PHMSA.

---

[1]  Lines 901 and 903 provide transportation service from Santa Barbara County to Pentland Station, Kern County.

[2]  The first amendment was issued on June 3, 2015, and the second was issued on November 12, 2015.

2 | P a g e
**Mr. Bob Gorham**
**California State Fire Marshal**

The post-accident transfer of regulatory authority from PHMSA to CASFM does not affect or otherwise impact PHMSA's ongoing investigation(s) of, and any enforcement action(s) related to, the Failure or to any other events involving the operation of Lines 901 and 903 occurring prior to the Transfer Dates. As a result, PHMSA will continue to assert its enforcement authority with respect to all actions and incidents occurring on Lines 901 and 903 prior to the Transfer Dates. CASFM, meanwhile, will exercise jurisdiction over any actions or events related to Lines 901 and 903 occurring after the Transfer Dates. CASFM will continue to implement and enforce the federal minimum pipeline safety regulations relating to Lines 901 and 903 beginning as of the Transfer Dates, and may adopt and enforce additional or more stringent standards for intrastate hazardous liquid pipelines under 49 U.S.C. § 60104(c). PHMSA and CASFM will cooperate and collaborate with each other, as necessary, on PHMSA's investigatory and enforcement activities relating to the Failure and on any other matters relating to Lines 901 and 903.

More specifically, PHMSA will be responsible for:

- Completing and finalizing the root-cause investigation of the Failure ;
- Issuing and finalizing any enforcement actions arising out of the investigation and any other events occurring prior to the Transfer Dates, including, but not limited to, the following types of actions: Notice of Probable Violation, Proposed Civil Penalty, Proposed Compliance Order, and/or Corrective Action Order (CAO), etc.;
- Completing the CAO issued to Plains on May 21, 2015, and any amendments thereto, and issuing any future CAOs related to the Failure;
- Collaborating with CASFM on any additional or modified safety requirements that may be needed in connection with any CAO that has been or may be imposed by PHMSA relating to Lines 901 and 903, including any potential re-start of the pipelines; and
- Transitioning full regulatory authority from PHMSA to CASFM once all PHMSA investigations and enforcement actions have been completed and closed.

CASFM will be responsible for:

- Including Lines 901 and 903 in CASFM's Annual Inspection Program (SB 295);
- Including Lines 901 and 903 in CASFM's Leak Detection Program (AB 864);
- Including Line 901 in the CASFM Higher Risk pipeline program, due to the release and absence of effective Cathodic Protection. This will require the pipeline to be tested annually for 5 years; and
- Exercising authority over Lines 901 and 903 under existing and future regulations established by CASFM.

If either pipeline is replaced rather than repaired, such work will be considered new construction, and the design, construction, operation, and maintenance would fall under the regulatory authority of the CASFM.

**3 |** P a g e
**Mr. Bob Gorham**
**California State Fire Marshal**

This Letter Agreement is subject to change based on any future events or newly-discovered facts that may impact any terms set forth herein.  Please sign below and email me a PDF of the signed letter to zach.barrett@dot.gov.  Thank you for your assistance and cooperation in this matter.

Sincerely,

Zach Barrett
Director for State Programs
Office of Pipeline Safety

ACKNOWLEDGED:

Bob Gorham
Program Manager/Supervising Pipeline Safety Engineer
Pipeline Safety Division
California State Fire Marshal

# EXHIBIT C



**U.S. Department
of Transportation**

**Pipeline and
Hazardous Materials
Safety Administration**

**Failure Investigation Report**

**Plains Pipeline, LP, Line 901**
**Crude Oil Release, May 19, 2015**
**Santa Barbara County, California**

**May 2016**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Table of Contents

Executive Summary ................................................................................................................ 3

Final Report Methodology ..................................................................................................... 4

Facility Background ................................................................................................................ 4

Events Immediately Prior to and During the Crude Oil Release ........................................... 6

Plains' Field Response and National Response Center Notifications .................................... 7

PHMSA's Corrective Action Order ....................................................................................... 9

Pipeline Alignment ................................................................................................................ 9

  Las Flores Station to Gaviota Station Line 901 Elevation Description .............................. 9

  Gaviota to Pentland Station Line 903 Elevation Description ........................................... 10

Post-Incident Investigation Results ...................................................................................... 11

  Metallurgical Evaluation of Failed Pipe ......................................................................... 11

  In-Line Inspection Survey Review .................................................................................. 12

     Number of Anomalies ................................................................................................ 13

  Cathodic Protection Findings ........................................................................................... 13

  Spill Volume Estimate from Plains' Third-Party Consultant ......................................... 13

Investigation Findings and Conclusions .............................................................................. 14

  Proximate or Direct Cause ............................................................................................... 14

  Contributory Causes ........................................................................................................ 14

PHMSA Post-Incident Action Chronology ......................................................................... 18

Appendices ........................................................................................................................... 20

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Executive Summary

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl) of heavy crude oil.[i]  An estimated 500 bbl of crude oil entered the Pacific Ocean.  Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station.  On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901.  Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release.  As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified.  On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan.[ii] No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline

- The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.

- The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2) Failure by Plains to detect and mitigate the corrosion

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

3) Lack of timely detection of and response to the rupture

- The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.

- Control room staff did not detect the abnormal conditions in regards to the release as they occurred.  This resulted in a delayed shutdown of the pipeline.

- The pipeline controller restarted the Line 901 pipeline after the release occurred.

- The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report. PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage. PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## Final Report Methodology

PHMSA conducted relevant interviews, gathered and reviewed numerous historical documents and available records, and performed a thorough review of the Plains Control Room in Midland, TX. An ILI subject matter expert (SME) was hired to review the raw magnetic flux leakage (MFL) data and final vendor reports from the MFL surveys, and evaluated Plains actions as a result of their review of the vendor reports. PHMSA issued a CAO which in part instructed Plains to have the failed pipe examined by a PHMSA-approved metallurgical laboratory and to have a root cause failure analysis (RCFA) performed by a third party independent consultant.

The factual evidence reviewed includes: the Plains Integrity Management Plan (IMP), CP records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures and reports obtained from the pipeline operator and PHMSA SMEs.

The arrangement of this report provides a general description of the pipeline system, the events that occurred on the day of the release, and acts or omissions of the operator that led to this failure and release of crude oil. Specific evidence is supplied and pertinent statements from each report are excerpted where appropriate.

## Facility Background

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

(1) Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel

Page 4 of 21

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam.  The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.



**Figure 1.** Map of Plains' Western Division Pipelines.  The arrow points to the approximate release site on Line 901.

At Sisquoc Station, crude oil can be pumped to one of two locations: a nearby refinery via a 12-inch diameter pipeline operated by Phillips 66, or continue down Line 903 to Pentland Station. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream.  At Emidio Station crude oil is delivered to above-ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.

Prior to the May 19, 2015 release, there had been four small releases meeting PHMSA reportable criteria at pump stations on Lines 901 and 903. No releases were reported to PHMSA on the pipelines outside of pump stations prior to 2015.  The  operator reported maximum operating pressure (MOP) of Line 901 is 1,341 psig.

At the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 and Line 903 under a Federal Energy Regulatory Commission (FERC) certificate  of economic regulatory jurisdiction that was issued in 1987.  Plains Pipeline, LP, is a subsidiary of PAAPL.  Based on the FERC filing, Lines 901 and 903 were classified as interstate  pipelines, pursuant to 49 U.S.C. § 60101(7), as facilities used to transport hazardous liquid in  interstate or foreign commerce, and as such, were regulated by PHMSA as interstate pipelines. Plains cancelled the FERC certificates for Lines 901 and 903 on February 12, 2016 and April 29, 2016,

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

respectively, stating that the transportation service was no longer available in interstate commerce. Line 903 from Gaviota to Sisquoc to Pentland Stations was purged with nitrogen in accordance with Amendment No. 2 to the CAO, and remains shut down between these stations. The Pentland to Emidio segment of Line 903 is active and operating intermittently at low pressures. This section of pipe between Pentland and Emidio is not directly connected to the Gaviota to Pentland segment and is used to transport crude product from breakout tanks in Pentland Station.

## Events Immediately Prior to and During the Crude Oil Release

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 bbl per hour (BPH) leaving the Las Flores Station, and the discharge pressure was approximately 575 psig.  Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903.  A Plains instrumentation and electrical technician was dispatched that morning to disconnect and remove a motor from a non-operational pump at the Sisquoc Station.  While the technician was performing his work, the operational pump (Pump 401) at the Sisquoc Station was shut down unintentionally (i.e., "uncommanded").  When Pump 401 on Line 903 stopped operating, the pressure in Line 901 increased. The pressure rose to a maximum of 696 psig at the Las Flores Station discharge.  The controller shut down the pump at Las Flores Station and the pressure remained at 677 psig.  Approximately four minutes later, the pump at Las Flores Station was restarted.  At approximately 10:55 a.m. PDT, the flow rate at Las Flores Station climbed from zero to 2,042 BPH.  Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the Las Flores pump was shut down a second and final time.  Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release.  PHMSA has determined that Pump 401 going offline in an "uncommanded" manner on the morning of May 19, 2015, was an abnormal event, but that this in itself should not have caused Line 901 to rupture.

PHMSA performed a detailed review of the SCADA event and alarm logs, and pressure and flow records.  The review indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure.  The alarm was not set at an appropriate value.  The alarm also did not have a major priority/severity or safety-related alarm status.  The controller did not recognize the information he received as indicative of an abnormal operation.  Evidence indicates that the controller was focused on the events at Sisquoc Station (i.e., restarting the Sisquoc pump that had gone down once uncommanded, and a second time on high case temperature along with other duties).[iii]

Due to the Sisquoc Station maintenance activity resulting in an unplanned pump shutdown, the controller anticipated alarms would be activated from the pipeline leak monitoring (PLM) system.  According to interviews and a review of the alarm log, the PLM inhibit was requested by the controller to the step-up shift supervisor between 11:15 and 11:22 a.m.[iv]  The step-up shift supervisor then inhibited (shut off) the PLM system alarms.[v]  Also, during this time, the controller started an investigation of the SCADA data in an attempt to understand the operational abnormalities that were occurring.  After attempting to restart the Sisquoc pump twice, the controller shut down the pipeline.  PHMSA requested the operator review the flow imbalance calculations and provide a time when the PLM system would have generated an alarm if not inhibited, and it was determined that  alarms would have been generated

Page **6** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

approximately two minutes before the controller shut down the pipeline.[vi]



**Figure 2**. Schematic of Plains Pipeline, LP, Line 901 and spill path.

## Plains' Field Response and National Response Center Notifications

The following is a timeline of Plains and emergency responder activities conducted immediately prior to locating the leak site:[vii]

- At 11:42 a.m. a call reporting a petroleum smell was received at Santa Barbara Fire Department (SBFD) Station 18. Engine 18 left the station to investigate the odor complaint near Refugio State Beach.

- At approximately 12:15 p.m., prior to a scheduled tabletop spill drill required by federal regulations 49 C.F.R. §194, the pre-drill meeting was completed and adjourned. A representative from the Santa Barbara Office of Emergency Management (SB-OEM) received a call from the SBFD reporting that there was oil on Refugio Beach. The SB-OEM representative and the Plains representatives left the spill drill and drove separately to Highway 101 at Refugio Beach.

- The Santa Barbara Dispatch notified the National Response Center (NRC #1116950) at 12:43 p.m. PDT of an unknown sheen in the ocean at Highway 101 and Refugio Beach.[viii]

- At approximately 12:55 p.m., the two Plains representatives arrived at the south side of Highway 101 where the SBFD personnel were. They noted oil in the ocean but could not determine the source of the oil. One of the Plains representatives told the assembled group that he did not think the oil was coming from Line 901 because the pipeline is located on the other side of Highway 101, and there would be oil flowing across Highway 101 if Line 901 was leaking.

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- The Plains representatives drove to the company's pipeline right-of-way (ROW).  At approximately 1:27 p.m., the Plains representatives located the leak site on the Plains ROW.  They called the controller to report the leak and to tell the controller to leave Line 901 shut down and to close the Refugio gate valve.  The Plains representatives used their cell phones to contact other Plains personnel, the landowner where the leak occurred, Plains' oil spill response contractors, and others.  The Plains representatives noted that crude oil from the release site had entered a culvert that crosses under the Highway 101 and railroad tracks and discharges to Refugio Beach.  The Plains representatives, along  with Fire Department personnel, attempted to stop the flow of oil into the culvert.  However, the culvert was too large to stop the flow with shovels, and sand bags were not  readily available, so their immediate efforts were unsuccessful.  At approximately 3:00 p.m., additional equipment and  personnel arrived, the culvert was dammed and oil was prevented from entering the  culvert.

- At 2:56 p.m., a representative from Plains called the NRC to report (NRC #1116972) the release of crude oil  at 2:56 p.m. PDT. This report indicated that the release was at Latitude: 34° 27' 43" N; and  Longitude: 120° 05' 24" W.  This NRC report was made 89 minutes after the release site was  found by Plains field personnel.[ix]



**Figure 3**. Spill location relative to Refugio Beach in Santa Barbara County, CA. Photo: John L. Wiley http://flickr.com/jw4pix

Federal pipeline safety regulations, (49 C.F.R. § 195.52), require that the NRC be notified at the earliest practicable moment following discovery of a release of a hazardous liquid, including "[a]ny failure that resulted in pollution of any stream, river, lake, reservoir, or other similar body of water that violated applicable water quality stands, caused a discoloration of the surface of the water or adjoining shoreline, or deposited a sludge or emulsion beneath the surface of the water or upon adjoining shorelines."  On January 30, 2013, PHMSA issued an

Page **8** of **21**

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Advisory Bulletin clarifying that this was to be interpreted as within one hour of discovery. Plains reported the rupture to the NRC approximately 89 minutes after discovery, thus notifying the NRC 29 minutes late.

The estimated costs reported by the operator as of December 23, 2015, were $142,931,884. This figure includes all costs the operator spent as a result of this release through the date reported, including commodity lost, the operator's property damage and repairs, operator's emergency response, environmental remediation, and estimated other costs spent including government agency costs and media relations expenses.[x]

## PHMSA's Corrective Action Order

On May 21, 2015, PHMSA issued a CAO, CPF No. 5-2015-5011H, to Plains. The CAO required Plains to purge Line 901; review the pipeline's construction, operating, maintenance, and integrity management history; expedite the review of data from the May 5, 2015, ILI tool run; conduct metallurgical evaluation of the failed pipe; repair any integrity-threatening anomalies identified by the ILI survey; and conduct a root cause failure analysis. The CAO requires Plains to purge Line 901 and to keep Line 901 shut down until PHMSA approves the restart of the pipeline. Plains' Line 901 was purged and filled with an inert nitrogen gas on June 18, 2015.

On June 3, 2015, PHMSA issued Amendment No. 1 to the CAO. The amendment was issued to address preliminary findings from the early stages of PHMSA's investigation, and the possibility that the conditions on Line 901 also existed on Plains Line 903. The amendment to the CAO required Plains to conduct additional non-destructive testing of ILI anomalies on Lines 901 and 903; review the construction, operating, maintenance, integrity management, and ILI history of Line 903; and reduce the operating pressure of Line 903 to 80% of the highest pressure sustained for a continuous 8-hour period during the month before the May 19 failure. This pressure reduction was intended to enhance safety until all facets of the line's integrity could be evaluated.

On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO. The amendment required Plains to empty and purge Line 903 between Gaviota and Pentland Stations and fill it with an inert gas. Line 903 was purged between Gaviota and Pentland Stations and filled with inert nitrogen. The complex purging operations began in December 2015, and were completed on April 18, 2016. Both Line 901 and the purged sections of Line 903 will remain shut down until all actions required by PHMSA's CAO and subsequent amendments have been completed. PHMSA may continue to issue additional amendments to the CAO as necessary.

## Pipeline Alignment

### Las Flores Station to Gaviota Station Line 901 Elevation Description

To fully understand the Line 901 release, it is vital to understand the elevation profile of Line 901 and Line 903 from the Las Flores Canyon to Pentland Station. Line 901 starts at the Las Flores Station at an elevation of approximately 180 feet. There are two large hills downstream of the originating pump station. The first hill has a peak elevation of approximately 740 feet and the second hill has an elevation of approximately 600 feet. The release occurred downstream of the second hill at an elevation of approximately 80 feet. Immediately downstream of the release point, the pipeline rises slightly and then runs relatively level approaching the Gaviota station. This fact is important because as soon as the pump at Las

Page **9** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

Flores Pump Station was turned off the second time, the only crude oil that could be released was the height of oil in the pipeline above the release site and not the amount located between the two aforementioned hills.

**Gaviota to Pentland Station Line 903 Elevation Description**

Line 903 receives all of the crude oil delivered by Line 901. The line elevation at Gaviota is approximately 150 feet.  The elevation at Sisquoc is approximately 880 feet.  Downstream of Sisquoc,  Line 903 rises to 2,420 feet and then to a height of approximately 2,750 feet and ultimately to an elevation of close to 3,000 feet before dropping into Pentland Station at an elevation of approximately 690 feet.  Line 903 exhibits many of the same construction and operation conditions as Line 901 and was addressed by the amendments to the CAO. Pump 401 at Sisquoc Station has adequate capacity to push the oil up and over the downstream hills and into Pentland Station but only if it has full suction pressure and full flow coming into the pump. Because of the release, the pump could not push the oil over the downstream hills, and so the oil in the pump became hot and the pump shut down to prevent overheating.

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## Post-Incident Investigation Results

### Metallurgical Evaluation of Failed Pipe

The failed pipe segment has been analyzed by third-party metallurgical experts, Det Norske Veritas (U.S.A.), Inc.'s (DNV-GL) in Dublin, OH.  The failed pipe assessment and testing was witnessed  by PHMSA, the California Department of Fish and Wildlife, and the U.S. Department of Justice.



**Figure 4**. The failed pipe and surrounding insulation and coating.



**Figure 5**. Pipe External Surface at the Line 901 failure site after cleaning.

Page **11** of **21**

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

DNV-GL's draft report was completed and disseminated to Plains and PHMSA on August 6, 2015.  The draft report was reviewed by PHMSA engineers, and a number of comments and clarification  requests were made.  DNV-GL reviewed the comments and revised the report. The Final Report  was issued on September 18, 2015.

The Final Report provides a summary of findings, including the following excerpt:

"The results of the metallurgical analysis indicate that the leak occurred at an area of  external corrosion that ultimately failed in ductile overload under the imposed operating  pressure.  The morphology of the external corrosion observed on the pipe section is  consistent with corrosion under insulation facilitated by wet-dry cycling."[xi]

### In-Line Inspection Survey Review

Plains conducted ILI surveys on Line 901 (10.7 miles in length) to assess the integrity of the pipeline in accordance  with PHMSA regulations in 2007, 2012, and 2015.  According to 49 C.F.R. § 195.452(j)(3), the pipeline is required to be surveyed at  intervals commensurate with the pipeline's risk of integrity threats, but at least every 5 years.   Plains changed Line 901 from a 5-year assessment cycle to a 3-year assessment cycle after the 2012 ILI survey.

The data collected during these surveys must be fully evaluated within 180 days of the ILI, and an operator must take action upon discovery of any "immediate repair conditions" as defined in 49 C.F.R. § 195.452(h) unless the operator can demonstrate that the 180-day period is impracticable.

The most recent ILI survey for Line 901 was completed on May 6, 2015.  The 2015 ILI survey data for  the first 2 miles of Line 901, as measured from the Las Flores Station, was found to be incomplete and not useable for ILI analysis.   For the rest of the ILI survey, the correlation digs,  which are used to gauge survey data accuracy in the ILI vendor's preliminary report, had not been finished  at the time of the May 19, 2015 failure.

PHMSA's independent third-party ILI SME also performed an analysis of the data from past ILI surveys of  Line 901.  Preliminary data from the results of each of the ILI surveys are summarized below  and show a growing number of corrosion anomalies on Line 901.

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

**Number of Anomalies**

| Metal loss | June 19, 2007 | July 3, 2012 | May 6, 2015 |
|---|---|---|---|
| Greater than 80% | 0 | 0 | 2 |
| 60-79% | 2 | 5 | 12 |
| 40-59% | 12 | 54 | 80 |

The May 6, 2015 ILI survey data and subsequent analysis by the ILI vendor predicted external corrosion at the failure site with an area of 5.38 inches by 5.45 inches, and a maximum depth of 47% of the original pipe wall thickness.  After the failure, the DNV-GL metallurgical investigators physically measured external corrosion at the failure site to have a maximum depth of 89%.[xii]  The dimensions of the corrosion feature were 12.1 inches axially by 7.4 inches in circumference.  The maximum depth, as measured using laser scan data, was 0.318 inches or 89% of the measured wall thickness (0.359 inches).

The ILI summary report prepared by PHMSA's SME also examined the "as-called" (ILI-predicted) versus as-found (field measured) lengths, widths and area for the excavated anomalies on Line 901.  The report demonstrates that the lengths and widths of the anomalies were under-called (underestimated) in many cases, however many were also over-called. Plains submitted little documentation concerning their analysis of how the field measured anomalies compared to the ILI vendor analysis.  Furthermore, Plains did not provide documentation showing that discrepancies between the originally reported anomaly sizes predicted by the ILI vendor and Plain's actual field-measured sizing of the corrosion anomalies were subsequently discussed with the ILI vendor, as required by Plains' IMP.[xiii]

## Cathodic Protection Findings

According to 49 C.F.R. § 195.563, CP is required under the federal Pipeline Safety Regulations to prevent external corrosion of buried pipelines.  Historical CP records for line 901 have been reviewed and reveal protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and Line 903, however, are insulated.  An increasing frequency and extent of corrosion anomalies were noted on both Lines 901 and 903 in ILI survey results, anomaly excavations, and repairs.  PHMSA inspectors noted moisture entrained in the insulation at four excavations performed by Plains on Line 901 after the May 19 spill and prior to the PHMSA-mandated purging of the pipelines.

## Spill Volume Estimate from Plains' Third-Party Consultant

Plains initially estimated the volume of spilled crude oil to be approximately 2,400 bbl, of which 500 bbl was estimated to have reached the ocean.   On  August 4, 2015, Plains reported to the Unified Command that the 2,400  bbl release estimate was still accurate.  However, after Plains completed the PHMSA-mandated purge, the  company's calculations indicated that up to 3,400 bbl had possibly been released from the  pipeline.   Plains notified the Unified Command

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

that RPS Knowledge Reservoir (RPS), a third-party investigator hired by Plains, was still trying to reconcile the difference.

On November 24, 2015, Plains informed PHMSA that RPS had completed their analysis regarding the release volume and produced a report of findings. RPS used the OLGA simulation software tool to model the behavioral dynamics of the pipeline prior to, during, and immediately after the May 19, 2015 leak. The report concluded that the discharge leak volume was 2,934 bbl. The RPS report was dated November 11, 2015. Plains has reported 1,100 bbl of crude oil have been recovered.

## Investigation Findings and Conclusions

Line 901 pipeline ruptured at approximately 56% of the MOP. Although the operational events that occurred on the morning of the release were abnormal, this should not have caused the release if the pipeline's integrity had been maintained to federal standards.

### Proximate or Direct Cause

PHMSA determined that the proximate or direct cause of the release was progressive external corrosion of the insulated, 24-inch diameter steel pipeline. The corrosion occurred under the pipeline's coating system, which consisted of a urethane coal tar coating applied directly to the bare pipe, covered by foam thermal insulation with an overlying Polyken tape wrap. Water has been noted in the foam insulation at a number of digs, indicating that the integrity of the coating system had been compromised. The external corrosion was facilitated by the environment's wet/dry cycling, as determined by the PHMSA-approved, third-party metallurgical laboratory. The release was a single event caused at an area where external corrosion had thinned the pipeline wall. There is no evidence that the pipeline leaked before the rupture. There was a telltale "fish mouth" (a split due to over-pressurization) at the release site indicating the line failed in a single event.

PHMSA's investigation identified numerous contributory causes of the rupture. The contributory causes can be grouped into three categories: 1) ineffective protection against external corrosion of the pipeline; 2) failure by Plains to detect and mitigate the corrosion;, and 3) lack of timely detection of the rupture. Below is a summary of the key contributory causes:

### Contributory Causes

1) Ineffective protection against external corrosion of the pipeline

- Plains' CP system was ineffective in protecting thermally insulated underground pipeline systems from external corrosion. Industry practices recognize that an impressed current system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised. The external coating in the area of the rupture had allowed moisture to enter the insulation adjacent to the steel pipe.[xiv] Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised.[xv]

2) Failure by Plains to detect and mitigate external corrosion

- Plains did not identify CUI as a risk-driving threat in their federally-mandated integrity management program (IMP).

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

- Plains' did not fully implement their IMP.
    - o Plains did not perform suitable analysis of the field measurements of the excavated corrosion anomalies that occurred after ILI surveys were completed in 2007 and 2012.

    - o The data reported by the ILI vendor were inconsistent (and did not meet the published accuracy of the ILI tools of +/- 10%, 80% of the time for depth) when compared to the results of the field-measured corrosion anomalies.

    - o Plains' as-found field measurements of corrosion anomalies were inconsistent with the as-called vendor-provided ILI data and analytical reports. ILI surveys conducted in 2007 and 2012 revealed inconsistencies in the character of the anomalies. In both of these cases, Plains did not consult the ILI vendor to help resolve the inconsistency.

    - o Plains failed to follow written procedures directing the IMP group to perform appropriate statistical analysis after the anomaly dig reports were received from the field, and to discuss any inconsistencies with the ILI vendor.[xvi]

        - ▪ Plains' Pipeline Integrity group created a unity plot for depth after the 2012 ILI survey and anomaly digs. There is no documentation detailing what was done with the information from the unity plot.

    - o Plains incorrectly added the over-called anomalies in the close-out reports.

        - ▪ The close-out reports should have only reported the anomalies that were within the reported accuracy of the ILI tool. The reported tool accuracy is +/- 10 %, 80 % of the time. Adding the overcalled anomalies outside of the tool accuracy skews the data.

- Plains' Pipeline Integrity group was historically focused on pitting corrosion under "shrink sleeves" at the pipeline girth welds (circumferential welds to join pipe segments).

    - o The release location was within 6 feet of a corrosion anomaly that was exposed and repaired after the 2012 ILI survey. There was evidence of corrosion and degraded coating systems between the 2012 repair site and the 2015 rupture site.

    - o The anomaly that ruptured was called out by the ILI tool at 45% depth in 2012. Plains' IMP specified adding 10% to all anomalies (55% depth in this case) then "growing them" to predicted failure using an anticipated corrosion growth rate. This analysis would provide a predicted failure time. Plains did not excavate the anomaly that failed.

3) Lack of timely detection of and response to the rupture

- The controller did not have information communicated from the SCADA system in such a manner to be successful in detecting abnormal operations. The pipeline SCADA system did not have safety-related alarms on low pressure configured at the

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

correct value or priority to alert the control room staff of the rupture. When this alarm was provided to the controller, the discharge pressure at Las Flores was 199 psig but, within a minute, pressure elevated above 210 psig, the alarm status cleared, and the discharge pressure remained above 200 psig (approximately  210-211 psig) until the pipeline was purged. The pipeline was still leaking when the discharge pressure at Las Flores was above 200 psig, and continued to do so without additional alarm indications. When the pipeline was down, isolated but still leaking, the minimum pipeline discharge pressure at Las Flores remained at 210-211 psig. The low discharge pressure alarm setpoint value was not set properly as it should have been above 211 psig. This type of alarm should be identified as a high priority safety related alarm. While the controllers and shift supervisors can access historical trend data or continue to monitor a given pressure or flow, when the pipeline was ultimately shut down at 11:30 a.m., neither the controller nor step-up shift supervisor detected any drop of pressure at the specific failure location that would indicate that oil was being released.

- Neither the pipeline controller nor step-up shift supervisor detected the initial abnormal conditions as the release occurred. There was an indication of decreased pressure and increased flow between 10:53 and 10:58 a.m., which is consistent with a pipeline release. This resulted in a delayed shutdown of the pipeline. Adequate alarm setpoint values with correct priorities are essential to controller and shift supervisor recognition of abnormal operations, especially when many pipeline systems are operated from the same console.

- The pipeline controller restarted Line 901 after the release occurred.

- The pipeline leak detection system lacked instrumentation and associated calculations to monitor line pack.

  o The function of the PLM system was a simple line balance calculation based on flow meter values without line pack considerations. The PLM relies on comparing "meter in – meter out" calculations over time. This type of leak detection system without the use of safety-related, high-priority, low-pressure alarms does not provide the controller or shift supervisors with adequate information when the pipeline is down.

  o When the pipeline is not running, even if only due to scheduling and not required maintenance activities, flows will be close to zero and the imbalance calculation will provide little if any value as currently configured. Leak detection on a down pipeline requires a robust system of planned and accurate high-priority alarm types and alarm setpoint values in order for response to occur on critical low pressures.

  o The leak detection system for Lines 901 and 903 consists of two leak detection segments. Additional instrumentation such as pressure and temperature transmitters located at Refugio Gate and Cuyama valve settings (both transmitter types on each side of the valves) would allow additional information about the operating status of the pipeline to be presented and pack calculations pursued.

  o Plains utilizes the SimSuite application for other pipelines in the control

Plains Pipeline, LP - Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

center.  This application does allow for pack calculations to be utilized in the leak detection system.  According to information obtained during meetings with Plains hydraulic specialists, Lines 901 and 903 were pipeline systems with a low to medium priority defined for future modeling efforts compared to other assets in the Plains operations. The approach utilized by Plains for prioritizing which systems should be modeled first did not appear to take into account all appropriate consequence-based asset impacts (such as culverts providing a pathway to the ocean) associated with these two systems.  Existing instrumentation and the need for added instrumentation would factor into this prioritization decision.

- Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as alarms.

  o Interviews determined that the step-up shift supervisor and shift supervisor training lacked formalized and succinct requirements, including that for leak detection system functions such as "inhibit" options.  The interviews determined that different shift supervisors performed PLM inhibit functions without contacting the console supervisor first as required by procedure.

  o Step-up and shift supervisor responsibilities include emergency shutdown of any pipeline.  However, training does not cover a means by which to accomplish this for all relevant pipelines.  A general emergency shutdown provision has not been programed for supervisory use on all systems.

- The oil spill response plan required by 49 C.F.R. §194 did not account for a culvert near the release site that traversed the Pacific Coast Highway and Amtrak railroad tracks.  This culvert provided a quick flow path between the pipeline ROW and the Pacific Ocean, thereby allowing crude oil to flow easily towards Refugio State Beach and the ocean.  The response plan did not have a response strategy that considered the presence of the culverts.

Page **17** of **21**

Plains Pipeline, LP – Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## PHMSA Post-Incident Action Chronology

Following the May 19, 2015 Plains Pipeline, LP, Line 901 rupture in Santa Barbara County, CA, PHMSA took the following actions:

- On May 19, 2015, PHMSA deployed inspectors to investigate the Plains Pipeline LP Line 901 pipeline failure in Santa Barbara County, CA.  PHMSA also provided information updates to the Unified Command (UC), US Coast Guard, the Federal on Scene Coordinator (FOSC), State Fish and Wildlife, and other agencies on site.
- On May 21, 2015:
  - PHMSA issued a Corrective Action Order (CAO), CPF No. 5-2015-5011H,  to Plains Pipeline LP ordering it to suspend operations and to specific safety actions to further protect the public, property, and the environment from potential hazards associated with the recent failure.  PHMSA staff reviewed the CAO with the operator and briefed the California State Attorney on the CAO and provided an overview of PHMSA's regulations.
  - PHMSA sent an inspector to Plains' control room in Midland, Texas to collect operational data and interview the control room operators on duty at the time of the incident and their supervisors.  The inspector gathered any pertinent logs and information, including electronic copies of relevant data from the Supervisory Control and Data Acquisition (SCADA) system.
  - PHMSA staff worked with the operator to review their plan to expose the pipe and to cold tap it to ensure there was no pressure or crude left in the line at a low spot immediately downstream of the release point. The plan was signed off by the UC at approximately 5 pm PDT.
- On May 22, 2015:
  - PHMSA staff met with representatives from the Assistant U.S. Attorney, DOT Inspector General, EPA Criminal Investigation Division, California Attorney General, and others to brief them on PHMSA's process for securing and transporting the failed pipe to a metallurgical lab for evaluation.
  - PHMSA staff remained on the scene as the operator exposed, tapped, removed any remaining product, and excavated the pipeline downstream of the release site.
- On May 25, 2015:
  - PHMSA issued an approval letter for Plains to excavate, remove and secure the failed joint of pipe under the supervision of two DNV metallurgists (third party contractor) but requested that the coating and insulation not be touched until the failed pipe has been removed because the DNV personnel were interested in in gathering available samples there as well.
  - A PHMSA inspector returned to Midland, TX to interview the controller and the Operations Control Center supervisor and to obtain any handwritten logs created by the controller on the morning of the release.
- On May 28, 2015:
  - A PHMSA investigator was on site when affected pipeline was removed, crated, and transported to secure location for metallurgical evaluation.  PHMSA retained a third-party ILI expert to examine the 2012 and 2015 ILI runs. DNV personnel took soil and insulation samples.
- On June 3, 2015, PHMSA amended the CAO to address preliminary findings from the early stages of the investigation (Amendment No. 1).  The amended CAO mandated

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

additional safety requirements on Line 901 and expanded the scope of the CAO to include the 128-mile long Line 903, which is located downstream of Line 901. The amendment reduced the operating pressure of the Lone 903 by 80% of the highest 8 hour continuous pressure between April 19, 2015 and May 19, 2015. On May 30, 2015, Plains voluntarily shutdown Line 903.

- On June 18, 2015, PHMSA staff monitored the Line 901 purge to ensure safety during the purging process. Plains completed the purge and injected inert gas in Line 901.
- On September 18, 2015, PHMSA received the DNV Final Mechanical and Metallurgical Report. PHMSA staff reviewed the document and provided comments.
- On November 12, 2015, PHMSA issued Amendment No. 2 to the CAO, which ordered Plains to purge and shutdown Line 903 from Gaviota to Pentland.
- On December 1, 2015, PHMSA staff monitored Plains moving Freeport McMoRan crude oil from their offshore platforms into Line 903 from Gaviota Station to Sisquoc Station. Movement of the Freeport McMoRan oil was completed on December 10, 2015.
- On December 4, 2015, PHMSA staff received the DNV Root Cause Failure Analysis Report. PHMSA reviewed and commented on the report.
- On December 14, 2015, PHMSA staff monitored the purge process on Line 903 from Gaviota Station to Sisquoc Station. The purge was completed on December 18, 2015 and the line was filled with inert gas.
- On February 17, 2016, PHMSA issued a Preliminary Factual Final Report.
- On April 2, 2016, PHMSA staff monitored the Line 903 Sisquoc to Pentland portion purge that was completed on April 18, 2016. Line 901 and 903 are shutdown, except for the Pentland to Emidio section of Line 903, which is not connected to 903 any longer.

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

## APPENDICES

A. Investigation Summary Detail

B. Supervisory Control and Data Acquisition (SCADA) Log Excerpts

C. Pipeline Leak Monitoring Details

D. Excerpts and Discussion of Plains Integrity Management Plan (IMP) Requirements

E. Corrosion Control and Pipeline Conditions

F. Industry Standards and General Requirements for In-Line Inspection

G. In-Line Inspection Report

H. PHMSA's Independent Analysis of In-Line Inspection Data

I. Maps and Photographs

J. National Response Center Report #1

K. National Response Center Report #2

L. Form PHMSA F 7000.1: Accident Report for Hazardous Liquid Pipeline Systems

M. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Mechanical and Metallurgical Testing

N. Det Norske Veritas (U.S.A.), Inc. (DNV GL): Line 901 Release (5/19/15) Technical Root Cause Analysis

O. NACE International: Effectiveness of Cathodic Protection on Thermally Insulated Underground Metallic Structures

---

[i] According to the *FRACTURE CONTROL TECHNOLOGY FOR NATURAL GAS PIPELINES CIRCA 2001* (the PRCI report superseding NG-18 Report 208): "The distinction between leak and rupture for the pipeline community is based on the size and configuration of the breach, not how it develops." Based on these calculations and visual observations, the length of the feature is consistent with a leak, arresting within the corrosion feature, and did not propagate outside of the feature into nominal wall-thickness pipe. According to the instructions for completing PHMSA Accident Form 7000-1, this type of accident would be classified as a rupture since PHMSA defines a "rupture" as a "loss of containment that immediate impairs the operation of the pipeline".

[ii] The remedial action plan requires: a) investigation and remediation of anomalies on Line 901 (including anomalies requiring repair per 49 C.F.R. § 195.452(h) and similar anomalies); b) analysis of field measurements taken from anomaly investigations; c) re-grade of previous in-line inspection (ILI) data from 2012 and 2015 ILI surveys using an expanded set of interaction criteria; d) additional integrity assessments using a circumferential magnetic flux leakage (MFL-C) ILI tool and integration of MFL-C ILI data with previous ILI survey results; e) investigation and remediation of anomalies that are identified in the MFL-C tool run (if any); f) based on information collected from remedial work plan and root cause analysis report released by Det Norske Veritas (U.S.A.), Inc., improving the integrity management program; and g) integrity studies to reduce spill volumes, including an emergency flow restriction device evaluation and a surge study. Completion of the remedial work plan is required prior to the PHMSA Western Region Director approving a restart plan and return to service for Line 901.

[iii] High case temperature refers to the oil temperature inside the pump cavity. The case holds the pump impeller

Plains Pipeline, LP Failure Investigation Report

Santa Barbara County, California Crude Oil Release - May 19, 2015

where oil passes through. This was a centrifugal pump that continues spinning whether there is product in the pump or not. When the rupture occurred, there was not enough pressure or flow rate to allow the pump to continue pumping the oil over the hills and into Pentland Station. Therefore, the oil that was in the pump remained in place and as the pump continued to spin, and temperature was reported to the SCADA system. If the pump reaches the high temperature setpoint, the pump shuts itself off to protect itself from burning up.

[iv] The PCR utilizes two shift supervisors to cover the entire set of 22 consoles. The California Console is handled by shift supervisor B. The shift supervisor B position at the time of the failure was filled by a step-up shift supervisor. A step-up shift supervisor is a controller who is currently qualified on a specific console in the PCR and has received some informal training by working on shift with other shift supervisors. Step-up shift supervisors are used to cover the shift supervisor positions when additional personnel are needed due to illness, vacation, training, etc. Plains has indicated that two step-up shift supervisors are not allowed to be on duty at the same time so one shift supervisor is paired with a step-up shift supervisor when additional personnel is needed.

[v] PLM is the SCADA vendor software tool that serves as the leak detection system for PCR.

[vi] *See* Appendix B.

[vii] SCADA Data/Plains Control Room time is local to the Central Time Zone. A two-hour time difference separates Central Time from Pacific Time, with Central Time falling two hours ahead. The release occurred in the Pacific Time Zone which is two (2) hours earlier. All times in this report have been adjusted to Pacific Time.

[viii] *See* Appendix J.

[ix] *See* Appendix K.

[x] *See* Appendix L.

[xi] *See* Appendix M.

[xii] PHMSA has access to this data through a view-only web portal.

[xiii] *See* Appendix G.

[xiv] The inability of an impressed cathodic protection system to protect insulated pipelines was most recently reaffirmed in the National Association of Corrosion Engineers (NACE) Publication 10A392 (2006 Edition) – "Effectiveness of Cathodic Protection (CP) on Thermally Insulated Underground Metallic Structures."

[xv] *See* NACE Report at Appendix O, Background section stating that "[o] n most thermally insulated oil and gas transmission pipelines installed prior to 1980 to 1981, a shop mold-formed thermal insulation was placed directly over the bare steel pipe, with an outer jacket applied to moisture-proof the system. At the field joint, preformed insulation half shells were applied over the joint area to fit between the ends of the shop-applied insulation. After the insulation was fitted, a heat shrink sleeve or a tape wrap was applied over the insulation. When the integrity of the outer moisture barrier was compromised, the space, gap, or void between the edges of the preformed half shells and the shop-applied insulation allowed oxygenated water to diffuse to the bare steel beneath. Damage to the outer moisture barrier has also occurred remote from the joint, allowing oxygenated ground water ingress.

"Thermally insulated pipelines have experienced relatively aggressive corrosion, with some failures occurring within three years of service, although acceptable industry standards of CP had been applied and maintained shortly after line construction. The most predominant failures have been those occurring at joints; however, moisture has migrated along the pipeline steel surface to create electrochemical corrosion cells remote from the field joint, culminating in extensive replacements of substantial lengths of line. An article titled 'Corrosion of Underground Insulated Pipelines' supports this committee's conclusions that sufficient CP current from an external source may not reach the insulated metallic surface in sufficient quantity to establish adequate corrosion control."

[xvi] *See* Appendix D.

# Appendix A

# Investigation Summary Detail

## Appendix A: Investigation Summary Detail

| | |
|---|---|
| DOT | US Department of Transportation |
| PHMSA | Pipelines and Hazardous Materials Safety Administration |
| OPS | Office of Pipeline Safety |
| | Western Region |

| | |
|---|---|
| **Principal Investigator** | Peter J. Katchmar |
| **Regional Accident Coordinator** | Peter J. Katchmar |
| **Region Director** | Chris Hoidal |
| **Date of Report** | 5/5/2016 |
| **Subject** | Failure Investigation Report – HL Santa Barbara County CA Crude Oil Release |

Operator, Location, & Consequences

| | |
|---|---|
| **Date of Failure** | 5/19/2015 |
| **Commodity Released** | Crude Oil |
| **City/County & State** | Refugio State Beach, Santa Barbara County, CA |
| **OpID & Operator Name** | 300 – Plains Pipeline, LP |
| **Unit # & Unit Name** | 33175 - CSFM #1050A |
| **SMART Activity #** | 150537 |
| **Milepost / Location** | MP 4.16 |
| **Type of Failure** | External Corrosion |
| **Fatalities** | 0 |
| **Injuries** | 0 |
| **Description of area impacted** | Ranch land ¼ mile east of the Pacific Ocean, Refugio State Beach and the Pacific Ocean. Oil flowed to a water drainage culvert that ran under California State Highway 101 (Pacific Coast Highway) and the Amtrak Railroad embankment and into the Pacific Ocean. |
| **Property Damage and Cleanup Cost** | $ 142,931,884 (through December 23, 2015) |

# Appendix B

# Supervisory Control and Data Acquisition (SCADA) Log Excerpts

## Appendix B: Supervisory Control and Data Acquisition (SCADA) Log Excerpts

Listed below is a chronology of events, as obtained from the Plains Control Room (PCR) Supervisory Control and Data Acquisition (SCADA)[1] logs. The SCADA log records alarms and events that occur per pipeline system for each line operated from the console. Due to the significant volume of entries and information occurring at the time of this release, only those data points relevant to the CA30 system (901 and portions of 903) have been included

- At 10:42:06, Pump 401 at the Sisquoc Station shut down uncommanded due to maintenance activities.

- At 10:48:44, the Plains controller at the PCR issued a command to shut down Pump 102 at the Las Flores Station as the result of pump problems at Sisquoc.

- At 10:48:52, the SCADA system reported that the Pump 102 at Las Flores had successfully shut down.

- The discharge pressure at the Las Flores Station immediately prior to shutdown was recorded by the SCADA to have reached ~677 psig at a flow setpoint of ~1220 Barrels per Hour (BPH).

- At 10:49, Tech 2 called the controller and notified him that he could restart Pump 401 at Sisquoc Station.

- At 10:52:52, the controller issued a command to restart Pump102 at Las Flores PS.

- At 10:53:01, the SCADA system reported Pump 102 successfully started.

- Between 10:53 and 10:56 the Pressure and Flow Data from the SCADA indicated the discharge pressure at the Las Flores PS reached ~721 psig and the flow rate reached as high as ~2042 barrels per hour (BPH).  Pressure and Flow Trends confirm that 10:55 is approximately when the release occurred.

- At 10:55:52, the controller commanded the Pump 401 at the Sisquoc Station  to start.

- At 10:56:52, the SCADA system reported that Pump 401 at Sisquoc Station was running.

- At 10:57:59, the SCADA system reported the discharge pressure at the Las Flores Station dropped to 199 psig and the SCADA system reported a low pressure alarm to the controller.

- At 10:58:48 the discharge pressure rises to 210 psig.  This automatically resets the low pressure alarm.

- At 10:58:58 the controller acknowledges the 210 psig discharge pressure notification.

---

[1] SCADA systems are used to remotely control and monitor pipeline operations.

- At 11:00:00 the SCADA system reported the flow rate was at 1458 BPH – (a soft high state)

- At 11:00:05 controller acknowledges the soft high flow rate.

- At 11:00:14 the SCADA system reported flow rate at Las Flores was 1254 BPH = Normal State.

- At 11:09:20, the SCADA System recorded that Sisquoc Pump 402 had a high case temperature.  However, Sisquoc Pump 402 was not running.

- At 11:12, Venoco personnel called the controller and notified him they wanted to start a delivery into line 901 through their line 96.  Venoco's line 96 ties into line 901 about 2.83 miles downstream of the Las Flores Station between the two hills.

- At 11:14, controller called the I&E Tech at Sisquoc Station to tell him of the high temperature on Pump 402.

- At 11:15:14, the SCADA System recorded that Sisquoc Pump 401 shut down on High Temperature.

- At 11:15:48, Venoco started their pump to start a delivery into line 901.

- At 11:20, Venoco personnel called the Plains controller and told him the pressure in line 901 was too low to run their line 96 pump.

- At 11:20:12, Venoco turned off their pump and closed their valve.

- At 11:22:58, the SCADA log states "PLM inhibited."  The Pipeline Leak Monitoring System, or PLM, calculates the imbalance between volumetric meters along the pipeline.

- At 11:26:43, the controller issued a command to start Pump 401 at Sisquoc PS.

- At 11:27:50, the pump start command timed out.  Pump 401 did not start.

- At 11:28:12 the controller again issued a command to start Pump 401 at Sisquoc PS.

- At 11:29:20, the pump start command timed out.  Pump 401 did not start.

- At 11:29:56, the controller issued a stop command to the Pump 102 at Las Flores PS. **[2 minutes after the PLM would have alarmed according to the calculation presented in Appendix C.]**

- At 11:30:05, the SCADA system reports that Pump 102 at Las Flores PS is stopped. Mainline Valve 102B at Las Flores closes automatically upon Las Flores Pump 102 shutdown. The pressure at Las Flores is recorded by the SCADA to be between 211 and 213 psig.

- At 1:27, the PCR was notified of the line 901 release near Refugio Beach, approximately 4.16 miles from the Las Flores PS.  The static pressure immediately downstream of the Las Flores PS is recorded by SCADA to be 211 psig.

- At 1:27:23, the controller at the PCR issues a command to close the Refugio Creek mainline valve.  **[This and the following actions were in response to the controller being informed of oil on the ground at MP 4.16.]**

- At 1:28:31, the controller Issues Command to close Valve 108 at Las Flores PS.
- At 1:29:34, SCADA reports the mainline valve at Refugio Creek, approximately 2.83 miles downstream of the Las Flores PS and 1.2 miles upstream of the release site, had successfully closed.
- At 1:30:34, SCADA reports Las Flores PS Valve 108 successfully closed.
- Between 3:47:14 and 3:48:13, the controller issues commands to close valves 208A, 208 C, and 209A at Gaviota Station.
- Between 3:49:51 and 3:51:11, SCADA reports successful closure of valves 208A, 208C, and 209A at Gaviota PS.
- At 3:57:48, controller issues command to close valve 209B at Gaviota PS.

At 4:00:49, SCADA reports successful closure of  Valve 209B at Gaviota PS and the pipeline remained down.

# Appendix C

# Pipeline Leak Monitoring Details

# Appendix C: Pipeline Leak Monitoring Details

Plains submitted documentation showing the parameters of the PLM and extrapolated what would have occurred if the PLM system had not been inhibited. The submitted documentation shows that the PLM would have alarmed at approximately two minutes before the controller issued the command to shut down the pump at Las Flores PS at approximately 11:30am PDT. The graphical representation is shown on this page.



Graphical Representation of when the PLM System would have alarmed had it not been "inhibited". Times in the graph and explanation are in Central Time. Pacific Time is two hours earlier.

Plains provided the following explanation along with the graphical representation above. It is quoted as all content is there. [A few changes were made for emphasis and readability that do not compromise the integrity of the explanation.]

> **"This is an explanation of how the program calculated the time when the PLM would have alarmed.**
>
> o   There are 5 meters that receive oil into the line 901/903 PLM. The SCADA tags are:
>   - ▪ ████████████
>   - ▪ ████████████
>   - ▪ ████████████
>   - ▪ ████████████
>   - ▪ ████████████
>
> o   There are 6 meters that deliver oil out of the PLM. The SCADA tags are:
>   - ▪ ████████████



- o Each of these meters are running accumulators, like the odometer on your car, that count barrels (BBLs) through them.  The BBLs through them in the last hour is the current value of the accumulator minus the value of the accumulator from 1 hour ago.  If we designate the specific value of the accumulator by appending the time parenthetically, the volume of oil through the first Las Flores meter in the hour before 5/19/15 13:27 would be:

    - ▪ ▮▮▮▮▮▮ (5/19/15 13:27) - ▮▮▮▮▮▮ 5/19/15 12:27)

- o The one hour over/short is the sum of all the oil through the out meters for the past hour minus the sum through the in meters for the same time period

- o ▮▮▮▮ (5/19/15 13:27) =
    - ▪ ▮▮▮▮▮ 5/19/15 13:27) ▮▮▮▮▮ (5/19/15 12:27) +
    - ▪ ▮▮▮▮▮ 5/19/15 13:27) ▮▮▮▮▮ (5/19/15 12:27) +
    - ▪ ▮▮▮▮▮ 5/19/15 13:27) ▮▮▮▮▮ (5/19/15 12:27) +
    - ▪ ▮▮▮▮▮ 5/19/15 13:27) ▮▮▮▮▮ (5/19/15 12:27) +
    - ▪ ▮▮▮▮▮ 5/19/15 13:27) ▮▮▮▮▮ (5/19/15 12:27) +
    - ▪ ▮▮▮▮▮ 5/19/15 13:27) ▮▮▮▮▮ (5/19/15 12:27) -
    - ▪ ▮▮▮▮▮ (5/19/15 13:27) ▮▮▮▮▮ 5/19/15 12:27) +
    - ▪ ▮▮▮▮▮ /19/15 13:27) - ▮▮▮▮▮ /19/15 12:27) +
    - ▪ ▮▮▮▮▮ (5/19/15 13:27) ▮▮▮▮▮ 5/19/15 12:27) +
    - ▪ ▮▮▮▮▮ (5/19/15 13:27) ▮▮▮▮▮ (5/19/15 12:27) +
    - ▪ ▮▮▮▮▮ (5/19/15 13:27) ▮▮▮▮▮ (5/19/15 12:27) )

- o The estimated value o▮▮▮▮ 5/19/15 13:26) was -585.6 BBLs.  The value of ▮▮▮▮ (5/19/15 13:27) was -607.5 BBLs.  The alarm limit was at -600 BBLs so the alarm would have been issued at 13:27.  [This equals 11:27am Pacific Time]

# Appendix D

# Excerpts and Discussion of Plains Integrity Management Plan (IMP) Requirements

## Appendix D: Excerpts and Discussion of Plains Integrity Management Plan (IMP) Requirements

Plains submitted a copy of their IMP dated, December 18, 2003.  Applicable sections from that IMP are copied below.

"Section 6.0 Procedures for Conducting Assessments and Processing Results

Rule 49 CFR §195.452 (f)(8) and (f)(4) requirements:

(f)(8) - A process for review of integrity assessment results and information analysis by a person qualified to evaluate the results and information.

(f)(4) Criteria for remedial actions to address integrity issues raised by the assessment methods and information analysis."

On page 6-4 of the Plains' IMP, there is a flowchart, "Figure 6-1 Pipeline In-Line Inspection (ILI) Assessment and Repair – Sequencing of Tasks."

Plains Marketing, L.P. / Plains Pipeline, L.P



FIGURE 6 – 1

Pipeline In-Line Inspection (ILI) Assessment
and Repair - Sequencing of Tasks

Date of Revision: 10 July 2008                     Page 6 - 4                     Integrity Management Plan

Page **2** of **4**

An enlarged portion of Figure 6-1, from the bottom right quadrant is copied below.



The two diamond shapes in the flowchart state the same decision point:

"Large discrepancy between pig calls and actual size of dents, metal loss or crack like anomalies?"

If "yes" the next box in both cases is:

"Integrity Specialist initiates ILI tool vendor re-grading of raw tool data."

PHMSA requested all documentation between the Plains IMP Group and their ILI vendor with respect to their line 901 and 903 before March 19, 2015. PHMSA was provided access to three email strings between the vendor and Plains IMP Group. The first email string had to do with discrepancies noted by Plains IMP group for "clustering" on the Pentland to Emidio

Page **3** of **4**

segment on line 903.

The second and third email strings discuss an anomaly called out as a 66% wall loss by the vendor which was found to be 95% wall loss when excavated and measured in the field.  This anomaly was on line 903 between the Gaviota PS and Sisquoc PS and was excavated after the 2013 ILI survey on that line segment.  This event was described as a "close call" by the Plains representative.  He asked the vendor what the cause of this under reporting might be.  The ILI vendor responded:

> "The anomaly in the 2008 run had a lower calculated wall loss of 28% (A neighboring anomaly had a wall loss of 32%, which ended up being assigned to the cluster) because the lower resolution DHD sensors capturing the signal as one anomaly with a wide profile, which resulted in a low wall loss calculation.  For the 2013 run, although the tool captured a better profile, with two peaks at that same spot, the anomaly sized a bit wider, encompassing part of the neighboring peak (which had the lower amplitude), which resulted in the 66% wall loss.  After adjusting the width to only account for the higher peak, the resulting wall loss was 76%."

The vendor also requested additional dig results from this Gaviota to Sisquoc survey via email.  Plains apparently sent them additional digs results at a later date via email attachment.

This interaction demonstrates that the ILI vendor is able to reanalyze data and did come closer to the actual anomaly depth.  Even after re-analyzing the anomaly, the vendor still under-called the anomaly by 19%.  This should have led to increased conversation.

When provided additional information from the operator, the vendor uses the "new" information to reanalyze the specific anomaly to better provide a more accurate characterization of the anomaly.  Also, the vendor analyst requested additional data from the digs that were being performed.

# Appendix E

# Corrosion Control and Pipeline Conditions

## Appendix E: Corrosion Control and Pipeline Conditions

### Corrosion Control

All interstate pipelines regulated by PHMSA on which construction was begun after March 31, 1970 are required to be coated and cathodically protected. Cathodic protection (CP) is a process by which bare steel is protected from corrosion by introducing a small electric current from a rectifier through an anode bed into the earth and back to the rectifier through the pipe (the cathode). A pipe will corrode if steel is allowed to leave the pipe at bare spots called "holidays" in the coating. CP forces electricity toward the pipe at holidays which counters the corrosion process.

### Pipeline Coatings

The first line of protection from pipeline corrosion is a good coating. Line 901 was installed with a coal tar urethane coating in intimate contact with the bare steel 24-inch pipe. Approximately 1.5-inches of urethane foam insulation were then sprayed onto the pipe over the coal tar urethane coating. The pipe was then finally wrapped with a polyethylene tape as a moisture barrier and to hold and protect the insulation on the pipe. The girth welds, where each joint of pipe is welded to the next joint, were coated with shrink sleeves which are made of a thermoplastic that shrinks when heat is applied with a torch which then adheres the sleeve tightly to the pipe.

### CP on Line 901

Operators are required to install and monitor a CP system within a year of constructing a pipeline. This was done for Line 901. Periodic testing and evaluations are required to ensure the CP system is functioning properly. Bimonthly inspections of rectifiers and annual inspections of pipe-to-soil potentials at each test station along the pipeline are required and reports are kept. PHMSA reviewed CP reports for Line 901 with a focus on 2003 to the present. The operator conducted a close-interval-survey (CIS) in December 2008 and again in April 2015 on Line 901. A CIS is an effort where the operator reports an "on" potential and an "off" potential at approximate three-foot intervals. These reports showed that the CP system appeared to be working well and that the pipe-to-soil potentials were within accepted criteria. The CIS in 2008 showed that the polarized potential of the pipeline was generally around a volt (-1,000mV). In 2015, the polarized potential had moved in the more negative direction towards the maximum polarized potential of steel or ~1,200mV. The off readings in 2015 were generally more negative than -1,100mV.

There are two explanations for the movement of the polarized potential on Line 901. One would be that the operator turned up the output on the rectifiers that supply the current to the pipe or they installed additional rectifiers. The second would be that the operator removed some of the protected steel from the CP circuit.

PHMSA reviewed the rectifier inspections and found that they were not "turned up" during this time period. The rectifiers had generally consistent output. This meant that the only other possibility would be the removal of a significant amount of steel from the protected pipeline system.

PHMSA requested that the operator provide documentation of the amount of pipe removed

from the system between 2008 and 2015. Plains provided a statement to PHMSA indicating that between 2008 and 2015, approximately 2120 feet of 20-inch and 24-inch piping was disconnected from or removed from the cathodically protected pipeline system.

**CP is Ineffective on Buried Insulated Pipelines**

After the release, PHMSA personnel visited Plains offices in Houston, TX, to continue the investigation. During this first visit, one of the first questions concerned external corrosion and cathodic protection because this appeared to be the apparent cause of the release. Plains personnel showed PHMSA a Technical Committee Report from the National Association of Corrosion Engineers (NACE International), titled, "Effectiveness of Cathodic Protection (CP) on Thermally Insulated Underground Metallic Structures" - NACE International Publication 10A392 (2006 Edition) – originally prepared in 1992 by NACE Task Group (TG) T-10A-19, a component of Unit Committee T-10A on Cathodic Protection and was reaffirmed with editorial changes in 2006 by Specific Technology Group (STG) 35 on Pipelines, Tanks, and Well Casings. It is published by NACE under the auspices of STG 35."

This report details the reasons that CP is not effective on buried insulated underground structures. In the "Background" section the report states,

> "Thermally insulated pipelines have experienced relatively aggressive corrosion, with some failures occurring within three years of service, although acceptable industry standards of CP had been applied and maintained shortly after line construction. The most predominant failures have been those occurring at joints; however, moisture has migrated along the pipeline steel surface to create electrochemical corrosion cells remote from the field joint, culminating in extensive replacements of substantial lengths of line."

Ultimately, it appears that moisture migrated along Line 901 to the lowest local elevation point and created an electrochemical corrosion cell approximately six (6) feet from the nearest girth weld.

**Discussion of Corrosion Under Insulation (CUI)**

On non-insulated buried pipelines, external corrosion is normally able to be mitigated by Cathodic Protection (CP). Generally, external corrosion cannot occur as long as CP current is getting onto the pipe. CP current creates an oxygen-free environment around the pipe which will stop the electrochemical process of corrosion, barring additional circumstances.

Where external corrosion does occur, current is allowed to get off the pipe and migrate into the surrounding soil. When this occurs, the current takes metal ions with it causing the wall loss or external corrosion. There is little to no "corrosion product" that remains at the pipe surface.

In a buried insulated line, the coatings and insulation do not allow the metal ions that result from the electrochemical process of corrosion to migrate away from the pipe surface. Thus, the "corrosion product" will remain close to the pipe and it will become dormant when the electrochemical process depletes all of the oxygen in the moisture. This is known as the dry cycle. When fresh "oxygenated" moisture infiltrates the coating and reaches the area of external corrosion on the pipe, the corrosion process reactivates and again continues until the oxygen is depleted. This is known as the wet cycle. This process is described in detail in the attached metallurgical report as Corrosion Under Insulation (CUI) facilitated by wet/dry cycling which was determined to be the actual cause of the wall thinning at the release site.

The metallurgical report contained descriptions of the "corrosion product" as being dense and

tightly adhered to the pipe.  The structure of the "corrosion product" was alternating layers of magnetite and goethite; both have magnetic properties.  Due to the composition and density, PHMSA requested additional testing to better quantify the parameters of density and magnetic permeability of the "corrosion product".  This was done and the results were presented in the final root cause failure analysis (RCFA) report also attached to this report.  The results came back that the density of the "corrosion product" was 25% of steel and the magnetic permeability was 5% that of steel.  While 5% magnetic permeability is small, the large volume of the corrosion product compared with that of the remaining pipe wall led, in part to the MFL tool's inconsistent reporting.  This phenomenon is discussed below and in more detail in the ILI SME Report.

**Magnetic Flux Leakage (MFL) Technology and Under-Calling the Failed Anomaly**

In simple terms, the MFL tools used are comprised of magnets that apply a magnetic flux into the pipe steel in the longitudinal direction.  The amount of magnetic flux put into the pipe is calibrated to saturate the full wall thickness.  There are numerous sensors placed circumferentially around the tool and central to the induced flux field so as to measure and record variances in the magnetic flux that remains in the pipe wall.  Any volumetric metal loss that the magnetic field encounters will cause the magnetic flux to "leak" from the pipe wall. The amount of this leakage is then recorded by any number of the sensors in its proximity. When this data is processed, the leakage can be measured to infer the depth, length and width of the metal loss in the pipe wall.  As discussed above, when external corrosion is allowed to leave the pipe and migrate into the surrounding soil, the anomaly that is left is usually only the remaining steel.  Slight corrosion product might be discovered but not to the extent encountered under insulated coated buried pipe.

On coated, insulated and buried pipe, the "corrosion product" grows and remains in close proximity to the pipe steel.  This is similar to the type of corrosion on vehicles, in which the corrosion under bubbled paint can be easily flaked off.  The corrosion-related paint bubbling on vehicles is similar to what occurred on Line 901.  There is a pinhole in the paint where oxygenated moisture can get in and allow the corrosion to occur.  The remaining paint has enough integrity to keep the moisture in, which allows the corrosion to occur and corrosion product to grow.  The corrosion product gets thicker and thicker until the paint fails entirely.

This is similar to the mechanism of CUI that occurred on Line 901.  The following picture is excerpted from the metallurgical report.



This picture is excerpted from the final metallurgical report. "Figure 16. Photograph showing a piece of insulation removed from adjacent to the failure location; near 4:30 orientation."

# EXHIBIT D

Case 2:26-cv-03396-SVW-SSC Document 21-1 Filed 05/07/26 Page 243 of 523
Case 2:20-cv-02415 Document 91 Filed 03/13/20 Page 1 of 102 Page ID #:94
Page ID #:754

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>     Plaintiffs,<br><br>        v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>     Defendants. | Civil Action No.<br><br>2:20-cv-02415<br><br>**CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03396-SVW-SSC Document 21-13 Filed 05/07/26 Page 244 of 523
Case 2:20-cv-02415 Document 91 Filed 03/13/20 Page 2 of 102 Page ID #:55
Page ID #:755

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03396-SVW-SSC Document 21-1 Filed 05/07/26 Page 245 of 523
Case 2:20-cv-02415 Document 91 Filed 03/13/20 Page 3 of 102 Page ID #:56
Page ID #:756

## TABLE OF CONTENTS

I.      BACKGROUND ................................................................................... - 5 -

II.     JURISDICTION AND VENUE ............................................................ - 6 -

III.    APPLICABILITY ................................................................................ - 7 -

IV.     DEFINITIONS ..................................................................................... - 7 -

V.      CIVIL PENALTIES ........................................................................... - 13 -

VI.     NATURAL RESOURCE DAMAGES ................................................ - 17 -

VII.    TRUSTEES' MANAGEMENT AND APPLICABILITY

       OF JOINT NRD FUNDS ................................................................. - 21 -

VIII.   TRUSTEES' MANAGEMENT OF RECREATIONAL

       USE FUNDS .................................................................................... - 22 -

IX.     INJUNCTIVE RELIEF ...................................................................... - 23 -

X.      CORRECTIVE ACTION ORDER ..................................................... - 27 -

XI.     STIPULATED PENALTIES .............................................................. - 27 -

XII.    FORCE MAJEURE ........................................................................... - 35 -

XIII.   DISPUTE RESOLUTION .................................................................. - 37 -

XIV.    REPORTING ..................................................................................... - 39 -

XV.     CERTIFICATION .............................................................................. - 40 -

XVI.    INFORMATION COLLECTION AND RETENTION ...................... - 40 -

XVII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ........... - 43 -

XVIII.  TRANSFER AND ACQUISITION OF ASSETS ............................... - 49 -

XIX.    COSTS ............................................................................................... - 50 -

XX.     NOTICES ........................................................................................... - 51 -

XXI.    EFFECTIVE DATE ........................................................................... - 54 -

XXII.   RETENTION OF JURISDICTION ................................................... - 54 -

XXIII.  MODIFICATION ............................................................................... - 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 246 of 523
Case 2:20-cv-02415   Document 91   Filed 03/13/20   Page 4 of 102   Page ID #:757
Page ID #:757

XXIV.    TERMINATION ................................................................................- 55 -

XXV.    PUBLIC PARTICIPATION................................................................- 56 -

XXVI.    SIGNATORIES/SERVICE .................................................................- 56 -

XXVII.    INTEGRATION ..................................................................................- 57 -

XXVIII. FINAL JUDGMENT...........................................................................- 57 -

XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION .................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- ii -

Case 2:26-cv-03396-SVW-SSC    Document 23-13/2    Filed 05/07/26    Page 247 of 523
Case 2:20-cv-02415    Document 61    Filed 03/13/20    Page 9 of 102    Page ID #:58
Page ID #:758

A.    WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California.  A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach.  The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B.    WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C.    WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

Case 2:26-cv-03396-SVW-SSC Document 21-1 Filed 05/07/26 Page 248 of 523
Case 2:20-cv-02415 Document 91 Filed 03/13/20 Page 6 of 102 Page ID #:55
Page ID #:759

D.  WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E.  WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F.  WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G.  WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves.  The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected.  Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H.  WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned.  As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts.  Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 2 -

Case 2:26-cv-03396-SVW-SSC Document 21-13 Filed 05/07/26 Page 249 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 7 of 102 Page ID #:760
Page ID #:760

I.	WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations.  Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J.	WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K.	WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L.	WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 3 -

Case 2:26-cv-03396-SVW-SSC Document 21-13 Filed 05/07/26 Page 250 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 8 of 102 Page ID #:151
Page ID #:761

40 C.F.R. § 300.600 and Executive Order 12777.  CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.  In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq.*).  CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California.  CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M.     WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages.  As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources.  By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N.     WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

Case 2:26-cv-03396-SVW-SSC Document 21-13 Filed 05/07/26 Page 251 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 9 of 102 Page ID #:102
Page ID #:762

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O.     WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P.     WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q.     WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R.     WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S.     WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I.     BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2. Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

Case 2:26-cv-03296-SVW-SSC Document 31-1 Filed 05/07/26 Page 253 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 11 of 102 Page ID #:104
Page ID #:764

does business in this District and the alleged claims occurred in this District.

3.      For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

### III.    APPLICABILITY

4.      Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5.      Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree.  Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### IV.    DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree. For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H .html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 8 -

Case 2:26-cv-03896-SVW-SSC  Document 31-1  Filed 05/07/26  Page 255 of 523
Case 2:20-cv-02415-SVW-SSC  Document 6-1  Filed 03/13/20  Page 13 of 102  Page ID #:106
Page ID #:766

"Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

Case 2:26-cv-03296-SVW-SSC Document 6 Document 31-1/20 Filed 05/07/26 02 Page 256 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 14 of 102 Page ID #:107
Page ID #:767

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley. Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

Case 2:26-cv-03296-SVW-SSC   Document 6-1   Filed 05/07/26   Page 257 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 15 of 102   Page ID #:108
Page ID #:768

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

Case 2:26-cv-03896-SVW-SSC Document 6-1 Filed 05/07/26 Page 258 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 16 of 102 Page ID #:109
Page ID #:769

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq*., and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 12 -

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V. CIVIL PENALTIES

A. Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated as follows:

8. <u>Penalty Payment to the United States (PHMSA)</u>. For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

a. Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b. One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c. Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Case 2:26-cv-03806-SVW-SSC Document 21-1 Filed 05/07/26 Page 260 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 18 of 102 Page ID #:771
Page ID #:771

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.      At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.      <u>Penalty Payment to the United States (EPA) shared with CDFW and RWQCB</u>. The Penalty Payment shall be allocated as follows:

a.      As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

Case 2:26-cv-03206-SVW-SSC Document 31-1/20 Filed 05/07/26 Page 261 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 19 of 102 Page ID #:112
Page ID #:772

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1)    To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2)    To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 15 -

> State Water Resources Control Board
> Division of Administrative Services, ATTN: Civil
> Liability Payment
> P.O. Box 1888
> Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)     To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division.  Such monies are to be deposited in the OSLTF.  The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8).  Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.  Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

Case 2:26-cv-03806-SVW-SSC Document 21-1 Filed 05/07/26 Page 263 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 21 of 102 Page ID #:114
Page ID #:774

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.     Penalty Payment to be Paid to CDFW.  For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.     Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.     NATURAL RESOURCE DAMAGES

12.     Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

Case 2:26-cv-03396-SVW-SSC Document 31-1 Filed 05/07/26 Page 264 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 22 of 102 Page ID #:115
Page ID #:775

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961.  The NRD Payment shall be allocated as follows:

a.      To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment.  Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds).  Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

Department of the Interior
Natural Resource Damage Assessment and
        Restoration Program
Attention:  Restoration Fund Manager
1849 "C" Street, N.W. Mail Stop 4449
Washington, D.C.  20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198.  DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 18 -

Case 2:26-cv-03296-SVW-SSC  Document 21-1  Filed 05/07/26  Page 265 of 523
Case 2:20-cv-02415-SVW-SSC  Document 6-1  Filed 03/13/20  Page 23 of 102  Page ID #:116
Page ID #:776

b.      To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund.  Payment shall be made by check payable to the California Department of Parks and Recreation.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree.  The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
>      Recreation
> Attn:  Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California  95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund.  CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident.  CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c.      To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF.  Payment shall be made by check payable to the National Fish and Wildlife Foundation.  At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 19 -

Case 2:26-cv-03206-SVW-SSC Document 21-1 Filed 05/07/26 Page 266 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 24 of 102 Page ID #:117
Page ID #:777

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Game
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d. To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03806-SVW-SSC  Document 31-1  Filed 05/07/26  Page 267 of 523
Case 2:20-cv-02415 Document 6-1  Filed 03/13/20  Page 25 of 102  Page ID #:118
Page ID #:778

The Regents of the University of California
Attn:  Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account.  The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees.  The projects shall address the research, education, and outreach missions of the University of California.  UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants.  To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident.  DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

Case 2:26-cv-03206-SVW-SSC  Document 31-1  Filed 05/07/26  Page 268 of 523
Case 2:20-cv-02415-SVW-SSC  Document 6-1  Filed 03/13/20  Page 26 of 102  Page ID #:119
Page ID #:779

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16.     The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process.  The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17.     The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided.  Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein.  The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII.     TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18.     CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 22 -

Case 2:26-cv-03206-SVW-SSC Document 31-1 Filed 05/07/26 Page 269 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 27 of 102 Page ID #:120
Page ID #:780

19.    The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.    UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.    Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.    Material Changes to Plains' IMP.

a.    Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)    Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)    Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)    White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

        4)      Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

        5)      Section 11.4, "Documentation of P&M Evaluation Meetings;" and

        6)      Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.      At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.      In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.      In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30)

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 24 -

Days.  Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved.  If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII.  Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23.    <u>Material Changes in Control Room Management Plan and Control Center General Procedures</u>.

a.    Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree.  Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph.  For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.    At least thirty (30) Days prior to making a material modification to the above sections of  its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s).  In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC Document 21-1 Filed 05/07/26 Page 273 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 30 of 102 Page ID #:123
Page ID #:783

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days. Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24. Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03806-SVW-SSC Document 31-1 Filed 05/07/26 Page 273 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 31 of 102 Page ID #:124
Page ID #:784

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X.    CORRECTIVE ACTION ORDER

25.    Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect.  All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI.    STIPULATED PENALTIES

26.    Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.  A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27.    <u>Late Payment of Civil Penalties and NRD Payment</u>.

a.    If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b.    If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c.    If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

Case 2:26-cv-03806-SVW-SSC Document 6-1 Filed 05/07/26 Page 274 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 32 of 102 Page ID #:125
Page ID #:785

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. <u>Stipulated Penalties for Non-Performance of Injunctive Relief</u>. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

    a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

    b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

    c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

    d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

    e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

    f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

    g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC   Document 31-1   Filed 05/07/26   Page 275 of 523
Case 2:20-cv-02415-SVW-SSC   Document 6-1   Filed 03/13/20   Page 33 of 102   Page ID #:126
Page ID #:786

h.      For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.      For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.      For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.      For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.      For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.      For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.      For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.      For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.      For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.      For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 29 -

Case 2:26-cv-03806-SVW-SSC Document 31-1 Filed 05/07/26 Page 276 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 34 of 102 Page ID #:127
Page ID #:787

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.       For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.       For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.       For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.       For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.       For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.       For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.       For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.       The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

Case 2:26-cv-03896-SVW-SSC Document 31-1/20 Filed 05/07/26 02 Page 277 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 39 of 102 Page ID #:128
Page ID #:788

29. <u>Stipulated Penalties for Non-Compliance with Corrective Action Order Terms.</u> Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

a. For operation of Line 901 in violation of paragraph 1.a of Appendix D;

b. For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

c. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

d. For operation of Line 903, in violation of paragraph 1.e of Appendix D;

e. For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

f. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

g. For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

h. For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

i. The penalties stipulated in this Section shall accrue as follows:

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 31 -

Case 2:26-cv-03806-SVW-SSC   Document 31-1   Filed 05/07/26   Page 278 of 523
Case 2:20-cv-02415-SVW-SSC   Document 6-1   Filed 03/13/20   Page 36 of 102   Page ID #:129
Page ID #:789

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30.     Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31.     For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32.     For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33.     For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34.     For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v.*
*Plaines All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 32 -

Case 2:26-cv-03206-SVW-SSC Document 21-1 Filed 05/07/26 Page 279 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 37 of 102 Page ID #:136
Page ID #:790

a.   Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b.   Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c.   Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d.   If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35.   For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36.   For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties).  Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 33 -

Case 2:26-cv-03806-SVW-SSC Document 6 Document 31-1 Filed 05/07/26 Page 280 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 38 of 102 Page ID #:131
Page ID #:791

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

    a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

    b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 281 of 523
Case 2:20-cv-02415-SVW-SSC Document 61 Filed 03/13/20 Page 39 of 102 Page ID #:132
Page ID #:792

c.      If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41.      If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42.      The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43.      Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII.    FORCE MAJEURE

44.      "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03806-SVW-SSC Document 31-1 Filed 05/07/26 Page 283 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 40 of 102 Page ID #:133
Page ID #:793

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 36 -

Case 2:26-cv-03206-SVW-SSC Document 21-1 Filed 05/07/26 Page 283 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 41 of 102 Page ID #:134
Page ID #:794

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 284 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 42 of 102 Page ID #:135
Page ID #:795

Decree.

50. <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. <u>Formal Dispute Resolution</u>. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC    Document 6-1    Filed 05/07/26    Page 285 of 523
Case 2:20-cv-02415-SVW-SSC    Document 61    Filed 03/13/20    Page 43 of 102    Page ID #:136
Page ID #:796

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54.    Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55.    Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56.    The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute.  Payment shall be stayed pending resolution of the dispute.  If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV.  REPORTING

57.    After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 286 of 523
Case 2:20-cv-02415 Document 61 Filed 03/13/20 Page 44 of 102 Page ID #:137
Page ID #:797

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV.   CERTIFICATION

58.    Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI.  INFORMATION COLLECTION AND RETENTION

59.    Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 40 -

c.  obtain documentary evidence, including photographs and similar data; and

d.  assess Defendants' compliance with this Consent Decree.

60.  Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree.  At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61.  This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62.  For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2.  Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63.  The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 41 -

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 288 of 523
Case 2:20-cv-02415-SVW-SSC Document 31-1 Filed 03/13/20 Page 46 of 102 Page ID #:139
Page ID #:799

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.).  If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality.  In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64.     For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65.     State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.).  If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records.  If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66.     The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only.  Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC   Document 6   Document 31-1/20   Filed 05/07/26   Page 289 of 523
Case 2:20-cv-02415   Document 61   Filed 03/13/20   Page 47 of 102   Page ID #:146
Page ID #:800

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes.  Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67.  At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68.  [*Intentionally left blank.*]

**XVII.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS**

69.  This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70.  Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

    a.    49 C.F.R. Part 194 Subpart B – Response Plans;

    b.    49 C.F.R. Part 195 Subpart B – Reporting;

    c.    49 C.F.R. Part 195 Subpart E – Pressure Testing;

    d.    49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

    e.    49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

    f.    49 C.F.R. Part 195 Subpart H – Corrosion Control;

    g.    49 C.F.R. Part 199 – Drug and Alcohol Testing; and

    h.    All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 44 -

Case 2:26-cv-03396-SVW-SSC Document 31-1/20 Filed 05/07/26 02 Page 291 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 49 of 102 Page ID #:142
Page ID #:802

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

          a.     The Pipeline Safety Laws specified in Paragraph 70; and

          b.     California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 45 -

Case 2:26-cv-03806-SVW-SSC Document 31-1 Filed 05/07/26 Page 293 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 50 of 102 Page ID #:143
Page ID #:803

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC Document 31-1 Filed 05/07/26 Page 293 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 51 of 102 Page ID #:144
Page ID #:804

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81. Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

82. By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

Case 2:26-cv-03296-SVW-SSC Document 31-1 Filed 05/07/26 Page 294 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 52 of 102 Page ID #:145
Page ID #:805

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

Case 2:26-cv-03296-SVW-SSC Document 21-1 Filed 05/07/26 Page 295 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 53 of 102 Page ID #:146
Page ID #:806

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII. TRANSFER AND ACQUISITION OF ASSETS

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision. Those provisions of Appendix B are:

      a. For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

      b. For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

      c. For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

      d. For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer. Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 49 -

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 296 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 54 of 102 Page ID #:147
Page ID #:807

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements.  Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree.  Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90.     In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree.  Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer.  Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier.  Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91.     For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX.  COSTS

92.     Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 50 -

Case 2:26-cv-03206-SVW-SSC Document 6-1 Filed 05/07/26 Page 297 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 59 of 102 Page ID #:148
Page ID #:808

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## **XX.  NOTICES**

93.    Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:    eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail:    EES Case Management Unit
Environment and Natural Resources
    Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA:    James M. Pates
Assistant Chief Counsel
    for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials
    Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA:    Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 51 -

Case 2:26-cv-03296-SVW-SSC  Document 21-1  Filed 05/07/26  Page 298 of 523
Case 2:20-cv-02415  Document 6-1  Filed 03/13/20  Page 56 of 102  Page ID #:149
Page ID #:809

As to DOI:                          Clare Cragan
                                    U.S. Department of the Interior
                                    Office of the Solicitor
                                    755 Parfet St., Suite 151
                                    Lakewood, Colorado 80215

As to NOAA:                         National Oceanic and Atmospheric
                                         Administration
                                    Office of General Counsel
                                    Natural Resources Section
                                    ATTN:  Christopher J. Plaisted
                                    501 W. Ocean Blvd, Suite 4470
                                    Long Beach, California  90802

As to USCG:                         Patricia V. Kingcade
                                    Attorney Advisor
                                    National Pollution Funds Center,
                                         US Coast Guard
                                    2703 Martin Luther King Jr. Ave SE
                                    Washington, DC 20593-7605

As to the State Agencies:           Michael Zarro
                                    Deputy Attorney General
                                    Office of the Attorney General
                                    Natural Resources Law Section
                                    300 S. Spring St., Suite 11220
                                    Los Angeles, California 90013

As to CDFW:                         California Department of Fish
                                         and Wildlife
                                    Office of Spill Prevention and Response
                                    Attn: Katherine Verrue-Slater
                                    Senior Counsel
                                    P.O. Box 160362
                                    Sacramento, California  95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 52 -

Case 2:26-cv-03296-SVW-SSC   Document 21-1   Filed 05/07/26   Page 299 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 57 of 102   Page ID #:150
Page ID #:810

As to CDPR:                     California Department of Parks and
                                   Recreation
                                Attn: Laura A. Reimche, Senior Counsel
                                1416 Ninth Street, Room 1404-6
                                Sacramento, California 95814

As to CSLC:                     California State Lands Commission
                                Attn: Patrick Huber, Legal Division
                                100 Howe Avenue, Suite 100-South
                                Sacramento, California 95825

As to OSFM:                     California Department of Forestry and
                                   Fire Protection
                                Legal Services Office
                                Attn: Joshua Cleaver, Staff Counsel
                                P.O. Box 944246
                                Sacramento, California 94244-2460

As to RWQCB:                    California Central Coast Regional Water
                                Quality Control Board
                                Attn: Naomi Rubin, Attorney III
                                801 K Street
                                Sacramento, California 95814

As to UC:                       Barton Lounsbury, Senior Counsel
                                University of California
                                Office of the General Counsel
                                1111 Franklin Street, 8th Floor
                                Oakland, California  94607

As to Defendants:               Megan Prout
                                Senior Vice President
                                Commercial Law and Litigation
                                333 Clay Street, Suite 1600
                                Houston, Texas  77002

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 53 -

Case 2:26-cv-03396-SVW-SSC Document 21-1 Filed 05/07/26 Page 300 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 58 of 102 Page ID #:151
Page ID #:811

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California 95814

94. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI. EFFECTIVE DATE

96. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII. RETENTION OF JURISDICTION

97. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII. MODIFICATION

98. The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 54 -

Case 2:26-cv-03296-SVW-SSC Document 31-1 Filed 05/07/26 Page 301 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 59 of 102 Page ID #:152
Page ID #:812

99. Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV. TERMINATION

100. After Defendants have: (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation. Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination. If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101. Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement. The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree. If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102. If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution). However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 55 -

Case 2:26-cv-03206-SVW-SSC   Document 21-1   Filed 05/07/26   Page 303 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 60 of 102   Page ID #:153
Page ID #:813

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

## XXV.    PUBLIC PARTICIPATION

103.    This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period.  Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104.    Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

## XXVI.   SIGNATORIES/SERVICE

105.    Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.  For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 303 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 61 of 102 Page ID #:154
Page ID #:814

## XXVII. INTEGRATION

107. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII. FINAL JUDGMENT

108. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109. For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.

_____
UNITED STATES DISTRICT JUDGE

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 304 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 62 of 102 Page ID #:155
Page ID #:815

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020

Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
   Division U.S. Department of Justice

3/13/2020

Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources

Division

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 58 -

Case 2:26-cv-03806-SVW-SSC Document 21-1 Filed 05/07/26 Page 305 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 63 of 102 Page ID #:156
Page ID #:816

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
    Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Case 2:26-cv-03306-SVW-SSC   Document 31-1   Filed 05/07/26   Page 306 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 64 of 102   Page ID #:157
Page ID #:817

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20

Date

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

Case 2:26-cv-03806-SVW-SSC   Document 6-1   Filed 05/07/26   Page 307 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 65 of 102   Page ID #:158
Page ID #:818

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020

Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
      Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 61 -

Case 2:26-cv-03806-SVW-SSC Document 21-1 Filed 05/07/26 Page 308 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 66 of 102 Page ID #:159
Page ID #:819

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 309 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 67 of 102   Page ID #:160
Page ID #:820

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

_____3/2/20_____

Date

_____

LISA ANN L. MANGAT
Director
California Department of Parks
    and Recreation

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 64 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
_____
Date

_____
THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 65 -

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 312 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 70 of 102 Page ID #:163
Page ID #:823

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
_____
Date

_____
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water
Quality Control Board

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 66 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel


Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

Case 2:26-cv-08896-SVW-SSC   Document 31-1   Filed 05/07/26   Page 314 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 72 of 102   Page ID #:165
Page ID #:825

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

_____                     _____
Date                                        BARTON LOUNSBURY
                                            Senior Counsel
                                            Office of the General Counsel

*3 March 2020*                              _____
Date                                        PEGGY FIEDLER
                                            Executive Director
                                            UC Natural Reserve System

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67A -

Case 2:26-cv-03306-SVW-SSC   Document 21-1   Filed 05/07/26   Page 315 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 73 of 102   Page ID #:166
Page ID #:826

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

Consent Decree

- 68 -

Case 2:26-cv-03396-SVW-SSC   Document 6   Filed 05/07/26   Page 316 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 74 of 102   Page ID #:167
Page ID #:827

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 69 -

Case 2:26-cv-03296-SVW-SSC   Document 21-1   Filed 05/07/26   Page 317 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 79 of 102   Page ID #:168
Page ID #:828

# APPENDIX A

## *(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*



*Appendix A – Line 901*

Scale: 1:100,000

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.



*Appendix A – Line 903*

Scale: 1:700,000

Sheet No: 1/1

Owner: PLAINS ALL AMERICAN PIPELINE, L.P.



*Appendix A – Line 2000*

Scale: 1:966,574

Sheet No: 1/1

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Case 2:26-cv-03806-SVW-SSC   Document 21-1   Filed 05/07/26   Page 321 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 79 of 102   Page ID #:172
Page ID #:832

# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-74-

Case 2:26-cv-03896-SVW-SSC   Document 21-1   Filed 05/07/26   Page 322 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 80 of 102   Page ID #:173
Page ID #:833

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A.  Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901.  Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B.  Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C.  Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903.  The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D.  Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E.  To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver.  Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received.  Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver.  Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A.  Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners.  Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

Case 2:26-cv-03806-SVW-SSC Document 31-1 Filed 05/07/26 Page 323 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 81 of 102 Page ID #:174
Page ID #:834

1.   On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a.   Test for potential AC/DC interference.  Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b.   Conduct a close interval survey (CIS) and AC/DC interference survey.

   c.   Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B.   As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C.   As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3.   **Third-Party Analysis of Line 2000 ILI Data**

A.   Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B.   The consultant shall:

   1.   Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2.   Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3.   Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4.   Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

Case 2:26-cv-03296-SVW-SSC Document 31-1 Filed 05/07/26 Page 324 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 82 of 102 Page ID #:175
Page ID #:835

5.     Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6.     Comply with additional requirements specified in the scope of work.

C.     The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1.     The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2.     The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3.     Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4.     Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4.   **Integrity Management**

A.     For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1.     Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a.     In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

Case 2:26-cv-03296-SVW-SSC Document 31-1 Filed 05/07/26 Page 325 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 89 of 102 Page ID #:176
Page ID #:836

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

    i. Assessment data from ILI tool runs;

    ii. Dig and repair data;

4

Case 2:26-cv-03296-SVW-SSC Document 31-1 Filed 05/07/26 Page 326 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 84 of 102 Page ID #:173
Page ID #:837

iii.     Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv.     Operational data, such as pressure and flow data;

v.     Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi.     Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii.     Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.     ILI Measures

a.     <u>Initial ILI Runs</u>. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i.     All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

Case 2:26-cv-03296-SVW-SSC   Document 31-1   Filed 05/07/26   Page 327 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 89 of 102   Page ID #:178
Page ID #:838

ii.  In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run.  If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b.  <u>Subsequent ILI Runs</u>.  After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year.  Alternatively, Plains may run a UT tool each year.  If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c.  <u>All ILI Runs</u>.  Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.  **Valves**

A.  Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1.  Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2.  Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B.  Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C.  Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

6.   **Risk Analysis**

A.   For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

1.   Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

a.   The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

b.   Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis.  The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

c.   The risk analysis shall be due within one year from entry of the CD.

7.   **Leak Detection**

A.   For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

B.   Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8.   **Non-waiver**

A.   Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9.   **Integrity Management**

A.   New Procedures for Interim Reviews and Assessments

7

Case 2:26-cv-03396-SVW-SSC Document 6-1 Filed 05/07/26 Page 329 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 87 of 102 Page ID #:180
Page ID #:840

1.  Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2.  Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3.  Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B.  Documentation for P&M Recommendations

1.  Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

    a.  What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

    b.  The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

Case 2:26-cv-03296-SVW-SSC   Document 31-1   Filed 05/07/26   Page 330 of 523
Case 2:20-cv-02415-SVW-SSC   Document 6-1   Filed 03/13/20   Page 86 of 102   Page ID #:181
Page ID #:841

     c.     The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

    2.     In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

    3.     In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.    Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented.  Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10.    **Valves and O&M**

A.    Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.    Within two years of entry of the CD, Plains shall develop and implement procedures to:

    1.     If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

    2.     Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

    3.     Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

    4.     Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.    Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

Case 2:26-cv-03396-SWW-SSC Document 21-1 Filed 05/07/26 Page 331 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 89 of 102 Page ID #:842
Page ID #:842

D. For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

1. Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E. Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11. **Leak Detection**

A. Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

1. Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B. For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C. Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

1. Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D. Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

1. Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

Case 2:26-cv-03296-SVW-SSC Document 31-1/20 Filed 05/07/26 Page 332 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 90 of 102 Page ID #:183
Page ID #:843

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E. Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F. Instrumentation and Display

1. To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a. Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b. Track these conditions through to resolution, including instrumentation relocation when necessary.

12. **Control Room Management**

A. For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1. Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2. Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3. Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4. Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

Case 2:26-cv-03206-SVW-SSC Document 21-1 Filed 05/07/26 Page 333 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 91 of 102 Page ID #:184
Page ID #:844

B. For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C. Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13. **Emergency Response and Oil Spill Response Plans**

A. California-Specific Provisions:

1. Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B. Company-Wide Provisions

1. Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2. Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3. Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

-86-

Case 2:26-cv-03296-SVW-SSC  Document 21-1  Filed 05/07/26  Page 334 of 523
Case 2:20-cv-02415-SVW-SSC  Document 6-1  Filed 03/13/20  Page 92 of 102  Page ID #:185
Page ID #:845

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B. Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15. **Drug and Alcohol Program**

A. Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors.  Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures.  Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

Case 2:26-cv-03206-SVW-SSC   Document 21-1   Filed 05/07/26   Page 336 of 523
Case 2:20-cv-02415   Document 6-1   Filed 03/13/20   Page 94 of 102   Page ID #:873
Page ID #:847

# APPENDIX C

## (*Intentionally left blank*)

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-03896-SVW-SSC Document 21-1 Filed 05/07/26 Page 337 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 95 of 102 Page ID #:188
Page ID #:848

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

Case 2:26-cv-03206-SVW-SSC Document 21-1/20 Filed 05/07/26 02 Page 338 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 96 of 102 Page ID #:189
Page ID #:849

## APPENDIX D

1.      All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

    a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

    b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

        1)      Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

        2)      Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

        3)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

        4)      A specific day-light restart that includes advance communications with local emergency response officials;

        5)      Master Control Room enhancements, including:

            a) Implementation of advanced leak-detection

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

Case 2:26-cv-03296-SVW-SSC Document 31-1 Filed 05/07/26 Page 340 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 98 of 102 Page ID #:191
Page ID #:851

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

Case 2:26-cv-03206-SVW-SSC Document 31-1/20 Filed 05/07/26 Page 341 of 523
Case 2:20-cv-02415 Document 6-1 Filed 03/13/20 Page 99 of 102 Page ID #:192
Page ID #:852

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

Case 2:26-cv-03296-SVW-SSC Document 6-1 Document 21-1 Filed 05/07/26 Filed 03/13/20 Page 342 of 523 Page 100 of 102 Page ID #:193

Page ID #:853

903 to the OSFM for review and approval.  Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree.  In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)      Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)      Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)      Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.**  After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.**  After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)      The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

Case 2:26-cv-03296-SVW-SSC Document 6-1 Filed 05/07/26 Page 343 of 523
Case 2:20-cv-02415-SVW-SSC Document 6-1 Filed 03/13/20 Page 101 of 102 Page ID #:194
Page ID #:854

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2)     The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction.  Requests for removal of the pressure restriction may be submitted by pipeline segment.

i.  **Notifications.**  Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j.  **Reporting Requirements for Lines 901 and 903.**  If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1)     The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2)     Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

Case 2:26-cv-03296-SVW-SSC Document 21-1 Filed 05/07/26 Page 344 of 523
Case 2:20-cv-02425-SVW Document 6-1 Filed 03/13/20 Page 102 of 102 Page ID #:855
Page ID #:855

3)     The Appendix D Documentation Report shall include but not be limited to:

    A.   Table of Contents;

    B.   [*intentionally left blank.*]

    C.   [*intentionally left blank.*]

    D.   Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

    E.   [*intentionally left blank.*]

    F.   [*intentionally left blank.*]

    G.   Lessons learned while fulfilling the requirements of this Appendix D.

# EXHIBIT E

# Hunt & Associates
## Biological Consulting Services

Paul Roberti
Pipeline and Hazardous Materials Safety Administration
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washinton, DC 20590
*Submitted via regulations.gov*                                            April 3, 2026

**Subject: Comments on Potential Impacts of Restarting and Operating the Las Flores Pipeline System on Listed Plants, Wildlife, and Habitats (Docket No. PHMSA-2026-0464).**

**Background:** On December 23, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) issued two approvals to Sable Offshore Corp. and its wholly-owned subsidiary Pacific Pipeline Company (together, "Sable"): an Emergency Special Permit ("ESP") for pipelines CA-324 and CA-325 and the approval of Restart Plans for those pipelines (together with the ESP, the "Approvals"). The ESP purported to permit Sable's restart and operation of pipelines CA-324 and CA-325 (the "Onshore Pipelines") by mandating more frequent In-Line Inspections ("ILI") and the immediate repair of anomalies that exceed specific safety thresholds as a substitute for the lack of an effective cathodic protection system on the Onshore Pipelines. The ESP did not authorize new pipeline construction and limited activities to preventative maintenance within the existing, previously disturbed Right-of-Way ("ROW"). The ESP expired on February 21, 2026.  On January 22, 2026, Sable submitted a Special Permit application seeking to receive a long-term waiver of those same safety requirements. That application is now subject to notice and comment. Should PHMSA approve that application, PHMSA's approval of Sable's Special Permit may affect species listed as threatened or endangered under the Endangered Species Act (ESA) and their critical habitat, as identified in this letter, and has reasonably foreseeable significant effects on the environment.

Sable owns the three offshore platforms Hondo, Harmony, and Heritage (collectively, "the Santa Ynez Unit" or "SYU") which are located in federal waters. Crude oil and natural gas developed at the SYU travels roughly three miles to shore via a subsea pipeline that terminates at an oil and gas processing facility called the Los Flores Canyon Processing Facility.  This facility is located in the Las Flores/Corral Canyon on the south coast of Santa Barbara County, and separates oil from gas and other by-products.  The Onshore Pipelines transport the oil along the south coast to Gaviota State Park, then northward (inland) to the Pentland Station in Kern County.

**Qualifications**: I am a professional biologist (B.S., Vertebrate Zoology, Univ. of California-Berkeley; M.A., Ecology and Systematics (Herpetology), Univ. of Kansas; Ph.D. Cand., Ecology and Evolutionary Biology, Univ. California-Santa Barbara).  I have been a resident of Santa Barbara County since 1982 and sole proprietor of Hunt & Associates Biological Consulting Services since 1985.  I am a herpetologist by training and a consulting biologist with over 45

years of field and research experience with rare, threatened and endangered plant and wildlife species and their habitats in southwestern California. As a consultant, I have prepared hundreds of biological assessments, biological evaluations, biological resources sections of EIR/EISs, habitat restoration plans, habitat conservation plans (HCPs), local, state, and federal resource agency consultation, mitigation analyses, and permit compliance monitoring. Clients include planning departments for city and county governments and planning agencies, state and federal resource management agencies, non-governmental conservation organizations, and private corporations and individuals. I have conducted field work and biological resource evaluations throughout much of the Onshore Pipelines' route between 1985 and the present. My comments are restricted to non-marine species and habitats.

**Federal and State Candidate and Listed Species:** The Onshore Pipelines route crosses several major landforms in Santa Barbara to Kern County that support the species in Table 1, including the southern foothills and coastal plain of the Santa Ynez Mountains, the Santa Ynez River valley, the Purisima Hills and Solomon Hills of the western Sierra San Rafael range, the Sierra Madre range, the Cuyama River valley, the western portion of the Temblor Range, and the southwestern corner of the San Joaquin Valley. The Onshore Pipelines route traverses a variety of aquatic, wetland, riparian, and upland habitats occupied by one or more of the species listed in Table 1. Particularly sensitive habitats are found in the seasonal, intermittent, and permanent drainages crossed by the pipeline route, including coastal drainages between the Las Flores Canyon Processing Facility and Gaviota Creek along the south coast of Santa Barbara County, and inland along Nojoqui Creek, the Santa Ynez River, Zaca Creek, the Sisquoc River, Tepesquet Creek, and the Cuyama River. Upland habitats traversed by the pipeline route include annual grassland, savannah, woodland, coastal sage scrub, chaparral, and chenopod scrub habitats that provide foraging, nesting, and/or dispersal corridors for listed species. Importantly, wetland, riparian, and many upland habitats along the pipeline route are designated as Environmentally Sensitive Habitat (ESH) by local, state, and/or federal agencies (e.g., County of Santa Barbara, California Department of Fish and Wildlife, U.S. Fish and Wildlife Service, and/or U.S. Army Corps of Engineers).

Table 1 lists 36 state and/or federal Candidate, Threatened, and Endangered (collectively, "Special-Status") plants and wildlife whose historical geographic ranges overlap the Onshore Pipelines route. Six of these species have been extirpated from much of their former range and no longer are expected to occur in the project area. Thirty (30) other species have been found or could occur along the route of the Onshore Pipelines and could be impacted by restarting and operating the pipelines.

**Fully Protected Species:** The California Department of Fish and Game created "Fully Protected" status in the 1960s to identify and provide additional protection to fish, amphibians, reptiles, birds, and mammals that were rare or faced possible extinction. This classification predates the California Endangered Species Act and most Fully Protected taxa are now listed as threatened or endangered under CESA. The California Department of Fish and Wildlife can authorize 'take' of Fully Protected species only for five types of projects, none of which include oil or gas transmission pipeline construction, maintenance, or operation. This means that the Las Flores Pipeline system must be maintained and operated so as not to cause 'take' of at least five of the seven Fully Protected species described in Table 1.

**Table 1. Federal-Listed, State-Listed, Candidate, and CDFW Fully Protected Plants and Wildlife in Las Flores Pipeline Project Area.**

| Species | Status | Critical Habitat Designated? | Occurrence in Project Area | Reasonably Foreseeable Impacts* |
|---|---|---|---|---|
| *PLANTS* | | | | |
| California jewelflower *Caulanthus californicus* | FE, SE | No | 45 occurrences found during surveys in March-April 2017 along Plains Pipeline route in Cuyama Valley, from 25 miles northwest to 2.5 miles east of jct Hwy. 166 x Hwy. 33. | Depletion of seed bank due to crushing of plants or burial of seeds by vehicles or heavy equipment during grubbing, grading; disruption of pollination, create conditions favorable to invasive, non-native grasses and forbs. |
| Gaviota tarplant *Deinandra increscens* ssp. *villosa* | FE, SE | Yes, project area overlaps critical habitat on south coast SB County. | Coastal bluff scrub, coastal grassland, and coastal sage scrub from Canada San Onofre west to Gaviota Pass in Santa Barbara County.  Most records are south of Hwy 101; three records are north of Hwy 101, near pipeline route. | Depletion of seed bank due to crushing of plants or burial of seeds by vehicles or heavy equipment during grubbing, grading; disruption of pollination, promote invasive, non-native grasses and forbs. |
| San Joaquin woollythreads *Monolopia congdonii* | FE | No | Several occurrences near pipeline route in Cuyama Valley from Cottonwood Canyon Rd east to northeastern edge of valley. | Depletion of seed bank due to crushing of plants or burial of seeds by vehicles or heavy equipment during grading, grubbing; disruption of pollination, promote invasive, non-native grasses and forbs. |
| Bakersfield cactus *Opuntia basilaris* var. *treleasei* | FE, SE | No | Formerly found throughout southern San Joaquin Valley and foothills, now restricted to valley floor and foothills around Comanche Point, E of Mettler, 30 mi E of Pentland; population found NW of Wheeler Ridge, about 15 mi SSE of Pentland in 1990s during surveys for Pacific Pipeline Project (Hunt, pers. observ.) now apparently extirpated). Likely no longer occurs along San Joaquin Valley segment of Las Flores Pipeline System route. | Project is not likely to impact this species. |

5290 Overpass Road, Suite 108
Santa Barbara, California   93111
Office: (805) 967-8512     Cell: (805) 689-7423
Email: anniella@verizon.net

4

| INVERTEBRATES | | | | |
|---|---|---|---|---|
| Vernal pool fairy shrimp *Branchinecta lynchi* | FT | Yes, but project area does not overlap critical habitat. | Species occurs in ephemeral pools, puddles, ponds, even tire ruts in dirt roads and other man-made depressions. Short-lived--max lifespan of 140 days; matures in 18-41 days.  Entire pipeline route is within geographic range. May occur in natural and man-made depressions over broad portion of pipeline route. | Work done in rainy season could kill individuals or bury cysts in ephemeral, man-made water sources, such as depressions made during grubbing or excavation, tire ruts in access roads, etc. |
| Monarch *Danaus plexippus* | FT | Yes, project area overlaps critical habitat at Gaviota State Park, Canada del Cementerio and Canada de Alcatraz on south coast SB County. | Meade (1999) documented autumnal and overwintering aggregations at Gaviota, Cementario, Alcatraz, Arroyo Quemado, Tajiguas, Refugio, and Corral Canyon drainages near the pipeline route. Occurs as transient individuals over most of the pipeline route. | Depletion of seed bank of larval host plant (milkweeds) or adult nectar plants (e.g., buckwheats), due to crushing of plants or burial of seeds during grubbing, grading; create conditions favorable to invasive, non-native grasses and forbs that outcompete larval host plants and adult nectar sources; disruption of aggregation sites by night-lighting, noise during repair/testing activities. |
| Kern primrose sphinx moth *Euproserpinus euterpe* | FT | Yes, but project area does not overlap. | Pipeline route passes through the geographic range of this species in the Cuyama Valley, from Cottonwood Canyon east to northeastern edge of valley.  Found in sandy washes, including Cuyama River floodplain and other sandy soils.  Records The moth's specific host plant requirements make the species particularly vulnerable to habitat degradation that results in the loss of their primary food plant, primrose (*Camissonia sp.*). | Depletion of seed bank of larval host plant (primroses); soil disturbance creates conditions favorable to invasive, non-native grass and forbs, such as filaree (*Erodium cicutarium*), which displaces larval host plants; mortality of adults from vehicular traffic or heavy equipment; crushing of pupae in diapause in underground refugia. |
| Crotch's bumble bee *Bombus crotchii* | CSE | No | Entire pipeline route is within historic geographic range of this species.  Species is declining throughout its range. | Loss of pollinator food plants and crushing of underground nests by vehicles and equipment during grubbing and grading; colonization of disturbed sites with invasive, non-native annual grasses and forbs. |

5

| | | | FISHES | |
|---|---|---|---|---|
| Southern steelhead *Oncorhynchus mykiss* | FE | Yes, project area overlaps critical habitat on south coast, Santa Ynez and Sisquoc River watersheds in Santa Barbara County. | Refugio Creek: historically occupied; barriers in watercourse (culverts) in State Park prevent anadromy; 2003 NMFS study concluded steelhead were absent from the drainage, but resident rainbow trout may occur in upper watershed.<br><br>Tajiguas Creek – culvert at mouth prevents anadromy; resident rainbow trout inhabit upper watershed; pipeline crosses drainage about 575 ft upstream of mouth.<br><br>Arroyo Quemado: historical occurrence; culverts at UPRR and Hwy 101 are passage barriers; resident rainbow trout in upper watershed; lagoon has potential for adults.<br><br>Arroyo Hondo – occupied; anadromous drainage.<br><br>Canada de San Onofre – historically present; resident rainbow trout may inhabit upper watershed.<br><br>Gaviota Creek – occupied; anadromous drainage; pipeline ROW crosses creek 3,300 ft upstream of lagoon.<br><br>Santa Ynez River – occupied; anadromous drainage; pipeline ROW crosses floodplain about 0.8-1 mi W (downstream) Hwy 101 bridge.<br><br>Sisquoc River – occupied; anadromous drainage; pipeline ROW crosses floodplain near Flood Ranch.<br><br>Tepesquet Creek: adult fish observed approx. 2,500 ft S (downstream) of pipeline crossing in early 2000s. (Hunt, pers. obser.); pipeline ROW crosses | Anadromous adults enter streams Dec-March; spawn Mar-Apr. Resident rainbow trout may occur upstream of barriers to anadromy. Vegetation grubbing, grading near creeks could increase soil erosion and cause sedimentation that can bury redds, eggs, larvae, as well as aquatic insect prey of juvenile and adult fish; turbid water can interfere with oxygen uptake by fish; work in drainages requires stream diversions that can trap juvenile and adult fish. |

6

| | | | floodplain 6,800 ft upstream of confluence with Sisquoc River. | |
|---|---|---|---|---|

| Tidewater goby *Eucyclogobius newberryi* | FT | Yes, project area overlaps critical habitat in Arroyo Hondo and Gaviota State Park watersheds. | Refugio Creek – Conception Recovery Unit CO3M; pipeline ROW crosses creek 1,100 ft upstream of mouth of creek.<br><br>Arroyo Quemado – Conception Recovery Unit CO3L; pipeline ROW crosses creek 675 ft upstream of Hwy 101 culvert.<br><br>Arroyo Hondo – Conception Recovery Unit CO3K; pipeline ROW crosses creek 100-150 N of Hwy 101.<br><br>Gaviota Creek – Conception Recovery Unit CO3J; pipeline ROW crosses creek 3,300 ft upstream of lagoon. | Adults construct nests and spawn in low-salinity terminal lagoons; individuals may disperse 1-2 miles upstream from lagoons; soil erosion and sedimentation from grubbing, grading activities could bury nests, eggs, larvae, and interfere with ability of adults to forage. |
|---|---|---|---|---|
| | | | ***AMPHIBIANS*** | |
| California tiger salamander *Ambystoma californiense* | FE/SE | Yes, but project area does not overlap critical habitat. | Pipeline ROW lies within the Eastern Los Alamos Valley and Eastern Santa Maria Valley metapopulations. Majority of adult populations are typically found within 2,200 feet (1.3 km) of breeding ponds. Potential breeding habitat occurs at three sites within CTS dispersal distance from pipeline route: stock ponds located at 34.69487N; -120.19198W; stock pond located 2,300 ft SE of the above pond; and stock pond located at 34.82914N; -120.21551W. | CTS emerge from rodent burrows at night during rains from Nov-Mar to feed and move to breeding ponds after they have filled (Dec-Mar), then return to same upland burrow systems; larval development takes 70+days. Vegetation grubbing, grading, trenching, soil compaction; vehicular traffic could run over individuals and crush burrow systems that provide essential refugia for CTS. Open trenches, soil stockpiles, and grading in uplands could trap individuals and/or interfere with dispersal between breeding sites and upland burrows. |
| Western spadefoot *Spea hammondii* | FPT | No | Pipeline route from Santa Ynez River in SB County to Pentland in Kern County is within geographic range of this species. Co-occurs with CTS at many locations, using same breeding sites and burrow systems. | Vegetation grubbing, grading, trenching, soil compaction; vehicular traffic could kill individuals and crush burrow systems that provide essential refugia. Open trenches, soil stockpiles, and grading in uplands could trap individuals and/or interfere with dispersal between breeding sites and upland burrows. |
| Arroyo toad *Anaxyrus californicus* | FE/SE | Yes, project area overlaps Critical | Pipeline ROW crosses Sisquoc River near Flood Ranch. | Vehicle traffic, grubbing, grading, trenching on terraces adjacent to Sisquoc River active channel could kill adults and juveniles; work in active channel could kill egg masses and larvae directly or |

8

| | | Habitat Unit 2 in Sisquoc River in SB County. | | due to sedimentation. |
|---|---|---|---|---|
| Foothill yellow-legged frog *Rana boylii* | SE/FE | Yes, but project does not overlap. | Pipeline route along south coast of SB County is in historic geographic range, but species has apparently been extirpated here. Populations may occur further north in drainages in the Transverse Range (Sierra San Rafael and Sierra Madre). | Pipeline repair and operation is not expected to impact this species. |
| California red-legged frog *Rana draytonii* | FT | Yes, pipeline crosses critical habitat along south coast drainages in SB County. | Adults, larvae, and/or egg masses have been found at the following locations in or near the pipeline route:<br><br>Las Flores Canyon Creek/Corral Canyon Creek: adults and larvae present in 2022. Critical Habitat.<br><br>Refugio Creek – Large breeding population present in 2026. Critical Habitat<br><br>Tajiguas Creek: adults and larvae present in early 2000s (Hunt, pers. observ.). Critical Habitat.<br><br>Arroyo Quemado: adults and larvae present in 2010s (Hunt, pers. observ.). Critical Habitat.<br><br>Canada de la Pila: adults and juveniles present on N side of landfill in 2000s (Hunt, pers. observ.).<br><br>Arroyo Hondo: adults, juveniles, larvae, egg masses observed in 2026.<br><br>Canada de Guillermo and Canada de la Posta, Canada de Molino, and Canada de los Zorillos: high potential.<br><br>Gaviota Creek main stem and upper watershed around Las Cruces: adults and juveniles observed in 2000s and 2010s (Hunt, pers. observ.). Critical Habitat. | Adults breed Feb-May; larval development 3-4 months; radio-tracking and other observations have documented that adults can disperse a mile or more from aquatic sites; adults show high site fidelity when relocated; dispersal between watersheds is overland, not along riparian corridor; adults and juveniles forage in uplands several hundreds of feet from aquatic sites.<br><br>Vehicular traffic, grading, veg removal, and trenching in work sites in uplands could kill or entrap adults and juveniles and crush burrow systems used as upland refugia. Sedimentation in creeks could bury egg masses and larvae and interfere with larval foraging. |

| | | | Nojoqui Creek: adults observed in 2000s from reach west of jct of Hwy 101 x old Alisal Road; also observed in Nojoqui Creek 2.2 rd mi S Buellton in 2025 (CNDDB)<br><br>Santa Ynez River: CRLF found 1.3 air mi SE jct SYR x Hwy 101 bridge in 2007 (CNDDB); floodplain provides good breeding, foraging, and dispersal habitat for CRLF.  Pipeline crosses floodplain 0.8-1.0 air mi west (downstream) of Hwy 101 bridge.<br><br>Zaca Creek: adults observed in creek at Jonata Park Road bridge over creek in 2000 (CNDDB); adults and larvae observed in creek west of jct Hwy 101 x old Hwy 154 in 1998-2000 (Hunt, pers. observ).<br><br>Overland sites between Zaca Creek and Sisquoc River - stock ponds located at 34.82309N; -120.22399W; 34.82914N; -120.21551W; and 34.82914N; -120.21557W may support CRLF breeding; pipeline route is within CRLF dispersal from these sites.<br><br>Sisquoc River: adults, juveniles, and larvae have been found at several locations in floodplain from confluence with Cuyama River upstream to pipeline crossing in 1990s (CNDDB).<br><br>Tepesquet Creek: adult CRLF observed 2,500 ft S (downstream) of pipeline crossing in 2000s (Hunt, pers. observ.). | |
| | | | ***REPTILES*** | |
| Southwestern pond turtle<br>*Actinemys pallida* | FPT | No | Historically occurred in drainages throughout SB County, now greatly reduced or extirpated from many locations (Thomson et al., 2016).  Extant populations in Las Flores/Corral Canyon, Refugio, Tajiguas, Arroyo Hondo, Gaviota, Nojoqui creeks, | Adults and juveniles spend most time in aquatic habitats (streams, ponds, etc.), but eggs are laid in nests located in upland habitats several hundred feet from aquatic sites.  Adult, juvenile, and hatchling turtles are subject to crushing from vehicle traffic |

10

| | | | Santa Ynez River, Zaca Creek, Sisquoc River, Tepesquet, La Brea creeks, and Cuyama River in SB County.  Northwestern pond turtles (*A. marmorata*), historically occurred in southern San Joaquin Valley in Kern County, now mostly extirpated from valley floor. | or heavy equipment during grubbing, grading; nests can be crushed during these activities.  Work in drainages can result in sedimentation that can bury foraging habitat. |
|---|---|---|---|---|
| Blunt-nosed leopard lizard *Gambelia sila* | FE/SE FP | No | Historic geographic range included the eastern half of the Cuyama Valley, now extirpated from much of the valley floor. Populations still occur in foothills bordering northeastern edge of Cuyama Valley into the Elkhorn Plain and foothills around the western edge of SJ Valley.  Pipeline route from east of Cottonwood Canyon in Cuyama Valley eastward to Pentland in Kern County is near recent observations. | Vehicle traffic, grubbing, grading, and trenching could crush and/or entrap individuals and collapse burrow systems used by this species as refugia. |
| | | | ***BIRDS*** | |
| California condor *Gymnogyps californianus* | FE/SE FP | Yes, but project area does not overlap. | Entire pipeline route is within geographic range of this species, but mostly likely to occur in open country along interior portions of route.  Nearest nest records are dozens of miles from pipeline route. | Not likely to be impacted by pipeline maintenance or operation. |
| Golden eagle *Aquila chrysaetos* | FP | No | Permanent resident to interior portions of SB and Kern counties.  Entire pipeline route is within geographic range, but most likely to forage and nest in open country along interior portions of route. | Night-lighting, increased noise, and human activity associated with pipeline repair and operations in the vicinity of active nests could cause adults to abandon nest sites. |
| Bald eagle *Haliaeetus leucocephalus* | SE/FP | No | Recent sightings along south coast of SB County and around interior reservoirs as winter visitor and occasional nester (e.g., Lake Cachuma; Twitchell Reservoir).  Rare elsewhere along pipeline route. | Not likely to be impacted by pipeline maintenance or operation. |
| Swainson's hawk *Buteo swainsoni* | ST | No | Rare fall and winter transient in open country along the pipeline route. | Night-lighting, increased noise, and human activity associated with pipeline repair and operations in the vicinity of roost sites could cause individuals to alter foraging patterns or abandon roost sites. |
| White-tailed kite *Elanus leucurus* | FP | No | Species experiences wide fluctuations in numbers in SB County. Foraging habitat typically includes open grassland, marshlands, agricultural fields. Kites are more common along coastal SB County in fall and winter.  Nests communally. Populations | Repair and testing activities during pipeline operation could disrupt foraging patterns in grassland and open woodland areas. |

| | | | recently are at a very low level in SB County. No recent nesting records along pipeline route. | |
|---|---|---|---|---|
| Western snowy plover *Charadrius nivosus nivosus* | FT | Yes, but project area does not overlap. | Pipeline route from Las Flores Canyon facility to Gaviota State Park is within geographic range. Winters on beaches along south coast of SB County. | Oil spill and subsequent containment and cleanup actions could kill adults, nestlings, and juveniles in nesting habitat miles from the location of spill (e.g., Coal Oil Point). Roosting and foraging habitat on beaches along south coast of SB County could be impacted by oil spill. Repair and maintenance of pipeline is not expected to impact this species. |
| California least tern *Sterna antillarum browni* | FE/SE FP | No | Summer resident (post-breeding) to beaches and nearshore waters along south coast of SB County. | Impacts due to oil spill would be similar to those for western snowy plover. Repair and maintenance of pipeline is not expected to impact this species. |
| Marbled murrelet *Brachyramphus marmoratus* | FT/SE | No | Late summer through winter visitor along south coast of SB County. Small numbers winter in nearshore waters in SB Channel. | Could be impacted by oil spills, including containment and cleanup actions. |
| Western yellow-billed cuckoo *Coccyzus occidentalis americanus* | FT/SE | Yes, but project area does not overlap. | Rare transient to south coast and riparian woodlands along Santa Ynez and Sisquoc rivers in SB County. | Impacts to this species could include disruption of roosting and/or foraging habitat due to increased noise, night-lighting associated with pipeline repair and testing at specific locations along pipeline route through suitable habitat, e.g., Santa Ynez River floodplain. |
| Burrowing owl *Athene cunicularia* | SC | No | Formerly relatively common breeder along south coast and open country in interior portions of SB County, now transient and winter visitor along south coast and rare breeder in the interior. May be found throughout pipeline route, particularly in Cuyama Valley and southern San Joaquin Valley. | Vegetation grubbing and grading, trenching, and vehicle and heavy equipment traffic activities could collapse burrow systems used by owls as refugia and for nesting. Noise, night-lighting, and increased human presence could cause birds to abandon burrow systems and alter foraging patterns. |
| Southwestern willow flycatcher *Empidonax traillii extimus* | FE/SE | Yes, project area overlaps critical habitat in Santa Ynez River in Santa Barbara County. | Nesting in Santa Ynez River bed within one mile downstream of Hwy 101 bridge (project area) in 1986; 1991-92; observations in 2019, 2020; May and June 2022 and June-July 2023 in riverbed about 0.5 mi W of Hwy 101 bridge; nests May-July. Pipeline ROW passes 750-1,075 ft W of 2022 sightings and 500 ft or less N of 1991-92 nesting sites. | Increased noise levels and human activity in daytime or at night during nesting season could interfere with courtship and breeding, and cause nest abandonment. Oil spill in Santa Ynez River floodplain could cause long-term damage to nesting and foraging habitat. |

| | | | | |
|---|---|---|---|---|
| Least Bell's vireo *Vireo bellii pusillus* | FE/SE | Yes, but project area does not overlap. | Recent sightings in Santa Ynez Riverbed one mile or less downstream of Hwy 101 bridge in 2016, 2017, 2019 (7 males on territory), and in 2022. Observations were made in April-July/August (nesting season is mid-March to late July). Most observations are within 0.5 mi S of Hwy 101 bridge. Pipeline ROW passes 2,300 ft W of 2022 sighting.<br><br>Species sighted in Sisquoc River in 1993 (LSA Associates) in vicinity of Garey bridge, about 1.5 miles upstream of pipeline ROW. Sightings and possible nesting along Sisquoc River near towns of Garey and Sisquoc and near confluence of Sisquoc River with Tepusquet Creek and downstream at confluence with Cuyama River. Current status there unknown. | Increased noise levels, night-lighting, and increased human activity in daytime or at night during nesting season could interfere with courtship and breeding, and cause abandonment of foraging habitat, territories, and/or nests. |
| Tricolored blackbird *Agelaius tricolor* | ST | No | Entire pipeline route is within geographic range, but populations, especially breeding sites, are very localized and declining. Breeding occurs April-July, in large, localized colonies in freshwater marsh habitats. Species foraging in agricultural areas and grasslands. Suitable wetland habitats in Cuyama Valley and San Joaquin Valley have historically supported large breeding colonies. | Increased noise levels, night-lighting, and increased human activity in daytime or at night during nesting season could interfere with courtship and breeding, and cause abandonment of foraging habitat, territories, and/or nests. |
| ***MAMMALS*** | | | | |
| Buena Vista Lake shrew *Sorex ornatus relictus* | FE/SSC | Yes, but project area does not overlap. | Historically occurred in wetland and riparian habitats associated with Kern, Buena Vista, and Tulare lakes on floor of southern San Joaquin Valley. Populations are now restricted to highly fragmented habitat remnants below elevations of 350 feet. Pipeline route on valley floor from east of Kern County-San Luis Obispo County line northeastward to pipeline terminus at Pentland (E of Maricopa) is in historic geographic range, but no portion of this route is below 725 feet above sea level. | Pipeline repair and operation is not expected to impact this species. |

| | | | No suitable habitat along route. Nearest extant population is 12 miles NE of Pentland in former Buena Vista Lake bed. | |
|---|---|---|---|---|
| San Joaquin antelope squirrel *Ammospermophilus nelsoni* | ST | No | Pipeline route from Cuyama Valley to Pentland in the San Joaquin Valley is in the historic geographic range of this species, but populations are now restricted to northern edge of Cuyama Valley from Aliso Canyon in SB County eastward into the southern San Joaquin Valley at Pentland in Kern County. | Vehicle traffic, vegetation grubbing, grading could crush individuals and collapse burrow systems. Night-lighting and increased noise levels at repair sites could cause individuals to abandon burrow systems and alter home ranges. |
| Giant kangaroo rat *Dipodomys ingens* | FE/SE | No | Pipeline route in Cuyama Valley from Aliso Canyon eastward along agriculture-foothill interface on valley floor and foothills, then northeastward into terminus at Pentland in San Joaquin Valley, traverses or borders habitats occupied by this species. | Vehicular traffic, grading, trenching, vegetation grubbing could collapse burrows, kill individuals, and/or entrap individuals. Night-lighting and increased noise levels associated with pipeline repair and testing could impact foraging and dispersal and cause individuals to abandon burrow system. |
| Tipton kangaroo rat *Dipodomys nitratoides nitratoides* | FE | No | No longer found in the project area. Geographic range is now restricted to the San Joaquin Valley floor and is highly fragmented. Pipeline terminus at Pentland is about 3 air mi SSW of the edge of historical range, but nearest observations during range-wide surveys in 2021 were 6-13 air mi N of Pentland. | Pipeline repair and operation is not expected to impact this species. |
| San Joaquin kit fox *Vulpes macrotis mutica* | FE/SE | No | Geographic range in Cuyama Valle and southern San Joaquin Valley is largely coincident with that of giant kangaroo rat, but species has broader ecological range. Recent observations in Cuyama Valley extend from near Cottonwood Canyon eastward along foothills north of valley floor, then northeastward into foothills, and into San Joaquin Valley floor. | Vehicular and heavy equipment traffic, grading, trenching, and vegetation grubbing could collapse burrows, kill individuals, and/or trap individuals. Pipeline testing at night and associated lighting and noise levels could cause individuals to abandon dens, and could disrupt foraging and dispersal patterns. |
| Ringtail *Bassariscus astutus* | FP | No | Pipeline route from Las Flores Canyon facility to Cuyama Valley is within geographic range. Expected to occur in most of the riparian woodland and adjacent upland scrub habitats crossed by the pipeline route. | Vehicular and heavy equipment traffic, grading, trenching, and vegetation grubbing could degrade foraging habitat and kill individuals. Pipeline testing at night and associated lighting and noise levels could cause individuals to abandon dens, and could disrupt foraging and dispersal patterns. |

14

*Regulatory Key:*

FE – Listed as Endangered under the federal Endangered Species Act.

FT – Listed as Threatened under the federal Endangered Species Act.

FPT – Proposed for Listing as Threatened under the federal Endangered Species Act.

SE – Listed as Endangered by the State of California under the California Endangered Species Act.

CSE – Candidate for listing as Endangered by the State of California under the California Endangered Species Act.

ST – Listed as Threatened by the State of California under the California Endangered Species Act.

FP – Fully Protected species in the State of California, i.e., CDFW cannot authorize 'take' of these species.

SSC – Species of Special Concern in the State of California (CDFW).

\* these species, if present, could be impacted by restarting and operating and/or maintaining the pipeline system if pre-work surveys, construction monitoring, and other prudent mitigation measures are not conducted by qualified biologists.

**Critical Habitat:**    Critical habitat is defined in Section 3(5)(A) of the federal Endangered Species Act as specific geographic areas and habitats that support the species and are considered essential for conserving a federally-listed species. Critical habitat may also include specific habitat areas outside the geographical area that was occupied by the species when it was listed (but where it historically occurred), if those areas are considered essential to conserve the species.  Critical habitat is used by the USFWS as a tool to guide cooperation between the U.S. Fish and Wildlife Service (USFWS) and project applicants if they are seeking funding or permits from another federal agency (a federal 'nexus').  Under Section 7 of the federal Endangered Species Act, all federal agencies are required to help conserve imperiled species and prohibited from destroying or adversely modifying designated critical habitat.  This means permitting agencies must consult with the Service about actions that they carry out, fund, or authorize to ensure that they will not destroy or adversely modify critical habitat. Even if a particular species has no critical habitat designation, federal agencies are still required to fulfill their conservation responsibilities by consulting with the USFWS if their actions "may affect" a listed species.  The Onshore Pipelines cross designated critical habitat for seven federally-listed species:

- Gaviota tarplant (*Deinandra increscens* var. *villosa*) – Canada San Onofre west to Gaviota Pass, Santa Barbara County;
- Monarch butterfly (*Danaus plexippus*) – Gaviota State Park, Canada del Cementerio and Canada de Alcatraz along south coast of Santa Barbara County;
- Southern steelhead (*Oncorhynchus mykiss*) – coastal drainages along south coast of Santa Barbara County between Arroyo Hondo and Gaviota Creek;
- Tidewater goby (*Eucyclogobius newberryi*) – Gaviota Creek and Arroyo Hondo, Santa Barbara County;
- Arroyo toad (*Anaxyrus californicus*) – Sisquoc River, Santa Barbara County;
- California red-legged frog (*Rana draytonii*) – coastal drainages along south coast of Santa Barbara County, Gaviota Creek and Nojoqui Creek watersheds;
- Southwestern willow flycatcher (*Empidonax traillii extimus*) – Santa Ynez River, Santa Barbara County.

**Species of Special Concern in California:** Not specifically discussed in this letter, and in addition to the taxa listed in Table 1, are several dozen plant and wildlife species classified as "Species of Special Concern in California". These taxa are regulated by the California Department of Fish and Wildlife under the California Environmental Quality Act because declining population levels, limited geographic ranges, and/or continuing threats have made them vulnerable to extinction (California Native Plant Society, 2026; CDFW, 2026).  The geographic ranges of many of these species also overlap the pipeline route and could be impacted by the same pipeline maintenance and repair activities relevant to listed taxa.

**Potential Impacts to Listed Species and Habitats:**  Sable's past, current, and future work on the Onshore Pipelines poses a significant and reasonably foreseeable risk to the environment and may significantly impact listed and other Special-Status species and destroy or adversely modify their habitats along the pipeline route.  Repair work needed to restore the Onshore Pipelines to

19

operation has involved vegetation removal, extensive grading, and increased heavy equipment and vehicular traffic.  For example, Figures 1a and 1b show a portion of the pipeline route through grassland, coastal sage scrub, and chaparral habitats in Gaviota State Park before and after Sable performed construction work in April and May of 2025.



**Fig. 1a. 2,000-foot long section of pipeline route (red line) in Gaviota State Park on 18 April 2025.**



**Fig. 1b. Same area on 22 May 2025 showing significant vegetation removal and grading along access road.**

Operating and maintaining the Onshore Pipelines necessarily involves much of the same equipment and activities needed to restart it, and could have similar long-term impacts to habitats and species.

Maintaining and/or repairing the pipeline could, depending on the location and extent of work, impact one or more of the listed species in Table 1. Maintenance and repair activities could result in vegetation grubbing, grading, excavation, and other ground-disturbing activities in wetland, riparian, and/or upland habitats. Grading and vegetation grubbing can remove or significantly alter suitable habitat causing wildlife to abandon these areas. The impacts of grading and vegetation loss on native plant and wildlife populations can extend beyond the immediate work areas because soil disturbance facilitates colonization and spread of invasive, non-native vegetation that displaces native plant species and degrades wildlife habitat quality.

Impacts to listed and other Special-Status species that may occur in these habitats could range from direct mortality of plants and ground-dwelling wildlife due to crushing of individuals and burrow systems by heavy equipment and vehicles, to loss or modification of essential habitats while work is occurring and until the site is fully restored, which could take years. It is foreseeable that additional significant impacts to wildlife may result from noise from construction equipment, hydrostatic testing, night-lighting, and increased human presence along the pipeline route.

Aquatic and wetland habitats may be significantly impacted by sedimentation and degradation of water quality due to soil erosion caused by vegetation removal and upslope soil disturbance. Soil erosion may reach drainages where it could degrade spawning habitat for fish, smother fish and amphibian masses, and lower oxygen levels for larval, juvenile, and adult fish and amphibians. Wildlife that relies on aquatic and wetland habitats may be significantly impacted by the loss of essential habitat, in addition to direct mortality caused by stream diversions, other structures in drainages, and disruption of movement. The impact to listed species could extend well downstream of the actual repair site if work were to occur in or near aquatic systems.

**Oil Spills:** The impact of pipeline failure on listed and other Special-Status plants and wildlife and their habitats as a result of an oil spill depends on the location and severity of the spill. Spills at drainage crossings, especially intermittent and permanent drainages, as well as on adjacent upland slopes that contribute to these watercourses, could result in direct mortality from contact with oil and polluted water in occupied habitat. Grading and excavation of contaminated soil during spill containment and cleanup could result in habitat loss and degradation for years afterwards until affected habitats have been restored. Impacts from a spill in coastal drainages in Santa Barbara County could extend downstream to include the terminal lagoon that serves as nursery habitat for steelhead (*Oncorhynchus mykiss*) and tidewater goby (*Eucyclogobius newberryi*) as well as nearshore marine waters. Pipeline failure resulting in an oil spill in designated critical habitat for any of the seven species listed previously, could destroy or result in long-term adverse modification of such habitat.

**Las Flores Canyon Processing Facility:** Aquatic and adjacent upland habitats associated with Las Flores Canyon Creek and Corral Canyon Creek support a regionally-important population of California red-legged frogs (*Rana draytonii*), a listed species (Table 1; pers. observ.). Re-

21

starting the Las Flores Canyon Processing Facility could increase human activity in the Las Flores Canyon and Corral Canyon watersheds, and could potentially affect this species with impacts ranging from direct mortality of juveniles and adults from vehicles and equipment; mortality of larvae and egg masses due to seasonal water releases, repair work at drainage crossings, disruption of foraging and movement patterns due to night-lighting at pipeline repair or testing sites, and/or habitat loss or modification at repair or spill cleanup sites.

**Conclusions:** The pipeline route traverses habitats known to support, or potentially support, dozens of listed and other Special-Status species.  These pipelines pose various risks to plants, wildlife, and habitats, including the risk of an oil spill.  Based upon the information presented above, I can confidently conclude the following regarding the operation and maintenance of the Onshore Pipelines:

(1) PHMSA's approval of Sable's Special Permit has reasonably foreseeable significant effects on the environment.
(2) PHMSA's approval of Sable's Special Permit may significantly affect a variety of listed and other Special-Status plant and wildlife species and their habitats, including those identified in this letter
(3) PHMSA's approval of Sable's Special Permit may affect ESA-listed threatened and endangered activities including but not limited to, the California jewelflower, Gaviota tarplant, San Joaquin woollythreads vernal pool fairy shrimp, monarch butterfly, Kern primrose sphinx moth, southern steelhead, tidewater goby, California tiger salamander, arroyo toad, California red-legged frog,  blunt-nosed leopard lizard, western snowy plover, California least tern, marbled murrelet, western yellow-billed cuckoo, southwestern willow flycatcher, least Bell's vireo, giant kangaroo rat, and San Joaquin kit fox.
(4) PHMSA's approval of Sable's Special Permit may affect the critical habitat identified above for one plant species and six wildlife species as follows, including the Gaviota tarplant, monarch butterfly, southern steelhead, tidewater goby, arroyo toad, California red-legged frog, and southwestern willow flycatcher.

---

Lawrence E. Hunt

**Document Review.** In preparing this letter, I have reviewed the following documents:

1. California Department of Fish and Wildlife, *California Terrestrial and Vernal Pool Invertebrates of Conservation Priority List* (Jan. 2024).
2. California Natural Diversity Database (CNDDB), *State and Federally Listed Endangered, Threatened, and Rare Plants of California* (Jan. 2026).
3. CNDDB, *State and Federally Listed Endangered and Threatened Animals of California* (Feb. 2026).
4. CNDDB, *Special Animals List* (Jan. 2026).

5. California Native Plant Society, *Inventory of Rare and Endangered Plants of California* (Aug. 2001).

6. California Native Plant Society, *Rare Plant Inventory*, https://rareplants.cnps.org/ (last visited Mar. 14, 2026).

7. National Marine Fisheries Service, *Southern California Steelhead Recovery Plan* (Jan. 2012).

8. United States Fish and Wildlife Service, *Emergency Consultation Request Letter* (Feb. 20, 2026) (available at: https://www.regulations.gov/document/PHMSA-2025-1502-0006).

9. Ventura Fish and Wildlife Office, *List of Threatened and Endangered Species that may be Affected by your Proposed Project* (Feb. 20, 2026).

10. Designation of Critical Habitat for *Eriodictyon capitatum* (Lompoc yerba santa) and *Deinandra increscens* ssp. *villosa* (Gaviota Tarplant), 67 Fed. Reg. 67968-68001 (Nov. 7, 2002).

11. Designation of Critical Habitat for the California Red-Legged Frog, 71 Fed. Reg. 19244-19346 (Apr. 13, 2006).

12. Revised Critical Habitat for the Arroyo Toad, 76 Fed. Reg. 7246-7467 (Feb. 9, 2011).

13. Designation of Revised Critical Habitat for Southwestern Willow Flycatcher, 76 Fed. Reg. 50542-50629 (Aug. 15, 2011).

14. Designation of Critical Habitat for Southwestern Willow Flycatcher, 78 Fed. Reg. 344-534 (Jan. 3, 2013).

15. Designation of Critical Habitat for Tidewater Goby, 78 Fed. Reg. 8746-8819 (Feb. 6, 2013).

16. Threatened Species Status with Section 4(d) Rule for Monarch Butterfly and Designation of Critical Habitat, 89 Fed. Reg. 100662-100716 (Dec. 12, 2024).

# Attachment  1

ATTACHMENT B

# California Terrestrial and Vernal Pool Invertebrates
# of Conservation Priority List *(TVPICP List)*

California Department of Fish and Wildlife

Wildlife Diversity Program, Wildlife Branch

Revised January 2, 2024

## List Purpose

This California Terrestrial and Vernal Pool Invertebrates of Conservation Priority List (TVPICP List; Table 1) was developed to identify California terrestrial and vernal pool invertebrates of conservation priority. This TVPICP List does not give any species included on the TVPICP List any formal legal status. This TVPICP List uses the definition of "terrestrial and vernal pool invertebrates" set out in California Code of Regulations, title 14, section 650, subdivision (b)(26)(E)(1): "invertebrates that occur on land above mean high tide of marine waters, including aquatic insects in the aerial life stage and those aquatic invertebrates that occur only in vernal pools or other ephemeral waters that support vernal pool invertebrates, but do not normally support finfish."

## Criteria for Inclusion on TVPICP List

The species on the TVPICP List are terrestrial or vernal pool invertebrates that satisfy at least one of the following criteria: (1) is designated as threatened, endangered, or candidate species under the federal Endangered Species Act (ESA); (2) is designated as threatened, endangered, or candidate species under the California Endangered Species Act (CESA); or (3) has a state NatureServe rank of S1, S1S2, SH, or SX. Global NatureServe ranks were not included as a factor in list development because the TVPICP List only includes California species. This TVPICP List was developed by querying the California Department of Fish and Wildlife's (CDFW) California Natural Diversity Database (CNDDB) on January 2, 2024. The CNDDB is an inventory of the status and locations of rare plants and animals in California.

## NatureServe Element Rankings

The CNDDB is a member of the NatureServe Network of natural heritage programs and uses the same conservation status ranking methodology as other network programs. The ranking system was originally developed by The Nature Conservancy and is now maintained by NatureServe. It includes a Global rank (G-rank) which describes the status for a given taxon over its entire distribution, and a state rank (S-rank) which describes the status for the taxon over its distribution within a given state. Procedurally, state programs such as the CNDDB develop the state ranks. Because the units of conservation may include non-taxonomic biological entities such as populations or ecological communities, NatureServe and CNDDB refer to the targets of biological conservation as "elements" rather than taxa. The criteria used to assign state element ranks are described below. CNDDB does not track all invertebrate species that occur in California, but instead focuses on a subset of species which can be found on CDFW's Special Animals List (https://wildlife.ca.gov/Data/CNDDB/Plants-and-Animals).

1

An element rank is assigned using standard criteria and rank definitions. This standardization makes the ranks comparable between organisms and across political boundaries. NatureServe has developed a "rank calculator" to help increase repeatability and transparency of the ranking process. The three main categories that are taken into consideration when assigning an element rank are rarity, threats, and trends. Within these three categories, various factors are considered, including:

- Range extent, area of occupancy, population size, total number of occurrences, and number of good occurrences (ranked A or B). Environmental specificity can also be used if other information is lacking.
- Overall threat impact as well as intrinsic vulnerability (if threats are unknown).
- Long-term and short-term trends.

An element's ranking status may be adjusted up or down depending upon the considerations above. NatureServe detailed information on element ranking methodology (https://www.natureserve.org/conservation-status-assessment).

## State Ranking

S-ranks refers to a species' imperilment status within a given state's boundaries, in this case, California:

- **SX: Presumed Extirpated\*** – Species believed to be extirpated from the state. Not located despite intensive searches of historical sites and other appropriate habitat, and virtually no likelihood that it will be rediscovered.
- **SH: Possibly Extirpated\*** – Known from only historical records but still some hope of rediscovery. There is evidence that the species may no longer be present in the state, but not enough to state this with certainty. Examples of such evidence include (1) that a species has not been documented in approximately 20-40 years despite some searching and/or some evidence of significant habitat loss or degradation; (2) that a species has been searched for unsuccessfully, but not thoroughly enough to presume that it is no longer present in the jurisdiction.
- **S1: Critically Imperiled\*** – At very high risk of extirpation in the state due to very restricted range, very few populations or occurrences, very steep declines, severe threats, or other factors.
- **S2: Imperiled** – At high risk of extirpation in the state due to restricted range, few populations or occurrences, steep declines, severe threats, or other factors.
- **S3: Vulnerable** – At moderate risk of extirpation in the state due to a fairly restricted range, relatively few populations or occurrences, recent and widespread declines, threats, or other factors.
- **S4: Apparently Secure** – At a fairly low risk of extirpation in the state due to an extensive range and/or many populations or occurrences, but with possible cause for some concern as a result of local recent declines, threats, or other factors.
- **S5: Secure** – At very low or no risk of extirpation in the state due to a very extensive range, abundant populations or occurrences, and little to no concern from declines or threats.
- **SNR: Unranked** – State rank not yet assessed.

**\*** *Species with this ranking are included on the TVPICP List.*

Uncertainty about the status of an element is expressed as a range of values. For example, S1S1 indicates the rank is somewhere between S1 and S2. While no species on the TVPICP List have a "?" in their S-rank, NatureServe adds question marks to S-ranks to represent uncertainty. For example, S2? Indicates the ranking fits closer to S2 than S2S3 but is still uncertain.

Other considerations used when ranking a species include the pattern of distribution of the element on the landscape, fragmentation of the population, and historical extent as compared to its modern range.

S-ranks for each species on the TVPICP List can be found in the "S-rank" column.

## California Endangered Species Act Listing Status

The CESA listing status of each species can be found in the "CalList" column of the TVPICP List. If the cell has a dash "—", the species has not been listed as threatened or endangered under CESA nor is it a candidate under CESA. The CESA listing status of each species on this TVPICP List is current as of the date of this TVPICP List. A 2081(a) Memorandum of Understanding is required for CESA candidate species or species listed as threatened or endangered. A "т" after the state status denotes whether an MOU is required at the time of list publication.

## Federal Endangered Species Act Listing Status

The federal ESA listing status of each species can be found in the "FedList" column of the TVPICP List. If the cell dash "—", the species has not been listed as threatened or endangered under the federal ESA nor is it a candidate for listing under the federal ESA. The federal ESA listing status of each species on this TVPICP List is current as of the date of this TVPICP List.

## Taxonomic Standards

This TVPICP List, consistent with CNDDB, follows current published taxonomy for invertebrates as recognized by NatureServe (https://help.natureserve.org/biotics/content/record_management/Element_Files/Element_Tracking/ETRACK_Invertebrate_References.htm).

The "Author, Date" column contains information from the Integrated Taxonomic Information System (ITIS; https://www.itis.gov/). If a scientific name changes after the publication date of this TVPICP List but before CDFW has issued an updated version of the list, searching the author and year in ITIS can assist in finding previously accepted names.

# Table 1. California Terrestrial and Vernal Pool Invertebrates of Conservation Priority List

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| **ARACHNIDA (spiders and their relatives)** | | | | | |
| *Aphrastochthonius grubbsi* | Grubbs' Cave pseudoscorpion | Muchmore, 1984 | — | — | S1 |
| *Aphrastochthonius similis* | Carlow's Cave pseudoscorpion | Muchmore, 1984 | — | — | S1 |
| *Banksula californica* | Alabaster Cave harvestman | Banks, 1900 | — | — | SH |
| *Banksula galilei* | Galile's cave harvestman | Briggs, 1974 | — | — | S1 |
| *Banksula grubbsi* | Grubbs' cave harvestman | Briggs and Ubick, 1981 | — | — | S1 |
| *Banksula incredula* | incredible harvestman | Ubick and Briggs, 2002 | — | — | S1 |
| *Banksula martinorum* | Martins' cave harvestman | Briggs and Ubick, 1981 | — | — | S1 |
| *Banksula melones* | Melones Cave harvestman | Briggs, 1974 | — | — | S1 |
| *Banksula rudolphi* | Rudolph's cave harvestman | Briggs and Ubick, 1981 | — | — | S1 |
| *Banksula tuolumne* | Tuolumne cave harvestman | Briggs, 1974 | — | — | S1 |
| *Banksula tutankhamen* | King Tut Cave harvestman | Ubick and Briggs, 2002 | — | — | S1 |
| *Calicina arida* | San Benito harvestman | Ubick and Briggs, 1989 | — | — | S1 |
| *Calicina breva* | Stanislaus harvestman | Briggs, 1968 | — | — | S1 |
| *Calicina cloughensis* | Clough Cave harvestman | Briggs and Hom, 1967 | — | — | S1 |
| *Calicina conifera* | Crane Flat harvestman | Ubick and Briggs, 1989 | — | — | S1 |
| *Calicina diminua* | Marin blind harvestman | Ubick and Briggs, 1989 | — | — | S1 |
| *Calicina dimorphica* | Watts Valley harvestman | Ubick and Briggs, 1989 | — | — | S1 |
| *Calicina macula* | marbled harvestman | Briggs, 1968 | — | — | S1 |
| *Calicina mesaensis* | Table Mountain harvestman | Ubick and Briggs, 1989 | — | — | S1 |
| *Calicina minor* | Edgewood blind harvestman | Briggs and Hom, 1966 | — | — | S1 |
| *Calicina piedra* | Piedra harvestman | Briggs, 1968 | — | — | S1 |
| *Calileptoneta briggsi* | Briggs' leptonetid spider | Ledford, 2004 | — | — | S1 |
| *Calileptoneta oasa* | Andreas Canyon leptonetid spider | Gertsch, 1974 | — | — | S1 |
| *Calileptoneta ubicki* | Ubick's leptonetid spider | Ledford, 2004 | — | — | S1 |
| *Calileptoneta wapiti* | Mendocino leptonetid spider | Gertsch, 1974 | — | — | S1 |

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| *Fissilicreagris imperialis* | Empire Cave pseudoscorpion | Muchmore, 1969 | — | — | S1 |
| *Hubbardia idria* | Idria short-tailed whipscorpion | Reddell and Cokendolpher, 1991 | — | — | S1 |
| *Hubbardia secoensis* | Arroyo Seco short-tailed whipscorpion | Briggs and Hom, 1988 | — | — | S1 |
| *Hubbardia shoshonensis* | Shoshone Cave whip-scorpion | Briggs and Hom, 1972 | — | — | S1 |
| *Larca aalbui* | Aalbu's Cave pseudoscorpion | Muchmore, 1984 | — | — | S1 |
| *Larca laceyi* | Lacey's Cave pseudoscorpion | Muchmore, 1981 | — | — | S1 |
| *Microcina edgewoodensis* | Edgewood Park micro-blind harvestman | Briggs and Ubick, 1989 | — | — | S1 |
| *Microcina jungi* | Jung's micro-blind harvestman | Briggs and Ubick, 1989 | — | — | S1 |
| *Microcina leei* | Lee's micro-blind harvestman | Briggs and Ubick, 1989 | — | — | S1 |
| *Microcina lumi* | Lum's micro-blind harvestman | Briggs and Ubick, 1989 | — | — | S1 |
| *Neochthonius imperialis* | Empire Cave pseudoscorpion | Muchmore, 1996 | — | — | S1 |
| *Pseudogarypus orpheus* | Music Hall Cave pseudoscorpion | Muchmore, 1981 | — | — | S1 |
| *Socalchemmis gertschi* | Gertsch's socalchemmis spider | Platnick and Ubick, 2001 | — | — | S1 |
| *Socalchemmis icenoglei* | Icenogle's socalchemmis spider | Platnick and Ubick, 2001 | — | — | S1 |
| *Socalchemmis monterey* | Monterey socalchemmis spider | Platnick and Ubick, 2001 | — | — | S1 |
| *Talanites ubicki* | Ubick's gnaphosid spider | Platnick and Ovtsharenko, 1991 | — | — | S1 |
| *Texella deserticola* | Whitewater Canyon harvestman | Ubick and Briggs, 1992 | — | — | S1 |
| *Texella kokoweef* | Kokoweef Crystal Cave harvestman | Ubick and Briggs, 1992 | — | — | S1 |
| *Texella shoshone* | Shoshone Cave harvestman | Ubick and Briggs, 1992 | — | — | S1 |
| **CRUSTACEANS, Order Anomopoda (water fleas)** | | | | | |
| *Dumontia oregonensis* | hairy water flea | Santos-Flores and Dodson, 2003 | — | — | S1 |
| **CRUSTACEANS, Order Anostraca (fairy shrimp)** | | | | | |
| *Branchinecta campestris* | pocket pouch fairy shrimp | Lynch, 1960 | — | — | S1 |
| *Branchinecta conservatio* | Conservancy fairy shrimp | Eng, Belk and Eriksen, 1990 | Endangered | — | S2 |
| *Branchinecta longiantenna* | longhorn fairy shrimp | Eng, Belk and Eriksen, 1990 | Endangered | — | S2 |
| *Branchinecta lynchi* | vernal pool fairy shrimp | Eng, Belk and Eriksen, 1990 | Threatened | — | S3 |
| *Branchinecta sandiegonensis* | San Diego fairy shrimp | Fugate, 1993 | Endangered | — | S1 |

5

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| *Linderiella santarosae* | Santa Rosa Plateau fairy shrimp | Thiéry and Fugate, 1994 | — | — | S1 |
| *Streptocephalus woottoni* | Riverside fairy shrimp | Eng, Belk and Eriksen, 1990 | Endangered | — | S2 |
| **CRUSTACEANS, Order Notostraca (tadpole shrimp)** | | | | | |
| *Lepidurus packardi* | vernal pool tadpole shrimp | Simon, 1886 | Endangered | — | S3 |
| **INSECTA, Order Coleoptera (beetles)** | | | | | |
| *Aegialia concinna* | Ciervo aegilian scarab beetle | Gordon & Cartwright, 1977 | — | — | S1 |
| *Agrilus harenus* | Harenus jewel beetle | Nelson, 1994 | — | — | S1 |
| *Anomala carlsoni* | Carlson's dune beetle | Hardy, 1976 | — | — | S1 |
| *Anomala hardyorum* | Hardy's dune beetle | Potts, 1976 | — | — | S1 |
| *Cicindela hirticollis abrupta* | Sacramento Valley tiger beetle | Casey, 1913 | — | — | SH |
| *Cicindela latesignata* | western beach tiger beetle | LeConte, 1851 | — | — | S1 |
| *Cicindela ohlone* | Ohlone tiger beetle | Freitag & Kavanaugh, 1993 | Endangered | — | S1 |
| *Cicindela senilis frosti* | senile tiger beetle | Varas-Arangua, 1928 | — | — | S1 |
| *Cicindela tranquebarica joaquinensis* | San Joaquin tiger beetle | Knisley and Haines, 2007 | — | — | S1 |
| *Cicindela tranquebarica viridissima* | greenest tiger beetle | Fall, 1910 | — | — | S1 |
| *Coelus globosus* | globose dune beetle | LeConte, 1851 | — | — | S1S2 |
| *Coelus gracilis* | San Joaquin dune beetle | Blaisdell, 1939 | — | — | S1 |
| *Coenonycha clementina* | San Clemente Island coenonycha beetle | Casey, 1909 | — | — | S1S2 |
| *Cyclocephala wandae* | Wandae dune beetle | Hardy, 1974 | — | — | S1 |
| *Deltaspis ivae* | marsh-elder long-horned beetle | Beierl and Barchet-Beierl, 1999 | — | — | S1 |
| *Desmocerus californicus dimorphus* | valley elderberry longhorn beetle | Fisher, 1921 | Threatened | — | S3 |
| *Dinacoma caseyi* | Casey's June beetle | Blaisdell, 1930 | Endangered | — | S1 |
| *Elaphrus viridis* | Delta green ground beetle | Horn, 1878 | Threatened | — | S1 |
| *Habroscelimorpha gabbii* | western tidal-flat tiger beetle | Horn, 1866 | — | — | S1 |
| *Juniperella mirabilis* | juniper metallic wood-boring beetle | Knull, 1947 | — | — | S1 |
| *Lepismadora algodones* | Algodones sand jewel beetle | Velten and Bellamy, 1987 | — | — | S1S2 |
| *Lichnanthe albipilosa* | white sand bear scarab beetle | Carlson, 1980 | — | — | S1 |
| *Lytta insperata* | Mojave Desert blister beetle | Horn, 1874 | — | — | S1S2 |
| *Microcylloepus formicoideus* | Furnace Creek riffle beetle | Shepard, 1990 | — | — | S1 |
| *Nebria darlingtoni* | South Forks ground beetle | Kavanaugh, 1979 | — | — | S1 |

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| *Nebria gebleri siskiyouensis* | Siskiyou ground beetle | Kavanaugh, 1979 | — | — | S1S2 |
| *Nebria sahlbergii triad* | Trinity Alps ground beetle | Kavanaugh, 1979 | — | — | S1 |
| *Onychobaris langei* | Lange's El Segundo Dune weevil | Van Dyke, 1951 | — | — | S1 |
| *Palaeoxenus dohrni* | Dohrn's elegant eucnemid beetle | Horn, 1878 | — | — | S1S2 |
| *Polyphylla barbata* | Mount Hermon (=barbate) June beetle | Cazier, 1938 | Endangered | — | S2 |
| *Polyphylla erratica* | Death Valley June beetle | Hardy and Andrews, 1978 | — | — | S1S2 |
| *Polyphylla morroensis* | Morro Bay June beetle | La Rue, 2016 | — | — | S1 |
| *Polyphylla nubila* | Atascadero June beetle | Van Dyke, 1947 | — | — | S1 |
| *Pseudocotalpa andrewsi* | Andrew's dune scarab beetle | Hardy, 1971 | — | — | S1 |
| *Trachykele hartmani* | serpentine cypress wood-boring beetle | Burke, 1920 | — | — | S1 |
| *Trichinorhipis knulli* | Knull's metallic wood-boring beetle | Barr, 1948 | — | — | S1 |
| *Trigonoscuta brunnotesselata* | brown tassel trigonoscuta weevil | Pierce, 1975 | — | — | S1 |
| *Trigonoscuta dorothea dorothea* | Dorothy's El Segundo Dune weevil | Pierce, 1975 | — | — | S1 |
| *Trigonoscuta rothi algodones* | Algodones dune weevil | Pierce, 1975 | — | — | S1 |
| *Trigonoscuta rothi imperialis* | Imperial dune weevil | Pierce, 1975 | — | — | S1 |
| *Trigonoscuta rothi punctata* | Punctate dune weevil | Pierce, 1975 | — | — | S1 |
| *Trigonoscuta rothi rothi* | Roth's dune weevil | Pierce, 1975 | — | — | S1 |
| *Trigonoscuta stantoni* | Santa Cruz Island shore weevil | Sleeper, 1975 | — | — | S1 |
| **INSECTA, Order Diptera (flies)** | | | | | |
| *Apiocera warneri* | Glamis sand fly | Cazier, 1985 | — | — | S1 |
| *Brennania belkini* | Belkin's dune tabanid fly | Philip, 1966 | — | — | S1S2 |
| *Cophura hurdi* | Antioch cophuran robberfly | Hull, 1960 | — | — | SX |
| *Efferia antiochi* | Antioch efferian robberfly | Wilcox, 1966 | — | — | S1S2 |
| *Metapogon hurdi* | Hurd's metapogon robberfly | Wilcox, 1964 | — | — | S1S2 |
| *Paracoenia calida* | Wilbur Springs shore fly | Mathis, 1975 | — | — | S1 |
| *Rhaphiomidas terminatus abdominalis* | Delhi Sands flower-loving fly | Cazier, 1941 | Endangered | — | S1 |
| *Rhaphiomidas terminatus terminatus* | El Segundo flower-loving fly | Cazier, 1941 | — | — | S1 |
| *Rhaphiomidas trochilus* | San Joaquin Valley giant flower-loving fly | Coquillett, 1892 | — | — | S1 |
| **INSECTA, Order Hemiptera (true bugs)** | | | | | |
| *Oravelia pege* | Dry Creek cliff strider bug | Drake and Chapman, 1963 | — | — | S1 |
| **INSECTA, Order Hymenoptera (ants, bees, and wasps)** | | | | | |

7

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| *Andrena blennospermatis* | Blennosperma vernal pool andrenid bee | Thorp, 1969 | — | — | S1 |
| *Andrena subapasta* | An andrenid bee | Thorp, 1969 | — | — | S1S2 |
| *Bombus caliginosus* | obscure bumble bee | Frison, 1927 | — | — | S1S2 |
| *Bombus crotchii* | Crotch's bumble bee | Cresson, 1878 | — | Candidate[T] | S2 |
| *Bombus franklini* | Franklin's bumble bee | Frison, 1921 | Endangered | Candidate[T] | SH |
| *Bombus morrisoni* | Morrison's bumble bee | Cresson, 1878 | — | — | S1S2 |
| *Bombus occidentalis* | western bumble bee | Greene, 1858 | — | Candidate[T] | S1 |
| *Bombus suckleyi* | Suckley's cuckoo bumble bee | Greene, 1860 | — | Candidate[T] | S1 |
| *Ceratochrysis bradleyi* | Bradley's cuckoo wasp | Bohart, 1982 | — | — | S1 |
| *Ceratochrysis gracilis* | Piute Mountains cuckoo wasp | Bohart, 1982 | — | — | S1 |
| *Ceratochrysis longimala* | Desert cuckoo wasp | Bohart, 1982 | — | — | S1 |
| *Cleptes humboldti* | Humboldt cuckoo wasp | Moczar, 1996 | — | — | S1S2 |
| *Dufourea stagei* | Stage's dufourine bee | Bohart, 1980 | — | — | S1 |
| *Euparagia unidentata* | Algodones euparagia | Carpenter and Kimsey, 2009 | — | — | S1S2 |
| *Hedychridium argenteum* | Riverside cuckoo wasp | Kimsey, 1978 | — | — | S1S2 |
| *Hedychridium milleri* | Borax Lake cuckoo wasp | Kimsey, 1978 | — | — | S1 |
| *Microbembex elegans* | Algodones elegant sand wasp | Griswold, 1996 | — | — | S1 |
| *Myrmosula pacifica* | Antioch multilid wasp | Mickel, 1940 | — | — | SH |
| *Neolarra alba* | white cuckoo bee | Cockerell, 1916 | — | — | SH |
| *Paranomada californica* | California cuckoo bee | Linsley, 1945 | — | — | S1 |
| *Parnopes borregoensis* | Borrego parnopes cuckoo wasp | Telford, 1964 | — | — | S1S2 |
| *Perdita algodones* | Algodones perdita | Timberlake, 1980 | — | — | S1 |
| *Perdita frontalis* | Imperial Perdita | Timberlake, 1968 | — | — | S1S2 |
| *Perdita hirticeps luteocincta* | yellow-banded andrenid bee | Tiberlake, 1960 | — | — | SX |
| *Perdita stephanomeriae* | a fairy bee | Timberlake, 1954 | — | — | S1S2 |
| *Protodufourea wasbaueri* | Wasbauer's protodufourea bee | Timberlake, 1955 | — | — | S1 |
| *Protodufourea zavortinki* | Zavortink's protodufourea bee | Griswold and Bohart, 1996 | — | — | S1 |
| *Rhopalolemma robertsi* | Roberts' rhopalolemma bee | Roid-Alsina, 1991 | — | — | S1 |
| *Sedomaya glamisensis* | Glamis night tiphiid | Kimsey and Wasbauer, 1999 | — | — | S1 |
| *Sphaeropthalma ecarinata* | Glamis night mutillid | Schuster, 1958 | — | — | S1 |
| *Sphecodogastra antiochensis* | Antioch Dunes halictid bee | McGinley, 2003 | — | — | S1 |
| *Stictiella villegasi* | Algodones sand wasp | Bohart, 1982 | — | — | S1 |
| *Trachusa gummifera* | San Francisco Bay Area leaf-cutter bee | Thorp, 1963 | — | — | S1 |
| **INSECTA, Order Lepidoptera (butterflies and moths)** | | | | | |

8

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| Apodemia mormo langei | Lange's metalmark butterfly | Comstock, 1938 | Endangered | — | S1 |
| Callophrys mossii bayensis | San Bruno elfin butterfly | Brown, 1942 | Endangered | — | S2 |
| Callophrys mossii hidakupa | San Gabriel Mountains elfin butterfly | Emmel, Emmel and Mattoon, 1998 | — | — | S1S2 |
| Callophrys sheridanii comstocki | desert green hairstreak | Henne, 1940 | — | — | S1S2 |
| Cercyonis pegala carsonensis | Carson Valley wood nymph | Austin, 1992 | — | — | S1S2 |
| Chlosyne leanira elegans | Oso Flaco patch butterfly | Priestaf and J. Emmel, 1998 | — | — | S1S2 |
| Coenonympha tullia yontockett | Yontocket satyr | Porter and Mattoon, 1989 | — | — | S1S2 |
| Danaus plexippus plexippus pop. 1 | monarch - California overwintering population | Linnaeus, 1758 | Candidate | — | S2 |
| Euphilotes allyni | El Segundo blue butterfly | Shields, 1975 | Endangered | — | S1 |
| Euphilotes baueri | Bauer's dotted-blue | Pratt and Emmel, 1998 | — | — | S1S2 |
| Euphilotes enoptes smithi | Smith's blue butterfly | Mattoni, 1955 | Endangered | — | S2 |
| Euphydryas editha bayensis | Bay checkerspot butterfly | Sternitzky, 1937 | Threatened | — | S3 |
| Euphydryas editha monoensis | Mono checkerspot butterfly | Gunder, 1928 | — | — | S1S2 |
| Euphydryas editha quino | Quino checkerspot butterfly | Behr, 1863 | Endangered | — | S1S2 |
| Euphyes vestris harbisoni | Harbison's dun skipper | Brown and McGuire, 1983 | — | — | S1S2 |
| Euproserpinus euterpe | Kern primrose sphinx moth | Edwards, 1888 | Threatened | — | S1 |
| Glaucopsyche lygdamus palosverdesensis | Palos Verdes blue butterfly | Perkins and Emmel, 1977 | Endangered | — | S1 |
| Hesperia miriamae longaevicola | White Mountains skipper | McGuire, 1998 | — | — | S1 |
| Hesperopsis gracielae | MacNeill's sootywing | MacNeill, 1970 | — | — | S1S2 |
| Icaricia icarioides albihalos | White Mountains icarioides blue butterfly | J. Emmel, T. Emmel & Mattoon, 1998 | — | — | S1 |
| Icaricia icarioides missionensis | Mission blue butterfly | Hovanitz, 1937 | Endangered | — | S2 |
| Icaricia icarioides parapheres | Point Reyes blue butterfly | Boisduval, 1852 | — | — | S1 |
| Icaricia icarioides pheres | Pheres blue butterfly | Boisduval, 1852 | — | — | SX |
| Icaricia saepiolus albomontanus | White Mountains saepiolus blue butterfly | Austin and Emmel, 1998 | — | — | S1 |
| Icaricia saepiolus aureolus | San Gabriel Mountains blue butterfly | J. Emmel, T. Emmel, and Mattoon, 1998 | — | — | S1 |
| Lycaena hermes | Hermes copper butterfly | Edwards, 1870 | Threatened | — | S1 |
| Lycaena rubidus incana | White Mountains copper | Austin, 1998 | — | — | S1 |

9

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| *Pelochrista hennei* | Henne's eucosman moth | Clarke, 1947 | — | — | S1 |
| *Philotiella speciosa bohartorum* | Bohart's blue butterfly | Tilden, 1969 | — | — | S1 |
| *Plebejus anna lotis* | lotis blue butterfly | Lintner, 1879 | Endangered | — | SH |
| *Plebulina emigdionis* | San Emigdio blue butterfly | Grinnell, 1905 | — | — | S1S2 |
| *Polites mardon* | mardon skipper | Edwards, 1881 | — | — | S1 |
| *Polites sabuleti albamontana* | White Mountains sandhill skipper | MacNeill, 1959 | — | — | S1S2 |
| *Pseudocopaeodes eunus obscurus* | Carson wandering skipper | Austin and J. Emmel, 1998 | Endangered | — | S2 |
| *Pyrgus ruralis lagunae* | Laguna Mountains skipper | Scott, 1981 | Endangered | — | S1 |
| *Speyeria adiaste adiaste* | unsilvered fritillary | Behr, 1862 | — | — | S1S2 |
| *Speyeria callippe callippe* | callippe silverspot butterfly | Boisduval, 1852 | Endangered | — | S1 |
| *Speyeria nokomis carsonensis* | Carson Valley silverspot | Austin, 1998 | — | — | S1 |
| *Speyeria zerene behrensii* | Behren's silverspot butterfly | Edwards, 1869 | Endangered | — | S1 |
| *Speyeria zerene hippolyta* | Oregon silverspot butterfly | Edwards, 1879 | Threatened | — | S1 |
| *Speyeria zerene myrtleae* | Myrtle's silverspot butterfly | dos Passos and Grey, 1945 | Endangered | — | S1 |
| *Speyeria zerene sonomensis* | Sonoma zerene fritillary | J. Emmel, T. Emmel, and Mattoon, 1998 | — | — | S1 |
| **INSECTA, Order Mecoptera (scorpionflies)** | | | | | |
| *Orobittacus obscurus* | gold rush hanging scorpionfly | Villegas and Byers, 1981 | — | — | S1 |
| **INSECTA, Order Orthoptera (crickets, grasshoppers, and katydids)** | | | | | |
| *Aglaothorax longipennis* | Santa Monica shieldback katydid | Rentz and Weissman, 1981 | — | — | S1S2 |
| *Ammopelmatus kelsoensis* | Kelso jerusalem cricket | Tinkham, 1965 | — | — | S1S2 |
| *Ammopelmatus muwu* | Point Conception jerusalem cricket | Rentz and Weissman, 1981 | — | — | S1 |
| *Idiostatus kathleenae* | Pinnacles shieldback katydid | Rentz, 1973 | — | — | S1S2 |
| *Idiostatus middlekauffi* | Middlekauff's shieldback katydid | Rentz, 1973 | — | — | S1 |
| *Psychomastax deserticola* | desert monkey grasshopper | Hebard, 1934 | — | — | S1 |
| *Tetrix sierrana* | Sierra pygmy grasshopper | Rehn and Grant, 1956 | — | — | S1 |
| *Trimerotropis infantilis* | Zayante band-winged grasshopper | Rentz and Weissman, 1981 | Endangered | — | S1 |
| *Trimerotropis occulens* | Lompoc grasshopper | Otte, 1984 | — | — | S1S2 |
| **INSECTA, Order Plecoptera (stoneflies)** | | | | | |
| *Capnia lacustra* | Lake Tahoe benthic stonefly | Jewett, 1965 | — | — | S1 |
| **INSECTA, Order Orthoptera (caddisflies)** | | | | | |

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| *Cryptochia denningi* | Denning's cryptic caddisfly | Wiggins, 1975 | — | — | S1S2 |
| *Cryptochia shasta* | confusion caddisfly | Denning, 1975 | — | — | S1 |
| *Diplectrona californica* | California diplectronan caddisfly | Banks, 1914 | — | — | S1 |
| *Farula praelonga* | long-tailed caddisfly | Wiggins and Erman, 1987 | — | — | S1S2 |
| *Goeracea oregona* | Sagehen Creek goeracean caddisfly | Denning, 1968 | — | — | S1S2 |
| *Lepidostoma ermanae* | Cold Spring caddisfly | Weaver, 1988 | — | — | S1 |
| *Limnephilus atercus* | Fort Dick limnephilus caddisfly | Denning, 1965 | — | — | S1S2 |
| *Neothremma siskiyou* | Siskiyou caddisfly | Denning, 1975 | — | — | S1 |
| *Parapsyche extensa* | King's Creek parapsyche caddisfly | Denning, 1949 | — | — | S1 |
| *Rhyacophila lineata* | Castle Crags rhyacophilan caddisfly | Denning, 1956 | — | — | S1 |
| *Rhyacophila mosana* | bilobed rhyacophilan caddisfly | Denning, 1956 | — | — | S1 |
| **GASTROPODA (snails and slugs)** | | | | | |
| *Ammonitella yatesii* | tight coin (=Yates' snail) | Cooper, 1868 | — | — | S1 |
| *Ancotrema voyanum* | hooded lancetooth | Newcomb, 1865 | — | — | S1S2 |
| *Assiminea infima* | Badwater snail | Berry, 1947 | — | — | S1 |
| *Binneya notabilis* | Santa Barbara shelled slug | Cooper, 1863 | — | — | S1 |
| *Eremarionta immaculata* | white desertsnail | Willett, 1937 | — | — | S1 |
| *Eremarionta millepalmarum* | Thousand Palms desertsnail | Berry, 1930 | — | — | S1 |
| *Eremarionta morongoana* | Morongo (=Colorado) desertsnail | Berry, 1929 | — | — | S1 |
| *Eremarionta rowelli bakerensis* | Baker's desertsnail | Pilsbry and Lowe, 1934 | — | — | S1 |
| *Eremarionta rowelli mccoiana* | California Mccoy snail | Willett, 1935 | — | — | S1 |
| *Haplotrema catalinense* | Santa Catalina lancetooth | Hemphill, 1890 | — | — | S1 |
| *Haplotrema duranti* | ribbed lancetooth | Newcomb, 1864 | — | — | S1S2 |
| *Helminthoglypta allynsmithi* | Merced Canyon shoulderband | Pilsbry, 1939 | — | — | S1 |
| *Helminthoglypta arrosa monticola* | mountain shoulderband | Roth, 1982 | — | — | S1 |
| *Helminthoglypta arrosa pomoensis* | Pomo bronze shoulderband | Smith, 1938 | — | — | S1 |
| *Helminthoglypta ayresiana sanctaecrucis* | Ayer's snail | Pilsbry, 1927 | — | — | S1S2 |
| *Helminthoglypta callistoderma* | Kern shoulderband | Pilsbry and Ferriss, 1919 | — | — | S1 |
| *Helminthoglypta coelata* | mesa shoulderband | Bartsch, 1916 | — | — | S1 |
| *Helminthoglypta concolor* | whitefir shoulderband | Roth and Hochberg, 1988 | — | — | S1S2 |

11

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| *Helminthoglypta fontiphila* | Soledad shoulderband | Gregg, 1931 | — | — | S1 |
| *Helminthoglypta hertleini* | Oregon shoulderband | Hanna and Smith, 1937 | — | — | S1S2 |
| *Helminthoglypta milleri* | peak shoulderband | Reeder, 1986 | — | — | S1 |
| *Helminthoglypta mohaveana* | Victorville shoulderband | Berry, 1927 | — | — | S1 |
| *Helminthoglypta nickliniana awania* | Peninsula coast range shoulderband | Bartsch, 1919 | — | — | S1 |
| *Helminthoglypta nickliniana bridgesi* | Bridges' coast range shoulderband | Newcomb, 1861 | — | — | S1S2 |
| *Helminthoglypta sequoicola consors* | redwood shoulderband | Berry, 1938 | — | — | S1 |
| *Helminthoglypta stiversiana williamsi* | Williams' bronze shoulderband | Smith, 1938 | — | — | S1 |
| *Helminthoglypta taylori* | westfork shoulderband | Reeder and Roth, 1988 | — | — | S1 |
| *Helminthoglypta traskii pacoimensis* | Pacoima shoulderband | Gregg, 1931 | — | — | S1 |
| *Helminthoglypta uvasana* | Grapevine shoulderband | Roth and Hochberg, 1992 | — | — | S1 |
| *Helminthoglypta vasquezi* | Vasquez shoulderband | Roth and Hochberg, 1992 | — | — | S1 |
| *Helminthoglypta walkeriana* | Morro shoulderband | Hemphill, 1911 | Threatened | — | S2 |
| *Herpeteros angelus* | Soledad desertsnail | Gregg, 1949 | — | — | S1 |
| *Hesperarion plumbeus* | leaden slug | Roth, 2004 | — | — | S1S2 |
| *Micrarionta facta* | Santa Barbara islandsnail | Newcomb, 1864 | — | — | S1S2 |
| *Micrarionta feralis* | San Nicolas islandsnail | Hemphill, 1901 | — | — | S1 |
| *Micrarionta gabbii* | San Clemente islandsnail | Newcomb, 1864 | — | — | S1 |
| *Micrarionta opuntia* | pricklypear islandsnail | Roth, 1975 | — | — | S1 |
| *Monadenia callipeplus* | downy sideband | Berry, 1940 | — | — | S1S2 |
| *Monadenia cristulata* | crested sideband | Berry, 1940 | — | — | S1S2 |
| *Monadenia fidelis leonina* | A terrestrial snail | Berry, 1937 | — | — | S1S2 |
| *Monadenia fidelis pronotis* | rocky coast Pacific sideband | Berry, 1931 | — | — | S1 |
| *Monadenia infumata ochromphalus* | yellow-based sideband | Berry, 1937 | — | — | S1S2 |
| *Monadenia infumata setosa* | Trinity bristle snail | Talmadge, 1952 | — | Threatened[T] | S2 |
| *Monadenia marmarotis* | marble sideband | Berry, 1940 | — | — | S1 |
| *Monadenia mormonum buttoni* | Button's Sierra sideband | Pilsbry, 1900 | — | — | S1S2 |
| *Monadenia mormonum hirsuta* | hirsute Sierra sideband | Pilsbry, 1927 | — | — | S1 |
| *Monadenia tuolumneana* | Tuolumne sideband | Berry, 1955 | — | — | S1 |
| *Monadenia yosemitensis* | Yosemite sideband | Lowe, 1916 | — | — | S1S2 |
| *Noyo intersessa* | Ten Mile shoulderband | Roth, 1987 | — | — | S1S2 |
| *Pristiloma shepardae* | Shepard's snail | Hemphill, 1892 | — | — | S1 |
| *Punctum hannai* | Trinity Spot | Roth, 1985 | — | — | S1S2 |

12

| Scientific Name | Common Name | Author, Date | FedList | CalList | S-Rank |
|---|---|---|---|---|---|
| *Radiocentrum avalonense* | Catalina mountainsnail | Hemphill, 1905 | — | — | S1 |
| *Rothelix warnerfontis* | Warner Springs shoulderband | Reeder and Miller, 1988 | — | — | S1 |
| *Sterkia clementina* | San Clemente Island blunt-top snail | Sterki, 1890 | — | — | S1S2 |
| *Trilobopsis roperi* | Shasta chaparral | Pilsbry, 1889 | — | — | S1 |
| *Trilobopsis tehamana* | Tehama chaparral | Pilsbry, 1928 | — | — | S1 |
| *Vespericola pressleyi* | Big Bar hesperian | Roth, 1985 | — | — | S1 |
| *Vespericola scotti* | Benson Gulch hesperian | Cordero and Miller, 1995 | — | — | S1 |
| *Vespericola sierranus* | Siskiyou hesperian | Berry, 1921 | — | — | S1S2 |
| *Xerarionta intercisa* | horseshoe snail | Binney, 1857 | — | — | S1 |
| *Xerarionta redimita* | wreathed cactussnail | Binney, 1858 | — | — | S1 |
| *Xerarionta tryoni* | Bicolor cactussnail | Newcomb, 1864 | — | — | S1 |

# Attachment 2

# STATE AND FEDERALLY LISTED ENDANGERED, THREATENED, AND RARE PLANTS OF CALIFORNIA

## January 2026

State of California

Natural Resources Agency

Department of Fish and Wildlife

Biogeographic Data Branch

California Natural Diversity Database (CNDDB)

Recommended Citation:

California Natural Diversity Database (CNDDB). January 2026. State and Federally Listed Endangered, Threatened, and Rare Plants of California. California Department of Fish and Wildlife. Sacramento, CA.

# Table of Contents

Introduction ............................................................................................................... i

Listing Status Summary Table ....................................................................................... iii

Abbreviations .............................................................................................................. iv

Additional Resources ................................................................................................... iv

# Introduction

This document contains a list of California plant taxa that have been officially classified as endangered, threatened, or rare by the California Fish & Game Commission (state listed) or by the U.S. Secretary of the Interior or the U.S. Secretary of Commerce (federally listed). This list also includes taxa that are official candidates for state or federal listing, or have been officially proposed for federal listing, as well as taxa that were once listed but have since been delisted.

State listing is pursuant to the Native Plant Protection Act (NPPA) of 1977 (Fish & G. Code, § 1900 et seq.) and/or the California Endangered Species Act (CESA) of 1984 (Fish & G. Code, § 2050 et seq.). Up through 1984, all state listed plants were listed as either endangered or rare under the NPPA. After 1984, all plants were state listed as either endangered or threatened under CESA. Plants listed as endangered under the NPPA are considered endangered under CESA (Fish & G. Code, 2062). The official California listing of endangered, threatened, and rare plants is contained in the California Code of Regulations, title 14, section 670.2.

Federal listing is pursuant to the Federal Endangered Species Act (ESA) of 1973, as amended (16 USC §§1531-1544; 50 CFR §§17.1-17.108). The federal agency responsible for listing plants is the United States Fish and Wildlife Service (USFWS). Under the ESA plants are listed as threatened or endangered. The official federal listing of endangered and threatened plants is published in the Federal Register (50 CFR §17.12).

Common and scientific names are shown as they are in current usage, typically based on the NatureServe Natural Heritage Network. If the current scientific name differs from that in state and federal listing documents, the scientific name at the time of listing is provided in the notes. Synonyms are included when state, federal, and/or CNDDB usage

i

differs. Name changes and other clarifying points are also noted. Where state and federal listings apply to different ranges, subspecies, or populations, each taxon is included in a separate row. Where state and federal listings differ in name, but represent the same biological unit, the common name from the California state listing is used.

"State Status" and "Federal Status" indicate current listing status. "State Status Date" and "Federal Status Date" is the date the listing status became effective. "Federal Status Date is typically *not* the date of publication of the rule in the Federal Register; it is usually about 30 days after publication, but may be longer.

Former listing statuses and dates they became effective are in the notes. If a plant was previously listed and no longer has a state and/or federal listing status, the entry text is shown in grey. If a plant was previously proposed or a candidate for listing, but the listing was not warranted or was revoked, the record has been removed from the table. All dates are in the "YYYYMMDD" format.

# Listing Status Summary Table

| Abbreviation | Designation | Totals |
|:---:|:---|:---:|
| SE[1] | State Listed – CESA Endangered, no NPPA status | 40 |
| SE[2] | State Listed – CESA Endangered and NPPA Endangered | 99 |
| ST | State Listed – CESA Threatened | 22 |
| SR | State Listed – NPPA Rare | 64 |
| SC | State Candidate for Listing | 4 |
| SD | State Delisted | 8 |
| FE | Federally Listed - Endangered | 131 |
| FT | Federally Listed - Threatened | 51 |
| FPE | Federally Proposed - Endangered | 0 |
| FPT | Federally Proposed - Threatened | 0 |
| FC | Federal Candidate for Listing | 0 |
| FD | Federally Delisted | 12 |
| | **# Plant Taxa State Listed Under CESA** | **161** |
| | **# Plant Taxa State Listed Under NPPA** | **163** |
| | **# Plant Taxa State Listed and not Federally Listed** | **108** |
| | **# Plant Taxa Federally Listed and not State Listed** | **65** |
| | **# Plant Taxa State Listed AND Federally Listed** | **117** |
| | **Total # State Listed Taxa (SE, ST, SR)** | **225** |
| | **Total # Federally Listed Taxa (FE, FT)** | **182** |
| | **Total # Listed Plant Taxa** | **290** |

iii

# Abbreviations

CCR: California Code of Regulations

CDFW: California Department of Fish and Wildlife (previously Department of Fish and Game (DFG))

CESA: California Endangered Species Act

ESA: Endangered Species Act (Federal)

FGC: California Fish and Game Commission

USFWS: United States Fish and Wildlife Service

# Additional Resources

The California Fish and Game Commission publishes notices related to changes to Title 14 of the California Code of Regulations.

Title 14 of the California Code of Regulations can be accessed through the Office of Administrative Law.

The U.S. Fish and Wildlife Service is responsible for protecting Endangered and Threatened species, and conserving candidate species and at-risk species so that ESA listing is not necessary.

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Acanthomintha duttonii* | San Mateo thorn-mint | SE[2] | 19790711 | FE | 19851018 | Scientific name at time of NPPA and ESA listing: *Acanthomintha obovata* ssp. *duttonii*. |
| *Acanthomintha ilicifolia* | San Diego thorn-mint | SE[2] | 19820117 | FT | 19981112 | |
| *Acanthoscyphus parishii* var. *goodmaniana* | Cushenbury oxytheca | | | FE | 19940923 | Scientific name at time of ESA listing: *Oxytheca parishii* var. *goodmaniana*. |
| *Acmispon argophyllus* var. *adsurgens* | San Clemente Island bird's-foot trefoil | SE[2] | 19820212 | | | Scientific name at time of NPPA listing: *Lotus argophyllus* var. *adsurgens*. |
| *Acmispon argophyllus* var. *niveus* | Santa Cruz Island bird's-foot trefoil | SE[2] | 19791116 | | | Scientific name at time of NPPA listing: *Lotus argophyllus* var. *niveus*. |
| *Acmispon dendroideus* var. *traskiae* | San Clemente Island lotus | SE[2] | 19820416 | FD | 20230224 | FE on 19770912. FT on 20130826. FD due to recovery. Scientific name at time of NPPA and ESA listing: *Lotus dendroideus* var. *traskiae*. |
| *Agrostis blasdalei* var. *marinensis* | Blasdale's bent grass | SD | 20081004 | | | SR on 19781110. Current taxonomic treatment no longer recognizes varieties within *A. blasdalei*. |
| *Allium munzii* | Munz's onion | ST | 19901108 | FE | 19981112 | Scientific name at time of CESA listing: *Allium fimbriatum* var. *munzii*. |
| *Allium yosemitense* | Yosemite onion | SR | 19820704 | | | |
| *Alopecurus aequalis* var. *sonomensis* | Sonoma alopecurus | | | FE | 19971121 | |
| *Ambrosia pumila* | San Diego ambrosia | | | FE | 20020801 | |
| *Amsinckia grandiflora* | large-flowered fiddleneck | SE[2] | 19810815 | FE | 19850607 | SR on 19781110. |
| *Arabis mcdonaldiana* | McDonald's rockcress | SE[2] | 19790711 | FE | 19781029 | |
| *Arctostaphylos bakeri* ssp. *bakeri* | Baker's manzanita | SR | 19790909 | | | NPPA listing status includes the entire species, *A. bakeri*. |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 387 of 523    Page ID #:898

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Arctostaphylos bakeri* ssp. *sublaevis* | The Cedars manzanita | SR | 19790909 | | | NPPA listing status includes the entire species, *A. bakeri*. |
| *Arctostaphylos confertiflora* | Santa Rosa Island manzanita | | | FE | 19970902 | |
| *Arctostaphylos densiflora* | Vine Hill manzanita | SE² | 19810815 | | | SR on 19781110. |
| *Arctostaphylos edmundsii* var. *parvifolia* | Little Sur manzanita | SD | 20081004 | | | NPPA Endangered on 19791116. SR on 19810815. Current taxonomic treatment no longer recognizes varieties within *A. edmundsii*. |
| *Arctostaphylos franciscana* | Franciscan manzanita | | | FE | 20121005 | |
| *Arctostaphylos glandulosa* ssp. *crassifolia* | Del Mar manzanita | | | FE | 19961106 | |
| *Arctostaphylos hookeri* ssp. *hearstiorum* | Hearsts' manzanita | SE² | 19790909 | | | |
| *Arctostaphylos imbricata* | San Bruno Mountain manzanita | SE² | 19790909 | | | |
| *Arctostaphylos montana* ssp. *ravenii* | Presidio manzanita | SE² | 19781110 | FE | 19791128 | Scientific name at time of NPPA and ESA listing: *Arctostaphylos hookeri* ssp. *ravenii*. |
| *Arctostaphylos morroensis* | Morro manzanita | SC | 20250516 | FT | 19950117 | SC on 19911205, removed from SC on 199308XX. |
| *Arctostaphylos myrtifolia* | Ione manzanita | | | FT | 19990625 | |
| *Arctostaphylos pacifica* | Pacific manzanita | SE² | 19790909 | | | |
| *Arctostaphylos pallida* | pallid manzanita | SE² | 19791116 | FT | 19980522 | |
| *Arenaria paludicola* | marsh sandwort | SE¹ | 19901108 | FE | 19930803 | |
| *Astragalus agnicidus* | Humboldt County milk-vetch | SE² | 19820416 | | | |
| *Astragalus albens* | Cushenbury milk-vetch | | | FE | 19940923 | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 388 of 523   Page ID #:899

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Astragalus brauntonii* | Braunton's milk-vetch | | | FE | 19970228 | |
| *Astragalus claranus* | Clara Hunt's milk-vetch | SE[1] | 20211206 | FE | 19971121 | ST on 19901108. Scientific name at time of CESA and ESA listing: *Astragalus clarianus.* |
| *Astragalus jaegerianus* | Lane Mountain milk-vetch | | | FE | 19981105 | |
| *Astragalus johannis-howellii* | Long Valley milk-vetch | SR | 19820704 | | | |
| *Astragalus lentiginosus* var. *coachellae* | Coachella Valley milk-vetch | | | FE | 19981105 | |
| *Astragalus lentiginosus* var. *piscinensis* | Fish Slough milk-vetch | | | FT | 19981105 | |
| *Astragalus lentiginosus* var. *sesquimetralis* | Sodaville milk-vetch | SE[2] | 19790909 | | | |
| *Astragalus magdalenae* var. *peirsonii* | Peirson's milk-vetch | SE[2] | 19791116 | FT | 19981105 | |
| *Astragalus monoensis* | Mono milk-vetch | SR | 19820704 | | | |
| *Astragalus pycnostachyus* var. *lanosissimus* | Ventura Marsh milk-vetch | SE[1] | 20001207 | FE | 20010620 | |
| *Astragalus tener* var. *titi* | coastal dunes milk-vetch | SE[2] | 19820212 | FE | 19980911 | |
| *Astragalus traskiae* | Trask's milk-vetch | SR | 19791116 | | | |
| *Astragalus tricarinatus* | triple-ribbed milk-vetch | | | FE | 19981105 | |
| *Atriplex coronata* var. *notatior* | San Jacinto Valley crownscale | | | FE | 19981112 | |
| *Atriplex tularensis* | Bakersfield smallscale | SE[1] | 19870116 | | | |
| *Baccharis vanessae* | Encinitas baccharis | SE[1] | 19870116 | FT | 19961106 | SR on 19820704. |
| *Bensoniella oregona* | bensoniella | SR | 19820704 | | | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 389 of 523   Page ID #:900

State and Federally Listed Endangered, Threatened, and Rare Plants of California – January 2026

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| Berberis sonnei | Truckee barberry | SD | 20081004 | FD | 20031001 | NPPA Endangered on 19790711. FE on 19791206. Synonym: *Mahonia sonnei*. Current taxonomic treatment considers this a form of the common *B. aquifolium* var. *repens*, not a separate taxon. |
| Berberis nevinii | Nevin's barberry | SE[1] | 19870116 | FE | 19981112 | Scientific name at time of CESA listing: *Mahonia nevinii*. |
| Berberis pinnata ssp. insularis | island barberry | SE[2] | 19791116 | FE | 19970902 | |
| Blennosperma bakeri | Sonoma sunshine | SE[1] | 19920507 | FE | 19920102 | |
| Blennosperma nanum var. robustum | Point Reyes blennosperma | SR | 19781110 | | | |
| Bloomeria humilis | dwarf goldenstar | SR | 19781110 | | | |
| Boechera hoffmannii | Hoffmann's rockcress | | | FE | 19970902 | Scientific name at time of ESA listing: *Arabis hoffmannii*. |
| Brodiaea filifolia | thread-leaved brodiaea | SE[2] | 19820117 | FT | 19981112 | |
| Brodiaea insignis | Kaweah brodiaea | SE[2] | 19791116 | | | |
| Brodiaea pallida | Chinese Camp brodiaea | SE[2] | 19781110 | FT | 19981014 | |
| Brodiaea rosea | Indian Valley brodiaea | SE[2] | 19790909 | | | Scientific name at time of NPPA listing: *Brodiaea coronaria ssp. rosea*. |
| Calamagrostis foliosa | leafy reed grass | SR | 19791116 | | | |
| Calochortus dunnii | Dunn's mariposa-lily | SR | 19791116 | | | |
| Calochortus persistens | Siskiyou mariposa-lily | SR | 19820704 | | | FC on 20040504; removed from FC list on 20151008. |
| Calochortus tiburonensis | Tiburon mariposa-lily | ST | 19880327 | FT | 19950306 | NPPA Endangered on 19781110. |
| Calyptridium pulchellum | Mariposa pussypaws | | | FT | 19981014 | |
| Calystegia stebbinsii | Stebbins' morning-glory | SE[2] | 19810815 | FE | 19961118 | SR on 19791116. |

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Camissonia benitensis* | San Benito evening-primrose | | | FD | 20220307 | FT on 19850314. FD due to recovery. |
| *Carex albida* | white sedge | SE² | 19791116 | FE | 19971121 | Current taxonomic treatment considers *Carex albida* a synonym of *Carex lemmonii*, a common taxon. Proposed for federal delisting on 20240702. Not currently tracked by the CNDDB. |
| *Carex tompkinsii* | Tompkins' sedge | SR | 19791116 | | | |
| *Carpenteria californica* | tree-anemone | ST | 19901108 | | | |
| *Castilleja affinis* var. *neglecta* | Tiburon paintbrush | ST | 19901108 | FE | 19950306 | Scientific name at time of CESA listing: *Castilleja neglecta*. |
| *Castilleja campestris* var. *succulenta* | succulent owl's-clover | SE² | 19790909 | FT | 19970425 | Scientific name at time of NPPA listing: *Orthocarpus succulentus*. |
| *Castilleja cinerea* | ash-gray paintbrush | | | FT | 19981014 | |
| *Castilleja gleasoni* | Mt. Gleason paintbrush | SR | 19820704 | | | |
| *Castilleja grisea* | San Clemente Island paintbrush | SE² | 19820212 | FD | 20230224 | FE on 19770912. FT on 20130826. FD due to recovery. |
| *Castilleja mollis* | soft-leaved paintbrush | | | FE | 19970902 | |
| *Castilleja uliginosa* | Pitkin Marsh paintbrush | SE² | 19781110 | | | |
| *Caulanthus californicus* | California jewelflower | SE¹ | 19870116 | FE | 19900820 | |
| *Caulanthus stenocarpus* | slender-pod jewelflower | SD | 20081004 | | | SR on 19791116. Current taxonomic treatment considers *Caulanthus stenocarpus* as a synonym of *Caulanthus heterophyllus*, a common taxon. |
| *Ceanothus ferrisiae* | Coyote ceanothus | | | FE | 19950306 | Scientific name at time of ESA listing: *Ceanothus ferrisae*. |
| *Ceanothus hearstiorum* | Hearsts' ceanothus | SR | 19810815 | | | NPPA Endangered on 19791116. |
| *Ceanothus maritimus* | maritime ceanothus | SR | 19781110 | | | |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 392 of 523    Page ID #:903

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Ceanothus masonii* | Mason's ceanothus | SR | 19781110 | | | |
| *Ceanothus ophiochilus* | Vail Lake ceanothus | SE[1] | 19940127 | FT | 19981112 | |
| *Ceanothus roderickii* | Pine Hill ceanothus | SR | 19820704 | FE | 19961118 | |
| *Cercocarpus traskiae* | Catalina Island mountain-mahogany | SE[2] | 19820416 | FE | 19970908 | |
| *Chloropyron maritimum* ssp. *maritimum* | salt marsh bird's-beak | SE[2] | 19790711 | FE | 19781029 | Scientific name at time of NPPA and ESA listing: *Cordylanthus maritimus* ssp. *maritimus.* |
| *Chloropyron molle* ssp. *molle* | soft bird's-beak | SR | 19790711 | FE | 19971222 | Scientific name at time of NPPA and ESA listing: *Cordylanthus mollis* ssp. *mollis*. |
| *Chloropyron palmatum* | palmate-bracted bird's-beak | SE[2] | 19840520 | FE | 19860731 | Scientific name at time of NPPA and ESA listing: *Cordylanthus palmatus.* |
| *Chorizanthe howellii* | Howell's spineflower | ST | 19870116 | FE | 19920622 | |
| *Chorizanthe orcuttiana* | Orcutt's spineflower | SE[2] | 19791116 | FE | 19961106 | |
| *Chorizanthe parryi* var. *fernandina* | San Fernando Valley spineflower | SE[1] | 20020908 | | | FC on 20040504. FPT on 20160915. Proposed Rule withdrawn on 20180315. |
| *Chorizanthe pungens* var. *hartwegiana* | Ben Lomond spineflower | | | FE | 19940307 | |
| *Chorizanthe pungens* var. *pungens* | Monterey spineflower | | | FT | 19940307 | |
| *Chorizanthe robusta* var. *hartwegii* | Scotts Valley spineflower | | | FE | 19940307 | USFWS listed the entire species, *Chorizanthe robusta.* |
| *Chorizanthe robusta* var. *robusta* | robust spineflower | | | FE | 19940307 | USFWS listed the entire species, *Chorizanthe robusta.* |
| *Chorizanthe valida* | Sonoma spineflower | SE[1] | 19901108 | FE | 19920622 | |
| *Cirsium ciliolatum* | Ashland thistle | SE[2] | 19820416 | | | |

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Cirsium fontinale* var. *fontinale* | fountain thistle | SE[2] | 19790711 | FE | 19950306 | |
| *Cirsium fontinale* var. *obispoense* | Chorro Creek bog thistle | SE[1] | 19930712 | FE | 19950117 | |
| *Cirsium hydrophilum* var. *hydrophilum* | Suisun thistle | | | FE | 19971222 | |
| *Cirsium rhothophilum* | surf thistle | ST | 19901108 | | | |
| *Cirsium scariosum* var. *loncholepis* | La Graciosa thistle | ST | 19901108 | FE | 20000419 | Scientific name at time of CESA and ESA listing: *Cirsium loncholepis*. |
| *Clarkia franciscana* | Presidio clarkia | SE[2] | 19781110 | FE | 19950306 | |
| *Clarkia imbricata* | Vine Hill clarkia | SE[2] | 19781110 | FE | 19971121 | |
| *Clarkia lingulata* | Merced clarkia | SE[1] | 19870116 | | | SR on 19820704. |
| *Clarkia speciosa* ssp. *immaculata* | Pismo clarkia | SR | 19781110 | FE | 19950117 | |
| *Clarkia springvillensis* | Springville clarkia | SE[2] | 19790909 | FT | 19981014 | |
| *Cordylanthus eremicus* var. *pubescens* | San Bernardino bird's-beak | SD | 19870116 | | | NPPA Endangered on 19781110. Current taxonomic treatments no longer recognize this taxon. |
| *Cordylanthus nidularius* | Mt. Diablo bird's-beak | SR | 19781110 | | | |
| *Cordylanthus rigidus* ssp. *littoralis* | seaside bird's-beak | SE[2] | 19820117 | | | |
| *Cordylanthus tenuis* ssp. *capillaris* | Pennell's bird's-beak | SR | 19781110 | FE | 19950306 | |
| *Crocanthemum greenei* | island rush-rose | | | FT | 19970902 | Scientific name at time of ESA listing: *Helianthemum greenei*. |
| *Croton wigginsii* | Wiggins' croton | SR | 19810815 | | | NPPA Endangered on 19790909. |
| *Dedeckera eurekensis* | July gold | SR | 19781110 | | | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 393 of 523   Page ID #:904

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Deinandra arida* | Red Rock tarplant | SR | 19820704 | | | Scientific name at time of NPPA listing: *Hemizonia arida*. |
| *Deinandra bacigalupii* | Livermore tarplant | SE[1] | 20171001 | | | |
| *Deinandra conjugens* | Otay tarplant | SE[2] | 19791116 | FT | 19981112 | Scientific name at time of NPPA and ESA listing: *Hemizonia conjugens*. |
| *Deinandra increscens* ssp. *villosa* | Gaviota tarplant | SE[1] | 19901108 | FE | 20000419 | Scientific name at time of CESA and ESA listing: *Hemizonia increscens* ssp. *villosa*. |
| *Deinandra minthornii* | Santa Susana tarplant | SR | 19781110 | | | Scientific name at time of NPPA listing: *Hemizonia minthornii*. |
| *Deinandra mohavensis* | Mojave tarplant | SE[2] | 19820117 | | | Scientific name at time of NPPA listing: *Hemizonia mohavensis*. |
| *Delphinium bakeri* | Baker's larkspur | SE[1] | 20061105 | FE | 20000225 | SR on 19791116. |
| *Delphinium hesperium* ssp. *cuyamacae* | Cuyamaca larkspur | SR | 19820704 | | | |
| *Delphinium luteum* | golden larkspur | SR | 19790909 | FE | 20000225 | |
| *Delphinium variegatum* ssp. *kinkiense* | San Clemente Island larkspur | SE[2] | 19820212 | FD | 20230224 | FE on 19770912. FD due to recovery. Scientific name at time of NPPA and ESA listing: *Delphinium kinkiense*. |
| *Dieteria asteroides* var. *lagunensis* | Mount Laguna aster | SR | 19790909 | | | Scientific name at time of NPPA listing: *Machaeranthera lagunensis*. |
| *Diplacus vandenbergensis* | Vandenberg monkeyflower | | | FE | 20140925 | |
| *Dithyrea maritima* | beach spectaclepod | ST | 19901108 | | | |
| *Dodecahema leptoceras* | slender-horned spineflower | SE[1] | 19870116 | FE | 19871028 | Scientific name at time of CESA and ESA listing: *Centrostegia leptoceras*. |
| *Downingia concolor* var. *brevior* | Cuyamaca Lake downingia | SE[2] | 19820212 | | | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 394 of 523   Page ID #:905

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Dudleya abramsii* ssp. *setchellii* | Santa Clara Valley dudleya | | | FE | 19950306 | Scientific name at time of ESA listing: *Dudleya setchellii*. |
| *Dudleya brevifolia* | short-leaved dudleya | SE² | 19820117 | | | |
| *Dudleya cymosa* ssp. *agourensis* | Agoura Hills dudleya | | | FT | 19970228 | USFWS listed the more encompassing *Dudleya cymosa* ssp. *ovatifolia* from which ssp. *agourensis* was split. |
| *Dudleya cymosa* ssp. *marcescens* | marcescent dudleya | SR | 19781110 | FT | 19970228 | |
| *Dudleya cymosa* ssp. *ovatifolia* | Santa Monica dudleya | | | FT | 19970228 | |
| *Dudleya nesiotica* | Santa Cruz Island dudleya | SR | 19791116 | FD | 20231207 | FT on 19970902. FD due to recovery. |
| *Dudleya parva* | Conejo dudleya | | | FT | 19970228 | Scientific name at time of ESA listing: *Dudleya abramsii* ssp. *parva*. |
| *Dudleya stolonifera* | Laguna Beach dudleya | ST | 19870116 | FT | 19981112 | SR on 19790909. |
| *Dudleya traskiae* | Santa Barbara Island dudleya | SE² | 19791116 | FE | 19780527 | |
| *Dudleya verityi* | Verity's dudleya | | | FT | 19970228 | |
| *Enceliopsis nudicaulis* var. *corrugata* | Ash Meadows daisy | | | FT | 19850619 | |
| *Eremalche parryi* ssp. *kernensis* | Kern mallow | | | FE | 19900820 | Scientific name at time of ESA listing: *Eremalche kernensis*. |
| *Eremogone ursina* | Big Bear Valley sandwort | | | FT | 19981014 | Scientific name at time of ESA listing: *Arenaria ursina*. |
| *Eriastrum densifolium* ssp. *sanctorum* | Santa Ana River woollystar | SE¹ | 19870116 | FE | 19871028 | |
| *Eriastrum ertterae* | Lime Ridge eriastrum | SE¹ | 20241105 | | | |
| *Eriastrum hooveri* | Hoover's woolly-star | | | FD | 20031007 | FT on 19900820. FD due to recovery. |
| *Eriastrum tracyi* | Tracy's eriastrum | SR | 19820704 | | | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 395 of 523   Page ID #:906

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Erigeron parishii* | Parish's daisy | | | FT | 19940923 | |
| *Eriodictyon altissimum* | Indian Knob mountainbalm | SE² | 19790711 | FE | 19950117 | |
| *Eriodictyon capitatum* | Lompoc yerba santa | SR | 19790909 | FE | 20000419 | |
| *Eriogonum alpinum* | Trinity buckwheat | SE² | 19790711 | | | |
| *Eriogonum apricum* var. *apricum* | Ione buckwheat | SE² | 19810815 | FE | 19990625 | SR on 19790711. USFWS listed the entire species, *Eriogonum apricum*. |
| *Eriogonum apricum* var. *prostratum* | Irish Hill buckwheat | SE¹ | 19870116 | FE | 19990625 | NPPA Endangered on 19790711. SR on 19810815. USFWS listed the entire species, *Eriogonum apricum*. |
| *Eriogonum butterworthianum* | Butterworth's buckwheat | SR | 19791116 | | | |
| *Eriogonum crocatum* | Conejo buckwheat | SR | 19790909 | | | |
| *Eriogonum giganteum* var. *compactum* | Santa Barbara Island buckwheat | SR | 19791116 | | | |
| *Eriogonum grande* var. *timorum* | San Nicolas Island buckwheat | SE² | 19791116 | | | Scientific name at time of NPPA listing: *Eriogonum grande* ssp. *timorum*. |
| *Eriogonum kelloggii* | Kellogg's buckwheat | SE² | 19820416 | | | FC on 20040504; removed from FC list on 20140918. |
| *Eriogonum kennedyi* var. *austromontanum* | southern mountain buckwheat | | | FT | 19981014 | |
| *Eriogonum microtheca* var. *lacus-ursi* | Bear Lake buckwheat | SC | 20241025 | | | |
| *Eriogonum ovalifolium* var. *vineum* | Cushenbury buckwheat | | | FE | 19940923 | |
| *Eriogonum thornei* | Thorne's buckwheat | SE² | 19791116 | | | Scientific name at time of NPPA listing: *Eriogonum ericifolium* var. *thornei*. |
| *Eriogonum twisselmannii* | Twisselmann's buckwheat | SR | 19820704 | | | |

Case 2:26-cv-03396-SVW-SSC Document 21-1 Filed 05/07/26 Page 396 of 523 Page ID #:907

State and Federally Listed Endangered, Threatened, and Rare Plants of California – January 2026

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Eriophyllum congdonii* | Congdon's woolly sunflower | SR | 19820704 | | | |
| *Eriophyllum latilobum* | San Mateo woolly sunflower | SE[1] | 19921231 | FE | 19950306 | |
| *Eryngium aristulatum var. parishii* | San Diego button-celery | SE[2] | 19790711 | FE | 19930803 | |
| *Eryngium constancei* | Loch Lomond button-celery | SE[1] | 19870116 | FE | 19870122 | Emergency FE listing on 19850801; formal FE status on 19870122. |
| *Eryngium racemosum* | Delta button-celery | SE[2] | 19820117 | | | |
| *Erysimum capitatum var. angustatum* | Contra Costa wallflower | SE[2] | 19781110 | FE | 19780527 | |
| *Erysimum menziesii* | Menzies' wallflower | SE[2] | 19840902 | FE | 19920622 | |
| *Erysimum teretifolium* | Santa Cruz wallflower | SE[2] | 19810815 | FE | 19940307 | SR on 19791116. |
| *Erythranthe arenicola* | Beach monkeyflower | SD | 19820704 | | | NPPA Endangered on 19791116. Scientific name at time of NPPA listing: *Mimulus guttatus* ssp. *arenicola*. |
| *Euphorbia hooveri* | Hoover's spurge | | | FT | 19970425 | Scientific name at time of ESA listing: *Chamaesyce hooveri*. |
| *Fremontodendron decumbens* | Pine Hill flannelbush | SR | 19790711 | FE | 19961118 | |
| *Fremontodendron mexicanum* | Mexican flannelbush | SR | 19820704 | FE | 19981112 | |
| *Fritillaria gentneri* | Gentner's fritillary | | | FE | 20000110 | |
| *Fritillaria roderickii* | Roderick's fritillary | SE[2] | 19791116 | | | |
| *Fritillaria striata* | striped adobe-lily | ST | 19870116 | | | |
| *Galium angustifolium* ssp. *borregoense* | Borrego bedstraw | SR | 19791116 | | | |
| *Galium buxifolium* | box bedstraw | SR | 19791116 | FD | 20231207 | FE on 19970902. FD due to recovery. |
| *Galium californicum* ssp. *sierrae* | El Dorado bedstraw | SR | 19791116 | FE | 19961118 | |

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Galium catalinense* ssp. *acrispum* | San Clemente Island bedstraw | SE[2] | 19820416 | | | |
| *Gilia tenuiflora* ssp. *arenaria* | Monterey gilia | ST | 19870116 | FE | 19920622 | |
| *Gilia tenuiflora* ssp. *hoffmannii* | Hoffmann's slender-flowered gilia | | | FE | 19970902 | |
| *Gratiola heterosepala* | Boggs Lake hedge-hyssop | SE[2] | 19781110 | | | |
| *Grindelia fraxinipratensis* | Ash Meadows gumplant | | | FT | 19850619 | Scientific name at time of ESA listing: *Grindelia fraxino-pratensis.* |
| *Hazardia orcuttii* | Orcutt's hazardia | ST | 20030125 | | | FC on 20040504; removed from FC list on 20131122. |
| *Helianthus niveus* ssp. *tephrodes* | Algodones Dunes sunflower | SE[2] | 19791116 | | | |
| *Hesperocyparis abramsiana* var. *abramsiana* | Santa Cruz cypress | SE[2] | 19791116 | FT | 20160321 | Scientific name at time of NPPA listing included the entire species: *Cupressus abramsiana.* USFWS listed the entire species, *Cupressus abramsiana*, as FE on 19870209. |
| *Hesperocyparis abramsiana* var. *butanoensis* | Butano Ridge cypress | SE[2] | 19791116 | FT | 20160321 | Scientific name at time of NPPA listing included the entire species: *Cupressus abramsiana.* USFWS listed the entire species, *Cupressus abramsiana*, as FE on 19870209. |
| *Hesperocyparis goveniana* | Gowen cypress | | | FT | 19980911 | Scientific name at time of ESA listing: *Cupressus goveniana* ssp. *goveniana.* |
| *Hesperolinon congestum* | Marin western flax | ST | 19921231 | FT | 19950306 | |
| *Hesperolinon didymocarpum* | Lake County western flax | SE[2] | 19810815 | | | SR on 19781110. |
| *Holmgrenanthe petrophila* | rock lady | SR | 19820704 | | | Scientific name at time of NPPA listing: *Maurandya petrophila.* |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 398 of 523   Page ID #:909

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Holocarpha macradenia* | Santa Cruz tarplant | SE[2] | 19790909 | FT | 20000419 | |
| *Hooveria purpurea* var. *purpurea* | Santa Lucia purple amole | | | FT | 20000419 | Scientific name at time of ESA listing: *Chlorogalum purpureum* var. *purpureum*. USFWS listed the entire species, *Chlorogalum purpureum*. |
| *Hooveria purpurea* var. *reducta* | Camatta Canyon amole | SR | 19781110 | FT | 20000419 | Scientific name at time of NPPA listing: *Chlorogalum purpureum* var. *reductum*. USFWS listed the entire species, *Chlorogalum purpureum*. |
| *Howellia aquatilis* | water howellia | | | FD | 20210716 | FT on 19940815. FD due to recovery. |
| *Ivesia callida* | Tahquitz ivesia | SR | 19820704 | | | |
| *Ivesia webberi* | Webber's ivesia | | | FT | 20140703 | |
| *Laphamia inyoensis* | Inyo rock daisy | ST | 20240424 | | | Scientific name at time of CESA listing: *Perityle inyoensis*. |
| *Lasthenia burkei* | Burke's goldfields | SE[2] | 19790909 | FE | 19920102 | |
| *Lasthenia conjugens* | Contra Costa goldfields | | | FE | 19970718 | |
| *Layia carnosa* | beach layia | SE[1] | 19901108 | FT | 20220502 | FE on 19920622. |
| *Leptosiphon croceus* | coast yellow leptosiphon | SE[1] | 20190401 | | | |
| *Lessingia germanorum* | San Francisco lessingia | SE[1] | 19901108 | FE | 19970721 | |
| *Lewisia congdonii* | Congdon's lewisia | SR | 19820704 | | | |
| *Lilaeopsis masonii* | Mason's lilaeopsis | SR | 19791116 | | | |
| *Lilium occidentale* | western lily | SE[2] | 19820117 | FE | 19940916 | |
| *Lilium pardalinum* ssp. *pitkinense* | Pitkin Marsh lily | SE[2] | 19781110 | FE | 19971121 | Scientific name at time of NPPA listing: *Lilium pitkinense*. |
| *Limnanthes alba* ssp. *parishii* | Parish's meadowfoam | SE[2] | 19790711 | | | Scientific name at time of NPPA listing: *Limnanthes gracilis* var. *parishii*. |
| *Limnanthes bakeri* | Baker's meadowfoam | SR | 19781110 | | | |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 399 of 523    Page ID #:910

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Limnanthes douglasii* ssp. *sulphurea* | Point Reyes meadowfoam | SE[2] | 19820416 | | | Scientific name at time of NPPA listing: *Limnanthes douglasii* var. *sulphurea*. |
| *Limnanthes floccosa* ssp. *californica* | Butte County meadowfoam | SE[2] | 19820212 | FE | 19920608 | |
| *Limnanthes vinculans* | Sebastopol meadowfoam | SE[2] | 19791116 | FE | 19920102 | |
| *Lithophragma maximum* | San Clemente Island woodland star | SE[2] | 19820212 | FE | 19970908 | |
| *Lomatium ravenii* | Lassen parsley | SD | 19840520 | | | NPPA Endangered on 19790909. |
| *Lupinus citrinus* var. *deflexus* | Mariposa lupine | ST | 19901108 | | | Scientific name at time of CESA listing: *Lupinus deflexus*. |
| *Lupinus constancei* | Lassics lupine | SE[1] | 20190401 | FE | 20231106 | |
| *Lupinus milobakeri* | Milo Baker's lupine | SE[1] | 20240904 | | | SR on 19781110. ST on 19870116. Scientific name at time of CESA and NPPA listing: *Lupinus milo-bakeri*. |
| *Lupinus nipomensis* | Nipomo Mesa lupine | SE[1] | 19870116 | FE | 20000419 | |
| *Lupinus padrecrowleyi* | Father Crowley's lupine | SR | 19810815 | | | NPPA Endangered on 19791116. Scientific name at time of NPPA listing: *Lupinus dedeckerae*. |
| *Lupinus tidestromii* | Tidestrom's lupine | SE[1] | 19870116 | FE | 19920622 | Federally listed at the species level; CESA listed as *Lupinus tidestromii* var. *tidestromii* (plants of *L. tidestromii* from Monterey County only). |
| *Malacothamnus clementinus* | San Clemente Island bushmallow | SE[2] | 19820212 | FD | 20230224 | FE on 19770912. FD due to recovery. |
| *Malacothamnus fasciculatus* var. *nesioticus* | Santa Cruz Island bushmallow | SE[2] | 19791116 | FE | 19970902 | Scientific name at time of ESA listing: *Malacothamnus fasciculatus* ssp. *nesioticus*. |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 400 of 523   Page ID #:911

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Malacothrix indecora* | Santa Cruz Island malacothrix | | | FE | 19970902 | |
| *Malacothrix squalida* | island malacothrix | | | FE | 19970902 | |
| *Monardella sinuata* ssp. *gerryi* | Gerry's curly-leaved monardella | SC | 20251024 | | | |
| *Monardella viminea* | willowy monardella | SE[2] | 19791116 | FE | 19981112 | Scientific name at time of NPPA and ESA listing: *Monardella linoides* ssp. *viminea.* |
| *Monolopia congdonii* | San Joaquin woollythreads | | | FE | 19900820 | Scientific name at time of ESA listing: *Lembertia congdonii.* |
| *Nasturtium gambelii* | Gambel's water cress | ST | 19901108 | FE | 19930803 | Scientific name at time of CESA and ESA listing: *Rorippa gambellii.* |
| *Navarretia fossalis* | spreading navarretia | | | FT | 19981112 | |
| *Navarretia leucocephala* ssp. *pauciflora* | few-flowered navarretia | ST | 19901108 | FE | 19970718 | Scientific name at time of CESA listing: *Navarretia pauciflora.* |
| *Navarretia leucocephala* ssp. *plieantha* | many-flowered navarretia | SE[2] | 19791116 | FE | 19970718 | Scientific name at time of NPPA listing: *Navarretia plieantha.* |
| *Nemacladus twisselmannii* var. *twisselmannii* | Twisselmann's nemacladus | SR | 19820704 | | | Scientific name at time of NPPA listing: *Nemacladus twisselmannii.* |
| *Neostapfia colusana* | Colusa grass | SE[2] | 19791116 | FT | 19970425 | |
| *Neviusia cliftonii* | Shasta snow-wreath | ST | 20230404 | | | Federal 90-day finding published on 20210324. |
| *Nitrophila mohavensis* | Amargosa nitrophila | SE[2] | 19791116 | FE | 19850619 | |
| *Noccaea fendleri* ssp. *californica* | Kneeland Prairie pennycress | | | FE | 20000310 | Scientific name at time of ESA listing: *Thlapsi californicum.* |
| *Nolina interrata* | Dehesa nolina | SE[2] | 19791116 | | | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 401 of 523   Page ID #:912

State and Federally Listed Endangered, Threatened, and Rare Plants of California – January 2026

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Oenothera avita* ssp. *eurekensis* | Eureka Dunes evening-primrose | SR | 19781110 | FD | 20180329 | FE on 19780527. FD due to recovery. Synonym: *Oenothera californica* ssp. *eurekensis*. |
| *Oenothera deltoides* ssp. *howellii* | Antioch Dunes evening-primrose | SE$^2$ | 19781110 | FE | 19780527 | Scientific name at time of NPPA listing: *Oenothera deltoides* var. *howellii*. |
| *Opuntia basilaris* var. *treleasei* | Bakersfield cactus | SE$^1$ | 19901108 | FE | 19900820 | Scientific name at time of CESA and ESA listing: *Opuntia treleasei*. |
| *Orcuttia californica* | California Orcutt grass | SE$^2$ | 19790909 | FE | 19930803 | Scientific name at time of NPPA listing: *Orcuttia californica* var. *californica*. |
| *Orcuttia inaequalis* | San Joaquin Valley Orcutt grass | SE$^2$ | 19790909 | FT | 19970425 | Scientific name at time of NPPA listing: *Orcuttia californica* var. *inaequalis*. |
| *Orcuttia pilosa* | hairy Orcutt grass | SE$^2$ | 19790909 | FE | 19970425 | |
| *Orcuttia tenuis* | slender Orcutt grass | SE$^2$ | 19790909 | FT | 19970425 | |
| *Orcuttia viscida* | Sacramento Orcutt grass | SE$^2$ | 19790711 | FE | 19970425 | Scientific name at time of NPPA listing: *Orcuttia californica* var. *viscida*. |
| *Oreocarya roosiorum* | bristlecone cryptantha | SR | 19820704 | | | Scientific name at time of NPPA listing: *Cryptantha roosiorum*. |
| *Ornithostaphylos oppositifolia* | Baja California birdbush | SE$^1$ | 20020404 | | | |
| *Packera ganderi* | Gander's ragwort | SR | 19820704 | | | Scientific name at time of NPPA listing: *Senecio ganderi*. |
| *Packera layneae* | Layne's ragwort | SR | 19791116 | FT | 19961118 | Scientific name at time of NPPA and ESA listing: *Senecio layneae*. |
| *Panicum acuminatum* var. *thermale* | Geysers panicum | SE$^2$ | 19790909 | | | Scientific name at time of NPPA listing: *Panicum thermale*. |
| *Pedicularis dudleyi* | Dudley's lousewort | SR | 19790909 | | | |

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Pentachaeta bellidiflora* | white-rayed pentachaeta | SE[1] | 19921231 | FE | 19950306 | |
| *Pentachaeta lyonii* | Lyon's pentachaeta | SE[1] | 19901108 | FE | 19970228 | |
| *Phacelia argentea* | sand dune phacelia | | | FT | 20230921 | |
| *Phacelia insularis* var. *insularis* | northern Channel Islands phacelia | | | FE | 19970902 | Scientific name at time of ESA listing: *Phacelia insularis* ssp. *insularis*. |
| *Phlox hirsuta* | Yreka phlox | SE[1] | 19870116 | FE | 20000306 | |
| *Physaria kingii* ssp. *bernardina* | San Bernardino Mountains bladderpod | | | FE | 19940923 | Scientific name at time of ESA listing: *Lesquerella kingii* ssp. *bernardina*. |
| *Pinus albicaulis* | whitebark pine | | | FT | 20230117 | Not currently tracked by the CNDDB. |
| *Piperia yadonii* | Yadon's rein orchid | | | FE | 19980911 | |
| *Plagiobothrys diffusus* | San Francisco popcornflower | SE[2] | 19790909 | | | |
| *Plagiobothrys strictus* | Calistoga popcornflower | ST | 19901108 | FE | 19971121 | |
| *Pleuropogon hooverianus* | North Coast semaphore grass | ST | 20030129 | | | SR on 19791116. |
| *Poa atropurpurea* | San Bernardino blue grass | | | FE | 19981014 | |
| *Poa napensis* | Napa blue grass | SE[2] | 19790711 | FE | 19971121 | |
| *Pogogyne abramsii* | San Diego mesa mint | SE[2] | 19790711 | FE | 19781029 | |
| *Pogogyne clareana* | Santa Lucia mint | SE[2] | 19791116 | | | |
| *Pogogyne nudiuscula* | Otay Mesa mint | SE[1] | 19870116 | FE | 19930803 | |
| *Polygonum hickmanii* | Scotts Valley polygonum | SE[1] | 20050519 | FE | 20030508 | |
| *Potentilla hickmanii* | Hickman's cinquefoil | SE[2] | 19790909 | FE | 19980911 | |
| *Pseudobahia bahiifolia* | Hartweg's golden sunburst | SE[2] | 19820117 | FE | 19970310 | |
| *Pseudobahia peirsonii* | San Joaquin adobe sunburst | SE[1] | 19870116 | FT | 19970310 | |
| *Rorippa subumbellata* | Tahoe yellow cress | SE[2] | 19820416 | | | FC on 20040504; removed from FC list on 20151008. |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 403 of 523    Page ID #:914

State and Federally Listed Endangered, Threatened, and Rare Plants of California – January 2026

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Rosa minutifolia* | small-leaved rose | SE[1] | 19891122 | | | |
| *Sanicula maritima* | adobe sanicle | SR | 19810815 | | | NPPA Endangered on 19791116. |
| *Sanicula saxatilis* | rock sanicle | SR | 19820704 | | | |
| *Sedella leiocarpa* | Lake County stonecrop | SE[1] | 19901108 | FE | 19970718 | Scientific name at time of CESA and ESA listing: *Parvisedum leiocarpum*. |
| *Sibara filifolia* | Santa Cruz Island winged-rockcress | | | FE | 19970908 | |
| *Sidalcea covillei* | Owens Valley checkerbloom | SE[2] | 19790711 | | | |
| *Sidalcea hickmanii* ssp. *anomala* | Cuesta Pass checkerbloom | SR | 19791116 | | | Scientific name at time of NPPA listing: *Sidalcea hickmanii* var. *anomala*. |
| *Sidalcea hickmanii* ssp. *parishii* | Parish's checkerbloom | SR | 19791116 | | | Scientific name at time of NPPA listing: *Sidalcea hickmanii* var. *parishii*. |
| *Sidalcea keckii* | Keck's checkerbloom | | | FE | 20000317 | |
| *Sidalcea oregana* ssp. *valida* | Kenwood Marsh checkerbloom | SE[2] | 19820117 | FE | 19971121 | |
| *Sidalcea pedata* | bird-foot checkerbloom | SE[2] | 19820117 | FE | 19841001 | |
| *Sidalcea stipularis* | Scadden Flat checkerbloom | SE[2] | 19820212 | | | |
| *Silene greenei* ssp. *angustifolia* | Red Mountain catchfly | SE[2] | 19820416 | | | Scientific name at time of NPPA listing: *Silene campanulata* ssp. *campanulata*. |
| *Stipa lemmonii* var. *pubescens* | pubescent needle grass | SD | 19870116 | | | SR on 19790909. |
| *Streptanthus albidus* ssp. *albidus* | Metcalf Canyon jewelflower | | | FE | 19950306 | |
| *Streptanthus glandulosus* ssp. *niger* | Tiburon jewelflower | SE[1] | 19901108 | FE | 19950306 | Scientific name at time of CESA and ESA listing: *Streptanthus niger*. |

| Taxon | Common Name | State Status | State Status Date | Federal Status | Federal Status Date | Notes |
|---|---|---|---|---|---|---|
| *Suaeda californica* | California seablite | | | FE | 19950117 | |
| *Swallenia alexandrae* | Eureka Valley dune grass | SR | 19810815 | FT | 20180329 | NPPA Endangered on 19790711. FE on 19780527. |
| *Taraxacum californicum* | California dandelion | | | FE | 19981014 | |
| *Thelypodium stenopetalum* | slender-petaled thelypodium | SE[2] | 19820212 | FE | 19841001 | |
| *Thermopsis macrophylla* | Santa Ynez false lupine | SR | 19810815 | | | NPPA Endangered on 19791116. Scientific name at time of NPPA listing: *Thermopsis macrophylla* var. *agnina*. |
| *Thysanocarpus conchuliferus* | Santa Cruz Island fringepod | | | FE | 19970902 | |
| *Trichostema austromontanum* ssp. *compactum* | Hidden Lake bluecurls | | | FD | 20180702 | FT on 19981014. FD due to recovery. |
| *Trifolium amoenum* | showy rancheria clover | | | FE | 19971121 | |
| *Trifolium polyodon* | Pacific Grove clover | SR | 19790909 | | | |
| *Trifolium trichocalyx* | Monterey clover | SE[2] | 19791116 | FE | 19980911 | |
| *Tuctoria greenei* | Greene's tuctoria | SR | 19790909 | FE | 19970425 | Scientific name at time of NPPA listing: *Orcuttia greenei*. |
| *Tuctoria mucronata* | Crampton's tuctoria or Solano grass | SE[2] | 19790711 | FE | 19781029 | Scientific name at time of NPPA and ESA listing: *Orcuttia mucronata*. |
| *Verbena californica* | Red Hills vervain | ST | 19940815 | FT | 19981014 | |
| *Verbesina dissita* | big-leaved crownbeard | ST | 19901108 | FT | 19961106 | |
| *Yucca brevifolia* | western Joshua tree | SC | 20201009 | | | |
| *Zeltnera namophila* | spring-loving centaury | | | FT | 19850619 | Scientific name at time of ESA listing: *Centaurium namophilum*. |

Case 2:26-cv-03396-SVW-SSC Document 21-1 Filed 05/07/26 Page 405 of 523 Page ID #:916

# Attachment 3

# STATE AND FEDERALLY LISTED ENDANGERED

# AND THREATENED ANIMALS OF CALIFORNIA

## February 2026

State of California

Natural Resources Agency

Department of Fish and Wildlife

Biogeographic Data Branch

California Natural Diversity Database (CNDDB)

Recommended Citation:

California Natural Diversity Database (CNDDB). February 2026. State and

Federally Listed Endangered and Threatened Animals of California. California

Department of Fish and Wildlife. Sacramento, CA.

# Table of Contents

Table of Contents ........................................................................................................iii

Overview ...................................................................................................................... i

Background .................................................................................................................. i

Listing Status Summary Table ...................................................................................ii

CDFW Fully Protected.................................................................................................iii

List Content ................................................................................................................iv

Abbreviations ............................................................................................................. v

Additional Resources ................................................................................................. v

# Overview

This document contains a list of animal taxa found within California or off the coast of the State that have been classified as endangered or threatened by the California Fish and Game Commission (FGC; state listed) or by the U.S. Secretary of the Interior or the U.S. Secretary of Commerce (federally listed). This list also includes taxa that are official candidates for state or federal listing, or have been officially proposed for federal listing, as well as taxa that were once listed but have since been delisted.

# Background

State listing is pursuant to the California Endangered Species Act of 1984 (CESA; California Code of Regulations, Title 14, Chapter 6, §§783.0-787.9; Fish and Game Code Chapter 1.5, §§ 2050-2115.5). The designations "Endangered" and "Rare" were first established in 1970 by the original California Endangered Species Act, and taxa with a state list date of June 27, 1971 were protected under this regulation. In 1984, CESA was amended, at which time the "Rare" designation was changed to "Threatened," and on January 1, 1985, all animal species previously designated as "Rare" were reclassified as "Threatened." The official California listing of Endangered and Threatened animals is contained in the California Code of Regulations, Title 14, §670.5.

Federal listing is pursuant to the Federal Endangered Species Act of 1973, as amended (16 USC §§1531-1544; 50 CFR §§17.1-17.108). The federal agencies responsible for listing are the United States Fish and Wildlife Service (USFWS) and the National Marine Fisheries Service (NMFS). Prior federal regulations include the Endangered Species Conservation Act of 1969, and the Endangered Species Preservation Act of 1966, under which all species with a federal list date of March 11, 1967 were listed. The official federal listing of Endangered and Threatened animals is published in the Federal Register, 50 CFR §17.11.

i

# Listing Status Summary Table

Totals include subspecies, Distinct Population Segments, and Ecologically Significant Units when listed separately.

| Abbreviation | Designation | Totals |
|---|---|---|
| | State Fully Protected | 34 |
| SE | State Listed - Endangered | 56 |
| ST | State Listed - Threatened | 43 |
| SC | State Candidate for Listing | 11 |
| SDR | State Delisted (Recovered) | 2 |
| SDE | State Delisted (Extinct) | 2 |
| FE | Federally Listed - Endangered | 91 |
| FT | Federally Listed - Threatened | 51 |
| FPE | Federally Proposed - Endangered | 4 |
| FPT | Federally Proposed - Threatened | 9 |
| FC | Federal Candidate for Listing | 4 |
| FDR | Federally Delisted (Recovered) | 14 |
| FDE | Federally Delisted (Extinct) | 2 |
| | **# Animal Taxa State Listed Only** | **38** |
| | **# Animal Taxa Federally Listed Only** | **80** |
| | **# Animal Taxa State AND Federally Listed** | **62** |
| | **Total # State Listed Taxa (SE, ST)** | **100** |
| | **Total # Federally Listed Taxa (FE, FT)** | **142** |
| | **Total # Listed Animal Taxa** | **180** |

# CDFW Fully Protected

The Fully Protected statute was the State's initial effort in the 1960s, pre-dating any endangered species act, to identify and provide protection to animals that were rare or faced possible extinction. Lists were created for birds, mammals, reptiles and amphibians, and fish. Most of the species on these lists have subsequently been listed under the California and/or federal endangered species acts; the exceptions are white-tailed kite, golden eagle, trumpeter swan, northern elephant seal, and ringtail cat. The white-tailed kite, golden eagle, and ringtail cat are tracked in the CNDDB. The trumpeter swan and northern elephant seal are not tracked by the CNDDB. More information on Fully Protected species and the take provisions can be found in the Fish and Game Code: birds at §3511, mammals at §4700, reptiles and amphibians at §5050, and fish at §5515. Additional information on Fully Protected fish can be found in the California Code of Regulations, Title 14, Division 1, Subdivision 1, Chapter 2, Article 4, §5.93. In July 2023, Senate Bill no. 147 removed American peregrine falcon, brown pelican, and thicktail chub as fully protected species under the Fish & Game Code because they have been delisted-recovered under CESA or are considered extinct.

# List Content

Common and scientific names are shown as they are in current usage, typically based standards used by the NatureServe Natural Heritage Network, unless otherwise noted. If current nomenclature differs from that in state and federal listing documents, the nomenclature at the time of listing is provided in the notes. Synonyms, name changes, and other clarifying points are also noted. Where state and federal listings apply to different ranges, subspecies, or populations, each taxa will be listed separately, and statuses that apply to only a portion of the taxon, or that also encompass other taxa, will be shown in parentheses. Where state and federal listings differ in name, but represent the same biological unit, the common name will be listed using the California state listing; the federal name will be listed in the notes.

The "List Date" for final federal listing is the date the listing became effective. This is typically not the date of publication of the rule in the Federal Register; it is usually about 30 days after publication, but may be longer.

If an animal was previously listed and no longer has any listing status, the entry text is grey. If an animal was previously proposed or a candidate for listing, but the listing was not warranted or was revoked, the record has been removed from the table.
For taxa having more than one status entry, the current status is in bold and underlined. All dates are in the "YYYYMMDD" format.

iv

# Abbreviations

- CCR: California Code of Regulations
- CDFW: California Department of Fish and Wildlife (previously Department of Fish and Game (DFG))
- CESA: California Endangered Species Act
- DPS: Distinct population segment
- ESA: Endangered Species Act (Federal)
- ESU: Evolutionarily significant unit
- FGC: California Fish and Game Commission
- NMFS: National Marine Fisheries Service
- NOAA: National Oceanic and Atmospheric Administration
- USFWS: United States Fish and Wildlife Service

# Additional Resources

- The California Fish and Game Commission publishes notices relating to changes to Title 14 of the California Code of Regulations
- Title 14 of the California Code of Regulations can be accessed through The Office of Administrative Law
- The U.S. Fish and Wildlife Service is responsible for protecting endangered and threatened species, and conserving candidate and at-risk species so that ESA listing is not necessary
- The National Marine Fisheries Service (a.k.a. NOAA Fisheries) Office of Protected Resources is responsible for protecting marine mammals and endangered and threatened marine life

v

## Invertebrates

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Haliotis cracherodii* | black abalone | | | | FE | 20090213 | Listed by NMFS in 2009 and by USFWS in 2011. |
| *Haliotis sorenseni* | white abalone | | | | FE | 20010628 | Listed by NMFS in 2001 and by USFWS in 2005. |
| *Helminthoglypta walkeriana* | Morro shoulderband | | | | FT | 20220307 | Listed as Federally Endangered on 19950117. Downlisted by USFWS to Threatened on 20220307. |
| *Monadenia infumata setosa* | Trinity bristle snail | ST | 19801002 | | | | Listed by the State of California as *Monadenia setosa*. |
| *Branchinecta conservatio* | Conservancy fairy shrimp | | | | FE | 19940919 | |
| *Branchinecta longiantenna* | longhorn fairy shrimp | | | | FE | 19940919 | |
| *Branchinecta lynchi* | vernal pool fairy shrimp | | | | FT | 19940919 | |
| *Branchinecta sandiegonensis* | San Diego fairy shrimp | | | | FE | 19970203 | |
| *Streptocephalus woottoni* | Riverside fairy shrimp | | | | FE | 19930803 | |
| *Lepidurus packardi* | vernal pool tadpole shrimp | | | | FE | 19940919 | |
| *Pacifastacus fortis* | Shasta crayfish | SE | 19880226 | | FE | 19881031 | Listed as State Threatened on 19801002. |
| *Syncaris pacifica* | California freshwater shrimp | SE | 19801002 | | FE | 19881130 | |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 415 of 523    Page ID #:926

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Pycnopodia helianthoides* | sunflower sea star | | | | FC | 20211220 | Not currently tracked by the CNDDB. |
| *Trimerotropis infantilis* | Zayante band-winged grasshopper | | | | FE | 19970224 | |
| *Cicindela ohlone* | Ohlone tiger beetle | | | | FE | 20011003 | |
| *Desmocerus californicus dimorphus* | valley elderberry longhorn beetle | | | | FT | 19800915 | |
| *Dinacoma caseyi* | Casey's June beetle | | | | FE | 20111024 | |
| *Elaphrus viridis* | Delta green ground beetle | | | | FT | 19800915 | |
| *Polyphylla barbata* | Mount Hermon (=barbate) June beetle | | | | FE | 19970224 | |
| *Rhaphiomidas terminatus abdominalis* | Delhi Sands flower-loving fly | | | | FE | 19930922 | |
| *Apodemia mormo langei* | Lange's metalmark butterfly | | | | FE | 19760608 | |
| *Callophrys mossii bayensis* | San Bruno elfin butterfly | | | | FE | 19760608 | Synonymous with *Incisalia fotis bayensis* and *Callophrys fotis bayensis*. |
| *Danaus plexippus plexippus* pop. 1 | monarch - California overwintering population | | | | FPT | 20241212 | |
| *Euphilotes allyni* | El Segundo blue butterfly | | | | FE | 19760608 | Listed by the USFWS as *Euphilotes battoides allyni*. |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 416 of 523    Page ID #:927

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Euphilotes enoptes smithi* | Smith's blue butterfly | | | | FE | 19760608 | Synonymous with *Philotes enoptes smithi* and *Shijimiaeoides enoptes smithi*. |
| *Euphydryas editha bayensis* | Bay checkerspot butterfly | | | | FT | 19871019 | |
| *Euphydryas editha quino* | quino checkerspot butterfly | SC | 20250820 | | FE | 19970116 | Synonymous with *Euphydryas editha wrighti*. |
| *Euproserpinus euterpe* | Kern primrose sphinx moth | | | | FT | 19800509 | |
| *Glaucopsyche lygdamus palosverdesensis* | Palos Verdes blue butterfly | | | | FE | 19800801 | |
| *Lycaena hermes* | Hermes copper butterfly | | | | FT | 20220120 | |
| *Icaricia icarioides missionensis* | Mission blue butterfly | | | | FE | 19760608 | |
| *Plebejus anna lotis* | lotis blue butterfly | | | | FE | 19760608 | Synonymous with *Lycaeides argyrognomon lotis*. |
| *Pseudocopaeodes eunus obscurus* | Carson wandering skipper | | | | FE | 20020807 | |
| *Pyrgus ruralis lagunae* | Laguna Mountains skipper | | | | FE | 19970116 | |
| *Speyeria callippe callippe* | callippe silverspot butterfly | | | | FE | 19971205 | |
| *Speyeria zerene behrensii* | Behren's silverspot butterfly | | | | FE | 19971205 | |

February 2, 2026

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 417 of 523    Page ID #:928

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Speyeria zerene hippolyta* | Oregon silverspot butterfly | | | | FT | 19801015 | |
| *Speyeria zerene myrtleae* | Myrtle's silverspot butterfly | | | | FE | 19920622 | The USFWS and others have not yet determined if the taxonomic expansion by Emmel and Emmel (1998) into *S. z. myrtleae* and *S. z. puntareyes* is warranted. *Speyereia zerene* along the coast of Marin and Sonoma counties are Federally Endangered under the subspecies concept in the 1992 listing. |
| *Bombus crotchii* | Crotch's bumble bee | SC | 20220930 | | | | Originally advanced to candidacy by the Fish and Game Commission on 20190618. The candidacy determination was challenged in court. Candidacy was temporarily stayed beginning February 2021 following an adverse trial court judgment. The Third District Court of Appeal reversed the trial court judgment. Candidacy was reinstated on 20220930. |
| *Bombus franklini* | Franklin's bumble bee | SC | 20220930 | | FE | 20210923 | Originally advanced to candidacy by the Fish and Game Commission on 20190618. The candidacy determination was challenged in court. Candidacy was temporarily stayed beginning February 2021 following an adverse trial court judgment. The Third District Court of Appeal reversed the trial court judgment. Candidacy was reinstated on 20220930. |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 418 of 523   Page ID #:929

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|-------|-------------|-------------|-----------------|----------------------|----------------|-------------------|-------|
| *Bombus occidentalis* | western bumble bee | SC | 20220930 | | | | Originally advanced to candidacy by the Fish and Game Commission on 20190618. The candidacy determination was challenged in court. Candidacy was temporarily stayed beginning February 2021 following an adverse trial court judgment. The Third District Court of Appeal reversed the trial court judgment. Candidacy was reinstated on 20220930. |
| *Bombus suckleyi* | Suckley's cuckoo bumble bee | SC | 20220930 | | FPE | 20241217 | Originally advanced to candidacy by the Fish and Game Commission on 20190618. The candidacy determination was challenged in court. Candidacy was temporarily stayed beginning February 2021 following an adverse trial court judgment. The Third District Court of Appeal reversed the trial court judgment. Candidacy was reinstated on 20220930. |

## Fishes

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|-------|-------------|-------------|-----------------|----------------------|----------------|-------------------|-------|
| *Acipenser medirostris* pop. 1 | green sturgeon - southern DPS | | | | FT | 20060606 | Includes all spawning populations south of the Eel River. |
| *Acipenser transmontanus* | white sturgeon | SC | 20240627 | | | | |
| *Gila crassicauda* | thicktail chub | SDE | 19801002 | | | | Listed as State Endangered on 19740110. Extinct |
| *Gila elegans* | bonytail | SE | 19740110 | | FE | 19800523 | Listed as State Threatened on 19710627. Federal common name: bonytail chub. |
| *Lavinia exilicauda chi* | Clear Lake hitch | ST | 20140806 | | FPT | 20250116 | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 419 of 523   Page ID #:930

State and Federally Listed Endangered and Threatened Animals of California – February 2026

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| Ptychocheilus lucius | Colorado pikeminnow | SE | 19710627 | Fully Protected | FE | 19670311 | |
| Siphateles bicolor mohavensis | Mohave tui chub | SE | 19710627 | Fully Protected | FE | 19701013 | Listed by the USFWS as *Siphteles mohavensis* and the State of California as *Gila bicolor mohavensis*. Listed as *Gila mohavensis*, Mohave chub, in Fully Protected statute. |
| Siphateles bicolor snyderi | Owens tui chub | SE | 19740110 | | FE | 19850904 | Listed by the State of California and the USFWS as *Gila bicolor snyderi*. |
| Catostomus microps | Modoc sucker | SE | 19801002 | Fully Protected | FDR | 20160107 | Listed as State Threatened on 19740110. Listed as Federally Endangered on 19850711. Determined as Federally Recovered and delisted on 20161007. |
| Pantosteus santaanae | Santa Ana sucker | | | | FT | 20000512 | Populations in the Los Angeles, San Gabriel, and Santa Ana River basins. |
| Chasmistes brevirostris | shortnose sucker | SE | 19740110 | Fully Protected | FE | 19880817 | Listed as State Threatened on 19710627. |
| Deltistes luxatus | Lost River sucker | SE | 19740110 | Fully Protected | FE | 19880817 | Listed as State Threatened on 19710627. |
| Xyrauchen texanus | razorback sucker | SE | 19740110 | Fully Protected | FE | 19911122 | Listed as State Threatened on 19710627. |
| Hypomesus transpacificus | Delta smelt | SE | 20100120 | | FT | 19930405 | Listed as State Threatened on 19931209. 20161202 USFWS Annual Notification of Findings indicated uplisting to Federally Endangered (original uplisting petition received 20060308) is "warranted-but-precluded," with a Listing Priority Number of 2. |
| Spirinchus thaleichthys | longfin smelt | ST | 20090405 | | | | |

State and Federally Listed Endangered and Threatened Animals of California – February 2026

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Spirinchus thaleichthys* pop. 2 | longfin smelt - San Francisco Bay-Delta DPS | (ST) | | | FE | 20240829 | |
| *Thaleichthys pacificus* | eulachon | | | | FT | 20110413 | The southern DPS of Pacific eulachon was listed as Threatened by NMFS on 20100517 and by USFWS in 20110413. |
| *Rhinichthys nevadensis caldera* | Long Valley speckled dace | | | | FPE | 20240808 | |
| *Rhinichthys gabrielino* | Santa Ana speckled dace | | | | FPT | 20240813 | |
| *Oncorhynchus henshawi henshawi* | Lahontan cutthroat trout | | | | FT | 19750716 | Listed as Federally Endangered on 19701013. Listed by the USFWS as *Salmo clarki henshawi*. |
| *Oncorhynchus henshawi seleniris* | Paiute cutthroat trout | | | | FT | 19750716 | Listed as Federally Endangered on 19670311. Listed by the USFWS as *Salmo clarki seleniris*. |
| *Oncorhynchus kisutch* pop. 2 | coho salmon - southern Oregon / northern California ESU | ST | 20050330 | | FT | 19970506 | The Federal listing is for the Southern Oregon-Northern California Coast ESU, and includes populations in coastal streams between Cape Blanco, Oregon and Punta Gorda, California. The Fish and Game Commission determined that coho from Punta Gorda to the Oregon border should be listed as Threatened on 20040225. This determination was finalized by the Office of Administrative Law on 20050330. NMFS completed a comprehensive status review 20050829 reaffirming the status. |

State and Federally Listed Endangered and Threatened Animals of California – February 2026

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Oncorhynchus kisutch* pop. 4 | coho salmon - central California coast ESU | SE | 20050330 | | FE | 20050829 | The Federal listing (originally listed as Federally Threatened on 19961130) is for the Central California Coast Coho ESU and includes populations from Punta Gorda south to, and including, the San Lorenzo River as well as populations in tributaries to San Francisco Bay, excluding the Sacramento-San Joaquin River system. Coho south of San Francisco Bay were state listed in 1995. In February 2004 the Fish and Game Commission determined that coho from San Francisco to Punta Gorda should also be listed as Endangered. This change was finalized by the Office of Administrative Law on 20050330. NMFS completed a comprehensive status review in 2005 reaffirming the status, and uplisting the Central Coast ESU from threatened to endangered. NMFS reaffirmed the FE status again 20140723. |
| *Oncorhynchus mykiss irideus* pop. 8 | steelhead - central California coast DPS | | | | FT | 19971017 | Coastal streams from the Russian River (inclusive) to Aptos Creek (inclusive), and the drainages of San Francisco, San Pablo, and Suisun Bays eastward to Chipps Island at the confluence of the Sacramento and San Joaquin Rivers; and tributary streams to Suisun Marsh including Suisun Creek, Green Valley Creek, and an unnamed tributary to Cordelia Slough (commonly referred to as Red Top Creek), exclusive of the Sacramento-San Joaquin River Basin of the California Central Valley. NMFS completed a comprehensive status review 20060206 reaffirming the status. |

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Oncorhynchus mykiss irideus* pop. 9 | steelhead - south-central California coast DPS | | | | FT | 19971017 | Coastal basins from the Pajaro River (inclusive) south to, but not including, the Santa Maria River. NMFS completed a comprehensive status review 20060206 reaffirming the status. |
| *Oncorhynchus mykiss irideus* pop. 10 | steelhead - southern California DPS | SE | 20250508 | | FE | 19971017 | Coastal basins from the Santa Maria River (inclusive), south to the U.S.-Mexico Border. NMFS completed a comprehensive status review 20060206 reaffirming the status. |
| *Oncorhynchus mykiss irideus* pop. 11 | steelhead - Central Valley DPS | | | | FT | 19980518 | The Sacramento and San Joaquin Rivers and their tributaries. NMFS completed a comprehensive status review 20060206 reaffirming the status. |
| *Oncorhynchus mykiss irideus* pop. 48 | steelhead - northern California DPS summer-run | SE | 20220503 | | FT | 20000807 | Naturally spawning population of the stream-maturing summer-run ecotype. From Redwood Creek watershed south to and inclusive of Gualala River watershed. Distribution within range more limited. NMFS completed a comprehensive status review 20060206 reaffirming the status. |
| *Oncorhynchus mykiss irideus* pop. 49 | steelhead - northern California DPS winter-run | | | | FT | 20000807 | Naturally spawning population of the ocean-maturing winter-run ecotype. From Redwood Creek watershed south to and inclusive of Gualala River watershed. Distribution throughout range. NMFS completed a comprehensive status review 20060206 reaffirming the status. |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 423 of 523   Page ID #:934

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Oncorhynchus mykiss whitei* | Little Kern golden trout | | | | FT | 19780515 | Originally listed as *Salmo aguabonita whitei*. The genus *Salmo* was reclassified as *Oncorhynchus* changing the name to *Oncorhynchus aguabonita whitei*. However, recent studies indicate this is a subspecies of rainbow trout, therefore *Oncorhynchus mykiss whitei*. |
| *Oncorhynchus tshawytscha* pop. 7 | chinook salmon - Sacramento River winter-run ESU | SE | 19890922 | | FE | 19940104 | The federal designation is for the Sacramento River winter-run ESU, and described as winter-run populations in the Sacramento River and its tributaries in California. Originally listed as Federally Threatened on 19901130. |
| *Oncorhynchus tshawytscha* pop. 11 | chinook salmon - Central Valley spring-run ESU | ST | 19990205 | | FT | 19990916 | The State listing is for "Spring-run chinook salmon (*Oncorhynchus tshawytscha*) of the Sacramento River drainage." The Federal listing is for the Central Valley spring-run ESU, and includes populations of spring-run Chinook salmon in the Sacramento River and its tributaries including the Feather River. NMFS completed a comprehensive status review 20050829 reaffirming the status. |
| *Oncorhynchus tshawytscha* pop. 14 | chinook salmon - southern Oregon/northern California coastal | | | | FC | 20230111 | |
| *Oncorhynchus tshawytscha* pop. 17 | chinook salmon - California coastal ESU | | | | FT | 19990916 | Rivers and streams south of the Klamath River to the Russian River. NMFS completed a comprehensive status review 20050829 reaffirming the status. |

Case 2:26-cv-03396-SVW-SSC     Document 21-1     Filed 05/07/26     Page 424 of 523     Page ID #:935

# State and Federally Listed Endangered and Threatened Animals of California – February 2026

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Oncorhynchus tshawytscha* pop. 30 | chinook salmon - upper Klamath and Trinity Rivers ESU | ST | 20220124 | | FC | 20180227 | Federal candidacy refers to both spring-run and fall-run fish. The State listing is for the spring-run fish. |
| *Salvelinus confluentus* | bull trout | SE | 19801002 | | FT | 19991201 | Considered to be extirpated in California. |
| *Cyprinodon macularius* | desert pupfish | SE | 19801002 | | FE | 19860430 | |
| *Cyprinodon nevadensis calidae* | Tecopa pupfish | SDE | 19870609 | | FDE | 19820216 | Listed as State Endangered on 19710627. Listed as Federally Endangered on 19701013. Extinct |
| *Cyprinodon radiosus* | Owens pupfish | SE | 19710627 | Fully Protected | FE | 19670311 | |
| *Cyprinodon salinus milleri* | Cottonball Marsh pupfish | ST | 19740110 | | | | |
| *Gasterosteus aculeatus williamsoni* | unarmored threespine stickleback | SE | 19710627 | Fully Protected | FE | 19701013 | |
| *Cottus asperrimus* | rough sculpin | ST | 19740110 | Fully Protected | | | |
| *Eucyclogobius newberryi* | tidewater goby | | | | FE | 19940307 | See Federal Register 79(49):14340-14362, 20140313, for down-listing proposed rule. |
| *Carcharhinus longimanus* | oceanic whitetip shark | | | | FT | 20180301 | Not currently tracked by the CNDDB. |
| *Galeorhinus galeus* | tope shark | | | | FC | 20220422 | Not currently tracked by the CNDDB. |
| *Sphyrna lewini* | scalloped hammerhead | | | | FT | 20140902 | Not currently tracked by the CNDDB. |

Case 2:26-cv-03396-SVW-SSC     Document 21-1     Filed 05/07/26     Page 425 of 523     Page ID #:936

## Amphibians

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Ambystoma californiense* | California tiger salamander | ST | 20100819 | | (FE), (FT) | | The State listing applies to the species as a whole throughout its range; federal statuses apply to Distinct Population Segments (see below). |
| *Ambystoma californiense* pop. 1 | California tiger salamander - central California DPS | (ST) | | | FT | 20040903 | The 2004 federal Threatened status originally applied to the species throughout its range; subsequent legal action resulted in reclassification of other DPSs to Endangered; the central California DPS remained listed as Threatened. |
| *Ambystoma californiense* pop. 2 | California tiger salamander - Santa Barbara County DPS | (ST) | | | FE | 20000915 | In 2004 the California tiger salamander was federally listed as Threatened statewide. The Santa Barbara County and Sonoma County Distinct Vertebrate Population Segments (DPS), formerly listed as Endangered, were reclassified to Threatened. On 20050819 U.S. District court vacated the down-listing of the Sonoma and Santa Barbara populations from Endangered to Threatened. Therefore, the Sonoma & Santa Barbara populations were once again listed as Endangered. |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 426 of 523    Page ID #:937

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Ambystoma californiense* pop. 3 | California tiger salamander - Sonoma County DPS | (ST) | | | FE | 20030319 | In 2004 the California tiger salamander was federally listed as Threatened statewide. The Santa Barbara County and Sonoma County Distinct Vertebrate Population Segments (DPS), formerly listed as Endangered, were reclassified to Threatened. On 20050819 U.S. District court vacated the down-listing of the Sonoma and Santa Barbara populations from Endangered to Threatened. Therefore, the Sonoma & Santa Barbara populations were once again listed as Endangered. |
| *Ambystoma macrodactylum croceum* | Santa Cruz long-toed salamander | SE | 19710627 | Fully Protected | FE | 19670311 | |
| *Batrachoseps major aridus* | desert slender salamander | SE | 19710627 | | FE | 19730604 | Listed by the State of California as *Batrachoseps aridus* and originally listed by the USFWS as *B. aridus*. USFWS 5-year review refers to *B. major aridus*. |
| *Batrachoseps simatus* | Kern Canyon slender salamander | ST | 19710627 | | FPT | 20221018 | |
| *Batrachoseps relictus* | Relictual slender salamander | | | | FPE | 20221018 | |
| *Batrachoseps stebbinsi* | Tehachapi slender salamander | ST | 19710627 | | | | |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 427 of 523    Page ID #:938

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Page ID #:939   Filed 05/07/26   Page 428 of 523

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Hydromantes shastae* | Shasta salamander | ST | 19710627 | | | | *Hydromantes shastae* has been proposed to consist of cryptic genetic structuring that may warrant recognition of additional species named as *Hydromantes samweli* and *Hydromantes wintu* (Bingham et al. 2018, Bull. Mus. Comp. Zool. 161(10):403-427). Until formally reviewed by the Fish and Game Commission, all populations in the Shasta salamander complex are legally state threatened. |
| *Hydromantes brunus* | limestone salamander | ST | 19710627 | Fully Protected | | | |
| *Plethodon asupak* | Scott Bar salamander | ST | 19710627 | | | | As recognized by the FGC, the Scott Bar salamander is currently protected under the CESA as a sub-population of the Siskiyou Mountains salamander (*Plethodon stormi*) (Calif. Regulatory Notice Register, No. 21-Z, p. 916, 20070525). |
| *Plethodon stormi* | Siskiyou Mountains salamander | ST | 19710627 | | | | The common name is spelled incorrectly in Title 14 of the CCR as "Siskiyou mountain salamander." Was a State Candidate for Delisting on 20050930. No action was taken by the FGC after the CDFW presented a Department report on 20061103; SMS was tabled at the 20070503 FGC meeting, and there was nothing to report regarding the Department's environmental documents at the 20071011 meeting. Therefore, with respect to Fish & Game Code 2075, it is assumed that this is no longer a candidate for delisting. |
| *Spea hammondii* | western spadefoot | | | | FPT | 20231205 | |

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Anaxyrus californicus* | arroyo toad | | | | FE | 19950117 | At the time of listing, arroyo toad was known as *Bufo microscaphus californicus*, a subspecies of southwestern toad. In 2001, it was determined to be its own species, *Bufo californicus*. Since then, many species in the genus *Bufo* were changed to the genus *Anaxyrus*, and now arroyo toad is known as *Anaxyrus californicus*. |
| *Anaxyrus canorus* | Yosemite toad | | | | FT | 20140630 | |
| *Anaxyrus exsul* | black toad | ST | 19710627 | Fully Protected | | | Listed by the State of California as *Bufo exsul*. |
| *Rana boylii* pop. 2 | foothill yellow-legged frog - Feather River DPS | ST | 20200320 | | FT | 20230928 | CESA listing status varies by clade; listing of the Northwest/North Coast clade is not warranted. |
| *Rana boylii* pop. 3 | foothill yellow-legged frog - north Sierra DPS | ST | 20200320 | | | | CESA listing status varies by clade; listing of the Northwest/North Coast clade is not warranted. |
| *Rana boylii* pop. 4 | foothill yellow-legged frog - central coast DPS | SE | 20200320 | | FT | 20230928 | CESA listing status varies by clade; listing of the Northwest/North Coast clade is not warranted. |
| *Rana boylii* pop. 5 | foothill yellow-legged frog - south Sierra DPS | SE | 20200320 | | FE | 20230928 | CESA listing status varies by clade; listing of the Northwest/North Coast clade is not warranted. |
| *Rana boylii* pop. 6 | foothill yellow-legged frog - south coast DPS | SE | 20200320 | | FE | 20230928 | CESA listing status varies by clade; listing of the Northwest/North Coast clade is not warranted. |
| *Rana cascadae* | Cascades frog | SC | 20171017 | | | | Date of FGC vote to advance to candidacy was 20171011. |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 429 of 523    Page ID #:940

February 2, 2026

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Rana draytonii* | California red-legged frog | | | | FT | 19960624 | Synonymous with *Rana aurora draytonii*. |
| *Rana muscosa* | southern mountain yellow-legged frog | SE | 20130401 | | (FE) | | Though the scientific name *Rana muscosa* is not disputed, the State uses this common name, whereas the USFWS listing refers to two distinct population segments. This species is also known by the common name Sierra Madre yellow-legged frog (Vredenburg et al. 2007). |
| *Rana muscosa* | mountain yellow-legged frog [Southern California DPS] | (SE) | | | FE | 20020801 | San Gabriel, San Jacinto, and San Bernardino Mountains only. |
| *Rana muscosa* | mountain yellow-legged frog [Northern California DPS] | (SE) | | | FE | 20140630 | North of the Tehachapi Mountains from the Monarch Divide to portions of the Kern River drainage. |
| *Rana pretiosa* | Oregon spotted frog | | | | FT | 20140929 | |
| *Rana sierrae* | Sierra Nevada yellow-legged frog | ST | 20130401 | | FE | 20140630 | |

## Reptiles

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Caretta caretta* | loggerhead sea turtle [North Pacific DPS] | | | | FE | 20111024 | The full species was listed as Federally Threatened on 19780728. On 20111024, the North Pacific DPS (north of the equator & south of 60 degrees north latitude) was listed as Federally Endangered. Not currently tracked by the CNDDB. |

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Chelonia mydas* | green turtle | | | | FT | 19780728 | Also known as green sea turtle. Originally listed as Federally Threatened on 19780728. On 20160506 Distinct Population Segments were detailed and the East Pacific DPS was confirmed as Federally Threatened. |
| *Lepidochelys olivacea* | olive (=Pacific) ridley sea turtle | | | | FT | 19780728 | Not currently tracked by the CNDDB. |
| *Dermochelys coriacea* | leatherback sea turtle | SE | 20221220 | | FE | 19700603 | Not currently tracked by the CNDDB. |
| *Actinemys marmorata* | northwestern pond turtle | | | | FPT | 20231003 | |
| *Actinemys pallida* | southwestern pond turtle | | | | FPT | 20231003 | |
| *Gopherus agassizii* | desert tortoise | SE | 20250715 | | FT | 19900402 | Originally listed as State Threatened on 19890803. |
| *Coleonyx switaki* | barefoot banded gecko | ST | 19801002 | | | | Alternate common names: Switak's banded gecko, barefoot gecko. |
| *Gambelia sila* | blunt-nosed leopard lizard | SE | 19710627 | Fully Protected | FE | 19670311 | Synonymous with *Gambelia silus*. Originally listed under the ESA as *Crotaphytus wislizenii silus*. |
| *Uma inornata* | Coachella Valley fringe-toed lizard | SE | 19801002 | | FT | 19801027 | |
| *Xantusia riversiana* | island night lizard | | | | FDR | 20140501 | Listed as Federally Threatened on 19770912. Recovered. |
| *Anniella alexanderae* | Temblor legless lizard | SC | 20220701 | | | | |
| *Charina umbratica* | southern rubber boa | ST | 19710627 | | | | Synonymous with *Charina bottae umbratica*. |
| *Masticophis lateralis euryxanthus* | Alameda whipsnake | ST | 19710627 | | FT | 19971205 | Synonymous with *Coluber lateralis euryxanthus*. |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 431 of 523   Page ID #:942

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Thamnophis gigas* | giant gartersnake | ST | 19710627 | | FT | 19931119 | Listed by State of California as *Thamnophis couchi gigas*. |
| *Thamnophis sirtalis tetrataenia* | San Francisco gartersnake | SE | 19710627 | Fully Protected | FE | 19670311 | |

## Birds

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Branta hutchinsii leucopareia* | cackling (=Aleutian Canada) goose | | | | FDR | 20010320 | Listed as Federally Endangered 19670311. Listed as Federally Threatened 19910111. Recovered. At time of federal listing, known as *Branta canadensis leucopareia*. |
| *Cygnus buccinator* | trumpeter swan | | | Fully Protected | | | Not currently tracked by the CNDDB. |
| *Centrocercus urophasianus* | greater sage-grouse | SC | 20230619 | | FPT | 20131028 | The federal proposal applies to the Bi-State DPS (Mono Basin of CA and NV; Mono, Alpine, and Inyo counties in California). |
| *Phoebastria albatrus* | short-tailed albatross | | | | FE | 20000830 | Synonymous with *Diomedea albatrus*. First appeared on the 19700603 list of Endangered foreign species, but was not noted to occur in the United States. It was left off the 19701013 list of Endangered native species. This was an oversight that wasn't corrected until the USFWS specifically listed it on 20000830. |
| *Pelecanus occidentalis californicus* | California brown pelican | SDR | 20090603 | | FDR | 20091217 | Listed as Federally Endangered on 19700603. Listed as State Endangered on 19710627. Recovered. Federal nomenclature: Brown pelican (*Pelecanus occidentalis*). |
| *Gymnogyps californianus* | California condor | SE | 19710627 | Fully Protected | FE | 19670311 | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 432 of 523   Page ID #:943

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Aquila chrysaetos* | golden eagle | | | Fully Protected | | | |
| *Buteo swainsoni* | Swainson's hawk | ST | 19830417 | | | | |
| *Elanus leucurus* | white-tailed kite | | | Fully Protected | | | |
| *Haliaeetus leucocephalus* | bald eagle | SE | 19710627 | Fully Protected | FDR | 20070808 | Listed under the Endangered Species Preservation Act on 19670311, and as Federally Endangered under ESA on 19780316. Downlisted to Federally Threatened on 19950811. Listed as State Endangered on 19710627. The Post-delisting Monitoring Plan will monitor the status of the bald eagle over a 20 year period with sampling events held once every 5 years. Listed as the southern bald eagle, *Haliaeetus leucocephalus leucocephalus*, in the Fully Protected statute. |
| *Falco peregrinus anatum* | American peregrine falcon | SDR | 20091104 | | FDR | 19990825 | Recovered. Originally listed as Federally Endangered on 19700603 and State Endangered on 19710627. |
| *Falco peregrinus tundrius* | Arctic peregrine falcon | | | | FDR | 19941005 | Recovered. Originally listed as Federally Endangered on 19700603, then downlisted to Federally Threatened on 19840419. Not currently tracked by the CNDDB. |
| *Laterallus jamaicensis coturniculus* | California black rail | ST | 19710627 | Fully Protected | | | |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 433 of 523    Page ID #:944

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Rallus obsoletus levipes* | light-footed Ridgway's rail | SE | 19710627 | Fully Protected | FE | 19701013 | Formerly light-footed clapper rail, *Rallus longirostris levipes* |
| *Rallus obsoletus obsoletus* | California Ridgway's rail | SE | 19710627 | Fully Protected | FE | 19701013 | Formerly California clapper rail, *Rallus longirostris obsoletus* |
| *Rallus obsoletus yumanensis* | Yuma Ridgway's rail | ST | 19780222 | Fully Protected | FE | 19670311 | Formerly Yuma clapper rail, *Rallus longirostris yumanensis*. Listed as State Endangered on 19710627. |
| *Antigone canadensis tabida* | greater sandhill crane | ST | 19830417 | Fully Protected | | | |
| *Anarhynchus nivosus nivosus* | western snowy plover | | | | FT | 19930405 | Federal status applies only to the Pacific coastal population. |
| *Sternula antillarum browni* | California least tern | SE | 19710627 | Fully Protected | FE | 19700603 | Listed by the USFWS as *Sterna albifrons browni* and the State of California as *Sterna antillarum browni*. |
| *Brachyramphus marmoratus* | marbled murrelet | SE | 19920312 | | FT | 19920928 | |
| *Synthliboramphus scrippsi* | Scripps's murrelet | ST | 20041222 | | | | At the time of listing, this species was known as the Xantus's Murrelet (Synthliboramphus hypoleucus), with the subspecies Synthliboramphus hypoleucus subsp. scrippsi having breeding populations in California. |
| *Synthliboramphus hypoleucus* | Guadalupe murrelet | ST | 20041222 | | | | At the time of listing, this species was known as the Xantus's Murrelet (Synthliboramphus hypoleucus), with the subspecies Synthliboramphus hypoleucus subsp. hypoleucus having breeding populations in Baja California. Not currently tracked by the CNDDB. |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 434 of 523    Page ID #:945

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Coccyzus americanus occidentalis* | western yellow-billed cuckoo | SE | 19880326 | | FT | 20141103 | Listed as State Threatened on 19710627. Federal listing is for the Western DPS of *Coccyzus americanus*. |
| *Athene cunicularia* | burrowing owl | SC | 20241010 | | | | |
| *Micrathene whitneyi* | elf owl | SE | 19801002 | | | | |
| *Strix nebulosa* | great gray owl | SE | 19801002 | | | | |
| *Strix occidentalis caurina* | northern spotted owl | ST | 20190318 | | FT | 19900723 | |
| *Strix occidentalis occidentalis* pop. 1 | California spotted owl - coastal-southern California DPS | | | | FPE | 20230223 | |
| *Strix occidentalis occidentalis* pop. 2 | California spotted owl - Sierra Nevada DPS | | | | FPT | 20230223 | |
| *Colaptes chrysoides* | gilded flicker | SE | 19880317 | | | | Listed by the State of California as *Colaptes auratus chrysoides*, gilded northern flicker. |
| *Melanerpes uropygialis* | Gila woodpecker | SE | 19880317 | | | | |
| *Empidonax traillii* | willow flycatcher | SE | 19910102 | | | | State listing includes all subspecies. |
| *Empidonax traillii extimus* | southwestern willow flycatcher | (SE) | | | FE | 19950329 | |
| *Lanius ludovicianus mearnsi* | San Clemente loggerhead shrike | | | | FE | 19770912 | |
| *Vireo bellii arizonae* | Arizona Bell's vireo | SE | 19880317 | | | | |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 435 of 523    Page ID #:946

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Vireo bellii pusillus* | least Bell's vireo | SE | 19801002 | | FE | 19860602 | |
| *Riparia riparia* | bank swallow | ST | 19890611 | | | | |
| *Polioptila californica californica* | coastal California gnatcatcher | | | | FT | 19930325 | |
| *Artemisiospiza belli clementeae* | San Clemente Bell's sparrow | | | | FDR | 20230224 | Federal nomenclature at time of listing: *Amphispiza belli clementeae*. Originally listed as Federally Threatened on 19770912. |
| *Melospiza melodia graminea* | Santa Barbara song sparrow | | | | FDE | 19831012 | Extinct. Originally listed as Federally Endangered on 19730604. This status refers specifically to the Santa Barbara song sparrow, which was later reclassified as a subspecies (Channel Islands song sparrow) with the same scientific name, but which also combined two additional groups formerly classified as their own subspecies. |
| *Melozone crissalis eremophilus* | Inyo California towhee | SE | 19801002 | | FT | 19870902 | Listed by the State of California as *Pipilo crissalis eremophilus* and the USFWS as *Pipilo fuscus eremophilus*. |
| *Passerculus sandwichensis beldingi* | Belding's savannah sparrow | SE | 19740110 | | | | Listed by the State of California as *Passerculus sandwichensis beldingii* |
| *Agelaius tricolor* | tricolored blackbird | ST | 20190318 | | | | |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 436 of 523    Page ID #:947

## Mammals

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Sorex ornatus relictus* | Buena Vista Lake ornate shrew | | | | FE | 20020405 | |
| *Leptonycteris yerbabuenae* | lesser long-nosed bat | | | | FDR | 20180518 | Recovered. Originally listed as Federally Endangered on 19881031 by USFWS under the scientific name *Leptonycteris sanborni*. |
| *Sylvilagus bachmani riparius* | riparian brush rabbit | SE | 19940529 | | FE | 20000324 | |
| *Aplodontia rufa nigra* | Point Arena mountain beaver | | | | FE | 19911212 | |
| *Ammospermophilus nelsoni* | Nelson's (=San Joaquin) antelope squirrel | ST | 19801002 | | | | |
| *Xerospermophilus mohavensis* | Mohave ground squirrel | ST | 19710627 | | | | Listed by the State of California as *Spermophilus mohavensis*. |
| *Dipodomys heermanni morroensis* | Morro Bay kangaroo rat | SE | 19710627 | Fully Protected | FE | 19701013 | |
| *Dipodomys ingens* | giant kangaroo rat | SE | 19801002 | | FE | 19870105 | |
| *Dipodomys merriami parvus* | San Bernardino kangaroo rat | SE | 20231122 | | FE | 19980924 | Federal nomenclature: San Bernardino Merriam's kangaroo rat. |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 437 of 523   Page ID #:948

State and Federally Listed Endangered and Threatened Animals of California – February 2026

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Dipodomys nitratoides exilis* | Fresno kangaroo rat | SE | 19801002 | | FE | 19850301 | Originally listed as State Threatened on 19710627. |
| *Dipodomys nitratoides nitratoides* | Tipton kangaroo rat | SE | 19890611 | | FE | 19880808 | |
| *Dipodomys stephensi* | Stephens' kangaroo rat | ST | 19710627 | | FT | 20220321 | Originally listed as Federally Endangered on 19881031. |
| *Perognathus longimembris pacificus* | Pacific pocket mouse | | | | FE | 19940926 | |
| *Microtus californicus scirpensis* | Amargosa vole | SE | 19801002 | | FE | 19841217 | |
| *Neotoma fuscipes riparia* | Riparian (=San Joaquin Valley) woodrat | | | | FE | 20000324 | |
| *Reithrodontomys raviventris* | salt-marsh harvest mouse | SE | 19710627 | Fully Protected | FE | 19701013 | |
| *Canis lupus* | gray wolf | SE | 20170101 | | FE | 19780410 | USFWS had delisted *Canis lupus* on 20210104, but a court ruling on 20220210 reinstated the Endangered status for all gray wolves in the lower 48 states, except for Minnesota where they are Threatened. |

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Urocyon littoralis* | island fox | ST | 19710627 | | (FT) | | State listing includes all 6 subspecies on all 6 islands. Federal listing is for only 4 subspecies on 4 islands. |
| *Urocyon littoralis catalinae* | Santa Catalina Island Fox | (ST) | | | FT | 20160912 | Originally listed as Federally Endangered on 20040405. |
| *Urocyon littoralis littoralis* | San Miguel Island Fox | (ST) | | | FDR | 20160912 | Originally listed as Federally Endangered on 20040405. |
| *Urocyon littoralis santacruzae* | Santa Cruz Island Fox | (ST) | | | FDR | 20160912 | Originally listed as Federally Endangered on 20040405. |
| *Urocyon littoralis santarosae* | Santa Rosa Island Fox | (ST) | | | FDR | 20160912 | Originally listed as Federally Endangered on 20040405. |
| *Vulpes macrotis mutica* | San Joaquin kit fox | ST | 19710627 | | FE | 19670311 | |
| *Vulpes vulpes necator* pop. 1 | Sierra Nevada red fox - southern Cascades DPS | ST | 19801002 | | | | |
| *Vulpes vulpes necator* pop. 2 | Sierra Nevada red fox - Sierra Nevada DPS | ST | 19801002 | | FE | 20210902 | |
| *Bassariscus astutus* | ringtail | | | Fully Protected | | | |
| *Enhydra lutris nereis* | southern sea otter | | | Fully Protected | FT | 19770211 | |
| *Gulo gulo* | wolverine | ST | 19710627 | Fully Protected | FT | 20240102 | |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 439 of 523   Page ID #:950

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Martes caurina humboldtensis* | Humboldt marten | SE | 20190318 | | FT | 20201109 | USFWS listed *Martes caurina* coastal DPS on 20201109, which includes coastal populations in Oregon and northern coastal California. USFWS noted that recent genetic analyses indicated that the DPS likely represent a subspecies, *M. c. humboldtensis*. |
| *Pekania pennanti* pop. 2 | Fisher - southern Sierra Nevada ESU | ST | 20190318 | | FE | 20200615 | California listing is under *Martes pennanti* and common name Pacific fisher, whereas the USFWS refers to *Pekania pennanti* and common name fisher. Previous USFWS candidacy referred to the West Coast DPS in California, Oregon, and Washington. On 20190318, the California Fish and Game Commission officially listed the southern Sierra ESU (defined as south of the Merced River) as State Threatened; the Southern Sierra Nevada DPS was listed as Federally Endangered 20200615. |
| *Puma concolor* | mountain lion (Southern California/Central Coast ESU) | SC | 20200421 | | | | Not currently tracked by the CNDDB. |
| *Arctocephalus townsendi* | Guadalupe fur seal | ST | 19710627 | Fully Protected | FT | 19860115 | Originally listed as Federally Endangered on 19670311. |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 440 of 523   Page ID #:951

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Eumetopias jubatus* | Steller sea lion [Eastern DPS] | | | | FDR | 20131204 | Recovered. Delisted by NMFS. On 19901204, the Steller sea lion was listed as federally Threatened throughout its entire range. On 19970604, NMFS reclassified Steller sea lions into two distinct population segments: the Western DPS (west of 144 degrees longitude) was listed as Endangered; the Eastern DPS (east of 144 degrees longitude) was listed as Threatened, and subsequently delisted in 2013. |
| *Mirounga angustirostris* | northern elephant seal | | | Fully Protected | | | Not currently tracked by the CNDDB. |
| *Ovis canadensis* | bighorn sheep | | | Fully Protected | | | Except Nelson bighorn sheep (subspecies Ovis canadensis nelsoni) as provided by subdivision (b) of Section 4902. Fully Protected with the exception of legal hunting conducted in compliance with California Code of Regulations 14 CCR 362. |
| *Ovis canadensis nelsoni* pop. 2 | Peninsular bighorn sheep DPS | ST | 19710627 | | FE | 19980318 | Listed by the State of California as *Ovis canadensis cremnobates*. The subspecies *O. c. cremnobates* has been synonymized with *O. c. nelsoni*. The desert bighorn sheep in the Peninsular Ranges, the Peninsular bighorn sheep, is now considered to be a Distinct Population Segment of *O. c. nelsoni*. |
| *Ovis canadensis sierrae* | Sierra Nevada bighorn sheep | SE | 19990827 | | FE | 20000103 | Listed by the State of California as California bighorn sheep (*Ovis canadensis californiana*). Originally listed as State Threatened on 19710627. |

Case 2:26-cv-03396-SVW-SSC   Document 21-1   Filed 05/07/26   Page 441 of 523   Page ID #:952

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 442 of 523    Page ID #:953

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Balaenoptera borealis* | sei whale | | | | FE | 19700603 | Not currently tracked by the CNDDB. |
| *Balaenoptera musculus* | blue whale | | | | FE | 19700603 | Not currently tracked by the CNDDB. |
| *Balaenoptera physalus* | fin whale | | | | FE | 19700603 | Not currently tracked by the CNDDB. |
| *Eubalaena japonica* | North Pacific right whale | | | Fully Protected | FE | 19700603 | Originally listed as part of the northern right whale (*Eubalaena glacialis*) species concept under the federal ESA. Taxonomy and nomenclature were updated and clarified in the Federal Register Vol. 68, No. 69, 20030410. In 2006, NMFS completed a status review of right whales in the N. Pacific and N. Atlantic Oceans and on 20080407, reclassified the previously Endangered northern right whale (*Eubalaena* spp.) as two separate Endangered species: North Pacific right whale (*E. japonica*) and North Atlantic right whale (*E. glacialis*). Listed as earlier synonym, *Eubalaena sieboldi*, in Fully Protected statute. Not currently tracked by the CNDDB. |
| *Eschrichtius robustus* | gray whale [Eastern North Pacific DPS] | | | | FDR | 19940616 | Recovered. Originally listed as Federally Endangered under the Endangered Species Conservation Act on 19700603. NMFS delisted the California population (Eastern North Pacific DPS), while keeping the Western North Pacific DPS as Endangered. Not currently tracked by the CNDDB. |

| Taxon | Common Name | State Status | State List Date | State Fully Protected | Federal Status | Federal List Date | Notes |
|---|---|---|---|---|---|---|---|
| *Megaptera novaeangliae* | humpback whale [Central America DPS] | | | | FE | 19700603 | Also known as Hump-backed whale. 20161011 ruling by NMFS established 14 Distinct Population Segments, and revised listing status by DPS. Both the Mexico DPS and Central America DPS feed and travel off the coast of California. Not currently tracked by the CNDDB. |
| *Megaptera novaeangliae* | humpback whale [Mexico DPS] | | | | FT | 20161011 | Also known as Hump-backed whale. Originally listed as Federally Endangered under the Endangered Species Conservation Act on 19700603. 2016 ruling by NMFS established 14 Distinct Population Segments, and revised listing status by DPS. Both the Mexico DPS and Central America DPS feed and travel off the coast of California. Not currently tracked by the CNDDB. |
| *Orcinus orca* | killer whale [Southern Resident DPS] | | | | FE | 20060216 | The Southern Resident DPS of killer whale was listed as Endangered by NMFS on 20060216 and by USFWS on 20070404. Not currently tracked by the CNDDB. |
| *Physeter macrocephalus* | sperm whale | | | | FE | 19700603 | Federal nomenclature at time of listing: *Physeter catodon*. Not currently tracked by the CNDDB. |

Case 2:26-cv-03396-SVW-SSC    Document 21-1    Filed 05/07/26    Page 443 of 523    Page ID #:954

# Attachment 4

# SPECIAL ANIMALS LIST

## January 2026

State of California

Natural Resources Agency

Department of Fish and Wildlife

Biogeographic Data Branch

California Natural Diversity Database (CNDDB)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Branchinecta longiantenna* | longhorn fairy shrimp | | G2 | S2 | Endangered | None | IUCN:EN | Yes | |
| *Branchinecta lynchi* | vernal pool fairy shrimp | | G3 | S3 | Threatened | None | IUCN:VU | Yes | |
| *Branchinecta mesovallensis* | midvalley fairy shrimp | | G2 | S2S3 | None | None | | Yes | |
| *Branchinecta sandiegonensis* | San Diego fairy shrimp | | G2 | S1 | Endangered | None | IUCN:EN | Yes | |
| *Linderiella occidentalis* | California linderiella | | G2G3 | S2S3 | None | None | IUCN:NT | Yes | |
| *Linderiella santarosae* | Santa Rosa Plateau fairy shrimp | | G1G2 | S1 | None | None | | Yes | |
| *Streptocephalus woottoni* | Riverside fairy shrimp | | G1G2 | S2 | Endangered | None | IUCN:EN | Yes | |

## CRUSTACEA, Order Notostraca (tadpole shrimp)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Lepidurus packardi* | vernal pool tadpole shrimp | | G3 | S3 | Endangered | None | IUCN:EN | Yes | |

## CRUSTACEA, Order Diplostraca (water fleas)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Dumontia oregonensis* | hairy water flea | | G1G3 | S1 | None | None | | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Danaus plexippus plexippus* pop. 1 | monarch - California overwintering population | | G4T1T2Q | S2 | Proposed Threatened | None | IUCN:EN USFS:S | Yes | |
| *Euchloe hyantis andrewsi* | Andrew's marble butterfly | | G3G4T2 | S2 | None | None | | Yes | |
| *Eugnosta busckana* | Busck's gallmoth | | G1G3 | S2S3 | None | None | | Yes | |
| *Euphilotes allyni* | El Segundo blue butterfly | | G1? | S1 | Endangered | None | | Yes | |
| *Euphilotes baueri* | Bauer's dotted-blue | | G2 | S1S2 | None | None | USFS:S | No | |
| *Euphilotes enoptes smithi* | Smith's blue butterfly | | G5T2 | S2 | Endangered | None | | Yes | |
| *Euphilotes glaucon comstocki* | Comstock's blue butterfly | | G4T2? | S2 | None | None | | Yes | |
| *Euphilotes mojave* | Mojave dotted-blue | | G3 | S3 | None | None | | No | |
| *Euphydryas editha bayensis* | Bay checkerspot butterfly | | G4G5T1 | S3 | Threatened | None | | Yes | |
| *Euphydryas editha monoensis* | Mono checkerspot butterfly | | G4G5T2 | S1S2 | None | None | USFS:S | Yes | |
| *Euphydryas editha quino* | quino checkerspot butterfly | | G4G5T1T2 | S1S2 | Endangered | Candidate Endangered | | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Euphyes vestris harbisoni* | dun skipper | | G5T1 | S1S2 | None | None | | No | |
| *Euproserpinus euterpe* | Kern primrose sphinx moth | | G1G2 | S1 | Threatened | None | | Yes | Yes |
| *Glaucopsyche lygdamus palosverdesensis* | Palos Verdes blue butterfly | | G5T1 | S1 | Endangered | None | | Yes | |
| *Hesperia miriamae longaevicola* | White Mountains skipper | | G2G3T1T2 | S1 | None | None | | Yes | |
| *Hesperopsis gracielae* | MacNeill's sootywing | | G2? | S1S2 | None | None | | No | |
| *Icaricia icarioides albihalos* | White Mountains icarioides blue butterfly | | G5T2T3 | S1 | None | None | | Yes | |
| *Icaricia icarioides missionensis* | Mission blue butterfly | | G5T2 | S2 | Endangered | None | | Yes | |
| *Icaricia icarioides moroensis* | Morro Bay blue butterfly | | G5T2 | S2 | None | None | | Yes | |
| *Icaricia icarioides parapheres* | Point Reyes blue butterfly | | G5T1T2 | S1 | None | None | | Yes | |
| *Icaricia icarioides pheres* | Pheres blue butterfly | | G5TX | SX | None | None | | Yes | |
| *Icaricia saepiolus albomontanus* | White Mountains saepiolus blue butterfly | | G5T2 | S1 | None | None | | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Rhyacophila spinata* | spiny rhyacophilan caddisfly | | G1G2 | S3 | None | None | | Yes | |

## INSECTA, Order Hymenoptera (ants, bees, and wasps)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Andrena blennospermatis* | Blennosperma vernal pool andrenid bee | | G2 | S1 | None | None | | Yes | |
| *Andrena macswaini* | An andrenid bee | | G2 | S2 | None | None | | Yes | |
| *Andrena subapasta* | An andrenid bee | | G1G2 | S1S2 | None | None | | Yes | |
| *Argochrysis lassenae* | Lassen cuckoo wasp | | G2 | S2 | None | None | | Yes | |
| *Ashmeadiella chumashae* | Channel Islands leaf-cutter bee | | G2? | S3 | None | None | | Yes | |
| *Bombus caliginosus* | obscure bumble bee | | G2G3 | S1S2 | None | None | IUCN:VU | Yes | |
| *Bombus crotchii* | Crotch's bumble bee | | G2 | S2 | None | Candidate Endangered | IUCN:EN | Yes | Yes |
| *Bombus franklini* | Franklin's bumble bee | | G1 | SH | Endangered | Candidate Endangered | IUCN:CR | Yes | Yes |
| *Bombus morrisoni* | Morrison bumble bee | | G3 | S1S2 | None | None | IUCN:VU | Yes | |
| *Bombus occidentalis* | western bumble bee | | G3 | S1 | None | Candidate Endangered | IUCN:VU USFS:S | Yes | Yes |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Oncorhynchus kisutch* pop. 2 | coho salmon - southern Oregon / northern California ESU | | G5T2Q | S2 | Threatened | Threatened | AFS:TH | Yes | Yes |
| *Oncorhynchus kisutch* pop. 4 | coho salmon - central California coast ESU | | G5T2Q | S2 | Endangered | Endangered | AFS:EN | Yes | Yes |
| *Oncorhynchus mykiss aguabonita* | California golden trout | | G5T1 | S1 | None | None | AFS:TH CDFW:SSC USFS:S | Yes | |
| *Oncorhynchus mykiss aquilarum* | Eagle Lake rainbow trout | | G5T1 | S1 | None | None | AFS:TH CDFW:SSC USFS:S | Yes | |
| *Oncorhynchus mykiss gilberti* | Kern River rainbow trout | | G5T1T2Q | S1 | None | None | AFS:TH CDFW:SSC USFS:S | Yes | |
| *Oncorhynchus mykiss irideus* pop. 1 | steelhead - Klamath Mountains Province DPS | | G5T3Q | S2 | None | None | CDFW:SSC USFS:S | No | Yes |
| *Oncorhynchus mykiss irideus* pop. 10 | steelhead - southern California DPS | | G5T1Q | S1 | Endangered | Endangered | AFS:EN | Yes | Yes |
| *Oncorhynchus mykiss irideus* pop. 11 | steelhead - Central Valley DPS | | G5T2Q | S2 | Threatened | None | AFS:TH CDFW:SSC | Yes | Yes |
| *Oncorhynchus mykiss irideus* pop. 48 | steelhead - northern California DPS summer-run | | G5T2Q | S2 | Threatened | Endangered | AFS:TH | Yes | |

January 9, 2026

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Gasterosteus aculeatus williamsoni* | unarmored threespine stickleback | | G5T1 | S1 | Endangered | Endangered | AFS:EN CDFW:FP | Yes | |

## CENTRARCHIDAE (sunfishes)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Archoplites interruptus* | Sacramento perch | Within native range only | G1 | S1 | None | None | AFS:TH CDFW:SSC IUCN:EN | Yes | |

## EMBIOTOCIDAE (surfperches)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Hysterocarpus traskii lagunae* | Clear Lake tule perch | | G5T3 | S3 | None | None | CDFW:SSC | Yes | |
| *Hysterocarpus traskii pomo* | Russian River tule perch | | G5T4 | S4 | None | None | AFS:VU CDFW:SSC | Yes | |
| *Hysterocarpus traskii traskii* | Sacramento-San Joaquin tule perch | | G5T2T3 | S2S3 | None | None | | No | |

## GOBIIDAE (gobies)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Eucyclogobius newberryi* | tidewater goby | | G3 | S3 | Endangered | None | AFS:EN CDFW:SSC IUCN:NT | Yes | |

# Amphibians

## AMBYSTOMATIDAE (mole salamanders)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Ambystoma californiense* pop. 1 | California tiger salamander - central California DPS | | G3T3 | S3 | Threatened | Threatened | CDFW:WL IUCN:VU | Yes | |
| *Ambystoma californiense* pop. 2 | California tiger salamander - Santa Barbara County DPS | | G3T2 | S2 | Endangered | Threatened | CDFW:WL IUCN:VU | Yes | |
| *Ambystoma californiense* pop. 3 | California tiger salamander - Sonoma County DPS | | G3T2 | S2 | Endangered | Threatened | CDFW:WL IUCN:VU | Yes | |
| *Ambystoma macrodactylum croceum* | Santa Cruz long-toed salamander | | G5T1T2 | S2 | Endangered | Endangered | CDFW:FP | Yes | |
| *Ambystoma macrodactylum sigillatum* | southern long-toed salamander | | G5T4 | S2 | None | None | CDFW:SSC | Yes | |

## DICAMPTODONTIDAE (giant salamanders)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Dicamptodon ensatus* | California giant salamander | | G2G3 | S2S3 | None | None | CDFW:SSC IUCN:NT | Yes | |

## ASCAPHIDAE (tailed frogs)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Ascaphus truei* | Pacific tailed frog | | G4 | S3S4 | None | None | CDFW:SSC IUCN:LC | Yes | |

## SCAPHIOPODIDAE (spadefoot toads)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Scaphiopus couchii* | Couch's spadefoot | | G5 | S2 | None | None | BLM:S CDFW:SSC IUCN:LC | Yes | |
| *Spea hammondii* | western spadefoot | | G2G3 | S3S4 | Proposed Threatened | None | BLM:S CDFW:SSC IUCN:NT | Yes | |

## BUFONIDAE (true toads)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Anaxyrus californicus* | arroyo toad | | G1G2 | S2 | Endangered | None | CDFW:SSC IUCN:EN | Yes | Yes |
| *Anaxyrus canorus* | Yosemite toad | | G2 | S2 | Threatened | None | CDFW:SSC IUCN:EN USFS:S | Yes | Yes |
| *Anaxyrus exsul* | black toad | | G1 | S1 | None | Threatened | BLM:S CDFW:FP IUCN:VU USFS:S | Yes | Yes |
| *Incilius alvarius* | Sonoran Desert toad | | G5 | SH | None | None | CDFW:SSC IUCN:LC | Yes | Yes |

January 9, 2026

## RANIDAE (true frogs)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Lithobates pipiens* | northern leopard frog | Native populations only | G5 | S2 | None | None | CDFW:SSC IUCN:LC | Yes | Yes |
| *Lithobates yavapaiensis* | lowland leopard frog | | G4 | SX | None | None | BLM:S CDFW:SSC IUCN:LC | Yes | Yes |
| *Rana aurora* | northern red-legged frog | | G4 | S3 | None | None | CDFW:SSC IUCN:LC USFS:S | Yes | Yes |
| *Rana boylii* pop. 1 | foothill yellow-legged frog - north coast DPS | | G3T4 | S4 | None | None | BLM:S CDFW:SSC USFS:S | Yes | |
| *Rana boylii* pop. 2 | foothill yellow-legged frog - Feather River DPS | | G3T2 | S2 | Threatened | Threatened | BLM:S USFS:S | Yes | |
| *Rana boylii* pop. 3 | foothill yellow-legged frog - north Sierra DPS | | G3T2 | S2 | None | Threatened | BLM:S USFS:S | Yes | |
| *Rana boylii* pop. 4 | foothill yellow-legged frog - central coast DPS | | G3T2 | S2 | Threatened | Endangered | BLM:S USFS:S | Yes | |
| *Rana boylii* pop. 5 | foothill yellow-legged frog - south Sierra DPS | | G3T2 | S2 | Endangered | Endangered | BLM:S USFS:S | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Rana boylii* pop. 6 | foothill yellow-legged frog - south coast DPS | | G3T1 | S1 | Endangered | Endangered | BLM:S USFS:S | Yes | |
| *Rana cascadae* | Cascades frog | | G3 | S3 | None | Candidate Endangered | CDFW:SSC IUCN:NT USFS:S | Yes | |
| *Rana draytonii* | California red-legged frog | | G2G3 | S2S3 | Threatened | None | CDFW:SSC IUCN:VU | Yes | Yes |
| *Rana muscosa* | southern mountain yellow-legged frog | | G1 | S2 | Endangered | Endangered | CDFW:WL IUCN:EN USFS:S | Yes | Yes |
| *Rana pretiosa* | Oregon spotted frog | | G2 | SH | Threatened | None | BLM:S CDFW:SSC IUCN:VU | Yes | |
| *Rana sierrae* | Sierra Nevada yellow-legged frog | | G2 | S2 | Endangered | Threatened | CDFW:WL IUCN:EN USFS:S | Yes | Yes |

January 9, 2026

# Reptiles

## CHELONIIDAE (sea turtles)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Chelonia mydas* | green turtle | | G4 | S1 | Threatened | None | IUCN:EN | Yes | |

## KINOSTERNIDAE (musk and mud turtles)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Kinosternon sonoriense* | Sonoran mud turtle | | G3 | SH | None | None | CDFW:SSC IUCN:NT | Yes | |

## EMYDIDAE (box and water turtles)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Actinemys marmorata* | northwestern pond turtle | | G2 | SNR | Proposed Threatened | None | BLM:S CDFW:SSC IUCN:VU USFS:S | Yes | |
| *Actinemys pallida* | southwestern pond turtle | | G2 | SNR | Proposed Threatened | None | BLM:S CDFW:SSC IUCN:VU USFS:S | Yes | |

## TESTUDINIDAE (land tortoises)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Gopherus agassizii* | desert tortoise | | G2G3 | S2S3 | Threatened | Endangered | IUCN:CR | Yes | |

## GEKKONIDAE (geckos)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Coleonyx switaki* | barefoot banded gecko | | G4 | S3 | None | Threatened | BLM:S IUCN:LC | Yes | |
| *Coleonyx variegatus abbotti* | San Diego banded gecko | | G5T5 | S1S2 | None | None | CDFW:SSC | Yes | |

## CROTAPHYTIDAE (collared and leopard lizards)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Gambelia copeii* | Cope's leopard lizard | | G5 | S1S2 | None | None | CDFW:SSC IUCN:LC | Yes | |
| *Gambelia sila* | blunt-nosed leopard lizard | | G1 | S2 | Endangered | Endangered | CDFW:FP IUCN:EN | Yes | |

## PHRYNOSOMATIDAE (spiny lizards)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Phrynosoma blainvillii* | coast horned lizard | | G4 | S4 | None | None | BLM:S CDFW:SSC IUCN:LC | Yes | |
| *Phrynosoma mcallii* | flat-tailed horned lizard | | G3 | S3 | None | None | BLM:S CDFW:SSC IUCN:NT | Yes | |
| *Sceloporus graciosus graciosus* | northern sagebrush lizard | | G5T5 | S3 | None | None | BLM:S | Yes | |
| *Uma inornata* | Coachella Valley fringe-toed lizard | | G1 | S1 | Threatened | Endangered | IUCN:EN | Yes | |

January 9, 2026

## CICONIIDAE (storks)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Mycteria americana* | wood stork | | G4 | S1 | None | None | CDFW:SSC IUCN:LC | No | |

## CATHARTIDAE (New World vultures)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Gymnogyps californianus* | California condor | | G1 | S2 | Endangered | Endangered | CDF:S CDFW:FP IUCN:CR | Yes | |

## PANDIONIDAE (ospreys)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Pandion haliaetus* | osprey | Nesting | G5 | S4 | None | None | CDF:S CDFW:WL IUCN:LC | Yes | |

## ACCIPITRIDAE (hawks, kites, harriers, and eagles)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Accipiter striatus* | sharp-shinned hawk | Nesting | G5 | S4 | None | None | CDFW:WL IUCN:LC | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Aquila chrysaetos* | golden eagle | Nesting and wintering | G5 | S3 | None | None | BLM:S CDF:S CDFW:FP CDFW:WL IUCN:LC | Yes | |
| *Astur atricapillus* | American goshawk | Nesting | G5 | S3 | None | None | BLM:S CDF:S CDFW:SSC USFS:S | Yes | |
| *Astur cooperii* | Cooper's hawk | Nesting | G5 | S4 | None | None | CDFW:WL IUCN:LC | Yes | |
| *Buteo regalis* | ferruginous hawk | Wintering | G4 | S3S4 | None | None | CDFW:WL IUCN:LC | Yes | |
| *Buteo swainsoni* | Swainson's hawk | Nesting | G5 | S4 | None | Threatened | BLM:S IUCN:LC | Yes | |
| *Circus hudsonius* | northern harrier | Nesting | G5 | S3 | None | None | CDFW:SSC IUCN:LC USFWS:BCC | Yes | Yes |
| *Elanus leucurus* | white-tailed kite | Nesting | G5 | S3S4 | None | None | BLM:S CDFW:FP IUCN:LC | Yes | |
| *Haliaeetus leucocephalus* | bald eagle | Nesting and wintering | G5 | S3 | Delisted | Endangered | BLM:S CDF:S CDFW:FP IUCN:LC USFS:S | Yes | |
| *Parabuteo unicinctus* | Harris' hawk | Nesting | G5 | S1 | None | None | CDFW:WL IUCN:LC | No | |

January 9, 2026

## GRUIDAE (cranes)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Antigone canadensis canadensis* | lesser sandhill crane | Wintering | G5T4 | S4 | None | None | CDFW:SSC | No | |
| *Antigone canadensis tabida* | greater sandhill crane | Nesting & wintering | G5T5 | S2 | None | Threatened | BLM:S CDFW:FP USFS:S | Yes | |

## CHARADRIIDAE (plovers and relatives)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Anarhynchus montanus* | mountain plover | Wintering | G3 | S2 | None | None | BLM:S CDFW:SSC IUCN:NT USFWS:BCC | Yes | |
| *Anarhynchus nivosus nivosus* | western snowy plover | Nesting | G3T3 | S3 | Threatened | None | CDFW:SSC | Yes | Yes |

## SCOLOPACIDAE (sandpipers and relatives)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Numenius americanus* | long-billed curlew | Nesting | G4 | S2 | None | None | CDFW:WL IUCN:LC | No | |

## LARIDAE (gulls and terns)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Chlidonias niger* | black tern | Nesting colony | G4G5 | S2 | None | None | CDFW:SSC IUCN:LC USFWS:BCC | Yes | |
| *Gelochelidon nilotica* | gull-billed tern | Nesting colony | G5 | S1 | None | None | CDFW:SSC IUCN:LC USFWS:BCC | Yes | Yes |
| *Hydroprogne caspia* | Caspian tern | Nesting colony | G5 | S4 | None | None | IUCN:LC | Yes | Yes |
| *Larus californicus* | California gull | Nesting colony | G5 | S4 | None | None | CDFW:WL IUCN:LC USFWS:BCC | Yes | |
| *Leucophaeus atricilla* | laughing gull | Nesting colony | G5 | S1 | None | None | CDFW:WL IUCN:LC | No | |
| *Rynchops niger* | black skimmer | Nesting colony | G5 | S2 | None | None | CDFW:SSC IUCN:LC USFWS:BCC | Yes | |
| *Sternula antillarum browni* | California least tern | Nesting colony | G4T2T3Q | S2 | Endangered | Endangered | CDFW:FP | Yes | Yes |
| *Thalasseus elegans* | elegant tern | Nesting colony | G4 | S3 | None | None | CDFW:WL IUCN:NT USFWS:BCC | No | Yes |

## ALCIDAE (auklets, puffins, and relatives)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Brachyramphus marmoratus* | marbled murrelet | Nesting | G3 | S2 | Threatened | Endangered | CDF:S IUCN:EN | Yes | |

Case 2:26-cv-03396-SVW-BSC    Document 21-1    Filed 05/07/26    Page 462 of 523
Page ID #:973

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Cerorhinca monocerata* | rhinoceros auklet | Nesting colony | G5 | S3 | None | None | CDFW:WL IUCN:LC | Yes | |
| *Fratercula cirrhata* | tufted puffin | Nesting colony | G5 | S1S2 | None | None | CDFW:SSC IUCN:LC USFWS:BCC | Yes | |
| *Ptychoramphus aleuticus* | Cassin's auklet | Nesting colony | G4 | S3 | None | None | CDFW:SSC IUCN:NT USFWS:BCC | No | |
| *Synthliboramphus scrippsi* | Scripps's murrelet | Nesting colony | G2 | S2 | None | Threatened | BLM:S IUCN:VU USFWS:BCC | Yes | Yes |

## CUCULIDAE (cuckoos and relatives)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Coccyzus americanus occidentalis* | western yellow-billed cuckoo | Nesting | G5T2T3 | S1 | Threatened | Endangered | BLM:S USFS:S | Yes | |

## STRIGIDAE (owls)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Asio flammeus* | short-eared owl | Nesting | G5 | S2 | None | None | CDFW:SSC IUCN:LC USFWS:BCC | Yes | |
| *Asio otus* | long-eared owl | Nesting | G5 | S3? | None | None | CDFW:SSC IUCN:LC USFWS:BCC | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Athene cunicularia* | burrowing owl | Burrow sites & some wintering sites | G4 | S2 | None | Candidate Endangered | BLM:S CDFW:SSC IUCN:LC USFWS:BCC | Yes | Yes |
| *Micrathene whitneyi* | elf owl | Nesting | G4 | S1 | None | Endangered | BLM:S IUCN:LC | Yes | |
| *Psiloscops flammeolus* | flammulated owl | Nesting | G4 | S2S4 | None | None | IUCN:LC USFWS:BCC | Yes | |
| *Strix nebulosa* | great gray owl | Nesting | G5 | S1 | None | Endangered | CDF:S IUCN:LC USFS:S | Yes | |
| *Strix occidentalis caurina* | northern spotted owl | | G3G4T3 | S2 | Threatened | Threatened | CDF:S | No | Yes |
| *Strix occidentalis occidentalis* | California spotted owl | | G3G4T2T3 | S2 | None | None | BLM:S CDFW:SSC USFS:S USFWS:BCC | No | Yes |

## APODIDAE (swifts)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Chaetura vauxi* | Vaux's swift | Nesting | G5 | S3 | None | None | CDFW:SSC IUCN:LC USFWS:BCC | No | |
| *Cypseloides niger* | black swift | Nesting | G4 | S3 | None | None | CDFW:SSC IUCN:VU USFWS:BCC | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Empidonax traillii brewsteri* | little willow flycatcher | Nesting | G5T3T4 | S3 | None | Endangered | | Yes | Yes |
| *Empidonax traillii extimus* | southwestern willow flycatcher | Nesting | G5T2 | S3 | Endangered | Endangered | | Yes | Yes |
| *Myiarchus tyrannulus* | brown-crested flycatcher | Nesting | G5 | S3 | None | None | CDFW:WL IUCN:LC | Yes | |
| *Pyrocephalus rubinus* | vermilion flycatcher | Nesting | G5 | S2S3 | None | None | CDFW:SSC IUCN:LC | Yes | |

## LANIIDAE (shrikes)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Lanius ludovicianus* | loggerhead shrike | Nesting | G4 | S4 | None | None | CDFW:SSC IUCN:NT | Yes | |
| *Lanius ludovicianus anthonyi* | Island loggerhead shrike | | G4T1 | S1 | None | None | CDFW:SSC | No | |
| *Lanius ludovicianus mearnsi* | San Clemente loggerhead shrike | | G4T1Q | S2 | Endangered | None | CDFW:SSC | Yes | Yes |

## VIREONIDAE (vireos)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Vireo bellii arizonae* | Arizona Bell's vireo | Nesting | G5T4 | S3 | None | Endangered | BLM:S | Yes | Yes |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Vireo bellii pusillus* | least Bell's vireo | Nesting | G5T2 | S3 | Endangered | Endangered | | Yes | Yes |
| *Vireo huttoni unitti* | Catalina Hutton's vireo | | G5T2? | S2 | None | None | CDFW:SSC | No | |
| *Vireo vicinior* | gray vireo | Nesting | G5 | S2 | None | None | BLM:S CDFW:SSC IUCN:LC USFS:S | Yes | |

## CORVIDAE (jays, crows, and magpies)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Aphelocoma californica cana* | Eagle Mountain scrub-jay | | G5T3 | S3 | None | None | CDFW:WL | No | |
| *Aphelocoma insularis* | Island scrub-jay | | G1 | S1 | None | None | IUCN:NT USFWS:BCC | No | |
| *Pica nuttalli* | yellow-billed magpie | Nesting & communal roosts | G3G4 | S3S4 | None | None | IUCN:VU USFWS:BCC | No | |

## ALAUDIDAE (larks)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Eremophila alpestris actia* | California horned lark | | G5T4Q | S4 | None | None | CDFW:WL IUCN:LC | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Icteria virens* | yellow-breasted chat | Nesting | G5 | S4 | None | None | CDFW:SSC IUCN:LC | Yes | |

### ICTERIDAE (blackbirds)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Agelaius phoeniceus aciculatus* | Kern red-winged blackbird | | G5T1 | S1 | None | None | CDFW:SSC | No | |
| *Agelaius tricolor* | tricolored blackbird | Nesting colony | G1G2 | S2 | None | Threatened | BLM:S CDFW:SSC IUCN:EN USFWS:BCC | Yes | |
| *Xanthocephalus xanthocephalus* | yellow-headed blackbird | Nesting | G5 | S3 | None | None | CDFW:SSC IUCN:LC | Yes | |

### PARULIDAE (wood-warblers)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Geothlypis trichas sinuosa* | saltmarsh common yellowthroat | | G5T3 | S3 | None | None | CDFW:SSC USFWS:BCC | Yes | Yes |

Case 2:26-cv-03396-SVW-BSC    Document 21-1    Filed 05/07/26    Page 467 of 523
Page ID #:978

# Mammals

## SORICIDAE (shrews)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Sorex lyelli* | Mount Lyell shrew | | G3G4 | S3S4 | None | None | CDFW:SSC IUCN:LC | Yes | |
| *Sorex ornatus relictus* | Buena Vista Lake ornate shrew | | G5T1 | S1 | Endangered | None | CDFW:SSC | Yes | |
| *Sorex ornatus salarius* | Monterey shrew | | G5T1T2 | S1S2 | None | None | CDFW:SSC | Yes | |
| *Sorex ornatus salicornicus* | southern California saltmarsh shrew | | G5T1? | S1 | None | None | CDFW:SSC | Yes | |
| *Sorex ornatus sinuosus* | Suisun shrew | | G5T1T2Q | S1S2 | None | None | CDFW:SSC | Yes | |
| *Sorex ornatus willetti* | Santa Catalina shrew | | G5T1 | S1 | None | None | CDFW:SSC | Yes | |
| *Sorex vagrans halicoetes* | salt-marsh wandering shrew | | G5T1 | S1 | None | None | CDFW:SSC | Yes | |
| *Sorex vagrans paludivagus* | Monterey vagrant shrew | | G5T1 | S2 | None | None | | Yes | |

January 9, 2026

## SCIURIDAE (squirrels and relatives)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Ammospermophilus nelsoni* | Nelson's (=San Joaquin) antelope squirrel | | G2G3 | S3 | None | Threatened | BLM:S IUCN:EN | Yes | |
| *Callospermophilus lateralis bernardinus* | San Bernardino golden-mantled ground squirrel | | G5T1 | S1 | None | None | | Yes | |
| *Glaucomys oregonensis californicus* | San Bernardino flying squirrel | | G5T1T2 | S1S2 | None | None | CDFW:SSC USFS:S | Yes | |
| *Neotamias alpinus* | Alpine chipmunk | | G4 | S3 | None | None | IUCN:LC | Yes | |
| *Neotamias panamintinus acrus* | Kingston Mountain chipmunk | | G4T1T2 | S1S2 | None | None | | Yes | |
| *Neotamias speciosus callipeplus* | Mount Pinos chipmunk | | G4T2 | S2 | None | None | USFS:S | Yes | |
| *Neotamias speciosus speciosus* | lodgepole chipmunk | | G4T3T4 | S2 | None | None | | Yes | |
| *Urocitellus mollis* | Piute ground squirrel | | G5 | S3 | None | None | IUCN:LC | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Dipodomys californicus eximius* | Marysville California kangaroo rat | | G3T1 | S1 | None | None | CDFW:SSC | Yes | |
| *Dipodomys heermanni arenae* | Lompoc kangaroo rat | | G4T1T2 | S1S2 | None | None | | No | |
| *Dipodomys heermanni berkeleyensis* | Berkeley kangaroo rat | | G4T1 | S2 | None | None | | Yes | |
| *Dipodomys heermanni dixoni* | Merced kangaroo rat | | G4T2 | S2 | None | None | | Yes | |
| *Dipodomys heermanni goldmani* | Salinas kangaroo rat | | G4T2T3 | S2S3 | None | None | | Yes | |
| *Dipodomys heermanni heermanni* | Heermann's kangaroo rat | | G4T2 | S2 | None | None | | No | |
| *Dipodomys heermanni morroensis* | Morro Bay kangaroo rat | | G4TH | SH | Endangered | Endangered | CDFW:FP | Yes | |
| *Dipodomys ingens* | giant kangaroo rat | | G1G2 | S2 | Endangered | Endangered | IUCN:EN | Yes | |
| *Dipodomys merriami collinus* | Earthquake Merriam's kangaroo rat | | G5T2? | S2 | None | None | | Yes | |
| *Dipodomys merriami parvus* | San Bernardino kangaroo rat | | G5T1 | S1 | Endangered | Endangered | CDFW:SSC | Yes | |
| *Dipodomys merriami trinidadensis* | Valle de la Trinidad kangaroo rat | | G5T2T3Q | S2 | None | None | | Yes | |

January 9, 2026

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Dipodomys nitratoides brevinasus* | short-nosed kangaroo rat | | G2T1T2 | S1S2 | None | None | BLM:S CDFW:SSC IUCN:VU | Yes | |
| *Dipodomys nitratoides exilis* | Fresno kangaroo rat | | G2TH | SH | Endangered | Endangered | IUCN:VU | Yes | |
| *Dipodomys nitratoides nitratoides* | Tipton kangaroo rat | | G2T1T2 | S2 | Endangered | Endangered | IUCN:VU | Yes | |
| *Dipodomys panamintinus argusensis* | Argus Mountains kangaroo rat | | G4T1T3 | S1S3 | None | None | | Yes | |
| *Dipodomys panamintinus panamintinus* | Panamint kangaroo rat | | G4T3 | S3 | None | None | | Yes | |
| *Dipodomys simulans* | Dulzura kangaroo rat | | G4 | S3 | None | None | IUCN:LC | Yes | |
| *Dipodomys stephensi* | Stephens' kangaroo rat | | G2 | S3 | Threatened | Threatened | IUCN:VU | Yes | |
| *Dipodomys venustus elephantinus* | big-eared kangaroo rat | | G2T2 | S3 | None | None | | Yes | |
| *Dipodomys venustus sanctiluciae* | Santa Lucia Mountain kangaroo rat | | G2T3 | S3 | None | None | | Yes | |
| *Dipodomys venustus venustus* | Santa Cruz kangaroo rat | | G2T1 | S1 | None | None | | Yes | |
| *Perognathus alticolus alticolus* | white-eared pocket mouse | | G2TH | SH | None | None | BLM:S CDFW:SSC IUCN:VU USFS:S | Yes | Yes |

January 9, 2026

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Urocyon littoralis littoralis* | San Miguel Island fox | | G3T1 | S1 | Delisted | Threatened | | Yes | Yes |
| *Urocyon littoralis santacruzae* | Santa Cruz Island fox | | G3T1 | S2 | Delisted | Threatened | | Yes | Yes |
| *Urocyon littoralis santarosae* | Santa Rosa Island fox | | G3T1 | S2 | Delisted | Threatened | | Yes | Yes |
| *Vulpes macrotis mutica* | San Joaquin kit fox | | G4T2 | S3 | Endangered | Threatened | | Yes | |
| *Vulpes vulpes necator* pop. 1 | Sierra Nevada red fox - southern Cascades DPS | | G5TNR | S1 | None | Threatened | USFS:S | Yes | |
| *Vulpes vulpes necator* pop. 2 | Sierra Nevada red fox - Sierra Nevada DPS | | G5T1 | S1 | Endangered | Threatened | USFS:S | Yes | |
| *Vulpes vulpes patwin* | Sacramento Valley red fox | | G5T2 | S2 | None | None | | No | |

## OTARIIDAE (sea lions and fur seals)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Arctocephalus townsendi* | Guadalupe fur-seal | | G2 | S1 | Threatened | Threatened | CDFW:FP IUCN:LC | Yes | |
| *Callorhinus ursinus* | northern fur-seal | | G3 | S1 | None | None | IUCN:VU | Yes | |

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Eumetopias jubatus* | Steller sea lion | | G3 | S2 | Delisted | None | IUCN:NT MMC:SSC | Yes | |

## PROCYONIDAE (raccoons and ringtails)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Bassariscus astutus nevadensis* | Nevada ringtail | | G5TNR | SNR | None | None | CDFW:FP | No | |
| *Bassariscus astutus octavus* | southern California ringtail | | G5T3 | S3 | None | None | CDFW:FP | No | |
| *Bassariscus astutus raptor* | northern California ringtail | | G5TNR | SNR | None | None | CDFW:FP | No | |
| *Bassariscus astutus willetti* | Palo Verde Mountains ringtail | | G5T2 | S2 | None | None | CDFW:FP | No | |
| *Bassariscus astutus yumanensis* | Yuma ringtail | | G5TU | S2 | None | None | CDFW:FP | No | |

## MUSTELIDAE (weasels and relatives)

| Scientific Name | Common Name | Comments | Global Rank | State Rank | ESA | CESA | Other Status | Records in CNDDB? | End Notes? |
|---|---|---|---|---|---|---|---|---|---|
| *Enhydra lutris nereis* | southern sea otter | | G4T2 | S3 | Threatened | None | CDFW:FP IUCN:EN MMC:SSC | Yes | Yes |
| *Gulo gulo* | wolverine | | G4 | S1 | Threatened | Threatened | CDFW:FP IUCN:LC USFS:S | Yes | |

*Euproserpinus euterpe*

Kern primrose sphinx moth

1) Until its rediscovery in Kern County in 1974, this moth had been thought to be extinct. A second population was later found in San Luis Obispo County (Xerces Society 2005).

*Speyeria zerene myrtleae*

Myrtle's silverspot butterfly

1) The USFWS and others have not yet determined if the taxonomic expansion by Emmel and Emmel (1998) into *S. z. myrtleae* and *S. z. puntareyes* is warranted. The *Speyereia zerene* along the coast of Marin and Sonoma Counties are federally endangered under the subspecies concept in the 1992 listing.

**INSECTA, Order Hymenoptera (ants, bees, and wasps)**

*Bombus crotchii*

Crotch's bumble bee

1) Originally advanced to candidacy by the Fish and Game Commission in June 2019. The candidacy determination was challenged in court. Candidacy was temporarily stayed beginning February 2021 following an adverse trial court judgment. The Third District Court of Appeal reversed the trial court judgment. Candidacy was reinstated on September 30, 2022.

*Bombus franklini*

Franklin's bumble bee

1) Originally advanced to candidacy by the Fish and Game Commission in June 2019. The candidacy determination was challenged in court. Candidacy was temporarily stayed beginning February 2021 following an adverse trial court judgment. The Third District Court of Appeal reversed the trial court judgment. Candidacy was reinstated on September 30, 2022.

*Bombus occidentalis*

western bumble bee

1) Originally advanced to candidacy by the Fish and Game Commission in June 2019. The candidacy determination was challenged in court. Candidacy was temporarily stayed beginning February 2021 following an adverse trial court judgment. The Third District Court of Appeal reversed the trial court judgment. Candidacy was reinstated on September 30, 2022.

*Bombus suckleyi*

Suckley's cuckoo bumble bee

1) Originally advanced to candidacy by the Fish and Game Commission in June 2019. The candidacy determination was challenged in court. Candidacy was temporarily stayed beginning February 2021 following an adverse trial court judgment. The Third District Court of Appeal reversed the trial court judgment. Candidacy was reinstated on September 30, 2022.

## Fishes

### SALMONIDAE (trout and salmon)

*Oncorhynchus kisutch* pop. 2

coho salmon - southern Oregon / northern California ESU

1) Federal listing refers to populations between Cape Blanco, Oregon and Punta Gorda, Humboldt County, California.
2) State listing refers to populations between the Oregon border and Punta Gorda, Humboldt County, California.

*Oncorhynchus kisutch* pop. 4

coho salmon - central California coast ESU

1) Federal listing is limited to naturally spawning populations in streams between Punta Gorda, Humboldt County and the San Lorenzo River, Santa Cruz County.
2) State listing is limited to populations south of Punta Gorda, Humboldt County.

*Oncorhynchus mykiss irideus* pop. 1

steelhead - Klamath Mountains Province DPS

1) This ESU includes all naturally spawned populations residing in streams between the Elk River in Oregon and the Klamath River in California, inclusive.
2) CDFW SSC designation refers only to the California portion of the ESU and refers only to the summer-run.

*Oncorhynchus mykiss irideus* pop. 10

steelhead - southern California DPS

1) The federal designation refers to fish in the coastal basins from the Santa Maria River (inclusive), south to the U.S. - Mexico Border.

*Oncorhynchus mykiss irideus* pop. 11

steelhead - Central Valley DPS

1) Federal listing includes all runs in the Sacramento and San Joaquin rivers and their tributaries.

*Oncorhynchus mykiss irideus* pop. 8

steelhead - central California coast DPS

1) Federal listing includes all runs in coastal basins from the Russian River in Sonoma County, south to Soquel Creek in Santa Cruz County, inclusive. It includes the San Francisco and San Pablo Bay basins, but excludes the Sacramento-San Joaquin River basins.

*Oncorhynchus mykiss irideus* pop. 9

Case 2:26-cv-03396-SVW-BSC    Document 21-1    Filed 05/07/26    Page 475 of 523
Page ID #:986

steelhead - south-central California coast DPS

1) Federal listing includes all runs in coastal basins from the Pajaro River south to, but not including, the Santa Maria River.
2) CDFW SSC designation refers to southern steelhead trout.

*Oncorhynchus tshawytscha* pop. 11

chinook salmon - Central Valley spring-run ESU

1) Federal listing refers to the Central Valley spring-run ESU. It includes populations spawning in the Sacramento River and its tributaries.

*Oncorhynchus tshawytscha* pop. 13

chinook salmon - Central Valley fall / late fall-run ESU

1) The Central Valley fall/late fall-run ESU refers to populations spawning in the Sacramento and San Joaquin rivers and their tributaries.
2) CDFW SSC designation refers only to the fall-run.

*Oncorhynchus tshawytscha* pop. 17

chinook salmon - California coastal ESU

1) Originally proposed as part of a larger Southern Oregon and California Coastal ESU. This new ESU was revised to include only naturally spawned coastal spring- and fall-run chinook salmon between Redwood Creek in Humboldt County and the Russian River in Sonoma County.

**OSMERIDAE (smelt)**

*Thaleichthys pacificus*

eulachon

1) The Federal Threatened status pertains to the "southern DPS" of eulachon that range from central British Columbia, Washington, Oregon, and northern California.

**CYPRINIDAE (minnows and carp)**

*Rhinichthys nevadensis nevadensis*

Amargosa speckled dace

1) Moyle et al. 2023 formally named/described the Rhinichthys complex in California and Nevada, and former Amargosa Canyon speckled dace (*R. osculus* ssp. 1) and Owens speckled dace (*R. osculus* ssp. 2) are combined as newly described Amargosa speckled dace (*R. nevadensis nevadensis*).

*Siphateles bicolor* ssp. 11

High Rock Springs tui chub

1) Formerly *Siphateles bicolor* ssp. 2, which did not account for other undescribed subspecies outside of CA.

*Siphateles bicolor* ssp. 12

Eagle Lake tui chub

1) Formerly *Siphateles bicolor* ssp. 1, which did not account for other undescribed subspecies outside of CA.

*Siphateles bicolor* ssp. 14

Pit River tui chub

1) Formerly *Siphateles bicolor* ssp. 3, which did not account for other undescribed subspecies outside of CA.

## Amphibians

### PLETHODONTIDAE (lungless salamanders)

*Aneides niger*

Santa Cruz black salamander

1) CDFW SSC status uses former subspecies concept of *Aneides flavipunctatus niger*.

*Batrachoseps relictus*

relictual slender salamander

1) Taxonomy follows Jockusch et al. 2012. Morphological and molecular diversification of slender salamanders (Caudata: Plethodontidae: *Batrachoseps*) in the southern Sierra Nevada of California with descriptions of two new species. Zootaxa 3190:1-30, which synonymized *Batrachoseps* sp. 1, Breckenridge Mountain slender salamander, with *B. relictus*.

*Plethodon asupak*

Scott Bar salamander

1) Since this newly described species was formerly considered to be a subpopulation of *Plethodon stormi* (Mead et al. 2005), and since *Plethodon stormi* is listed as threatened under CESA, *Plethodon asupak* retains the designation as a threatened species under CESA (Calif. Regulatory Notice Register, No. 21-Z, p.916, 25 May 2007).

### BUFONIDAE (true toads)

*Anaxyrus californicus*

arroyo toad

1) At the time of listing, arroyo toad was known as *Bufo microscaphus californicus*, a subspecies of southwestern toad. In 2001, it was determined to be its own species, *Bufo californicus*. Since then, many species in the genus *Bufo* were changed to the genus *Anaxyrus*, and now arroyo toad is known as *Anaxyrus californicus* (Frost et al. 2006).

*Anaxyrus canorus*

Case 2:26-cv-03396-SVW-BSC    Document 21-1    Filed 05/07/26    Page 477 of 523
Page ID #:988

Yosemite toad

1) Formerly *Bufo canorus*; Frost et al. (2006. The Amphibian Tree of Life. Bulletin of the American Museum of Natural History 297: 1-370) placed this species in the genus *Anaxyrus* (Tschudi 1845).

*Anaxyrus exsul*

black toad

1) Formerly *Bufo canorus*; Frost et al. (2006. The Amphibian Tree of Life. Bulletin of the American Museum of Natural History 297: 1-370) placed this species in the genus *Anaxyrus* (Tschudi 1845).

*Incilius alvarius*

Sonoran Desert toad

1) Formerly *Bufo alvarius*. Between 2006-2009, the scientific name has been changed to *Cranopsis alvaria*, *Ollotis alvaria*, *Incilius alvarius*, back to *Ollotis alvarius*, and then back to *Incilius alvarius*. The common name has changed from Colorado River toad to Sonoran Desert toad.

**RANIDAE (true frogs)**

*Lithobates pipiens*

northern leopard frog

1) Formerly *Rana pipiens*; Frost et al. (2006. The Amphibian Tree of Life. Bulletin of the American Museum of Natural History 297: 1-370) placed this species in the genus *Lithobates* (Fitzinger 1843).

*Lithobates yavapaiensis*

lowland leopard frog

1) Formerly *Rana yavapaiensis*; Frost et al. (2006. The Amphibian Tree of Life. Bulletin of the American Museum of Natural History 297: 1-370) placed this species in the genus *Lithobates* (Fitzinger 1843).

*Rana aurora*

northern red-legged frog

1) An mtDNA study (Shaffer et al. 2004) concluded that *Rana aurora aurora* and *Rana aurora draytonii* should be recognized as separate species with a narrow zone of overlap

*Rana draytonii*

California red-legged frog

1) An mtDNA study (Shaffer et al. 2004) concluded that *Rana aurora aurora* and *Rana aurora draytonii* should be recognized as separate species with a narrow zone of overlap, and that the range of *draytonii* extends about 100 km further north in coastal California than previously thought.

Case 2:26-cv-03396-SVW-BSC    Document 21-1    Filed 05/07/26    Page 478 of 523
Page ID #:989

1) The IUCN designation of Near Threatened refers to the full species.

**CHARADRIIDAE (plovers and relatives)**

*Anarhynchus nivosus nivosus*

western snowy plover

1) Federal listing applies only to the Pacific coastal population.
2) CDFW SSC designation refers to both the coastal and interior populations.

**LARIDAE (gulls and terns)**

*Gelochelidon nilotica*

gull-billed tern

1) Taxonomy recently changed from *Sterna nilotica*.

*Hydroprogne caspia*

Caspian tern

1) Taxonomy recently changed from *Sterna caspia*.

*Sternula antillarum browni*

California least tern

1) Taxonomy recently changed from *Sterna antillarum browni*.

*Thalasseus elegans*

elegant tern

1) Taxonomy recently changed from *Sterna elegans*.

**ALCIDAE (auklets, puffins, and relatives)**

*Synthliboramphus scrippsi*

Scripps's murrelet

1) Formerly included in Xantus's murrelet as *Synthliboramphus hypoleucus scrippsi*. Now considered a full species.

**STRIGIDAE (owls)**

*Athene cunicularia*

burrowing owl

1) A burrow site = an observation of one or more owls at a burrow or evidence of recent occupation such as whitewash and feathers. Winter observations at a burrow are mapped. Winter observations with or without a burrow in San Francisco, Ventura, Sonoma, Marin, Napa, and Santa Cruz Counties are mapped.

*Strix occidentalis caurina*

northern spotted owl

1) There are no spotted owl EOs in the CNDDB. All spotted owl location information is maintained in a separate database (https://wildlife.ca.gov/Data/CNDDB/Spotted-Owl-Info). CNDDB subscribers can access these datasets from the same bookmark as the CNDDB layer in BIOS (https://www.wildlife.ca.gov/Data/BIOS).

*Strix occidentalis occidentalis*

California spotted owl

1) There are no spotted owl EOs in the CNDDB. All spotted owl location information is maintained in a separate database (https://wildlife.ca.gov/Data/CNDDB/Spotted-Owl-Info). CNDDB subscribers can access these datasets from the same bookmark as the CNDDB layer in BIOS (https://www.wildlife.ca.gov/Data/BIOS).
2) On 20230223, coastal-southern California DPS was federally proposed Endangered, and Sierra Nevada DPS was federally proposed Threatened.

## TYRANNIDAE (tyrant flycatchers)

*Empidonax traillii*

willow flycatcher

1) State listing of the full species includes all subspecies.

*Empidonax traillii brewsteri*

little willow flycatcher

1) State listing of the full species includes all subspecies.

*Empidonax traillii extimus*

southwestern willow flycatcher

1) State listing of the full species includes all subspecies.

## LANIIDAE (shrikes)

*Lanius ludovicianus mearnsi*

San Clemente loggerhead shrike

Case 2:26-cv-03396-SVW-BSC    Document 21-1    Filed 05/07/26    Page 480 of 523
Page ID #:991

1) Subspecific identity of shrikes currently on San Clemente is uncertain. Mundy et al. (1997a, b) provided evidence L. l. mearnsi is genetically distinct from *L. l. gambeli* and *L. l. anthonyi*, whereas Patten and Campbell (2000) concluded, based on morphology, that the birds now on San Clemente are intergrades between *L. l. mearnsi* and *L. l. anthonyi*.

**VIREONIDAE (vireos)**

*Vireo bellii arizonae*

Arizona Bell's vireo

1) The IUCN designation of Near Threatened refers to the full species.

*Vireo bellii pusillus*

least Bell's vireo

1) The IUCN designation of Near Threatened refers to the full species.

**TROGLODYTIDAE (wrens)**

*Campylorhynchus brunneicapillus sandiegensis*

coastal cactus wren

1) CDFW Bird Species of Special Concern report uses the common name San Diego cactus wren.

**POLIOPTILIDAE (gnatcatchers)**

*Polioptila californica californica*

coastal California gnatcatcher

1) CDFW Bird Species of Special Concern report uses the common name Alta California gnatcatcher.

**MIMIDAE (mockingbirds and thrashers)**

*Toxostoma lecontei*

Le Conte's thrasher

1) CDFW SSC designation refers only to the San Joaquin population.
2) The BLM Sensitive designation refers to the San Joaquin Le Conte's thrasher, *Toxostoma lecontei macmillanorum*, although the subspecies concept is not universally recognized.

**PASSERELLIDAE (sparrows)**

*Artemisiospiza belli clementeae*

San Clemente Bell's sparrow

1) Subspecific validity uncertain. Recognized by AOU (1957), but not by Patten and Unitt (2002).

# Attachment  5

# CALIFORNIA NATIVE PLANT SOCIETY'S

# Inventory

## OF RARE AND ENDANGERED
## PLANTS OF CALIFORNIA





CALIFORNIA NATIVE PLANT SOCIETY        SPECIAL PUBLICATION #1  SIXTH EDITION

532C, 532D, 547B, 547C, 547D, 548A, 561D, 563C, 564D, 576B, 593C*, 594D

Chaparral (openings), cismontane woodland, meadows and seeps, valley and foothill grassland / serpentinite; elevation 20–900 meters.

Annual herb, blooms April–June.

Possibly threatened by mining, vehicles, and road construction. See *Manual of the Flowering Plants of California*, p. 943 (1925) by W.L. Jepson for original description, and *Systematic Botany* 16(1):658 (1991) for taxonomic treatment.

## Castilleja schizotricha Greenm.

"split-hair Indian paintbrush"
                                      Scrophulariaceae
**List 4 / RED 1-1-2**
Siskiyou; Oregon

Upper montane coniferous forest (decomposed granitic or marble); elevation 1500–2300 meters.

Perennial herb (hemiparasitic), blooms July–August.

Endangered in Oregon.

## Castilleja subinclusa ssp. franciscana

Considered but rejected: too common

## Castilleja uliginosa Eastw.

"Pitkin Marsh Indian paintbrush"
                                      Scrophulariaceae
**List 1A**
**State Endangered**
Sonoma*
502A*

Marshes and swamps (freshwater); elevation 60 meters.

Perennial herb (hemiparasitic), blooms June–July.

Known from two occurrences in Pitkin Marsh and Trembley's Marsh. Last known remaining plant died in 1987, despite management efforts; field surveys needed, although no access allowed by landowner after 1987. See *C. miniata* ssp. *miniata* in *The Jepson Manual*. See *Leaflets of Western Botany* 3:166–117 (1942) for original description.

## Caulanthus amplexicaulis Wats. var. barbarae (J.T. Howell) Munz

"Santa Barbara jewel-flower"   Brassicaceae
**List 1B / RED 3-1-3**
Santa Barbara
168B, 169A, 193C, 194D

Closed-cone coniferous forest, chaparral, cismontane woodland / serpentinite; elevation 470–1220 meters.

Annual herb, blooms May–July.

Known from approximately five occurrences in the San Rafael Mtns. Possibly threatened by grazing. See *Leaflets of Western Botany* 9:223 (1962) for original description.

## Caulanthus californicus (Wats.) Pays.

"California jewel-flower"        Brassicaceae
**List 1B / RED 3-3-3**
**State Endangered/Federal Endangered**
Fresno, Kings*, Kern, Santa Barbara, San Luis Obispo, Tulare*, Ventura*

191B*, 191C*, 192A, 192B*, 192D, 214A*, 216B*, 217C, 217D, 218A*, 219D*, 239B*, 239A*, 239D*, 240A*, 240B*, 242B*, 244C, 262D*, 264D*, 265A, 265C*, 266A*, 266B*, 267A*, 287B*, 287C*, 287D*, 288D*, 291B*, 291C*, 291D*, 310C*, 311A*, 314A*, 314C*, 315A*, 315C*, 315D

Chenopod scrub, pinyon and juniper woodland, valley and foothill grassland / sandy; elevation 70–1000 meters.

Annual herb, blooms February–May.

Need historical quads for Ventura County. Over 35 historical occurrences extirpated; new populations recently discovered. Threatened by agriculture, urbanization, energy development, and grazing, and possibly by non-native plants. See *Fremontia* 16(1):18–19 (1988) for species account.

## Caulanthus coulteri Wats. var. lemmonii (Wats.) Munz

"Lemmon's jewelflower"          Brassicaceae
**List 1B / RED 2-2-3**
Alameda*, Fresno, Kings, Kern, Monterey, Santa Barbara, San Benito, San Joaquin, San Luis Obispo, Stanislaus, Ventura

166B, 190A, 191B, 192B, 192C, 217C, 218A, 243D, 244A, 244B, 244C, 245A, 245D, 267A, 267B, 267C, 268A, 269B, 269C, 270A, 291B, 291C, 292D, 293D, 294C, 295A, 317A, 338B, 339A, 342D, 424B, 445A, 445D

Pinyon and juniper woodland, valley and foothill grassland; elevation 80–1220 meters.

Annual herb, blooms March–May.

Need quads for San Benito County. Threatened by development. See *Proceedings of the American Academy of Arts and Sciences* 23:261 (1888) for original description, and *Aliso* 4(3):503 (1960) for revised nomenclature.

## Caulanthus glaucus

Considered but rejected: too common

## Caulanthus heterophyllus var. pseudosimulans

Considered but rejected: not yet published

## Caulanthus major (Jones) Pays. var. nevadensis Roll.

"slender jewelflower"           Brassicaceae
**List 4 / RED 1-1-1**
Alpine, Lassen, Plumas; Nevada, Oregon

Pinyon and juniper woodland (often rocky); elevation 1500–2500 meters.

Perennial herb, blooms June–July.

Candidate for state listing in Oregon.

## Caulanthus simulans Pays.

"Payson's jewel-flower"          Brassicaceae
**List 4 / RED 1-2-3**
Riverside, San Diego

Chaparral, coastal scrub / sandy, granitic; elevation 90–2200 meters.

Annual herb, blooms March–June.

Confused with *C. heterophyllus* var. *pseudosimulans* (unpublished), which is more coastal and, unlike *C. simulans*, appears after fires. Some populations threatened by proposed reservoir construction, but many populations occur on public lands (Anza Borrego SP, BLM, and USFS). Also threatened by urbanization, grazing, and road construction.

## Caulanthus stenocarpus

Considered but rejected: a synonym of *C. heterophyllus* var. *heterophyllus*; a common taxon

## Caulostramina jaegeri (Roll.) Roll.

"Jaeger's caulostramina"         Brassicaceae
**List 1B / RED 3-2-3**
Inyo
349C, 350B, 350D, 392D

Great Basin scrub, pinyon and juniper woodland, subalpine coniferous forest / carbonate, rocky; elevation 2135–2800 meters.

Perennial herb, blooms May–July.

Known from approximately five occurrences in the Inyo Mtns. See *Contributions from the Dudley Herbarium* 3:174 (1941) for original description, and *Contributions from the Gray Herbarium* 204:155–157 (1973) for revised nomenclature.

## Deinandra arida (Keck) B.G. Baldwin

"Red Rock tarplant"                    Asteraceae

**List 1B / RED 3-2-3**

**State Rare**

Kern

235B, 235C

Mojavean desert scrub (clay, volcanic tuff); elevation 300–950 meters.

Annual herb, blooms April–November.

Known from fewer than ten occurrences near Red Rock Cyn. in the Mojave Desert. Protected at Red Rock Cyn. SP. State-listed as *Hemizonia arida*; see this name in *The Jepson Manual*. See *Aliso* 4(1):109 (1958) for original description, and *Novon* 9:462–471 (1999) for revised nomenclature.

## Deinandra bacigalupi B.G. Baldwin

"Livermore tarplant"                    Asteraceae

**List 1B / RED 3-2-3**

Alameda

445B

Meadows and seeps (alkaline); elevation 150–185 meters.

Annual herb, blooms June–October.

Known from only two occurrences near Livermore. Needs field surveys. Potentially threatened by development. Not in *The Jepson Manual*. See *Madroño* 46(1):55 (1999) for original description.

## Deinandra clementina (Bdg.) B.G. Baldwin

"island tarplant"                    Asteraceae

**List 4 / RED 1-1-3**

Anacapa Island, Santa Barbara Island, San Clemente Island, Santa Catalina Island, San Nicolas Island

Coastal bluff scrub, valley and foothill grassland; elevation 15–200 meters.

Shrub (deciduous), blooms April–July.

A synonym of *Hemizonia clementina* in *The Jepson Manual*. See *Erythea* 7:70 (1899) for original description, and *Novon* 9:462–471 (1999) for revised nomenclature.

## Deinandra conjugens (Keck) B.G. Baldwin

"Otay tarplant"                    Asteraceae

**List 1B / RED 3-3-2**

**State Endangered/Federal Threatened**

San Diego; Baja California

10B, 10C, 11A, 11B, 11D

Coastal scrub, valley and foothill grassland / clay; elevation 25–300 meters.

Annual herb, blooms May–June.

Threatened by development, agriculture, vehicles, illegal dumping, non-native plants, and Border Patrol activities. Known in Baja California from only one occurrence. State and federally listed as *Hemizonia conjugens*; see this name in *The Jepson Manual*. See *Aliso* 4(1):109 (1958) for original description, *Madroño* 25(3):159 (1978) for information on distribution and taxonomy, and *Novon* 9:462–471 (1999) for revised nomenclature.

## Deinandra floribunda Davids. & Moxley

"Tecate tarplant"                    Asteraceae

**List 1B / RED 2-2-2**

San Diego; Baja California

7B, 8A, 8D, 9B*, 9C, 9D, 19C, 19D

Chaparral, coastal scrub; elevation 70–1220 meters.

Annual herb, blooms August–October.

Threatened by development. A synonym of *Hemizonia floribunda* in *The Jepson Manual*. See *Novon* 9:462–471 (1999) for taxonomic treatment.

## Deinandra halliana (Keck) B.G. Baldwin

"Hall's tarplant"                    Asteraceae

**List 1B / RED 3-3-3**

Fresno, Monterey, San Benito, San Luis Obispo

244A, 268A, 268B, 292D, 315C, 316D, 339A, 339B, 340C, 362D

Chenopod scrub, cismontane woodland, valley and foothill grassland / clay; elevation 300–950 meters.

Annual herb, blooms April–May.

Threatened by grazing and non-native plants. Appears only in unusually wet years. A synonym of *Hemizonia clementina* in *The Jepson Manual*. See *Madroño* 3(1):12 (1935) for original description, and *Novon* 9:462–471 (1999) for revised nomenclature.

## Deinandra increscens (H.M Hall) B.G. Baldwin ssp. foliosa (Hoover) B.G. Baldwin

"leafy tarplant"                    Asteraceae

**List 1B / RED 2-2-3**

Monterey?, Santa Barbara, San Luis Obispo

196A, 220B, 245C, 245D

Valley and foothill grassland; elevation 300–500 meters.

Annual herb, blooms June–September.

Does plant occur in Monterey County? Threatened by development. See *The Vascular Plants of San Luis Obispo County, California*, p. 288 (1970) by R.F. Hoover for original description, and *Novon* 9:462–471 (1999) for revised nomenclature.

## Deinandra increscens (Keck) B.G. Baldwin ssp. villosa (Tanowitz) B.G. Baldwin

"Gaviota tarplant"                    Asteraceae

**List 1B / RED 3-3-3**

**State Endangered/Federal Endangered**

Santa Barbara

144B, 145A, 171D, 196D

Coastal bluff scrub, coastal scrub, valley and foothill grassland; elevation 35–430 meters.

Annual herb, blooms May–October.

Known from fewer than ten occurrences. Seriously threatened by energy development and non-native plants. Conservation bank established by DFG in 1996. State and federally-listed as *Hemizonia increscens* ssp. *villosa*; see this name in *The Jepson Manual*. See *Systematic Botany* 7(3):314–339 (1982) for original description, and *Novon* 9:462–471 (1999) for revised nomenclature.

## Deinandra minthornii (Jeps.) B.G. Baldwin

"Santa Susana tarplant"                    Asteraceae

**List 1B / RED 2-2-3**

**State Rare**

Los Angeles, Ventura

112B, 112C, 113A, 113C, 113D, 138C, 138D

Chaparral, coastal scrub / rocky; elevation 280–760 meters.

Shrub (deciduous), blooms July–November.

Threatened by development. State-listed as *Hemizonia minthornii*; see this name in *The Jepson Manual*. See *Manual of the Flowering Plants of California*, p. 1092 (1925) by W.L. Jepson for original description, and *Novon* 9:462–471 (1999) for revised nomenclature.

## Monardella robisonii Epl.

"Robison's monardella"    Lamiaceae
**List 1B / RED 3-1-3**

Riverside, San Bernardino

81A, 100B, 102C, 103B, 103D, 104D

Pinyon and juniper woodland; elevation 610–1500 meters.

Perennial herb (rhizomatous), blooms April–October.

Known from fewer than twenty occurrences. May occur in Baja California; need confirmation. Closely related to and possibly a variety of *M. linoides*.

## Monardella scelerata

Considered but rejected: not published

## Monardella stebbinsii Hardham & Bartel

"Stebbins's monardella"    Lamiaceae
**List 1B / RED 3-1-3**

Plumas

606C

Broadleaved upland forest, chaparral, lower montane coniferous forest / serpentinite, rocky; elevation 780–1100 meters.

Perennial herb (rhizomatous), blooms July–September.

Known from only four occurrences along the North Fork of the Feather River. Possibly threatened by mining. See *Aliso* 12(4): 693–699 (1990) for original description.

## Monardella undulata Benth.

"curly-leaved monardella"    Lamiaceae
**List 4 / RED 1-2-3**

Monterey, Marin, Santa Barbara, Santa Cruz, San Francisco, San Luis Obispo, San Mateo, Sonoma

Closed-cone coniferous forest, chaparral, coastal dunes, coastal prarie, coastal scrub, lower montane coniferous forest (ponderosa pine sandhills) / sandy; elevation 0–305 meters.

Annual herb, blooms May–September.

Threatened by coastal development, sand mining, and non-native plants.

## Monardella undulata var. frutescens

See *Monardella frutescens*

## Monardella villosa Benth. ssp. globosa (Greene) Jokerst

"robust monardella"    Lamiaceae
**List 1B / RED 3-2-3**

Alameda, Contra Costa, Humboldt, Lake, Mendocino, Napa, San Mateo, Sonoma

428C, 446C, 447A, 465B, 465C, 482C, 482D, 499D, 503D, 518D, 519A, 600B, 635C

Chaparral (openings), cismontane woodland, coastal scrub; elevation 185–600 meters.

Perennial herb (rhizomatous), blooms June–July.

Known from approximately ten occurrences. Most not recently seen; need field surveys. Need quads for Lake and Marin counties. See *Pittonia* 5:82 (1902) for original description, and *Phytologia* 72(1):9–16 (1992) for revised nomenclature.

## Monardella villosa ssp. obispoensis

Considered but rejected: too common

## Monardella viridis Jeps. ssp. saxicola (Jtn.) Ewan

"rock monardella"    Lamiaceae
**List 4 / RED 1-2-3**

Los Angeles, San Bernardino

Chaparral, lower montane coniferous forest / rocky; elevation 500–1800 meters.

Perennial herb (rhizomatous), blooms June–September.

Threatened by development.

## Monardella viridis Jeps. ssp. viridis

"green monardella"    Lamiaceae
**List 4 / RED 1-1-3**

Lake, Napa, Solano, Sonoma

Broadleaved upland forest, chaparral, cismontane woodland; elevation 300–1010 meters.

Perennial herb (rhizomatous), blooms July–September.

Hybridizes with *M. villosa* ssp. *villosa*.

## Moneses uniflora (L.) Gray

"woodnymph"    Ericaceae
**List 4 / RED 1-1-1**

Del Norte, Fresno, Humboldt, Siskiyou; Oregon, Washington, and elsewhere

Broadleaved upland forest, North Coast coniferous forest; elevation 100–1065 meters.

Perennial herb, blooms May–July.

## Monolopia congdonii (Gray) B.G. Baldwin

"San Joaquin woollythreads"    Asteraceae
**List 1B / RED 2-2-3**
**Federal Endangered**

Fresno, Kings, Kern, Santa Barbara, San Benito, San Luis Obispo, Tulare*

167C, 192A*, 192B, 192D, 217B, 217C, 217D, 218A, 218C, 218D, 239A*, 239B*, 239D, 240A*, 240B*, 240C, 241B, 242B, 243A*, 265B*, 265C, 265D*, 266D*, 287B*, 290B, 290C, 291A*, 291B*, 313C*, 314A*, 314B*, 314C, 314D, 315A*, 315C, 315D, 338A*, 338B*, 338D*, 360B*, 360C*, 361B*, 361C, 361D

Chenopod scrub, valley and foothill grassland (sandy); elevation 60–800 meters.

Annual herb, blooms February–May.

Approximately half of historical occurrences extirpated. Seriously threatened by agricultural conversion, energy development, urbanization, grazing, trampling, and vehicles. Federally-listed as *Lembertia congdonii*; see this name in *The Jepson Manual*. See *Proceedings of the American Academy of Arts and Sciences* 19:20 (1883) for original description, and *Novon* 9:460–461 (1999) for revised nomenclature.

## Monolopia major

Considered but rejected: too common

## Monotropa hypopithys

Considered but rejected: too common

## Monotropa uniflora L.

"Indian-pipe"    Ericaceae
**List 2 / RED 2-2-1**

Del Norte, Humboldt; Oregon, Washington, and elsewhere

672C, 740C, 740D

Broadleaved upland forest, North Coast coniferous forest; elevation 10–200 meters.

Perennial herb (achlorophyllous), blooms June–July.

## Montia funstonii

Considered but rejected: a synonym of *M. fontana*; a common taxon

## Ophioglossum vulgatum

See *Ophioglossum pusillum*

## Opuntia basilaris Engelm. & Bigel. var. brachyclada (Griffiths) Munz

"short-joint beavertail"        Cactaceae

**List 1B / RED 3-2-3**

Los Angeles, San Bernardino

133B, 133C, 133D, 134A, 134B, 134D, 135A, 135B, 136A, 138A, 161C, 161D, 175B, 176A

Chaparral, Joshua tree "woodland", Mojavean desert scrub, pinyon and juniper woodland; elevation 425–1800 meters.

Shrub (stem succulent), blooms April–June.

Threatened by urbanization, mining, horticultural collecting, grazing, and vehicles. Angeles NF has adopted species management guidelines. See *Proceedings of the Biological Society of Washington* 27:25 (1914) for original description.

## Opuntia basilaris Engelm. & Bigel. var. treleasei (Coult.) Toumey

"Bakersfield cactus"        Cactaceae

**List 1B / RED 3-3-3**

**State Endangered/Federal Endangered**

Kern

214A, 214C, 214D, 215D, 238C, 238D*, 239A, 239B, 239C*, 239D, 240A*, 263D

Chenopod scrub, cismontane woodland, valley and foothill grassland / sandy or gravelly; elevation 120–550 meters.

Shrub (stem succulent), blooms May.

Threatened by energy development, agricultural conversion, grazing, vehicles, and especially urbanization in the Bakersfield area. Known by 1991 to be extirpated at eleven of thirty-five occurrences. USFWS uses the name *O. treleasei*. See *Contributions from the U.S. National Herbarium* 3:434 (1896) for original description, *Wasmann Journal of Biology* 25:289–290 (1967) for species account, and *Madroño* 39(1):79 (1992) for information on a new population.

## Opuntia bigelovii var. hoffmannii

Considered but rejected: a hybrid (*O. xfosbergii*)

## Opuntia californica (T. & G.) Cov. var. californica

"snake cholla"        Cactaceae

**List 1B / RED 3-3-2**

San Diego; Baja California

10C, 11A, 11B, 11D

Chaparral, coastal scrub; elevation 30–150 meters.

Shrub (stem succulent), blooms April–May.

Threatened by development. A synonym of *O. parryi* var. *serpentina* in *The Jepson Manual*; see *O. parryi*. See *Haseltonia* 4:103 (1996) for taxonomic discussion.

## Opuntia curvospina Griffiths

"curved-spine beavertail"        Cactaceae

**List 2 / RED 3-2-2**

San Bernardino; Arizona, Nevada

201A, 224C, 225A

Chaparral, Mojavean desert scrub, pinyon and juniper woodland; elevation 1000–1400 meters.

Shrub (stem succulent), blooms April–June.

Known in California from fewer than five occurrences. Stabilized hybrid between *O. phaeacantha* and *O. chlorotica*; see the latter in *The Jepson Manual*. See *Bulletin of the Torrey Botanical Club* 43:88 (1916) for original description, *Systematic Botany* 5(4):408–418 (1980) for discussion of hybrid origin, and *Haseltonia* 4:103–104 (1996) for nomenclatural information.

## Opuntia fragilis (Nutt.) Haw.

"brittle prickly-pear"        Cactaceae

**List 2 / RED 3-3-1**

Siskiyou; Arizona, Nevada, Oregon, and elsewhere

716B

Pinyon and juniper woodland (volcanic); elevation 880 meters.

Shrub (stem succulent), blooms April–July.

Known in California from only two populations near Owl's Head in the Shasta Valley. Probably reduced by grazing.

## Opuntia munzii C.B. Wolf

"Munz's cholla"        Cactaceae

**List 1B / RED 3-1-3**

Imperial, Riverside

27D, 42B, 42C, 43A, 43D

Sonoran desert scrub (sandy or gravelly); elevation 150–600 meters.

Shrub (stem succulent), blooms May.

Known from fewer than ten occurrences in the Chocolate Mtns. Of hybrid origin, but stabilized; only reproducing vegetatively. Some occurrences threatened by military activities.

## Opuntia parryi var. serpentina

See *Opuntia californica* var. *californica*

## Opuntia phaeacantha var. major

Considered but rejected: too common and taxonomic problem

## Opuntia phaeacantha var. mojavensis

Considered but rejected: a synonym of *O. phaeacantha*; a common taxon

## Opuntia prolifera

Considered but rejected: too common

## Opuntia pulchella Engelm.

"beautiful cholla"        Cactaceae

**List 2 / RED 2-2-1**

Inyo, Mono; Arizona?, Nevada, Utah, and elsewhere

411B, 411C, 412D, 431A

Desert dunes, Great Basin scrub?, Mojavean desert scrub / sandy; elevation 1500–1980 meters.

Shrub (stem succulent), blooms May–June.

Threatened by grazing impacts. See *Transactions of the Academy of Science of St. Louis* 2:201 (1863) for original description, and *Madroño* 32(2):123 (1985) for first California records.

## Opuntia treleasei

See *Opuntia basilaris* var. *treleasei*

## Opuntia wigginsii L. Benson

"Wiggins's cholla"        Cactaceae

**List 3 / RED 3-1-2**

Imperial, Riverside, San Diego; Arizona

18A, 18B, 30C, 32C, 40B

Sonoran desert scrub (sandy); elevation 30–885 meters.

Shrub (stem succulent), blooms March.

Apparently a sporadic hybrid between *O. ramosissima* and *O. echinocarpa*; needs further study. See *O. ramosissima* in *The Jepson Manual*.

## Opuntia wolfii (Benson) Baker

"Wolf's cholla"        Cactaceae

**List 4 / RED 1-1-3**

Imperial, San Diego; Baja California?

Sonoran desert scrub; elevation 300–1200 meters.

Shrub (stem succulent), blooms April–May.

# Attachment  6





CNPS Rare Plant Inventory

# Rare Plant Inventory

## A Science-Driven Approach

©2003 Norman Jensen

**Featured Rare Plant**

*Lupinus tracyi*

Tracy's lupine

**Version v-9.5.1a** Release Notes

Search for species name or Keyword    Go

Simple Search   |   Advanced Search

Plummer's mariposa-lily (*Calochortus plummerae*). Credit Lara Hartley.

## Additions / Changes / Deletions

NAME

*Mimulus rattanii* ssp. *decurtatus*
changed from 4.2 to CBR on 2026-02-25

*Mimulus subsecundus*
changed from 4.3 to CBR on 2026-02-25

*Spermolepis lateriflora*
changed from 2A to 2B.3 on 2026-02-25

*Githopsis diffusa* ssp. *filicaulis*
changed from 3.1 to 1B.2 on 2026-01-21

*Tripterocalyx micranthus*
changed from 2B.3 to 2B.2 on 2025-12-23

*Phacelia sericea* var. *ciliosa*

**Status Review Documents**      **Propose Status Changes**

## Currently in Review

NAME

Status Review Forum          Reviewer Signup

**Suggested Citation:**

California Native Plant Society, Rare Plant Program. 2026. Rare Plant Inventory (online edition, v9.5.1). Website https://www.rareplants.cnps.org [accessed 19 March 2026].

}

# Attachment 7

# SOUTHERN CALIFORNIA STEELHEAD RECOVERY PLAN





**Southwest Regional Office**
**National Marine Fisheries Service**
**Long Beach, CA**

January 2012

## 1.2 Southern California Steelhead Listing History

After NMFS completed a comprehensive status review of all West Coast steelhead populations (Busby *et al.* 1996), southern California populations were proposed for listing by NMFS as an endangered Evolutionarily Significant Unit (ESU) on August 9, 1996 (61 FR 56138). An ESU is composed of a group of conspecific populations that are substantially reproductively–isolated from other conspecific populations, and that possess important elements of the evolutionary legacy of the species which are expressed genetically and phenotypically that have adaptive value (56 FR 224, Waples 1998, 1995, 1991a, 1991b). The Southern California Steelhead ESU was formally listed as endangered on August 18, 1997 (62 FR 43937). The original ESU boundaries during the first listing of 1997 were from the Santa Maria River south to Malibu Creek. Following this initial listing, *O. mykiss* were discovered in watersheds south of Malibu Creek (Topanga Creek in Los Angeles County and San Mateo Creek in Orange, Riverside, and San Diego Counties) and genetic testing confirmed that these *O. mykiss* were most closely related to the more northern populations of the Southern California Steelhead ESU. This resulted in the range for the ESU being extended south to the U.S.-Mexico border on May 1, 2002 (67 FR 21586).

During the time between the initial listing and a subsequent re-listing in 2006, NMFS adopted the DPS designation for steelhead to replace the ESU designation to be consistent with the listing policies and practices of the U. S. Fish and Wildlife Service. A DPS designation (61 FR 4722) uses similar but slightly different criteria from the ESU designation for determining when a group of organisms constitutes a DPS under the Endangered Species Act (ESA). A DPS is a population or group of populations that is discrete from other populations of the same taxon, and significant to its taxon. A group of

organisms is discrete if it is "markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, and behavioral factors." While a group of organisms is discrete if it is "markedly separated from other populations of the same taxon" it does not have to exhibit reproductive isolation under the DPS designation.

Following a subsequent status review of West Coast steelhead populations in 2005 (Good *et al.* 2005), a final listing determination for the endangered southern California steelhead as a DPS was issued on January 5, 2006 (71 FR 834).

The final designation for the Southern California Steelhead DPS encompasses all naturally spawned steelhead between the Santa Maria River (inclusive) and the U.S.-Mexico border. Consequently, this DPS includes only those *O. mykiss* whose freshwater habitat occurs below impassible barriers, whether artificial or natural, and which exhibit an anadromous life history. Individuals that have originated in freshwater above impassible barriers and exhibit an anadromous life history are also considered as part of the DPS when they are within waters below the most downstream impassible barriers.

## 1.3 Designated Critical Habitat

The ESA requires NMFS to designate critical habitat for all listed species. Critical habitat is defined as specific areas where physical or biological features essential to the conservation (recovery) of the species exist and may require special management considerations or protection. For recovery planning and implementation purposes, these physical or biological features can be viewed as the set of habitat characteristics or conditions that are the end goal of many recovery actions.

When designating critical habitat, NMFS considers certain habitat features called "Primary Constituent Elements" (PCEs) that are

essential to support one or more life history stage(s) of the listed species (50 CFR 424.12b). PCEs considered essential for the conservation of the Southern California Steelhead DPS are those sites and habitat components that support one or more life stages and contain physical or biological features essential to survival, growth, and reproduction. These PCEs include:

- ❑ **Freshwater spawning sites** with sufficient water quantity and quality as well as adequate substrate (*i.e.*, spawning gravels of appropriate sizes) to support spawning, incubation and development.
- ❑ **Freshwater rearing sites** with sufficient water quantity and floodplain connectivity to form and maintain physical habitat conditions and allow development and mobility; sufficient water quality to support growth and development; food and nutrient resources such as terrestrial and aquatic invertebrates and forage fish; and natural cover such as shade, submerged and overhanging large wood, log jams, aquatic vegetation, large rocks and boulders, side channels, and undercut banks.
- ❑ **Freshwater migration corridors** free of obstruction and excessive risk of predation with adequate water quantity to allow for juvenile and adult mobility; cover, shelter, and holding areas for juveniles and adults; and adequate water quality to allow for survival.
- ❑ **Estuarine areas** that provide uncontaminated water and substrates; food and nutrient sources to support growth and development; and connected shallow water areas and wetlands to conceal and shelter

juveniles. Estuarine areas include coastal lagoons that are seasonally stable, predominantly freshwater-flooded habitats that remain disconnected from the marine environment except during high streamflow events, and tidally-influenced estuaries that provide a dynamic shallow water environment.

- ❑ **Marine areas** with sufficient water quality to support growth, development and mobility; food and nutrient resources such as marine invertebrates and forage fish; and nearshore marine habitats with adequate depth, cover and marine vegetation to provide shelter.

The final critical habitat designation for the Southern California Steelhead DPS was issued on September 2, 2005 (70 FR 52488). A total of 708 miles of stream habitat was designated as critical habitat from the 32 watersheds within the range of this DPS. Critical habitat for the Southern California Steelhead DPS includes most, but not all, occupied habitat from the Santa Maria River in southern San Luis Obispo County to San Mateo Creek in northern San Diego County, but excludes some occupied habitat based on economic considerations and all military lands with occupied habitat. Critical habitat was not designated for most of the watersheds south of Malibu Creek with the exception of San Juan Creek and San Mateo Creek. The stream channels with designated critical habitat are listed in 70 FR 52488. A review of the current critical habitat designations may result in modifications of the current critical habitat designations, including the addition of unoccupied habitat which exhibit PCEs.

# Attachment 8



# United States Department of the Interior

**FISH AND WILDLIFE SERVICE**
Ventura Fish And Wildlife Office
2493 Portola Road, Suite B
Ventura, CA 93003-7726
Phone: (805) 644-1766 Fax: (805) 644-3958
Email Address: FW8VenturaSection7@FWS.Gov

Emergency Special Permit
Pipeline and Hazardous Materials Safety Administration
Project code: 2026-0052879

The U.S. Fish and Wildlife Service (Service) received the Federal Lead Agency's 02/20/2026 19:00:57 UTC request to consult, pursuant to the emergency Endangered Species Act (ESA) section 7 consultation procedures, for the Project. The Federal Lead Agency determined their action is an emergency based upon implementation of Executive Order 14156 (Declaring a National Energy Emergency) [1]. The ESA section 7 implementing regulations include a consultation process to address emergencies and the need to consult on discretionary federal actions in an expedited manner (50 CFR 402.05). These regulations apply "to situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." 50 CFR 402.05(a). (Refer to Chapter 8 of the 1998 Endangered Species Consultation Handbook (Consultation Handbook) for more detailed information on emergency consultations.) When using emergency consultation procedures, federal agencies must still comply with section 7(a)(2) of the ESA by ensuring that their actions are not likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of designated critical habitat (16 U.S.C. 1531 et seq.).

Pursuant to 50 CFR 402.05(a), "Where emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures that the Director determines to be consistent with the requirements of sections 7(a)-(d) of the Act." As part of the IPaC project entry for this project, the Federal Lead Agency indicated that it has less than seven days to informally coordinate with the Service pursuant to 50 CFR 402.05(a). IPaC will automatically notify the local field office identified in the Official Species List of your emergency consultation request and may provide additional technical assistance. However, the Federal Lead Agency does NOT have to wait on field office communication before implementing its response action, provided it retains a copy of this letter demonstrating compliance with 50 CFR 402.05(a).

Based upon the information provided by the Federal Lead Agency, please reference the hyperlinks included in the Official Species List for General Project Design Guidelines providing recommendations to help avoid or minimize adverse effects to listed species and designated critical habitat. In these cases, the Service may provide additional avoidance and minimization measures informally through alternate procedures, pursuant to 50 CFR 402.05(a). The Service recommends early and ongoing communication with Service field office personnel prior to and during implementation of an emergency action. Additionally, there may be tools (e.g., existing programmatic consultations, determination keys, etc.) that will help the Federal Lead Agency to conclude consultation prior to the implementation of actions that may affect listed species or designated habitat.

Using these tools and working with Service during this informal coordination process under 50 CFR 402.05(a) will also help to streamline the Federal Lead Agency's later compliance with 50 CFR 402.05(b), which requires Federal Lead Agencies to provide the Service with the information necessary to initiate consultation, per 50 CFR 402.13(c) and 402.14(c)(1),plus (1) a description of the emergency actions; (2) a justification for the expedited consultation; and (3) an evaluation of the impacts of the emergency response on affected species and their habitats, including documentation of how the Service's recommendations were implemented and the results of implementation in minimizing impacts to those species and habitats. In accordance with 50 CFR 402.05(b), the Service will use this information to subsequently issue a biological opinion or letter of concurrence, as appropriate. Thank you for the opportunity to assist the Federal Lead Agency in complying with section 7(a)(2) of the ESA.

Sincerely,

**Ventura Fish And Wildlife Office**
2493 Portola Road, Suite B
Ventura, CA 93003-7726
(805) 644-1766

---

[1]On April 23, 2025, the Department of the Interior (Department) announced alternative procedures for conducting emergency section 7 consultation for energy projects covered under Executive Order (EO) 14156 "Declaring a National Energy Emergency." Prior to informally coordinating with the Service pursuant to item 4 of the Department's alternative procedures, the Federal action agency and applicant (if any) must follow items 1-3 of the Department's alternative procedures.

# Attachment 9



# United States Department of the Interior



**FISH AND WILDLIFE SERVICE**
Ventura Fish And Wildlife Office
2493 Portola Road, Suite B
Ventura, CA 93003-7726
Phone: (805) 644-1766 Fax: (805) 644-3958
Email Address: FW8VenturaSection7@FWS.Gov

In Reply Refer To:                                              02/20/2026 19:00:40 UTC
Project Code: 2026-0052879
Project Name: Emergency Special Permit

Subject:  List of threatened and endangered species that may occur in your proposed project
          location or may be affected by your proposed project

To Whom It May Concern:

The enclosed list identifies species listed as threatened and endangered, species proposed for
listing as threatened or endangered, designated and proposed critical habitat, and species that are
candidates for listing that may occur within the boundary of the area you have indicated using
the U.S. Fish and Wildlife Service's (Service) Information Planning and Conservation System
(IPaC). The species list fulfills the requirements under section 7(c) of the Endangered Species
Act (Act) of 1973, as amended (16 U.S.C. 1531 et seq.). Please note that under 50 CFR
402.12(e) of the regulations implementing section 7 of the Act, the species list should be verified
after 90 days. We recommend that verification be completed by visiting the IPaC website at
regular intervals during project planning and implementation for updates to species lists
following the same process you used to receive the enclosed list. Please include the Consultation
Tracking Number in the header of this letter with any correspondence about the species list.

Due to staff shortages and excessive workload, we are unable to provide an official list more
specific to your area. Numerous other sources of information are available for you to narrow the
list to the habitats and conditions of the site in which you are interested. For example, we
recommend conducting a biological site assessment or surveys for plants and animals that could
help refine the list.

If a Federal agency is involved in the project, that agency has the responsibility to review its
proposed activities and determine whether any listed species may be affected. If the project is a
major construction project*, the Federal agency has the responsibility to prepare a biological
assessment to make a determination of the effects of the action on the listed species or critical
habitat. If the Federal agency determines that a listed species or critical habitat is likely to be
adversely affected, it should request, in writing through our office, formal consultation pursuant
to section 7 of the Act. Informal consultation may be used to exchange information and resolve
conflicts with respect to threatened or endangered species or their critical habitat prior to a

written request for formal consultation. During this review process, the Federal agency may engage in planning efforts but may not make any irreversible commitment of resources. Such a commitment could constitute a violation of section 7(d) of the Act.

Federal agencies are required to confer with the Service, pursuant to section 7(a)(4) of the Act, when an agency action is likely to jeopardize the continued existence of any proposed species or result in the destruction or adverse modification of proposed critical habitat (50 CFR 402.10(a)). A request for formal conference must be in writing and should include the same information that would be provided for a request for formal consultation. Conferences can also include discussions between the Service and the Federal agency to identify and resolve potential conflicts between an action and proposed species or proposed critical habitat early in the decision-making process. The Service recommends ways to minimize or avoid adverse effects of the action. These recommendations are advisory because the jeopardy prohibition of section 7(a)(2) of the Act does not apply until the species is listed or the proposed critical habitat is designated. The conference process fulfills the need to inform Federal agencies of possible steps that an agency might take at an early stage to adjust its actions to avoid jeopardizing a proposed species.

When a proposed species or proposed critical habitat may be affected by an action, the lead Federal agency may elect to enter into formal conference with the Service even if the action is not likely to jeopardize or result in the destruction or adverse modification of proposed critical habitat. If the proposed species is listed or the proposed critical habitat is designated after completion of the conference, the Federal agency may ask the Service, in writing, to confirm the conference as a formal consultation. If the Service reviews the proposed action and finds that no significant changes in the action as planned or in the information used during the conference have occurred, the Service will confirm the conference as a formal consultation on the project and no further section 7 consultation will be necessary. Use of the formal conference process in this manner can prevent delays in the event the proposed species is listed or the proposed critical habitat is designated during project development or implementation.

Candidate species are those species presently under review by the Service for consideration for Federal listing. Candidate species should be considered in the planning process because they may become listed or proposed for listing prior to project completion. Preparation of a biological assessment, as described in section 7(c) of the Act, is not required for candidate species. If early evaluation of your project indicates that it is likely to affect a candidate species, you may wish to request technical assistance from this office.

Only listed species receive protection under the Act. However, sensitive species should be considered in the planning process in the event they become listed or proposed for listing prior to project completion. We recommend that you review information in the California Department of Fish and Wildlife's Natural Diversity Data Base. You can contact the California Department of Fish and Wildlife at (916) 324-3812 for information on other sensitive species that may occur in this area.

[*A Biological Assessment is required for construction projects (or other undertakings having similar physical impacts) that are major Federal actions significantly affecting the quality of the

human environment as defined in the National Environmental Policy Act (42 U.S.C. 4332(2)(c)). For projects other than major construction activities, the Service suggests that a biological evaluation similar to a Biological Assessment be prepared to determine whether the project may affect listed or proposed species and/or designated or proposed critical habitat. Recommended contents of a Biological Assessment are described at 50 CFR 402.12.

**Note:** IPaC has provided all available attachments because this project is in multiple field office jurisdictions.

Attachment(s):

- Official Species List
- USFWS National Wildlife Refuges and Fish Hatcheries
- Bald & Golden Eagles
- Migratory Birds
- Wetlands

# OFFICIAL SPECIES LIST

This list is provided pursuant to Section 7 of the Endangered Species Act, and fulfills the requirement for Federal agencies to "request of the Secretary of the Interior information whether any species which is listed or proposed to be listed may be present in the area of a proposed action".

This species list is provided by:

**Ventura Fish And Wildlife Office**
2493 Portola Road, Suite B
Ventura, CA 93003-7726
(805) 644-1766

This project's location is within the jurisdiction of multiple offices. However, only one species list document will be provided for all offices. The species and critical habitats in this document reflect the aggregation of those that fall in each of the affiliated office's jurisdiction. Other offices affiliated with the project:

**Sacramento Fish And Wildlife Office**
Federal Building
2800 Cottage Way, Room W-2605
Sacramento, CA 95825-1846
(916) 414-6600

# PROJECT SUMMARY

Project Code:          2026-0052879
Project Name:          Emergency Special Permit
Project Type:          Pipeline - Onshore - Maintenance / Modification - Above Ground
Project Description:   PHMSA proposes to issue an ESP that waives certain compliance
requirements of 49 CFR § 195.452(h)(4)(iii)(H) to allow for a more
stringent integrity management schedule. The purpose of the action is to
facilitate the safe restart and operation of pipeline segments CA-324 and
CA-325 by mandating more frequent In-Line Inspections (ILI) and
immediate repair of anomalies that exceed specific safety thresholds.

The proposed action does not authorize new pipeline construction.
Activities are limited to preventative maintenance (localized excavations
to inspect and repair pipeline anomalies) within the existing, previously
disturbed Right-of-Way (ROW).

Project Location:
The approximate location of the project can be viewed in Google Maps: https://
www.google.com/maps/@34.78156205,-120.18661329384105,14z



Counties:  Kern , San Luis Obispo , and Santa Barbara counties, California

Project code: 2026-0052879                                    02/20/2026 19:00:40 UTC

# ENDANGERED SPECIES ACT SPECIES

There is a total of 31 threatened, endangered, or candidate species on this species list.

Species on this list should be considered in an effects analysis for your project and could include species that exist in another geographic area. For example, certain fish may appear on the species list because a project could affect downstream species.

IPaC does not display listed species or critical habitats under the sole jurisdiction of NOAA Fisheries[1], as USFWS does not have the authority to speak on behalf of NOAA and the Department of Commerce.

See the "Critical habitats" section below for those critical habitats that lie wholly or partially within your project area under this office's jurisdiction. Please contact the designated FWS office if you have questions.

---

1. NOAA Fisheries, also known as the National Marine Fisheries Service (NMFS), is an office of the National Oceanic and Atmospheric Administration within the Department of Commerce.

## MAMMALS

| NAME | STATUS |
|------|--------|
| Buena Vista Lake Shrew *Sorex ornatus relictus* | Endangered |

There is **final** critical habitat for this species. Your location does not overlap the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/1610
General project design guidelines:
  https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

| NAME | STATUS |
|------|--------|
| Giant Kangaroo Rat *Dipodomys ingens* | Endangered |

No critical habitat has been designated for this species.
Species profile: https://ecos.fws.gov/ecp/species/6051
General project design guidelines:
  https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

| NAME | STATUS |
|------|--------|
| San Joaquin Kit Fox *Vulpes macrotis mutica* | Endangered |

No critical habitat has been designated for this species.
Species profile: https://ecos.fws.gov/ecp/species/2873
General project design guidelines:
  https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

| NAME | STATUS |
|------|--------|
| Tipton Kangaroo Rat *Dipodomys nitratoides nitratoides* | Endangered |

No critical habitat has been designated for this species.
Species profile: https://ecos.fws.gov/ecp/species/7247
General project design guidelines:
  https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

## BIRDS

| NAME | STATUS |
|------|--------|
| California Condor *Gymnogyps californianus* | Endangered |

Population: Wherever found, except where listed as an experimental population
There is **final** critical habitat for this species. Your location does not overlap the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/8193
General project design guidelines:
  https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

| NAME | STATUS |
|------|--------|
| California Least Tern *Sternula antillarum browni* | Endangered |

No critical habitat has been designated for this species.
Species profile: https://ecos.fws.gov/ecp/species/8104
General project design guidelines:
  https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

| NAME | STATUS |
|------|--------|
| California Ridgway's Rail *Rallus obsoletus obsoletus* | Endangered |

No critical habitat has been designated for this species.

| NAME | STATUS |
|------|--------|

Species profile: https://ecos.fws.gov/ecp/species/4240
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

**Least Bell's Vireo** *Vireo bellii pusillus*                                     Endangered
There is **final** critical habitat for this species. Your location does not overlap the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/5945
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

**Southwestern Willow Flycatcher** *Empidonax traillii extimus*                    Endangered
There is **final** critical habitat for this species. Your location overlaps the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/6749
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

**Western Snowy Plover** *Charadrius nivosus nivosus*                              Threatened
Population: Pacific Coast population DPS-U.S.A. (CA, OR, WA), Mexico (within 50 miles of
Pacific coast)
There is **final** critical habitat for this species. Your location does not overlap the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/8035
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

**Yellow-billed Cuckoo** *Coccyzus americanus*                                     Threatened
Population: Western U.S. DPS
There is **final** critical habitat for this species. Your location does not overlap the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/3911
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

## REPTILES

| NAME | STATUS |
|------|--------|

**Blunt-nosed Leopard Lizard** *Gambelia silus*                                    Endangered
No critical habitat has been designated for this species.
Species profile: https://ecos.fws.gov/ecp/species/625
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

**Northwestern Pond Turtle** *Actinemys marmorata*                                 Proposed
No critical habitat has been designated for this species.                          Threatened
Species profile: https://ecos.fws.gov/ecp/species/1111
General project design guidelines:

| NAME | STATUS |
|------|--------|

https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

**Southwestern Pond Turtle** *Actinemys pallida*

No critical habitat has been designated for this species.

Species profile: https://ecos.fws.gov/ecp/species/4768

General project design guidelines:

https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

Proposed Threatened

## AMPHIBIANS

| NAME | STATUS |
|------|--------|

**Arroyo (=arroyo Southwestern) Toad** *Anaxyrus californicus*

There is **final** critical habitat for this species. Your location does not overlap the critical habitat.

Species profile: https://ecos.fws.gov/ecp/species/3762

General project design guidelines:

https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11304.pdf

Endangered

**California Red-legged Frog** *Rana draytonii*

There is **final** critical habitat for this species. Your location overlaps the critical habitat.

Species profile: https://ecos.fws.gov/ecp/species/2891

General project design guidelines:

https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

Threatened

**California Tiger Salamander** *Ambystoma californiense*

Population: U.S.A. (CA - Santa Barbara County)

There is **final** critical habitat for this species. Your location does not overlap the critical habitat.

Species profile: https://ecos.fws.gov/ecp/species/2076

General project design guidelines:

https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11304.pdf

Endangered

**Foothill Yellow-legged Frog** *Rana boylii*

Population: South Coast Distinct Population Segment (South Coast DPS)

There is **proposed** critical habitat for this species. Your location does not overlap the critical habitat.

Species profile: https://ecos.fws.gov/ecp/species/5133

General project design guidelines:

https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11304.pdf

Endangered

**Western Spadefoot** *Spea hammondii*

Population: Northern DPS

No critical habitat has been designated for this species.

Species profile: https://ecos.fws.gov/ecp/species/5425

General project design guidelines:

https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

Proposed Threatened

## FISHES

| NAME | STATUS |
|------|--------|
| Tidewater Goby *Eucyclogobius newberryi* | Endangered |

There is **final** critical habitat for this species. Your location does not overlap the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/57
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

## INSECTS

| NAME | STATUS |
|------|--------|
| Kern Primrose Sphinx Moth *Euproserpinus euterpe* | Threatened |

There is **proposed** critical habitat for this species.
Species profile: https://ecos.fws.gov/ecp/species/7881

| NAME | STATUS |
|------|--------|
| Monarch Butterfly *Danaus plexippus* | Proposed Threatened |

There is **proposed** critical habitat for this species. Your location overlaps the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/9743
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

## CRUSTACEANS

| NAME | STATUS |
|------|--------|
| Vernal Pool Fairy Shrimp *Branchinecta lynchi* | Threatened |

There is **final** critical habitat for this species. Your location does not overlap the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/498
General project design guidelines:
https://ipac.ecosphere.fws.gov/project/5ARJQEW5DVFLDFNGCYBI2RWYLI/documents/generated/11271,11304.pdf

## FLOWERING PLANTS

| NAME | STATUS |
|------|--------|
| California Jewelflower *Caulanthus californicus* | Endangered |

No critical habitat has been designated for this species.
Species profile: https://ecos.fws.gov/ecp/species/4599

| NAME | STATUS |
|------|--------|
| Gambel's Watercress *Rorippa gambellii* | Endangered |

No critical habitat has been designated for this species.
Species profile: https://ecos.fws.gov/ecp/species/4201

| NAME | STATUS |
|------|--------|
| Gaviota Tarplant *Deinandra increscens ssp. villosa* | Endangered |

There is **final** critical habitat for this species. Your location overlaps the critical habitat.
Species profile: https://ecos.fws.gov/ecp/species/4218

| NAME | STATUS |
|------|--------|
| Kern Mallow *Eremalche kernensis* | Endangered |

No critical habitat has been designated for this species.

| NAME | STATUS |
|---|---|
| Species profile: https://ecos.fws.gov/ecp/species/1731 | |
| **Marsh Sandwort** *Arenaria paludicola* | Endangered |
| No critical habitat has been designated for this species. Species profile: https://ecos.fws.gov/ecp/species/2229 | |
| **Salt Marsh Bird's-beak** *Cordylanthus maritimus ssp. maritimus* | Endangered |
| No critical habitat has been designated for this species. Species profile: https://ecos.fws.gov/ecp/species/6447 | |
| **San Joaquin Wooly-threads** *Monolopia (=Lembertia) congdonii* | Endangered |
| No critical habitat has been designated for this species. Species profile: https://ecos.fws.gov/ecp/species/3746 | |
| **Spreading Navarretia** *Navarretia fossalis* | Threatened |
| There is **final** critical habitat for this species. Your location does not overlap the critical habitat. Species profile: https://ecos.fws.gov/ecp/species/1334 | |

## CRITICAL HABITATS

There are 4 critical habitats wholly or partially within your project area under this office's jurisdiction.

| NAME | STATUS |
|---|---|
| **California Red-legged Frog** *Rana draytonii* | Final |
| https://ecos.fws.gov/ecp/species/2891#crithab | |
| **Gaviota Tarplant** *Deinandra increscens ssp. villosa* | Final |
| https://ecos.fws.gov/ecp/species/4218#crithab | |
| **Monarch Butterfly** *Danaus plexippus* | Proposed |
| https://ecos.fws.gov/ecp/species/9743#crithab | |
| **Southwestern Willow Flycatcher** *Empidonax traillii extimus* | Final |
| https://ecos.fws.gov/ecp/species/6749#crithab | |

# USFWS NATIONAL WILDLIFE REFUGE LANDS AND FISH HATCHERIES

Any activity proposed on lands managed by the National Wildlife Refuge system must undergo a 'Compatibility Determination' conducted by the Refuge. Please contact the individual Refuges to discuss any questions or concerns.

The following FWS National Wildlife Refuge Lands and Fish Hatcheries lie fully or partially within your project area:

| FACILITY NAME | ACRES |
|---|---|
| BITTER CREEK NATIONAL WILDLIFE REFUGE | 14,879.455 |

https://www.fws.gov/our-facilities?
$keywords="%5C%22BITTER+CREEK+NATIONAL+WILDLIFE+REFUGE%5C%22"

# BALD & GOLDEN EAGLES

Bald and Golden Eagles are protected under the Bald and Golden Eagle Protection Act [2] and the Migratory Bird Treaty Act (MBTA) [1]. Any person or organization who plans or conducts activities that may result in impacts to Bald or Golden Eagles, or their habitats, should follow appropriate regulations and consider implementing appropriate avoidance and minimization measures, as described in the various links on this page.

---

1.  The Bald and Golden Eagle Protection Act of 1940.
2.  The Migratory Birds Treaty Act of 1918.
3.  50 C.F.R. Sec. 10.12 and 16 U.S.C. Sec. 668(a)

There are Bald Eagles and/or Golden Eagles in your project area.

**Measures for Proactively Minimizing Eagle Impacts**
For information on how to best avoid and minimize disturbance to nesting bald eagles, please review the National Bald Eagle Management Guidelines. You may employ the timing and activity-specific distance recommendations in this document when designing your project/ activity to avoid and minimize eagle impacts. For bald eagle information specific to Alaska, please refer to Bald Eagle Nesting and Sensitivity to Human Activity.

The FWS does not currently have guidelines for avoiding and minimizing disturbance to nesting Golden Eagles. For site-specific recommendations regarding nesting Golden Eagles, please consult with the appropriate Regional Migratory Bird Office or Ecological Services Field Office.

If disturbance or take of eagles cannot be avoided, an incidental take permit may be available to authorize any take that results from, but is not the purpose of, an otherwise lawful activity. For assistance making this determination for Bald Eagles, visit the Do I Need A Permit Tool. For assistance making this determination for golden eagles, please consult with the appropriate Regional Migratory Bird Office or Ecological Services Field Office.

**Ensure Your Eagle List is Accurate and Complete**
If your project area is in a poorly surveyed area in IPaC, your list may not be complete and you may need to rely on other resources to determine what species may be present (e.g. your local FWS field office, state surveys, your own surveys). Please review the Supplemental Information on Migratory Birds and Eagles, to help you properly interpret the report for your specified location, including determining if there is sufficient data to ensure your list is accurate.

For guidance on when to schedule activities or implement avoidance and minimization measures to reduce impacts to bald or golden eagles on your list, see the "Probability of Presence Summary" below to see when these bald or golden eagles are most likely to be present and breeding in your project area.

| NAME | BREEDING SEASON |
|---|---|
| Bald Eagle *Haliaeetus leucocephalus*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/1626 | Breeds Jan 1 to Aug 31 |
| Golden Eagle *Aquila chrysaetos*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/1680 | Breeds Jan 1 to Aug 31 |

# PROBABILITY OF PRESENCE SUMMARY

The graphs below provide our best understanding of when birds of concern are most likely to be present in your project area. This information can be used to tailor and schedule your project activities to avoid or minimize impacts to birds. Please make sure you read "Supplemental Information on Migratory Birds and Eagles", specifically the FAQ section titled "Proper Interpretation and Use of Your Migratory Bird Report" before using or attempting to interpret this report.

**Probability of Presence** (■)

Green bars; the bird's relative probability of presence in the 10km grid cell(s) your project overlaps during that week of the year.

**Breeding Season** (■)
Yellow bars; liberal estimate of the timeframe inside which the bird breeds across its entire range.

**Survey Effort** (|)
Vertical black lines; the number of surveys performed for that species in the 10km grid cell(s) your project area overlaps.

**No Data** (−)
A week is marked as having no data if there were no survey events for that week.



■ probability of presence    ■ breeding season    | survey effort    − no data



Additional information can be found using the following links:

- Eagle Management https://www.fws.gov/program/eagle-management
- Measures for avoiding and minimizing impacts to birds https://www.fws.gov/library/collections/avoiding-and-minimizing-incidental-take-migratory-birds
- Nationwide avoidance and minimization measures for birds https://www.fws.gov/sites/default/files/documents/nationwide-standard-conservation-measures.pdf
- Supplemental Information for Migratory Birds and Eagles in IPaC https://www.fws.gov/media/supplemental-information-migratory-birds-and-bald-and-golden-eagles-may-occur-project-action

# MIGRATORY BIRDS

The Migratory Bird Treaty Act (MBTA) [1] prohibits the take (including killing, capturing, selling, trading, and transport) of protected migratory bird species without prior authorization by the Department of Interior U.S. Fish and Wildlife Service (Service).

---

1. The Migratory Birds Treaty Act of 1918.
2. The Bald and Golden Eagle Protection Act of 1940.
3. 50 C.F.R. Sec. 10.12 and 16 U.S.C. Sec. 668(a)

For guidance on when to schedule activities or implement avoidance and minimization measures to reduce impacts to migratory birds on your list, see the "Probability of Presence Summary" below to see when these birds are most likely to be present and breeding in your project area.

| NAME | BREEDING SEASON |
|---|---|
| Allen's Hummingbird *Selasphorus sasin*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/9637 | Breeds Feb 1 to Jul 15 |

| NAME | BREEDING SEASON |
|------|-----------------|
| **Bald Eagle** *Haliaeetus leucocephalus*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/1626 | Breeds Jan 1 to Aug 31 |
| **Belding's Savannah Sparrow** *Passerculus sandwichensis beldingi*<br>This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA<br>https://ecos.fws.gov/ecp/species/8 | Breeds Apr 1 to Aug 15 |
| **Black Oystercatcher** *Haematopus bachmani*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/9591 | Breeds Apr 15 to Oct 31 |
| **Black Scoter** *Melanitta nigra*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/10413 | Breeds elsewhere |
| **Black Skimmer** *Rynchops niger*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/5234 | Breeds May 20 to Sep 15 |
| **Black Turnstone** *Arenaria melanocephala*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/10557 | Breeds elsewhere |
| **Black-chinned Sparrow** *Spizella atrogularis*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/9447 | Breeds Apr 15 to Jul 31 |
| **Black-legged Kittiwake** *Rissa tridactyla*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/10459 | Breeds elsewhere |
| **Black-vented Shearwater** *Puffinus opisthomelas*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/9623 | Breeds elsewhere |

| NAME | BREEDING SEASON |
|---|---|
| **Brandt's Cormorant** *Urile penicillatus* <br> This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska. <br> https://ecos.fws.gov/ecp/species/11903 | Breeds Apr 15 to Sep 15 |
| **Brown Pelican** *Pelecanus occidentalis* <br> This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities. <br> https://ecos.fws.gov/ecp/species/6034 | Breeds Jan 15 to Sep 30 |
| **Bullock's Oriole** *Icterus bullockii* <br> This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA <br> https://ecos.fws.gov/ecp/species/9458 | Breeds Mar 21 to Jul 25 |
| **California Gull** *Larus californicus* <br> This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska. <br> https://ecos.fws.gov/ecp/species/10955 | Breeds Mar 1 to Jul 31 |
| **California Thrasher** *Toxostoma redivivum* <br> This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska. <br> https://ecos.fws.gov/ecp/species/9436 | Breeds Jan 1 to Jul 31 |
| **Cassin's Finch** *Haemorhous cassinii* <br> This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska. <br> https://ecos.fws.gov/ecp/species/9462 | Breeds May 15 to Jul 15 |
| **Clark's Grebe** *Aechmophorus clarkii* <br> This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska. <br> https://ecos.fws.gov/ecp/species/10575 | Breeds Jun 1 to Aug 31 |
| **Common Loon** *gavia immer* <br> This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities. <br> https://ecos.fws.gov/ecp/species/4464 | Breeds Apr 15 to Oct 31 |
| **Common Murre** *Uria aalge* <br> This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities. <br> https://ecos.fws.gov/ecp/species/10453 | Breeds Apr 15 to Aug 15 |

| NAME | BREEDING SEASON |
|------|-----------------|
| **Common Yellowthroat** *Geothlypis trichas sinuosa*<br>This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA<br>https://ecos.fws.gov/ecp/species/2084 | Breeds May 20 to Jul 31 |
| **Double-crested Cormorant** *phalacrocorax auritus*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/3478 | Breeds Apr 20 to Aug 31 |
| **Elegant Tern** *Thalasseus elegans*<br>This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA<br>https://ecos.fws.gov/ecp/species/8561 | Breeds Apr 5 to Aug 5 |
| **Golden Eagle** *Aquila chrysaetos*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/1680 | Breeds Jan 1 to Aug 31 |
| **Heermann's Gull** *Larus heermanni*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/11955 | Breeds Mar 15 to Aug 31 |
| **Lawrence's Goldfinch** *Spinus lawrencei*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/9464 | Breeds Mar 20 to Sep 20 |
| **Lecontes Thrasher** *Toxostoma lecontei*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/8969 | Breeds Feb 15 to Jun 20 |
| **Long-eared Owl** *asio otus*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/3631 | Breeds Mar 1 to Jul 15 |
| **Marbled Godwit** *Limosa fedoa*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/9481 | Breeds elsewhere |
| **Mountain Plover** *Charadrius montanus*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/3638 | Breeds elsewhere |

| NAME | BREEDING SEASON |
|------|-----------------|
| **Northern Harrier** *Circus hudsonius* <br> This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA <br> https://ecos.fws.gov/ecp/species/8350 | Breeds Apr 1 to Sep 15 |
| **Nuttall's Woodpecker** *Dryobates nuttallii* <br> This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA <br> https://ecos.fws.gov/ecp/species/9410 | Breeds Apr 1 to Jul 20 |
| **Oak Titmouse** *Baeolophus inornatus* <br> This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska. <br> https://ecos.fws.gov/ecp/species/9656 | Breeds Mar 15 to Jul 15 |
| **Olive-sided Flycatcher** *Contopus cooperi* <br> This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska. <br> https://ecos.fws.gov/ecp/species/3914 | Breeds May 20 to Aug 31 |
| **Pomarine Jaeger** *Stercorarius pomarinus* <br> This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities. <br> https://ecos.fws.gov/ecp/species/10458 | Breeds elsewhere |
| **Red Phalarope** *Phalaropus fulicarius* <br> This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities. <br> https://ecos.fws.gov/ecp/species/10469 | Breeds elsewhere |
| **Red-breasted Merganser** *Mergus serrator* <br> This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities. <br> https://ecos.fws.gov/ecp/species/10693 | Breeds elsewhere |
| **Red-necked Phalarope** *Phalaropus lobatus* <br> This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities. <br> https://ecos.fws.gov/ecp/species/10467 | Breeds elsewhere |
| **Red-throated Loon** *Gavia stellata* <br> This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities. <br> https://ecos.fws.gov/ecp/species/9589 | Breeds elsewhere |

| NAME | BREEDING SEASON |
|------|-----------------|
| **Ring-billed Gull** *Larus delawarensis*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/10468 | Breeds elsewhere |
| **Royal Tern** *Thalasseus maximus*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/10471 | Breeds Apr 15 to Aug 31 |
| **Santa Barbara Song Sparrow** *Melospiza melodia graminea*<br>This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA<br>https://ecos.fws.gov/ecp/species/5513 | Breeds Mar 1 to Sep 5 |
| **Scripps's Murrelet** *Synthliboramphus scrippsi*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/10677 | Breeds Feb 20 to Jul 31 |
| **Short-billed Dowitcher** *Limnodromus griseus*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/9480 | Breeds elsewhere |
| **Sooty Shearwater** *Ardenna grisea*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/10417 | Breeds elsewhere |
| **Surf Scoter** *Melanitta perspicillata*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/10463 | Breeds elsewhere |
| **Tricolored Blackbird** *Agelaius tricolor*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/3910 | Breeds Mar 15 to Aug 10 |
| **Western Grebe** *Aechmophorus occidentalis*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/6743 | Breeds Jun 1 to Aug 31 |

| NAME | BREEDING SEASON |
|------|-----------------|
| **Western Gull** *Larus occidentalis*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/11969 | Breeds Apr 21 to Aug 25 |
| **Western Screech-owl** *Megascops kennicottii cardonensis*<br>This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA<br>https://ecos.fws.gov/ecp/species/11923 | Breeds Mar 1 to Jun 30 |
| **White-headed Woodpecker** *Dryobates albolarvatus gravirostris*<br>This is a Bird of Conservation Concern (BCC) only in particular Bird Conservation Regions (BCRs) in the continental USA<br>https://ecos.fws.gov/ecp/species/11993 | Breeds May 1 to Aug 15 |
| **White-winged Scoter** *Melanitta fusca*<br>This is not a Bird of Conservation Concern (BCC) in this area, but warrants attention because of the Eagle Act or for potential susceptibilities in offshore areas from certain types of development or activities.<br>https://ecos.fws.gov/ecp/species/10462 | Breeds elsewhere |
| **Willet** *Tringa semipalmata*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/10669 | Breeds elsewhere |
| **Wrentit** *Chamaea fasciata*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/10668 | Breeds Mar 15 to Aug 10 |
| **Yellow-billed Magpie** *Pica nuttalli*<br>This is a Bird of Conservation Concern (BCC) throughout its range in the continental USA and Alaska.<br>https://ecos.fws.gov/ecp/species/9726 | Breeds Apr 1 to Jul 31 |

# PROBABILITY OF PRESENCE SUMMARY

The graphs below provide our best understanding of when birds of concern are most likely to be present in your project area. This information can be used to tailor and schedule your project activities to avoid or minimize impacts to birds. Please make sure you read "Supplemental Information on Migratory Birds and Eagles", specifically the FAQ section titled "Proper Interpretation and Use of Your Migratory Bird Report" before using or attempting to interpret this report.

**Probability of Presence** (■)

Green bars; the bird's relative probability of presence in the 10km grid cell(s) your project overlaps during that week of the year.

**Breeding Season** (▇)
Yellow bars; liberal estimate of the timeframe inside which the bird breeds across its entire range.

**Survey Effort** (❘)
Vertical black lines; the number of surveys performed for that species in the 10km grid cell(s) your project area overlaps.

**No Data** (─)
A week is marked as having no data if there were no survey events for that week.







| SPECIES | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|



Yellow-billed
Magpie
BCC Rangewide
(CON)



Additional information can be found using the following links:

- Eagle Management https://www.fws.gov/program/eagle-management
- Measures for avoiding and minimizing impacts to birds https://www.fws.gov/library/collections/avoiding-and-minimizing-incidental-take-migratory-birds
- Nationwide avoidance and minimization measures for birds
- Supplemental Information for Migratory Birds and Eagles in IPaC https://www.fws.gov/media/supplemental-information-migratory-birds-and-bald-and-golden-eagles-may-occur-project-action

# WETLANDS

Impacts to NWI wetlands and other aquatic habitats may be subject to regulation under Section 404 of the Clean Water Act, or other State/Federal statutes.

For more information please contact the Regulatory Program of the local U.S. Army Corps of Engineers District.

Please note that the NWI data being shown may be out of date. We are currently working to update our NWI data set. We recommend you verify these results with a site visit to determine the actual extent of wetlands on site.

WETLAND INFORMATION WAS NOT AVAILABLE WHEN THIS SPECIES LIST WAS GENERATED. PLEASE VISIT HTTPS://WWW.FWS.GOV/WETLANDS/DATA/MAPPER.HTML OR CONTACT THE FIELD OFFICE FOR FURTHER INFORMATION.

## IPAC USER CONTACT INFORMATION

Agency:  Pipeline and Hazardous Materials Safety Administration
Name:    Travis Mast
Address: 220 Binney St
City:    Cambridge
State:   MA
Zip:     01452
Email    travis.mast@dot.gov
Phone:   6174943782

You have indicated that your project falls under or receives funding through the following special project authorities:

- EMERGENCY CONSULTATION (EO 14156)