LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
MARGARET M. HALL (Bar No. 293699)
mhall@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622
Fax: (805) 962-3152
*Attorneys for Environmental Defense Center,
Get Oil Out!, Santa Barbara County Action
Network, Sierra Club, and Santa Barbara
Channelkeeper*

JULIE TEEL SIMMONDS (Bar No. 208202)
jteelsimmonds@biologicaldiversity.org
EMILY JEFFERS (Bar No. 274222)
ejeffers@biologicaldiversity.org
TALIA NIMMER (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin Street, Suite 375
Oakland, CA 94612
Phone: (510) 844-7100
*Attorneys for Center for Biological
Diversity and Wishtoyo Foundation*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>                              Plaintiff,<br><br>      and<br><br>ENVIRONNMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, SANTA BARBARA CHANNELKEEPER, CENTER FOR BIOLOGICAL | Case No.: 2:26-cv-03396-SVW-SSCx<br><br>**INTERVENOR PLAINTIFFS' [PROPOSED] COMPLAINT IN INTERVENTION**<br><br>Hon. Stephen V. Wilson<br>Hearing: June 8, 2026<br>Time: 1:30 p.m.<br>Place: Courtroom 10A |

DIVERSITY, and WISHTOYO FOUNDATION,

Proposed Intervenor-Plaintiffs,

v.

CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants.

## JURISDICTION AND VENUE

1. This action arises under the United States Constitution, the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*.; the Defense Production Act (DPA), 50 U.S.C. §§ 4501 *et seq*.; and federal regulations implementing the DPA. This Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

2. Venue is proper in this judicial district under 28 U.S.C. section 1391(e) because this is a civil action in which Defendants are agencies of the United States or officers of such an agency and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## INTRODUCTION

3. For two years, Sable Offshore Corp. and its wholly-owned subsidiary Pacific Pipeline Company (together, "Sable") have been attempting to restart two of the most controversial and dangerous pieces of oil infrastructure in California: defective oil pipelines CA-324 and CA-325 (the "Onshore Pipelines"), which have sat idle since causing a catastrophic oil spill in 2015. And for two years, Sable had been prevented from restarting the Onshore Pipelines by critical federal and state laws, regulations, and judicial orders intended to protect public safety and the environment.

4.      However, towards the end of 2025, Sable, having staked its entire business on the restart of the Onshore Pipelines, eventually found itself facing the prospect of financial insolvency. As desperation set in, Sable changed tack. In a last ditch-effort to bring the Onshore Pipelines online, Sable began courting the federal administration in the hope that the administration could somehow sweep aside the various legal impediments to its restart project. What ultimately emerged from Sable's coordination with the administration was a scheme centered on a novel use of the DPA, which played out in a carefully choreographed fashion over the next several months.

5.      On December 12, 2025, Sable sent a formal letter to the United States Department of Justice (DOJ) lamenting the various requirements for restarting the Onshore Pipelines found in both state law as well as a federal Consent Decree that was entered by this Court in the wake of the 2015 spill. To solve that problem, Sable requested that the United States turn to the DPA. On March 3, 2026, the DOJ began to oblige. It first responded by issuing a legal opinion, at Sable's behest, that advanced an unfounded and unprecedented theory about the scope of the DPA. The opinion concluded, conveniently, that a DPA Order "requiring" restart of the Onshore Pipelines could excuse Sable from complying with virtually all state and federal requirements currently prohibiting restart.

6.      Ten days later Secretary of the United States Department of Energy Chris Wright (the "Secretary") issued an order under Title I of the DPA (the "Wright Order") directed to Sable. Although the Secretary stopped short of "requiring" Sable to operate the Onshore Pipelines, he instructed Sable to, *inter alia*, "immediately prioritize and allocate pipeline transportation services for hydrocarbons . . . through the [Onshore Pipelines]," and to "immediately commence performance under contracts or orders for services . . . for hydrocarbon transportation capacity in the [Onshore Pipelines]."

7. The next day, in open defiance of multiple state laws and court orders, Sable restarted the Onshore Pipelines, claiming that the Wright Order directed it to "commence the flow of crude oil through the [Onshore Pipelines]."[1]

8. On information and belief, never before has a private party solicited a DPA prioritization or allocation order from the federal government. That is likely because such orders are intended to impose a *burden* on a private party to advance interests related to federal procurement and contracting. The DPA's use here, to confer on Sable a purported *benefit*, is fundamentally at odds with its statutory scheme, and it reveals the Wright Order for the ruse that it is.

9. Indeed, the Wright Order represents a shocking and unlawful overreach of Executive authority that harms not only the State of California (the "State"), but also Intervenor Plaintiffs, public safety, and the environment. The restart of these defective Onshore Pipelines—particularly without compliance with the critical laws and orders cast aside by Sable—invites and all but ensures another oil disaster on the Central Coast, , jeopardizing the many sensitive areas through which the Onshore Pipelines pass. Those areas contain, *inter alia*, major sources of groundwater; major rivers, creeks, and perennial streams; a variety of sensitive coastal, aquatic, wetland, riparian, and upland habitats that are occupied by state or federally listed species; dozens of recreation areas, including Gaviota State Park and Carrizo Plain National Monument; and a suburban neighborhood in Buellton, California.

10. The Wright Order is invalid, unlawful, and must be struck down under the APA for the following reasons.

11. First, the Wright Order is contrary to law. On its face, the order omits elements and findings specifically required by the DPA as well as DOE's own binding

---

[1] Real Parties in Interest's *Ex Parte* Notice of Defense Production Act Order and Request for Immediate Recission of Preliminary Injunction, p. 4., *Center for Biological Diversity et al. v. California Dep't of Forestry and Fire Protection, Office of the State Fire Marshal et al.*, Case No. 25CV02244 (Santa Barbara Sup. Ct, Apr. 15, 2025).

regulations, including, for example, that the order have a "[s]pecific start and end calendar date[] for each required allocation action." 10 C.F.R. § 217.54.

12. Second, and relatedly, the Wright Order was issued in excess of the Secretary's delegated statutory authority under the DPA. Indeed, rather than allocate shares or parts of an *existing* resource, it purportedly orders Sable to create a service that has not existed since 2015—pipeline transportation services through the Onshore Pipelines—and instructs Sable to "utilize" those pipelines' capacity. The DPA does not authorize DOE to compel a new resource into existence or command that it be "utilized" in a particular way. Further, to the extent the Secretary intended the Wright Order to preempt or displace various legal impediments to Sable's restart efforts, or that the Order could be interpreted to have such an effect, such power likewise exceeds the Secretary's authority under the DPA.

13. Third, the Secretary neglected to make the findings, required under sections 101(b) and (c), that oil and/or hydrocarbon transportation services are a scarce and critical material or resource, or that such material or resource is essential to the national defense or one of the needs specified in section 101(c), and any implied findings to this effect are arbitrary and capricious. Similarly, the Secretary's determination that the production of oil at the Santa Ynez Unit (SYU) and transport of oil through the Onshore Pipelines can only be reasonably accomplished by issuing the Wright Order is also arbitrary and capricious.

