ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
JUSTIN D. HEMINGER
Deputy Assistant Attorneys General
RILEY W. WALTERS
Email:  Riley.Walters@usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:  (202) 514-5442

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants. | Case No. 2:26-cv-03396-SVW-SSC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND STAY**<br><br>Hearing Date: June 1, 2026<br>Time: 1:30 pm<br>Judge: Honorable Stephen V. Wilson |

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................... 1

BACKGROUND ........................................................................................... 3

    I.     The Defense Production Act ......................................................... 3

    II.    The Pipeline Capacity Prioritization and Allocation Order ......... 4

    III.   Related Litigation ......................................................................... 5

LEGAL STANDARD ................................................................................... 6

ARGUMENT ................................................................................................ 6

    I.     California Is Not Likely to Succeed on the Merits ...................... 6

        A.    The Defense Production Act Order is not reviewable under the Administrative Procedure Act because the Order is presidential action, not agency action ................................ 7

        B.    The Defense Production Act Order is both lawful and rational .................................................................................. 9

            1.    The Defense Production Act Order is not contrary to law ............................................................................ 9

            2.    The Defense Production Act Order is rational ...... 19

    II.    California Has Not Established that it Is Likely to Suffer Irreparable Harm or that the Equitable Factors Favor a Preliminary Injunction and Stay .............................................. 21

        A.    California is not likely to suffer irreparable harm absent preliminary relief ............................................................. 21

        B.    The balance of harms and the public interest weigh strongly against an injunction ......................................... 24

CONCLUSION ............................................................................................ 25

i

*Defs.' Opp'n to Mot. for a*
*Prelim. Inj. and Stay*

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*All. for The Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)..................................................................................21

*Amylin Pharms., Inc. v. Eli Lilly & Co.*,
  456 F. App'x 676 (9th Cir. 2011)............................................................................22

*Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*,
  801 F. Supp. 2d 383 (D. Md. 2011) ......................................................................8, 9

*Bloate v. United States*,
  559 U.S. 196 (2010) ................................................................................................12

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016)................................................................................21

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988)..................................................................................22

*Chairez v. Mayorkas*,
  168 F.4th 1227 (9th Cir. 2026).................................................................................7

*City of New York v. FCC*,
  486 U.S. 57 (1988) ..................................................................................................15

*Clam Ventures LLC v. Newsom*,
  2021 WL 1502657 (C.D. Cal. Mar. 25, 2021) .......................................................23

*Cohen v. Apple Inc.*,
  46 F.4th 1012 (9th Cir. 2022)..................................................................................14

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..................................................................................................7

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988) .............................................................................................9, 19

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016) ........................................................................8, 9

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*,
  532 F.2d 957 (5th Cir. 1976)....................................................................................3

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

*FDA v. Wages & White Lion Investments, LLC*,
   604 U.S. 542 (2025) ..................................................................................18

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) ..................................................................................14

*Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*,
   59 F.4th 180 (5th Cir. 2023)......................................................................16

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .....................................................................................7

*Freeman v. Gonzales*,
   444 F.3d 1031 (9th Cir. 2006).....................................................................11

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ........................................................................6

*Gros Ventre Tribe v. United States*,
   469 F.3d 801 (9th Cir. 2006) ........................................................................7

*Haig v. Agee*,
   453 U.S. 280 (1981) ...................................................................................24

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ...................................................................................19

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
   452 U.S. 264 (1981) ...................................................................................16

*Hou. Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*,
   643 F.2d 1185 (5th Cir. 1981).....................................................................10

*Immigrant Defs. Law Ctr. v. Noem*,
   145 F.4th 972 (9th Cir. 2025).......................................................................6

*Immigrant Defs. Law Ctr. v. Noem*,
   781 F. Supp. 3d 1011 (C.D. Cal. 2025)......................................................21

*Islamic Am. Relief Agency v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) ...................................................................20

*Jensen v. Nat'l Marine Fisheries Serv.*,
   512 F.2d 1189 (9th Cir. 1975)...................................................................7, 8

*Johnson v. Tyson Foods, Inc.*,
   580 F. Supp. 3d 382 (N.D. Tex. 2022)................................................... 13, 15

iii

*Knick v. Township of Scott*,
  588 U.S. 180 (2019) ................................................................................16

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................19

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ..................................................................................6

*McDaniel v. Wells Fargo Invs.*,
  717 F.3d 668 (9th Cir. 2013) ..................................................................10

*Murphy v. NCAA*,
  584 U.S. 453 (2018) ......................................................................... 15, 16

*Nat. Res. Def. Council v. U.S. Dep't of State*,
  658 F. Supp. 2d 105 (D.D.C. 2009) ......................................................8, 9

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
  23 F.3d 1508 (9th Cir. 1994) ..................................................................22

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ......................................................................9

*Nelson v. Stewart*,
  422 F.3d 463 (7th Cir. 2005) ..................................................................14

*New York v. United States*,
  505 U.S. 144 (1992) ......................................................................... 15, 16

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
  762 F.2d 1374 (9th Cir. 1985) ................................................................22

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
  418 U.S. 264 (1974) ................................................................................14

*Pacific Dawn LLC v. Pritzker*,
  831 F.3d 1166 (9th Cir. 2016) ................................................................20

*Pennsylvania Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998) ..................................................................................9

*Pom Wonderful LLC v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014) ......................................................... 21, 22

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992) ................................................................................17

iv

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ...................................................................................20

*Sisseton–Wahpeton Oyate v. U.S. Dep't of State*,
  659 F. Supp. 2d 1071 (D.S.D. 2009) ........................................................................8

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) .................................................................................................16

*Trump v. Hawaii*,
  585 U.S. 667 (2018) .................................................................................................20

*United States v. Hatch*,
  722 F.3d 1193 (10th Cir. 2013) ...............................................................................16

*Webster v. Doe*,
  486 U.S. 592 (1988) ........................................................................................... 19, 20

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) .................................................................................. 6, 21, 22, 25

**Statutes**

5 U.S.C. § 701(a)(2) ....................................................................................................19

5 U.S.C. § 702 ...............................................................................................................7

5 U.S.C. § 704 ...............................................................................................................7

5 U.S.C. § 706 .............................................................................................................18

49 U.S.C. § 60119(a) ...................................................................................................24

50 U.S.C. § 4502(a)(1) ..................................................................................................3

50 U.S.C. § 4502(a)(3) ...............................................................................................3, 12

50 U.S.C. § 4502(a)(4) ..................................................................................................3

