# Exhibit B



# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants. | Civil Action No.<br><br>2:26-cv-03396-SVW-SSC<br><br>**DECLARATION OF DUSTIN B. HUBBARD IN SUPPORT OF UNITED STATES' OPPOSITION TO CALIFORNIA'S MOTION FOR A PRELIMINARY INJUNCTION** |

I, Dustin B. Hubbard, declare as follows:

1.      I am the Director of the Western Region for the Office of Pipeline Safety at the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), an operating administration within the United States Department of Transportation. I have been in my current position since April 2019. My business address is 12300 W. Dakota Avenue, Suite 340, Lakewood, CO 80228.

2.      I received my Bachelor of Science in Mechanical Engineering from the University of California, San Diego in 2002 and a Master of Science in Mechanical Engineering from the California State University, Long Beach in 2006.

3.      In my current position as Region Director, I oversee the inspection, investigation, and enforcement of the federal safety standards and reporting requirements that apply to owners and operators of pipeline facilities, primarily in the western United States, including Alaska and Hawaii. Prior to serving as the Director, I was a Senior Inspector and Data Analyst with PHMSA dating back to 2010. Prior to my work with the federal government, I was a structural analyst in the aerospace industry and an Engineroom Supervisor with the U.S. Navy onboard the USS Wabash and USS Duluth.

4.      I submit this declaration in support of the United States' Opposition to California's Motion for a Preliminary Injunction. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently testify to the truth of these facts.

I.      BACKGROUND

5.      Sable Offshore Corporation and Pacific Pipeline Company (together, "Sable") currently own the Santa Ynez Pipeline System ("SYPS"), an interstate pipeline facility that transports crude oil produced on the Outer Continental Shelf through an onshore processing facility in Santa Barbara County, California, to a terminal in Kern County, California. The SYPS contains two pipeline segments that transport crude oil from the onshore processing facility to the terminal. These

-1-

pipeline segments are now known as CA-324 and CA-325 and were previously called Lines 901 and 903, respectively ("the Segments").

6.    In 2015, before Sable's acquisition of the Segments, Segment 901/CA-324 experienced a rupture that led to a release of crude oil. PHMSA conducted an accident investigation and determined that the cause of the rupture was external corrosion. Following the rupture, PHMSA issued a Corrective Action Order (CAO) to the Segments' then-owner and operator, Plains All American Pipeline, L.P. and Plains Pipeline, L.P. (Plains). A true and correct copy of the CAO is available at https://primis.phmsa.dot.gov/enforcement-data/case/520155011H.  The CAO initially directed Plains to shut down Segment 901/CA-324 and to implement certain corrective measures to address the root cause of the release. PHMSA subsequently applied the same conditions to Segment 903/CA-325 in an amended CAO.

7.    In 2020, Plains entered into a consent decree with the United States and several entities representing the State of California in *United States & People of the State of California v. Plains All American Pipeline, L.P. et al.*, 2:20-cv-02415. The consent decree incorporated all outstanding corrective measures imposed in the CAO. When Sable acquired the SYPS, it agreed to comply with certain Segment-specific provisions in the consent decree.

## II.    PREPERATIONS TO RESTART THE SEGMENTS

8.    All of the corrective measures set forth in the CAO that have accrued to date have been completed.

9.    **Attachment 1** to this declaration is a true and correct copy of a bi-annual report submitted pursuant to the consent decree. PHMSA received and maintained this report in the course of its regularly conducted activities. As set forth in the report, since acquiring the Segments Sable has remediated all portions of the Segments with metal loss of 40 percent or greater. In addition, twenty-seven (27) new safety valves were installed on the Segments within Santa Barbara, Kern,

-2-

and San Luis Obispo Counties, an enhanced Computational Pipeline Monitoring Real Time Transient Model leak detection system has been implemented, construction of a primary operations control center was completed, and additional control room enhancements were made.

10.     **Attachment 2** to this declaration is a true and correct copy of a January 22, 2026 letter from Sable to PHMSA. PHMSA received and maintained this letter in the course if its regularly conducted activities. As described in the letter, from March to May 2025, Sable subjected the Segments to extensive safety testing, including strength and spike hydrostatic pressure testing. The testing involved increasing the pressure in Segment 901/CA-324 to 150 percent of its maximum operating pressure and increasing the pressure in Segment 903/CA-325 to 139 percent of its maximum operating pressure. Neither Segment experienced any leakage during the strength or spike test. The successful completion of strength and spike hydrostatic pressure testing without leakage demonstrates that a pipeline does not have any injurious anomalies or defects and is otherwise fit for service.

11.     **Attachment 3** to this declaration is a true and correct copy of a December 17, 2024 waiver Sable received for the Segments from the California Office of the State Fire Marshal. PHMSA received and maintained a copy of the waivers in the course of its regularly conducted activities. The waivers specify pressure and temperature operating limits, in-line inspection frequency, repair criteria, and strength and spike pressure testing, among other conditions.

12.     From December 9 through December 11, 2025, I and several qualified Office of Pipeline Safety inspectors conducted an on-site inspection of the SYPS as part of a jurisdictional audit. The inspection included reviewing Sable's written procedures and records for the SYPS and conducting field observations of the Las Flores pipeline facility, pump stations at Gaviota and Sisquoc, control room in Santa Maria, and the offshore Harmony platform.

-3-

13. I and several qualified PHMSA inspectors on my staff also reviewed Sable plans and procedures for restarting the Segments and discussed its processes and safety procedures for restart with Sable personnel.

14. **Attachment 4** to this declaration is a true and correct copy of a December 22, 2025 letter I issued approving Sable's restart plan for the Segments. The approval letter was written and is maintained in the course of PHMSA's regularly conducted activities.

15. The restart plan provided for the gradual restart of the Segments in phases. During restart, each portion of the system was brought up to operating pressure in stages where each stage is a pressure increment that was held for a minimum of two hours before proceeding to a higher-pressure increment. These holding periods are referred to as a stand-up pressure test. During the hold periods between pressure increments, the line pressures were monitored for any fluctuation that could indicate a problem holding pressure. The pipeline was also patrolled by aircraft flyovers for any indications of a leak. Once the pressure remained steady for a minimum of two hours, the next pressure stage was initiated. If at any time, there was an indication that pressure is not holding, the pipeline would have been shut down and the reason for the pressure drop investigated and corrected before continuing. The Segments passed all of the stand-up pressure tests without issue.

16. **Attachment 5** to this declaration is a true and correct copy of a December 22, 2025 emergency special permit PHMSA issued to Sable for the Segments. The emergency special permit was written and is maintained in the course of PHMSA's regularly conducted activities. The emergency special permit[1] is substantially identical to the waiver received from the California Office of the State Fire Marshal, adopting the same strict operational and safety conditions,

---

[1] Special permits issued by PHMSA are the federal equivalent to state waivers issued by the California Office of the State Fire Marshal.

-4-

including the same operating limits, in-line inspections, repair criteria, and testing. The emergency special permit expired on February 21, 2026, but Sable has agreed to continue following the conditions until PHMSA issues a decision on its request for a non-emergency special permit.

17.    **Attachment 6** to this declaration is a true and correct copy of an excerpt from a January 22, 2026 application for a non-emergency special permit from PHMSA that would apply to the Segments. PHMSA received and is maintaining the non-emergency special permit application in the course of its regularly conducted activities. If granted, the non-emergency special permit would impose substantially the same conditions on the operation of the Segments as the emergency special permit.

18.    **Attachment 7** to this declaration is a true and correct copy of a draft non-emergency special permit PHMSA posted for public comment. The draft non-emergency special permit is maintained in the course of PHMSA's regularly conducted activities. The comment period ended on March 26, 2026, and comments received are currently under review.

## III.    RESTART OF THE SEGMENTS

19.    On the morning of March 14, 2026, I arrived onsite with two other PHMSA pipeline safety inspectors to observe restart of the Segments. Since then, I and other PHMSA safety inspectors have been onsite to supervise the restart or, when not onsite, in communication with Sable about the progress of the restart. Based on my personal observations, the observations of my staff, and information from Sable, the Segments have been filled with oil and pressurized, and transporting crude oil since March 29, 2026 without any signs of release or other safety issues.

20.    Based on my personal observations, the observations of my staff, and information from Sable, Sable has complied and continues to comply with the

restart plan. PHMSA will continue to supervise operation of the Segments until Sable has fully executed the special permit conditions.

21.    The Segments have now operated for over 40 days with no incident.

22.    PHMSA retains authority, pursuant to federal law (49 U.S.C. § 60112), to order the immediate shutdown of the SYPS if PHMSA determines the pipeline is or would be hazardous to life, property, or the environment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May  8  , 2026 in Lakewood, Colorado.

*Dustin Hubbard* (signature)

Dustin Hubbard
Director, Western Region

-6-

# Attachment 1

**Pacific Pipeline Company (PPC)**
**Consent Decree Bi-Annual Report**
**September 30, 2025**

**Introduction**
This report has been prepared in compliance with the requirements of Section XIV of the Consent Decree (Civil Action 2:20-cv-02415) (hereinafter referred to as "CD") with an effective date of October 14, 2020 ("Effective Date"). This report is submitted to update the status of PPC's compliance with the CD, including any measures taken to comply with the injunctive relief requirements in Appendices B and D.

The reporting period for this bi-annual report is from the date of the last bi-annual report (March 31, 2025), and encompasses the period from April 1, 2025 to September 30, 2025 ("Reporting Period").

This report is presented in three sections: the first covers measures taken to comply with the requirements of the body of the CD (Section I through XXIX); the second covers the measures taken to comply with the Injunctive Relief requirements presented in Section IX and Appendix B of the CD; and the third covers the measures taken to comply with Section X (Correction Action Order) which addresses the outstanding terms and obligations from the closed out PHMSA Corrective Action Order ("CAO"), which outstanding terms and obligations are now set forth in Appendix D of the CD.

**I.        Requirements of the Consent Decree**

During the Reporting Period, PPC engaged in the following activities as required by the CD:
- Section III – Applicability
- Section IX – Injunctive Relief
- Section XIV – Reporting

The compliance status of each of these sections is presented below.

**Section III – Applicability**
Copies of the CD have been provided to all PPC officers, employees and agents whose duties may reasonably include ensuring compliance with provisions of the CD. When applicable, PPC will provide a copy of the CD to those contractors who may perform work required under the CD. As additional officers, employees, agents and contractors are identified whose duties and work pertain to compliance with CD obligations, they will be provided a copy of the CD.

**Section IX – Injunctive Relief**
Per Paragraph 21 of the CD, PPC agreed to implement applicable injunctive relief measures set forth in Appendix B of the CD. The status of these actions are described in more detail in Section II (Requirements of Appendix B – Injunctive Relief) below.

**Section XIV – Reporting**
This report serves as a bi-annual report as required under Section XIV. Within the report, PPC describes the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement. This report is only applicable to the transferred assets, specifically Line 901 (hereinafter referred to as "CA-324") and the Gaviota to Pentland segment of Line 903 (hereinafter referred to as "CA-325").

**II.        Requirements of Appendix B - Injunctive Relief requirements under Appendix B of the CD**

Under Section XVIII, Paragraph 88, PPC is bound by provisions under paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B related to existing but non-operational segments of  CA-324 and CA-325 and paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B for any lines built to replace CA-324 or CA-325. CA-324 and CA-325  are active

A **Sable Offshore Corp.** Subsidiary

Copy

September 30, 2025
Page 4

and maintained and inspected pursuant to applicable regulations. CA-324 and CA-325 are not currently transporting product, and they are categorized as active and maintained and inspected pursuant to applicable regulations. (PPC notes that the CD uses the terms "operational" and "non-operational" to describe whether the pipeline is currently transporting petroleum (operational) vs. being maintained and inspected, but not transporting petroleum ("non-operational").  "Non-operational" as used in this context does not connote a status other than active per PHMSA regulations.)

