LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:  +1 424.653.5501

BABST CALLAND
  Nicholas McDaniel (*pro hac vice* forthcoming)
  *nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone:  +1 202.853.3455
Facsimile:  +1 202.853.3491

HOLLAND & KNIGHT LLP
  Andrew Klair (Bar No. 334960)
  *andrew.klair@hklaw.com*
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
  James W. Noe (*pro hac vice* forthcoming)
  *jim.noe@hklaw.com*
  Rafe Petersen (*pro hac vice* forthcoming)
  *rafe.petersen@hklaw.com*
  Matthew Z. Leopold (*pro hac vice* forthcoming)
  *matt.leopold@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF CALIFORNIA,<br><br>                 Plaintiff,<br><br>        v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>                 Defendants. | Case No. 2:26-cv-03396-SVW-SSCx<br><br>**PROPOSED INTERVENORS SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S PROPOSED OPPOSITION TO CALIFORNIA'S MOTION FOR PRELIMINARY INJUNCTION AND STAY**<br><br>Date: June 1, 2026<br>Time: 1:30pm<br>Courtroom: 10A<br>Judge: Hon. Stephen V. Wilson |

CASE NO. 2:26-cv-03396-SVW-SSCx
PROPOSED OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND AND STATEMENT OF INTEREST .........................2

III.  LEGAL STANDARD ...........................................................................4

IV.   ARGUMENT .........................................................................................5

    A.   California Is Not Likely To Succeed On The Merits.........................5

        1.   The Court Lacks Jurisdiction To Decide Hypotheticals About The Preemptive Effect Of The DPA Order ..........................................................................5

        2.   The Hypothetical Preemptive Effect Of The DPA Order Is Not A Reason To Overturn The DPA Order ...................................................................................7

        3.   If It Reaches The Consequences Of The DPA Order, The Court Should Affirm Its Preemptive Effect ...................................................................................9

    B.   California Does Not Show Imminent And Irreparable Harm ...........................................................................14

        1.   Unspecified Alleged Pipeline "Risks" Do Not Constitute Imminent And Irreparable Harm ...........................15

        2.   Federal Preemption Does Not Constitute Imminent And Irreparable Harm ...........................................................18

        3.   The Mere Assertion Of An Ultra Vires Regulatory Action Does Not Constitute Imminent And Irreparable Harm ...............................................................19

        4.   California Does Not Show Imminent And Irreparable Harm As A Property Owner ...............................20

    C.   An Injunction Will Harm Sable And The Public Interest ..................20

        1.   An Injunction Will Seriously Harm Sable's Finances And The Livelihoods Of Hundreds Of

        Sable Employees ................................................................20

        2.      An Injunction Will Harm The Public Interest .........................21

    D.      The Severity Of The Harm California Seeks To Cause
            Necessitates A Bond................................................................22

V.          **CONCLUSION**....................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahlman v. Barnes,*

No. 20-55568, 2020 WL 3547960 (9th Cir. June 17, 2020)................................ 14

