ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013-1256
 Telephone:  (213) 269-6605
 Fax:  (213) 897-2638
 E-mail:  Jeremy.Brown@doj.ca.gov
 Alicia.Roessler@doj.ca.gov
 Rebecca.Hunter@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>*Plaintiff,*<br><br>**v.**<br><br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br><br>*Defendants,*<br><br>and<br><br>**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY**,<br><br>*Intervenor-Defendants*. | Case No. 2:26-cv-3396-SVW-SSCx<br><br>**NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Judge:          Hon. Stephen V. Wilson<br><br>Action Filed: March 31, 2026 |

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS:

On July 14, 2026, Judge Dolly M. Gee of the United States District Court, Central District of California, issued an Order re Defendants' Motion to Dismiss and Intervenors' Motions to Dismiss in the associated case of Sable Offshore Corp., et al. v. County of Santa Barbara, et al., Case No. 2:25-cv-04165-DMG-CTS (C.D. Cal. July 14, 2026) (the Order).

The Order addresses Sable's authorities and responsibilities under the the Defense Production Act (DPA), as well as issues of federal preemption and its limits. In the Order, the Court discusses the DPA on pages 17-20.  Because similar issues as to the same party are before this Court in the instant matter, California provides the Court with a copy of the order. A true and correct copy of the Order is attached hereto as Exhibit A.

Dated:  July 17, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorney General
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
 *Attorneys for Plaintiff State of California*

1

# Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |

| | | | |
|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 1 of 25 |

Present: The Honorable    DOLLY M. GEE, CHIEF UNITED STATES DISTRICT JUDGE

| DEREK DAVIS | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE DEFENDANTS' MOTION TO DISMISS AND INTERVENORS' MOTION TO DISMISS [69] [70]**

On March 16, 2026, Plaintiffs/Petitioners Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO") (collectively, "Sable") and Exxon Mobile Corporation ("ExxonMobil"), Mobil Pacific Pipeline Company ("MPPC"), and ExxonMobil Pipeline Company ("EMPCo") (collectively, "Exxon Mobil Affiliates") filed an Amended and Supplemental Petition for writ of mandate and Complaint for declaratory relief. [Doc. # 64 ("First Amended Petition/Complaint" or "FAC").]

Plaintiffs bring four petitions for writ of mandate under California Code of Civil Procedure 1085 and 1094.5. *See* FAC at ¶¶ 118–159. In addition, Plaintiffs bring claims for: (5) injunctive relief pursuant to 42 U.S.C. section 1983 for violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution; (6) declaratory relief that Santa Barbara County Code Chapter 25B (hereinafter "Chapter 25B") as applied violates the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution; (7) declaratory and injunctive relief for violation of the Supremacy Clause of the United States Constitution (Art. VI, cl. 2) and Article XI, Section 7 of the California Constitution; and (8) breach of the February 8, 1988 Celeron Settlement Agreement (the "Celeron Agreement"). *Id.* at ¶¶ 160–195.

Before the Court are two motions to dismiss the constitutional claims and breach of contract claim filed by Respondents/Defendants the Board and the County of Santa Barbara (together, "the County") and Intervenors Environmental Defense Center ("EDC"), Get Oil Out! ("GOO"), Santa Barbara County Action Network ("SBCAN"), Sierra Club, and Santa Barbara Channelkeeper ("SBCK"). [Doc. ## 69-1 ("County MTD"), 70-1 ("Intervenors MTD").] The

---

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk DD |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | *Sable Offshore Corp., et al. v. County of Santa Barbara, et al.* | Page | 2 of 25 |
|---|---|---|---|

motions are fully briefed. [Doc. ## 73 ("Opp.")[1], 75 ("County Reply"), 76 ("Intervenors Reply").] The Court held a hearing on the motions on July 10, 2026.

For the reasons set forth below, the Court **GRANTS** the County's and the Intervenors' motions to dismiss.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

**A.      Chapter 25B and the Board**

On September 12, 2025, the Court issued an order resolving cross-motions for summary judgment brought by Plaintiffs and Intervenors. [Doc. # 52 ("MSJ Ord.").] The Court incorporates by reference its summary of the procedural and factual history of this case from the Order. *See* MSJ Ord. at 2–11.[2] In brief, Plaintiffs sought a writ of mandate following the Santa Barbara County Board of Supervisors' (the "Board") tie vote on the appeal of the Santa Barbara County Planning Commission's (the "Planning Commission") decision to approve the transfer of Final Development Permits ("FDPs") pursuant to Chapter 25B. *Id.* at 2. There are three transfer applications at issue for eight FDPs. *See id.* at 3.[3] The FDPs apply to the Santa Ynez Unit ("SYU"), the POPCO facility, and the Las Flores Pipeline (the "Pipeline") (collectively, the "Facilities").[4] *Id.* The Court issued a peremptory writ of mandate pursuant to California Code of Civil Procedure 1085 directing the Board to "affirm, reverse, or modify" the Planning Commission's decision in compliance with Santa Barbara County Code Chapter 25B. *Id.* at 25; *see also* Doc. # 53 (Peremptory Writ of Mandate).

---

[1] The Court granted Plaintiffs leave to file a consolidated brief in opposition to the motions to dismiss. *See* Doc. # 72.

[2] All page citations herein refer to the page numbers inserted by the CM/ECF system.

[3] The transfers and FDPs at issue, specifically, are: (1) the SYU (FDP No. 87-DP-32cz) from ExxonMobil to Sable (owner, operator, and guarantor); (2) the POPCO facility (FDP No. 93-FDP-015 and 74-CP-11) from ExxonMobil Corporation to Sable (operator and guarantor); and (3) the pipeline (FDP Nos. 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85-DP-66cz, 83-DP-25cv) from EMPCo to Sable (operator) and ExxonMobil to Sable (guarantor). MSJ Ord. at 3.

[4] Previously, the Court distinguished between the SYU and POPCO properties as "facilities" and the pipeline as a separate structure. *See* MSJ Ord. at 3. Because Plaintiffs allege all three as "Facilities" (SYU, POPCO, and pipeline), the Court refers to all three structures collectively as the "Facilities" for clarity. *See* FAC at ¶ 1.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | *Sable Offshore Corp., et al. v. County of Santa Barbara, et al.* | Page | 3 of 25 |
|---|---|---|---|

Following the Court's MSJ Order and peremptory writ of mandate, the Board held a hearing on November 4, 2025. FAC at ¶ 10. County staff recommended the Board approve the FDP applications and deny the appeals. *Id.* Hartmann and Capps did not recuse themselves. *Id.* Plaintiffs allege Hartmann specifically asked questions related to the potential of a spill and sought confirmation that Sable or its insurers would cover damages from a spill. *Id.* at ¶ 11. She stated, "I do believe it helps to keep Exxon on the hook, both for spill and for abandonment if necessary." *Id.* At the end of the hearing, the Board voted four-to-one to continue the hearing with direction to County staff to prepare written findings denying the FDPs. *Id.* at ¶ 14.

The Board held a hearing on December 16, 2025. *Id.* at ¶ 15. Hartmann recused herself. *Id.* at ¶ 16. The Board voted three-to-one to approve the appeals, deny the FDP applications, and adopt the County's proposed findings in support. *Id.*

**B.      Relevant History of the FDPs**

As relevant to this Order, the FDPs initially were issued in 1987 (SYU), 1988 (Pipeline), and 1993 (POPCO Facilities). *Id.* at ¶ 47. Chapter 25B was enacted in 2001. *Id.* at ¶ 50. In 2023, the Exxon Mobil Affiliates applied to transfer the pipeline-related FDPs from then-owner, guarantor, and operator Plains Pipeline L.P. to themselves. *Id.* at ¶¶ 59, 65. The Planning Commission approved the applications to transfer the pipeline-related FDPs. *Id.* at ¶ 61. Interested parties appealed the Planning Commission's determination to the Board. *Id.* The appellants argued about permit conditions and maintenance, including about the installation and operation of a cathodic protection system. *Id.* at ¶ 62. The Board denied the appeal and affirmed the Planning Commission's approval. *Id.* Following the denial of the appeals, the County transferred the pipeline-related FDPs to the Exxon Mobil Affiliates. *Id.* at ¶ 65.

