ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013-1256
 Telephone:  (213) 269-6605
 Fax:  (213) 897-2638
 E-mail:  Jeremy.Brown@doj.ca.gov
 Alicia.Roessler@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,** | Case No. 2:26-cv-3396-SVW-SSCx |
| *Plaintiff,* | **FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF; ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF (L.R. 83-11)** |
| **v.** | |
| **CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,** | **(Defense Production Act, 50 U.S.C. § 4501 et seq.; Administrative Procedure Act, 5 U.S.C. §§ 701-706; Violation of U.S. Constitution Separation of Powers and 10th Amendment;** *Ultra Vires* – **Conduct in Excess of Statutory Authority; Declaratory Relief)** |
| *Defendants.* | |
| and | |
| **SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,** | |
| *Intervenor-Defendants.* | |

First Amended Complaint for Declaratory and
Injunctive Relief

**INTRODUCTION**

1.     In a breathtaking power grab, the federal Executive Branch has asserted that, with the stroke of a Cabinet Secretary's pen on an order under the Defense Production Act, the federal government may preempt and supersede all state laws governing hazardous oil pipelines, California's sovereign property rights, and any order of a state or federal court, in an effort to extract as much petroleum as it can from the coastal waters off of California. This stunning usurpation of California's police powers, and the powers of the state and federal courts, should be struck down swiftly and certainly.

2.     Onshore oil pipelines that run along the Santa Barbara, California, coast and inland to Kern County, California, were shut down in 2015 following a catastrophic rupture that spilled over 120,000 gallons of oil onto Refugio State Beach and into the ocean. In recent years, the pipeline operator has made repairs to the pipeline and sought to restart the pipelines, which fall within the jurisdiction of at least eight state agencies with regulatory authority over the pipelines and related facilities, or whose property the pipelines cross. The subset of those agencies that must grant affirmative approval for the pipelines to restart have been carefully examining the pipeline operator's requests, consistent with the specific safety and legal requirements under their respective statutes. Some approvals have been granted conditionally, while some remain under review pending the pipeline operator's submission of additional information or completion of legally required steps.

3.     The pipeline operator was unhappy with the speed of those approvals, however—not because they were taking longer than other similarly complex and environmentally sensitive reviews, but because the pipeline operator was severely undercapitalized and desperate to begin generating revenue. Accordingly, the pipeline operator asked Defendant United States Secretary of Energy Chris Wright to order it to restart the pipelines under the Defense Production Act (DPA).

First Amended Complaint for Declaratory and Injunctive Relief

Secretary Wright issued that order on March 13, 2026. *See* Secretarial Order entitled *Pipeline Capacity Prioritization and Allocation Order* (the Wright Order). ECF 23-1 pp. 1-4. The pipeline operator then relied on the Wright Order, and a contemporaneous opinion from the U.S. Department of Justice's Office of Legal Counsel, to argue that any state laws or existing court orders standing in the way of restart could be ignored and set aside. The very next day, on March 14, 2026, the pipeline operator restarted pumping oil through the pipelines despite an outstanding preliminary injunction in state court, despite not having necessary permits from either the state or the federal government for pipeline operation, despite still not having approval from several state agencies, and despite not having a current or valid easement to keep or utilize the segment of its pipeline crossing California state property.

4.    By way of this action, the State of California seeks declaratory relief and permanent injunctive relief under the United States Constitution and the Administrative Procedure Act (APA) and vacatur under the APA with respect to the Wright Order.

5.    The Wright Order directs the pipeline operator to immediately "prioritize and allocate" transportation of hydrocarbon services, i.e., crude oil, produced at three offshore platforms in the Outer Continental Shelf known as the Santa Ynez Unit. The crude oil extracted from the Santa Ynez Unit is transported through an undersea pipeline (the Offshore Pipeline), which Offshore Pipelines are partly on lands leased from the California State Lands Commission, into a production facility onshore where it is treated and separated into distinct petroleum products, and then enters a different intrastate onshore pipeline system and travels, including in part through Gaviota State Park, approximately 120 miles to an inland distribution station (Lines CA-324/325 or Pipelines). The Wright Order also directs the Pipeline operator to "immediately commence performance" under contracts for oil production and transportation from the Santa Ynez Unit through the Offshore

First Amended Complaint for Declaratory and Injunctive Relief

Pipeline, processing facility, and Lines CA-324/325, and to prioritize contracts regarding such oil over other contracts the company may have.

6. Defendant Secretary Wright claims that his order is authorized by the DPA. Defendants assert that Title I of the DPA "authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense" with respect to energy production. Defendants cite the *Declaring a National Energy Emergency* Executive Order (Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025)) (EO 14156) and generally claim that greenlighting the oil production and transportation from the Santa Ynez Unit through the Offshore Pipeline, processing facility, and Lines CA-324/325 is "necessary and appropriate to promote the national defense," and "maximize[s] domestic energy supplies" where those supplies are "scarce."

7. A legal opinion issued by the U.S. Department of Justice's Office of Legal Counsel 10 days before the Wright Order opined that an order signed by a Cabinet Secretary under the DPA fully preempts contrary state law, as well as existing contrary federal and state court orders. As a result, the Wright Order purports to authorize activity that is illegal or unauthorized under both state law, and federal law, and barred by existing court orders, by directing and compelling that lawless action from a privately owned oil company desperate for a shortcut to restarting its oil production from the Outer Continental Shelf through Lines CA-324/325 that have been shut down since the disastrous 2015 oil spill. Nothing in the DPA authorizes this usurpation of a State's sovereign property rights and police powers or the authority of the courts to enforce their own orders, and the federal Executive Branch's self-serving legal opinion to the contrary lacks merit.

8. The facts do not justify this overreach either. Restarting the flow of oil through Lines CA-324/325 does not fix any of these purported problems. Defendants' national defense and national energy emergency justifications are

4

First Amended Complaint for Declaratory and Injunctive Relief

patently unreasoned. To the contrary, the offshore platforms have a maximum expected gross oil rate of roughly 50,000 barrels per day, contributing a fraction of a percent to the domestic energy market. Although international conflict has driven up oil prices globally by reducing oil exports from the Middle East, there is no actual *shortage* of crude oil in the United States; the incremental oil production the Wright Order directs would thus neither address a shortage (because there is none) nor lower the cost of crude oil in the United States (because this miniscule incremental production would not have an impact on the global price of oil). And even if there were any marginal benefit to the "national defense," it would be vastly outweighed by the environmental and safety risks, as well as the unlawful and unconstitutional displacement of the State's police powers and the intrusion upon the State's sovereign property rights.

9.     Indeed, without this Court's intervention, the Wright Order would permit the federal government to order and authorize the restart of unpermitted and noncompliant infrastructure for oil and gas production and transportation in the State of California. Defendants improperly use the DPA to authorize sweeping preemption of state and federal regulatory frameworks governing oil and gas production and transportation, coastal management, environmental protections, property interests, and more. Such broad preemption is patently unauthorized by the DPA, and the Wright Order amounts to an unprecedented and historic grant of power to an oil corporation. If allowed to stand, the Wright Order would displace California's broad and comprehensive state environmental, pipeline safety, coastal management, sovereign property rights, and common law frameworks. Unlawfully bypassing any and all state requirements is an affront to the sovereignty of California and its right to manage its property and exercise its police powers within its own borders.

10.   Not only does the Wright Order seek to preempt California law, but it also seeks to authorize the pipeline operator to directly violate at least two separate

First Amended Complaint for Declaratory and Injunctive Relief

court orders—one from a state superior court and one from another federal court—requiring the operator to meet certain conditions before it can restart operating the Pipelines. This violation of the Constitutional separation of powers between the Executive and Judicial branches is yet another attempt by the current federal administration to undermine the rule of law and to eviscerate a co-equal branch of the federal government.

11.   To prevent these harms to Plaintiff, this Court should declare that the Wright Order is unlawful under the APA and violates the United States Constitution. For these and other reasons discussed below, the Wright Order should be declared unlawful and vacated.

