James P. Duffy (*pro hac vice* forthcoming)
Ridgeline Center for Law and Policy
712 H Street NE, Suite 90006
Washington, DC 20002
(802) 233-7967
jay.duffy@ridgelinecenter.org

Cara Horowitz (Bar No. 220701)
405 Hilgard Avenue
Los Angeles, CA 90095
(310) 206-4033
Horowitz@law.ucla.edu

*Attorneys for* Amici Curiae

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>*Plaintiff*,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>*Defendants*,<br><br>and<br><br>SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,<br><br>*Intervenor-Defendants*. | Case No. 2:26-cv-3396-SVW-SCC<br><br>**[PROPOSED] MEMORANDUM OF POINTS AND AUTHORITIES OF AMICI CURIAE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**<br><br>Hearing Date: October 5, 2026<br>Time: 1:30 pm<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICI CURIAE* ........ 1

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. National-security and emergency assertions do not excuse compliance with statutory prerequisites. ........ 2

II. The Wright Order fails to satisfy the DPA's statutory predicates. ........ 3

A. The Wright Order identifies neither a military-fuel shortfall nor how Sable's crude oil or the SYPS could meet one. ........ 5

B. DLA Energy's approach to military-fuel security undermines the Wright Order's asserted national-defense need. ........ 6

III. DOE invoked national defense as a pretext for the Wright Order. ........ 8

A. DOE's stated rationale reflects the Administration's domestic energy agenda, not a national-defense need. ........ 8

B. The circumstances surrounding the Wright Order point to favoritism toward Sable, not national defense. ........ 9

CONCLUSION ........ 12

CERTIFICATE OF COMPLIANCE ........ 14

APPENDIX ........ 15

# TABLE OF AUTHORITIES

**Cases**

*Anthropic PBC v. Dep't of War*,
825 F. Supp. 3d 1101 (N.D. Cal. 2026) ........ 3

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ........ 3

*Doe v. Trump*,
957 F.3d 1050 (9th Cir. 2020) ........ 9

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) ........ 2, 9

*Naswood v. Banks*,
No. EDCV 09-1675-SVW (DTB), 2011 U.S. Dist. LEXIS 175523 (C.D. Cal. Sep. 12, 2011) ........ 4

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026) ........ 3

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ........ 4

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025) ........ 3

*Oregon v. Trump*,
165 F.4th 1158 (9th Cir. 2025) ........ 9

*PBC v. Dep't of War*,
No. 3:26-cv-01996-RFL, 2026 U.S. Dist. LEXIS 194178 (N.D. Cal. Aug. 27, 2026) ........ 2, 3

*RENEW Ne. v. Dep't of the Interior*,
No. 25-cv-13961, 2026 U.S. Dist. LEXIS 87471 (D. Mass. Apr. 21, 2026) ........ 4

*Roman Catholic Diocese v. Cuomo*,
592 U.S. 14 (2020) .......... 2

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .......... 2

**Statutes**

50 U.S.C. § 4502(a)(5) .......... 1

50 U.S.C. § 4511 .......... 3

**Administrative and Executive Materials**

DLA Energy, *Archived Fact Books*,
https://www.dla.mil/Energy/About/Library/ .......... 5

DLA Energy, *DLA Energy's Pacific Pivot Begins in the Americas* (June 24, 2015) .......... 7

DLA Energy, *Fiscal Year 2019 Fact Book* .......... 7

DLA Energy, *Fiscal Year 2022 Fact Book* .......... 7

DLA Energy, *Fiscal Year 2025 Fact Book* .......... 5

DLA Energy, *Fueling the Military's Objectives: DLA Energy's Agile Contracting Powers Missions in the Western Hemisphere* (June 15, 2026) .......... 7

DOE, *Naval Petroleum Reserves,*
https://www.energy.gov/hgeo/opr/naval-petroleum-reserves .......... 5

**Other Authorities**

Br. of Energy Law Scholars *Amici Curiae* in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss, *Washington v. Trump*,
No. 2:25-cv-00869 (W.D. Wash. May 13, 2026) .......... 4

Erika Kranz, Env't & Energy L. Program at Harv. L. Sch., *One Year of Trump's "Energy Emergency" in Context and in Court* (Jan. 21, 2026) .......... 4