14. Finally, to the extent the Secretary intends the Wright Order to supersede an applicable federal Consent Decree and other, court-ordered injunctions, or the Wright Order can, contrary to its text, be interpreted as having that effect, the Wright Order violates the bedrock constitutional principle of separation of powers. The DPA does not grant the Secretary the authority to overturn a valid court order or deprive a court of its right to enforce its lawfully-issued decrees.

15. Thus, Intervenor Plaintiffs request that the Court vacate the order, as required, under Section 706 of the APA; declare the Wright Order to be unlawful,

unconstitutional, in excess of the Secretary's statutory authority, and issued in violation of the APA; and issue a permanent injunction prohibiting Defendants from invoking the Wright Order to authorize or compel operation of the Santa Ynez Unit and the Onshore Pipelines, and from allowing anyone operating as Defendants' agents or working in concert with them to rely on or invoke the Wright Order to operate the Santa Ynez Unit and the Onshore Pipelines without having received necessary state-law approvals and without satisfying the terms of court orders.

## PARTIES

### Plaintiff

16.    Plaintiff the State of California is a sovereign State of the United States. Attorney General Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11. The State of California administers its laws through various Executive Branch agencies and independent commissions of the State, including the Department of Forestry and Fire Protection's Office of the State Fire Marshal, the Department of Conservation's Geologic Energy Management Division, the California Coastal Commission, the State Lands Commission, the Department of Parks and Recreation, the State and Regional Water Resources Control Boards, the Department of Fish and Wildlife and that department's Office of Spill Prevention and Response.

### Defendants

17.    Defendant Chris Wright is the Secretary of the United States Department of Energy (DOE), and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. § 7131.

18.    Defendant United States Department of Energy is a cabinet agency within the Executive Branch of the United States government. 42 U.S.C. § 7131.

**Intervenor Plaintiffs**

19.    Intervenor Plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper, Center for Biological Diversity, and Wishtoyo Foundation (collectively "Intervenor Plaintiffs") are environmental organizations with a long history of involvement in oil and gas development activities in general, in addition to specific experience with the proposed restart of the offshore platforms and Onshore Pipelines. The 2015 oil spill at Refugio State Beach personally impacted Intervenor Plaintiffs by curtailing their members' use and enjoyment of the coast and ocean, and they are deeply concerned about the impacts of another oil spill along the Onshore Pipelines' route.    Intervenor Plaintiffs have engaged consistently with the decision-making process related to restarting the Onshore Pipelines by participating in administrative processes and litigation concerning various decisions relating to restarting the Onshore Pipelines, during which they have presented evidence demonstrating the likely adverse impacts associated with the Onshore Pipelines and advanced arguments under local, state, and federal law in opposition to restart. Intervenor Plaintiffs have urged decisionmakers to deny or disapprove operations of the Onshore Pipelines, arguing that the infrastructure cannot be safely operated because, by flaw of design, the pipelines lack effective protection from corrosion—which was the root cause of the 2015 spill. Intervenor Plaintiffs have an interest in the subject matter of this litigation that may be impaired or impeded by the disposition of this case, and their interests are not adequately represented by the existing parties to the action.

20.    Intervenor Plaintiff EDC is a California public benefit, non-profit corporation, headquartered in Santa Barbara, California. Founded in response to the 1969 Santa Barbara oil spill, EDC defends nature and advances environmental justice on California's Central Coast through advocacy and legal action. EDC's program areas include climate and energy, ocean, land and water, and environmental justice. EDC has more than 2,400 members and advocates on behalf of itself and other non-profit, environmental organizations. Since its founding, EDC has worked to protect the local

coastline, marine environment, watersheds, and terrestrial environment of Santa Barbara County from the risks and impacts of oil production. EDC has advocated against restart of the Onshore Pipelines and is engaged in litigation to enforce state laws and local ordinances protecting the environment and ensuring public review before the corroded Onshore Pipelines responsible for catastrophic coastal damage can be restarted.

21. Intervenor Plaintiff GOO! is a public interest group dedicated to the protection of the Santa Barbara Channel and coastline from the deleterious environmental, economic, and aesthetic impacts of oil development. GOO!'s core membership consists of approximately 1,500 politically, socially, and economically diverse individuals from the Santa Barbara area and surrounding counties. GOO!'s primary activities include enhancing public awareness about oil-related issues and impacts through education and opposing the proliferation of oil development, or minimizing its impacts, by participating in the administrative and legislative processes. GOO! was formed in the wake of the 1969 Santa Barbara oil spill, and throughout its existence, it has fought to protect California from further oil development and exploitation. GOO! is represented by EDC in several administrative proceedings regarding Sable's attempt to restart the Onshore Pipelines, as well as in litigation to enforce local ordinances and state laws.

22. Intervenor Plaintiff SBCAN is a countywide non-profit membership-based organization that has been dedicated to promoting social and economic justice; preserving environmental and agricultural resources; and creating sustainable communities for over two decades. SBCAN has an estimated 120 active members and an email list of approximately 1,200 interested people. SBCAN focuses its efforts to protect Santa Barbara County's natural resources and community from the risks associated with oil and gas operations. SBCAN is represented by EDC in several administrative proceedings regarding Sable's attempt to restart the Onshore Pipelines, as well as in litigation to enforce local ordinances and state laws.

23.     Intervenor Plaintiff Sierra Club is a national organization with over one million members, including more than 105,000 members in California and around 5,005 active members in the Santa Barbara-Ventura Chapter. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the earth; practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. Consistent with its mission, Sierra Club is committed to the transition away from fossil fuels. Sierra Clubs and its members are concerned about the dangers posed by oil and gas drilling, its threats to the safety and health of those who live, learn, work, and recreate along the pipeline route, the risks of major accidents that would devastate the local environment, such as oil spills, and its contribution to the ongoing climate crisis. Sierra Club is represented by EDC in several administrative proceedings regarding Sable's attempt to restart the Onshore Pipelines, as well as in litigation to enforce local ordinances and state laws.

24.     Intervenor Plaintiff SBCK is a non-profit public benefit corporation founded in 1999. SBCK's mission is to protect and restore the Santa Barbara Channel and its watersheds. SBCK accomplishes its mission through science-based advocacy, education, fieldwork, enforcement, and community engagement. SBCK and its members are committed to protecting the Santa Barbara Channel from pollution threats such as coastal and offshore oil development, including pollution from pipeline oil spills such as the May 2015 spill near Refugio State Beach. SBCK has more than 2,000 members. SBCK is represented by EDC in several administrative proceedings regarding Sable's attempt to restart the Onshore Pipelines, as well as in litigation to enforce local ordinances and state laws.

25.     Intervenor Plaintiff CBD is a nonprofit conservation organization dedicated to the recovery of endangered, threatened, and rare species and their habitats through science, policy, and law. CBD has over 93,900 members worldwide, including 20,407 members who live in California, and 908 members who live in Santa Barbara, San Luis

Obispo, and Kern counties. CBD has worked for many years to protect imperiled plants and wildlife, open space, air and water quality, and the overall quality of life for people in the region where the Onshore Pipelines are located. This work includes years of research and advocacy before local, state, and federal bodies to ensure that the Onshore Pipelines would not restart without full compliance with pipeline safety, environmental, and other applicable laws.  CBD is currently involved in state and federal litigation challenging approvals issued to Sable.