50 U.S.C. § 4502(a)(5) ....................................................................................... passim

50 U.S.C. § 4511 ...........................................................................................................8

50 U.S.C. § 4511(a)(1) ................................................................................................10

50 U.S.C. § 4511(a)(2) ....................................................................................... passim

50 U.S.C. § 4511(a)-(c) ..............................................................................................21

50 U.S.C. § 4511(a), (c) ................................................................................................3

v

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

50 U.S.C. § 4511(b) ....................................................................................................13

50 U.S.C. § 4511(c) ....................................................................................................12

50 U.S.C. § 4516 .....................................................................................................4, 20

50 U.S.C. § 4552(13) ..................................................................................................11

50 U.S.C. § 4552(14) ..................................................................................................20

50 U.S.C. § 4552(16)(A) ....................................................................................... 11, 12

50 U.S.C. § 4552(8) ....................................................................................................12

50 U.S.C. § 4554(a) ......................................................................................................8

**Regulations**

10 C.F.R. § 216.4(b) ...................................................................................................18

10 C.F.R. § 216.4(c) ...................................................................................................18

10 C.F.R. § 217.31(a)(3) ............................................................................................18

10 C.F.R. § 217.52 ......................................................................................................18

10 C.F.R. § 217.53(b) .................................................................................................12

10 C.F.R. § 217.54(a) .................................................................................................18

10 C.F.R. § 217.54(b) .................................................................................................17

10 C.F.R. § 217.54(d) .................................................................................................17

10 C.F.R. § 217.56 ......................................................................................................19

10 C.F.R. § 217.62 ......................................................................................................18

10 C.F.R. Part 217 ......................................................................................................18

**Other Authorities**

77 Fed. Reg. 16651 (Mar. 16, 2012)............................................................................3

85 Fed. Reg. 26313 (Apr. 28, 2020) ..........................................................................13

90 Fed. Reg. 8433 (Jan. 20, 2025) ..........................................................................1, 4

91 Fed. Reg. 13199 (Mar. 13, 2026).............................................................................3

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ............................................................................9

vi

H.R. Rep. No. 2759, 81st Cong., 2d Sess. (1950) .....................................................10

*Defs.' Opp'n to Mot. for a*
*Prelim. Inj. and Stay*

**INTRODUCTION**

The Defense Production Act (DPA) grants the President broad power to maximize domestic energy supplies and to ensure that private industry supports national defense requirements.  Having been delegated DPA authority by the President, the Secretary of Energy determined that the immediate flow of oil through the Santa Ynez Pipeline System (the Pipeline) is necessary and appropriate to meet core national security needs.  The West Coast generally, and California in particular, is a geographically isolated energy market with declining production and increasing reliance on imports, which makes the region's energy supply particularly vulnerable to disruptions like the recent global supply shock caused by the conflict in Iran.  *See* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 9-10.[1]  Nearly a third of California's crude oil imports come from the Persian Gulf, where Iran's actions in the Strait of Hormuz started affecting supply in early March.  Ex. A (Nunes Decl.) ¶ 13.

Shortly thereafter, the Secretary issued a DPA order (the Order) directing the Pipeline's owner, Sable Offshore Corp. and Pacific Pipeline Company (Sable), to immediately resume transporting oil through the Pipeline.  For two months, the Pipeline has operated safely, delivering about 30,000 barrels per day to domestic refineries.  Ex. A (Nunes Decl.) ¶ 17.  That is enough to meet the daily motor vehicle gasoline needs for Fresno.  *Id.* ¶ 18.  And the volume is expected to eventually reach around 60,000 barrels per day, enough to supply the daily needs of San Diego.  *Id.* ¶¶ 17-18.  At bottom, the Order reflects what both the President and Congress have recognized:  Our national security is tied to our energy security.  *See Declaring a National Energy Emergency*, Exec. Order No. 14156, § 1, 90 Fed. Reg. 8433 (Jan. 20, 2025); 50 U.S.C. § 4502(a)(5).

But California thinks it knows better.  Despite the concrete benefits provided by the Pipeline's operation, California asks for emergency relief to shut it down and

---

[1] Page cites for exhibits refer to the printed numbers in the original document.

1

strip the President of the power Congress gave him to "assure the availability of domestic energy supplies for national defense needs."  50 U.S.C. § 4502(a)(5). California is not entitled to the extraordinary relief it seeks.

To begin, California fails to show that it is likely to succeed on the merits.  Its Administrative Procedure Act (APA) claims fail out of the gate because the Order—an exercise of presidential authority—is not reviewable under that statute and binding precedent.  Even if California's APA claims were reviewable, they would still fail. California's lead argument, for example, is that the President's DPA authority is confined only to reordering existing contracts with the Federal Government.  That argument ignores the DPA's plain text.  *See, e.g.*, 50 U.S.C. § 4511(a)(2) (power includes "allocat[ing] materials, services, and facilities" as the President "deem[s] necessary or appropriate to promote the national defense").  With no textual support for its position, California tries to squeeze presidential authority out of the DPA through constitutional avoidance.  But it is not even clear what constitutional violation California is trying to avoid.  And California's other arguments about preemption are irrelevant—the question how the Order may interact with various state laws and programs is not before the Court.  The only issue here is whether the Order itself is lawful on its face.  It is.

California also fails to identify an imminent, irreparable injury.  The *possibility* of an oil spill in the future does not qualify, especially when the evidence shows that the Pipeline is operating safely under federal supervision.  Nor do *hypothetical* conflicts that may or may not arise between the Order and state programs that are not even at issue in this case.  And California's position becomes weaker still when its alleged harm is balanced against the national security interests underlying the Order and the public interest in oil flowing through the Pipeline, which offsets slowed imports from abroad.

California falls far short of meeting its burden to justify the extraordinary remedy it seeks.  The Court should deny its motion.

*Defs.' Opp'n to Mot. for a Prelim. Inj. and Stay*

## BACKGROUND

### I. The Defense Production Act

The DPA grants the President—and any department head to which he delegates authority—"a sweeping delegation of power" to ensure that domestic industry can support the national defense. *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 993 (5th Cir. 1976). Congress enacted the DPA because "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States." 50 U.S.C. § 4502(a)(1); *see also id.* § 4502(a)(3) (finding that "the development of domestic productive capacity" is necessary "to provide for the national security" of the United States and "national defense preparedness"). Consistent with this prophylactic focus, the DPA grants the President "an array of authorities to shape national defense preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base." *Id.* § 4502(a)(4).