PPC has reviewed the sections of the CD that apply to the transferred assets and provides the following updates:

Appendix B, Article I - Section 2.B:  PPC plans to restart in accordance with the Consent Decree (including Appendix D) during the fourth quarter of 2025.

Appendix B, Article I – Sections 4, 5, 6, and 7.A: Although these requirements only apply to operating segments, and CA-324 and CA-325 are not currently operating, PPC has proactively addressed and complied with these provisions in anticipation of restart of these Lines.

> Section 4.  All metal loss anomalies found to date on CA-324 and CA-325 through ILI runs with reported depth of 40% or greater wall loss have been analyzed and 100% of the remediations have been completed. These ILIs, analyses, and remediation efforts have been conducted consistent with the specifications provided in Section 4 of Appendix B of the Consent Decree.

> Sections 5 and 6.  PPC has procured a total of twenty-seven (27) valves for installation on CA-324 and CA-325 within Santa Barbara, Kern and San Luis Obispo Counties. Following a settlement with Santa Barbara County to authorize valve installation to the county's earlier denial of approvals to install the valves, installation work immediately commenced at locations indicated by Plains EFRD analysis, as well as a risk analysis submitted by Plains pursuant to the Coastal Best Available Technology (CBAT) Rule under 19 CCR 2111(c).  With installation of these safety valves (along with implementation of enhanced leak detection measures and emergency response measures), CA-324 and CA-325 reflect implementation of the best available technology to limit discharge volume in the event of a release incident pursuant to the CBAT Rule.  This installation exceeds the requirements of Section 6 of the Consent Decree, which gives the operator discretion to determine how to implement the results of a risk analysis. All twenty-seven (27) valves have been installed as follows: CA 324: seven (7) valves installed in Santa Barbara County; CA 325: nine (9) valves installed in Santa Barbara County, nine (9) valves installed in San Luis Obispo County and two (2) valves installed in Kern County.

> Section 7.A.  As noted in the CBAT risk analysis above, PPC has implemented a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) leak detection system that complies with API 1130.  The system implemented by PPC is part of a suite of measures that constitute best available technology to limit discharge volume in the event of a release.

Appendix B, Article II – Section 12.A:
PPC has completed construction of its primary operations control center, located east of Santa Maria, California, and has completed the below items in accordance with the terms of the Consent Decree:

> Section 12.A1.  PPC has completed communication commissioning for all MOVs and pump stations at their physical locations.  Point-to-point verifications are 100% complete.

> Section 12.A2.  PPC has updated its P&ID, software, manuals, and operating procedures to reflect the existing field configuration.

> Section 12.A3.  PPC has updated its SCADA alarm configuration, programming, and alert notifications.

> Section 12.A4.  PPC has updated the names of all facilities, equipment, devices, measurement points and allocations, and finalized its Control Room Management Plan, Control Center General Procedures, shift reports, and form templates.

A **Sable Offshore Corp.** Subsidiary

**III.    Requirements of Appendix D – Remaining Corrective Actions from the PHMSA CAO**

PPC met with OSFM from August 12 – 14, 2025 to (1) review and discuss PPC's completion of all mandated actions required prior to restart under the Consent Decree, (2) review and discuss the linefill and restart procedures, and (3) conduct field visits of pump stations and valve sites.

OSFM conducted its Operations & Maintenance inspections from August 6 – 8, 2025 and found no preliminary findings of either unsatisfactory results or concerns.

OSFM conducted its Control Room Management inspections from September 2 – 5, 2025 and found no preliminary findings of either unsatisfactory results or concerns.

By letter dated September 11, 2025, PPC requested OSFM's approval of the Restart Plans for Lines CA-324 and CA-325.

A **Sable Offshore Corp.** Subsidiary

# Attachment 2



January 22, 2026

<u>VIA ELECTRONIC MAIL</u>

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Safety Administration (PHMSA)
US Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

**RE:    *Application for Special Permit***
**        *Sable Offshore Corp.***

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) respectfully submits this Application for Special Permit pursuant to 49 U.S.C. § 60118(c)(1) and 49 C.F.R. § 190.341.  As part of this Application, Sable requests that PHMSA issue a Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS).  The Application seeks waiver of certain provisions under 49 C.F.R. Part 195 to implement Appendix B, Article I.1.A and Appendix D, Section 1.b.10 and 1.f of the Consent Decree issued in Civil Action No. 2:20-CV-02415 in the US District Court for the Central District of California (Consent Decree).

Sable shares PHMSA's commitment to pipeline safety and is proposing to comply with substantial alternative measures that provide an equivalent, if not greater, measure of safety as compared to the Part 195 regulation from which it seeks relief.  These alternative measures are specifically designed to address the risk of cathodic protection shielding and the attendant external corrosion threats on CA-324 and CA-325 due to degradation of its original coating. These measures include, but are not limited to, significantly increased frequency of In-Line Inspection (ILI) tool runs and more stringent anomaly repair criteria.  PHMSA granted Sable an Emergency Special Permit pursuant to 49 C.F.R. § 190.341(g) on December 23, 2025. This application requests substantially the same conditions as provided in the Emergency Special Permit.

In addition, these conditions are substantially the same measures that have already been reviewed and approved by the California Office of the State Fire Marshal (OSFM) through issuance of State Waivers dated December 17, 2024 granting waiver of the same standards for

CA-324 and 325, at a time when these segments were considered part of an intrastate pipeline facility.  As part of the State Waiver process, PHMSA evaluated and approved the State Waivers pursuant to its federal oversight obligation in 49 U.S.C. § 60118(d) by issuing letters of no-objection to OSFM on February 11, 2025.[1]

Sable seeks this Special Permit from PHMSA due in part to Sable's November 26, 2025 determination, and PHMSA's December 17, 2025 concurrence that Lines CA-324 and 325 (formerly known as Lines 901 and 903, respectively) are properly classified as pipeline segments that are part of the interstate SYPS pipeline facility.  As an interstate pipeline, SYPS is subject to PHMSA's exclusive pipeline safety oversight under 49 U.S.C. § 60104(c).  As a result, and for the additional reasons provided in this application, Sable respectfully requests that PHMSA issue a special permit to replace the Emergency Special Permit issued for CA-324 and 325.  Sable has patterned this application on its Emergency Special Permit application and the Pacific Pipeline Company's July 10, 2023 applications for state waivers.

Below please find the information specified in 49 C.F.R. § 190.341 in support of this Application:

**(1)** ***The name, mailing address, and telephone number of the applicant and whether the applicant is an operator;***

Sable Offshore Corp. PPC (Operator ID #40881)
Attn: Lance Yearwood
845 Texas Avenue
Suite 2920
Houston, TX 77002
(713) 579-8118

**(2)** ***A detailed description of the pipeline facilities for which the special permit is sought, including:***

    **(i)** ***The beginning and ending points of the pipeline mileage to be covered and the Counties and States in which it is located***

Sable operates the SYPS pipeline facility that encompasses, among other things, a Part 195-regulated emulsion line that transports oil from offshore oil production platforms to the Las Flores Canyon Processing Facility (LFC), LFC, and the Las Flores Pipeline, consisting of Part 195-regulated segments CA-324 and CA-325.  A Special Permit is sought specifically for segments CA-324 and CA-325. CA-325 can be further divided into two sub-segments: CA-325A and CA-325B.   Table 2-1 summarizes relevant information.  A map of the pipeline system is included as ***Attachment A*** and further details about these segments are below:

---

[1] See Docket Nos. PHMSA-2025-0002 and PHMSA-2025-0003.

2

Copy

**Table 2-1: Pipeline Segments Applicable to Special Permit Application**

| Pipeline Facility Name | Pipeline Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|---|
| SYPS | CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| SYPS | CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| SYPS | CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

a. *Description of CA-324 and CA-325*

The CA-324 24-inch pipeline segment (formerly referred to as Line 901) is approx. 10.86 miles in length and generally parallels U.S. Highway 101 along the south coast between the LFC consolidated oil and gas processing facility and Gaviota Pump Station. This pipeline segment is located north of U.S. Highway 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons.

The CA-325A 30-inch pipeline segment (formerly referred to as Line 903 – Gaviota to Sisquoc) is approx. 38.72 miles in length. This pipeline segment extends west from Gaviota Pump Station to an MOV located east of Gaviota Creek and U.S. Highway 101. It then enters Gaviota State Park approx. 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area. It then crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101 "Caltrans" rest stop area. The pipeline segment then extends west and north from the Gaviota Creek MOV.

CA-325A continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park. The pipeline segment traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, and then crosses back into the Park before descending toward the west fork of Gaviota Creek (Betty Creek). The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101. The pipeline segment continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains. It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed. North of Moonshine Creek, the route crosses ridges with rock outcroppings.

3

The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills.  It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley.  The pipeline segment crosses beneath the Sisquoc River and continues north across the River Valley.  It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Pump Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline segment (formerly referred to as Line 903 – Sisquoc to Pentland) is approx. 74.84 miles in length.  The pipeline segment follows Santa Maria Canyon after leaving the Sisquoc Pump Station.  It then extends northeast towards Tepusquet Road.  The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon.  The pipeline segment follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest.  The route crosses rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon.  At the Cuyama River crossing, CA-325B exits Santa Barbara County and enters San Luis Obispo County. The pipeline segment continues for approx. 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

Table 2-2 indicates High Consequence Areas (HCAs) along the Lines CA-324 and 325.

**TABLE 2-2: HIGH CONSEQUENCE AREA SUMMARY**

| Pipeline Segment Designation | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|
| CA-324 | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | 74.84 | Impact to ecologically sensitive regions |

Lines CA-324 and 325 traverse multiple Counties as well as State and Federal land. Approximate mileage is included in Table 2-3, below.

**TABLE 2-3: JURISDICTIONAL MILEAGE**

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction (Note 1)** | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |
| | Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| | City of Buellton | 0 | 1.1 | 0 | 1.1 |
| | Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction.*

 

(ii) *Whether the pipeline is interstate or intrastate and a general description of the right-of-way including proximity of the affected segments to populated areas and unusually sensitive areas*

The SYPS pipeline facility that Sable operates, including segments CA-324 and 325 that are parts of the SYPS, are all interstate. CA-324 and 325 have potential to impact HCAs, including unusually sensitive areas. A map of the pipeline facility is included as Attachment A and further details about CA-324 and 325 and its right-of way are provided above.

(iii) *Relevant pipeline design and construction information including the year of installation, the material, grade, diameter, wall thickness, and coating type;*

    a. *Pipeline Design and Construction Information*

The CA-324 segment was constructed from low carbon steel pipe. It contains predominantly 0.344-inch nominal wall thickness, high frequency electric resistance welded (HF-ERW) API 5L X65 pipe manufactured in 1985 and 1986 by Nippon Steel Corp., Hikari Works mill, in Japan

using plate steel with UOE pipe forming process.  A summary of CA-324 line pipe specifications is included in Table 2-4.

The CA-325A/B segment was constructed from low carbon steel pipe .  It contains various grades and wall thicknesses of double submerged arc welded (DSAW) API 5L pipe manufactured between 1984 and 1986, from a variety of mills in Belgium, Brazil, France, Germany, and Israel, summarized in Table B-4.  Additionally, it includes small portions of replaced sections with newer pipe, including HF-ERW.  A summary of CA-325A/B line pipe specifications is included in Table 2-4.