*Akhtar v. Burzynski,*

384 F.3d 1193 (9th Cir. 2004)................................................................ 8

*All. for the Wild Rockies v. Cottrell,*

632 F.3d 1127 (9th Cir. 2011)................................................................ 4

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM,*

781 F. Supp. 3d 920 (N.D. Cal. 2025) ................................................. 19

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*

167 F.4th 1247 (9th Cir. 2026) ............................................................ 21

*Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v.*

*Enbridge Energy Co., Inc.,*

626 F. Supp. 3d 1030 (W.D. Wis. 2022) ............................................. 22

*Bondi v. VanDerStok,*

604 U.S. 458 (2025) ............................................................................. 8

*Caribbean Marine Servs. Co. v. Baldrige,*

844 F.2d 668 (9th Cir. 1988)................................................... 15, 16, 17

*Chemehuevi Indian Tribe v. McMahon,*

No. EDCV151538DMGFFMX, 2017 WL 6820023 (C.D. Cal. Oct. 31, 2017) .. 8

*Crosby v. Nat'l Foreign Trade Council,*

530 U.S. 363 (2000)............................................................................. 10

*Crowe & Dunleavy, P.C. v. Stidham,*

640 F.3d 1140 (10th Cir. 2011).......................................................... 17

*Doe #1 v. Trump,*

   957 F.3d 1050 (9th Cir. 2020)......................................................................... 14

*Florida v. Dep't of Health & Hum. Servs.,*

   19 F.4th 1271 (11th Cir. 2021) .................................................................... 18

*Free v. Bland,*

   369 U.S. 663 (1962)......................................................................................... 9

*Geier v. Am. Honda Motor Co.,*

   529 U.S. 861 (2000)....................................................................................... 10

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.,*

   736 F.3d 1239 (9th Cir. 2013)....................................................................... 19

*Hercules, Inc. v. United States,*

   24 F.3d 188 (Fed. Cir. 1994)......................................................................... 12

*Hercules, Inc. v. United States,*

   516 U.S. 417 (1996) ................................................................................. 12, 13

*Hines v. Davidowitz,*

   312 U.S. 52 (1941)......................................................................................... 10

*Indiana v. Haaland,*

   No. 24-cv-1665, 2024 WL 5213401 (D.D.C. Dec. 24, 2024) ...................... 18

*INS v. Nat'l Ctr. for Immigrants' Rts., Inc.,*

   502 U.S. 183 (1991) ........................................................................................ 8

*Johnson v. Tyson Foods, Inc.,*

   580 F. Supp. 3d 382 (N.D. Tex. 2022) ........................................................ 11

*Kentucky v. United States ex rel. Hagel,*

   759 F.3d 588 (6th Cir. 2014)......................................................................... 17

*La. Pub. Serv. Comm'n v. F.C.C.,*

   476 U.S. 355 (1986) ........................................................................................ 7

*Maryland v. King,*

567 U.S. 1301 (2012) ...................................................................................... 19

*Melendres v. Arpaio*,

   695 F.3d 990 (9th Cir. 2012) ........................................................................ 19

*Montalvo v. Spirit Airlines*,

   508 F.3d 464 (9th Cir. 2007) .......................................................................... 9

*Murphy v. NCAA*,

   584 U.S. 453 (2018) ................................................................................. 11, 13

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Svc.*,

   886 F.3d 803 (9th Cir. 2018) ........................................................................ 15

*Nat'l Fed. of the Blind v. United Airlines Inc.*,

   813 F.3d 718 (9th Cir. 2016) ........................................................................ 10

*New York v. Dep't of Just.*,

   343 F. Supp. 3d 213 (S.D.N.Y. 2018) ......................................................... 13

*New York v. United States*,

   505 U.S. 144 (1992) ........................................................................................ 9

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,

   418 U.S. 264 (1974) ........................................................................................ 9

*Pub. Utilities Comm'n of State of Cal. v. United States*,

   355 U.S. 534 (1958) ........................................................................................ 9

*Reed v. Tyson Foods, Inc.*,

   No. 21-cv-01155, 2021 WL 5107725 (W.D. Tenn. Nov. 3, 2021) ............... 11

*Reno v. Flores*,

   507 U.S. 292 (1993) ........................................................................................ 8

*Rufo v. Inmates of Suffolk Cnty. Jail*,

   502 U.S. 367 (1992) ...................................................................................... 14

*Russello v. United States*,

   464 U.S. 16 (1983) ........................................................................................ 10

*Santa Barbara County v. Hickel,*

 426 F.2d 164 (9th Cir. 1970) ................................................................... 14

*Sierra Club v. Clinton,*

 689 F. Supp. 2d 1123 (D. Minn. 2010) .................................................... 22

*TransUnion LLC v. Ramirez,*

 594 U.S. 413 (2021) ..................................................................................... 6

*Trump v. CASA, Inc.,*

 606 U.S. 831 (2025) ................................................................................... 19

*U.S. v. Fruehauf,*

 365 U.S. 146 (1961) ..................................................................................... 8

*United States v. Salerno,*

 481 U.S. 739 (1987) ..................................................................................... 8

*United States v. Shih,*

 73 F.4th 1077 (9th Cir. 2023) ................................................................... 21

*United States v. Vertac Chemical Corp.,*

 46 F.3d 803 (8th Cir. 1995) ...................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.,*

 555 U.S. 7 (2008) ............................................................ 4, 14, 17, 20, 21

*Wit v. United Behav. Health,*

 No. 14-CV-02346-JCS, 2024 WL 1016069 (N.D. Cal. Feb. 6, 2024) ................ 20

**Statutes**

50 U.S.C. § 4511 .............................................................................................. 5

50 U.S.C. § 4557 ....................................................................................... 11, 13

50 U.S.C. § 4558 ....................................................................................... 10, 13

U.S. CONST. art. VI, cl. 2 ................................................................................ 7

**Rules**

Fed. R. Civ. P. 65 .......................................................................................... 22

**Regulations**

91 Fed. Reg. 8949 (Feb. 24, 2026) ............................................................... 3

## I.    **INTRODUCTION**

California asks for an extraordinary injunction to stop the federal government from accessing oil in federal waters—oil that the Secretary of Energy has determined is "necessary," "scarce, critical and essential" to the Nation's defense. The Secretary did so under express authority created by Congress and duly delegated to him by the President. California's contrary suggestion—that the President cannot, even in a declared national energy emergency, direct energy production from federal offshore oil and gas leases and operation of a critical supporting pipeline—is wrong as a matter of statutory, regulatory, and constitutional law.

The motion fails on the merits and every equitable factor. The challenged Defense Production Act order ("DPA Order") does not exceed the federal government's authority, and the possibility that federal law may sometimes preempt state law is not only a far cry from irreparable injury but instead a fundamental feature of the American constitutional design. In any event, California's speculative parade of preemption-related horribles is neither a part of this case nor a proper basis to overturn the DPA Order, since California ties its preemption arguments to only two concrete circumstances: whether Sable must comply with a 2020 Consent Decree and whether it may transport hydrocarbons through Gaviota State Park. Both questions are being litigated in separate actions before this Court and are resolvable without reference to the DPA. Because California's facial challenge here cannot show that there is no set of circumstances in which the DPA Order is invalid, it is best adjudicated through as-applied challenges California has already brought in those cases.

By contrast, Sable is likely to suffer significant, concrete harm if California's overbroad injunction request is granted. An injunction could eliminate Sable's sole source of revenue, placing a tremendous burden on Sable, its employees, and shareholders. And California's request ignores the core public interests at stake here:

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

The United States has ordered Sable to transport oil through the pipeline to "promote the national defense" and "address energy vulnerabilities on the West Coast." ECF 16-1 at 9-10. California presents zero evidence to counter these national defense and energy emergency findings. These considerations weigh heavily in favor of preserving the status quo and denying injunctive relief.

California's motion should be denied.

## II.    BACKGROUND AND STATEMENT OF INTEREST

Sable operates the Santa Ynez Pipeline System ("SYPS"), which connects the single largest producing offshore oilfield in the United States—three oil production platforms in sixteen federal leases comprising approximately 76,000 acres of the Outer Continental Shelf in the federal waters of the Santa Barbara Channel—to an onshore terminal in Kern County, California. *See* Declaration of J. Caldwell Flores ¶¶ 3-4 ("Flores Decl."). The SYPS consists of offshore-to-onshore lines, a midstream processing facility at Las Flores Canyon, and onshore pipeline segments that transport the oil to Pentland Station in Kern County. *Id.* In 2015, before Sable owned the SYPS, a leak along one of the onshore pipeline segments resulted in the Refugio oil spill. *Id.* ¶ 6.