**C.      The DPA Order**

On January 20, 2025, the President of the United States issued Executive Order 14156. *Id.* at ¶ 110. The Executive Order entitled "Declaring a National Energy Emergency" first set forth the "Nation's dangerous energy situation." 90 Fed. Reg. 8433, 8434. The Executive Order *inter alia* identified the "West Coast" as an area of "insufficient energy production, transportation, refining, and generation" and asserted this status "constitute[d] an unusual and extraordinary threat to [the] Nation's economy, national security, and foreign policy." *Id.* at 8434. The President therefore declared a national emergency. *Id.*

//
//

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | *Sable Offshore Corp., et al. v. County of Santa Barbara, et al.* | | Page | 4 of 25 |
|---|---|---|---|---|

The Executive Order directed the following as related to the Defense Production Act, 50 U.S.C. § 4501 *et seq.* (the "DPA"):

> The heads of executive departments and agencies ("agencies") shall identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources, including, but not limited to, on Federal lands. If an agency assesses that use of either Federal eminent domain authorities or authorities afforded under the Defense Production Act (Public Law 81-774, 50 U.S.C. 4501 *et seq.*) are necessary to achieve this objective, the agency shall submit recommendations for a course of action to the President, through the Assistant to the President for National Security Affairs.

*Id.*

On March 13, 2026, the Secretary of Energy issued a "Pipeline Capacity Prioritization and Allocation Order" (the "DPA Order") pursuant to Executive Order 13603. FAC at ¶ 115, Ex. 11 [Doc. # 64-11]. Executive Order 13603, entitled "National Defense Resources Preparedness," was issued on March 16, 2012. Executive Order 13603 generally "delegate[d] authorities and address[ed] national defense resource policies and programs under [the DPA]." Executive Order 13603 § 101 ("Purpose"). Specifically, Executive Order 13603 allocated the President's "authority . . . to require acceptance and priority performance of contracts or orders (other than contracts of employment) to promote the national defense over performance of any other contracts or orders, and to allocate materials, services, and facilities as deemed necessary or appropriate to promote the national defense" to the Secretary of Energy "with respect to all forms of energy[.]" *Id.* at § 201.

The DPA Order listed Sable as the only covered entity. FAC, Ex. 11 at 2. First, it defined a need for the use of the SYU and transport of oil and gas in light of Executive Order 14156. *Id.* at 2–3. It found Sable informed the Secretary of Energy that "California agencies" were using "state measures" to "block pipeline operations. *Id.* at 3. In light of these findings and "in accordance with Title I of the DPA, that the actions directed [. . .] are appropriate to promote the national defense and to maximize domestic energy supplies . . .[,]" the Secretary of Energy directed Sable to "immediately commence performance under contracts or orders for services . . . for hydrocarbon transportation capacity[.]" *Id.* at 4. "Such contracts for hydrocarbon transportation services . . . shall take priority over other non-[Facilities] hydrocarbon transportation contracts or others for such services from the SYU that are entered, hereinafter are entered, or could as an alternative to the [Facilities] be entered into for hydrocarbon transportation services[.]" *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |

| | | | |
|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 5 of 25 |

Sable was ordered to "comply with [the DPA Order] immediately" and to maintain compliance "until the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." *Id.*

**D.    RJNs**

The County requests judicial notice of Sable Offshore Corp's Form 8-K.  [Doc. # 69-2.] Intervenors request judicial notice of:  (1) a 2015 consent decree entered in a separate action (*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.* (No. CV 20-2415)); (2) a 2016 letter from the Office of Pipeline Safety for the Pipeline and Hazardous Materials Safety Administration ("PHMSA") to the California Office of State Fire Marshal ("OSFM"); and (3) orders issued in a separate action (*Center for Biological Diversity, et al., v. California Dept. of Forestry and Fire Protection, et al.* (No. CV 25-2244)).  [Doc. # 70-3.]  Since the Court did not rely on these exhibits in reaching its decision, the requests for judicial notice ("RJNs") are **DENIED as moot**.

**II.**
**LEGAL STANDARD**

Under Rule 12(b)(6), a defendant may seek to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a pleading need not contain "detailed factual allegations," it must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In evaluating the sufficiency of a complaint, courts must accept all factual allegations as true.  *Id.* (citing *Twombly*, 550 U.S. at 555).  Legal conclusions, in contrast, are not entitled to the assumption of truth.  *Id.*  The Court draws all reasonable inferences in favor of the nonmoving party.  *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).

//
//
//
//
//

Case 2:25-cv-04165-DMG-CTS    Document 83    Filed 07/14/26    Page 6 of 25    Page ID #:18787

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 6 of 25 |
|---|---|---|---|

**III.**
**DISCUSSION**

**A.    The Takings Clause**

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation.  U.S. Const. amend. V, XIV.   Courts in the Ninth Circuit employ a two-step analysis to determine whether a constitutional taking has occurred.  *Bowers v. Whitman*, 671 F.3d 905, 912 (9th Cir. 2012).   First, the Court determines "whether the subject matter is 'property' within the meaning of the Fifth Amendment."  *Id.*  Upon finding a cognizable property interest, the Court moves to the second step which is whether "there has been a taking of that property, for which compensation is due."  *Id.*

Beyond the classic taking where the government takes physical property, the Supreme Court recognizes regulatory takings where the government "instead imposes regulations that restrict an owner's ability to use his own property."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).   There are two "relatively narrow categories" of regulatory action that constitute *per se* takings under the Fifth Amendment:  (1) where the government "requires an owner to suffer a permanent physical invasion of her property"; or (2) where a regulatory action completely deprives an owner of all economically beneficial use of her property.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).   For all other regulatory takings challenges, courts apply the standard set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).  *Penn Central* instructs courts to consider the following factors as principal guidelines:  (1) the "economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."  *Id.* at 124. The Court determines whether a regulatory taking has occurred in the second step of the analysis. *See Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1002 n.17 (9th Cir. 2007), *aff'd sub nom. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008).

Article I, section 19 of the California Constitution states that "[p]rivate property may be taken or damaged for public use only when just compensation . . . has first been paid to . . . the owner."  Cal. Const. art. I, § 19.  The Takings Clause in the California Constitution "should be construed 'congruently' with the federal [T]akings [C]lause" with the "minor difference[]" that the California clause also includes damage to property.  *Bottini v. City of San Diego*, 27 Cal. App. 5th 281, 311 (2018); *San Remo Hotel L.P. v. City and Cnty. of San Francisco*, 27 Cal. 4th 643, 664 (2002).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 7 of 25 |

### 1.      Property Interest

The parties dispute whether Plaintiffs have a constitutionally protected property interest. Plaintiffs plead the following interests: (1) the FDPs themselves are vested entitlements that "run[] with the Facilities"; (2) ExxonMobil and MPPC have a vested right to "sell their assets and exit the FDPs without improper County interference"; (3) Sable has a vested right to "operate the Facilities consistent with the FDPs." FAC at ¶¶ 46–49, 162; Opp. at 21–22. Plaintiffs characterize these interests as separate from the "transfer paperwork itself." Opp. at 22. The Court will address each alleged interest in turn.

### a.   If the FDPs are rights that run with the Facilities, they are not vested entitlements as to Sable and the Exxon Mobil Affiliates.

Certain property rights "run with the land." Plaintiffs do not provide authority for the proposition that FDPs are rights that run with the Facilities.[5] Nonetheless, property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bowers*, 671 F.3d at 912 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "Property's core meaning is determined by reference to traditional background principles of property law." *Zeyen v. Bonneville Joint Dist., # 93*, 114 F.4th 1129, 1142 (9th Cir. 2024) (quoting *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1200 (9th Cir. 1998)).