## JURISDICTION AND VENUE

12.   This action arises under the United States Constitution, the APA (5 U.S.C. § 701 *et seq.*); the DPA (50 U.S.C. § 4501 *et. seq.*); and federal regulations implementing the DPA. This Court has subject matter jurisdiction pursuant to title 28 of United States Code, sections 1331 and 2201, subdivision (a). Jurisdiction is also proper under the judicial review provisions of the APA (5 U.S.C. § 702).

13.   Venue is proper in this judicial district under title 28 of the United States Code, section 1391, subdivision (e), because this is a civil action in which Defendants are agencies of the United States or officers of such an agency; the California Attorney General and the State of California have offices at 300 South Spring Street, Los Angeles, California, and therefore reside in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### Plaintiff

14.   Plaintiff the State of California is a sovereign State of the United States. Attorney General Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to

First Amended Complaint for Declaratory and Injunctive Relief

protect California's rights and interests and the resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11. The State of California administers its laws through various Executive Branch agencies and independent commissions of the State, including the Department of Forestry and Fire Protection's Office of the State Fire Marshal (OSFM), the Department of Conservation's Geologic Energy Management Division (CalGEM), the California Coastal Commission, the State Lands Commission, the California Department of Parks and Recreation (State Parks), the State and Regional Water Resources Control Boards, the Department of Fish and Wildlife and that department's Office of Spill Prevention and Response.

## Defendants

15.   Defendant Chris Wright is the Secretary of the United States Department of Energy, and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. § 7131.

16.   Defendant United States Department of Energy (DOE) is a cabinet agency within the Executive Branch of the United States government. 42 U.S.C. § 7131.

## ALLEGATIONS

**I.   Congress Enacted the DPA To Respond to Legitimate Needs for Goods and Services in Times of Emergency.**

17.   Congress enacted the DPA, 50 U.S.C. § 4501 *et seq.*, to provide the President, and Executive Branch officials by delegation, with authority to shape military preparedness and provide necessary industrial supplies for the national defense.

18.   The DPA authorizes the Executive to employ three tools to carry out its purpose. Title I of the DPA provides for the "allocation and prioritization" of government contracts for strategic and critical goods. Title III allows the Executive to utilize financial incentives to expand capacity. Title VII authorizes the Executive

First Amended Complaint for Declaratory and Injunctive Relief

to enter into voluntary agreements with private industry. (Other titles of the DPA have since expired and are no longer in effect.)[1]

19.   The cornerstone provision of the DPA is Title I (hereinafter referred to as "Section 101"), "Priorities and Allocations."[2] Section 101 authorizes the President to require industry to prioritize and give preference to federal contracts or orders over other contracts or orders.[3] Additionally, the President may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense."[4]

20.   The DPA defines "national defense" as "programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity," as well as "emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act and critical infrastructure protection and restoration."[5]

21.   Historically, the DPA has primarily been invoked for military contracts for goods and services and to react to a global crisis, such as the COVID-19 pandemic. The Executive has used the DPA to direct industry to prioritize the fulfillment of government contracts for specific goods it deemed critical and strategic, such as meat production[6] and medical supplies in response to COVID-19, and for the Department of Defense to "allocate" civilian aircraft for potential use by the government during a national defense emergency.[7]

---

[1] 50 U.S.C. § 4501 *et seq.*
[2] *See* 50 U.S.C. § 4511, or Section 101 of the DPA.
[3] 50 U.S.C. § 4511(a)(1).
[4] 50 U.S.C. § 4511(a)(2).
[5] 50 U.S.C. § 4552(14).
[6] *See* Exec. Order No. 13917, 85 Fed. Reg. 26,313 (Apr. 28, 2020).
[7] The allocation authority supports the Civil Reserve Air Fleet program, which was created initially in 1951, and is now managed by the U.S. Department of Transportation. Alexandra G. Neenan, *The Defense Production Act of 1950:*
(continued…)

First Amended Complaint for Declaratory and
Injunctive Relief

22. The Executive's authority under the DPA is limited by the text of the statute.

23. The DPA requires that orders issued under Section 101(a) adhere to Section 101(b), which governs the "use[]" of all "powers granted in [Section 101]."[8] Accordingly, Section 101(a) cannot be used to "control the general distribution of any material in the civilian market unless the President," or his delegee, "finds (1) that such material is a scarce and critical material essential to the national defense, and (2) the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship."[9]

24. Section 101(c) of the DPA confers a distinct grant of authority specifically directed at contracts and allocation orders for energy production. It provides that "[n]otwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders . . . relating to[] materials, equipment, and services in order to maximize domestic energy supplies," and the President must find that such an order would not conflict with another order already established under Section 101(a).[10] Critically, this authority is limited and may not be invoked to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that such materials, services, and facilities are scarce, critical, and essential to maintain or expand energy exploration, production, refining, or transportation; to conserve energy supplies; or to construct or maintain energy facilities; and that these

_____

*History, Authorities, and Considerations for Congress* (Oct. 6, 2023), available at https://www.congress.gov/crs-product/R43767.
[8] 50 U.S.C. § 4511(b).
[9] 50 U.S.C. § 4511(b).
[10] 50 U.S.C. § 4511(c)(1) & (3).

9                                    First Amended Complaint for Declaratory and
                                                              Injunctive Relief

objectives "cannot reasonably be accomplished without exercising" this authority.[11] These are required threshold findings of fact, not merely discretionary recitals.

25.   The DPA authorizes the President to delegate any of his authority granted under Section 101 to a federal agency. "The head of each Federal agency to which the President has delegated authority . . . shall [] issue, and annually review and update whenever appropriate, final rules, in accordance with [the APA's requirements for rule making (5 U.S.C. § 553)], that establish standards and procedures by which the priorities and allocations authority under this section is used to promote the national defense, under both emergency and nonemergency conditions."[12] The agency head must also, "as appropriate and to the extent practicable, consult with the heads of other Federal agencies to develop a consistent and unified Federal priorities and allocations system."[13]

26.   The Secretary of Energy has priorities and allocations authority under Section 101(a), but previously only had authority under Section 101(c) to make the "critical and essential" findings under Section 101(c)(2)(A).[14] The Secretary later received full authority under Section 101(c).[15] DOE first promulgated regulations in 1978 for its exercise of authority under the DPA. DOE has since amended those regulations several times. DOE currently has promulgated regulations containing procedures for its allocation and priorities authority under Section 101(a) and authority to make the "critical and essential" findings under Section 101(c)(2)(A).[16] DOE has yet to issue final rules, in conformance with Section 101(d)(1) of the

---

[11] 50 U.S.C. § 4511(c)(2).
[12] 50 U.S.C. § 4511(d)(1).
[13] 50 U.S.C. § 4511 (d)(2).
[14] Exec. Order No. 13,603 §§ 201(a)(2), 203, 803(a), 77 Fed. Reg. 16651 (Mar. 16, 2012) (EO 13603); *see, e.g.*, Exec. Order No. 12,919 §§ 201(a)(2) & 203, 59 Fed. Reg. 29525 (June 7, 1994).
[15] Exec. Order No. 14,391 § 2, 91 Fed. Reg. 13199 (Mar. 13, 2026) (EO 14391).
[16] *See* 10 C.F.R. §§ 216.1, 217.1.

First Amended Complaint for Declaratory and Injunctive Relief

DPA, that establish standards and procedures for the DOE's use of the full authority under Section 101(c).

27.  DOE's regulations pertaining to Section 101(a) describe various types of orders that the Secretary may issue under the DPA, including "allocation" orders and "rated" orders.[17] The regulations impose specific requirements on the content for each type of order. Allocation orders are defined as "official action[s] to control the distribution of materials, services, or facilities."[18] They must include "a detailed description of each required allocation action," "the specific start and end calendar dates for each required allocation action," a statement that it is an allocation order certified for national defense use, and a current copy of the regulations.[19] If an allocation order seeks to "control the general distribution of a material in the civilian market," the Secretary must also make the findings under Section 101(b) of the DPA.