Ian M. Stevenson, James Bikales & Scott Waldman, *White House Official's Move to Oil Company She Aided Raises Ethics Questions*, POLITICO (Aug. 21, 2026) .......... 12

Just Security, *The "Presumption of Regularity" in Trump Administration Litigation* (4th ed.) .......... 8

Letter from Senator Adam B. Schiff et al., Members of Cong., to Jim Flores, Chairman & CEO, Sable Offshore Corp. (May 27, 2026) .......... 12

Nasdaq, *Sable Offshore Corp. Common Stock (SOC) Historical Quotes* .......... 10

Sable Offshore Corp., *Form 8-K* (Nov. 3, 2025) .......... 10

Sable Offshore Corp., *Form 10-K* (Feb. 27, 2026) .......... 10

Sable Offshore Corp., *Form 10-Q* (Aug. 12, 2025) .......... 10

Sable Offshore Corp., *Q2 2026 Investor Presentation* (Aug. 10, 2026) .......... 6

Sable Offshore Corp., *Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025* (May 19, 2025) .......... 10

Sable Offshore Corp., *Second Amendment to Senior Secured Term Loan Agreement* (Nov. 3, 2025) .......... 10

Sam Koppelman & Till Daldrup, Hunterbrook Media, *Exclusive: Exxon Spinout Sable Leaked Key Info To Investors Including Golfer Phil Mickelson* (Oct. 31, 2025) .......... 11

Till Daldrup & Jacob Hutt, Hunterbrook Media, *Zombie Pipeline: Why Sable is Still a Pipe Dream*, (Jan. 23, 2026) .......... 10

Tr. of Mot. Hr'g, *Vineyard Wind 1, LLC v. Dep't of the Interior*, No. 1:26-cv-10156-BEM (D. Mass. Jan. 30, 2026), ECF No. 79 .......... 8

Tr. of Prelim. Inj. Hr'g, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026), ECF No. 65 .......... 3, 8

## INTEREST OF *AMICI CURIAE*

*Amici Curiae* include Members of Congress listed in the attached appendix. They have a strong institutional interest in preserving Congress's constitutional and statutory role in defining the scope of Executive Branch authority. Many represent California and/or serve on committees with jurisdiction over energy and environment, as well as national security. *Amici Curiae* therefore have a particular interest in ensuring that the Executive Branch exercises its authority under the Defense Production Act of 1950 ("DPA") only when the statute's required predicates are satisfied and within the bounds Congress prescribed.

*Amici Curiae* also include Paasha Mahdavi, an Associate Professor of Political Science and Affiliated Professor of Environmental Science & Management at the University of California, Santa Barbara, where he directs the Energy Governance and Political Economy Lab. His peer-revied research focuses on the political economy of the oil and gas industry, with independent applications to Sable Offshore Corp.'s ("Sable") production capacity and the impacts of its operations on domestic energy markets.

## INTRODUCTION

This case is not about national defense. It is about a heavily leveraged, crude-oil company asking the President to transform the DPA from a statute designed to "assure the availability of domestic energy supplies for national defense needs," 50 U.S.C. § 4502(a)(5), into a corporate rescue operation for political allies; a rescue that advances the Administration's political preference for fossil-fuel development at the expense of all other concerns. The Department of Energy's ("DOE") March 13, 2026 order (the "Wright Order") comes nowhere close to identifying a need for Sable crude oil or pipelines in the Order's generalized invocation of California's military presence and increased reliance on foreign crude. DOE never explains why

those general circumstances create a national-defense need for Sable's crude, much less how restarting its beleaguered pipelines would meet one.

Merely invoking "national defense" or an "emergency" does not insulate executive action from the statutory prerequisites that Congress imposed in the DPA on the exercise of delegated authority. Enforcing these requirements, i.e., that the Secretary establish the statutory predicates for invoking the DPA, does not amount to second-guessing genuine executive judgments about national defense. Instead, enforcement honors the conditions precedent Congress imposed to prevent abuse of the DPA. DOE's failure to satisfy these statutory prerequisites invalidates the Wright Order.