26.    Intervenor Plaintiff Wishtoyo was founded in 1995 to preserve and protect Chumash culture and the culture of first nations peoples; to protect natural and cultural resources essential to Chumash lifeways and all people; and to educate and instill in youth environmental values, awareness, and stewardship. Wishtoyo is a place, organization, and movement inspiring people to live in harmony with our Earth again. Wishtoyo serves as a "rainbow bridge" linking Chumash and indigenous lifeways with the protection of natural and cultural resources, utilizing traditional ecological knowledge to provide environmental and cultural preservation, justice, education, research, and advocacy. Wishtoyo has a longstanding record of protecting and restoring the coastal watersheds of Chumash homelands, the Santa Barbara Channel, and the Pacific Ocean. Wishtoyo is represented by CBD in several administrative proceedings regarding Sable's attempt to restart the Onshore Pipelines, as well as in litigation to enforce local ordinances and state laws.

27.    Many of the Intervenor Plaintiffs' members live, work, and/or recreate along the route of the Onshore Pipelines and were significantly harmed by the 2015 oil spill from the Onshore Pipelines, the underlying cause of which (ineffective protection from corrosion) has not been remediated. They would likely be similarly harmed in the event of another oil spill from the Onshore Pipelines, which, as noted, traverse a variety of sensitive habitats that are occupied by state or federally listed species, popular recreation areas, and major sources of surface and groundwater.

28.     Additionally, as planned, Sable is wielding the Wright Order in virtually all existing proceedings in which its restart project is at issue, including in multiple lawsuits in which Intervenor Plaintiffs are adverse parties. To the extent Sable has properly invoked the Wright Order in those proceedings, the validity of the order, challenged herein, bears directly on Intervenor Plaintiff's claims.

29.     Unless vacated, the Wright Order will continue to threaten public safety, the environment, and the Intervenor Plaintiffs' interests.

## LEGAL BACKGROUND

### I.     Defense Production Act

30.     Congress enacted the DPA, 50 U.S.C. §§ 4501 *et seq.*, to grant the President—and by delegation, Executive Branch officials—authority to promote military preparedness and ensure the availability of industrial resources necessary for national defense.

31.     The DPA provides the Executive Branch with three primary tools: Title I, which authorizes the prioritization of contracts  and the allocation of existing strategic and critical goods as necessary or appropriate to promote the national defense; Title III, which permits the use of financial incentives to expand industrial production capacity; and Title VII, which allows the government to enter into voluntary agreements with private industry. 50 U.S.C. §§ 4501 *et. seq*.

32.     Title I empowers the President to (1) require private industry to prioritize and give preference to contracts necessary or appropriate to promote the national defense and (2) allocate materials, services, and facilities as deemed necessary or appropriate to promote national defense. 50 U.S.C. § 4511(a).

33.     Where the DPA is used to control the distribution of any material in the civilian market, the President must find "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant

dislocation of the normal distribution of such material in the civilian market to such a degree to create appreciable hardship." 50 U.S.C. § 4511(b).

34.    The DPA includes a distinct provision for energy-related actions. *See* 50 U.S.C. § 4511(c). Specifically, the President may require prioritization or allocation of materials and services to maximize domestic energy supplies. *See* 50 U.S.C. § 4511(c)(1). However, this authority is subject to strict prerequisites. The President must find that: (1) the targeted "materials, services, and facilities are scarce, critical, and essential-- (i) to maintain or expand exploration, production, refining, transportation; (ii) to conserve energy supplies; or (iii) to construct or maintain energy facilities;" and (2) the objectives "cannot reasonably be accomplished" without invoking the DPA authority. *See* 50 U.S.C. § 4511(c)(2)(A)–(B).

35.    Nothing in the DPA indicates that it displaces power that rightfully belongs with the Judicial Branch or the states.

## II.    Administrative Procedure Act

36.    The APA provides for judicial review of "final agency action." 5 U.S.C. § 704.

37.    Agency actions subject to judicial review include the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

38.    An order subject to judicial review means "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6).

39.    Under the APA, reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions" in several circumstances. 5 U.S.C. § 706(2). Those circumstances include when an agency action is found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

40.     Agency actions are arbitrary and capricious if the agency "relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

41.     An agency must provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43 (internal quotation marks omitted).

### III.    Separation of Powers

42.     The Constitution divided the powers of the Federal Government into three defined categories: Legislative, Executive, and Judicial. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).

43.     In creating the Constitution, the Framers wished to avoid "[t]he accumulation of all powers legislative, executive, and judiciary in the same hands" which would be "the very definition of tyranny." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 960 (1983) (quoting the Federalist No. 47. p. 324 (J. Cooke ed. 1961) (J Madison)).

44.     To maintain the separation of powers, "the carefully defined limits on the power of each Branch must not be eroded." *Id.* at 957–58.

45.     Article III, Section 1 of the United States Constitution vests the judicial power of the United States in federal courts. U.S. Const., art. III, Sec. 1.

46.     It is the constitutional role of the judiciary to control, by Article III judges, the interpretation, declaration, and application of federal law. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 76–81 (1982).

47. Courts have the inherent power to enforce obedience with their judicial orders, which is "essential to the preservation of order in judicial proceedings." *Ex parte Robinson*, 86 U.S. 505, 510 (1873).

## FACTUAL BACKGROUND

**I.       Overview of the Facilities Encompassed by the Wright Order.**

48. The Wright Order directs Sable to "immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the [Santa Ynez Pipeline System] including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." *Pipeline Capacity Prioritization and Allocation Order* (the Wright Order), p. 3 (March 13, 2026).[2]

49. The SYU is a project that, when operational, develops crude oil and natural gas reserves from three offshore platforms that sit in federal waters off the coast of Santa Barbara County: Harmony, Heritage, and Hondo. Oil emulsion produced offshore—consisting of oil, water, brine, gasses, and other impurities—is transported onshore by a subsea produced emulsion pipeline (the "Offshore Pipeline"). The Offshore Pipeline originates in federal waters, travels through three miles of state waters, and terminates at an oil and gas processing plant located in Las Flores Canyon, just west of Goleta, California (the "LFC Facilities"). There, the raw emulsion produced offshore undergoes extensive treatment and refinement, ultimately creating several new products, including "treated and stabilized crude" and marketable natural gases.

---

[2] Until recently, the Onshore Pipelines were known and referred to as the "Las Flores Pipeline System," and recognized as an intrastate facility comprising only lines CA-324 and CA-325. However, beginning in December 2025, Sable and the federal administration began asserting that the Offshore and Onshore Pipelines form a single, interstate pipeline facility, and rebranded this newly imagined pipeline as the Santa Ynez Pipeline System. Hence, the Wright Order uses the term "SYPS," or Santa Ynez Pipeline System, to refer to both the Onshore and Offshore Pipelines. Intervenor Plaintiffs disagree that the Onshore and Offshore Pipelines constitute a single pipeline facility, and that issue is currently being litigated in the Ninth Circuit Court of Appeals, Case No. 25-8059. Thus, Intervenor Plaintiffs refer to these pipeline facilities separately herein as the Onshore and Offshore Pipelines.