As relevant here, the President may require entities to prioritize the performance of certain contracts, and to allocate materials, services, and facilities as he shall "deem necessary or appropriate" to promote the national defense and maximize domestic energy supplies. *See id.* § 4511(a), (c). The President has delegated these authorities to the Secretary of Energy and other executive department and agency heads. *See Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, 91 Fed. Reg. 13199 (Mar. 13, 2026); *National Defense Resources Preparedness*, Exec. Order. No. 13603, 77 Fed. Reg. 16651 (Mar. 16, 2012).

Throughout the DPA, Congress emphasized the link between domestic energy supplies and the national defense. For example, the DPA makes clear that "national defense preparedness" depends on "the availability of domestic energy supplies for national defense needs." 50 U.S.C. § 4502(a)(5). It defines "national defense"

3

broadly to include "energy production or construction." *Id.* § 4552(14). And it specifically designates energy as a "strategic and critical material." *Id.* § 4516.

**II. The Pipeline Capacity Prioritization and Allocation Order**

In January 2025, the President declared a National Energy Emergency, finding that the Nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy"—threats that are "most pronounced" on the West Coast. Exec. Order No. 14156, § 1. The West Coast, and especially California, "is a geographically distinct region and market for petroleum" within the United States. Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 2. That is because "[t]here are no inbound petroleum pipelines to California from other states." *Id.* This isolation makes California a "fuel island"; to meet demand, the state must rely on either in-state production or imports. *Id.* at 7.

At the same time, California hosts "the highest concentration of defense-related activities in the United States," with 32 military bases that support U.S. Indo-Pacific Command and serve as the "vanguard" against nuclear adversaries, including China, Russia, and North Korea. *Id.* at 3, 9. A rapid and reliable fuel supply for these forces is critical to our national security and military readiness. *Id.* at 3.

Although in-state oil production historically met these defense needs, since 2001, California has overseen a 65 percent drop in its in-state production. *Id.* at 4. This fact, combined with the lack of inbound pipelines from other states, has left California—and essential U.S. military personnel and installations—heavily dependent on imports. California now imports 61 percent of its crude oil from foreign sources, making it the most oil-import-dependent state in the Nation. *Id.* Much of that oil comes from the Persian Gulf, where an ongoing conflict with Iran and crisis in the Strait of Hormuz has constrained this supply chain. *Id.* at 9-10; Ex. A (Nunes Decl.) ¶¶ 13-14. All this harms Californians. It also exposes "military fuel disruption vulnerabilities that now compromise U.S. force readiness and

4

*Defs.' Opp'n to Mot. for a*<br>*Prelim. Inj. and Stay*

national security." Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 4.

Meanwhile, the Santa Ynez Unit (the Unit)—one of the largest offshore oil fields in the United States—sits in federal waters off the coast of California. *Id.* at 1-2 & n.1. California has access to the Unit through the Pipeline, which can carry the sitting and available oil from offshore oil rigs to onshore refineries. *Id.* at 2. Although operating the Pipeline "would help alleviate California's petroleum scarcity by providing a secure, consistent, [and] local source of crude oil," the Pipeline has sat idle since 2015. *Id.* at 6. As a result, "the oil reserves in [the Unit] have become a stranded resource." *Id.*

After the start of the Iran conflict, the Secretary of Energy took action to address these problems. The Secretary determined that restarting the Pipeline is essential to core national defense and security needs stemming from West Coast energy shortages and supply chain risks. *See generally* Ex. A (Nunes Decl.) Attach. 1 (DPA Order); *id.* Attach. 2 (DPA Findings). He therefore issued the Order, which directs Sable to immediately prioritize and allocate transportation services for hydrocarbons from the Unit through the Pipeline, and to start performing under contracts for such transportation. *Id.* Attach. 1 (DPA Order) at 3. In issuing the Order, the Secretary also prepared separate documents with relevant findings and determinations. *Id.* Attach. 2 (DPA Findings), Attach. 3 (DPA Memo).

## III.   Related Litigation

California's rendition of the background facts is disputed, but for present purposes, what matters is that the Pipeline and the Order are implicated in other cases. In March 2026, the United States moved to terminate or modify a 2020 consent decree resolving claims related to a 2015 leak of the Pipeline that led to an oil spill, before Sable owned the Pipeline. *See United States et al. v. Plains All Am. Pipeline L.P. et al.*, 2:20-cv-02415-SVW-SSC (C.D. Cal.) (*Plains*), Dkt. No. 49. As the United States explains in its motion, Sable is not a party to the consent decree. *See id.* at 5, 11-14. California is also challenging the federal Pipeline and Hazardous

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

Materials Safety Administration's (PHMSA) recognition in late 2025 that the Pipeline is interstate in nature and thus falls within PHMSA's exclusive regulatory jurisdiction. *See* Pet. for Rev., *California v. PHMSA*, 26-508 (9th Cir. Jan. 23, 2026), Dkt. No. 1. Contrary to California's assertions, PHMSA's action is consistent with its longstanding treatment of pipelines originating on the Outer Continental Shelf. Finally, the California Department of Parks and Recreation (CDPR) brought a trespass action against Sable for operating the Pipeline, a small portion of which runs underneath a state park. *See CDPR v. Sable Offshore Corp.*, 2:26-cv-02946-SVW-SSC (C.D. Cal. Mar. 19, 2026) (*CDPR*), Dkt No. 1. Sable disputes the trespass claim as time-barred, estopped, and preempted by the Pipeline Safety Act and the DPA Order. *See id.*, Dkt. No. 24. The United States filed a statement of interest in that litigation and has moved to intervene. *Id.*, Dkt. Nos. 38, 52.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The first factor—likely success on the merits—is the most important, and if a movant fails to make that showing, a court need not consider the other factors. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). "[T]he preliminary injunction 'factors also determine when a court should grant a stay of agency action under section 705 of the APA.'" *Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 983-84 (9th Cir. 2025).

## ARGUMENT

### I. California Is Not Likely to Succeed on the Merits.

California is unlikely to succeed on the merits because the Order is

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

unreviewable under the APA and, in any event, is consistent with both the DPA and the Constitution. The Court need not reach the other *Winter* factors, but if it does, they also cut against California's request for extraordinary relief.

> **A.    The Defense Production Act Order is not reviewable under the Administrative Procedure Act because the Order is presidential action, not agency action.**

Because the DPA does not create a private right of action, California's only statutory path to judicial review is the APA. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 808 n.7 (9th Cir. 2006). The APA waives sovereign immunity for, and structures judicial review around, "agency action." 5 U.S.C. §§ 702, 704; *Chairez v. Mayorkas*, 168 F.4th 1227, 1231 (9th Cir. 2026). Because the President is not an "agency," the APA's waiver and review provisions do not apply to presidential action. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Dalton v. Specter*, 511 U.S. 462, 469-70 (1994).