**TABLE 2-4: LINE PIPE SPECIFICATIONS**

| Pipeline Segment Designation | Outside Diameter (in) | Nominal Wall Thickness (in) | Grade | Seam Type | Year Installed | Length (mi) |
|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 24 | 0.344 | X65 | HF-ERW | 1990 | 10.69 |
| | 24 | 0.375 | X65 | HF-ERW | 1990 | 0.02 |
| | 24 | 0.5 | X60 | HF-ERW | 1990 | 0.16 |
| CA-325A Gaviota to Sisquoc | 30 | 0.281 | X70 | DSAW | 1986 | 21.85 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 12.47 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 2.27 |
| | 30 | 0.375 | X65 | DSAW | 2014 | 0.12 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.38 |
| | 30 | 0.406 | X65 | HF-ERW | 2000 | 0.03 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 0.17 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.75 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.562 | X65 | DSAW | 1986 | 0.06 |
| | 30 | 0.75 | X65 | DSAW | 1986 | 0.35 |
| CA-325B Sisquoc to Pentland | 30 | 0.281 | X70 | DSAW | 1986 | 19.29 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 17.03 |
| | 30 | 0.344 | X65 | DSAW | 2007 | 0.24 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 12.88 |
| | 30 | 0.375 | X70 | DSAW | 2017 | 0.16 |
| | 30 | 0.375 | X70 | DSAW | 2018 | 0.02 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.12 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 24.41 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.13 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.625 | X65 | DSAW | 1986 | 0.01 |
| | 30 | 0.75 | X70 | DSAW | 1986 | 0.27 |

### b. Coating

Lines CA-324 and 325 are externally coated with the following coating system as illustrated in Figure 2-5:
- Coal tar urethane (CTU) coating in intimate contact with the steel pipe
- Layer of rigid thermal polyurethane (PU) foam insulation
- Outer layer of polyethylene (PE) tape wrap

**FIGURE 2-5: EXTERNAL COATING SYSTEM DIAGRAM**



Shrink sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at original construction pipeline field joints. The use of the PU foam and PE tape was selected at the time of original construction to minimize heat loss of the crude oil within the pipeline during transit. The pipeline segments have an impressed-current cathodic protection (CP) system that was energized at the time of installation. The CP system consists of active rectifiers at Las Flores Canyon Station, Gaviota Station, and Sisquoc Station, a critical bond and new, deep well anode bed at Pentland Station, as well as over 140 test stations across the entire CA-324 and CA-325A/B pipeline segments. The PU insulation and PE tape wrap has the ability to "shield" the cathodic protection, such that the CP current may not reach the pipe surface to arrest corrosion in the limited instance the CTU coating becomes disbonded. As a result, despite ongoing operation of the cathodic protection system in compliance with applicable regulations, the pipeline remains at risk of corrosion under insulation (CUI).

The CP system remains active and provides a level of external corrosion deterrence, and it is highly effective on portions of the pipeline without insulation (e.g. fusion bonded epoxy (FBE) and epoxy-coated regions). Cathodic protection has and will continue to be implemented, tested, and maintained on the pipeline at appropriate levels and in compliance with applicable

regulations.[2]  Additionally, the use of modern, advanced in-line inspection technologies, along with explicit integrity management programs and procedures for robust characterization, validation, and stringent criteria for anomaly repair support supplemental integrity management steps that exceed regulatory corrosion protection requirements and enable safe, responsible operation.  Comprehensive conditions for effective management of the external corrosion risks associated with shielding of CP are described in subsequent sections in this Application.

> *(iv)*  *Relevant operating information including operating, leak history, and most recent testing or assessment results;*

> a.  *Operating Information and Leak History*

Lines CA-324 and 325 were previously owned and operated by Plains All American Pipeline LP to transport crude oil, and were formerly known as Lines 901 and 903, respectively.  These pipeline segments have remained under "active" status pursuant to PHMSA's Part 195 regulations,[3] but have not transported crude oil since May 19, 2015.

Prior to May 19, 2015, there were no releases from CA-324 or 325 which met reportable criteria under PHMSA's Part 195 standards.  On May 19, 2015, CA-324 (then known as Line 901) experienced a release on a section of buried pipe.  PHMSA's Failure Investigation Report (May 2016) attributed the rupture of the pipeline to "progressive external corrosion of the insulated, 24-inch diameter steel pipeline."  PHMSA's findings indicate that the direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released crude oil.  PHMSA's investigation identified the following categories of contributory causes:

1.  Ineffective protection against external corrosion of the pipeline
    - The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
    - The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2.  Failure to detect and mitigate corrosion

---

[2] As noted in PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016), pipelines with coatings that result in cathodic protection "shielding" may nonetheless still be in compliance with 49 C.F.R. Part 195 subpart H. CA-324 and 325 have not been previously determined as out of compliance with any cathodic protection or corrosion control regulations in Part 195, nor is it apparent that there is any such regulation in Part 195 with which these segments' cathodic protection system do not comply.  As noted elsewhere in this application, even to the extent there were such regulations, the same conditions proposed to be established through this special permit would properly address any integrity risks presented by the limited effectiveness of cathodic protection on CA-324 and 325, and fulfill the Consent Decree's and CAO's directive to obtain a special permit for these purposes.

[3] See Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")  See also, PHMSA December 17, 2025 Determination of Interstate Classification, p.3, n.8, confirming active status of Las Flores Pipeline.

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

Subsequently, PHMSA issued a Corrective Action Order (CAO) to the operator (Plains).[4] PHMSA's third amendment to the CAO provided options for how the operator could address the risks associated with shielded cathodic protection and CUI.[5]  Specifically, PHMSA provided that the operator could mitigate these risks through a special permit that included a "long-term continuous monitoring plan to address the ineffective CP under insulation."[6]  That amended CAO provided that the CUI plan must be based on one of several specified methods, including submitting a request for a Special Permit containing the following provisions to "mitigate the threat of CUI":

1) Accelerated reassessments;

2) Usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking;

3) Coordination of data from the appropriate alternating ILI technologies;

4) More stringent repair criteria targeted at CUI; and

5) Advanced data analysis techniques to account for the potential growth of CUI including interaction criteria for anomaly assessment.[7]

This Special Permit Application includes provisions to address all of these topics, as noted further below.

On October 14, 2020, the Consent Decree was entered by the United States District Court for the Central District of California.[8]  The Consent Decree adopted relevant remaining provisions of PHMSA's Corrective Action Order in Appendix D, section 1.[9]

In October 2022, Pacific Pipeline Company (PPC), then a subsidiary of ExxonMobil, acquired CA-324 and 325 from Plains.  In 2024, Sable acquired PPC and currently serves as the designated operator of CA-324 and 325, as well as other components of the SYPS pipeline facility.

Maximum Operating Pressure (MOP) information for CA-324 and 325 is provided in Table 2-6.

---

[4] Plains Pipeline, LP, CPF No. 5-2015-5011H, Corrective Action Order (May 21, 2015), subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016.

[5] Amendment No. 3 to the Corrective Action Order, Item 2 (c), p.8, CPF No. 5-2015-5011H (June 16, 2016).

[6] *Id.*

[7] *Id.*  See also PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016).

[8] *United States et al v. Plains All American Pipeline, LP et al*, no. 2:20-CV-02415 (C.D. Cal. Oct. 14, 2020).

[9] *Id*. at 91 ("All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree…").

**TABLE 2-6: DOCUMENTED MOP and %SMYS[10]**

| Pipeline Designation | %SMYS | Documented MOP (psig) |
|---|---|---|
| CA-324 | 55.8% | 1003 (maximum)<br>(1.5 x MOP Spike test (15 mins) = 1505 psi;<br>1.25 x MOP strength test (8 hrs) = 1254 psi) |
| CA-325A | 69.3% | 1000 (maximum)<br>(1.39 x MOP spike test (15 mins) = 1390 psi<br>1.25 x MOP strength test (8 hrs) = 1250 psi) |
| CA-325B (MP 49.57-107.55) | 71.5% | 1292<br>(1.25 x MOP strength test (8 hrs) = 1615 psi) |
| CA-325B (MP 107.55-124.42) | 72.0% | 1170[11]<br>(1.25 x MOP strength test (8 hrs) = 1463 psi) |

    b. *Most Recent Testing and Assessment Results*

        i.      Hydrostatic Testing

CA-324 was originally hydrostatically pressure-tested on November 25, 1990 to 1765 pounds per square inch gauge (psig), as calculated at the highest elevation. CA-325A was originally hydrostatically pressure-tested in nine separate segments between pressures of approx. 778 to 1757 psig, as calculated at the highest elevations of each segment, between October 14, 1986 and December 3, 1986. CA325B was originally hydrostatically pressure-tested within eleven separate sections between pressures of 686 to 1753 psig, as measured at the highest elevations of each segment, between January 13, 1986 and November 8, 1986. Portions of pipe replaced after original construction hydrotest were tested at or above the originally established test pressure and established maximum operating pressure (MOP) prior to being placed into service.

Sable hydrostatically pressure-tested Segments CA-324 and 325 from March 30 through May 27, 2025, dividing the lines in 8 sections. Segments CA-324 and CA-325A were spike-tested as well to 150% and 139% of MOP, respectively. No test failures occurred during the 2025 hydrostatic

---

[10] MOP for the pipeline is adjusted by the change in elevation at that location compared to the lowest elevation in each section where the MOP is established. CA-324 and CA-325A each have one MOP low elevation point where MOP is established. CA-325B has two MOP control points. Test pressure for each segment is based upon the MOP at the low point for each pipe section.

[11] Test pressure for this segment was based on the maximum allowable MOP limited by 72% SMYS at the lowest elevation of the pipe.

tests or spike tests.  These pressure test results combined with 2022 and 2023 ILI assessments, discussed in the following section of this application and repairs performed according to the more stringent Consent Decree criteria at Appendix B, section 4.A.1 of the Consent Decree, provide a high degree of assurance that CA-324 and CA-325 are fit to resume service.[12]

A summary of the percent of specified minimum yield strength (% SMYS) and the corresponding MOP, as established by the construction hydrotest records, is included above in Table 2-7.  A summary of hydrotest records by segment are included in Table 2-8.

**TABLE 2-8: HYDROSTATIC TEST SUMMARY**

| Pipeline Segment | Location | Date | Begin Station | End Station | Type | High Point Min Pressure (psig) | Low Point Max Pressure (psig) | Elevation Adjusted MOP (psig) |
|---|---|---|---|---|---|---|---|---|
| CA-324 | Las Flores Sta | 5/12/25 | 0+00 | 573+75 | Spike (150%) | 1166 | 1514 | 1003 |
| | | | | | 8-hour (125%) | 915 | 1264 | 1003 |
| CA-325A | Gaviota Sta | 5/27/25 | 554+21 | 1337+21 | Spike (139%) | 872 | 1400 | 1000 |
| | | | | | 8-hour (125%) | 730 | 1260 | 1000 |
| | MP 25.71 | 3/30/25 | 1338+21 | 2602+76 | Spike (139%) | 800 | 1289 | 1000 |
| | | | | | 8-hour (125%) | 660 | 1149 | 1000 |
| CA-325B | Sisquoc Sta | 4/13/25 | 2603+76 | 3186+76 | 8-hour (125%) | 892 | 1625 | 1292 |
| | MP 60.63 | 4/14/25 | 3187+76 | 3914+76 | 8-hour (125%) | 751 | 1614 | 1292 |
| | MP 74.44 | 4/22/25 | 3915+76 | 4455+76 | 8-hour (125%) | 1209 | 1379 | 1292 |
| | MP 84.65 | 5/2/25 | 4456+76 | 5669+76 | 8-hour (125%) | 922 | 1253 | 1292 |
| | MP 107.64 | 5/9/25 | 5670+76 | 6554+49 | 8-hour (125%) | 459 | 1473 | 1170 |
| | Pentland Sta | | | | | | | |

---

[12] See, e.g., NACE Publcation 10A392, "Effectiveness of Cathodic Protection on Thermally Insulated Underground Metallic Structures," Sept. 2006 at p. 8 (appended to Line 901 Failure Investigation Report), available at https://www.phmsa.dot.gov/foia/plains-pipeline-lp-line-901-failure-investigation-report  ("The use of internal pipeline corrosion inspection tools to locate/detect metal loss on external metallic surfaces has been relatively successful in evaluating corrosion control" and recommending "When practical, the thermally insulated metallic surfaces need to be inspected at routine time intervals for metal loss (e.g., an internal pipeline inspection tool could be used"); PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016),

11

ii.    In-Line Inspection History

The following Table 2-9 provides a summary of CA-324, CA-325A, and CA-325B ILI
activities, as of July 2023. Note that CA-324 Las Flores Canyon to Gaviota has been
inspected since the 2015 release, in February and December of 2022 (circumferential
magnetic flux leakage (MFL-C) and ultrasonic wall measurement (UTWM) surveys,
respectively). Also note that CA-325A Gaviota to Sisquoc, and CA-325B Sisquoc to
Pentland, have been inspected since the 2015 release, with axial magnetic flux leakage (MFL-
A) surveys in September and October 2023, respectively.