Sable acquired the SYPS in 2024 through transactions with ExxonMobil and its subsidiaries. Then Sable began performing repair and maintenance work along the pipeline under the direct oversight of state and federal regulators and consistent with heightened repair criteria established by the 2020 Consent Decree that resolved spill-related claims against the pipeline segment's prior owner. *Id*. ¶ 11. Over the past two years, Sable has invested over $215 million in the SYPS, installed 27 new safety valves, and accomplished hundreds of repairs. *Id.* ¶¶ 9, 12. Sable has implemented above-industry-standard methods of ensuring integrity against corrosion, a new control system with real-time leak detection and automatic

shutdown capability, and other ongoing maintenance consistent with the Consent Decree. *Id.* ¶¶ 14-17.

In November 2025, due to Sable's unified ownership and operation of the integrated SYPS, including those portions originating on the Outer Continental Shelf, PHMSA redesignated the SYPS as an interstate pipeline and resumed federal oversight on that basis. *See id.* ¶¶ 25-27.[1] PHMSA reviewed and approved Sable's Restart Plan and granted Sable an Emergency Special Permit imposing heightened safety standards that matched special conditions previously imposed by California's pipeline regulator, the Office of State Fire Marshal ("OSFM"). *See id.* ¶¶ 29-30. Sable has since applied for a non-emergency Special Permit on substantially identical terms, and PHMSA noticed that permit for public comment, which comment period closed on April 3, 2026. *See* 91 Fed. Reg. 8949, 8949 (Feb. 24, 2026). Sable is implementing all conditions of the Special Permit. *See* Flores Decl. ¶ 31.

On March 13, 2026, on behalf of and under authority delegated by the President of the United States, the Secretary of Energy issued the DPA Order ordering Sable to immediately resume petroleum transportation throughout the SYPS, concluding such transportation is "necessary or appropriate to promote the national defense." Pipeline Capacity Prioritization and Allocation Order, ECF 16-1 at 9. The Secretary cited Executive Order 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025), which declared a "National Energy Emergency," and concluded that consumers and the military require Sable's "continuous production to address energy vulnerabilities on the West Coast." *Id.* at 9–10. Sable complied with the DPA Order and accordingly restarted oil transportation throughout the SYPS. PHMSA technical staff have been

---

[1] At the time of the 2020 Consent Decree, the onshore pipeline segments were considered intrastate and subject to the jurisdiction of the California Office of State Fire Marshal.

onsite during the restart process, supervising compliance with safety requirements. *See* Flores Decl. ¶¶ 35-39.

California's challenge to the DPA Order directly affects Sable. The Motion for Preliminary Injunction repeatedly places Sable at the center of the dispute, alleging that Sable requested the DPA Order, relied on it to restart operations of the SYPS, and continues to operate pursuant to that order's directives. ECF 16-2 at 1–2. And California's requested injunction is crafted broadly in a clear attempt to enjoin Sable from operating the SYPS.

## III.   **LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*[2] "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter,* 555 U.S. at 20). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can [also] support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The movant must "make a showing on all four prongs." *Id.*

---

[2] Emphasis added and internal quotations/citations omitted throughout unless otherwise stated.

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

## IV.    **ARGUMENT**

### A.    **California Is Not Likely To Succeed On The Merits**

California has not established that it is likely to succeed on the merits of any of its theories for overturning the DPA Order. The United States will likely address threshold questions of reviewability under the Administrative Procedure Act, as well as Secretary Wright's statutory authority to issue the DPA Order and his compliance with the applicable regulations. It suffices here to state that the DPA Order, to the extent it is reviewable, is on firm statutory and regulatory footing. Secretary Wright made the required findings under both section 101(a) ("necessary or appropriate to promote the national defense") and section 101(c) ("materials" or "services" are "scarce," "critical" and "essential" to the "domestic energy supplies").  50 U.S.C. § 4511(a), (c). California argues the DPA merely empowers the President to reprioritize existing contracts and orders, but this argument ignores the statute's text, which authorizes the President "to *allocate* materials, services, and facilities . . . ." 50 U.S.C. § 4511(a) (emphasis added). While the first subsection of §101(a) addresses priorities of orders and contracts, the second subsection addresses and authorizes allocation. Secretary Wright made the required findings for allocation for §101(a) and section 101(c) both.

### 1.    *The Court Lacks Jurisdiction To Decide Hypotheticals About The Preemptive Effect Of The DPA Order*

Sable focuses the remainder of its argument on California's other primary argument on the merits: the constitutional implications of the DPA Order's preemptive effect. The Court should decline California's invitation to render an advisory opinion on the preemptive effect of the DPA Order. "Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive

Branches, or of private entities. And federal courts do not issue advisory opinions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

California ties its arguments on the preemptive effect of the DPA Order to only two concrete circumstances: whether Sable must comply with the Consent Decree and whether Sable may transport hydrocarbons through portions of the SYPS located in Gaviota State Park. ECF 16-2 at 12–15. But these issues are being litigated in separate actions before the Court. *United States v. Plains All Am. Pipeline*, No. 2:20-cv-02415 (C.D. Cal. Filed Mar. 13, 2020) (Consent Decree); *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 2:26-cv-02946 (C.D. Cal. removed Mar. 19, 2026) (Gaviota State Park). The Court should reserve its decision on the merits of those issues to those actions, where the parties can fully develop the factual record and brief the law.