An FDP is akin to a Conditional Use Permit ("CUP"), which is recognized in California law as a property right that runs with the land rather than the owner. *See Budd v. City of Santa Maria*, 266 F. App'x 661, 663 (9th Cir. 2008) (citing *Malibu Mountains Recreation, Inc. v. Cnty. of Los Angeles*, 67 Cal. App. 4th 359 (1998)); *see Bennett v. City of Kingman*, 543 F. Supp. 3d 794, 807 (D. Ariz. 2021), *aff'd*, No. 21-16105, 2023 WL 118740 (9th Cir. Jan. 6, 2023) (finding a property interest in a zoning permit analogous to a CUP). Like a CUP, an FDP vests when it "has been granted and the successful applicant has thereafter acted upon the grant to his or her detriment." *Malibu Mountains Recreation, Inc.*, 67 Cal. App. 4th at 367. If the permit or license has been denied, the right has not yet vested. *Id.*

---

[5] Plaintiffs cite only to the general, well-known, and undisputed principle that "property" is a bundle of rights related to the physical object, including the right to possess, use, and dispose of it. *See* Opp. at 22 (*citing Gregory v. City of San Juan Capistrano*, 142 Cal. App. 3d 72, 88 (Ct. App. 1983), *disapproved of on other grounds by Fisher v. City of Berkeley*, 37 Cal. 3d 644 (1984) (quoting *U.S. v. General Motors Corp.*, 323 U.S. 373, 377–78 (1945)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | | |
|---|---|---|---|---|
| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |

| | | | |
|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 8 of 25 |

Sable's FDP applications have conclusively been denied. FAC at ¶ 16. Accordingly, even if an FDP is a property right that runs with the Facilities, it is not a vested entitlement as to Sable. "[T]o be cognizable under the Takings Clause, a constitutionally protected property right must be vested." *Zeyen*, 114 F.4th at 1141 (citing *Bowers*, 671 F.3d at 912). With respect to the Exxon Mobil Affiliates, while they can be considered the current owners of the FDPs, Plaintiffs have alleged generalized but not specific facts indicating that the Exxon Mobil Affiliates have acted upon them to their detriment. *See* FAC at ¶ 171; *Malibu Mountains Recreation, Inc.*, 67 Cal. App. 4th at 367; *see also Bowers*, 671 F.3d at 916 ("[A]n interest in a particular land use does not constitute a protected property interest, unless the interest has vested in equity based on principles of detrimental reliance.").

> **b. Sable does not have a vested right to operate the Facilities with the FDPs or a vested right to approval of the FDP applications.**

The Court turns next to Plaintiffs' other interests as pleaded. Sable's alleged property right to obtain the FDPs—whether characterized as a right "to operate the Facilities consistent with the FDPs" because they have begun operation notwithstanding the denials, or an "interest in the FDPs" and transfer thereof—also is not vested. *See* FAC at ¶ 48; Opp. at 25. To determine whether a property right has vested for a Takings Clause claim, the inquiry is "the certainty of one's expectation in the property interest at issue." *Zeyen*, 114 F.4th at 1141 (quoting *Bowers*, 671 F.3d at 913). "[I]f the property interest is 'contingent and uncertain' or the receipt of the interest is 'speculative' or 'discretionary,' then the government's modification or removal of the interest will not constitute a constitutional taking." *Bowers*, 671 F.3d at 913 (quoting *Engquist*, 478 F.3d at 1003–04). A "vested right" is a "right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." *Zeyen*, 114 F.4th at 1141 (quoting Black's Law Dictionary (12th ed. 2024)). There must be a "high threshold of certainty" to find an entitlement has vested. *Id.* at 1141–42 (collecting Supreme Court cases).

Sable cannot claim a vested right to approval of its FDP applications. An application, by its nature, is contingent and nothing in Chapter 25B suggests Sable is entitled to the Board's approval of these applications as a matter of right. *See, e.g., Gypsum Res., LLC v. Clark Cnty.*, 674 F. Supp. 3d 985, 1007 (D. Nev. 2023) (finding plaintiff lacked a vested right to approval of its major project application for a residential development). Sable's desire to receive a favorable disposition on the applications, as strong as it may be, is unilateral. *See Bennett*, 543 F. Supp. 3d at 807 ("Protected property interests do not arise from mere desires or unilateral expectations: there must be a legitimate claim of entitlement.") (citing *Roth*, 408 U.S. at 577).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 9 of 25 |

Indeed, as the Court pointed out in its order on the cross-motions for summary judgment, the Board's review of the FDP applications involves discretionary elements such as *de novo* review and the requirement to make factual findings. *See* MSJ Ord. at 17–19; *cf. Evans Creek, LLC v. City of Reno*, No. 21-16620, 2022 WL 14955145, at *2 (9th Cir. Oct. 26, 2022) (holding plaintiffs should have known their "requests" for annexation might be denied where the government had discretion, based on "multiple statutorily prescribed factors," to deny the request). Contrary to Plaintiffs' arguments, the Court did not find the entire Chapter 25B process was mandatory and ministerial. *See* Opp. at 24. It merely found the duty to act upon the appeal was mandatory and ministerial. MSJ Ord. at 21. In other words, the Board did not have a mandatory and ministerial duty to *approve* the transfer of FDPs to Sable. To the extent Plaintiffs allege otherwise, it is a legal conclusion not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678.

> c. **The Exxon Mobil Affiliates have a property interest in disposing of the FDPs.**

The Exxon Mobil Affiliates are differently situated from Sable in this action. The Exxon Mobil Affiliates allege they remain owner, operator, guarantor and holder of the FDPs. FAC at ¶ 34. As Plaintiffs allege, and apparent from the plain language of Chapter 25B, the Exxon Mobil Affiliates remain responsible and liable for applicable potential harms contemplated by Chapter 25B. FAC at ¶¶ 18, 34; County Code §§ 25B-4.[6] The Exxon Mobil Affiliates have a property interest in disposing of the FDPs and eliminating their exposure to various liabilities as the current owner, operator, and guarantor of the Facilities. *See* FAC at ¶ 171 ("ExxonMobil and MPPC have a vested right to transfer their assets, including the FDPs"); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 (1982) (recognizing "the bare legal right to dispose of the occupied space by transfer or sale").

> 2. **Regulatory Taking as to the Exxon Mobil Affiliates**

Given that Plaintiffs have adequately alleged that the Exxon Mobil Affiliates have a property interest in disposing of the FDPs, the next issue before the Court is whether the Exxon Mobil Affiliates have plausibly pled a compensable taking. Plaintiffs do not allege or raise the possibility of a regulatory *per se* taking. Accordingly, the Court turns to the *Penn Central* factors. *See* Opp. at 26. *Penn Central* instructs courts to consider the following factors as principal

---

[6] Chapter 25B provides that until a change of owner, or guarantor, is approved pursuant to the chapter, the former owner or guarantor "shall continue to be liable for compliance with all terms and conditions of the permit and any applicable county ordinances." County Code §§ 25B-4(e), (g). Owners, operators, or guarantors are liable to comply with the FDP conditions. *Id.* at § 25B-4(h). Owners and operators are liable for proper abandonment of the facility. *Id.* at § 25B-4(i).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 10 of 25 |

guidelines: (1) the "economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." 483 U.S. at 124. The first and second factors are the "primary factors." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 630 (9th Cir. 2020) (citing *Lingle*, 544 U.S. at 538–39 (2005)). The inquiry "depends largely upon the particular circumstances in the case at hand." *Id.* (internal quotation marks and punctuation removed).