28.  Rated orders are defined as a "prime contract, a subcontract, or a purchase order in support of an approved program issued in accordance with the provisions of this part."[20] A rated order must assign one of three priority levels: "DX" rated orders are prioritized over "DO" rated orders, which are prioritized over "unrated" orders.[21] Additionally, rated orders must include a program identification symbol denoting which currently approved program the order supports, the required delivery date for the order, and a statement that it is a rated order certified for national defense use.[22] The words "immediately" or "as soon as possible" are insufficient to satisfy the regulation's requirement of a required delivery date.[23]

29.  DOE's regulations relating to Section 101(c) of the DPA require DOE to use certain procedures and criteria when considering and making findings under

---

[17] 10 C.F.R. § 217.20.
[18] 10 C.F.R. § 217.20.
[19] 10 C.F.R. § 217.54.
[20] 10 C.F.R. § 217.20.
[21] 10 C.F.R. § 217.31(a).
[22] 10 C.F.R. §§ 217.31(b), 217.32.
[23] 10 C.F.R. § 217.32(b).

First Amended Complaint for Declaratory and Injunctive Relief

Section 101(c)(2)(A)—essentially, findings whether energy programs or projects "maximize domestic energy supplies and whether or not supplies of materials and equipment, services, or facilities are critical and essential."[24] In order to make the "maximize domestic energy supplies" and "critical and essential" findings, DOE must consider numerous factors related to a proposed energy project—including: (1) the quantity of energy involved, (2) the benefits of timely energy program furtherance or project completion, (3) socioeconomic impact, (4) the need for the end product for which the materials are allegedly required, (5) established national energy policies, (6) the availability and utility of substitute materials, and (7) the impact of the nonavailability of the specific materials on the furtherance or timely completion of the approved energy program or project—prior to the issuance of an order under Section 101(c).[25] Under these regulations, if DOE determines that the project meets the criteria under Section 101(c)(2)(A), DOE must communicate that determination and finding to the Department of Commerce (DOC), which determines whether the relevant supplies are scarce and whether "maintenance or furtherance of exploration, production, refining, transportation, or conservation of energy supplies or the construction or maintenance of energy facilities cannot be reasonably accomplished without exercising the authority specified in DPA section 101(c)."[26] If DOC makes those two findings, it will inform DOE, which must in turn notify the project that it may "use priority ratings under the Defense Priorities and Allocations System."[27]

30.   The DPA contains no provision indicating that it displaces judicial power or state power preserved by the Constitution or Congress in other statutes, coastal management, environmental protections, property interests, and more.

---

[24] 10 C.F.R. §§ 216.1(b), 216.4(a).
[25] 10 C.F.R. § 216.4.
[26] 10 C.F.R. § 216.1(c).
[27] 10 C.F.R. § 216.1(c).

First Amended Complaint for Declaratory and Injunctive Relief

31.  Finally, the DPA contains a sunset provision that requires Congress to periodically reauthorize it to retain effect. Notably, in 2009, Congress did not reauthorize the provision that allowed the President to use the DPA to requisition private property.

**II.  Faulty Maintenance of Line CA-324 Resulted in One of the Largest Oil Spills in California History and Extensive Damage to the State, and Authorizing Its Unlawful Restart by an Irresponsible Company Is a Dangerous Usurpation of California's Sovereign Property and Police Powers.**

32.  Defendants purport to use the Wright Order to direct a pipeline operator, Sable Offshore Corporation Sable), to restart production and transportation of oil and gas through pipelines that were shut down since a devastating oil spill in 2015. By way of background, the Wright Order pertains to several processes and pieces of infrastructure. Crude oil and other hazardous liquids are produced at three offshore drilling platforms off the Santa Barbara Coast (the Santa Ynez Unit) and transported by undersea pipelines—including through pipelines on lands leased from the California State Lands Commission—to a processing facility immediately onshore, called the Las Flores Canyon Processing Facility. There, the liquids and natural gas are separated and treated, and the processed oil product is then placed into different pipelines, Lines CA-324/325, that span more than 120 miles— including a portion of which is currently trespassing through Gaviota State Park— from the Santa Barbara County coast inland to Kern County, California, for storage and ultimately distribution. The Santa Ynez Unit, the Las Flores Canyon Processing Facility, the Offshore Pipelines and Lines CA-324/325 first came online between 1970 and the mid-1990s.

First Amended Complaint for Declaratory and Injunctive Relief



33. On May 19, 2015, Line CA-324 (then known as Line 901) ruptured, releasing over 120,000 gallons of heavy crude oil into the environment along the Santa Barbara coast at Refugio State Beach, which came to be known as the Refugio Oil Spill. The spill coated seven miles of shoreline with crude oil and tar balls and damaged beaches more than 100 miles down the coast.

34. Investigations determined that Lines CA-324/325's system designed to prevent corrosion used a defective design that could not be remediated. The investigation report determined that the cause of the rupture was external corrosion of the pipeline wall at the point of failure.

35. The Refugio Oil Spill caused widespread damage to California's natural resources, lands, and livelihoods. The spill oiled the Pacific Ocean and the coastal zone from Refugio Beach to as far south as Manhattan Beach in Los Angeles County.

First Amended Complaint for Declaratory and
Injunctive Relief

36. The spill adversely impacted natural resources under the trusteeship of the State of California, including marine mammals and fish, kelp and eelgrass, and it degraded marine and coastal habitats. It harmed migratory marine mammals and birds that spend a portion of their lifecycle within the waters of the Channel Islands National Marine Sanctuary. The California Department of Fish and Wildlife had to close commercial and recreational fishing. The spill also impeded shoreline and offshore recreation and boating at Channel Islands National Park and marred and closed Santa Barbara's beaches to public use and enjoyment.

37. Lines CA-324/325 were taken out of operation after the spill, and state and federal regulators, as mentioned, investigated the failure. Around that time, in 2016, the Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that Lines CA-324/325 were *intra*state pipelines, and that the State of California had authority to regulate and impose safety standards pursuant to the Pipeline Safety Act.[28] Regulatory authority over Lines CA-324/325 was then transferred from PHMSA to the California Department of Forestry and Fire Protection, Office of the State Fire Marshal (OSFM).

38. On May 12, 2020, the United States, California state regulatory agencies, and the University of California filed a civil action against then-owner and operator, Plains All American Pipeline Company (Plains), for causing the Refugio Oil Spill. *United States et al. v. Plains All American Pipeline*, Case No. 2:20-cv-02415 (March 13, 2020) (*United States v. Plains*).

39. State and federal agencies engaged in efforts that culminated in an agreed-upon Consent Decree, filed in 2020 in the Central District of California, which required that the operator pay over $60 million in damages and penalties, and which prescribed terms for any future restart of the Pipelines. The Court (Hon.

---

[28] *See* 49 U.S.C. § 60105.

First Amended Complaint for Declaratory and Injunctive Relief

Philip S. Gutierrez) signed the Consent Decree on October 14, 2020, which is a judgment binding all parties.

40. Plains was also found guilty of a felony and eight misdemeanors for failing to properly maintain these Pipelines.

41. The United States and California designated OSFM as the agency that is responsible for oversight of the Lines CA-324/325, consistent with PHMSA's confirmation of OSFM jurisdiction in 2016.

42. The Consent Decree requires that, prior to restarting Line 901 (now Line CA-324), Plains shall apply for a State Waiver (i.e., state approval to use anti-corrosion measures that differ from the federally required technology, cathodic protection) from OSFM. The Consent Decree also assigned OSFM the power to approve a restart plan and provided procedures for its modification and termination, as well as for the Court's retention of jurisdiction to enforce compliance with its terms. In its acquisition of Lines CA-324/325, Sable agreed to be bound by the Consent Decree.

43. For more than ten years, Lines CA-324/325 remained idle until March 14, 2026, when Sable restarted Lines CA-324/325 based on the Wright Order.