## ARGUMENT

### I. National-security and emergency assertions do not excuse compliance with statutory prerequisites.

"[N]ational-security concerns must not become a talisman used to ward off inconvenient claims." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017). Courts have reiterated that the "empty invocation of national security is not a blank check." *PBC v. Dep't of War*, No. 3:26-cv-01996-RFL, 2026 U.S. Dist. LEXIS 194178, at *10–11 (N.D. Cal. Aug. 27, 2026). And the Supreme Court in *Learning Resources, Inc. v. Trump* invalidated "unbounded" tariffs based on asserted emergency authority, emphasizing Congress's use of "procedural prerequisites" and "careful constraints" when conferring the claimed tariff authority in other statutes. 607 U.S. 229, 244, 251 n.4, 308 ("tight restraints" and "strict procedural constraints") (2026). Deference to national-security or emergency determinations cannot license "wholesale judicial abdication." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 30 (2020) (Kavanaugh, J., concurring).

These principles play a vital role where Congress has conditioned delegated authority on statutory prerequisites. Even applying a deferential standard, the Ninth

Circuit required predicate findings to meet the requirements of good faith and "a colorable assessment of the facts and law within a range of honest judgment." *Newsom v. Trump*, 141 F.4th 1032, 1047–51 (9th Cir. 2025). Over and over, across a range of statutory authorities, courts have rejected this Administration's asserted national-security rationales where the record revealed a lack of factual support, contradictions in the stated justification, predetermined outcomes, or irregular procedures. *E.g.*, Tr. of Prelim. Inj. Hr'g 42:4–45:01, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026), https://tinyurl.com/mts5yuhu; *Anthropic PBC v. Dep't of War*, 825 F. Supp. 3d 1101, 1133 (N.D. Cal. 2026); *PBC v. Dep't of War*, 2026 U.S. Dist. LEXIS 194178, at *9–10; *Nat'l TPS All. v. Noem*, 166 F.4th 739, 771–74 (9th Cir. 2026) (Mendoza, J., joined by Wardlaw, J., concurring), *reh'g denied*, 169 F.4th 796 (9th Cir. 2026), *overruled on other grounds by Mullin v. Doe*, 146 S. Ct. 2121 (2026).

The DPA requires predicate findings concerning, among other things, scarcity, criticality, essentiality to national defense, and whether the asserted need can otherwise be met; it is not a freestanding license to control the "normal distribution" of products "in the civilian market." 50 U.S.C. § 4511. "Deference" does not relieve DOE or the President from those statutory prerequisites or permit conclusory assertions to substitute for the factual basis that Congress required. The Executive Branch must provide "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public," not explanations that are "contrived" or "incongruent with" the record. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Hand-waving about "national security" is not enough.

## II. The Wright Order fails to satisfy the DPA's statutory predicates.

DOE fails to articulate why Sable's crude-oil production and operation of the Santa Ynez Pipeline System ("SYPS") (lines CA-324 and CA-325) are "necessary" for national defense. *See* Am. Compl., ECF No. 72 ¶¶ 90, 91–93, 150–51. The Order

fails to identify any specific military need for crude oil or even explain how Sable's crude will be refined and ultimately distributed for military use. *See id.* ¶¶ 77, 91–93, 148, 150–51. Instead, DOE invokes generalities: California's gasoline prices, declining crude-oil production, reliance on imported crude, and limited pipeline infrastructure—without further explanation. *See id.* ¶¶ 90–93; Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. and Stay, ECF No. 23, Ex. A, at 59. Those generalized concerns do not connect Sable's operations to any specific national-defense need or otherwise satisfy the DPA's statutory prerequisites.

Nor can the President's January 2025 declaration of a national "energy emergency" fill that gap. That declaration itself is pretextual, *see generally* Br. of Energy Law Scholars *Amici Curiae* in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss, *Washington v. Trump*, No. 2:25-cv-00869 (W.D. Wash. May 13, 2025), https://tinyurl.com/57c5m627, and merely reflects a policy preference for fossil-fuel development, not any actual energy-supply emergency, *see generally* Erika Kranz, Env't & Energy L. Program at Harv. L. Sch., *One Year of Trump's "Energy Emergency" in Context and in Court* (Jan. 21, 2026), https://tinyurl.com/9pru5vrs.[1] In any event, a presidential directive neither expands an agency's statutory authority nor excuses compliance with the Administrative Procedure Act. *See Nebraska v. Su*, 121 F.4th 1, 17 (9th Cir. 2024); *RENEW Ne. v. Dep't of the Interior*, No. 25-cv-13961, 2026 U.S. Dist. LEXIS 87471, at *64–65 (D. Mass. Apr. 21, 2026). The "emergency" declaration therefore cannot supplant DPA prerequisites nor fill in missing connection between Sable's operations and "national defense." The Wright Order fails at each step.