50.    The treated crude produced at the LFC Facilities is then placed into the Onshore Pipelines and transported approximately 120 miles from Santa Barbara County to Pentland Station in Kern County for storage and distribution.



51.    The first Onshore Pipelines segment, CA-324, is an eleven-mile pipeline that originates at the LFC Facilities and travels westward along the Gaviota Coast in close proximity to the Pacific Ocean. Near Gaviota State Park, oil product that passes through CA-324 is transferred to CA-325, which extends the remaining 110 miles to Pentland Station.

52.    Along the way, CA-325 passes directly through six major groundwater basins that provide domestic and public water supply; the Santa Ynez, Sisquoc, and Cuyama rivers; dozens of creeks and drainages; renowned recreation and conservation areas, including Gaviota State Park and the Carrizo Plain National Monument; and critical habitat for over a dozen special-status species, like the California red-legged frog. Perhaps most concerning, however, is that CA-325 passes directly through a suburban

neighborhood in Buellton, California, complete with schools, parks, and dozens of residential homes.

53.    Two features of the Onshore Pipelines' technical specifications are particularly relevant here. The first is the pipelines' coating and insulation system. As depicted below, the Onshore Pipelines were installed with three "layers" of material: (1) a coal tar urethane coating; then (2) polyurethane foam thermal insulation, intended to maintain the viscous oil product at an elevated temperature to facilitate transportation; and, lastly, (3) a wrap of polyethylene tape, which would act as a moisture barrier.



54.    The second is the Onshore Pipelines' cathodic protection system—the foremost means by which the pipelines were intended to be protected from corrosion. In short, a cathodic protection system imparts an electric current onto a pipeline through a process that, when effective, causes a substitute source of metal to corrode in place of the pipeline. As long as the current is sufficient, the system theoretically prevents external corrosion of the pipeline, or at least holds it in check. The importance of a properly designed and functioning cathodic protection system cannot be overstated. "Protection of a pipeline from corrosion is of *critical importance* to the environment"; without such

protection, the strength of the wall can deteriorate, leading to a break in the pipe and a possible oil spill.[3]

## II.    The Defective Onshore Pipelines Targeted by the Wright Order Caused One of California's Worst Oil Spills and Remain Unsafe.

55.    On May 19, 2015, pipeline CA-324 ruptured near Refugio State Beach, spilling over 120,000 gallons of oil into the ocean and surrounding environment. The spill was one of the largest oil disasters in California history, and it affected approximately 150 miles of California coast. Thousands of acres of shoreline and subtidal habitat were destroyed, and an untold number of animals were injured or killed. The spill also forced the closure of fisheries and beaches, costing local businesses hundreds of millions of dollars and causing an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties.

56.    After an investigation, the Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that the rupture was the result of "progressive external corrosion" and that the pipeline's cathodic protection system, intended to prevent such corrosion, was ineffective.[4] Without proper protection from corrosion, the pipeline wall had thinned as much as eighty-nine percent, leaving it unable to withstand the internal pressure of operations. Inspections revealed that, without effective protection from corrosion, the Onshore Pipelines had continued to pervasively corrode, resulting in hundreds of metal loss anomalies with a depth of forty-percent or greater wall loss, triggering the need for repair under the Consent Decree.

57.    The ineffectiveness of cathodic protection on CA-324 was a product of the pipeline's flawed design. Specifically, the various layers of material installed on the pipeline—its non-conductive coating, foam insulation, and outer protective tape wrap—

---

[3] California State Lands Commission *et al.*, *Draft Environmental Impact Report Environmental Impact Statement*, p. 4–106 (August 1984) (emphasis added).

[4] Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report, Plains Pipelines, LP, Line 901, Crude Oil Release, May 19, 2015, Santa Barbara County, California*, p. 14 (May 2016) [hereinafter "PHMSA Report"].

created conditions that prevented the pipeline's cathodic protection system from functioning properly.

58.    Notably, the above issues were not limited to CA-324: PHMSA found pervasive metal loss throughout the entirety of the Onshore Pipelines. PHMSA ultimately concluded that, by flaw of design, cathodic protection is ineffective on *both* CA-324 and CA-325. It further concluded that, writ large, "[cathodic protection] is ineffective on buried insulated pipelines" like the Onshore Pipelines.[5]

59.    Following the spill, the Onshore Pipelines were purged and shut down. Due to the unavailability of the pipelines, the SYU was likewise idled, and extraction at the offshore field ceased.

### III.    Transfer of Jurisdiction to OSFM and The Consent Decree Governing Restart

60.    When initially permitted in the 1980s, the Onshore Pipelines were intended to be part of a larger pipeline system that would extend from Las Flores Canyon to Texas. Thus, the Onshore Pipelines were initially classified as *inter*state facilities, which, pursuant to the Pipeline Safety Act (PSA), placed them under PHMSA's jurisdiction. *See* 49 U.S.C. § 60104(c). However, while the Onshore Pipelines were installed in the early 1990s, it is unclear if the broader project connecting them to Texas ever came to fruition, and, as early as 2000, it was acknowledged that the pipelines were not actually being used to transport crude oil out of state. Recognizing as much, after the 2015 spill, Plains cancelled its Federal Energy Regulatory Commission (FERC) certificates for the pipelines, and PHMSA formally reclassified them as *intra*state facilities that would be subject, per the PSA, to the exclusive regulatory authority of the California Department of Forestry and Fire Protection, Office of the State Fire Marshal (OSFM). The reclassification of the Onshore Pipelines as *intra*state, and the corollary transfer of jurisdiction to OSFM, was memorialized in a 2016 Memorandum of Understanding (MOU) between PHMSA and OSFM.

---

[5] PHMSA Report at Appendix E, p. 2.

61.     Several years later, On May 12, 2020, the United States and various State agencies filed a civil action against Plains All American Pipeline Company (Plains), the owner and operator of the Onshore Pipelines at the time of the rupture, for causing the Refugio Oil Spill. *U.S. v. Plains All American Pipeline*, Case No. 2:20-cv-02415 (March 13, 2020).

62.     The parties reached a settlement, which was memorialized in a Consent Decree filed in 2020 in the Central District of California. The Consent Decree required Plains to pay over $60 million in damages and penalties. On October 14, 2020, the Court signed the Consent Decree, which is a judgment binding all parties, including successors in interest.

63.     In addition to imposing monetary penalties on Plains, the Consent Decree contemplated the future of the Onshore Pipelines. It offered three paths forward for Plains (and any subsequent owner) considering the pipelines' design defects. First, Plains could abandon and decommission the Onshore Pipelines. Second, Plains could replace the pipelines with new, non-insulated pipe, which could potentially allow cathodic protection to function properly. And, as a third and final option, Plains could restart the existing pipelines, but only under strict conditions.

64.     As relevant here, those restart conditions included (1) remediating all areas of the pipelines where the pipeline wall had corroded more than 40%; (2) obtaining, exclusively from OSFM, waivers for the "limited effectiveness of cathodic protection"; and (3) obtaining, exclusively from OSFM, approval of a Restart Plan for both Onshore Pipelines.[6]

65.     Plains appeared to be pursing the second option when it applied to Santa Barbara County (the "County") for necessary land use permits to construct new, safer pipelines. However, as Plains' application to the County was pending, Plains sold the

---

[6] Consent Decree, at Appendix B, Art. 1, § 1(A), U.S. v. Plains All American Pipeline, Civil Action No. 2:20-cv-02415 (Mar. 13, 2020) [hereinafter "Consent Decree"], available at https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf.