California's claims are not reviewable under the APA. The Secretary of Energy issued the Order under a delegation of authority that Congress vested in the President. The only question here is whether it matters that a *delegee*, rather than the President *personally*, exercised discretionary authority vested in the President by law. The answer is no.

Under Ninth Circuit precedent, when an agency head exercises the President's delegated authority, the action is presidential action for purposes of APA review. In *Jensen v. National Marine Fisheries Service*, a treaty gave the President authority to approve fishing regulations issued by a commission, and the President delegated that authority to the Secretary of State. 512 F.2d 1189, 1190-91 (9th Cir. 1975). In rejecting an APA challenge to the Secretary's exercise of that authority, the Ninth Circuit held that "[f]or purposes of this appeal the Secretary's actions are those of the President, and therefore by the terms of the APA the approval of the regulation at issue here is not reviewable." *Id.* at 1191.

7

*Defs.' Opp'n to Mot. for a Prelim. Inj. and Stay*

Other courts have held that the bar on APA review of presidential action extends to agency action taken pursuant to a delegation of presidential authority. For example, the court in *Detroit International Bridge Company v. Government of Canada* held that the Secretary of State's exercise of delegated presidential authority to approve a permit for an international bridge was "presidential in nature"—and thus "unreviewable under the APA"—because it "involved the exercise of discretionary authority committed to the President" by the International Bridge Act of 1972. 189 F. Supp. 3d 85, 100-02 (D.D.C. 2016), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018); *see also Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*, 801 F. Supp. 2d 383, 404 (D. Md. 2011) (holding that "actions taken pursuant to delegated presidential authority … will not be held subject to review under the APA"), *aff'd on other grounds*, 698 F.3d 171 (4th Cir. 2012); *Nat. Res. Def. Council (NRDC) v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 111-13 (D.D.C. 2009) (holding that "an act need not be carried out by the President personally to constitute presidential action exempt from judicial review under the APA" because an agency "stands in the President's shoes" when it exercises "the President's inherent discretionary power"); *Sisseton–Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009) ("The President is free to delegate some of his powers to the heads of executive departments … and those delegation actions that are carried out create a presumption of being as those of the President.").

So too here—the Secretary of Energy's "actions are those of the President," *Jensen*, 512 F.2d at 1191, and the issuance of the Order is "unreviewable presidential action because it involved an exercise of discretionary authority committed to the President by law" in the DPA. *Detroit Int'l Bridge*, 189 F. Supp. 3d at 102; *see* 50 U.S.C. §§ 4511, 4554(a). What is more, the "separation of powers concerns" undergirding the court's holding in *Detroit International Bridge* are weightier here because the case arises in the "sensitive" and "complex" area of national security.

8

189 F. Supp. 3d at 103; *Ancient Coin*, 801 F. Supp. 2d at 403; *NRDC*, 658 F. Supp. 2d at 111; *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (noting that "courts traditionally have been reluctant to intrude" into "national security affairs").

None of this is to say that agency action becomes unreviewable whenever it is directed by the President. APA review is available for "actions involving authority delegated by Congress to an agency" but "directed by the President." *Detroit Int'l Bridge*, 189 F. Supp. 3d at 104 (quoting Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001)). That explains why courts review agency actions that simply implement executive orders. *See Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). But when, as here, the President formally delegates *his* statutory or constitutional authority to an agency head, and the agency head then acts solely under *that* authority, there is presidential action beyond the scope of the APA.

**B.    The Defense Production Act Order is both lawful and rational.**

Even if California could clear this reviewability barrier, it is still unlikely to succeed on the merits. The Order complies with the DPA, the Constitution, and Department of Energy regulations. And California's arbitrary-and-capricious challenge not only mischaracterizes the record—it invites the Court to second-guess the national security determinations that Congress assigned to the Executive Branch.

**1. The Defense Production Act Order is not contrary to law.**

California makes three arguments about the legality of the Order, but it is incorrect on all of them. The Order (1) is a proper exercise of DPA authority to prioritize and allocate, (2) is consistent with the Constitution, and (3) accords with Department of Energy regulations.

*a. Prioritization and Allocation*. In the Order, the Secretary invokes both prioritization and allocation authorities under section 4511. California suggests that section 4511(a) is only about *contract prioritization*, citing the section title. *See* Pl.'s Mem. in Support of Mot. for Prelim. Inj. at 9, Dkt. No. 16-2 ("CA Mem."). But "the title of a statute cannot limit the plain meaning of the text." *Pennsylvania Dep't of*

9

*Corr. v. Yeskey*, 524 U.S. 206, 212 (1998).  And the plain text establishes two distinct authorities: (1) prioritization of contracts or orders, 50 U.S.C. § 4511(a)(1), and (2) allocation of materials, services, and facilities, *id.* § 4511(a)(2).  California's attempt to collapse these authorities into a single authority about contract prioritization defies the statute's plain text.  And whether taken individually or in combination, section 4511(a)'s two "broad and flexible" authorities plainly allow the Secretary to order the Pipeline to operate.  H.R. Rep. No. 2759 at 4, 81st Cong., 2d Sess. (1950).

    <u>Prioritization</u>.  Under section 4511(a)(1), the President may "require that performance under contracts or orders … which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order."  50 U.S.C. § 4511(a)(1).  And "for the purpose of assuring such priority," he may "require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance."  *Id.*  This statutory text reveals two important points.  First, prioritization is not limited to contracts with the Federal Government—the President may also prioritize the performance of contracts between and among private parties. *See McDaniel v. Wells Fargo Invs.*, 717 F.3d 668, 677 (9th Cir. 2013) ("Under the standard rules of statutory construction, we will not read into the statute a limitation that is not there." (cleaned up)).  Second, the President's authority is not limited to prioritizing *existing* contracts—he may also "require *acceptance* and performance" of contracts deemed essential to the national defense, which necessarily means that he may direct parties to prioritize contracts not yet formed.  50 U.S.C. § 4511(a)(1) (emphasis added); *Hou. Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981) ("It is fundamental that a contract is formed only upon acceptance of an offer.").