**TABLE 2-9: IN LINE INSPECTION SUMMARY**

| Pipeline Segment | Date of Inspection | Technology | Vendor |
| --- | --- | --- | --- |
| CA-324 | 6/18/07 | Def+MFL+IMU | Rosen |
| | 7/3/12 | Def+MFL+IMU | Rosen |
| | 5/6/15 | Def+MFL+IMU | Rosen |
| | 2/23/22 | CMFL | Baker Hughes |
| | 12/10/22 | UTWM | Baker Hughes |
| CA-325A | 1/1/03 | Def+MFL+IMU | Tuboscope |
| | 3/20/08 | Def+MFL+IMU | Rosen |
| | 4/29/13 | Def+MFL+IMU | TD Williamson |
| | 9/20/23 | AMFL | Baker Hughes |
| CA-325B | 10/1/94 | Unknown | Tuboscope |
| | 1/8/03 | Def+MFL | Tuboscope |
| | 10/21/06 | Def+MFL | Tuboscope |
| | 3/10/12 | Def+MFL | TD Williamson |
| | 6/12/13 | AMFL | TD Williamson |
| | 10/1/23 | AMFL | Baker Hughes |

12

The 2022 and 2023 assessments listed above were run in nitrogen.  These tools were selected specifically to identify internal and external corrosion anomalies as well as potential clusters of anomalies.  During April 2024 to May 2025, Sable repaired all defects as required under 49 C.F.R. § 195.452 as well as the more stringent repair criteria set out in Appendix B, section 4.A.1 of the Consent Decree.  Altogether, Sable conducted approximately 170 digs and made over 200 pipeline repairs based on the 2022 and 2023 assessments.

To account for the possibility of any continuing external corrosion, Sable has proposed in Condition 10 to run an ILI tool within 7 days of steady state operation upon restart.  Moreover, Sable has also proposed significantly increased ILI tool runs in Condition 14 to evaluate the pipeline for external corrosion and other threats.  Finally, Sable has proposed stringent repair criteria for any defects detected through these assessments, in Conditions 16-17.

### c.  Other Activities

In addition to hydrostatic and spike testing and ILI assessments and associated anomaly repairs, Sable has conducted several additional activities on or relating to the pipeline to further mitigate the risk and consequences of a spill.

*EFRD Analysis and Valve Installation*.  Pursuant to Appendix B, Section 10.A of the Consent Decree, analyses to determine the need for emergency flow restricting devices (EFRDs) had been performed, and Sable actioned these results by installing a total of 27 new safety valves along CA-324 and 325.  These safety valves serve to limit the spill volume in the event of a rupture, reflecting best available technology to minimize spill volume pursuant to California AB 864.

*Pipeline Control and Leak Detection*.  Sable has installed an API 1130-compliant Real Time Transient Model Computational Pipeline Monitoring (RTTM CPM) leak detection system, to limit release detection time and further minimize release volumes in the event of a leak.  The RTTM CPM system also reflects best available technology to minimize spill volume pursuant to California AB 864.  Sable also has installed new flow meters at Gaviota and Sisquoc Pump Stations to increase detection resolution of the leak detection system by providing flow data via the pipeline's supervisory control and data acquisition (SCADA) system to the control center, and installed additional pressure transmitters for enhanced pressure surveillance as integrating with the leak detection system.  Sable has further installed an automatic shutoff system (ASOS) that would automatically initiate a pump shutdown sequence and valve closures upon receipt of a rupture alarm as indicated by the above and other existing instrumentation on CA-324 and 325.

*Updated Programs and Procedures*. Pursuant to the Consent Decree, Sable has implemented enhancements to its control room management (CRM) procedures and operations, including point-to-point verification reviews for each component of its SCADA system, and updated

13

piping and instrumentation diagrams, software, manuals, and operating procedures to confirm they reflect existing field configuration. Sable has also made enhancements to the pipeline master control room, including adjusting alarm thresholds to better account for topography, sensor location, and to integrate with the above control and leak detection capabilities. Sable has also implemented updated integrity management procedures to reflect the more stringent assessment, data integration, and anomaly repair requirements in the Consent Decree.

*Enhanced Spill Response Resources*. Sable has developed a Tactical Response Plan to supplement its existing Incident Contingency Plan, with a focus on furthering emergency response preparation and planning within coastal zones and high pressure areas along the segments. Further, Sable has undertaken enhanced engagement with local emergency responders, including the Santa Barbara County Fire Department.

These actions collectively demonstrate that these segments and the overall pipeline is fit to resume operation. In addition to these activities that have established pipeline integrity today, Sable will continue to provide integrity assurance in future years through application of comprehensive conditions proposed in this application, which go well beyond what is required in Part 195.

### *(3) A list of the specific regulation(s) from which the applicant seeks relief;*

Sable seeks relief from 49 C.F.R. § 195.452(h)(4)(iii)(H), requiring remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld.[13]

Moreover, Sable is seeking this Special Permit pursuant to Appendix B Sections 1.A and B and Appendix D, Sections 1.b.10 and 1.f of the Consent Decree, stating that a "State Waiver" for limited effectiveness of cathodic protection must be applied for and received prior to restarting Lines 901 and 903 (now CA-324 and 325).[14] As noted in PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016), pipelines with coatings that result in cathodic protection "shielding" may nonetheless still be in compliance with 49 C.F.R. Part 195 subpart H.

Given that CA-324 and 325 were then-considered intrastate at the time of the Consent Decree but are now considered interstate (removing any regulatory jurisdiction of OSFM over these

---

[13] Waiver of this provision does not fully obviate the need for Sable to repair corrosion of or along a longitudinal seam weld. Sable will still be required to remediate corrosion and other anomalies according to the remaining criteria in § 195.452(h) and the enhanced anomaly criteria in this proposed special permit.

[14] CA-324 and 325 have not been previously determined as out of compliance with any cathodic protection or corrosion control regulations in Part 195, nor is it apparent that there is any such regulation in Part 195 with which these segments' cathodic protection system do not comply. As noted elsewhere in this application, even to the extent there were such regulations, the same conditions proposed to be established through this special permit would properly address any integrity risks presented by the limited effectiveness of cathodic protection on CA-324 and 325, and fulfill the Consent Decree's and CAO's directive to obtain a special permit for these purposes.

14

pipelines), Sable interprets these provisions to require obtaining a special permit from PHMSA for limited effectiveness of cathodic protection prior to restarting CA-324 and 325. Sable already received an Emergency Special Permit and State Waivers from OSFM pursuant to this language of the Consent Decree. Sable now seeks a Special Permit from PHMSA that substantially carries over the conditions entered in the Emergency Special Permit and the State Waivers.

### (4) *An explanation of the unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for its facility;*

#### A. *General External Corrosion Under Insulation*

CA-324 and 325 were shut down in 2015 following the above-described release on CA-324. A Consent Decree was entered by the US District Court for the Central District of California on October 14, 2020, that requires a State Waiver prior to restarting CA-324 and CA-325A/B. CA-324 and 325 are comprised of buried and insulated pipe. The pipeline has a coal-tar coating system and insulation wrap that provides corrosion deterrence.

Sable seeks approval to manage external corrosion risk on CA-324 and 325 through a supplemental combination of more frequent reassessments, usage of the appropriate assessment tools, integration of data from the appropriate alternating ILI technologies, enhanced anomaly response criteria targeted at corrosion under insulation, and advanced data analysis techniques to account for potential growth of corrosion under insulation including feature interaction criteria for anomaly assessment. As noted above, the Consent Decree specifically incorporated the outstanding requirements of a CAO (as amended), which provided that a long-term CUI plan as part of restart could be based on a special permit that included the above measures. Table 4-1 below summarizes each of these measures and the proposed condition number(s) in Attachment B of this Application that address them.

**TABLE 4-1: SUMMARY OF CAO CUI PLAN REQUIREMENTS AND CORRESPONDING SPECIAL PERMIT CONDITIONS**

| CAO Special Permit-based CUI Plan Requirement | Proposed Special Permit Condition Number(s) (see Appx. B) and Summary |
|---|---|
| *Accelerated reassessments* | *Condition 14(c):* Requires two Ultrasonic Wall Measurement (UTWM) ILI assessments per year for the first two years following restart, then, at minimum, annual ILI assessments thereafter, to assess metal loss, including due to corrosion. Part 195 only requires such |

15

| | integrity assessments on a once-per-five year schedule, and the Special Permit Segments were previously only assessed on a once-per-three year schedule. The higher assessment frequency established in the Special Permit will facilitate the timely detection and repair of such anomalies before they pose integrity risks.<br><br>*Condition 14(d):*<br>Requires, at minimum, annual Ultrasonic Shear Wave Crack Detection (USCD) ILI assessments. Part 195 only requires such assessments on a once-per-five year schedule. The higher assessment frequency established in the Special Permit will facilitate the timely detection and repair of such anomalies before they pose integrity risks.<br><br>*Condition 14(e):*<br>Requires running high-resolution deformation ILI tool along with each UTWM ILI assessments |
|---|---|
| *Usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking* | *Condition 14(c) and (e):*<br>UTWM tools are appropriate specifically to assess metal loss anomalies arising from the threat of internal or external corrosion, the latter of which is a special threat due to limited effectiveness of cathodic protection on the Special Permit Segments. Moreover, high-resolution deformation tools are appropriate to assess anomalies resulting from threats of geological or other external force threats (e.g., erosion and ground movement), or construction anomalies.<br><br>*Condition 14(d):*<br>USCD tools are appropriate to detect crack-based anomalies due to, among other things, stress corrosion cracking. |
| *Coordination of data from the appropriate alternating ILI technologies;* | *Condition 14(i)-(k):*<br>Requires ILI tool vendor to determine tool tolerance per API 1163 2nd Ed. and include that tolerance in determining the size of each indication reported to Sable. Sable must account for this tool tolerance and anomaly growth rates in scheduling repairs and future reassessment intervals, and must demonstrate ILI tool accuracy for each run by using calibration, excavations, and unity plots demonstrating tool accuracy meets the vendor's specifications (typical for depth within 10% accuracy for 80% of |

16

|  | the time).  Sable must perform at least four validation digs in accordance with Level 2 of API 1163. |
|---|---|
| *More stringent repair criteria targeted at CUI* | *Conditions 16-17:* <br> Requires immediate repair of crack or crack-like anomalies equal to or greater than 50% of wall thickness (vs 80% threshold in § 195.452(h)(4)(i)). <br><br> Requires 180-day repair of all internal or external metal loss anomalies with an ILI-reported depth of 40% wall loss or more, including tool tolerance (vs 50% wall loss threshold in § 195.452(h)(4)(iii)(F)). |
| *Advanced data analysis techniques to account for the potential growth of CUI including interaction criteria for anomaly assessment* | *Condition 18:* <br> Requires Sable to develop a corrosion growth rate procedure to annually calculate corrosion growth rates between successive ILI assessments, including the most accurate signal matching between ILI data sets. <br><br> *Condition 21(b)-(f):* <br> Requires Sable to field-analyze a sample of assessment-identified anomalies to compare, and to apply 6t by 6t interaction criteria, and to use an approved third-party to review all ILI reports, verification dig results, unity plots, field findings, and any other finding that could affect the integrity of the Special Permit Segments within 6 months of each ILI assessment. |

Each of the components of the special permit approach to a long-term CUI plan are addressed by the conditions of this proposed Special Permit.  The proposed Special Permit is appropriate to mitigate risks associated with limited effectiveness of cathodic protection.