The Court's discretion is particularly important because the Consent Decree and Gaviota State Park actions might be decided without any discussion of the DPA. In the Consent Decree litigation, multiple dominos must fall before the Wright Order would come into play: the Court would have to deny the United States' pending motion to terminate the Consent Decree, hold next that Sable is bound by the Consent Decree, hold further that Sable has violated the Consent Decree, and hold finally that any violations warrant the imposition of sanctions. Only then would the Court need to evaluate the DPA Order's impact. Likewise, in the Gaviota State Park litigation, the Court would need to resolve Sable's multiple non-DPA defenses to California's trespass allegations—including consent, estoppel, and preemption under the Pipeline Safety Act—before reaching the consequences of the DPA Order. The failure of any one of these conditions precedent would turn California's arguments about the preemptive effect of the DPA Order into abstract propositions.

California may challenge the preemptive effect of the DPA Order in the specific contexts in which it might arise—whether in the Consent Decree action, the

6

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

Gaviota State Park action, or some other pending or future action.[3] What California may not do is obtain an advisory opinion on the consequences of the DPA Order in *this* action. The Court thus should reject California's arguments on the preemptive effect of the DPA Order as not properly before the Court.

                2.      *The Hypothetical Preemptive Effect Of The DPA Order Is Not A Reason To Overturn The DPA Order*

California further argues that the DPA Order is invalid because, in some speculative scenario not being litigated here, it may have a preemptive effect on state law that California disagrees with.  This is not a valid basis for finding the DPA Order unlawful.

Federal preemption of state law is commonplace. Preemption is a product of the Supremacy Clause of the United States Constitution, which provides that the Constitution, federal laws, and treaties "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. From this constitutional command flows the principle that state laws that interfere with or are contrary to federal law must yield. *See, e.g.*, *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368 (1986).

Characterizing the United States as asserting "limitless" preemption power, California raises hypothetical preemption scenarios that it claims are unlawful—some invented out of whole cloth—as a supposed basis for overturning the DPA Order.[4] California's hypothetical preemption scenarios attack a strawman. Neither

---

[3] To be clear, to the extent it is reviewable at all, Sable does not dispute that this case is the appropriate forum to challenge the *validity* of the DPA Order.

[4] California, for instance, merely identifies the *possibility* that the DPA Order might displace CalGEM and CDFW from asserting jurisdiction. In the case of CalGEM, it speculates that the DPA Order *might* preclude it from inspecting the Las Flores Canyon facility, which *might* cause certain assumed regulatory violations to go unaddressed, which *might* result in environmental harm. ECF 16-5 ¶¶ 6–11. And in the case of CDFW, California presumes that Sable *might* be required to perform work on the SYPS that *might* take place in a location where certain water features or protected species are present. ECF 16-4 ¶¶ 10–15.

the United States nor Sable contends that the DPA Order preempts all state laws touching upon Sable's operations. *See, e.g.,* OLC Opinion at 16 (tying the President's power to expressly preempt state laws to whether preemption is "necessary" to performance of obligations under an order).[5] Sable, for example, can abide by generally applicable employment laws without any consequence for its duties under the DPA Order. Indeed, it is precisely because of this abstraction that courts have consistently refused to give "such advance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests . . . ." *U.S. v. Fruehauf*, 365 U.S. 146, 157 (1961).

California, the United States, and Sable may disagree about the exact scope of state law preemption under the DPA Order. But if California wishes to bring a preemption-based challenge, it must show "no set of circumstances exist[] under which the [DPA Order] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).[6] In other words, California—which claims that the DPA Order engages in "limitless preemption," Mot. 13—would have to show that *every possible preemption scenario* is unlawful, because the fact that the DPA Order "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.* And courts must not strike down an entire federal

---

[5] Indeed, California and its agencies are already arguing in parallel cases that the DPA Order *does not* preempt any state laws, exactly the opposite of their stance here. *See id.* California "cannot now reverse its position in order to suit its current objectives." *Chemehuevi Indian Tribe v. McMahon,* No. EDCV151538DMGFFMX, 2017 WL 6820023, at *3 (C.D. Cal. Oct. 31, 2017).

[6] The Supreme Court has repeatedly suggested that *Salerno*'s "no set of circumstances" rule applies to APA challenges. *See Bondi v. VanDerStok*, 604 U.S. 458, 467 (2025); *Reno v. Flores*, 507 U.S. 292, 301 (1993); *INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 188 (1991). The Ninth Circuit has done the same. *See Akhtar v. Burzynski*, 384 F.3d 1193, 1198 (9th Cir. 2004).

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

statute when a narrowing construction or severability analysis could eliminate any constitutional defect. *New York v. United States*, 505 U.S. 144, 170, 186 (1992). This case is a textbook example: California has brought multiple as-applied challenges to the DPA Order, and questions about the DPA Order's preemptive scope can be litigated in those cases with the benefit of a factual record. Granting broad-based relief here on preemption grounds would short-circuit those analyses through an entirely speculative ruling.

> 3. *If It Reaches The Consequences Of The DPA Order, The Court Should Affirm Its Preemptive Effect*

California's criticisms of the DPA Order's preemptive effects, while not properly before the Court, are also wrong on the merits. Consistent with its purpose to support the national defense and domestic energy supplies, the DPA both expressly and impliedly preempts conflicting state laws.

Federal preemption may be either express or implied. *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007). Implied preemption takes two forms: conflict preemption, where "a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law," and field preemption, where "Congress indicates in some manner an intent to occupy a given field to the exclusion of state law." *Id.* Executive agencies may validly preempt state laws when acting within the scope of their statutory authority. *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974); *cf. Free v. Bland*, 369 U.S. 663, 666 (1962); *Pub. Utilities Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543–44 (1958). "It is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of

discretionary Presidential action." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000).