### a. The Exxon Mobil Affiliates have not adequately alleged an economic impact.

Plaintiffs allege the Exxon Mobil Affiliates remain subject to "potential legal and financial exposure" and have "suffered and continue to suffer substantial damages in an amount to be proven at trial." FAC at ¶¶ 171, 174. Aside from these vague and conclusory statements, Plaintiffs do not allege any economic impact to the Exxon Mobil Affiliates specifically. Nor do they allege sufficient facts that would allow the court to measure the diminution of value of the property as connected to the Exxon Mobil Affiliates' rights. *See Bridge Aina Le'a, LLC*, 950 F.3d at 631.

### b. The Exxon Mobil Affiliates have not adequately alleged reasonable investment-backed expectations.

The Court uses an "objective analysis to determine the reasonable investment-backed expectations of the [o]wners." *Bridge Aina Le'a, LLC*, 950 F.3d at 633 (quoting *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 452 (9th Cir. 2018)). The investment-backed expectations must be *reasonable. Id.* "[U]nilateral expectations or abstract needs cannot form the basis of a claim that the government has interfered with property rights." *Id.* (internal quotation marks and punctuation omitted). Plaintiffs argue ExxonMobil "had reasonable, investment-backed expectations that it would be able to sell the Facilities unencumbered to Sable." Opp. at 29. Plaintiffs allege the Exxon Mobil Affiliates "invest[ed] substantial time, money, and resources" and "invested many millions of dollars in the Facilities." FAC at ¶¶ 18, 48.

As a threshold matter, it is unclear what investments the Exxon Mobil Affiliates have made here. The Exxon Mobil Affiliates successfully sold the Facilities to Sable for $625,000,000—this sale proceeded unhindered and without interference from the County. *See* MSJ Ord. at 4. To the extent the Exxon Mobil Affiliates invested money *into* the Facilities while they were owner, operator, and guarantor, it is unclear what return the Exxon Mobil Affiliates expect from those investments beyond the sale price. *See* FAC at ¶ 48 ("Over the years, the Facilities' prior owners, including ExxonMobil, invested many millions of dollars in the Facilities."). Indeed, the Exxon Mobil Affiliates seek to clean its hands of the Facilities entirely.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 11 of 25 |
|---|---|---|---|

Assuming the Exxon Mobil Affiliates could allege with greater specificity what "investments" they made, they fail to allege reasonable expectations at least as to the pipeline. *See* FAC at ¶ 48. As explained above, an FDP application is contingent by its nature and the Exxon Mobil Affiliates' desire to have Sable's FDP applications approved by the County was unilateral. To judge "reasonable expectations," the Court evaluates "the regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a, LLC*, 950 F.3d at 634.

Chapter 25B was adopted in 2001. FAC at ¶ 50. In 2023, the Exxon Mobil Affiliates submitted applications for transfer of the pipeline-related FDPs from then-owner, guarantor, and operator Plains Pipeline L.P. to themselves. *Id.* at ¶ 59. Indeed, according to Plaintiffs' allegations, this process was characterized by extensive debate and "similar" "argument[.]" *Id.* at ¶¶ 60–65. Such an environment shows the Exxon Mobil Affiliates could not have reasonably expected the FDP process to be a seamless rubber-stamping exercise when they faced "similar" challenges one year prior to the sale of the Facilities to Sable. *See* FAC at ¶ 66; *accord Pakdel v. City & Cnty. of San Francisco*, 636 F. Supp. 3d 1065, 1076 (N.D. Cal. 2022) (finding landlord plaintiffs' expectation to be "continually unencumbered" by government regulation was unreasonable).

As for the SYU and POPCO facilities, however, it became apparent during the July 10, 2026 hearing that it is unclear when those FDPs were transferred to the Exxon Mobil Affiliates. *See* FAC at ¶ 65 (limiting FAC paragraphs 58 to 65 to the pipeline-related FDPs). It is possible that the Exxon Mobil Affiliates came into possession of the FDPs before the enactment of Chapter 25B or that the transfer of those FDPs went without any challenges or appeal.

### c. Chapter 25B's interest in protecting public health and safety counsels against finding a taking.

Finally, the Court considers the character of the County's actions. A taking "may more readily be found when the interference with the property can be characterized as a physical invasion by the government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124.[7] Plaintiffs allege and argue the County acted in accordance with its "duty 'to the public[.]'" Opp. at 32 (citing FAC at ¶¶ 11, 90)). This counsels *against* finding a taking. *See Colony Cove*

---

[7] Plaintiffs raise the principle that the Government should not "force[] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Bridge Aina Le'a, LLC*, 950 F.3d at 636 (quoting *Lingle*, 544 U.S. at 537 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960))). Although this a "general principle" that speaks to the purpose of the Takings Clause, it does not replace or resolve the third *Penn Central* factor. *Lingle*, 544 U.S. at 542.

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 12 of 25 |

*Props., LLC v. City of Carson*, 888 F.3d 445, 454 (9th Cir. 2018) (holding rent control ordinance designed to protect the public counseled against finding a *Penn Central* taking). Indeed, the purpose of Chapter 25B is, in part, to protect public health and safety. *See* MSJ Ord. at 4 (citing County Code § 25B-1). The "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law[.]" *Penn Central*, 438 U.S. at 124 (internal quotation marks omitted).

### d. Leave to amend.

Should a court dismiss certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*)); *see* Fed. R. Civ. P. 15(a)(2). Here, it is possible that Plaintiffs could allege further facts that show an economic impact suffered by the Exxon Mobil Affiliates or investment-backed expectations. Plaintiffs could also allege facts as to the regulatory environment when the SYU and POPCO facility-related FDPs were transferred to the Exxon Mobil Affiliates and potentially add new facts as to the same for the pipeline-related FDPs. They could, in addition, allege facts that establish detrimental reliance on their FDPs which potentially would show a plausible vested property right that runs with the land. The Exxon Mobil Affiliates Takings Clause claims are therefore **DISMISSED with leave to amend**.

With regard to Sable, however, Plaintiffs cannot amend a vested property right into existence—Sable does not hold the FDPs and its unilateral interest in the approval of its applications cannot be cured. Amendment would therefore be futile as to Sable's Takings Clause claim. Sable's Taking Clause claim is **DISMISSED without leave to amend**.

### B. Federal Preemption

Plaintiffs claim the Board's denial of the FDP applications was preempted pursuant to the Supremacy Clause. U.S. Const. art. VI, cl. 2. Plaintiffs claim preemption by the Pipeline Safety Improvement Act of 2002, 49 U.S.C. § 60101 *et seq.* ("PSA") and the DPA. The Court will address each of these arguments *seriatim*.

### 1. The Supremacy Clause

Federal law "shall be the supreme Law of the Land . . ., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, "if federal law imposes restrictions or confers rights on private actors and a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 13 of 25 |

state law confers rights or imposes restrictions that conflict with the federal law, the federal law takes precedence and the state law is preempted." *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 968 (9th Cir. 2026) (quoting *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (internal quotation marks and punctuation removed)). Federal law includes statutes and regulations "properly adopted in accordance with statutory authorization." *City of New York v. F.C.C.*, 486 U.S. 57, 63 (1988). For the purposes of the Supremacy Clause, courts analyze local ordinances in the same way as state laws. *See, e.g.*, *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973). The Court begins with a presumption against preemption. *Gonzalez v. Arizona*, 677 F.3d 383, 395 (9th Cir. 2012).