44. Since Sable acquired the Pipelines in 2024, it has consistently demonstrated that it is willing to cut corners and disregard legal compliance in its crusade to return to production to dig itself out of a financial hole.

45. In February 2024, Sable acquired the Santa Ynez Unit, Las Flores Canyon Processing Facility, and Lines CA-324/325 from ExxonMobil for a total of $625 million dollars, financed almost entirely by a $622 million loan from ExxonMobil.

46. Sable was and remains undercapitalized. As a condition of the acquisition, if Sable did not restart production by January 1, 2026, ExxonMobil had the right of reversion. The maturity date was extended to March 31, 2027, but with

First Amended Complaint for Declaratory and Injunctive Relief

a higher interest rate, pursuant to the Second Amendment to Senior Secured Term Loan Agreement.

47. Sable's precarious financial position dictated that it prioritize restarting the Pipelines quickly, above all else. Shortly after the acquisition, Sable began its venture to restart oil production at the Santa Ynez Unit, transport crude oil through Lines CA-324/325, and sell the oil commercially. In order to do so Sable ultimately opted to attempt to repair and augment the Pipelines instead of replacing them. Sable's crews began working on Lines CA-324/325 despite not having received several requisite permits or approvals.

48. By Plaintiff's knowledge and information, there are several active lawsuits to date related to the pipeline work and potential restart. Since early 2025, several state and local entities have issued administrative notices of violation and brought enforcement actions, and actions seeking other forms of relief, against Sable, alleging the company failed to comply with certain requirements of the state framework in performing pipeline maintenance and potential restart, including obtaining applicable property rights.[29] Sable, including its wholly-owned

---

[29] *See Sable Offshore Corp. et al. v. Cal. Coastal Comm'n*, Case No. 25CV00974 (Santa Barbara Super. Ct., Feb. 18, 2025) (Coastal Commission cross complained against Sable to enforce administrative orders, including fines for unpermitted repair work in the coastal zone); *People of the State of California v. Sable Offshore Corp.,* Case No. 25-000333 (Santa Barbara Super. Ct., Sep. 16, 2025) (Santa Barbara County District Attorney brought criminal charges alleging intentional violations of the California Water Code and Fish and Game Code related to the unpermitted repair work); *People of the State of California ex rel. Central Coast Reg'l Water Quality Control Bd. v. Sable Offshore Corp.*, Case No. 25CV06285 (Santa Barbara Super. Ct., Oct. 3, 2025) (alleging violations of the California Water Code involving failure to comply with an investigative order; failure to report waste discharges; and discharge of waste into "waters of the state" without permits); *Cal. Dep't of Parks and Recreation v. Sable Offshore Corp. et al.*, Case No. 26CV01759 (Santa Barbara Super. Ct., Mar. 17, 2026) (State Parks alleged trespass by Sable relating to use of the pipeline, including to transport oil through Gaviota State Park without a valid property interest) (removed Mar. 19,

(continued…)

First Amended Complaint for Declaratory and Injunctive Relief

subsidiaries, sued California regulators and local authorities for, *inter alia*, attempting to implement State law and taking enforcement action regarding Sable's legal violations.[30] Nonprofits have sued challenging OSFM's issuance of State Waivers for alternative anti-corrosion technology for Lines CA-324/325.[31] Sable removed this case to federal court, and the removal and remand motions are fully briefed and under submission of this Court.

49.   Importantly, the Santa Barbara County Superior Court issued a preliminary injunction on July 29, 2025, which enjoined Sable from restarting the Pipelines until 10 court days following the filing and service of notice by or on behalf of Sable that Sable has received all necessary approvals and permits for restarting the Pipelines, and that Sable intends to commence such restart. As of the date of this Complaint, that preliminary injunction remains in place—which Sable is now in violation of—despite Sable twice attempting to dissolve it. Nonprofits have also sued the United States Bureau of Oceanic Energy Management and

---

2026 into federal district court as *Cal. Dep't of Parks and Recreation v. Sable Offshore Corp. et al*., Case No. 2:26-cv-02946 (C.D. Cal.)).

[30] *See Sable Offshore Corp. et al. v. Cal. Coastal Comm'n,* Case No. 25CV00974 (Santa Barbara Sup. Ct., Feb. 18, 2025) (challenging the Coastal Commission's jurisdiction to enforce an administrative penalty); *Pac. Pipeline Co. v. State of California*, Case No. 1:26-cv-01486 (E.D. Cal, Sep. 29, 2025); *Sable Offshore Corp. v. Quintero,* Case No. 2:26-cv-02739 (C.D. Cal., March 13, 2026) (seeking declaratory relief related to issue of obtaining easement within Gaviota State Parks); *Sable Offshore Corp. v. Cal. Dep't of Conservation, Geologic Energy Mgmt. Div. et al.,* Case No. 26WM000036 (Sacramento Super. Ct., February 17, 2026) (challenging CalGEM's bond requirement for production facilities under Public Resources Code section 3205.8 and applicability of SB 1137).

[31] *Env't Def. Center et al. v. Cal. Dep't of Forestry and Fire Prot., Office of the State Fire Marshal et al.,* Case No. 25CV02247 (Santa Barbara Super. Ct, Apr. 15, 2025) and *Ctr for Biological Diversity et al. v. California Dep't of Forestry and Fire Prot., Office of the State Fire Marshal et al*., Case No. 25CV02244 (Santa Barbara Super. Ct, Apr. 15, 2025).

First Amended Complaint for Declaratory and Injunctive Relief

Bureau of Safety and Environmental Enforcement regarding federal leases for the Santa Ynez Unit.[32]

50.    On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. On October 22, 2025, OSFM informed Sable that the State Waivers required Sable to, before any restart, repair metal loss anomalies detected during in-line inspections and declined to approve the restart plan at that time.

51.    Rather than coming into compliance with the State Waiver requirements, on November 26, 2025, Sable instead petitioned PHMSA to reverse its position that the Pipelines are subject to State jurisdiction—which position was memorialized in the Consent Decree—and step in and unilaterally assume jurisdiction over the Pipelines. Sable's letter to PHMSA "notif[ied]" the agency of *Sable's* determination that the Pipelines were interstate— a determination that PHMSA must make, and one counter to PHMSA's longstanding determination —and asked that PHMSA assume exclusive authority over the Pipelines by redesignating them as interstate under the Pipeline Safety Act (49 U.S.C. § 60100 *et seq.*).

52.    On December 17, 2025, PHMSA adopted Sable's determination. The agency, in violation of the Consent Decree, issued an order redesignating the Pipelines as *inter*state, purporting to strip OSFM of its authority to regulate the *intra*state Pipelines, and declaring the Pipelines under PHMSA's "exclusive regulatory authority" (Federalization Order).

53.    On December 22, 2025, PHMSA issued a one-page letter approving Sable's Restart Plan for the Pipelines.

54.    On December 23, 2025, PHMSA issued an Emergency Special Permit to Sable, waiving compliance with certain requirements related to remediation of corrosion in the pipeline wall. PHMSA also stated that the granting of the

---

[32] *Ctr for Biological Diversity et al. v. Doug Burgum et al.,* Case No. 2:25-cv-02840, (C.D. Cal, Apr. 2, 2025); *Ctr for Biological Diversity et al. v. Debra Haaland et al.*, Case No. 2:24-cv-05459 (C.D. Cal, June 27, 2024).

First Amended Complaint for Declaratory and Injunctive Relief

Emergency Special Permit was necessary to address the energy emergency declared in EO 14156.

55.   On January 23, 2026, California filed a petition for review in the Ninth Circuit Court of Appeals challenging PHMSA's Federalization Order, PHMSA's approval of the restart plan, and the emergency special permit.[33]

56.   On February 26, 2026, Sable announced that it was abandoning its State Waivers, which are required by the Consent Decree before the Pipelines could be restarted, citing PHMSA's Federalization Order as the basis.