[1] The Court may take judicial notice of this and other documents cited herein *sua sponte*. *Naswood v. Banks*, No. EDCV 09-1675-SVW (DTB), 2011 U.S. Dist. LEXIS 175523, at *7 n.2 (C.D. Cal. Sep. 12, 2011).

### A. The Wright Order identifies neither a military-fuel shortfall nor how Sable's crude oil or the SYPS could meet one.

While the materials supporting the Wright Order vaguely gesture at the military presence in California and foreign oil dependence potentially causing fuel supply risk, ECF No. 23, Ex. A, at 45–46, they do not assert that any military installations lack refined fuel, identify a military-fuel contract that cannot be fulfilled, or explain why existing supplies are inadequate. One telling failure of omission: DLA Energy—a component of the U.S. Defense Logistics Agency, which itself is within the Department of War—is responsible for supplying the military's petroleum needs and identifying any unmet fuel requirement or fuel contract requiring priority treatment. DLA Energy procures, stores, transports, and distributes the military's refined petroleum products, principally jet fuel, diesel, and gasoline. DLA Energy, *Fiscal Year 2025 Fact Book* 4, https://perma.cc/FCA2-SYWB. In 2025 alone, the agency managed 903 petroleum contracts serving more than 4,000 locations. *Id.* at 4, 10. Yet the Wright Order neither cites information from DLA Energy nor identifies any DLA contract, fuel requirement, or supply constraint that Sable's crude would address.

Nor does the Wright Order establish the other end of the supply chain: that Sable's *crude* oil will ultimately meet any actual national-defense need for *refined* petroleum. Sable produces crude oil and does not operate a refinery capable of producing any fuel that the military consumes. The military does not purchase crude oil[2] and has not managed it directly since the dismantling of the Naval Petroleum Reserve in 1996. DOE, *Naval Petroleum Reserves*, https://www.energy.gov/hgeo/opr/naval-petroleum-reserves. Instead, for Sable's crude oil to become a product that DLA Energy could purchase, the crude first must

[2] DLA Energy Fact Books from 2008 through 2024, which report petroleum purchases by product category, reflect no purchases of crude oil. *See* DLA Energy, *Archived Fact Books*, https://www.dla.mil/Energy/About/Library/.

be sold into the commercial market, transported to a refinery, and refined into usable petroleum products. But the Wright Order ignores the supply-chain problem of converting Sable's crude into military-ready fuel, let alone delivery to DLA Energy or a military installation. The Order simply disregards the unlikelihood that fuel refined from Sable's crude will ever satisfy a military need.

Sable's own disclosures underscore the disconnect. Its crude oil entered an ordinary commercial market that was not suffering from a shortage of crude: when Sable restarted production in March 2026, California refiners *displaced* previously scheduled crude-oil cargoes to accommodate Sable's unexpected supply. Sable Offshore Corp., *Q2 2026 Investor Presentation* 11 (Aug. 10, 2026), https://tinyurl.com/t7fnhxvb. Refiners then *limited* Sable's throughput, imposed price deductions based on sulfur content, and negotiated additional marketing arrangements. *Id.* at 4, 11–12. The Wright Order is missing causal connection at both ends of the supply chain.

**B. DLA Energy's approach to military-fuel security undermines the Wright Order's asserted national-defense need.**

History further undermines the Wright Order's premise that Sable's operations will address, even incrementally, a purported defense energy-supply deficiency. The SYPS remained out of service for nearly eleven years after the 2015 Refugio oil spill. If SYPS operation had been critical to West Coast military-fuel security, its decade-plus absence would likely have surfaced somewhere in DLA Energy's extensive public discussion of military-fuel readiness, as either a cause of shortage or an opportunity to cure one.

It did not. In June 2015—the same month the SYPS went offline—DLA Energy published a detailed account of its West Coast fuel strategy to accommodate a greatly expanded Pacific focus. It described modernized military-fuel infrastructure and an expanding network of commercial suppliers supporting

military installations throughout the West. DLA Energy, *DLA Energy's Pacific Pivot Begins in the Americas* (June 24, 2015), https://perma.cc/844T-2HG2. DLA Energy mentioned neither the loss of Sable's crude oil nor any resulting fuel shortage.