Onshore Pipelines to Pacific Pipeline Company ("PPC"), then a wholly owned subsidiary of Exxon Mobil Corporation ("Exxon"), which was the longtime owner of the SYU. Shortly thereafter, PPC withdrew the application.

**IV.    Sable's Acquisition of the Onshore Pipelines, Efforts to Restart, and Disregard of State and Judicial Authority**

66.    On February 14, 2024, Exxon sold the SYU and all associated assets, including the Onshore Pipelines, to Sable.

67.    Sable—a new, speculative company—was severely undercapitalized, so the deal was financed almost entirely by a loan from Exxon, which provided $622 million of the $625 million purchase price. In return, Sable agreed that the SYU assets and Onshore Pipelines may revert to Exxon if it fails to restart the SYU within two years. Notably, these assets are Sable's only assets, leaving it without any source of revenue so long as they are idled.

68.    Because of these constraints, Sable sought to quickly restart, rather than replace, the defective Onshore Pipelines. In its haste to do so, it began willfully disregarding state law, ignoring agency directives, and otherwise cutting regulatory corners.

69.    In its rush to repair the severely corroded pipelines, Sable performed dozens of excavations along the pipeline route without obtaining requisite authorizations from local and state agencies. These violations led to a historic $18 million fine, a felony criminal complaint, and an injunction in state court preventing Sable from conducting further unpermitted repairs in the Coastal Zone.

70.    Separately, under Chapter 25-B of the Santa Barbara County Code, Sable was required to obtain approval from the County of Santa Barbara to operate the Onshore Pipelines and LFC Facilities, which operate primarily pursuant to County-issued land use permits. On December 16, 2026, the County Board of Supervisors denied Sable's request, finding that the company lacked the skills, training, and resources necessary to operate the Onshore Pipelines or LFC Facilities in compliance with applicable permits and

County codes. Sable sued the County, and Intervenor Plaintiffs EDC, GOO!, SBCAN, SBCK, and Sierra Club intervened in the case on behalf of the County.

71.    Sable also needed permission to conduct repairs and, separately, an easement to operate the Onshore Pipelines within Gaviota State Park (the "Park"). Sable had little trouble securing its first round of permissions. Despite Sable's well documented history of violating State directives, on May 8, 2025, the California Department of Parks and Recreation ("State Parks") issued a Right of Entry (ROE) Permit to Sable, allowing Sable to repair the pipeline anomalies within the Park. In doing so, State Parks exempted the activity from environmental review and failed to provide for public input. Sable later violated the express terms and conditions of the ROE, resulting in impacts to air quality caused by transporting soil in uncovered dump trucks; impacts to wildlife caused by entanglement in nylon mesh, and ingestion of plastic trash and spray foam insulation and sealant; and impacts to water quality and aesthetics caused by introduction of trash in the Park and nearby beaches. State Parks nevertheless continued to process Sable's application for an easement—up until Sable informed State Parks that it would be restarting the Onshore Pipelines under the Wright Order without the agency's permission, at which point State Parks denied Sable's application.

72.    Meanwhile, pursuant to the Consent Decree, Sable applied to OSFM for waivers for the limited effectiveness of cathodic protection on the Onshore Pipelines. In December 2024, OSFM approved Sable's State Waivers without conducting environmental review or providing any formal opportunity for public process. In doing so, OSFM failed to adequately address Intervenor Plaintiffs' or the public's concerns about the risks of allowing the Onshore Pipelines to operate without first remediating the underlying cause of the 2015 oil spill. The State Waivers became final in February 2025 when, pursuant to the Pipeline Safety Act, PHMSA did not object to OSFM's Waivers.

73.    In April 2025, Intervenor Plaintiffs filed companion lawsuits challenging the State Waivers in the Superior Court for the County of Santa Barbara. On July 18, 2025, Santa Barbara County Superior Court Judge Donna D. Geck issued a preliminary

injunction which enjoined Sable from restarting the Onshore Pipelines until 10 court days after the filing and service of notice that Sable has received all necessary approvals and permits for restarting the Onshore Pipelines, and that Sable intends to commence such restart. That injunction remains in place and Sable is currently violating it.

74.     As those lawsuits proceeded, Sable requested authorization from OSFM, pursuant to the Consent Decree, to restart the Onshore Pipelines. The agency refused, citing the fact that additional repairs required by the State Waivers are needed to ensure the Onshore Pipelines are safe to operate.

75.     Rather than coming into compliance with State and County requirements, Sable threatened to circumvent their authority by utilizing an Offshore Storage and Treating Vessel ("OS&T") to move its processing, storage, and transportation activities offshore. In fact, before the Onshore Pipelines became operational in the early 1990's, the SYU relied upon an OS&T to get its product to market. On October 9, 2025, Sable announced that "continued delays in approving the restart plans for the Las Flores Pipeline System will cause Sable to fully pivot to its accelerated OS&T strategy."[7]

76.     Subsequently, on November 26, 2025, Sable sent a letter to PHMSA suddenly claiming, unilaterally, that the Onshore Pipelines were *inter*state facilities over which OSFM lacked jurisdiction. In response, on December 17, 2025, PHMSA granted Sable's request and issued an order redesignating the Onshore Pipelines as *inter*state, purporting to strip OSFM of its authority to regulate the *intra*state Onshore Pipelines.

77.     On December 22, 2025, less than a week after asserting jurisdiction, PHMSA issued a one-page, cursory letter approving Sable's Restart Plan for CA-324 and CA-325 and purporting to authorize restart of the Onshore Pipelines. The next day, PHMSA issued, under the PSA, a new waiver (called an "Emergency Special Permit" or "ESP") for the Onshore Pipelines on an emergency basis. The "emergency" necessitating the ESP, said PHMSA, was the President's general dissatisfaction with nationwide

---

[7] Sable Offshore Corp., *Securities and Exchange Commission Form 8-k* (Oct. 9, 2025), available at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000079/socc-20251009.htm

energy development. Under that pretext, PHMSA refused to provide public notice or solicit comment, as is generally required under the PSA, or conduct environmental review of the ESP under the National Environmental Policy Act (NEPA). Notably, the ESP expired on February 21, 2026.

78. On December 24, 2025, Intervenor Plaintiffs filed a petition for review in the Ninth Circuit Court of Appeals challenging PHMSA's approval of the Restart Plan and the Emergency Special Permit. On January 23, 2026, the State filed a similar petition for review in the Ninth Circuit Court of Appeals challenging PHMSA's Federalization Order, PHMSA's approval of the Restart Plan, and the Emergency Special Permit. The State's petition and Intervenor Plaintiffs' petition were later consolidated.