    The Secretary thus acted well within his authority in ordering Sable to immediately prioritize the performance of contracts for hydrocarbon transportation services and "to accept and perform such contracts or order[s] up to and so long as

10

the [Pipeline] has capacity to transport." Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 3. And Sable, of course, could not comply with this command without restarting the pipeline. *See Freeman v. Gonzales*, 444 F.3d 1031, 1036 (9th Cir. 2006) ("A statutory grant of power carries with it, by implication, everything necessary to carry out the power and make it effectual and complete." (cleaned up)). California's contrary argument—that the Secretary could only prioritize outstanding contracts between Sable and the Federal Government, contracts that Sable could not even perform given the dormant pipeline—imposes atextual limitations on the Secretary's prioritization authority. *See also* Presidential Memorandum on Order Under Defense Production Act Regarding General Motors Company (Mar. 27, 2020), https://tinyurl.com/2k8jkmzu (invoking DPA to order General Motors to accept, perform, and prioritize contracts for *ventilator* production).

Allocation. If there were any doubt about the Secretary's ability to order the Pipeline's operation, his invocation of the DPA's allocation authority eliminates it. Section 4511(a)(2) broadly authorizes the President "to allocate *materials*, *services*, and *facilities* in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2) (emphasis added). California claims that this authority merely allows the President to reshuffle existing resources, not to order a pipeline to operate. CA Mem. at 10. But California misreads both the Order and the DPA.

To begin, the Order allocates an existing "material" (hydrocarbons in the Unit) for transfer through the Pipeline to onshore sites and, ultimately, to market. *See* 50 U.S.C. § 4552(13) (defining "materials" to include "any raw materials" and "services ancillary to the use of any such materials"). Or, to borrow from California, the Order "apportion[s]" hydrocarbons in the Unit "for a specific purpose." CA Mem. at 10. Relatedly, the Order allocates the "service" of transportation from the Unit to onshore sites through an existing "facility" (the Pipeline). *See* 50 U.S.C. § 4552(16)(A) (defining "services" to include "any effort that is needed for or

11

*Defs.' Opp'n to Mot. for a Prelim. Inj. and Stay*

incidental to" the "development" or "production" or "distribution" of "an industrial resource"); *id.* § 4552(8) (defining "facilities" to include "all types of buildings, structures, or other improvements to real property" and "services relating to the use of any such building, structure, or other improvement"). Thus, even if California's narrow reading of "allocate" were correct, the Order is a permissible allocation because it simply directs Sable to move oil from an oil field to onshore sites "in such manner" and "to such extent" as the Secretary deems necessary and appropriate to ensure the national defense. *Id.* § 4511(a)(2).

California's flawed reading—that ordering the Pipeline to operate is not an "allocation"—also ignores critical statutory text. *See Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010) (reliance "upon a dictionary definition" must "account for the governing statutory context"). Recall that section 4511(a)(2) authorizes the President to allocate "services," which is defined to include "any effort that is needed for or incidental to" the "development" or "production" of "an industrial resource." 50 U.S.C. § 4552(16)(A). Productive activity is thus something the President may allocate—and section 4511(a)(2) grants him broad discretion to do so "in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." *Id.* § 4511(a)(2). This grant of authority necessarily includes the power to compel production. *See id.* § 4502(a)(3) (Congressional finding that "the development of domestic productive capacity" is critical for ensuring the national defense); *id.* § 4511(c) (providing that an allocation order may be used to "maximize domestic energy supplies"); 10 C.F.R. § 217.53(b) (providing that an allocation order may "require[] a person to take or refrain from taking certain actions"). So the Secretary acted well within his authority in directing a dormant pipeline to operate.

Indeed, such power has been exercised—and upheld—before. In the wake of the COVID-19 pandemic, the Secretary of Agriculture used DPA allocation authority to order meat and poultry processing plants to remain in operation—and,

12

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

for plants that had closed, to promptly *resume operations*—under specialized federal health guidance.[2]  Recognizing that "the DPA accords the Executive Branch great flexibility," the district court held that the Secretary had permissibly exercised his allocation authority to determine the "manner," "conditions," and "extent" of meat and poultry processors' operations, and that the DPA order preempted conflicting state law that would have impeded those operations.  *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388-89 (N.D. Tex. 2022) (cleaned up), *aff'd on other grounds*, 2023 WL 2645553 (5th Cir. Mar. 27, 2023).  The Secretary of Energy has acted similarly in ordering Sable to resume operation of the Pipeline.

In short, the Order is a valid exercise of the Secretary's DPA authorities.  And, contrary to California's assertion, the findings required under section 4511(b) are inapplicable because directing Sable to operate a specific pipeline does not "control the *general* distribution of any material in the civilian market."  50 U.S.C. § 4511(b) (emphasis added).  As the Secretary explained, the Order leaves private parties "free to contract and negotiate hydrocarbon materials themselves and otherwise distribute and sell them through civilian markets."  *See* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 11.  Nor does section 4511(b) apply to the allocation of pipeline *facilities* and transportation *services*; it applies only to "material[s]."  50 U.S.C. § 4511(b).  Still, the Secretary *did* make the required findings under section 4511(b) in the alternative.  *See id.* Attach. 2 (DPA Findings) at 3.[3]

---

[2] *See Delegating Authority Under the Defense Production Act With Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19*, Exec. Order No. 13917, 85 Fed. Reg. 26313 (Apr. 28, 2020); Letter from Secretary Purdue *Re: Executive Order 13917 Delegating Authority Under the Defense Production Act with Respect to the Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* (May 5, 2020), https://tinyurl.com/3tb3zfb5.

[3] For all the same reasons, the Secretary properly exercised his prioritization and allocation authorities under section 4511(c) "to maximize domestic energy supplies."  *Contra* CA Mem. at 11-12.

13

***b. Preemption and Anticommandeering***.  California next urges that the Order is unconstitutional and contrary to law because (1) the relevant DPA provisions lack preemptive language, (2) the Order impairs California's property rights, and (3) the Order conflicts with a federal consent decree.  Each point is fatally flawed.

*First*, California's claim that the Order is contrary to law because it does not preempt state law is a non sequitur.  *See* CA Mem. at 12-13.  The preemptive effect of the Order is distinct from its legal validity.  *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (whether an action preempts state law is distinct from "whether that action is within the scope of the [agency's] delegated authority").  And the only question before this Court is the Order's legal validity under federal law—the preemptive scope of the Order must be considered in a case or controversy involving an alleged conflict between the Order and a specific state law, which would likely involve Sable seeking declaratory relief against California (as in *Sable Offshore Corp. v. Quintero*, 2:26-cv-02739-SVW-SSC) or raising preemption as a defense to a state-law claim (as in *CDPR*).  *See Nelson v. Stewart*, 422 F.3d 463, 466 (7th Cir. 2005) ("Most often, a defendant raises federal preemption as a defense to a state-law action.").  The Secretary is unaware of any case—and California cites none—holding that a federal action was unlawful simply because it failed to preempt state law.