## B.  Selective Seam Weld Corrosion (SSWC)

The PHMSA Fact Sheet on Selective Seam Corrosion (known in industry as SSC or SSWC) describes SSWC as "a localized corrosion attack along the bond line of low-frequency electric resistance welded (LF-ERW) and electric flash welded (EFW) piping, that leads to the

17

Exhibit B
Page 97

development of a wedge-shaped groove that is often filled with corrosion products."[15]  The Fact Sheet goes on to say that "LF-ERW or EFW pipe manufacturing processes first came into use in the 1920s.  Both types of pipe are manufactured by forming steel plates into round cylinders and then joining the longitudinal edges through a welding process.  Due to technology and quality control issues with some of the pipe manufactured prior to 1970, the weld bondline may be susceptible to corrosion processes.  This is particularly true if the pipeline has the following conditions present:

- Exposure to corrosive conditions due to poor or absent coating;
- Ineffective cathodic protection; or
- The presence of non-metallic inclusions in the weld bondline region (e.g., contaminants present during the manufacturing process).

SSWC is generally not considered to be a concern with pipe manufactured after 1970 due to the use of cleaner steels having greatly reduced sulfur contents and the replacement of low frequency welding equipment with high frequency equipment in the manufacturing process."  As noted above, Line CA-324 contains exclusively high frequency ERW (HF-ERW) longitudinal seamed pipe manufactured in 1985 and 1986.  When ILI tools call corrosion along the seam, it may simply be corrosion incidental to the seam rather than corrosion that preferentially attacks the seam.  Indeed, SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system.  Therefore, the threat of SSWC is not considered applicable to Line CA-324.  As such, selection of future inspection technologies will prioritize the identification and characterization of external blunt metal loss as the primary threat to this buried, insulated line, namely ultrasonic wall measurement (UTWM) and axial magnetic flux leakage (MFL-A) technologies.

Note that Sable only accepts calls from circumferential magnetic flux leakage (MFL-C), spiral magnetic flux leakage (SMFL), ultrasonic crack detection (UTCD) and/or electromagnetic acoustic transducer (EMAT) ILI systems when applying criteria for corrosion interaction with the longitudinal seam weld, as these technologies are designed for and, therefore are best suited for detection of the longitudinal seam weld and axially oriented corrosion.  MFL-A and/or UTWM are not designed for detection of the longitudinal seam weld or axially oriented corrosion, so calls from those ILI systems are not reviewed for longitudinal seam weld interaction.

CA-324 was inspected using an MFL-C tool in February 2022, to better characterize the threat of external metal loss under insulation. Since SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this pipeline, Sable is therefore requesting PHMSA to issue a special permit which allows for the use of engineering analysis

---

[15] PHMSA Fact Sheet on Selective Seam Corrosion, December 1, 2011;
https://primis.phmsa.dot.gov/comm/FactSheets/FSSelectiveSeamCorrosion.htm

and protocols to differentiate between corrosion anomalies that do not present a specific risk to the seam weld and associated heat affected zones in lieu of the current requirement under 49 C.F.R. § 195.452(h)(4)(iii)(H).  Remediation and repair activities would then be scheduled according to the findings of the proposed evaluation.

### *(5)  A description of any measures or activities the applicant proposes to undertake as an alternative to compliance with the relevant regulation, including an explanation of how such measures will mitigate any safety or environmental risks*

The Application includes memorializing certain integrity management procedures included in the Consent Decree in addition to further measures beyond Part 195 to maintain the integrity of the pipeline, including measures specific to SSWC.  Many of these measures were negotiated and agreed upon as part of the Consent Decree.

A comprehensive list of these proposed measures is contained in draft Special Permit conditions, at Attachment B.  These measures include, among other things, temperature limitations and monitoring, hydrostatic testing, including spike test, requirements (which Sable has already completed), a five-fold more frequent than required by § 195.452 ILI assessment schedule, a substantially more stringent set of anomaly repair criteria, corrosion growth rate analysis, in-field direct examination, and additional recordkeeping and reporting requirements, as compared to the baseline Integrity Management requirements in Part 195.  These measures, in their totality, in addition to hundreds of recently completed anomaly repairs under the repair conditions of the Consent Decree, will substantially minimize the possibility that future conditions that threaten the integrity and safety of the pipeline will go undiscovered or unremediated.

### *(6)  A description of any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a special permit would be in the public interest*

Grant of the Special Permit would create positive impacts on affected stakeholders and operating the covered pipeline segments in accordance with the special permit would be in the public interest.  Grant of the Special Permit would be consistent with operation of CA-324 and 325, which would help address the national energy emergency that has been declared by the President in Executive Order (EO) 14156 (January 20, 2025), which recognizes the seriousness of the West Coast energy shortage, and seeks to boost domestic energy production to address the shortage.  Specifically, EO 14156 determined and declared pursuant to the National Emergencies Act (50 U.S.C. 1601 et seq) that the energy production and transportation capacity of the United States "are all far too inadequate to meet our Nation's needs" and that "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."  EO 14156 specifically notes that these problems "are most

19

Exhibit B
Page 99

pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs and devastate the prosperity of not only local residents but the entire United States population." EO 14156 concludes that our nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy," and that "in light of these findings, [the President] hereby declare[s] a national emergency."

Grant of the Special Permit helps address the energy security and supply issues that acutely affect the West Coast, as noted in EO 14156 by supporting operation of a vital source of crude oil transportation to local and regional refineries (amounting to 10-15% of current California-wide production levels), and helps reverse unfavorable market conditions for refineries. It would also help displace the need for imported oil and gasoline from other nations to California. See Attachments C-F for additional materials in support of these benefits.

### (7) *A certification that operation of the applicant's pipeline under the requested waiver would not be inconsistent with pipeline safety*

Sable certifies that operation of CA-324 and 325 under the requested special permit is not inconsistent with pipeline safety and maintains equivalent or greater protection than that prescribed under 49 C.F.R. Part 195.

### (8) *If the application is for a renewal of a previously granted waiver or special permit, a copy of the original grant of the waiver or permit; and*

As discussed, PHMSA previously granted an Emergency Special Permit to Sable, and this application seeks to carry forward substantially the same conditions as the Emergency Special Permit and the two existing state waivers issued by OSFM on December 17, 2024. A copy of the Emergency Special Permit is attached to this application at Attachment G.

### (9) *Any other information PHMSA may need to process the application including environmental analysis where necessary.*

This application does not seek relief from 49 C.F.R. § 195.563 and the requirements to provide cathodic protection for buried pipelines. The cathodic protection system remains active and continues to be maintained on CA-324 and 325. Further, this cathodic protection system continues to achieve the specifications provided in § 195.571 and the applicable sections it references in NACE SP 0169-2007, as well as other corrosion control regulations in Part 195. Rather, Sable proposes the aforementioned inspection and remediation actions as a means of addressing the limitations of cathodic protection PHMSA observed for buried, insulated pipe.

20

Cathodic protection will continue to be implemented on the pipeline system at appropriate levels in adherence to 49 C.F.R. 195 and tested at appropriate intervals.  Cathodic protection will continue to function with high effectiveness at pipeline repair locations where the thermal insulation has been removed.

CA-324 and 325 have not been previously determined as out of compliance with any cathodic protection or corrosion control regulations in Part 195, nor is it apparent that there is any such regulation in Part 195 with which these segments' cathodic protection system do not comply.  As noted elsewhere in this application, the same conditions proposed to be established through this special permit would properly address any integrity risks presented by the limited effectiveness of cathodic protection on CA-324 and 325, and fulfill the Consent Decree's and CAO's directive to obtain a special permit for these purposes.

As noted above, Sable already received an Emergency Special Permit on December 23, 2025 and State Waivers from OSFM in December 2024 (which PHMSA evaluated and approved) regarding waiver of the same standards for CA-324 and 325.  Sable is seeking from PHMSA a special permit to supersede the Emergency Special Permit, which contains substantially the same conditions as reflected in the Emergency Special Permit and State Waivers (with adjustments for tasks already completed by Sable).

 Sable includes a proposed Draft Environmental Assessment with this application, at Attachment G.

Sable believes that the proposed Special Permit reflects a conservative and measured approach to the identification and remediation of external corrosion metal loss features on CA-324 and 325, will adequately manage risk factors associated with cathodic protection, and enable safe, long-term operation of the pipeline.

We appreciate PHMSA's consideration of this Application.  Should you have any questions, or require anything further to conduct your review of this Application please do not hesitate to contact me.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer, Sable Offshore Corp.
President, Pacific Pipeline Company

21

Exhibit B
Page 101

# Attachment 3

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR**
**LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON**
**THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG**
**A LONGITUDINAL SEAM WELD (CA-324)**

Operator:    Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:    OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable
Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara
County, California as described in the request of state waiver dated April 24,
2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Exhibit B
Page 103

Docusign Envelope ID: 87118E7A-FD76-4881-86B3-BCF5F180FFD7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Exhibit B
Page 105

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a)  Dates for integrity assessment

   b)  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Exhibit B
Page 107

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCF5F180FFD7

Lance Yearwood
December 17, 2024
Page 6

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)

d) Required tool specifications including operational specifications and anomaly sizing tolerances

e) Tool validation methodology

f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

g) Criteria used to identify locations for excavation and field verification

h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Exhibit B
Page 108

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Docusign Envelope ID: 87118E7A-5D76-4881-86B3-BCF5F180FFD7

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**Discovery of Condition**

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**Immediate Repair Conditions**[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

**180-Day Repair Conditions**[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a.  Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

**Data Requirements for Predicted Failure Analysis**

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

**Recordkeeping**

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
   a. Technical approach used for the analysis
   b. All data used and analyzed
   c. Pipe and longitudinal weld seam properties
   d. Procedures used to implement state waiver conditions

Exhibit B
Page 114

Copy

Lance Yearwood
December 17, 2024
Page 13

    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
    o. Safety factors used for fatigue life and/or predicted failure pressure calculations
    p. Reassessment time interval and safety factors
    q. The date of the review
    r. Confirmation of the results by qualified technical subject matter expert(s)
    s. Approval by responsible Sable management personnel
    t. Records of additional preventive and mitigative (P&M) measures performed
    u. Reports required by this State Waiver.

**Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:
    a. Tool type and run date
    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c. Dig sheets
    d. Field contact information for Sable
    e. Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Lance Yearwood
December 17, 2024
Page 14

        a. Tool type
        b. Run date
        c. Summary of Conditions Report[18]
        d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:

        a. A Closure Report for the previous calendar (CY) which contains:
            i. Features that were remediated in previous CY
               1. Provide documentation for the in-the-ditch assessments and repairs
            ii. Identify features that remain to be assessed
            iii. Unity Plots for previous ILI runs
        b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
        c. The third-party ILI expert reviews in accordance with Condition 52
        d. AC and DC Interference surveys that are due in accordance with Condition 53
        e. A copy of the CGRA for prior year including:
            i. Mean corrosion growth rate for the pipeline
            ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87418E7A-ED76-4881-86B3-BCF5F180FFD7

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA

Exhibit B
Page 117

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                      Gavin Newsom, Governor

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:   Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline:   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Exhibit B
Page 118

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Exhibit B
Page 119

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Exhibit B
Page 120

Lance Yearwood
December 17, 2024
Page 4

8.  Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
    a.  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
    b.  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
    At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9.  All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 5

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.