California relies on *Russello v. United States*, 464 U.S. 16 (1983), to argue that Congress did not intend for the DPA to generally preempt state laws because it included express language preempting certain laws relating to antitrust, loans, and investments. ECF 16-2 at 12. But *Russello* is a statutory interpretation decision that has no relevance to the preemption analysis. It is well-established that "the inclusion of . . . an express preemption clause within a statutory scheme does not foreclose the application of ordinary implied preemption principles." *Nat'l Fed. of the Blind v. United Airlines Inc.*, 813 F.3d 718, 731 (9th Cir. 2016). The Supremacy Clause supplies preemptive force *automatically* whenever a regulated party cannot comply with both federal and state directives, and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Crosby*, 530 U.S. at 372–73 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Express preemption clauses such as § 308(j), 50 U.S.C. § 4558(j), operate where express displacement is required even absent a direct conflict (e.g., antitrust scrutiny of joint defense-production activity that no state law specifically forbids); they say nothing about the well-settled background rule that conflicting state law yields whenever compliance with both is impossible. *See id.*; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–74 (2000). Were California's position correct, no executive order issued under any statute lacking an express preemption clause could ever displace conflicting state law—a proposition the Supreme Court has consistently rejected. *See Hines*, 312 U.S. at 67–68. In any case, California does not seem to believe its own argument: it concedes that the DPA might at least impliedly preempt certain state contract laws. ECF 16-2 at 12.

The Court, moreover, need not look far for cases applying § 101 of the DPA to impliedly preempt conflicting state laws. When the Secretary of Agriculture invoked the DPA in 2020 to require meat-processing plants to remain operational notwithstanding state-law obstacles, courts uniformly held that conflicting state requirements—including those sounding in tort law, not just contract—were preempted. *See Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388–89 (N.D. Tex. 2022); *Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at \*6 (W.D. Tenn. Nov. 3, 2021). As the *Johnson* court explained, the plaintiffs sought "to impose liability … for failure to operate consistent with state-law standards," but those standards conflicted with standards imposed "pursuant to [the President's] delegated DPA authority." 580 F. Supp. 3d at 389. Because the "application of those state-law standards would undermine the President's statutory authority" under the DPA, the plaintiffs' claims were preempted. *Id.*; *see also Reed*, 2021 WL 5107725, at \*6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions …, the state law must yield." (cleaned up)).

California's *Russello* premise is wrong on its own terms in any event. The DPA *does* contain an express preemption provision in § 101's immediate neighborhood. Section 707, 50 U.S.C. § 4557, provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." As the Office of Legal Counsel has explained, § 707 "is an express preemption provision," because it "confers on private entities … a federal right to engage in certain conduct – conduct required by a DPA order – subject only to certain (federal) constraints, not constraints imposed by state law." OLC Opinion at 11–12 (citing *Murphy v. NCAA*, 584 U.S. 453, 478–79 (2018)). And § 707's reference to acts resulting "indirectly" from compliance demonstrates that Congress "anticipated

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

that DPA orders might engender conflict with other legal obligations, even where dual compliance remains technically possible." *Id.* at 18 n.7. The DPA's text thus presupposes, rather than precludes, the broad preemptive operation California now denies.

California's parallel effort to limit the scope of § 707 to breach-of-contract claims fares no better because California overstates the cases on which it relies. ECF 16-2 at 13. In *Hercules, Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994) ("*Hercules I*"), the Federal Circuit held that the plaintiff was not entitled to *indemnification* from the United States for personal injury claims arising from its manufacture of Agent Orange under DPA orders. While *Hercules I* was on appeal to the Supreme Court, the Eighth Circuit adopted its reasoning in *United States v. Vertac Chemical Corp.*, 46 F.3d 803, 812–13 (8th Cir. 1995), to hold that the defendant was not entitled to *indemnification* from the United States for environmental liabilities—also arising from its manufacture of Agent Orange under DPA Orders. Both courts nonetheless left open the possibility that § 707 might provide *immunity* in other circumstances. *Hercules I*, 24 F.3d at 203 n.15, *Vertac*, 46 F.3d at 812 n.11. The Supreme Court then issued its decision:  it specifically declined to limit § 707 to situations only where "orders are delayed or displaced," as *Hercules I* did with respect to indemnity, or otherwise opine on the scope of § 707's immunity, explaining that the section "plainly provides immunity, not indemnity," and thus it did not need to reach the question of scope. *Hercules, Inc. v. United States*, 516 U.S. 417, 430 and n.14 (1996) ("*Hercules II*").

Neither *Hercules I* nor *Vertac* decided (because neither case asked) whether a DPA order can preempt conflicting state requirements that obstruct the conduct it commands. The answer to that question is *yes*.  Indeed, California's narrower premise—that § 707 reaches only liability arising from priority orders, *see* ECF 16-2 at 13—cannot be squared with the statutory text. Section 707 provides immunity

for "any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter," 50 U.S.C. § 4557.  There is no express or implied limitation to priority orders, and—as noted above—the Supreme Court expressly declined to endorse one. *See Hercules II*, 516 U.S. at 429 n.14. Two further textual features confirm the breadth of the immunity. *First*, § 707 shields against "damages or penalties." *Second*, § 707 contains no reference to "contract" law at all. When Congress meant to preempt only a discrete category of law under the DPA, it said so expressly—as it did with respect to antitrust laws in § 708, 50 U.S.C. § 4558(j). The absence of any comparable limiting term in § 707 forecloses the suggestion that Congress silently confined that section to contract-based liability arising from priority orders, while leaving recipients of allocation orders exposed to whatever non-contract liabilities or penalties state law might impose for the very conduct the federal order compels.