Preemption may be express or implied. At issue with regard to the PSA is express preemption. Express preemption occurs when Congress enacts a clear statement "expressly" preempting the state law. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig. ("In re Volkswagen")*, 959 F.3d 1201, 1211 (9th Cir. 2020) (citing *Kansas*, 589 U.S. at 202). "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.* (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

Plaintiffs' assertion of preemption by the DPA focuses on implied preemption. Implied preemption has been recognized by the Supreme Court in two circumstances, commonly referred to as "field preemption" and "conflict preemption." *Id.* at 1212. In these instances, "a high threshold must be met" for the Court to find implied preemption. *Id.* The Court's analysis is "guided by two cornerstones of . . . pre-emption jurisprudence." *Id.* at 1211 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). First, the "ultimate touchstone" is "the purpose of Congress." *Id.* (quoting *Wyeth*, 555 U.S. at 565). The purpose is "grounded in the text and structure of the statute at issue." *Id.* (quoting *Kansas*, 589 U.S. at 208) (internal quotation marks and citation removed)). Second, courts "start with the assumption that the historic police powers of the States" are not preempted "unless that was the clear and manifest purpose of Congress." *Id.* at 1212 (quoting *Wyeth*, 555 U.S. at 565).

Express preemption pursuant to the PSA and implied preemption by the DPA are discussed in greater detail below.

### 2.    The Pipeline Safety Act (PSA)

The PSA's purpose is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 14 of 25 |
|---|---|---|---|

enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1). "Federal legislation seeks to provide 'a national hazardous liquid pipeline safety program with nationally uniform minimal standards and with enforcement administered through a Federal–State partnership.'" *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877–78 (9th Cir. 2006) (quoting 49 C.F.R. pt. 195, app. A).[8]

As a threshold matter, Intervenors dispute who holds jurisdiction over the Pipeline—the California Office of the State Fire Marshal ("OSFM") or the Pipeline Hazardous Materials Safety Administration ("PHMSA"). Intervenors MTD at 12. The Intervenors argue the Pipeline is an *intra*state pipeline and therefore the OSFM has jurisdiction. *Id.* In contrast, Plaintiffs contend that the Pipeline is an *inter*state pipeline and therefore PHMSA has jurisdiction. Opp. at 37. This issue is the subject of litigation in the Ninth Circuit. *See California v. PHMSA*, Nos. 25-8059, 26-508 (9th Cir. 2026). The Court need not resolve this question to determine whether the County's action was preempted.

The PSA's express preemption clause applies to both intrastate and interstate pipelines. If the Pipeline is interstate, the PSA provides that state and local authorities "may not adopt or continue in force safety standards[.]" 49 U.S.C. § 60104(c).[9] If the Pipeline is intrastate, the PSA allows a state authority with PSA certification (such as OSFM) to "adopt additional or more stringent safety standards . . . only if those standards are compatible with the minimum standards prescribed under this chapter." *Id.* No party alleges the County applied for PSA certification.[10] Regardless of which entity has jurisdiction, however, the County has not attempted to impose any safety standard that would run afoul of either of them.[11]

---

[8] The regulation references the Hazardous Liquids Pipeline Safety Act of 1979 ("HLPSA"), which was combined with National Gas Pipeline Safety Act of 1968 and recodified into the PSA. *See Olympic Pipe Line Co.*, 437 F.3d at 877 n.14.

[9] There are two "exceptions to this prohibition": a state authority may enter into an agreement with the Department of Transportation ("DOT") to participate in the oversight of the interstate pipeline facilities, or the DOT may designate an agent to conduct inspections on behalf of the DOT. *See Olympic Pipe Line Co.*, 437 F.3d at 878 (citing 49 U.S.C. §§ 60106(a), 60117(c)). Neither are alleged in this action.

[10] The Court notes that a "State agency" under the PSA could include a municipality. *See Olympic Pipe Line Co.*, 437 F.3d at 880 (citing *Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052 (9th Cir. 1987)). The County *could* qualify as a "State agency" delegated authority under the PSA *if* it had applied for certification. 49 U.S.C. § 60104(c). But it did not.

[11] This obviates Intervenors' argument that the Board vote could not have been preempted because PHMSA "had not asserted control" over the Facilities at the time of the vote. *See* Intervenors MTD at 9. It is irrelevant to this action which entity asserted jurisdiction at that point in time.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 15 of 25 |
|---|---|---|---|---|

The Ninth Circuit's opinion in *Olympic Pipe Line Co.* is instructive. In *Olympic Pipe Line Co.*, the City of Seattle refused to "automatically renew" the Olympic Pipe Line Company's ("Olympic") franchise for the Seattle Lateral Pipeline following an explosion. 437 F.3d at 875. The Washington Utilities and Transportation Commission ("WUTC") applied for and received authority under the PSA to participate in and ensure compliance with the PSA's safety standards. *Id.* at 879. The WUTC was therefore delegated authority to inspect pipeline operators and facilities under the PSA. *Id.* at 880. As in this case, the question was whether actions by an entity outside of PHMSA or a state agency (WUTC/OSFM) were preempted by the PSA. The Ninth Circuit held the PSA expressly preempted the City of Seattle's "attempt to impose safety regulations" on the Seattle Lateral Pipeline. *Id.*

The key distinction between *Olympic Pipe Line Co.* and this case is that the County's actions are not analogous to those taken by the City of Seattle. The City of Seattle demanded Olympic respond to 33 safety concerns, including a request to conduct an additional hydrostatic test of the Seattle Lateral Pipeline after a section of the pipeline failed prior tests requested by a different municipality. *Id.* at 875. Because Olympic refused, the City of Seattle ordered the suspension of Olympic's operations of the Seattle Lateral Pipeline but indicated it would rescind the order if Olympic would perform the hydrostatic test and two inspection digs. *Id.* Here, even assuming all facts alleged in the FAC are true, Plaintiffs have not shown a comparable attempt by the County to impermissibly regulate pipeline "safety standards."

The text of the PSA's preemption clause is explicit in asserting jurisdiction over "safety standards" for interstate and intrastate pipelines. *See* 49 U.S.C. § 60104(c). Where a statute contains an express preemption clause, the "plain wording of the clause" is the first focus of the court and "contains the best evidence of Congress' pre-emptive intent." *In re Volkswagen*, 959 F.3d at 1211 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Here, Plaintiffs point to comments made by certain Board members in advance of the December 2025 vote. *See* FAC at ¶¶ 89–100, 180–182. Even assuming Hartmann affected the vote despite her decision to recuse herself, her comments do not come near to the preempted actions by the City of Seattle in *Olympic Pipe Line Co. See, e.g.,* FAC at ¶ 92 (Hartmann stated other agencies' accusations of violations, presumably against Sable, "are not necessarily related to Sable's ability to ensure the facilities are safe for operation."). Nor do Hartmann's questions about insurance in the event of a spill equate to imposing safety standards upon Plaintiffs. *See* Opp. at 35 (citing FAC at ¶¶ 11, 92, 134). Plaintiffs do not allege the Board, at any point, has ordered them *through the FDP process* to cease operations in the Facilities. The PSA provides for this authority, but Chapter 25B does not. *See* 49 U.S.C. § 60117(p) (providing the Secretary of Transportation authority to issue an emergency order imposing emergency restrictions, prohibitions, and safety measures). The Board members' comments do not plausibly amount to an attempt to regulate "safety standards."

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 16 of 25 |
|---|---|---|---|---|

Chapter 25B does include generalized considerations of "safety." After all, one of Chapter 25B's purposes is to "safeguard the natural resources and environment of the county of Santa Barbara, by ensuring [] safe operation[.]" County Code § 25B-1. The Board is required to make the factual finding that the new operator "does not reflect a record of non-compliant or unsafe operations[.]" *Id.* at § 25B-10(a)(9). Plaintiffs do not claim Chapter 25B alone, outside of these errant comments by Board members, is facially preempted by the PSA. *See* Opp. at 34 n.9. Indeed, Chapter 25B largely dictates *who* can hold the FDPs and who *bears* liability and responsibility for certain standards. The PSA appears to divest itself from such concerns by incorporating a savings clause for tort claims. *See* 49 U.S.C. § 60120 ("This chapter does not affect the tort liability of any person."). Plaintiffs' broad theory of preemption would transform any passing mention of "safety" in a local ordinance into an act preempted by the PSA's jurisdiction over "safety standards." That is not consistent with the weight of authority.[12]

At the July 10, 2026 hearing, Plaintiffs represented that PHMSA approved Sable as operator of the Facilities purportedly in December of 2025. Plaintiffs did not include this allegation in their amended complaint. Because it is unclear what factors were considered in PHMSA's findings and the extent of overlap, if any, with findings required under Chapter 25B, it is *possible* that aspects of PHMSA's approval of Sable conflict with the Board's denial. The Court also notes, however, that ongoing litigation in the Ninth Circuit may determine that the OSFM has jurisdiction over the Facilities rather than the PHMSA, which could render PHMSA's approval arguably inapplicable.