57.   Sable's restart of the Pipelines, absent the requisite permits and compliance with state and federal law, is an affront not only to California's police powers, but also the proper and safe regulation of the Pipelines and is alarming given the history of the Pipelines. Furthermore, Sable's loan indebtedness and pressure to restart before its assets revert to ExxonMobil, give the company an incentive to prioritize its own financial solvency over the safety and compliance of its project. Sable's desire to circumvent the law is not only borne out by its actions, but plainly evidenced by two letters requesting that federal regulators, first PHMSA and now DOE, help the company restart in circumvention of California's laws and rights and at least two court orders. Defendants' unprecedented act of government assistance to a single struggling oil company endangers the health and safety of California's residents and the environment.

**III.   The Wright Order Was Issued at Sable's Request To Restart the Pipelines by Bypassing State and Federal Law, Including Two Judicial Orders.**

58.   On December 12, 2025, Sable sent a letter to DOE requesting that it act under the DPA to authorize and order the restart of the Pipelines.[34]

---

[33] *State of California v. PHMSA et al.*, No. 25-508, consolidated with *Env't Defense Center v. PHMSA*, No. 25-8059 (9th Cir.).

[34] 50 Op. O.L.C __ (March 3, 2026) Slip Op. at 3, citing to a Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe,
(continued…)

First Amended Complaint for Declaratory and Injunctive Relief

59.   On March 3, 2026, the U.S. Department of Justice's Office of Legal Counsel issued an opinion entitled *Preemptive Effect of Defense Production Act Order on State Law* (OLC Opinion). 50 Op. O.L.C. __ (Mar. 3, 2026). At DOE's request, the OLC Opinion addressed whether an order issued under the DPA to Sable by the President or his delegee "would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure."[35] The OLC Opinion concluded that an "order issued under [the DPA] could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree . . . including those vesting authority over resumption of transportation [of oil through the Pipelines] with [OSFM]."[36]

60.   Shortly thereafter, on March 13, 2026, President Trump issued EO 14391, titled *Adjusting Certain Delegations Under the Defense Production Act*.[37] EO 14391 amended previous EO 13603, which delegated certain authorities of the President under the DPA to specified Executive department and agency heads, by adding the Secretary of Energy.

61.   That same day, the Wright Order was issued pursuant to Section 101.[38] Specifically, the Wright Order directs Sable to:

> . . . [I]mmediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS [Santa Ynez Pipeline System], including transportation service activities at the onshore facilities at Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.
>
> . . . [I]mmediately commence performance under current contracts or orders for services, including contracts or order hereinafter entered into or sought, for

Partner, Holland & Knight LLP, Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act at 1 (Dec. 12, 2025).

[35] *Id.* at 1.

[36] *Id.* at 22.

[37] EO 14391, *supra*, at n. 15.

[38] 50 U.S.C. § 4511; The Order was issued pursuant to the delegation of authority conferred on the Secretary by amended EO 13603.

First Amended Complaint for Declaratory and Injunctive Relief

> hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal;
>
> . . . .
>
> . . . [C]omply with this order immediately and to maintain that compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise.[39]

62.    The Wright Order restates Sable's claims that "the State of California is impeding it from resuming transportation of Santa Ynez Unit production through the SYPS" and that:

> California agencies have deployed an array of state measures—including [California Senate Bill No. 237 (2025), setting stricter conditions on restart of pipelines that have been idle, inactive or out of service for five years or more], the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[40]

63.    On March 14, 2026, one day after the Wright Order was issued, Sable restarted the Pipelines, in direct violation of the Consent Decree - which it is bound by - the preliminary injunction in the Santa Barbara County Superior Court, and all state and federal laws governing the restart. The restart also constitutes an intentional trespass across state owned property through Gaviota State Park.

64.    Sable immediately issued a press release and announced it "immediately complied" with the DPA Order and restarted pumping through the CA Lines 324/325 "*at the direction of the United States Secretary of Energy, Chris Wright.*"[41]

---

[39] Wright Order, ECF 23-1 at 3.

[40] *Id*. at 2.

[41] Sable Offshore Corp., *Sable Resumes Oil Flow as Ordered by the Federal DPA with Expected Gross Oil Rate of 50,000 Bbls/d and Expects First Sales by April 1, 2026* (Mar. 16, 2026), available at https://sableoffshore.com/news/news-
(continued…)

First Amended Complaint for Declaratory and Injunctive Relief

65. The DOE issued a press release and several statements confirming that Secretary Wright issued an order under the DPA directing Sable to immediately "restore the Santa Ynez Unit and Pipeline."

66. On March 17, 2026, Sable sent a letter to the U.S. Department of Justice and the California Department of Justice, also stating it had "complied with Order" and restarted the Pipelines, and that it was no longer going to abide by the Consent Decree.[42]

**IV. Secretary Wright Orders the Immediate Restart of the Pipelines in Direct Contravention of the DPA and Its Regulations.**

67. Secretary Wright issued the Wright Order pursuant to the DPA's Title I prioritization and allocation authority under Sections 101(a) and (c) that permits orders that compel the performance of government contracts with industry necessary to promote the national defense.

68. To the best of California's knowledge and belief, Sable is not part of a "program for military and energy production," nor is it supplying oil to a military program.

69. Although the Wright Order purports to proceed under Sections 101(a) and (c) of the DPA, it exceeds the Secretary's authority under each.

70. Under those provisions, the federal government may order a private actor to "prioritiz[e]" certain contracts over others and to honor a particular "allocat[ion]" of material and services among competing needs.

71. The Wright Order is interpreted by Defendants to do something quite different. It does not, for example, prioritize the production of oil over other activities Sable may want to pursue, nor does it prioritize sales of oil to some

---

details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx (emphasis added).

[42] Letter from Anthony C. Duenner, Executive Vice President, General Counsel and Secretary, Sable Offshore Corp., March 17, 2026.

First Amended Complaint for Declaratory and Injunctive Relief

purchasers over others. Rather, as interpreted and applied by the federal government, it directs and authorizes Sable to operate its Pipelines without regard to contrary law or court orders.

72.   Notably, the DPA's Title I regulations establish a "Department of Energy Priorities and Allocations Program" specifically for regulating the prioritization and allocation of government contracts with industry.[43]

73.   These Title I contracts are called "requirements contract," "basic ordering agreement," "prime vendor contract," or "similar procurement document . . . ."[44]

74.   The DPA regulations assign levels of priority to contracts based on a rating system that rates a contract as "DO" or "DX" or "unrated."[45] DX rated orders are prioritized over DO orders, and DO orders are prioritized over unrated orders. The Wright Order lacks any priority rating information.

75.   Any contracting decisions made under this system must be made with a "strong preference" for small businesses, especially those in economically depressed areas.[46] Sable is not a small business.

76.   Notably, the DPA's Title I regulations require that these prioritization contracts include a specific delivery date. The Wright Order does not include a delivery date. The word "immediately," as used in the Wright Order to authorize the restart, does not constitute a delivery date as required.[47]

77.   However, the Wright Order does not say, and no public information indicates, that Sable holds a Title I government contract or that Sable is required to sell its crude to the government in a Title 1 contract. The Wright Order also fails to state where, or to whom, Sable will sell the crude oil it produces.

---

[43] 10 C.F.R. § 217.3.
[44] 10 C.F.R. § 217.32.
[45] 10 C.F.R. § 217.31.
[46] 10 C.F.R. § 216.
[47] 10 C.F.R. § 217.32.

First Amended Complaint for Declaratory and Injunctive Relief

78.   The Wright Order also does not meet the regulatory requirements of an allocation order because it continues in perpetuity, without a start and end date, fails to include a detailed description of the required allocation actions, and does not comply with other details required by title 10 of the Code of Federal Regulations, section 217.54.

79.   It is simply inexplicable and unlawful for the Secretary to utilize the DPA's Title I authority to direct the wholesale and "immediate" restart of the Pipelines in the absence of any required Title I contracts, orders, or allocations.