Over the following decade, DLA Energy continued to describe West Coast and Pacific fuel security in terms of commercial partnerships, storage, transportation, supplier diversification, and predictive logistics. *See generally, e.g.*, DLA Energy, *Fiscal Year 2019 Fact Book*, https://perma.cc/Z4JT-TJHP; DLA Energy, *Fiscal Year 2022 Fact Book*, https://perma.cc/W77P-MSEX. If DLA Energy was failing to deliver sufficient volumes of refined petroleum products to California military installations or had identified an unmet need that Sable's operation could fill, there would be written evidence in DLA Energy's public records. There is none.

DLA Energy's silence undermines the purported national security needs that DOE invoked to justify its extraordinary federal intervention in 2026. Even amid the recent disruption in the Strait of Hormuz, DLA Energy has addressed military refined-petroleum needs by modifying or creating finished-fuel contracts, making spot purchases, returning storage tanks to service, and deploying commercial tankers filled with petroleum products such as diesel and jet fuel. *See* DLA Energy, *Fueling the Military's Objectives: DLA Energy's Agile Contracting Powers Missions in the Western Hemisphere* (June 15, 2026), https://perma.cc/373R-SJBH. If there were unmet military-fuel needs due to global events in 2026, the Wright Order logically would have built off DLA Energy's measures by using DPA authority, for example, to mandate that suppliers prioritize military contracts or allocate any scare materials to restore storage capacity. Instead, the Wright Order props up a particular, troubled, upstream crude source with no connection to actual refined-petroleum supply needs for the military.

## III. DOE invoked national defense as a pretext for the Wright Order.

### A. DOE's stated rationale reflects the Administration's domestic energy agenda, not a national-defense need.

DOE's failure to connect Sable's crude oil and pipelines to a national-defense need in the record points to pretext. DOE's findings reflect its disagreement with California's overall energy policy, not a shortage of military-ready refined petroleum. DOE emphasizes California's gasoline prices, declining in-state crude production and refining, dependence on foreign crude, and state safety, health, and environmental protections that the Administration contends constrain oil production. ECF No. 23, Ex. A, at 53, 55, 58, 63. Those generalized concerns fall well short of establishing the kind of specific military-fuel shortfall that DOE suggests in the Wright Order.

The Administration's attempt to achieve policy objectives by manufacturing national-security needs to unlock statutory authority reflects a broader pattern that justifies judicial skepticism. *See, e.g.*, Just Security, *The "Presumption of Regularity" in Trump Administration Litigation* (4th ed.), https://perma.cc/M2RF-P5SM (cataloguing 90 instances of courts' expressing doubt about this Administration's information and representations). For example, the Administration invoked national-security concerns to halt several permitted offshore wind projects, but courts rejected each of those actions. One court concluded that Administration's "failure to explain or apply [its] reasoning suggests that the stated national security reason may have been pretextual," Tr. of Prelim. Inj. Hr'g 44:8–:10, *Revolution Wind*, No. 1:25-cv-02999-RCL, https://tinyurl.com/mts5yuhu, while another emphasized that invoking national security "does not end the inquiry," Tr. of Mot. Hr'g 55:8–:12, *Vineyard Wind 1, LLC v. Dep't of the Interior*, No. 1:26-cv-10156-BEM (D. Mass. Jan. 30, 2026), https://tinyurl.com/34pjfk44. The Administration has also invoked emergency or national-security rationales to prevent planned coal-plant

retirements. *See, e.g.*, *Michigan v. Dep't of Energy*, No. 25-1159 (D.C. Cir. filed July 24, 2025).

Here, too, the Court "need not accept the [Secretary's] telling of the story as the last word, particularly in the face of contrary evidence." *Oregon v. Trump*, 165 F.4th 1158, 1184 (9th Cir. 2025) (Bybee, J., statement in support of en banc review). Congress did not authorize the Executive Branch to invoke the DPA to advance a domestic energy-policy preference or benefit a favored corporate ally. "National security" hand-waving cannot replace proper factfinding and logical reasoning. *Cf. Doe v. Trump*, 957 F.3d 1050, 1067 (9th Cir. 2020) (concluding that a proclamation rested on "virtually no factual findings" and "minimal reasoning"). Nor does the Wright Order's reliance on the "energy emergency" declaration cure the problem; indeed, such authorities "'afford a ready pretext for usurpation.'" *Learning Res., Inc.*, 607 U.S. at 247 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring)). Deference to national-security determinations does not require this Court to sanction executive action beyond the authority Congress actually conferred, much less a hollow invocation of national defense to justify such a parochial outcome.