79. In addition to the lawsuits brought by the Intervenor Plaintiffs, there are several active lawsuits to date related to the pipeline work and potential restart. Since early 2025, several state and local entities have issued administrative notices of violation and brought enforcement actions, and actions seeking other forms of relief, against Sable, alleging the company failed to comply with certain requirements regarding repair and potential restart of the Onshore Pipelines, including obtaining applicable property rights. For example, on February 18, 2025, the California Coastal Commission filed a cross-complaint against Sable to enforce various administrative orders, including fines for unpermitted repair work in the coastal zone. *See Sable Offshore Corp. et al. v. California Coastal Commission*, Case No. 25CV00974 (Santa Barbara Sup. Ct., Feb. 18, 2025). On May 28, 2025, the court issued a preliminary injunction, prohibiting Sable from conducting any development on the Onshore Pipelines in violation of the Commission's cease-and-desist order.

80. On September 16, 2025, the Santa Barbara County District Attorney brought criminal charges against Sable alleging intentional violations of the California Water Code and Fish and Game Code related to unpermitted repair work. *The People of the State of California v. Sable Offshore Corp.,* Case No. 25-000333 (Santa Barbara Sup. Ct., Sep. 16, 2025).

81.     On October 3, 2025, the California Regional Water Quality Control Board sued Sable, alleging violations of the California Water Code involving failure to comply with an investigative order, failure to report waste discharges, and discharge of waste into "waters of the state" without permits. *People of the State of California ex rel. California Regional Water Quality Control Board, Central Coast Region v. Sable Offshore Corp.*, Case No. 25CV06285 (Santa Barbara Sup. Ct., Oct. 3, 2025).

82.     On March 17, 2026, State Parks filed suit against Sable, alleging that Sable was trespassing by using pipeline CA-325 to transport oil through Gaviota State Park without a valid property interest. *Cal. Dep't of Parks and Recreation v. Sable Offshore Corp., et al.*, Case No. 26CV01759 (Santa Barbara Super. Ct., Mar. 17, 2026) (removed Mar. 19, 2026 into federal district court as *Cal. Dep't of Parks and Recreation v. Sable Offshore Corp., et al.*, C.D.Cal. 2:26-cv-02946).

83.     Rather than comply with State requirements, Sable filed its own suits (along with its wholly owned subsidiaries) against  California regulators and the County of Santa Barbara for attempting to implement State and local laws and regulations, and for attempting to hold Sable to its legal obligations. On February 18, 2025, Sable challenged the Coastal Commission's jurisdiction to enforce an administrative penalty. *See Sable Offshore Corp. et al. v. California Coastal Commission,* Case No. 25CV00974 (Santa Barbara Sup. Ct., Feb. 18, 2025). On May 8, 2025, Sable sued the County of Santa Barbara for denying its requested transfer of permits from ExxonMobil to Sable. *See Sable Offshore Corp. et al. v. County of Santa Barbara, et al.*, Case No. 2:25-cv-04165 (C.D. Cal., May 8, 2025). On September 29, 2025, Sable sought relief regarding the applicability of SB 237 (a State law requiring a coastal development permit prior to restarting an idle pipeline, Cal. Pub. Res. Code section 30262(b)(2), (3)) to the Onshore Pipelines. *Pacific Pipeline Co. v. State of California*, Case No. 1:26-cv-01486 (E.D. Cal, Sep. 29, 2025). On March 13, 2026, Sable sought declaratory relief related to the issue of obtaining an easement within Gaviota State Park. *Sable Offshore Corp. v. Quintero,* Case No. 2:26-cv-02739 (C.D. Cal., March 13, 2026). On February 17, 2026, Sable sued the

Complaint in Intervention

California Geologic Energy Management Division ("CalGEM") to challenge CalGEM's bond requirement for production facilities and the applicability of AB 1167 to its acquisition of the SYU onshore facilities. *Sable Offshore Corp. v. CalGEM, et al.*, Case No. 26WM000036 (Sacramento Sup. Ct., February 17, 2026).

84.    On February 26, 2026, Sable announced that it was abandoning the State Waivers, notwithstanding the Consent Decree's requirement that they be obtained before the Onshore Pipelines can be legally restarted. Sable claimed that PHMSA's approvals permitted it to do so. Sable has also applied to PHMSA for a long-term Special Permit to replace the Emergency Special Permit, which expired in February 2026.

## V.    The Wright Order was Issued at Sable's Request to Facilitate the Restart of the Onshore Pipelines.

85.    On December 12, 2025, Sable sent a formal letter to the DOE complaining about the restart requirements established by state law and the Consent Decree. Sable asked the Secretary to issue an order under the DPA, in an attempt to provide Sable with the cover it needed to restart the Onshore Pipelines regardless of whether it had conformed with its obligations under state law and the Consent Decree.

86.    The federal government decided to oblige.  First, on March 3, 2026, the U.S. Department of Justice's Office of Legal Counsel released an opinion in response to questions from the DOE. As the opinion described them, those questions asked whether an order issued under the DPA to Sable would preempt California law and override the Consent Decree. Conveniently for Sable, DOJ decided that the answer to both questions was yes. Its opinion advanced a novel series of unfounded legal arguments concluding that a DPA order would preempt both, providing Sable with a clear path to restart.

87.    Ten days later, on March 13, 2026, President Trump issued an Executive Order, "Adjusting Certain Delegations Under The Defense Production Act," amending a previous Executive Order that delegated "certain authorities of the President under the [DPA]" to the Secretary of Commerce to expand that delegation of authority to include the Secretary of Energy.

88.     Later that day, the Secretary released the Wright Order. The Secretary pointed to the "shortages identified in the EO 14156," but that executive order states broad, baseless *conclusions* about "insufficient energy production" in the United States and fails to provide sufficient evidence to support those conclusions. Wright Order at 2; Exec. Order No. 14,156, 90 Fed. Reg. 8433, 8434 (Jan. 20, 2025). In fact, the evidence overwhelmingly shows that the United States has an excess of oil resources. The United States is the world's largest producer of crude oil,[8] and even more significantly, is the world's third largest exporter of oil.[9] It has been a net energy exporter since 2019, when President Trump declared the nation energy independent.[10]

89.     The Secretary's Order invoked Title I of the DPA and instructed Sable to "immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the [Santa Ynez Pipeline System], including transportation service activities at the onshore facilities at Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." Wright Order at 3.

90.     The Wright Order also required Sable to "immediately commence performance under current contracts or orders for services, including contracts or orders hereinafter entered into or sought, for hydrocarbon transportation capacity in the [Santa Ynez Pipeline System] from the point of production in the SYU through the [Santa Ynez Pipeline System], including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal." *Id.*

---

[8] U.S. Energy Information Admin., Oil and Petroleum Products Explained, available at: https://www.eia.gov/energyexplained/oil-and-petroleum-products/where-our-oil-comes-from.php.

[9] U.S. Energy Information Admin., U.S. Exports of Crude Oil, available at: https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrexus1&f=a; World's Top Exports, Crude Oil Exports by Country, available at: https://www.worldstopexports.com/worlds-top-oil-exports-country/.

[10] U.S. Energy Information Admin., U.S. Energy Facts Explained, available at: https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php; Forbes, U.S. Energy Independence Set New Record In 2023 (July 01, 2024), available at: https://www.forbes.com/sites/rrapier/2024/07/01/us-energy-independence-set-new-record-in-2023/.