Still, California is wrong that the Order lacks preemptive force.  An order issued under authority that Congress delegated to the President preempts conflicting state law.  *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974).  And contrary to California's misplaced focus on whether Congress authorized preemption in the DPA, an order's preemptive effect "does not depend on express congressional authorization to displace state law." *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 154.  When considering the preemptive force of Executive action, courts "do not focus on Congress's intent to supersede state law," but on whether the *Executive* "'meant to pre-empt' the state law." *Cohen v.*

14

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

*Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022). And as with federal statutes, such intent is implied for "any state or local law that conflicts with such [Executive action] or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64 (1988). Accordingly, the Order preempts any California law that conflicts with its directive that Sable immediately operate the Pipeline. *See Johnson*, 580 F. Supp. 3d at 388-89 (holding that a DPA allocation order preempted conflicting state law).

*Second*, California's contention that the Order impairs its property rights is misguided for similar reasons. Whether the Order even affects a specific property interest cannot be answered in the abstract; it requires its own concrete case or controversy—such as the *Quintero* and *CDPR* actions. The question should not (and cannot) be collaterally decided here.

And even if the Order did affect California's property interests, that would not mean that the Order is invalid. California still must ground its argument in the violation of some *federal* law. The DPA, for its part, nowhere suggests that property interests somehow limit the President's prioritization and allocation authorities. To the contrary, these authorities necessarily affect property interests because they involve directing the use of private resources. That likely explains why California grounds its argument in constitutional avoidance rather than the text of the DPA (though even California's overly restrictive reading of the statute allows the President to affect property rights).

But constitutional avoidance is about interpreting statutes to—as the name suggests—avoid constitutional problems. And California's insistence on a constitutional problem is untethered to any recognized constitutional *doctrine*. For example, California's attempt to dress up its argument with anticommandeering language fails because that doctrine prohibits the Federal Government from "issu[ing] orders *directly* to the States." *Murphy v. NCAA*, 584 U.S. 453, 470 (2018) (emphasis added). It reflects the basic principle that the "Constitution … confers upon Congress the power to regulate individuals, not States." *New York v. United*

15

*Defs.' Opp'n to Mot. for a*
*Prelim. Inj. and Stay*

*States*, 505 U.S. 144, 166 (1992).  Or put differently, "[w]here a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Id.* at 178.  Here, the Order imposes an obligation directly on *Sable*, not California.  That obligation may conflict with obligations imposed by state law—which, in the proper case, would tee up preemption, not anticommandeering, *see Murphy*, 584 U.S. at 470-71, 477-79—but it does not conscript California into doing anything.

Insofar as California relies on the Tenth Amendment more generally, the Supreme Court "long ago rejected the suggestion" that the Federal Government "invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority ... in a manner that displaces the States' exercise of their police powers." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981).  If the federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013).  And here, the Secretary acted pursuant to a valid federal statute.

In truth, California's argument sounds much more like a takings or due process claim.  *See* CA Mem. at 14-15 ("it would be unconstitutional to deploy the DPA to force States to dedicate state land to the federal government's ends").  But it has not brought a takings claim, which would fail anyway because taking property is not unconstitutional—only failing to provide just compensation—and claims for compensation must be brought in the Court of Federal Claims; they are not reviewable under the APA. *Knick v. Township of Scott*, 588 U.S. 180, 205 (2019); *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 191 (5th Cir. 2023).  Nor has California brought a due process claim, which also would fail because states lack due process rights. *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966).

*Finally*, California's argument that the Order conflicts with the federal consent decree assumes that Sable is a party to the consent decree.  But as the United States explains in its motion to terminate or modify the consent decree, Sable is not

16

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

a party, which means that there is no conflict. *See Plains*, Dkt. No. 49 at 5, 11-14; *id.*, Dkt. No. 60 at 4-9. What is more, California's portrayal of the Order as a frontal assault on the consent decree is false. The Order does what Congress authorized: direct Sable to operate a pipeline to satisfy critical national security needs. California cites no support for the proposition that a consent decree conditions the President's authority under the DPA.

California gets things exactly backwards. Consent decrees are creatures of equity and "*must* … be modified if … one or more of the obligations placed upon the parties has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992) (emphasis added); *see also id.* (consent decrees may also be modified "when the statutory or decisional law has changed to make legal what the decree was designed to prevent"). The Order now makes it "impermissible under federal law" for Sable *not* to operate the Pipeline *immediately*. *Id.* Thus, the Order *requires* that the consent decree be modified—relief the Federal Government has sought from this Court in the consent decree case—which necessarily means that it does not *violate* the consent decree. *Id.* At the very least, the Court should decide the United States' motion to terminate or modify the consent decree before resolving this motion, as doing so would crystallize the issues here.

*c. Department of Energy Regulations*. The Secretary acted consistent with departmental regulations in issuing the Order. *First*, the Order "reads in substance" (10 C.F.R. § 217.54(d)) like the language in the regulation—it makes clear that (1) it is an "allocation" order in both the title and body, (2) it is necessary for the "national defense," and (3) Sable is the covered entity and must immediately "comply" with its terms. Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 1, 3. *Second*, by directing Sable to act "immediately," the Order's start date is the date it was signed—March 13, 2026. 10 C.F.R. § 217.54(b). And rather than pick an arbitrary end date that may not reflect conditions on the ground, the Order reasonably directs Sable to comply "until such time as the conditions necessitating the issuance

17

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

of this order abate or until Sable is directed otherwise."  Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 3; *see* 50 U.S.C. § 4511(a)(2) (authorizing the President to allocate "in such manner" and "to such extent" as he deems "necessary or appropriate"). *Third*, the Order gives a detailed description of the required allocation action—Sable must "allocate pipeline transportation services for hydrocarbons from the [Unit] through the [Pipeline], including transportation service activities at the onshore facilities in Las Flores Canyon, California, to Pentland Station terminal in Pentland, California."  Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 3; 10 C.F.R. § 217.54(a). Notably, Sable—the party these regulations are designed to protect—has expressed no uncertainty over its obligations.