14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.

16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.

18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

**In-Line Inspection (ILI) Assessment and Frequency**

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Exhibit B
Page 123

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

b. USCD Performance Specification Requirements

i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6]  that demonstrate ILI tool accuracy to  meet  the  tool  accuracy specification  provided  by  the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Exhibit B
Page 126

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Exhibit B
Page 127

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEFF3-2115-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 13

    n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    o. Safety factors used for fatigue life and/or predicted failure pressure calculations

    p. Reassessment time interval and safety factors

    q. The date of the review

    r. Confirmation of the results by qualified technical subject matter expert(s)

    s. Approval by responsible Sable management personnel

    t. Records of additional preventive and mitigative (P&M) measures performed

    u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification*.[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B*. The email notification shall include, if applicable:

    d. Tool type and run date

    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

    f. Dig sheets

    g. Field contact information for Sable

    h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:

    i. Tool type

    j. Run date

    k. Summary of Conditions Report[18]

    l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Copy

Docusign Envelope ID: 466BEFF3-2115-476E-8D10-BAFB95600F3B    Case 2:26-cv-03396-SVW-SSC    Document 23-2    Filed 05/11/26    Page 64 of 121    Page ID #:1280

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:

    a.  A Closure Report for the previous calendar (CY) which contains:
          i.  Features that were remediated in previous CY
              1.  Provide documentation for the in-the-ditch assessments and repairs
          ii.  Identify features that remain to be assessed
          iii.  Unity Plots for previous ILI runs
    b.  Fracture mechanics and pressure cycling analyses in accordance with Condition 49
    c.  The third-party ILI expert reviews in accordance with Condition 53
    d.  AC and DC Interference surveys that are due in accordance with Condition 54
    e.  A copy of the CGRA for prior year including:
          i.  Mean corrosion growth rate for the pipeline
          ii.  Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Lance Yearwood
December 17, 2024
Page 15


Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.


Sincerely,



JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:     Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
        Tuan Tran, Pipeline Safety Engineer, OSFM
        Josh Cleaver, Staff Counsel, CAL FIRE
        Max Kieba, Engineering and Research Division, PHMSA
        Joshua Johnson, Engineering and Research Division, PHMSA


Exhibit B
Page 132

# Attachment 4

Exhibit B
Page 133



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO  80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:** **Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,

DUSTIN B HUBBARD    Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

Exhibit C
Page 404

Exhibit B
Page 134

cc:    Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
       Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
       jim.hosler@fire.ca.gov

Exhibit C
Page 405

Exhibit B
Page 135

# Attachment 5

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

**Docket Number:**                2025-1502

**Requested By:**                 Sable Offshore Corp. PPC

**Operator ID#:**                 40881

**Date Requested:**               December 19, 2025

**Issuance Date:**                December 23, 2025

**Expiration Date:**              February 21, 2026

**Code Section:**                 49 CFR § 195.452(h)(4)(iii)(H)

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California.  This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days.  The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*.  PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Exhibit B
Page 137

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325.  The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3]  The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4]  The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6]  Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days.  On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a).  The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

Exhibit B
Page 138

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1)      The *special permit segments* may only be used to transport crude oil.

2)      Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3)      Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a)   The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b)   The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                    Page 3 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 139

c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 4 of 16

Exhibit B
Page 140

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)    Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

a)   API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

b)   API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)   All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)   Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                     Page 5 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 141

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12)    Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13)    Pressure Testing:[11]

a)  Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b)  Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c)  Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

   i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d)  Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e)  Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition.  Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                    Page 6 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 142

hydrostatic test on CA-325B:

    i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.  All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f)  Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g)  Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h)  Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i)  Section(s) of the ***special permit segments*** that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the ***special permit segments*** cannot be safely operated.

14)    In-Line Inspection (ILI) Assessment and Frequency:

a)  Prior to performing in-line inspections of the ***special permit segment***, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i.  Dates for integrity assessment

    ii.  In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii.  In-line inspection tool vendor(s)

    iv.  Required tool specifications including operational specifications and anomaly sizing tolerances

    v.  Tool validation methodology

    vi.  Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC    Page 7 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 143

      vii.  Criteria used to identify locations for excavation and field verification

      viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

    i. Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    ii. Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

    i. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

    ii. USCD Performance Specification Requirements

        1. The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                Page 8 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 144

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC    Page 9 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 145

Edition, April 2013).

15)     Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16)     Immediate Repair Conditions:[16]

    a)  A crack or crack-like anomaly that meets any of the following criteria:

        i.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b)  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c)  Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17)     180-Day Repair Conditions:[18]

    a)  A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b)  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c)  All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d)  For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18)     Corrosion Growth Rate Analysis (CGRA):

    a)  Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H).  All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                    Page 10 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 146

prior ILI) and perform pipeline remediations needed to assure the integrity of the **special permit segments** is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 11 of 16

Exhibit B
Page 147

they input it into the formula for calculating the number of wraps needed for repair method 5.

iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC    Page 12 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 148

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

i. Technical approach used for the analysis

ii. All data used and analyzed

iii. Pipe and longitudinal weld seam properties

iv. Procedures used to implement emergency special permit conditions

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                          Page 13 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 149

> v.    Evaluation methodology used
>
> vi.    Models used
>
> vii.    Direct in situ examination data
>
> viii.    All in-line inspection tool assessments information evaluated
>
> ix.    Pressure test data and results
>
> x.    All in-the-ditch assessments performed on the *special permit segments*
>
> xi.    All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
>
> xii.    All finite element analysis results
>
> xiii.    The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
>
> xiv.    The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
>
> xv.    Safety factors used for fatigue life and/or predicted failure pressure calculations
>
> xvi.    Reassessment time interval and safety factors
>
> xvii.    The date of the review
>
> xviii.    Confirmation of the results by qualified technical subject matter expert(s)
>
> xix.    Approval by responsible Sable management personnel
>
> xx.    Records of additional preventive and mitigative (P&M) measures performed
>
> xxi.    Reports required by this emergency special permit.

24)    Reporting:

> a)    Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]
>
> b)    An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:
>
> > i.    Tool type and run date
> >
> > ii.    Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California                Page 14 of 16

Exhibit B
Page 150

      iii. Dig sheets

      iv. Field contact information for Sable

      v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

         1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

         2. Identify features that remain to be assessed

         3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

         1. Mean corrosion growth rate for the **special permit segments**

         2. Distribution graph of the corrosion growth rate for the **special permit segments** (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov.  PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC           Page 15 of 16
Emergency Special Permit – Corrosion Mitigation – California

Exhibit B
Page 151

## IV.  Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the *special permit segments* to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.


AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

LINDA GAIL DAUGHERTY
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

Exhibit B
Page 152

# Attachment 6

**Attachment B:**
**Proposed Special Permit Conditions**

23

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# <span style="color:red">DRAFT</span> SPECIAL PERMIT

## Special Permit Information:

**Docket Number:**              PHMSA-[]

**Requested By:**               Sable Offshore Corp.

**Operator ID #:**              40881

**Original Date Requested:**    January 22, 2026

**Original Issuance Date:**     Date

**Code Section(s):**            49 CFR § 195.452(h)(4)(iii)(H)

## <span style="color:red">Proposed</span> Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] <span style="color:red">proposes to grant</span> this special permit to Sable Offshore Corp. (Sable) for two hazardous liquid pipelines (Lines CA-324 and CA-325) that are constituents of the interstate Santa Ynez Pipeline System (SYPS) pipeline facility, located on the Outer Continental Shelf (OCS) and in California.

## I.    Purpose and Need:

Sable sought this special permit to waive requirements of 49 CFR §195.452(h)(4)(iii)(H) as applicable to Lines CA-324 and CA-325.  The regulation requires remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld.  These pipelines present a risk of such corrosion under insulation that may occur as a result of limited effectiveness of cathodic protection due to shielding effects of polyurethane foam and polyethylene tape wrap installed on these pipelines.   Sable proposes an alternative approach to appropriately manage this risk, which approach was previously reviewed and

---

[1] Throughout this special permit, the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

24

approved under an Emergency Special Permit granted by PHMSA on December 23, 2025 and as part of State Waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for segments CA-324 and CA-325.

Sable also sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the US District Court for the Central District of California, which provides, among other things, that a "State Waiver" for the limited effectiveness of cathodic protection must be applied for and received from OSFM prior to restarting Lines CA-324 and 325.  Moreover, the Consent Decree incorporates outstanding requirements from the closed Corrective Action Order at CPF No. 5-2015-5011H, as amended, which includes a requirement to include in a Restart Plan a long-term CUI plan based on one of several methods, including obtaining a special permit that requires: 1) accelerated reassessments; 2) usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking; 3) coordination of data from the appropriate alternating ILI technologies; 4) more stringent repair criteria targeted at CUI; and 5) advanced data analysis techniques to account for the potential growth of CUI including interaction criteria for anomaly assessment.[2] This Special Permit addresses each of these requirements through imposing conditions that require substantially more frequent integrity assessments as compared to Part 195, each of which must use threat-appropriate tools (including for wall loss anomalies from external and internal-based corrosion and for detecting crack anomalies from conditions such as stress corrosion cracking).  This Special Permit also establishes more stringent anomaly repair criteria as compared to under Part 195.  Further, this Special Permit requires integrating data from integrity assessments to continuously gauge assessment performance through comparison with in-the-field and other comparative benchmarks, and requires the performance of a corrosion growth rate analysis to inform Sable's analysis of integrity assessment data.

CA-324 and 325 were formerly considered intrastate at the time of entry of this Consent Decree, and were regulated by OSFM pursuant to its state certification received under 49 USC § 60105(a).  However, these pipelines are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025, of the SYPS as an interstate pipeline facility. As a result, PHMSA, and not OSFM, is the sole pipeline safety regulatory agency with authority to grant waiver of the pipeline safety regulations.  This change in designation immediately affected the measures implemented in the two State Waivers issued by OSFM for CA-324 and 325 in December 2024.   To address any regulatory gaps between the transition of regulatory oversight from OSFM to PHMSA and respond to the ongoing national energy emergency, PHMSA issued an Emergency Special Permit that

---

[2] See also PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016),

Exhibit B
Page 156

contained substantially the same conditions as the State Waivers on December 23, 2025. Sable then requested a special permit pursuant to 49 U.S.C. § 60118(c)(1) and 49 CFR § 190.341 to provide an ongoing basis for the waiver requested by Sable and the operation of CA-324 and 325 after the expiration of the Emergency Special Permit. The requested conditions in the special permit application are substantially the same as those approved in the Emergency Special Permit.

## II.    Special Permit Segments

This permit pertains to the specified special permit segments and corresponding special permit inspection area defined in this section.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III.    Conditions

PHMSA proposes to grant this special permit subject to Sable implementing each of the following conditions.  These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with requirements in 49 CFR §195.452(h)(4)(iii)(H).

**General Conditions:**

1)    The Special Permit Segments may only be used to transport crude oil.

26

2)    Prior to transporting crude oil in the Special Permit Segments, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3)    Sable shall not exceed maximum operating pressure (MOP) limits for the Special Permit Segments, as follows:

    a)    The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

    b)    The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

    c)    The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4)    Sable shall not exceed maximum operating temperature limits for crude oil transported in the Special Permit Segments, as follows:

    a)    The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degree Fahrenheit for more than 12 consecutive hours.

    b)    The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours.  Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    c)    The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours.  Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5)    This special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this special permit.

6)    This special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7)    In-line inspections (ILIs) performed pursuant to this special permit must include:

27

    **a)** Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

    **b)** Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    **c)** Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

**8)** Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[3], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[4]

**9)** Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

    **a)** API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

---

[3] The heat affected zone (HAZ), as used in this special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[4] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

    **b)** API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[5]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[6] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of the Special Permit Segments.