California's remaining arguments against preemption also fail. *First*, the anticommandeering doctrine is inapplicable, because it only prohibits the federal government from "issu[ing] orders *directly* to the States." *Murphy*, 584 U.S. at 470 (2018). The DPA Order imposes no obligations on California; it is directed to a private party—Sable—and happens to conflict with certain state law obligations California seeks to enforce. That is preemption, and "commandeering does not occur when Congress validly preempts state law through the Supremacy Clause." *New York v. Dep't of Just.*, 343 F. Supp. 3d 213, 232 (S.D.N.Y. 2018). *Second*, the DPA Order does not purport to vacate, modify, or review the Consent Decree; it imposes a federal regulatory obligation on a private party that, under ordinary Supremacy Clause principles, supersedes any inconsistent state law conditions incorporated into its terms. That again is preemption, not Executive review of Article III judgments. To the extent the Consent Decree's terms are in conflict with the DPA Order (something that has not yet been determined), the Consent Decree "must be

modified." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992) (consent decree must be modified if obligation "has become impermissible under federal law"); OLC Opinion at 22. A DPA order has the force of federal law; if the Consent Decree purports to require what federal law now forbids (or vice-versa), the Consent Decree must yield, not the federal directive.

The Court may reserve decision on the preemptive effect of the DPA Order for the specific cases in which it is being litigated. But to the extent the Court addresses it here, the text, structure, and purpose of the DPA are clear: the DPA Order prevails over conflicting state law.

**B.    California Does Not Show Imminent And Irreparable Harm**

California also fails to demonstrate any immediate, irreparable harm. "[A] showing of irreparable injury is an absolute prerequisite" to injunctive relief. *Ahlman v. Barnes*, No. 20-55568, 2020 WL 3547960, at *2 (9th Cir. June 17, 2020); *see also Santa Barbara County v. Hickel*, 426 F.2d 164, 168 (9th Cir. 1970). California further has the "burden of showing that irreparable injury is likely to occur during the period before the [case] is decided." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). In this third recent attempt at emergency relief, California can still point to *no specific real-world consequence it has or will experience from pipeline operation under the DPA Order.* California hints at a range of alleged harms, but all are speculative and none are irreparable. At most, California raises a mere "possibility" of harm, "inconsistent with [the] . . . extraordinary remedy that may only be awarded upon a clear showing." *Winter*, 555 U.S. at 22.

*1. Unspecified Alleged Pipeline "Risks" Do Not Constitute Imminent And Irreparable Harm*

California gestures at alleged "pipeline[] risks," ECF 16-2 at 19, but the State's two-page discussion of irreparable harm never quantifies those risks or explains how pipeline operation would cause them. The two scenarios named in the brief—"the risk of harm to species" and the possibility that California's "protections for public health" would be displaced, *id.* at 19–20—are entirely speculative. To secure a preliminary injunction, the State "must do more than merely allege imminent harm": it "must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Yet in its briefing and declarations, California does not even *claim* such an injury, nor does it *ever actually identify a safety risk with the pipeline*. Thus, California's request presents two levels of speculation: *first*, that operation of the SYPS presents a safety risk; and, *second*, that the safety risk can cause the identified harms.

*First,* California's brief nowhere explains how, where, and to what degree pipeline operation would pose a "risk of harm to species." ECF 16-2 at 19. The supporting Vance Declaration, ECF 16-4, merely lists protected species that are *somewhere in the same county* as an SYPS pipeline segment. *Id.* ¶¶ 8, 10, 12. It also relies on the species impact of constructing an entirely new pipeline based on a proposal that pre-dates Sable's ownership—something that Sable has never proposed, let alone done. *See* Declaration of Steve Rusch ("Rusch Decl.") ¶ 6. Nowhere does it ever articulate how flowing oil through the existing pipeline would harm a single endangered species. In any case, any species impact was already considered in the pipeline's original environmental documents. *See id.* ¶ 5. California's only case to support its position is *National Wildlife Federation v. National Marine Fisheries Service*, 886 F.3d 803 (9th Cir. 2018), which held that

irreparable harm to a species need not involve an "extinction-level threat." *Id.* at 818. Yet California identifies *no* threat to *any* species here.

California alternatively suggests that Sable may someday need a "lake or streambed" permit for future construction work and that the State would be injured if this process were preempted. ECF 16-4 ¶ 13; ECF 16-2 at 20. But Sable has continued to work with CDFW to obtain permits after the issuance of the DPA Order. *See* Rusch Decl. ¶ 8. California also concedes that whether a permit "*might* be required" will "[d]epend[] on the type of maintenance, repair, or other work to the Pipeline that will need to be completed," ECF 16-4 ¶ 15. The future possibility that Sable *might* ignore CDFW permitting, for unknown and unplanned construction that then *might* affect unknown species is precisely the kind of "[s]peculative injury [that] does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine*, 844 F.2d at 674.

*Second,* California's reliance on the preemption of its "protections for public health"—which appears to refer to CalGEM's regulatory regime—is similarly unavailing. As an initial matter, CalGEM's jurisdiction is in active dispute in *Sable Offshore Corp. v. California Geologic Energy Management Division*, No. 26WM000036 (Cal. Super. Ct. Sacramento Cnty. Feb. 17, 2026). But even if CalGEM could properly exercise regulatory authority over Las Flores Canyon— something it has never done in the facility's thirty-year history—California provides no allegation or evidence whatsoever of a safety risk. Instead, both the State's motion and the Sharma Declaration, ECF 16-5, simply recite generalized potential dangers that regulation could theoretically guard against. *See, e.g., id.* ¶ 9. California argues that "*[i]f* Sable denies access to CalGEM inspectors . . . it would impede CalGEM's ability to ensure compliance" with regulations, *id.* ¶ 11, but California nowhere argues that Sable has *ever* denied access to inspectors. In fact, Sable believes it has fully cooperated with CalGEM, whose agents have been accommodated at the

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

facility on five separate inspection days. Rusch Decl. ¶¶ 17-18. Neither the brief nor the Sharma Declaration argue that there is in fact a safety problem at Las Flores Canyon, and California therefore cannot meet its burden to "*demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine*, 844 F.2d at 674.