---

[12] The County's and the Intervenors' out of circuit authorities are not binding upon this Court, but are persuasive and are consistent with *Olympic Pipe Line Co.* and this Court's Order insofar as they draw distinctions between mere mentions of safety and actual safety standard regulations. *See Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 671 (8th Cir. 2025), *cert. denied*, 146 S. Ct. 1509 (2026) ("The evidence supports that, at their core, the setbacks regulate safety [. . .]. Their direct and substantial effect on safety [is preempted by the PSA]. This holding does not prohibit local governments from considering safety, nor prevent them from enacting all zoning ordinances, as the Counties suggest. **This court emphasizes the distinction between safety standards—which the PSA preempts— and safety considerations—which the PSA does not preempt.**") (emphasis added); *Washington Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 421 (4th Cir. 2013) ("Even assuming safety concerns played some part in the enactment of the County Zoning Plans, those concerns would have been merely incidental to the overall purpose of the County Zoning Plans. This is insufficient to justify a finding that the County Zoning Plans were, in fact, safety regulations."); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 212 (5th Cir. 2010) ("Here, Congress has spoken clearly. The PSA preempts safety standards for natural gas pipeline facilities. Grand Prairie's setback requirement is not a safety standard in letter, purpose, or effect. It may remain in force.").

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 17 of 25 |
|---|---|---|---|

Nonetheless, because it is uncertain whether Plaintiffs could allege new facts that would cure the deficiencies in the pleadings as to their PSA-related preemption claim, Plaintiffs' Supremacy Clause claim based on the PSA is **DISMISSED with leave to amend**.

### 3.      The Defense Production Act (DPA)

Plaintiffs allege the Board used Chapter 25B "as a tool to frustrate Sable's compliance with the DPA Order" and the denial of the FDP applications "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress and the Executive Branch."  FAC at ¶ 183.

As a threshold matter, the County and the Intervenors contest whether this claim can be plausible considering the DPA Order was issued approximately three months *after* the Board denied the FDP applications.  *See* County MTD at 20; Intervenors MTD at 17.  Plaintiffs argue their request for relief is prospective based upon current preemption rather than retroactive preemption.  *See* Opp. at 39, 42.  As a matter of logic, it is patently implausible that the Board denied the FDP applications in order to frustrate an order that did not exist at the time of its decision.  Plaintiffs do allege, however, a claim of conflict preemption to the effect that it is impossible for Sable to comply with both the DPA Order and the Board's denial of the FPD applications and/or the denial stands as an obstacle to the implementation of the DPA Order.  *See* Opp. at 39–40; FAC at ¶ 183.  This current alleged conflict may exist, and persist, regardless of whether the Board was aware of the DPA Order at the time of the vote.  *See Gonzalez v. Drew Indus. Inc.*, 750 F. Supp. 2d 1061, 1064 (C.D. Cal. 2007) (citing *Michigan Canners & Freezers Ass'n. v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 469 (1984)) ("The general rule is that federal law does not displace existing state law.  Preemption is the exception to this rule.").

Conflict preemption occurs where a state law "actually conflicts with federal law[.]"  *In re Volkswagen*, 969 F.3d at 1212 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)).   An actual conflict may arise when "compliance with both state and federal law is impossible" or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (quoting *Oneok, Inc. v. Learjet*, Inc., 575 U.S. 373, 377 (2015)) (internal quotation marks removed).  To evaluate obstacle preemption, the Court must identify the "full purposes and objectives of the federal law from the text and structure of the statute at issue."  *Id.* (internal quotation marks omitted).

The Court begins with the text and structure of the DPA to ascertain Congressional purpose.  *See In re Volkswagen*, 959 F.3d at 1211.  The DPA was enacted to "ensure the vitality

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 18 of 25 |
|---|---|---|---|

of the domestic industrial base" and "provide for the national security [and] the national defense preparedness effort of the United States Government."  50 U.S.C. §§ 4502(a)(2), (3).  To advance these goals, the President is provided with "an array of authorities to shape national defense preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base[.]"  *Id.* at § 4502(a)(4).  The President's authorities include the following abilities: to require persons/companies to prioritize and accept contracts; to incentivize the domestic industrial base to expand the production and supply of goods (through loans, loan guarantees, purchases, procurement and installation of equipment); and to establish agreements with private industry, block mergers/acquisitions/takeovers, and employ specific persons.  *See* Michael H. Cecire & Heidi M. Peters, Cong. Rsch. Serv., R43767, The Defense Production Act of 1950: History, Authorities, and Considerations for Congress (2020) (summarizing 50 U.S.C. §§ 4511– 4589).  The President may delegate these authorities to other executive branch officials.  *See id.*; *see, e.g.,* 50 U.S.C. § 4511(d).

As evidenced by the text and structure of the statute, the DPA is designed to provide the President delegable authorities to influence domestic industry in the interest of national security through market vehicles such as contracts, loans, employment, and procurement.  Regarding contracts specifically, the DPA authorizes the President to:

> require that performance under contracts or orders . . . which he[/she] deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he[/she] finds to be capable of their performance[.]

50 U.S.C. § 4511(a)(1).[13]  With this "grounding" in mind, the Court turns to the DPA Order.

First, Plaintiffs argue the DPA Order, issued by the Secretary of Energy, is the source of preemption  rather than the DPA itself.  *See* Opp. at 41.  The Supreme Court has ruled that a statutorily authorized Executive Order can create rights with preemptive power under the

---

[13] Plaintiffs cite to the district court's order in *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388 (N.D. Tex. 2022), *aff'd*, No. 22-10171, 2023 WL 2645553 (5th Cir. Mar. 27, 2023).  *See* Opp. at 40 n.12.  *Johnson* is distinguishable.  The DPA Order references the President's delegated authority under clause (a)(1) of section 4511 while the district court's order in *Johnson* relies upon clause (a)(2).  *See* 50 U.S.C. § 4511(a)(2) ("The President is hereby authorized . . . (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.").

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 19 of 25 |
|---|---|---|---|

Supremacy Clause. *See Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974). Similarly, the DPA as enacted by Congress delegated specific authority to the President and provided for the delegation of this authority to executive officers such as the Secretary of Energy. *Accord City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1108 (9th Cir. 2022) ("DPA directives are basically regulations."); *Washington v. Monsanto Co.*, 738 F. App'x 554, 556 (9th Cir. 2018) (referring to letters sent by the federal government directing a company to purchase certain goods under the DPA as "federal law").

Plaintiffs did not provide—and the Court could not locate—authority for the proposition that, in the event of a conflict, an order by an agency official can override a Congressionally enacted statute.[14] Such a proposition would grant agency officials freewheeling authority to overstep or singlehandedly create federal law. Even a federal regulation cannot preempt state law more than the statute it implements. *ConocoPhillips Alaska, Inc.*, 177 F.4th at (citing *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022)). Moreover, the Supreme Court has ruled that the Supremacy Clause "gives priority to 'the Laws of the United States,' not . . . preferences of federal officers." *Kansas*, 589 U.S. at 212 (quoting Art. VI, cl. 2.). Because the Court finds *infra* that the DPA and the DPA Order do not conflict, however, it need not resolve these broad questions.