80.   The Secretary's use of the DPA's Title I authority to order the immediate restart of the Pipelines out of the context of ordering the performance of a government contract or allocation order is incongruent with the statute and regulations that support the DPA's Title I power and amounts to an unprecedented abuse of power by the Secretary, and the order is contrary to law and arbitrary and capricious.

81.   Even if Sable had applied for or obtained a Title I government contract to supply its oil to the government, the Wright Order is still invalid because it fails to meet the threshold findings requirements of Title I.

82.   The DPA only authorizes the Secretary to require priority performance of contracts or allocation orders to maximize domestic energy supplies pursuant to Section 101(c) if two key findings are made.

83.   First, he must find that the covered "materials, services, and facilities are *scarce, critical, and essential*—(i) to maintain or expand exploration, production, refining, transportation; (ii) to conserve energy supplies; or (iii) to construct or maintain energy facilities" (emphasis added).

84.   Second, he must determine that the "maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities *cannot reasonably be*

First Amended Complaint for Declaratory and Injunctive Relief

*accomplished* without exercising the authority specified in paragraph (1) of this subsection"[48] (emphasis added).

85.   The law governing agency actions requires that these findings must be more than mere declarations, but rather, supported by sound reasoning that supports the choice made.

86.   The Wright Order contains no information in the order itself, nor does it cite to any documents that contain these required findings. However, on May 11, 2026, Defendants submitted documents attached to their Opposition (ECF 23) to Plaintiff's Motion for Preliminary Injunction and Stay that to California's knowledge, were not previously available to the public and were not cited or attached to the Wright Order. Defendants have not filed these documents in any of the related cases pending before this Court. These documents are dated March 13, 2026, the same date as the Wright Order, and purport to address findings required by Sections 101 (a) through (c), but they fall short.[49]

87.   For example, there is no information provided that describes the cost of extraction on the environment or community. Nor is there an identification of other energy sources or a comparison to other possible energy sources that might provide more energy independence with fewer impacts, such as a renewable energy source. The Secretary failed to adequately explain why the DOE chose to favor Sable's oil project above all others.

88.   The Order also fails to discuss the impact of another oil spill on California's economy.

89.   The impacts of the 2015 oil spill—which caused hundreds of millions of dollars of damage to California's natural resources and economy—coupled with the ongoing safety issues, are another vital piece of the problems surrounding Sable's restart that were ignored in the Wright Order. Indeed, the Wright Order and the

---

[48] 50 U.S.C. § 4511(c).
[49] See ECF 23-1, pp. 1190-1216 (Attachs. 2 and 3).

First Amended Complaint for Declaratory and Injunctive Relief

associated findings documents that Defendants produced post hoc make no mention of the 2015 oil spill and its severe, adverse impacts on California.

90.   The Wright Order also does not attempt to articulate why the Pipelines, in particular, are critical to the national defense. The Wright Order also does not allege that Sable is part of a national energy program or a national defense program. Nor does it state in the Order or the findings how much of Sable's oil would actually reach military end users. There is also no evidence of a fuel readiness gap provided by a credible military source that shows military fuel needs cannot be met without Sable's oil, as they have been for the last decade that the Pipelines have been shut down.

91.   The United States already produces significantly more oil and gas than it uses. It is the world's largest exporter of liquified natural gas and exports millions of barrels a day of crude oil. It has been a net energy exporter since 2019, when President Trump declared the nation energy independent.[50]

92.   The Wright Order fails to provide a rational basis that connects how ordering Sable to "require acceptance and prioritize performance" of "contracts" or "allocations" would promote the national defense.

93.   Defendants fail to rationally explain why the restart of Sable's pipeline must be "immediate" and circumvent state and federal law, as well as existing court orders. Defendants failed to explain which specific state and federal laws were keeping Sable from restarting the pipeline, why those laws were doing so, why

---

[50] U.S. Energy Information Admin., In-Brief Analysis: The United States was the world's largest liquified natural gas exporter in 2023 (Apr. 1, 2024), available at https://www.eia.gov/todayinenergy/detail.php?id=61683. U.S. Energy Information Admin., U.S. Exports of Crude Oil (Jan. 31, 2025), available athttps://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrexus1&f=a. U.S. Energy Information Admin., U.S. Energy Facts Explained (July 15, 2024), available at https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php.

First Amended Complaint for Declaratory and Injunctive Relief

displacing those laws was necessary for Sable to restart the pipeline to promote the national defense, and address the impacts of doing so. And by failing to address the 2015 oil spill and the failure of Sable's pipeline that caused it, Defendants have turned a blind eye to the whole reason the court orders were entered at all.

## V. The Wright Order Impermissibly Tries To Displace a Robust, Coordinated Apparatus of State Law and Attempts To Usurp State Agency Jurisdiction.

94.   In the three-page Wright Order, Secretary Wright gave Sable a convenient escape from compliance with state pipeline regulation and environmental, and land use laws that it, in multiple instances to date, has failed to comply with. This attempts to make inapplicable the comprehensive state regulatory framework governing the restart. Secretary Wright's use of the DPA to broadly authorize preemption of state law in the Wright Order is contrived, in direct conflict with the statute, and without lawful and reasoned explanation.

95.   The California regulatory framework governing the restart vests authority in eight different state agency regulators, who play crucial and interrelated roles in regulating the Pipelines restart. The state scheme is critical for California's safety.

96.   A variety of state laws apply to the restart. First, two California state laws and regulations govern pipeline safety and oil spill response.

97.   The Elder California Pipeline Safety Act of 1981, Cal. Gov't Code § 51010 *et seq.*, applies to public safety, risk reduction, and spill prevention of hazardous liquid pipelines within California. OSFM implements the law. California Senate Bill 237, which took effect January 1, 2026, amended the Elder California Pipeline Safety Act to require spike hydrostatic testing for any oil pipeline that has been idle, inactive, or out of service for five years or more.

98.   The Lempert-Keene-Seastrand Act of 1990, Cal. Gov't Code § 8574.1 *et seq.*, applies to oil spill prevention, preparedness and response. The Office of Spill Prevention and Response, within the California Department of Fish and Wildlife, implements the law.

28                    First Amended Complaint for Declaratory and Injunctive Relief

99. Second, California state laws and regulations govern the restart's impacts to water quality.

100. The Porter-Cologne Water Quality Control Act of 1969, Cal. Wat. Code, § 13000 *et seq.*, applies to the discharge of waste, stormwater, and land disturbances that could occur during pipeline repair or construction. The California State and Regional Water Quality Control Boards implement the law.

101. Third, California state laws and regulations govern the restart's impacts to wildlife and habitats.

102. The California Endangered Species Act of 1984, Cal. Fish & Game Code, § 2050 *et seq.*, applies to the management and protection of listed species. And section 1602 of the California Fish and Game Code requires a lake or streambed alteration permit if the pipeline's onshore activities may substantially adversely impact fish and wildlife. The California Department of Fish and Wildlife implements these laws.

103. Fourth, California state laws and regulations govern activity and development in the coastal zone. The California Coastal Act of 1976, Cal. Pub. Res. Code § 30000 *et seq.*, regulates development in the "coastal zone."[51]

104. California Senate Bill 237 amended the California Coastal Act clarifying that the repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more and is located in the coastal zone, such as the Pipelines, requires a new coastal development permit governed by the requirements of California Public Resources Code section 30262. Cal. Pub. Res. Code § 30262(b)(2). The California Coastal Commission implements these laws.

105. Fifth, California state laws and regulations apply to certain oil and gas production facilities, including the Las Flores Canyon Processing Facility.

---

[51] Cal. Pub. Res. Code § 30103.

First Amended Complaint for Declaratory and Injunctive Relief

106. Sections 3106, 3224 and 3270 of the California Public Resources Code ensure that operators carry out oil and gas production, operation, and decommissioning of "production" facilities in a manner that prevents damage to the health and safety of California's citizens, or damage to the environment and natural resources. CalGEM implements these laws.

107. Furthermore, the Pipelines cross state land and are subject to state property law. The State's lands are administered and managed by several state agencies.