### B. The circumstances surrounding the Wright Order point to favoritism toward Sable, not national defense.

Sable's conduct leading up to the Wright Order belies the asserted national-security justification. Far from addressing a sudden defense need for Sable's crude oil after more than a decade of inactivity, the Wright Order oversteps DPA authority to help a fossil-fuel ally in desperate need of a financial bailout.

Sable acquired the SYPS and associated offshore crude-extraction assets from Exxon in 2024 under an agreement that included a $622-million loan from Exxon, and put Sable under enormous pressure to restart production. ECF No. 72 ¶ 45. If Sable failed to resume initial crude-oil production, regardless of its ability to

transport it through the SYPS, by October 2025, Exxon could reclaim the assets—which would effectively end Sable's business. *Id.* ¶ 46.[3] On April 15, 2025, Sable CEO Jim Flores proposed beginning production without required State approvals, telling investors that it would be "much harder to stop [Sable] once [it was] in production than the status quo being off production."[4] Sable resumed initial crude production on May 15, 2025.[5]

Although restarting Sable's crude-oil production likely prevented Exxon from reclaiming Sable's assets in the near-term, production did not end Sable's financial troubles because it still could not transport crude to buyers via the SYPS. Restarting production also *accelerated* the maturity date of Sable's debt to January 10, 2026, forcing Sable to restructure even as it lacked any means of generating revenue.[6] The restructured debt's terms—higher interest rate, liquidity covenants, and a requirement to raise an additional $225 million from equity investors—demonstrate that Sable was in dire financial straits.[7] Financial markets responded immediately, cutting Sable's stock price in half as the terms became public.[8]

---

[3] *See also* Sable Offshore Corp., *Form 10-K* 1, 59, 70 (Feb. 27, 2026) (discussing the purchase agreement amendment that required first production at least 150 days before the restart failure date of March 1, 2026), https://perma.cc/KR3L-26BB.

[4] Till Daldrup & Jacob Hutt, Hunterbrook Media, *Zombie Pipeline: Why Sable is Still a Pipe Dream*, (Jan. 23, 2026), https://perma.cc/2N3X-HD3S.

[5] Sable Offshore Corp., *Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in July 2025* (May 19, 2025), https://tinyurl.com/4k2f7c6y.

[6] Sable Offshore Corp., *Form 10-Q* 8, 19, 41 (Aug. 12, 2025), https://perma.cc/2F6L-QSD7.

[7] Sable Offshore Corp., *Second Amendment to Senior Secured Term Loan Agreement* (Oct. 31, 2025), https://perma.cc/T7HT-K44M; Sable Offshore Corp., *Form 8-K* (Nov. 3, 2025), https://perma.cc/L8AY-AH9K.

[8] Sable's stock closed at $12.83 on October 30, 2025 (the day before the deal was signed) and $5.90 on November 4, 2025 (the day after it was announced), a drop of $6.93 per share. *See* Nasdaq, Sable Offshore Corp. Common Stock (SOC) Historical Quotes, https://perma.cc/Q8UU-Q9U4.

Around the same time, Sable sought federal intervention to restart the SYPS. Flores reportedly disclosed to select investors his plan to take advantage of Administration connections to obtain a federal order allowing Sable to bypass California's safety requirements and environmental protections.[9] Flores claimed connections with DOE Secretary Wright and to have reached "DJT" through an intermediary during which Flores proposed painting President Trump's name on Sable's offshore platforms—an idea he said the President "liked . . . in gold."[10] Sable formalized its plan on December 12, 2025, with a letter to DOE requesting a DPA order directing operation of the SYPS. ECF No. 72 ¶ 58.

The Administration soon provided the relief Sable sought. On March 3, 2026, the Department of Justice's Office of Legal Counsel issued an opinion concluding that a DPA order would preempt state laws and the federal consent decree preventing Sable from using the pipelines. *Id.* ¶ 59. Ten days later, President Trump delegated the relevant DPA authority to Secretary Wright; that same day, Wright used it to order Sable to operate the SYPS. *Id.* ¶¶ 60–62. Sable began transporting oil the next day. *Id.* ¶ 63.