Complaint in Intervention

91.     This Order was left open-ended. Even though no hydrocarbon transportation services through the Onshore Pipelines existed at the time of the Order, the Order did not clarify by what date Sable was required to comply, or for how long. It simply stated that Sable was required to "comply with this order immediately and to maintain compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." *Id.*

92.     The DOE released a press release that same day stating that Secretary Wright had issued an order under the DPA directing Sable to "restore operations of the Santa Ynez Unit and Santa Ynez Pipeline System."[11]

93.     With the order it had solicited in hand, Sable restarted the Onshore Pipelines on March 14, 2026, in direct violation of the Consent Decree, a State Court preliminary injunction, and state and federal law governing restart.

94.     On March 16, 2026, Sable released its own press statement announcing that it had complied with the DPA Order by restarting the Onshore Pipelines "at the direction of the United States Secretary of Energy, Chris Wright."[12]

95.     The following day, Sable sent a letter to the U.S. Department of Justice and the California Department of Justice, stating it had restarted the Onshore Pipelines and that it would no longer abide by the Consent Decree.

**VI.     Sable Is Attempting to Bypass Critical State Laws and Regulations in Reliance on the Wright Order.**

96.     In restarting the Onshore Pipelines using the Wright Order, Sable bypassed the regulatory framework both the Consent Decree and California state law impose to

---

[11] Department of Energy, *Secretary Wright Directs Sable Offshore to Restore the Santa Ynez Unit and Pipeline* (Mar. 13, 2026) https://www.energy.gov/articles/secretary-wright-directs-sable-offshore-restore-santa-ynez-unit-and-pipeline.

[12] Sable Offshore Corporation, *Sable Resumes Oil Flow as Ordered by the Federal DPA with Expected Gross Oil Rate of 50,000 Bbls/d and Expects First Sales by April 1, 2026* (Mar. 16, 2026) https://sableoffshore.com/news/news-details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx.

govern the restart of the Onshore Pipelines. Under the framework established by state law, eight state agencies play distinct yet interconnected roles in ensuring that if the Onshore Pipelines are restarted, that restart is done safely and consistent with protection of the environment. They also engage with the public to gather input on the potential impacts the Onshore Pipelines would have on local communities and, ideally, incorporate those concerns into their decision-making processes. Additionally, the Consent Decree provides that only OSFM has the authority to approve pipeline safety waivers or restart.

97.    These agencies ensure that Sable complies with a range of applicable state laws before restarting the Onshore Pipelines, including requirements related to pipeline safety, environmental protection, and land use.

98.    OSFM implements the Elder California Pipeline Safety Act of 1981, Cal. Gov. Code § 51010 *et seq*., which applies to public safety, risk reduction, and spill prevention from hazardous liquid pipelines within California. California Senate Bill 237, which took effect January 1, 2026, amended the Elder California Pipelines Safety Act to require spike hydrostatic testing for any oil pipeline that has been idle, inactive, or out of service for five years or more. Such testing is necessary to identify any problems with pipeline integrity and to prevent the risk of an oil spill.

99.    The Office of Spill Prevention and Response (OSPR) within the California Department of Fish and Wildlife (CDFW) carries out the Lempert-Keene-Seastrand Act of 1990, Cal. Gov. Code section §§ 8574.1 et seq., which applies to oil spill prevention, preparedness, and response. OSPR is required to approve oil spill prevention and response plans, and to ensure that oil companies demonstrate the necessary financial assurances to respond appropriately to an oil spill.

100.    CDFW implements the California Endangered Species Act of 1984, Cal. Fish & Game Code, § 2050 et seq., which applies to the management and protection of listed species. It also implements Section 1603 of the California Fish and Game Code, which requires a lake or streambed alteration permit if the Onshore Pipelines' activities may substantially impact fish and wildlife.

101.   The California State and Regional Water Quality Control Boards implement the Porter-Cologne Water Quality Control Act of 1969, Cal. Wat. Code, § 13000 *et seq.*, which applies to the discharge of waste, stormwater, and land disturbances that could occur during pipeline repair or construction.

102.   The California Coastal Commission administers the California Coastal Act of 1976, Public Resources Code §§ 30000 *et seq.*, which regulates development within the "coastal zone." California Senate Bill 237 amended the California Coastal Act. It clarified that repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more and is located in the coastal zone (such as the Onshore Pipelines) requires a new coastal development permit. Cal. Pub. Res. Code § 30262(b)(2), (3). This law guarantees a public process to ensure that reactivated oil facilities meet all current safety and environmental protection requirements.

103.   CalGEM implements Section 3106 of the California Public Resources Code, which ensures that operators, such as Sable, carry out oil and gas production, operation, and decommissioning of production facilities in a manner that prevents damage to the health and safety of California's citizens, or damage to the environment and natural resources.

104.   The Intervenor Plaintiffs rely upon these laws and agencies to perform their work and advocate on behalf of the environment. Many of the laws mentioned, such as SB 237, were strongly supported by Intervenor Plaintiffs. Intervenor Plaintiffs and their members depend on agencies such as the California Coastal Commission, which was first established by a voter initiative, to faithfully administer the State's laws and provide opportunities for the public to engage with the decision-making process. This process, while imperfect, provides Intervenor Plaintiffs and the public generally with the ability to shape projects that are likely to affect their communities and ensure that the state understands local concerns and impacts. It is critical to the well-being of the public and the environment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### Violations of Administrative Procedure Act, § 706(2)(A), (C)
#### Contrary to Law, In Excess of Statutory Authority

105. Intervenor Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

106. The APA provides for judicial review of final agency actions. 5 U.S.C. § 704.

107. Agency actions subject to judicial review include the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

108. A reviewing court must "hold unlawful and set aside" agency action that fails to comply with statutory or constitutional constraints. Specifically, this includes agency actions that are "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

109. The Wright Order was issued by the Secretary of the Department of Energy, an administrative agency of the federal government, and is therefore an agency action subject to the APA.

110. The Secretary relied upon the authority granted to him by Title I of the DPA when issuing the Wright Order, which constituted a final agency action.

111. The Wright Order violates DOE's own implementing regulations, including by requiring Sable to prioritize contracts or allocate resources without providing clear start and end dates to the Order. *See* 10 C.F.R. § 217.54. The Wright Order uses the term "immediately," which is nonspecific, and has no termination date. Thus, it is ordering Sable to continue following the order in perpetuity, which exceeds the scope of the Secretary's allocation authority under its own implementing regulations.

112. Similarly, the Wright Order is contrary to law because it fails to make a series of findings required by DPA sections 101(b) and 101(c), including: that either oil

or hydrocarbon transportation services are "scarce, critical, and essential," or supported by any of the needs listed in the DPAt; or that there are not other means of meeting those needs. 50 U.S.C. § 4511(b), (c).

113.   The Wright Order also violates and exceeds the powers created by the DPA because, among other things, the statute's prioritization and allocation language does not permit the Secretary to order the *production* of oil or the *restart* of the Onshore Pipelines, only to prioritize certain contracts and allocate existing resources and services among competing needs. To the extent the Secretary orders Sable to produce oil from the SYU and restart the Onshore Pipelines, the Secretary exceeds his authority under the DPA.