*Fourth*, the rated order provisions in 10 C.F.R. Part 217, Subpart C do not apply because the Order is a "Priorities Directive," not a rated order, which is why no "DX/DO" ratings were required.  *See* Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 3; 10 C.F.R. § 217.62 ("A Priorities Directive takes precedence over all" rated orders); *id.* § 217.31(a)(3)  (same).  *Fifth*, the Secretary was not required to submit findings to the President under 10 C.F.R. § 217.52, because the Order does not control the general distribution of a material in the civilian market.  *See* Ex. A (Nunes Decl.) Attach. 2 (DPA Findings) at 3; *supra* at 13.   And *sixth*, the Secretary considered all relevant factors in making the determinations in 10 C.F.R. § 216.4(b) (*see* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 3, 4, 5-6, 7, 9, 13) and findings in 10 C.F.R. § 216.4(c) (*see id.* at 2, 4, 5, 6, 9).

Even if the Order did not satisfy some aspect of a regulation, the Court should not grant California's extraordinary relief for two reasons.  For one, the APA expressly incorporates the harmless-error rule, and California was not prejudiced by any purported failure to follow the regulations.  5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542, 930 (2025) ("When it is clear that the agency's error had no bearing on the procedure used or the substance of the decision reached, a remand

18

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

would be pointless." (cleaned up)).  Indeed, the Secretary issued the Order based on his determination that it was *necessary* to the national defense.  California thus cannot plausibly argue that a minor procedural error in issuing the Order changed the outcome.

For another, Department regulations provide that "[a]n allocation order may be changed … by official action."  10 C.F.R. § 217.56.  So if the Court concludes that the Order violates a regulation and that the error is not harmless, it should allow the Secretary to fix the error through the simple process provided in the regulations, rather than preliminarily enjoining the Order and disrupting ongoing operations of a pipeline that the Executive Branch has deemed critical to the national defense.

### 2. The Defense Production Act Order is rational.

As an initial matter, agency action is committed to agency discretion—and thus unreviewable—if "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); 5 U.S.C. § 701(a)(2).  Review is also unavailable for "certain categories" of actions "traditionally regarded as committed to agency discretion."  *Lincoln v. Vigil*, 508 U.S. 182, 191-93 (1993).  This is why the APA's general presumption of reviewability "runs aground when it encounters concerns of national security."  *Egan*, 484 U.S. at 527.

In its motion, California wisely does not challenge the national defense determination under section 4511(a).  *See* CA Mem. at 17-18; *Webster v. Doe*, 486 U.S. 592, 600 (1988) (holding that statute authorizing CIA Director to terminate employees when he "shall *deem* such termination necessary or advisable in the interests of the United States" "foreclose[d] the application of any meaningful judicial standard of review").  California instead challenges the Secretary's findings under section 4511(c), which are distinct from his use of section 4511(a) and would not, even if invalid, support enjoining the entire Order.

But California is wrong that the Secretary's findings under section 4511(c)

19

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

were arbitrary and capricious. Even in the ordinary case, "[t]he arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). And when, as here, national security is involved, review is even more deferential. *See Trump v. Hawaii*, 585 U.S. 667, 704 (2018) ("our inquiry into matters of … national security is highly constrained"); *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("our review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential"). Section 4511(c)—though nominally about maximizing domestic energy supplies—is no less concerned with national security than section 4511(a), given the DPA's explicit and repeated recognition of the link between domestic energy supplies and our national security. *See, e.g.*, 50 U.S.C. §§ 4502(a)(5), 4516, 4552(14) ; *Webster*, 486 U.S. at 600 (considering the "overall structure" of the statute to determine reviewability).

California asserts that the Secretary's use of his authority under section 4511(c) relied on the mere recitation of the required findings, without providing any support for them. That is false—the Secretary provided an extensive factual basis for, and explanation of, these findings. *See* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 5-8, 11-13. That is more than enough, especially given that the Order is "a preventative measure in the context of … national security," so the Secretary was "not required to conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Trump*, 585 U.S. at 686-87. Nor does California explain how courts could even review these determinations, given that the DPA does not require the President to provide a detailed basis for his determinations; it simply requires that he *make* the determinations. *Cf. id.* at 685-86.

As for California's claim that the Secretary ignored important aspects of the problem, the Secretary considered "the relevant factors required by the [DPA]," *Pacific Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016)—whether the

20

*Defs.' Opp'n to Mot. for a Prelim. Inj. and Stay*

Order was "necessary or appropriate to promote the national defense" and satisfied the required findings, 50 U.S.C. 4511(a)-(c). Congress itself recognized in the DPA that shortfalls in the energy supply harm the national defense, *see* 50 U.S.C. § 4502(a)(5), so the same determination—and resulting action—by the Secretary could not be arbitrary and capricious. California's argument that the Secretary overlooked the effect of the Order on the consent decree or on California's sovereign interests begs the question on the merits of those claims and would require the Secretary to consider factors different from what the DPA directs. Finally, the Secretary explained his finding under section 4511(c)(2). *See* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 13.

**II. California Has Not Established that it Is Likely to Suffer Irreparable Harm or that the Equitable Factors Favor a Preliminary Injunction and Stay.**

"Regardless of the strength of its showings on the other factors, a plaintiff may not obtain a preliminary injunction unless he or she establishes that irreparable harm is likely to result in the absence of the requested injunction." *Immigrant Defs. Law Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1032-33 (C.D. Cal. 2025) (citing *All. for The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). California comes nowhere close to establishing that it is *likely* to suffer irreparable harm absent preliminary relief. And the balance of equities and public interest, which merge here, tip decisively in the Federal Government's favor.

**A.    California is not likely to suffer irreparable harm absent preliminary relief.**

In *Winter*, the Supreme Court held that a party seeking preliminary relief must demonstrate that irreparable harm is "likely," not just that it is a "possibility." 555 U.S. at 22. The likelihood must be "grounded in evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014) (citation omitted); *Boardman v. Pac. Seafood Grp.*, 822 F.3d

21

*Defs.' Opp'n to Mot. for a Prelim. Inj. and Stay*

1011, 1022 (9th Cir. 2016) ("speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction" (cleaned up)).  Irreparable harm must also be "immediate."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Amylin Pharms., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) ("harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough").