13) Pressure Testing:[7]

---

[5] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[6] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

[7] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c) Prior to placing Line 325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

   i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e) Prior to placing Line 325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:

    i.   All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.   All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

**f)** Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

**g)** Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

**h)** Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[8]

**i)** Section(s) of the Special Permit Segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this special permit if failure(s) raise the concern that the Special Permit Segments cannot be safely operated.

**14)** In-Line Inspection (ILI) Assessment and Frequency:

**a)** Prior to performing in-line inspections of the Special Permit Segment, Sable shall provide PHMSA with a written notification to describing its assessment plan with the following information:

    **i.**   Dates for integrity assessment

    **ii.**   In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[9] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    **iii.**   In-line inspection tool vendor(s)

    **iv.**   Required tool specifications including operational specifications and anomaly sizing tolerances

---

[8] All submissions to PHMSA required by this special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.
[9] Industry standards referenced in this special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this special permit.

    **v.** Tool validation methodology

    **vi.** Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    **vii.** Criteria used to identify locations for excavation and field verification

    **viii.** Non-destructive examination

**b)** Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

**c)** Metal Loss Tool(s):

    **i.** Initial ILI tool runs – Each year, during the first two (2) years of operating the Special Permit Segments, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    **ii.** Subsequent ILI tool runs – After the first two (2) years of operating the Special Permit Segments, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the Special Permit Segment within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

**d)** Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[10] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

   **i.** These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   **ii.** USCD Performance Specification Requirements

   **1.** The USCD tools must have a probability of detection that is $\geq 90\%$ for axial and circumferential cracks.

   **2.** The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

   **3.** The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

   **4.** The depth sizing accuracy for cracks must be $\pm 0.8$ mm for axial cracks and $\pm 1$ mm for circumferential cracks.

**e)** Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

**f)** Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the Special Permit Segment in which the ILI tool velocity was outside of the specified tool velocity range.

**g)** All ILI tool runs must obtain the Test ID from PHMSA prior to a run.

**h)** Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

**i)** Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[10] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

33

**j)** Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[11] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

**k)** Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[12]

**a)** A crack or crack-like anomaly that meets any of the following criteria:

    **i.** Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

    **ii.** Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

**c)** Any external cluster corrosion or external general corrosion that is located on the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[13]

---

[11] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[12] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[13] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

34

17)     180-Day Repair Conditions:[14]

    **a)**  A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    **b)**  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    **c)**  All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[15]

    **d)**  For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18)     Corrosion Growth Rate Analysis (CGRA):

    **a)**  Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the Special Permit Segments is maintained.[16] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

    **b)**  The CGRA procedure must include ILI data matching methods[17] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

    **c)**  Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

---

[14] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H).  All immediate repair conditions must be remediated with a permanent repair method.

[15] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the PHMSA.

[16] At a minimum, Sable must include signal matching between ILI data sets.

[17] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

35

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[18]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[19] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[20] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

   ii. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

   iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[18] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[19] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[20] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[21]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

   i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

   ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

---

[21] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the Special Permit Segments. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.[22]

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this special permit shall be kept for the life of the Special Permit Segments and must be submitted to the PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

    i. Technical approach used for the analysis

    ii. All data used and analyzed

    iii. Pipe and longitudinal weld seam properties

    iv. Procedures used to implement special permit conditions

---

[22] Sable indicated in its application that it has already completed the evaluation required in this condition. Sable must submit results to PHMSA prior to restarting Line CA-324 and 325.

38

    v.    Evaluation methodology used

    vi.    Models used

    vii.    Direct in situ examination data

    viii.    All in-line inspection tool assessments information evaluated

    ix.    Pressure test data and results

    x.    All in-the-ditch assessments performed on the Special Permit Segments

    xi.    All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

    xii.    All finite element analysis results

    xiii.    The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

    xiv.    The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

    xv.    Safety factors used for fatigue life and/or predicted failure pressure calculations

    xvi.    Reassessment time interval and safety factors

    xvii.    The date of the review

    xviii.    Confirmation of the results by qualified technical subject matter expert(s)

    xix.    Approval by responsible Sable management personnel

    xx.    Records of additional preventive and mitigative (P&M) measures performed

    xxi.    Reports required by this special permit.

**24)** Reporting:

    **a)** Any release on the Special Permit Segments shall be reported to the PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[23]

    **b)** An email notification shall be made at least three (3) days prior to a Special Permit Segment being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

        i.    Tool type and run date

        ii.    Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

        iii.    Dig sheets

        iv.    Field contact information for Sable

        v.    Time and location of the field evaluation and repair.

---

[23] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

39

   c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA  and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[24]

      iv. Final Vendor Report and Pipe Tally

   d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

         1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

         2. Identify features that remain to be assessed

         3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

         1. Mean corrosion growth rate for the Special Permit Segments

         2. Distribution graph of the corrosion growth rate for the Special Permit Segments (e.g. occurrences (#) vs. corrosion rate (mpy)

25) Limitations:

   a) This special permit is limited to a  term of ten (10) years from the date of issuance. If Sable elects to seek renewal of this special permit, Sable must submit its renewal request at least 180 days prior to expiration of this ten (10) year period to PHMSA pursuant to 49 CFR 190.341(f). The renewal application must demonstrate that the special permit is still consistent with pipeline safety. PHMSA may seek additional information from Sable prior to granting any request for the special permit renewal.

   b) Should Sable fail to comply with any conditions of this special permit or should PHMSA determine that this special permit is no longer appropriate or is inconsistent with pipeline

---

[24] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

safety, PHMSA may revoke the special permit and require Sable to comply with all appropriate regulatory requirements.

c) PHMSA may order the Special Permit Segments to be shutdown if appropriate pursuant to its authority under 49 U.S.C. § 60112.

d) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this special permit. The terms and conditions of any compliance order shall take precedence over the terms of this special permit.

e) In the event of conflict between the conditions of this special permit and industry standards, the special permit conditions shall prevail.

f) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the special permit, Sable must provide the PHMSA written notice of the change within 30 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the special permit.

# Attachment 7

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY
# ADMINISTRATION
# <span style="color:red">DRAFT</span> SPECIAL PERMIT

## Special Permit Information:

**Docket Number:**          PHMSA-2026-0464

**Requested By:**           Sable Offshore Corp.

**Operator ID #:**          40881

**Original Date Requested:**    January 22, 2026

**Original Issuance Date:**     <mark>February X, 2026</mark>

**Effective Dates:**        <mark>February X, 2026</mark>

**Code Section(s):**        49 CFR § 195.452(h)(4)(iii)(H)

## <span style="color:red">Proposed</span> Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS)[1] <span style="color:red">proposes to grant</span> this special permit to Sable Offshore Corp. (Sable).  This special permit would apply to two segments of the Santa Ynez Pipeline System (SYPS), an interstate hazardous liquid pipeline facility that transports crude oil produced on the Outer Continental Shelf (OCS) through an onshore processing facility located in Santa Barbara County, California, to a terminal located in Kern County, California.  The two segments that would be subject to the special permit are known as Lines CA-324 and CA-325.  The regulation that would be waived is 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H), which requires hazardous liquid pipeline operators to remediate certain longitudinal seam weld corrosion within 180 days of discovery.

## I.    Purpose and Need:

Lines CA-324 and CA-325 were originally installed with polyurethane foam and an overlying polyethylene wrap tape to provide thermal insulation.  The use of these materials is known to cause shielding, a condition that interferes with the proper functioning of cathodic protection and increases the risk of corrosion in pipeline systems.  Sable has requested a special permit authorizing an alternative approach for managing the increased corrosion risk on Lines CA-324

---

[1] Throughout this special permit, the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

and CA-325 to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California. The Consent Decree includes provisions to address a rupture that occurred on the SYPS in Santa Barbara County, California, in May 2015.

As relevant here, the Consent Decree required the prior operator of the SYPS to obtain a waiver before restarting Lines CA-324 and CA-325 to ensure that effective measures were in place to mitigate the risk of corrosion. The Consent Decree also incorporated the outstanding requirements from a corrective action order that PHMSA issued following the rupture (CPF No. 5-2015-5011H), one of which required the restart plan for Lines CA-324 and CA-325 to include a long-term plan for managing corrosion under insulation (CUI). The Consent Decree provided multiple options for satisfying this requirement, one of which was obtaining a special permit that requires: 1) accelerated reassessments; 2) usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking; 3) coordination of data from the appropriate alternating in-line inspection (ILI) technologies; 4) more stringent repair criteria targeted at CUI; and 5) advanced data analysis techniques to account for the potential growth of CUI, including interaction criteria for anomaly assessment.[2]

The conditions in this draft special permit address the requirements in the Consent Decree. Specifically, the conditions require substantially more frequent integrity assessments as compared to the pipeline safety regulations at 49 CFR Part 195, each of which must use threat-appropriate tools (including for wall loss anomalies from external and internal-based corrosion and for detecting crack anomalies from conditions such as stress corrosion cracking); establish more stringent anomaly repair criteria as compared to Part 195; require enhanced data integration from integrity assessments to continuously gauge assessment performance through comparison with in-the-field and other comparative benchmarks; and require the performance of a corrosion growth rate analysis to better inform the analysis of integrity assessment data. PHMSA notes that it previously issued an emergency special permit to Sable imposing similar conditions on the operation of Lines CA-324 and CA-325 on December 23, 2025 (Docket no. PHMSA-2025-1502),[3] and that the California Office of State Fire Marshal (OSFM) issued a waiver to Sable containing essentially the same conditions on December 17, 2024.

PHMSA further notes that the jurisdictional status of Lines CA-324 and CA-325 has changed since the District Court entered the Consent Decree. At that time, CA-324 and CA-325 were considered part of an intrastate hazardous liquid pipeline facility subject to regulation by OSFM pursuant to the terms of its annual certification with PHMSA.[4] However, Sable's subsequent acquisition and reconfiguration of the SYPS to operate as a single pipeline system transporting crude oil from the OCS into and through California makes Lines CA-324 and CA-325 part of an

---

[2] *See also* PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016).

[3] The emergency special permit included several conditions which Sable indicated it had completed prior to the effective date of the emergency special permit but that it had not provided to PHMSA for review. Sable provided additional records to PHMSA following the issuance of the emergency special permit, rendering those conditions no longer necessary for inclusion in this special permit. In addition, on February 13, 2026, Sable requested that its application be considered in accordance with the Notice of Limited Enforcement Discretion and Statement of Policy issued by PHMSA on January 12, 2026. As part of that request, Sable agreed to follow the terms and conditions in the emergency special permit until PHMSA issues a decision on this application.

[4] *See* 49 U.S.C. §§ 60101(a)(10) (defining "intrastate hazardous liquid pipeline facility"); 60105 (establishing requirements for State pipeline safety program certifications).

Exhibit B
Page 175

interstate hazardous liquid pipeline facility.[5]  Accordingly, PHMSA has the sole and exclusive authority to regulate the SYPS and to issue the special permit for Lines CA-324 and CA-325 that Sable has requested in this proceeding.[6]

## II.     Special Permit Segments

This permit pertains to the specified special permit segments defined in this section.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III.     Conditions

PHMSA proposes to grant this special permit subject to Sable implementing each of the following conditions.  These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with requirements in 49 CFR § 195.452(h)(4)(iii)(H).

**General Conditions:**

1)     The special permit segments may only be used to transport crude oil.

2)     Prior to transporting crude oil in the special permit segments, Sable must develop and implement procedures for the conditions and requirements described in the special permit.

3)     Sable shall not exceed maximum operating pressure (MOP) limits for the special permit segments, as follows:

a)     The MOP of Line CA-324 cannot exceed 1,003 pounds per square inch gauge (psig).

b)     The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota

---

[5] *See* 49 U.S.C. § 60101(a)(7); 49 CFR Part 195, Appendix A, Example 7.  On November 26, 2025, Sable informed PHMSA that the SYPS will be operated as a single interstate pipeline facility originating at three offshore oil production platforms on the OCS and terminating in Kern County, California.  Sable also noted that the SYPS had been considered an interstate pipeline facility in operating under this configuration prior to 2016, when the tariffs filed with the Federal Energy Regulatory Commission (FERC) for CA-324 and CA-325 had been canceled.  On December 17, 2025, following an on-site PHMSA inspection of the pipelines, control room, and an offshore platform, as well as review of Sable's records and prior OSFM inspection records, PHMSA's Associate Administrator for Pipeline Safety informed Sable that the agency concurred with Sable's determination that the SYPS is an interstate pipeline facility.