In reality, the SYPS operates under a comprehensive federal safety regulatory scheme that includes extensive oversight, liability insurance, and rapid remediation measures in the unlikely event of a spill. Sable safely resumed the transportation of hydrocarbons through the SYPS only after implementing significant repair and maintenance tasks with multiple qualified PHMSA safety inspectors onsite to observe the resumption of oil flow. Flores Decl. ¶¶ 35-39. PHMSA inspectors returned to monitor the process once the SYPS was operating, and Sable has continued to monitor pressure and conduct safety checks, including aircraft flyovers to monitor operations. *Id.* These efforts have been successful: the SYPS has now been operating for eight weeks and no issues have been detected. *Id*. ¶ 45.

*Third,* California's assertion that it may "bear" irreparable financial costs is incorrect, especially given California's entirely unsubstantiated theories of harm. California cites *Crowe & Dunleavy, P.C. v. Stidham*, 640 F.3d 1140 (10th Cir. 2011), and *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588 (6th Cir. 2014), for the proposition that monetary damages are irreparable if the defendant has sovereign immunity. *See* ECF 16-2 at 19. Yet California does not seek monetary damages in this litigation, and in any event, Sable carries insurance with spill liability coverage of $700 million. Flores Decl. ¶ 16. Simply put, California cannot show irreparable injury, financial or otherwise, "is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

*2.    Federal Preemption Does Not Constitute Imminent And Irreparable Harm*

California's other major theory of harm is the alleged "[i]ntangible injur[y]" of "the Wright Order divest[ing] the State of its regulatory authority." ECF 16-2 at 19. But a state does not suffer "irreparable injury" merely because "federal law preempts conflicting state law." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1292 (11th Cir. 2021). "[T]o conclude otherwise would mean that a state would suffer irreparable injury from all [] federal laws with preemptive effect." *Id.*; *see also Indiana v. Haaland*, No. 24-cv-1665, 2024 WL 5213401, at *9 (D.D.C. Dec. 24, 2024) (rejecting similar state claim of "sovereign injury"). To the extent California wishes to challenge PHMSA's determination that the pipeline is interstate because it transports hydrocarbons from the Outer Continental Shelf—outside of California's jurisdiction—into California, it is already doing so before the Ninth Circuit, with oral argument set for July 7. *See California v. PHMSA*, Nos. 25-8059, 26-508 (9th Cir. 2026).

Nor has Sable ever claimed that the DPA Order is—as California repeatedly and wrongly asserts—a universal trump card. The consequence of the DPA Order is to preempt State laws that contravene the actions directed by the DPA Order. *See* DPA Order, ECF 16-1 at 9–12; § 707. Sable has argued the DPA provides a defense to certain specific state law claims; it has not argued that it is free to ignore all state laws that touch on any aspect of the SYPS. *See, e.g.*, Opp'n to Mot. for Prelim. Inj. at 21, *Cal. Dep't of Parks & Rec. v. Sable Offshore Corp.*, No. 2:26-cv-02946-SVW-SSC, ECF 24 (Apr. 3, 2026). As explained above, the preemptive effect of the DPA with respect to individual laws involves fact-intensive inquiries that can be evaluated in specific individual challenges. But the mere possibility of future preemption is not immediate and irreparable harm.

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

In any event, California's asserted injury from an inability to "effectuat[e] [its] statutes," Mot. 20 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)), cannot support injunctive relief. California's suit requires this Court to choose between federal and state law. Any harm that California would suffer from preemption would, in the event of an injunction, be experienced in greater measure by the United States's inability to "effectuat[e]" the congressionally authorized Defense Production Act. And while the Supremacy Clause means that preemption does not give rise to irreparable injury to a state, the United States *does* experience a serious injury when its enactments are enjoined. *See Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025).

> 3.     *The Mere Assertion Of An Ultra Vires Regulatory Action Does Not Constitute Imminent And Irreparable Harm*

The State's one-sentence statement that the "deprivation of constitutional rights" alone constitutes irreparable harm, *see* ECF 16-2 at 7, is likewise incorrect. Courts consistently require an independent showing of irreparable harm. *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 781 F. Supp. 3d 920, 940 (N.D. Cal. 2025) (finding federal government engaged in an "ultra vires act" but that "plaintiffs' contention that they continue to face irreparable organizational harms falls short"); *cf. Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (holding success on the merits does not create a presumption of irreparable harm). California's only contrary case, *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), concerned plaintiffs who were "subjected to unlawful detention" for their immigration status, and the court there found irreparable harm because "Plaintiffs faced a real possibility that they would again be stopped or detained," *id.* at 1002. The theoretical and academic harm inflicted by the existence of an allegedly ultra vires federal regulatory action—especially when California cannot articulate a real-

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

world injury—bears no similarity to the injury experienced by an individual unconstitutionally arrested and detained.

### 4. *California Does Not Show Imminent And Irreparable Harm As A Property Owner*

California's passing assertion that the DPA Order "displace[s] State Parks's rights and obligations as a property owner," ECF 16-2 at 20, does not constitute irreparable harm, either. The State does not cite a single case for this proposition. And its parenthetical citation to a CEQA statute does not argue that irreparable harm exists. In any event, as Sable has demonstrated in different briefing before this Court, California cannot point to any harm suffered by State Parks, nor any environmental review State Parks has requested concerning transport of oil through the pipeline— nor could it, because oil contained in an existing underground pipeline has no effect on the environment. *See* Opp'n to Mot. for Prelim. Inj. at 17–19, *Cal. Dep't of Parks & Rec.*, ECF 24 (C.D. Cal. Apr. 3, 2026).