The DPA Order directs Sable to "immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought" for entities including the Facilities at issue. DPA Order at 4. "Such contracts for hydrocarbon transportation services [for the Facilities] shall take priority over other non-[Facilities] hydrocarbon transportation contracts or orders for such services from the [Facilities] that are entered, hereinafter are entered, or could as an alternative to the [Facilities] be entered into for hydrocarbon transportation services[.] [. . .] For purposes of assuring such priority, Sable is directed to accept and perform such contracts or order up to and so long as the [pipeline] has capacity to transport." *Id.*

Sable argues the federal government, the State of California, and Sable "all [understand] the DPA Order to require Sable to immediately operate the Facilities." Opp. at 40. This proposition, however, is not alleged in the Complaint. Plaintiffs cite to documents filed in other cases involving Plaintiffs and the Facilities. See Opp. at 40. These are not documents attached to the FAC, incorporated by reference in the FAC, or matters of judicial notice. *See United States*

---

[14] Plaintiffs cite to an unpublished decision by the Ninth Circuit. *See* Opp. at 41 (citing *Silver Dollar Grazing Ass'n v. U.S. Fish & Wildlife Serv.*, No. 07-35612, 2009 WL 166924, at *2 (9th Cir. Jan. 13, 2009)). The Ninth Circuit in *Silver Dollar Grazing Ass'n* did not address whether an order by an agency official can prevail over a conflicting Congressionally enacted statute. It merely held that an executive order may have the force of law and therefore be reviewable under the APA. *See id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 20 of 25 |
|---|---|---|---|---|

*v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Judicial notice for the truth of the facts from another case is not appropriate. *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 n. 5 (9th Cir. 2003), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (*en banc*); *see also* Fed. R. Evid. 201 ("The court may judicially notice a fact that is *not subject to reasonable dispute . . . .*") (emphasis added). Accordingly, the Court may not consider this evidence without converting the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *Id.* at 907. The Court declines to do so considering the current stage of the case, the still unresolved petitions for writ of mandate, and ongoing litigation regarding the effect of the DPA Order.[15] See FAC at ¶¶ 118–158.

Even if Sable *believes* the DPA Order commands it to commence operation of the Facilities, it is evident that Plaintiffs do not allege in the FAC any applicable contracts or orders for services *prioritized* over other contracts or orders pursuant to both the DPA and the DPA Order. *See accord Hercules Inc. v. United States*, 24 F.3d 188, 191 n.4 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996) ("The DPA authorizes the President, *inter alia*, to require acceptance and performance of contracts which he deems necessary or appropriate to promote the national defense *in preference to* other contracts.") (emphasis added). To the extent Plaintiffs argue other contracts or orders are not required, this interpretation of federal law appears to be an erroneous conclusion of law and is not grounded in the language of the DPA or the DPA Order. *See Iqbal*, 556 U.S. at 678. Without these other contracts or orders, Plaintiffs' claim that it cannot comply with the DPA or the DPA Order (whether due to impossibility or obstacle preemption) is deficient—there are no alleged contracts or orders to perform under or deprioritize. Accordingly, Plaintiffs' Supremacy Clause claim premised on the DPA is **DISMISSED with leave to amend**.

## C.    State Preemption

Plaintiffs claim the California Department of Fish and Wildlife Office of Spill Prevention and Response ("OSPR") has the "exclusive authority to require that owners and operators have the financial wherewithal to cover costs associated with a worst-case-scenario incident[] and sets specific requirements." FAC at ¶ 186. The California Constitution provides "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const. art. XI, § 7. Conflicting ordinances are preempted by state law and therefore void. *O'Connell v. City of Stockton*, 41 Cal. 4th 1061, 1065 (2007). The party alleging preemption has the burden of demonstrating it. *Chevron U.S.A. Inc. v. Cnty. of Monterey*, 15 Cal. 5th 135, 142 (2023).

---

[15] The parties dispute whether the DPA Order is a valid extension of the President's authority to dictate the prioritization of contracts under the DPA—this is the subject of litigation in a separate case and this Court need not resolve the issue at this time. *See* Opp. at 41 and *California v. Wright*, CV No. 26-3396-SVW (SSCx) (C.D. Cal. Mar. 31, 2026).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 21 of 25 |
|---|---|---|---|

A conflict exists where the ordinance "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." *O'Connell*, 41 Cal. 4th at 1065 (quoting *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893, 897 (1993)). An ordinance "duplicates" state law when it is "coextensive," "contradicts" state law when it is "inimical to or cannot be reconciled with state law," and "enters a field fully occupied by state law" when the Legislature expressly or impliedly wholly occupies the field. *Id.* The Legislature may impliedly occupy an area of law where: "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the locality." *Id.* (internal quotation marks omitted).

Here, Plaintiffs recognize the lack of an express preemption provision. *See* Opp. at 43. Accordingly, any preemption here must be implied. Plaintiffs argue the Legislature implicitly occupied this area of law—the financial responsibility of owners and operators for oil spills—by regulating full and complete coverage of the area. *See* Opp. at 43.

"Field preemption generally exists where the Legislature has comprehensively regulated in an area, leaving no room for additional local action." *T-Mobile W. LLC v. City & Cnty. of San Francisco*, 6 Cal. 5th 1107, 1122 (2019). The Court must look to the language of the statute and the "whole purpose and scope of the legislative scheme." *O'Connell*, 41 Cal. 4th at 1068 (quoting *Am. Fin. Servs. Assn. v. City of Oakland*, 34 Cal. 4th 1239, 1252 (2005)). The financial certificate requirement was enacted as part and parcel of the State of California's Lempert-Keene-Seastrand Oil Spill Prevention and Response Act ("Lempert-Keene Act"). *See Ass'n of Am. R.R. v. California Off. of Spill Prevention & Response*, 113 F. Supp. 3d 1052, 1055 (E.D. Cal. 2015). The Lempert-Keene Act regulates the transportation of "oil through or near the waters of the state" and accordingly imposes requirements on various forms of transportation that may pass through waters (tank vessels, railroads) and maritime based buildings (marine terminals, facilities that impact waters). *See id.*; Cal. Gov't Code § 8670.37.51. The financial certificate requirement follows if owners or operators of any applicable entity are required to have an oil spill contingency plan pursuant to a separate section of the Lempert-Keene Act. *See* 14 C.C.R. § 791.6 ("Purpose and Scope").

The Lempert-Keene Act provides "[a]n owner or operator of a facility where a spill could impact waters of the state shall apply for and obtain a certificate of financial responsibility issued by the administrator for the facility or the oil to be handled, stored, or transported by the facility."

---

CV-90                    **CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk DD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | | |
|---|---|---|---|---|
| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 | |

| | | | | |
|---|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 22 of 25 | |

Cal. Gov't Code § 8670.37.51(d)(1). The certificate is "conclusive evidence that the person or entity holding the certificate is the party responsible for the specified vessel, facility, or oil for purposes of determining liability *pursuant to this chapter*." *Id.* at § 8670.37.52 (emphasis added). If a spill occurs, the Lempert-Keene Act imposes strict liability for responsible parties and provides for a variety of damages. Cal. Gov't Code § 8670.56.5; *see Loretz v. Regal Stone, Ltd.*, 756 F. Supp. 2d 1203, 1216 (N.D. Cal. 2010).

Plaintiffs' claim of state law preemption does not hold up under close inspection. Upon review of the Lempert-Keene Act, it is evident that it did not regulate the area so comprehensively that it left no room for additional local action by the County. The Lempert-Keene Act is cabined to vessels and buildings that affect waters—these arguably do not include facilities such as sections of the pipeline here that run underground. The Lempert-Keene Act is tailored specifically to oil spills into state waters, including the imposition of oil spill contingency plans. The financial certificate follows the owner or operator who is required to have an oil spill contingency plan. The certificate also only designates who is strictly liable under the Lempert-Kenne Act in the event of a spill. Even if strict liability is imposed, the certificate does not "restrict[] or set[] financial limitations on any duty, obligation, or liability of the responsible party to the State of California or any other public or private entity." 14 C.C.R. § 791.6(d).