108. The California State Lands Commission issues and manages leases for existing oil and gas operations in State waters. The California State Lands Commission currently holds two of Sable's undersea pipelines leases, one for oil and one for natural gas, that together connect the Santa Ynez Unit offshore platforms to the Santa Ynez Pipeline System and onshore Las Flores Canyon Facilities and Onshore Pipelines.

109. State Parks may grant easements for oil or gas pipelines on property that it owns.[52] Because the onshore Pipelines cross approximately four miles of Gaviota State Park, which is owned by State Parks, Sable must obtain an easement from State Parks to run its oil across state land.

110. Sable does not currently have any easement rights or other property rights that allow it to transport oil through Gaviota State Park.

111. In 1987, State Parks granted an easement to Sable's predecessor-in-interest, Celeron Pipeline Company of California, to transport hydrocarbon substances through the segment of Line CA-325 (then Line 903) that crossed Gaviota State Park. This easement was for a term of 30 years. It began on July 28, 1986, and expired on July 27, 2016.

112. Since 2016, State Parks has issued annual Right of Entry (ROE) permits to Sable's predecessors-in-interest or companies affiliated with Sable that have

---

[52] Cal. Pub. Res. Code § 5012.

First Amended Complaint for Declaratory and
Injunctive Relief

allowed them to access Gaviota State Park in order to perform maintenance on the then-dormant Line CA-325.

113. The ROE permits are not easements. Sable does not currently have any easement rights or other property rights that would allow it to transport oil through Gaviota State Park. The ROEs are necessary because Sable does not have an easement that would otherwise allow it to access the Park.

114. To the extent the Wright Order directs Sable to trespass on state land by operating without an easement, the Order infringes on state property rights and is unconstitutional.

115. In the days following Sable's March 14, 2026 restart announcement, State Parks, the State Lands Commission and the California Coastal Commission issued letters to Sable seeking confirmation from that company that it would adhere to state law obligations. State Parks received no responses to its letter.

116. Through these state agencies, the State of California carefully exercises its police powers to protect the public health and welfare as required by the Legislature of the State of California through its duly enacted laws. The DPA does not authorize the Secretary to issue an order that preempts California's laws.

## VI. Defendants Impermissibly Wield Executive Power To Abrogate Federal Law and Judicial Orders.

117. The Wright Order, if allowed to stand, purports to subvert a vast array of long-standing federal laws, a federal judicial Consent Decree, and at least one state preliminary injunction that put conditions on any restart of the Pipelines. The DPA contains no provision that allows it to direct Sable to circumvent federal law, the Consent Decree that arose from the devastating Refugio Oil Spill and pipeline safety problems from the Pipelines, or the state court's preliminary injunction. While actions to enforce the Consent Decree and preliminary injunction are pending in the courts that issued those orders—and thus the State does not ask this Court to enforce those orders itself against nonparty Sable—the Wright Order's

First Amended Complaint for Declaratory and Injunctive Relief

suggestion that it could upend those judicial orders is infirm and should be invalidated.

118. In addition to California's regulatory framework governing the safe and secure production of oil from Sable's Pipelines, there are several federal statutes that are not preempted by the DPA, such as the Pipeline Safety Act, the Submerged Lands Act, and the Coastal Zone Management Act.

119. Furthermore, the Consent Decree and preliminary injunction are judicial orders that Sable must comply with, and the Wright Order cannot modify or abridge them.

120. Sable has not met the conditions for restart. The DPA does not authorize the Secretary to use a Title I DPA Order to sidestep Judicial Orders and require Sable to restart "immediately" in violation of the Consent Decree and preliminary injunction.

**VII. Defendants' Actions Harm California.**

121. Without this Court's intervention, the Defendants' unlawful use of the Wright Order voids state laws and infringes on state property rights, resulting in harms to California.

122. Defendants' interpretation and use of the Wright Order is an affront to, and usurpation of, the traditional police powers delegated to the states, in that it seeks to override any and all California laws that stand in the way of the restart of the Pipelines. The Wright Order also tramples over California's property rights to the extent it purports to allow Sable to operate Line CA-325 through a state park without an easement—or the safety and environmental conditions the Department of Parks and Recreation previously imposed under a now-expired easement—and to operate the Offshore Pipeline through leases from the California State Lands Commission without abiding by lease terms, including those mandating compliance with all other state laws.

First Amended Complaint for Declaratory and Injunctive Relief

123. Without cathodic protection or the safe alternative required by the State Waivers, there is also increased risk of oil spills in the Pipelines.

124. Spills resulting from restarting the Pipelines under a handcuffed state regulatory framework would have serious environmental impacts across multiple categories, including water quality safety, coastal protection, and species protection.

125. Given the devastating impact of the Refugio Oil Spill and Sable's numerous pipeline safety violations, Sable's unlawful restart poses significant risks to California's economy, natural resources, and communities' health, safety, and welfare.

## CAUSES OF ACTION

### COUNT I

**Violations of Administrative Procedure Act, § 706(2)(A)-(C)**
**Contrary to Law, In Excess of Statutory Authority**

126. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

127. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

128. The APA also provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review." 5 U.S.C. § 704.

129. An agency may not take any action that exceeds the scope of its statutory authority or violates federal law.

130. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . an abuse of discretion, or otherwise not accordance with law,  [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) – (C).

33

First Amended Complaint for Declaratory and Injunctive Relief

131. Agency action is not in accordance with the law if the agency fails to interpret and implement the statutory language consistent with the statute's text, structure, and purpose.  Defendants may only exercise authority conferred by statute. Agency action is also not in accordance with law if agency action is inconsistent with applicable federal regulations.

132. Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not amount to deference—rather, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109) (2015) (Scalia, J., concurring in judgment)).

133. The Wright Order is a final agency action that is reviewable under the APA. 5 U.S.C. § 551.

134. The President's involvement with the Wright Order began and ended with EO 14391, delegating Section 101(c) authority to the Secretary of Energy. The President neither issued nor directed DOE to issue the Wright Order. Secretary Wright exercised independent discretion to issue the Wright Order.

135. Defendants have no authority under the DPA to immunize Sable from compliance with state and federal laws and Court Orders, including the Consent Decree and preliminary injunction. There is no express nor implied authority in the DPA to preempt all relevant state and federal laws governing the restart. If allowed to stand, this illegal assertion of authority to displace a broad regulatory framework

First Amended Complaint for Declaratory and Injunctive Relief

could have wide-ranging applications and extend beyond judicially enforceable limits.

136. In addition, to the extent the Wright Order purports to preempt Plaintiff's right to own, manage, and dispose of its own land in Gaviota State Park, Defendants have no authority for such preemption absent a clear congressional judgment. *See, e.g.*, *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993). Defendants unlawfully claim power beyond what Congress intended when it enacted the DPA.

137. The Wright Order is not valid because it is contrary to the requirements for contract prioritizations and allocation orders codified in the statute and regulations, which specifically apply to government contracts and government contractors, conditions that are not applicable here.

138. The Wright Order is contrary to Title I's required specificity in description of contract prioritizations and allocations. The Wright Order lacks specificity as to any Title I contracts, orders, or allocations that Sable must enter into. The Wright Order fails to state where, or to whom, Sable will sell its crude from the Pipelines.

139. The Wright Order does not meet the regulatory requirements of an allocation order because it continues in perpetuity, without a start and end date, fails to include a detailed description of the required allocation actions, and does not comply with other details required by title 10 of the Code of Federal Regulations, section 217.

140. Even if the Wright Order otherwise complied with the DPA, it would not have the sweeping preemptive scope that Defendants claim. Nothing in the DPA purports to preempt all state laws and regulations that affect or apply to contracts governed by the DPA.

First Amended Complaint for Declaratory and Injunctive Relief

141. Pursuant to title 5 of the United States Code, section 706, and title 28 of the United States Code, section 2201, Plaintiff is entitled to a declaration that Defendants lack legal authority under the DPA and its implementing regulations in issuing the Wright Order, and, in so doing, acted contrary to law and in violation of the APA.