The manner in which DOE provided Sable relief further undermines the asserted national-defense rationale. DOE issued the Order without: (1) consulting the Department of Commerce, the Department of War, or DLA Energy; (2) specifying regulatorily required start-and-end dates; or (3) meeting other requirements of its own regulations. *See* ECF No. 72 ¶¶ 26–29 (listing regulatory requirements), 78 (noting failure to comply with 10 C.F.R. § 217.54). The Order seeks to override state-law protections that do not impede the overall flow of crude

---

[9] *See* Sam Koppelman & Till Daldrup, Hunterbrook Media, *Exclusive: Exxon Spinout Sable Leaked Key Info To Investors Including Golfer Phil Mickelson* (Oct. 31, 2025), https://perma.cc/K94L-99WW.

[10] *Id.*

oil in California, while singling out one crude producer for favorable treatment. Nothing about the asserted national-defense need explains these departures. The evident urgency was instead Sable's own need for immediate federal intervention to begin generating revenue and temporarily stave off financial crisis.

The unusually close relationship between the Administration and Sable continued after the Order. Brittany Kelm, a senior White House energy adviser, worked extensively to secure Sable's restart and was publicly credited with having "unlocked production in California."[11] Kelm then left the government to lead Sable's Washington DC policy office.

The sequence prompted a congressional investigation. Members conducting that oversight concluded that the circumstances "suggest that the Trump Administration is willing to circumvent state laws to benefit industry partners and preferred energy sources, and [that Sable is] a willing partner in its efforts."[12] These circumstances, alongside DOE's other failures, support the conclusion that "national defense" supplied a pretextual justification for an outcome Sable and the Administration already wanted—and was not the reason DOE deployed the DPA. The Court should not be taken in by that pretextual assertion.

## **CONCLUSION**

For these reasons and those presented in Plaintiff's Opposition, the Court should deny the Defendants' Motion to Dismiss Amended Complaint.

[11] Ian M. Stevenson, James Bikales & Scott Waldman, *White House Official's Move to Oil Company She Aided Raises Ethics Questions*, POLITICO (Aug. 21, 2026), https://www.politico.com/news/2026/08/21/white-house-oil-sable-kelm-01044410.

[12] Letter from Senator Adam B. Schiff et al., Members of Cong., to Jim Flores, Chairman & CEO, Sable Offshore Corp. (May 27, 2026), https://perma.cc/CU3X-VPNP.

Dated: September 4, 2026

Respectfully submitted,

/s/ *Cara Horowitz*
Cara Horowitz (Bar No. 220701)
405 Hilgard Avenue
Los Angeles, CA 90095
(310) 206-4033
Horowitz@law.ucla.edu

James P. Duffy (*pro hac vice forthcoming*)
Ridgeline Center for Law and Policy
712 H Street NE, Suite 90006
Washington, DC 20002
(802) 233-7967
jay.duffy@ridgelinecenter.org

*Attorneys for* Amici Curiae

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for *Amici Curiae*, certifies that this Memorandum contains 12 pages, which complies with the Court's New Case Order, ECF 18 at 2, setting a 25-page limit, as well Local Rule 11-6.1.

Dated: September 4, 2026

Respectfully Submitted,

/s/Cara Horowitz
Cara Horowitz

# **APPENDIX**

LIST OF *AMICI CURIAE*

**Members of Congress**

Sen. Sheldon Whitehouse
*Rhode Island*

Sen. Alex Padilla
*California*

Sen. Adam Schiff
*California*

Sen. Richard Blumenthal
*Connecticut*

Sen. Tammy Duckworth
*Illinois*

Rep. Salud Carbajal
*California – 24*

Rep. Jared Huffman
*California – 2*

Rep. Nancy Pelosi
*California – 11*

Rep. Zoe Lofgren
*California – 18*

Rep. Ted Lieu
*California – 36*

Rep. Nanette Díaz Barragán
*California – 44*

Rep. Julia Brownley
*California – 26*

Rep. Laura Friedman
*California – 30*

Rep. Sydney Kamlager-Dove
*California – 37*

Rep. Mike Levin
*California – 49*

Rep. Sam Liccardo
*California – 16*

Rep. Doris Matsui
*California – 7*

Rep. Dave Min
*California – 47*

Rep. Kevin Mullin
*California – 15*

Rep. Jimmy Panetta
*California – 19*