114.   Further, the DPA does not grant the Defendants the authority to preempt state law, displace applicable federal law, or override binding court orders. To the extent the Secretary purports to do so through issuance of the Wright Order—as Sable claims, and as the Secretary likewise suggests—he exceeds the scope of authority conferred by the DPA.

115.   In issuing the Wright Order, Defendants exceeded the scope of their legal authority under the DPA and acted contrary to the DPA and its implementing regulations. As such, issuance of the Wright Order is an agency action "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under the APA. 5 U.S.C. §§ 706(2)(A), (C). Accordingly, the court must hold unlawful and set aside the Wright Order. *See* 5 U.S.C. § 706(2); 28 U.S.C. § 2201.

**SECOND CAUSE OF ACTION**
**Violation of Administrative Procedure Act 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**

116.   Intervenor Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

117.   A reviewing court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

118.   Agency actions are arbitrary and capricious if the agency "relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43.

119.   An agency must provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

120.   The Wright Order fails to consider several critical aspects of the problem. For example, the Secretary did not consider how Sable might use the Wright Order to undermine state laws and regulations or evade judicial orders. Nor did the Secretary evaluate the environmental risks of restarting the heavily-corroded Onshore Pipelines, which retain the same design flaw that caused the 2015 Refugio Beach oil spill, before they meet the State's safety requirements. The Wright Order makes no reference to alternative methods of getting SYU's oil to market, despite Sable's consideration of the OS&T strategy, instead simply stating that Sable's oil "cannot be used . . . without reliable transport of SYU's production through the Santa Ynez Pipeline System." Wright Order at 2. The Wright Order likewise fails to recognize that the United States is a net exporter of oil. Because the Secretary has entirely failed to consider key aspects of the problem in the Wright Order, the order is invalid.

121.   To the extent that the Wright Order contains findings at all, they are cursory, not adequately explained, lack evidentiary support, and in fact run contrary to the evidence before the agency. The Secretary occasionally cites conclusions made either by the President or by Sable, but does not set forth his own reasoned determinations. Those few determinations that the Secretary may claim to have made are not supported by a rational connection between the facts found and decision made. The Wright Order fails to explain the factual basis for any of the findings required by the DPA and its implementing regulations. For example, it relies upon the President's national security

Complaint in Intervention

assertions but provides insufficient evidence to demonstrate how Sable's oil, in particular, "is a scarce and critical material essential to the national defense." 50 U.S.C. § 4511(b)(1). The Secretary also fails to provide specific evidence for any implicit determination that the national defense need for oil cannot be otherwise met. 50 U.S.C. § 4511(b)(2). The Wright Order likewise fails to support its finding that oil is scarce, critical, and essential under section 101(c). *See* 50 U.S.C. § 4511(c)(1). The Wright Order vaguely refers to how Sable can help address "energy vulnerabilities on the West Coast," but does not explain what the "energy vulnerabilities" entail or how Sable's energy production would solve that alleged problem. Wright Order at 2. Moreover, the Secretary fails to find that using the Wright Order to restart the Onshore Pipelines is the only reasonable method to get Sable's oil to market, overlooking Sable's path to restart under the Consent Decree. *See* 50 U.S.C. § 4511(c)(2). These cursory, unsupported conclusions render the Wright Order arbitrary and capricious.

122.  Likewise, the Secretary relied on factors Congress did not intend for him to consider, such as the existence of state requirements perceived to slow the development of the infrastructure at issue. Wright Order at 2. ("According to Sable, the State of California is impeding it from resuming transportation of SYU production through the SYPS.").

123.  Accordingly, the Wright Order is arbitrary and capricious and must be set aside. 5 U.S.C. 706(2)(A); *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43.

**THIRD CAUSE OF ACTION**
**Violations of the U.S. Constitution, Separation of Powers and Administrative Procedure Act,  5 U.S.C. § 706(2)(B)**

124.  Intervenor Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

125.  The Constitution divided the powers of the Federal Government into three defined categories: Legislative, Executive, and Judicial. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).

126. Article III, Section 1 of the United States Constitution vests the Judicial Power of the United States in federal courts. U.S. Const., art. III, Sec. 1.

127. It is the constitutional role of the judiciary to control, by Article III judges, the interpretation, declaration, and application of federal law. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 76–81 (1982).

128. Courts have the inherent power to enforce obedience with their judicial orders, which is "essential to the preservation of order in judicial proceedings." *Ex parte Robinson*, 86 U.S. 505, 510 (1873).

129. Congress cannot vest review of Article III court decisions in Executive Branch officials, and, by extension, the Legislative and Executive Branches cannot unilaterally override Judicial determinations. Separation of powers principles protect judicial independence by ensuring that once a court renders a decision, it cannot be subject to Executive revision or nullification.

130. To the extent the Secretary intends the Wright Order to usurp the Judiciary's authority to modify, reverse, or enforce judicial judgments, or to the extent the Wright Order is interpreted to in fact have that effect, the Wright Order violates the separation of powers. Through a DPA order, the Secretary cannot encroach upon this core function of the Judiciary. Nothing in Congress's enactment of the DPA suggests an intent to authorize such interference; and even if it did, Congress cannot amend the Constitution through ordinary legislation. Only a constitutional amendment can alter the separation of powers. The Executive has no power to order Sable to act in direct contravention of the Consent Decree and a preliminary injunction or invalidate those judicial decrees.

131. Accordingly, to the extent the Wright Order is used to modify or nullify the Consent Decree or any lawfully-issued injunction, the Wright Order violates the constitutional principles of separation of powers doctrine by purporting to claim for the Executive Branch power that is reserved to the Judicial Branch. *See* U.S. Const., art. III, Sec. 1; *Free Enter. Fund*, 561 U.S. at 483. Accordingly, the Wright Order is an agency

action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## RELIEF REQUESTED

For the foregoing reasons, Intervenor Plaintiffs respectfully request that the Court:

1. Declare that the Wright Order is contrary to law, in excess of statutory authority, and arbitrary and capricious under the APA;

2. Vacate the Wright Order pursuant to the APA, 5 U.S.C. section 706;

3. Declare that the Wright Order violates the constitutional principles of separation of powers doctrine;

4. Enjoin Defendants from invoking the Wright Order to authorize or compel operation of the Santa Ynez Unit and the Onshore Pipelines, and from allowing anyone operating as Defendants' agents or working in concert with them to rely on or invoke the Wright Order to operate the Santa Ynez Unit and the Onshore Pipelines without having received necessary state-law approvals and without satisfying the terms of court orders; and

5. Grant other such relief as this Court may deem proper.

Dated: May 7, 2026

Respectfully submitted,

*/s/ Margaret M. Hall*
Margaret M. Hall
Linda Krop
Jeremy M. Frankel
ENVIRONMENTAL DEFENSE CENTER
*Counsel for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Surfrider Foundation.*

/s/ Julie Teel Simmonds
Julie Teel Simmonds
Emily Jeffers
Talia Nimmer
CENTER FOR BIOLOGICAL
DIVERSITY
*Counsel for Center for
Biological Diversity and
Wishtoyo Foundation*

Complaint in Intervention