California waited nearly two months—and over a month after filing this action—to seek emergency relief against the Order.  *See Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).  Its theories of irreparable harm explain the lack of urgency.  California first claims that the Order causes irreparable harm "by forcing the State to bear the noncompliant pipeline's *risks* while immunizing Sable from the consequences, thus reducing Sable's *incentive* to invest in safe operations."  CA Mem. at 19 (emphasis added).  Second, California argues that the operation of the Pipeline subjects it "to the *risk* of harm to species protected under the California Endangered Species Act."  *Id.* (emphasis added).  Both theories traffic in pure speculation, relying on (in California's own words) alleged "risks" and reduced "incentive" to operate safely.  *Id.*  These layers of speculation, at most, support the mere *possibility* of harm at some indefinite future time, not likely and imminent irreparable harm that is "grounded in evidence."  *Winter*, 555 U.S. at 22; *Caribbean Marine Servs.*, 844 F.2d at 674; *Pom Wonderful*, 775 F.3d at 1133.  Indeed, California offers no evidence that the Pipeline is unsafe, much less that it is being operated in a manner that is *likely* to result in an *imminent* spill that, in turn, would be severe enough to cause environmental damage or harm to an endangered species.  *See Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (irreparable harm requires "a definitive threat of future harm to protected species, not mere speculation").

California mentions the 2015 spill caused by external corrosion of the Pipeline, when a different company operated it, and *over two decades* after

22

operations began.  *See* Pl.'s Request for Judicial Notice, Ex. 3 at 4-5 (noting no reported releases outside of pump stations from the early 1990s to 2015).  But its condition now is nothing like what existed in 2015.  Since then, Sable has remediated all anomalies with metal loss over 40 percent, installed 27 new safety valves, implemented an enhanced leak detection system, and upgraded the Pipeline's control room.  Ex. B (Hubbard Decl.) ¶ 9, Attach. 1.  It has also performed rigorous strength and hydrostatic spike tests that increased internal pressure significantly above the Pipeline's maximum operating pressure.  *Id.* ¶ 10, Attach. 2.  No leak occurred during the tests, demonstrating that the Pipeline has no serious defects and is fit for service.  *Id.*  And that has proven true—Sable has now operated the Pipeline for nearly two months with no releases or safety concerns.  *Id.* ¶ 21.

California wrongly asserts that the preconditions for safely restarting the Pipeline are unmet.  The restart occurred pursuant to a comprehensive plan approved by PHMSA, and federal pipeline safety inspectors have been overseeing Sable's compliance with the plan since operations resumed.  *Id.* ¶¶ 12-15, 19-20.  Sable also continues to comply with an emergency special permit from PHMSA containing substantially the same provisions already approved by California in state waivers, and Sable has applied for a regular permit with the same provisions.  *Id.* ¶¶ 16-18, Attachs. 5-7.  On this record, California cannot establish likely irreparable harm.

Nor is there merit to California's other theories of irreparable harm.  California is not entitled to the presumption of irreparable harm for constitutional violations because it has not established a likelihood of success on its constitutional claims.  *See Clam Ventures LLC v. Newsom*, 2021 WL 1502657, at *8 (C.D. Cal. Mar. 25, 2021).  California also asserts irreparable injury based on the Order's alleged displacement of state regulatory authority, but such displacement of a particular state law or action is not before the Court.

To be sure, California ticks off "state regulatory powers" and "rights" that the Order allegedly "purports to displace."  CA Mem. at 20.  But these "powers" and

23

*Defs.' Opp'n to Mot. for a*
*Prelim. Inj. and Stay*

"rights" are not part of this case or controversy—which means that the Court would be issuing an advisory opinion if it opined on how the Order interacts with, for example, the California Geologic Energy Management Division's testing or the Department of Fish and Wildlife's duties to protect endangered species. Even California's own declarants cannot say how (or if) the Order will affect those activities. *See* Sharma Decl. ¶ 11, Dkt. No. 16-5 ("*If* Sable denies access to CalGEM inspectors on the basis of the Wright Order, it *would* impede CalGEM's ability to ensure compliance …." (emphasis added)); Vance Decl. ¶ 15, Dkt. No. 16-4 ("*Depending* on the type of maintenance repair, or other work to the Pipeline that will need to be completed, [certain permits] *might* be required before the work may begin." (emphasis added)). Not only does California lack standing to raise these hypothetical future harms—they are purely speculative, not *likely*.

Insofar as California contends that the Order displaces the State's authority over the Pipeline's operation, that is inaccurate—if anything, PHMSA displaced that authority in late 2025 when it recognized that the Pipeline is interstate (placing it within PHMSA's exclusive jurisdiction) and approved the Pipeline's restart. Ex. B (Hubbard Decl.) ¶¶ 14-18. California thus lacks standing to challenge the Order on this basis. Worse, to hold that the Order—which was issued later, in March 2026—displaced California's authority would effectively declare that PHMSA's prior exercise of jurisdiction and approval of a restart was invalid and ineffective, which would interfere with the Ninth Circuit's ongoing consideration of that issue and exceed this Court's jurisdiction. *See* 49 U.S.C. § 60119(a).

**B.     The balance of harms and the public interest weigh strongly against an injunction.**

"It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (cleaned up). In *Winter*, the Supreme Court held that the public interest and balance of equities tipped "strongly in favor" of the government based on the President's

24

determination that the challenged activity was "essential to national security." 555 U.S. at 26. So too, the Secretary issued the Order based on his determination that the immediate operation of the Pipeline is necessary to promote the national defense. As in *Winter*, that determination should be decisive, especially given the weaknesses in California's theories of harm.

But if more were needed, enjoining the Order would result in the immediate loss of between 30,000 and 60,000 barrels per day of domestic oil supply—quantities large enough to meet the daily motor vehicle gasoline needs of major cities—which is especially critical given the ongoing situation in the Strait of Hormuz and resulting 200,000-barrel-per-day supply gap. Ex. A (Nunes Decl.) ¶¶ 13-14, 18-19, 21. Enjoining the Order would also affect other states that rely on California for their own supply needs. *Id.* ¶ 11. Compared to California's evidence-free, speculative harms, these public interest impacts tip the scales decisively in the Federal Government's favor.

## CONCLUSION

The Court should deny California's motion for a preliminary injunction and stay.

DATED:  May 11, 2026              Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
JUSTIN D. HEMINGER
Deputy Assistant Attorneys General

*/s/ Riley W. Walters*
Riley W. Walters
Email:  Riley.Walters@usdoj.gov
Counsel (DC Bar No. 90008638)
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone:  (202) 514-5442

*Attorneys for Defendants*

25

*Defs.' Opp'n to Mot. for a
Prelim. Inj. and Stay*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Federal Defendants, certifies that this brief contains 25 pages, which:

  _X_ complies with the Court's New Case Order, Dkt. No. 18 at 2, setting a 25-page limit for opposition briefs.

DATED: May 11, 2026                  /s/ *Riley W. Walters*

                                      Riley W. Walters

26

*Defs.' Opp'n to Mot. for a*
*Prelim. Inj. and Stay*