[6] 49 U.S.C. § 60104(c).

Exhibit B
Page 176

and Sisquoc stations) cannot exceed 1,000 psig.

    **c)** The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Check Valve 37) cannot exceed 1,292 psig.

**4)** Sable shall not exceed maximum operating temperature limits for crude oil transported in the special permit segments, as follows:

    **a)** The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit (°F) for more than 12 consecutive hours.

    **b)** The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 °F for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    **c)** The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 °F for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

**5)** This special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this special permit.

**6)** This special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

**7)** ILIs performed pursuant to this special permit must include

    **a)** Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        **i.** Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        **ii.** General corrosion means uniform or gradually varying loss of wall thickness over an area.

    **b)** Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    **c)** Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

**8)** Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24-inch pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24-inch pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344 inches that was manufactured by Nippon Steel Corp. in the 1980s. At least three separate tests must be performed to obtain the fracture toughness

values of the pipe body, heat affected zone (HAZ),[7] and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e., three samples for pipe body, three samples for HAZ, and three samples for the HF-ERW long seam weld).  The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21.  Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)  Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30-inch pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30-inch pipe specifications:

a)  API 5L X70 pipe with a nominal thickness of 0.281 inches that was manufactured by the various pipe mills in the 1980s.

b)  API 5L X65 pipe with a nominal thickness of 0.344 inches that was manufactured by the various pipe mills in the 1980s.

At least three separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, HAZ, and the double submerged arc weld (DSAW) long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e., three samples for pipe body, three samples for HAZ, and three samples for the DSAW long seam weld).  The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21.  Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)  All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-324 and CA-325A/B.[10]  Upon restart Sable must utilize ultrasonic thickness wall measurement (UTWM) and ultrasonic shear wave crack detection (USCD) ILI tools within 7 days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA.  Sable must utilize the UTWM and USCD ILI results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)  Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.*  If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with section 1.2 and exclusions in accordance with section 1.3 of ASME B31G 2012 Edition.  However, if the metal loss anomaly intersects or is within 1 inch (circumferentially) of the

---

[7] The HAZ, as used in this special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition.  Sable has submitted fracture toughness results to PHMSA, and PHMSA will review the results and confirm the completion of required testing prior to the restart of Line CA-324.

[9] Sable indicated in its application that it has already completed all of the testing required in this condition.  Sable has submitted fracture toughness results to PHMSA, and PHMSA will review the results and confirm the completion of required testing prior to the restart of Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence.  Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of the special permit segments.

13) Pressure testing:[11]

a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100 percent specified minimum yield strength for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   i. All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c) Prior to placing Line 325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

   i. All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e) Prior to placing Line 325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:

   i. All metal loss anomalies that have an ILI reported depth of 40 percent and

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable has submitted results to PHMSA. PHMSA will review the submitted records to confirm this Condition is satisfied.

greater wall loss.

    **ii.** All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

**f)** Sable must obtain the test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

**g)** Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

**h)** Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

**i)** Section(s) of the special permit segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this special permit if failure(s) raise the concern that the special permit segments cannot be safely operated.

**14)** ILI assessment and frequency:

**a)** Prior to performing ILIs of the special permit segment, Sable shall provide PHMSA with a written notification describing its assessment plan with the following information:

    **i.** Dates for integrity assessment.

    **ii.** ILI tool(s) selected, in accordance with API Standard 1163, section 5, and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications.

    **iii.** ILI tool vendor(s).

    **iv.** Required tool specifications, including operational specifications and tool validation methodology.

    **v.** Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications.

    **vi.** Criteria used to identify locations for excavation and field verification.

    **vii.** Non-destructive examination.

**b)** Within 7 days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect

---

[12] All submissions to PHMSA required by this special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address, Dustin.Hubbard@dot.gov, or his designee.

[13] Industry standards referenced in this special permit must utilize the editions that are incorporated by reference in 49 CFR § 195.3 unless another edition is explicitly specified in this special permit.

the ILI tool performance.

c) Metal loss tool(s):

   i. Initial ILI tool runs – Each year, during the first 2 years of operating the special permit segments, Sable shall conduct at least two ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every 6 months not to exceed 9 months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

   ii. Subsequent ILI tool runs – After the first 2 years of operating the special permit segments, Sable shall conduct at least one UTWM each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining failure pressure ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the special permit segment within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an IMU.

d) Crack detection tools – Sable shall conduct at least one USCD tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

   i. These crack tool runs must utilize an IMU and must be able to detect and size axial and circumferential cracks.

   ii. USCD performance specification requirements:

      1. The USCD tools must have a probability of detection that is greater than or equal to 90 percent for axial and circumferential cracks.

      2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

---

[14] Sable may petition PHMSA to revise the reassessment interval for crack detection tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

**f)** Where any ILI tool fails to record data for 5 percent or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2 percent or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the special permit segment in which the ILI tool velocity was outside of the specified tool velocity range.

**g)** All ILI tool runs must obtain the test ID from PHMSA prior to a run.

**h)** Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10 percent or greater, based on raw data, prior to adding in any correction for tool tolerance.

**i)** Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

**j)** Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10 percent accuracy for 80 percent of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

**k)** Prior to the ILI final report being received, Sable must perform at least four separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

15) Discovery of condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate repair conditions:[16]

   **a)** A crack or crack-like anomaly that meets any of the following criteria:

   **i.** Crack or crack-like anomaly that is equal to or greater than 50 percent of pipe wall thickness.

   **ii.** Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

---

[15] A minimum of four independent direct examination excavations must be used for unity plots.

[16] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR § 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

    **b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    **c)** Any external cluster corrosion or external general corrosion that is located on the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-day repair conditions:[18]

    **a)** A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    **b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    **c)** All internal or external metal loss anomalies that have an ILI reported depth of 40 percent or greater wall loss, including tool sizing tolerance for depth.[19]

    **d)** For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within 1 inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion growth rate analysis (CGRA):

    **a)** Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILIs (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the special permit segments is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

    **b)** The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILIs, methodologies for growth rate calculations and errors from comparing ILI data.

    **c)** Sable must identify the projected date when remaining metal loss indications will reach a depth of 70 percent or greater wall loss.

    **d)** When determining the projected date when remaining metal loss indications will reach a depth of 70 percent or greater wall loss, Sable must account for reported ILI

---

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR § 195.452(h)(4)(iii), except for those associated with 49 CFR § 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31 percent metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41 percent metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by the PHMSA.

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

depth, tool tolerance and corrosion growth rates.[22]

    **e)** All metal loss indications that are projected to reach a depth of 70 percent or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**19)** Pressure reduction:  If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for 2 months prior to the date of inspection, until the anomaly is repaired.

**20)** In field direct examination of pipe:

    **a)** Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking, such as magnetic particle inspection, shear wave technology, or phased array ultrasonic testing (PAUT).[24]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

    **b)** Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40 percent in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

        **i.** Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

        **ii.** Sable must increase the metal loss anomaly's depth by 20 percent when it inputs it into the formula for calculating the number of wraps needed for repair method 5.

        **iii.** After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15 percent of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

    **c)** Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

    **d)** Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections.  Any time a shrink sleeve or

---

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure.  A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.

**e)** Sable must recoat in accordance with its coating repair procedure.

**f)** All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**21)** Integrity management:

**a)** A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

**i.** Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

**ii.** Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

**b)** Sable must analyze a sample of additional indications of varying amounts of metal loss between 10 percent and 40 percent for validation. The sample size shall be at least ten, unless fewer than ten indications are reported within that range, in which case Sable would examine the number of indications called.

**c)** When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

**d)** Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

**e)** Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the special permit segments. The review must be conducted within 6 months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

**f)** Within 1 year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.[25]

**22)** Data requirements for predicted failure analysis:

**a)** Unless the defect dimensions have been verified using a direct examination

---

[25] Sable indicated in its application that it has already completed the evaluation required in this condition. Sable has submitted records of the evaluation, and PHMSA will confirm that the Condition is satisfied prior to the restart of Lines CA-324 and 325.

measurements, Sable must explicitly analyze uncertainties in reported assessment results, including—but not limited to—tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this special permit shall be kept for the life of the special permit segments and must be submitted to the PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

i. Technical approach used for the analysis.

ii. All data used and analyzed.

iii. Pipe and longitudinal weld seam properties.

iv. Procedures used to implement special permit conditions.

v. Evaluation methodology used.

vi. Models used.

vii. Direct in situ examination data.

viii. All ILI tool assessments information evaluated.

ix. Pressure test data and results.

x. All in-the-ditch assessments performed on the special permit segments.

xi. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results.

xii. All finite element analysis results.

xiii. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology.

xiv. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods.

xv. Safety factors used for fatigue life and/or predicted failure pressure calculations.

xvi. Reassessment time interval and safety factors.

xvii. The date of the review.

xviii. Confirmation of the results by qualified technical subject matter expert(s).

Exhibit B
Page 186

**xix.** Approval by responsible Sable management personnel.

**xx.** Records of additional preventive and mitigative measures performed.

**xxi.** Reports required by this special permit.

**24)** Reporting:

**a)** Any release on the special permit segments shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

**b)** An email notification shall be made at least 3 days prior to a special permit segment being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

**i.** Tool type and run date.

**ii.** Unique identifier (e.g., dig number, joint number, flaw ID, condition type).

**iii.** Dig sheets.

**iv.** Field contact information for Sable.

**v.** Time and location of the field evaluation and repair.

**c)** Sable shall provide a summary of conditions report within 210 days of the last date of an ILI run to PHMSA and include:

**i.** Tool type.

**ii.** Run date.

**iii.** Summary of conditions report.[27]

**iv.** Final vendor report and pipe tally.

**d)** Sable shall provide a report to PHMSA by June 15 of every year for the duration of this special permit. At a minimum, the annual report shall contain the following, if applicable:

**i.** A closure report for the previous calendar year (CY), which contains:

**1.** Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs.

**2.** Identify features that remain to be assessed.

**3.** Unity plots for previous ILI runs.

**ii.** Fracture mechanics and pressure cycling analyses in accordance with condition 21(a).

**iii.** The third-party ILI expert reviews in accordance with condition 21(e).

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, State, or Federal regulations.

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA) to be included in the summary of conditions reports, closure report, and annual reports if information provided is not deemed sufficient.

    **iv.** AC and DC interference surveys that are due in accordance with condition 21(f).

    **v.** A copy of the CGRA for prior year, including:

        **1.** Mean corrosion growth rate for the special permit segments.

        **2.** Distribution graph of the corrosion growth rate for the special permit segments (e.g., occurrences (#) versus corrosion rate (mpy)).

**25)** Limitations:

**a)** PHMSA proposes to grant this special permit for the operational life of Lines CA-324 and CA-325. For purposes of 49 CFR § 190.341(j)(ii), a "material change in conditions or circumstances" shall include only conditions or circumstances arising after the issuance of this special permit that implicate directly the national security interests of the United States or that result directly from an emergency as declared by the President of the United States.

**b)** PHMSA may order the special permit segments to be shut down if appropriate pursuant to its authority under 49 U.S.C. § 60112.

**c)** PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this special permit. The terms and conditions of any compliance order shall take precedence over the terms of this special permit.

**d)** In the event of conflict between the conditions of this special permit and industry standards, the special permit conditions shall prevail.

**e)** If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the special permit, Sable must provide the PHMSA written notice of the change within 30 days of the consummation date.