### C. An Injunction Will Harm Sable And The Public Interest

Because California has not demonstrated irreparable harm, the Court need not reach the remaining *Winter* factors. *See Wit v. United Behav. Health*, No. 14-CV-02346-JCS, 2024 WL 1016069, at *1–2 (N.D. Cal. Feb. 6, 2024). Nevertheless, proper consideration of the balance of equities and public interest also requires denial of the requested injunctive relief. *Winter*, 555 U.S. at 23.

### 1. *An Injunction Will Seriously Harm Sable's Finances And The Livelihoods Of Hundreds Of Sable Employees*

The Santa Ynez Unit and the SYPS are Sable's sole assets. Since 2024, Sable has invested more than $215 million in safely restoring them to full operation and began oil sales on March 29, 2026. Flores Decl. ¶¶ 9, 44. Shutting down the pipeline segments would be a difficult, complex, time-consuming process that carries additional safety risks. *Id.* ¶ 53. Sable would need to make operational adjustments

at the Las Flores Canyon facility, utilize pipeline intervention tools or "pigs" to remove oil and clean the lines, and repressurize the pipeline segments with nitrogen—all tasks that would require significant time and resources. *Id*. ¶ 53. If operation of the SYPS is enjoined, Sable will lose substantially all its revenue, totaling approximately $4.73 million per day or $143.86 million per month, based on current data and projections. *Id*. ¶ 54. A business disruption of this magnitude will immediately and significantly harm Sable's finances and threaten its ability to pay its approximately 200 full-time employees across California. *Id*. ¶ 56. A court-ordered shutdown would also jeopardize longstanding relationships with contractors, whose jobs are not easily replaced if lost. The combined annual direct employee and contractor payroll supported by Sable is estimated at $100 to $200 million. *Id*. ¶ 57. Shutdown could also cause a decline in the company's share price, destroying value for institutional investors and workers whose pensions and retirement plans hold equity in Sable. *Id*. ¶ 55. These severe harms tip the equities sharply in Sable's favor.

### 2.    An Injunction Will Harm The Public Interest

*Winter* itself noted that the balance of equities tips in the government's favor when the President has determined that the challenged activity is "essential to national security." 555 U.S. at 26. Here, the federal government has determined that the SYPS is "a critical energy resource" necessary to address "energy vulnerabilities on the West Coast" and "adversarial dependence" on hostile foreign actors. *See* ECF 16-1 at 10. Courts must be "hesitant to review the executive's declaration of a national emergency," *United States v. Shih*, 73 F.4th 1077, 1091–92 (9th Cir. 2023), and deference is heightened "when the President is exercising congressionally delegated national security authority, for which an appreciable measure of deference is traditionally afforded." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 167 F.4th 1247, 1257 (9th Cir. 2026).

California advances only a single argument about the public interest, claiming it supports an injunction because an injunction would prevent an alleged violation of federal law. *See* ECF 16-2 at 21. But this argument is a tautology: it assumes that the DPA Order is unlawful. If California cannot show success on the merits, as it cannot, then it necessarily has no irreparable harm. Moreover, in the pipeline context, courts have held that, despite compelling allegations of trespass and environmental harm (not present here), where "an immediate shutdown of the pipeline would have significant public and foreign policy implications" *an injunction should not issue. Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co., Inc.*, 626 F. Supp. 3d 1030, 1037, 1055 (W.D. Wis. 2022); *see also Sierra Club v. Clinton*, 689 F. Supp. 2d 1123, 1147 (D. Minn. 2010) (declining to enjoin pipeline where federal government concluded the national interest would be served by continued operations).

**D.     The Severity Of The Harm California Seeks To Cause Necessitates A Bond**

Finally, a preliminary injunction must be supported by an appropriate bond. *See* Fed. R. Civ. P. 65(c). California seeks to enjoin an operating business generating approximately $5 million each day, for an indeterminate time, while this litigation proceeds, and California has ample financial resources to post a bond. Given that California is not an officer or agency of the United States, California should be required to post a bond in the amount of $100,000,000.

**V.     CONCLUSION**

California's motion should be denied.

Dated:  May 11, 2026                              Respectfully submitted,

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

LATHAM & WATKINS LLP

By: /s/ *Jessica Stebbins Bina*

LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
  10250 Constellation Blvd., Suite 1100
  Los Angeles, CA 90067
  Telephone:  +1 424.653.5500
  Facsimile:   +1 424.653.5501

BABST CALLAND
  Nicholas McDaniel (*pro hac vice*
    forthcoming)
  *nmcdaniel@babstcalland.com*
  505 Ninth St., NW, Suite 602
  Washington, DC 20004
  Telephone:  +1 202.853.3455
  Facsimile:   +1 202.853.3491

HOLLAND & KNIGHT LLP
  Andrew Klair (Bar No. 334960)
  *andrew.klair@hklaw.com*
  560 Mission St., Suite 1900
  San Francisco, CA 94105
  Telephone: +1 415.743.6962
    James W. Noe (*pro hac vice*
      forthcoming)
    *jim.noe@hklaw.com*
    Rafe Petersen (*pro hac vice*
      forthcoming)
    *rafe.petersen@hklaw.com*
    Matthew Z. Leopold (*pro hac vice*
      forthcoming)
    *matt.leopold@hklaw.com*
  800 17th St., NW, Suite 1100
  Washington, DC 20006
  Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

CASE NO. 2:26-cv-03396-SVW-SSC
OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION AND STAY

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company, hereby certifies that this Proposed Opposition to Motion for Preliminary Injunction and Stay contains 7,000 words, which complies with the word limit for Local Rule 11-6.1.

Dated: May 11, 2026                     /s/ Jessica Stebbins Bina
                                        Jessica Stebbins Bina