Indeed, rather than assert sole control over liability for oil spills, the Lempert-Keene Act explicitly accommodates civil penalties from violations of "local laws." *Id.* ("This includes civil penalties assessed pursuant to all applicable federal, state and local laws."). It also contemplates payments "to cover liabilities arising from a discharge of oil" that could *also* arise separately under "any other provision of federal, state, or local law." Cal. Gov't Code § 8670.56.5(k). Finally, it expressly declines to "limit the authority of another state or local agency to implement and enforce state or local laws under its jurisdiction" or to "limit the authority of an agency to enforce existing permits or permit conditions." Cal. Gov't Code § 8670.7(h)(3). Considering California courts are "reluctant to invoke the doctrine of implied preemption," based upon the Lempert-Keene Act's language, purpose, and general scheme, the Court cannot conclude the Legislature implicitly intended to comprehensively occupy the field. *Garcia v. Four Points Sheraton LAX*, 188 Cal. App. 4th 364, 374 (2010).

Even if the Lempert-Keene Act occupied the field of oil spill contingency planning, Plaintiffs have not alleged a plausible conflict. Plaintiffs allege preemption based, again, on isolated comments by Board members in the November and December hearings. Specifically, Plaintiffs point to Hartmann's question of whether the FDPs require the owner or operator to have the financial responsibility to clean up a spill and Capps' statement that Sable has "unresolved financial concerns." FAC at ¶ 187. These comments do not plausibly constitute a claim that the

---

CV-90                                   **CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk DD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 23 of 25 |
|---|---|---|---|

County impermissibly infringed on the field of oil spill contingency planning. The FAC is devoid of any allegations that the County imposed any requirements around oil spills. Furthermore, Chapter 25B is not limited to oil spills. It also designates who is liable in the event of abandonment of the facility, which can occur absent an oil spill, and liability for non-oil spill related fires or injuries to members of the public that occur outside of the facility's premises. County Code §§ 25B-3, 25B-4(i), 25B-10(a)(9). Chapter 25B also does not *impose* liability in any way, shape, or form. It merely identifies the owner, operator, or guarantor of the facility.

Amendment would be futile as the Court finds there is no implied field preemption as a matter of law. In light of the foregoing, Plaintiffs' state preemption claim based on the Lempert-Keene Act (OSPR) is **DISMISSED without leave to amend**.

**D.      The Celeron Settlement Agreement**

"The interpretation of a settlement agreement is governed by principles of state contract law." *Botefur v. City of Eagle Point, Or.*, 7 F.3d 152, 156 (9th Cir. 1993). To state a breach of contract claim under California law, the plaintiff must allege: (1) the existence of a contract; (2) performance; (3) breach; and (4) resulting damages. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 610 (9th Cir. 2020).

On February 8, 1988, the Celeron Pipeline Company of California (hereinafter "Celeron") entered into a binding settlement agreement with the County. FAC at ¶ 43. Plaintiffs assert they are successors to the Celeron Agreement. *Id.* at ¶ 191 n.11. According to Plaintiffs, the parties agreed that "[a]s to areas covered by Part 195, the County is generally without jurisdiction." *Id.* (quoting the Celeron Agreement). "Part 195" is a regulation promulgated by the Department of Transportation.[16] In the Celeron Agreement, the County allegedly agreed it had "no authority over the design, construction and operation" of the pipeline except as set forth in the agreement and an attached final development plan/conditional use plan. FAC at ¶ 43 (quoting the Celeron Agreement). The Celeron Agreement also provided the County cannot take "any action which involve[s] Part 195 areas and is not authorized under 2.5.1 [in the Celeron Agreement], including suspending or withholding ministerial permits, and which will stop or delay [the permit holder's] construction and/or operation." *Id.* (quoting the Celeron Agreement).

Plaintiffs allege the County breached the Celeron Agreement by failing to approve the FDP applications. FAC at ¶ 191. Specifically, Plaintiffs claim the findings made by the Board in the

---

[16] As explained *infra*, "Part 195" refers to a regulation promulgated by the Department of Transportation pursuant to the HLPSA. *See* 49 C.F.R. pt. 195; *see Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946, 947 (E.D. Wash. 1997). The HLPSA was recodified into the PSA. *See Olympic Pipe Line Co.*, 437 F.3d at 877 n.14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 24 of 25 |

December 2025 hearing violated the Celeron Agreement's term that the County lacked authority over the "operation" of the pipeline. *Id.* at ¶ 193. As a result of this breach, Plaintiffs allege Sable has "incur[ed] excessive costs to operate" the pipeline. *Id.* at ¶ 194.

Plaintiffs do not claim Chapter 25B as enacted violates the Celeron Agreement. Indeed, this would not be permitted because "a municipality may not 'contract away' its legislative and governmental functions." *Discovery Builders, Inc. v. City of Oakland*, 92 Cal. App. 5th 799, 810 (2023) (quoting *Cnty. Mobilehome Positive Action Comm., Inc. v. Cnty. of San Diego*, 62 Cal. App. 4th 727, 736 (1998)). Rather, Plaintiffs claim that Chapter 25B as applied through the Board's comments during deliberations violates the Celeron Agreement. *See* Opp. at 45. "Part 195" is a regulation promulgated by the Department of Transportation pursuant to the HLPSA, which was recodified into the PSA. *See* 49 C.F.R. pt. 195; *Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946, 947 (E.D. Wash. 1997); *Olympic Pipe Line Co.*, 437 F.3d at 877 n.14. The Celeron Agreement's restrictions, including against the withholding of "ministerial permits," are defined pursuant to the PSA. For the same reasons explained above, *see* Part III(B)(2), the PSA governs safety standards—but the Board's deliberations did not delve into safety standards. The County complied with the Celeron Agreement and Plaintiffs therefore have not alleged a plausible breach. Leave to amend this claim as to terms in the Celeron Agreement related to "Part 195" would be futile. *See id.*

To the extent Plaintiffs allege a term of the Celeron Agreement separate from Part 195 bars "withholding" of "ministerial permits" which "delay operation," the FAC is devoid of the facts needed to plead a plausible breach of contract claim. Plaintiffs did not attach a copy of the Celeron Agreement to the FAC or submit it for judicial notice. It is unclear what section "2.5.1" refers to or what "ministerial permits" the contracting parties considered at the time the Celeron Agreement was entered into. Indeed, it is unclear if Chapter 25B-related topics would even fall within the Agreement's ambit since it was entered into 13 years before Chapter 25B was enacted. Nonetheless, because it is uncertain whether Plaintiffs could plead additional facts to allege a breach of contract claim unrelated to "Part 195," the Court **DISMISSES** the breach of contract claim **with leave to amend**.

**IV.**
**CONCLUSION**

In light of the foregoing, the County's and the Intervenors' motions to dismiss are **GRANTED**. Plaintiffs' fifth and sixth causes of action for Takings Clause violations as to the Exxon Mobil Affiliates; seventh cause of action under the Supremacy Clause, based on PSA and DPA-related preemption; and eighth cause of action for breach of contract are **DISMISSED with**

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | *Sable Offshore Corp., et al. v. County of Santa Barbara, et al.* | Page | 25 of 25 |
|---|---|---|---|

**leave to amend**. The fifth and sixth causes of action for Takings Clause violations as to Sable and the seventh cause of action for state law preemption pursuant to the California Constitution are **DISMISSED without leave to amend and with prejudice**.

By **August 4, 2026**, Plaintiffs shall file their Second Amended Petition and Complaint consistent with the Court's Order or a notice of their intent not to amend. Defendants shall file a response within **21 days** after the filing and service of any Second Amended Petition and Complaint.

**IT IS SO ORDERED.**