142. Plaintiff is also entitled to vacatur of the Wright Order pursuant to title 5 of the United States Code, section 706.

## COUNT II

### Violation of Administrative Procedure Act 5 U.S.C. § 706(2)(A) Arbitrary and Capricious

143. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

144. Defendants are included as "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and the Wright Order is agency action subject to review under the APA.

145. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

146. Agency action is arbitrary and capricious if the agency fails to consider important factors, considers issues that Congress did not intend for it to consider, or fails to articulate a reasoned explanation for the action.

147. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

First Amended Complaint for Declaratory and Injunctive Relief

148. An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

149. An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id*. at 785. Agency action taken on pretextual grounds violates the APA's requirements of reasoned agency-decision-making.

150. The Wright Order and its supporting documents, including the findings required under Section 101(a), (b) and (c), fail to provide a rational basis explaining how ordering Sable to "require acceptance and prioritize performance" of "contracts" or "allocations" would promote the national defense or maximize domestic energy supplies.

151. The Defendants provide no reasoned basis and fail to explain why and how the restart of oil production and transportation from the Santa Ynez Unit through the Offshore and Lines CA-324/325 is necessary to "promote the national defense" as defined in the DPA. Accordingly, Defendants' national defense determination is arbitrary and capricious.

152. The Defendants failed to consider important aspects of the problem, including but not limited to the past failure of Sable's pipeline that caused the 2015 oil spill and the resulting impacts on California, the fact that immediately restarting transportation of crude oil through the Pipelines would violate state and federal law and Court Orders, and the significant risk that restarting the pipeline poses to California's economy, natural resources, and communities' health, safety, and welfare, thereby rendering the order arbitrary and capricious.

First Amended Complaint for Declaratory and Injunctive Relief

153. Further, the Wright Order contains no reasoning as to the impact it would have, if allowed to stand, on California's state regulatory framework.

154. Pursuant to title 5 of the United States Code, section 706, and title 28 of the United States Code, section 2201, Plaintiff is entitled to a declaration that the Wright Order violates the APA because it is arbitrary and capricious.

155. Plaintiff is also entitled to vacatur of the Wright Order pursuant to title 5 of the United States Code, section 706.

**COUNT III**

**Violation of the U.S. Constitution
Separation of Powers**

156. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

157. Article III, Section 1 of the United States Constitution vests the judicial Power of the United States in federal courts. U.S. Const., art. III, § 1.

158. It is the constitutional role of the judiciary to control, by Article III judges, the interpretation, declaration, and application of federal law. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 76-81 (1982).

159. The Constitution identifies specific roles for the Executive in the lawmaking process, via the Recommendation Clause and the Presentment Clause, which creates the President's veto power; outside these roles, the Executive Branch has no authority to change the law to suit the President's policy. U.S. Const., art. II, § 3; *id*. § 7, cl. 2; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

160. Congress cannot vest review of Article III court decisions in Executive Branch officials, and, by extension, the legislative and Executive Branches cannot unilaterally override judicial determinations. Separation of powers principles protect judicial independence by ensuring that once a court renders a decision, it cannot be subject to Executive revision or nullification. Congress also possesses the

38

power to legislate. Article I, Section 1 of the U.S. Constitution states "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const., art. I, § 1.

161. The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

162. With the Wright Order, Defendants attempt to usurp the judiciary's authority to modify or reverse judicial judgments in direct violation of the separation of powers. The Executive Branch's attempt to overrule the careful judgements of the Judicial branch by ordering Sable to restart is in direct contravention of the Consent Decree and the preliminary injunction, both judicial orders. Because the Consent Decree is an exercise of this court's Article III power, only an Article III court can modify or retract it.

163. Defendants violated constitutional separation of powers constraints because, through the Wright Order, Defendants claim to have overridden Congress's considered judgments by attempting to broadly preempt state law, when the text of the DPA does not empower Defendants to do so.

164. Further, Defendants impermissibly attempt to substitute the President's policy priorities for the will of Congress in enacting the DPA.

165. Plaintiff is aggrieved persons suffering a legal wrong or adversely affected by Defendants' conduct under title 5 of the United States Code, section 702.

166. Pursuant to title 28 of the United States Code, section 2201, Plaintiff is entitled to a declaration that the Wright Order violates the constitutional principles of separation of powers doctrine and impermissibly arrogates to the Executive Branch power that is reserved to the Judicial branch.

First Amended Complaint for Declaratory and Injunctive Relief

## COUNT IV

**Violation of the Tenth Amendment to the U.S. Constitution
Sovereign Interests**

167. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

168. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const., amend. X.

169. Each state as a sovereign has reserved power to own, manage, and dispose of its property, including state parkland.

170. To the extent the Wright Order directs Sable to trespass on state land in Gaviota State Park by operating even without an easement, or to force California to grant Sable an easement or other property right to transport oil through Gaviota State Park, the Order infringes upon California's sovereign power to own, manage, and dispose of its property.

171. Defendants have no authority under the DPA to infringe upon or preempt California's sovereign power to own, manage, and dispose of its property. A state's power to own, manage, and dispose of its property is not subject to preemption absent a clear congressional judgment. *See, e.g., Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993); *Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017).

172. And the federal government has no constitutional power to commandeer state property for federal ends in violation of the Tenth Amendment, including by compelling the state to give a private company free use of that property in potential violation of the State's own constitutional prohibition on gifting public funds or things of value to private parties (Cal. Const., art. XVI, § 6).

40

First Amended Complaint for Declaratory and Injunctive Relief

173. If Congress intends to override a state's right to own, manage, and dispose of its own property, it must speak clearly as to such intention, which it has not done in the DPA.

174. Plaintiff is an aggrieved person suffering a legal wrong or adversely affected by Defendants' conduct under title 5 of the United States Code, section 702.

175. Pursuant to title 28 of the United States Code, section 2201, Plaintiff is entitled to a declaration that, to the extent the Wright Order directs Sable to trespass on state land in Gaviota State Park by operating even without an easement, or to force California to grant Sable an easement or other property right to transport oil through Gaviota State Park, the Wright Order violates the Tenth Amendment to the U.S. Constitution.

## COUNT V

### *Ultra Vires* – Conduct in Excess of Statutory Authority

176. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

177. Neither the President nor an agency can take any action that exceeds their constitutional or statutory authority.

178. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

179. By using the Wright Order to broadly authorize Sable to disregard state and federal law, as well as orders issued by the state and federal courts, Defendants have acted contrary to law and outside the authority granted to them under the DPA. *See Murphy Company v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023).

First Amended Complaint for Declaratory and Injunctive Relief

180. Because Defendants have acted in excess of their delegated powers under the DPA, Plaintiff is entitled to a declaration under title 28 of the United States Code, section 2201, that Defendants' actions are ultra vires and that Defendants' use of the Wright Order to broadly preempt California law is not authorized under the DPA.

181. Plaintiff is also entitled to an injunction prohibiting Defendants, and all those acting in concert with Defendants, from enforcing or relying on the Wright Order in a manner that violates California law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

1. Issue a judicial declaration that the Wright Order is unconstitutional and/or unlawful because it violates the APA and the U.S. Constitution;

2. Issue a judicial declaration that Defendants' actions are ultra vires;

3. Vacate the Wright Order pursuant to title 5 of the United States Code, section 706;

4. Enjoin Defendants from invoking the Wright Order to authorize or compel operation of Lines CA-324/325, and from allowing anyone operating as Defendants' agents or working in concert with them to rely on or invoke the Wright Order to operate the Santa Ynez Unit and the Pipelines without having received necessary state-law approvals and without satisfying the terms of court orders;

5. Grant other such relief as this Court may deem proper.

42                                    First Amended Complaint for Declaratory and
                                                         Injunctive Relief

Dated: July 20, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN, JR.
Supervising Deputy Attorney General
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
Deputy Attorney General

_____

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

First Amended Complaint for Declaratory and Injunctive Relief