ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br><br>*Plaintiff*,<br><br>v.<br><br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br><br>*Defendants*,<br><br>and<br><br>**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,**<br><br>*Intervenor-Defendants*. | No. 2:26-c No. 2:26-cv-3396-SVW-SSCx<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: September 28, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1
BACKGROUND ..... 1
LEGAL STANDARD ..... 4
ARGUMENT ..... 4
- I. California's APA Claims (Counts I and II) Are Well Pled. ..... 4
  - A. The Wright Order Is Contrary to Law and Not a Valid DPA Order. ..... 4
  - B. The Wright Order Is Arbitrary and Capricious. ..... 7
- II. California's Constitutional and Ultra Vires Claims (Counts III, IV and V) Are Well Pled. ..... 9
  - A. California's Separation of Powers and Ultra Vires Claims Are Not Barred. ..... 9
  - B. The Wright Order's Preemptive Effect Over State Law Is Unlawful and Unconstitutional. ..... 11
  - C. The Wright Order Usurps Article III Judicial Power. ..... 14
  - D. The Wright Order Violates the Tenth Amendment. ..... 15
- III. California's APA Claims (Counts I and II) Are Reviewable. ..... 17
  - A. The Wright Order Is Final Agency Action, Not Presidential Action, and Is Reviewable Under the APA. ..... 17
  - B. The DPA Statute and Regulations Provide this Court with a Standard of Review Under the APA. ..... 21
  - C. California Is Within the DPA's Zone of Interests. ..... 25

CONCLUSION ..... 25
CERTIFICATE OF COMPLIANCE ..... 27

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott Lab'ys v. Gardner*
387 U.S. 136 (1967) .......... 17-18

*Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*
498 U.S. 517 (1991) .......... 4

*Airline Serv. Providers Ass'n v. L.A. World Airports*
873 F.3d 1074 (9th Cir. 2017) .......... 15

*Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*
801 F. Supp. 2d 383 (D. Md. 2011) .......... 19

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) .......... 4

*Baker v. Carr*
369 U.S. 186 (1969) .......... 22

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) .......... 4

*Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*
507 U.S. 218 (1993) .......... 15

*Bowen v. Mich. Acad. of Fam. Physicians*
476 U.S. 667 (1986) .......... 17

*Collins v. Yellen*
594 U.S. 220 (2021) .......... 11

*Dalton v. Specter*
511 U.S. 462 (1994) .......... 9, 20, 21

*Dep't of Com. v. New York*
588 U.S. 752 (2019) .......... 7

*Department of Navy v. Egan*
484 U.S. 518 (1988) .......... 22, 23

# TABLE OF AUTHORITIES

**Page**

*Detroit Int'l Bridge Co. v. Gov't of Canada*
189 F. Supp. 3d 85 (D.D.C. 2016) ........ 19

*Doe #1 v. Trump*
957 F.3d 1050 (9th Cir. 2020) ........ 22

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) ........ 18, 20

*El-Shifa Pharmaceutical Industries Co. v. United States*
402 F. Supp. 2d 267 (D.D.C. 2005) ........ 20

*FCC v. Prometheus Radio Project*
592 U.S. 414 (2021) ........ 7

*FDA v. R. J. Reynolds Vapor Co.*
606 U.S. 226 (2025) ........ 4

*Franklin v. Massachusetts*
505 U.S. 788 (1992) ........ 20, 21

*Gerritsen v. Warner Bros. Entertainment Inc.*
116 F. Supp. 3d 1104 (C.D.Cal. 2015) ........ 21

*Haitian Refugee Ctr. v. Gracey*
809 F.2d 794 (D.C. Cir. 1987) ........ 11

*Heckler v. Chaney*
470 U.S. 821 (1985) ........ 21

*Hencely v. Fluor Corp.*
146 S. Ct. 1086 (2026) ........ 11

*Hercules Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ........ 12

*Hercules Inc. v. United States*
516 U.S. 417 (1996) ........ 13

*Hishon v. King & Spalding*
467 U.S. 69 (1984) ........ 4

## TABLE OF AUTHORITIES

**Page**

*In re Agent Orange Prod. Liab. Litig.*
597 F. Supp. 740 (E.D.N.Y. 1984) .......... 12

*Jensen v. National Marine Fisheries Service*
512 F.2d 1189 (9th Cir. 1975) .......... 18, 19

*Lincoln v. Vigil*
508 U.S. 182 (1993) .......... 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*
567 U.S. 209 (2012) .......... 25

*Medtronic, Inc. v. Lohr*
518 U.S. 470 (1996) .......... 12

*Miller v. French*
530 U.S. 327 .......... 14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*
463 U.S. 29 (1983) .......... 7, 8

*Murphy Co. v. Biden*
65 F.4th 1122 (9th Cir. 2023) .......... 10

*Murphy v. NCAA*
584 U.S. 453 (2018) .......... 16, 17

*Nat. Res. Def. Council v. U.S. Dep't of State*
658 F. Supp. 2d 105 (D.D.C. 2009) .......... 20

*Nat. Res. Def. Council v. Winter*
527 F. Supp. 2d 1216 (C.D. Cal. 2008) .......... 23

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003) .......... 6

*Nebraska v. Su*
121 F.4th 1 (9th Cir. 2024) .......... 18, 19, 20

*New York v. United States*
505 U.S. 144 (1992) .......... 16

# TABLE OF AUTHORITIES

**Page**

*Newsom v. Trump*
141 F.4th 1032 (9th Cir. 2025)....................22

*NRC v. Texas*
605 U.S. 665 (2025)....................10

*Plaut v. Spendthrift Farm, Inc.*
514 U.S. 211, 218 (1995)....................14

*Printz v. United States*
521 U.S. 898 (1997)....................16

*Protect Our Communities Fdn. v. Chu*
2014 WL 1289444 (S.D. Cal., Mar. 27, 2014)....................20

*Pub. Citizen v. U.S. Trade Rep.*
5 F.3d 549 (D.C. Cir. 1993)....................21

*Sierra Club v. Trump*
929 F.3d 670 (9th Cir. 2019)....................10, 11

*Sisseton–Wahpeton Oyate v. U.S. Dep't of Stat*e
659 F. Supp. 2d 1071 (D.S.D. 2009)....................19

*Sprietsma v. Mercury Marine*
537 U.S. 51 (2002)....................13

*Trump v. Hawaii*
585 U.S. 667 (2018)....................23

*Tulare County v. Bush*
185 F. Supp. 2d 18 (D.D.C. 2001)....................1920

*United States v. Plains All American Pipeline, L.P.*
Case No. 2:20-cv-02415 (C.D.Cal. Mar. 13, 2020)....................2, 15

*United States v. Vertac Chem. Corp.*
46 F.3d 803 (8th Cir. 1995)....................12, 13

*United States v. Youssef*
547 F.3d 1090 (9th Cir. 2008)....................12

# TABLE OF AUTHORITIES

**Page**

*Webster v. Doe*
486 U.S. 592 (1988) .......... 23

*Ziglar v. Abbasi*
582 U.S. 120 (2017) .......... 22

**STATUTES**

United States Code, Title 5
§ 704 .......... 18
§ 706 .......... 3

United States Code, Title 50
§ 4501 .......... 1, 23
§ 4502(a)(3)(D) .......... 6, 7
§ 4511(a) .......... 2, 5, 8
§ 4511(a)(1) .......... 24
§ 4511(a)(2) .......... 24
§ 4511(c) .......... 2, 5, 8
§ 4511(c)(2). .......... 24
§ 4511(d)(1) .......... 24
§ 4552(14) .......... 24
§ 4552(15) .......... 25
§ 4557 .......... 12
§ 4558(j) .......... 11
§ 4564(a). .......... 24
§ 4565 .......... 19

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Tenth Amendment .......... 2, 4, 16, 17

**RULES**

Federal Rule of Civil Procedure 12(b)(1) .......... 4
Federal Rule of Civil Procedure 12(b)(6) .......... 4

# TABLE OF AUTHORITIES

**Page**

**OTHER AUTHORITIES**

Code of Federal Regulations, Title 10
§ 216 ........ 1, 24
§ 216.1(b) ........ 24
§ 216.4(a) ........ 24
§ 217 ........ 1, 24
§ 217.20 ........ 5
§ 217.31 ........ 5
§ 217.51(f) ........ 6
§ 217.52 ........ 6
§ 217.54 ........ 5
§ 217.54(b) ........ 6

Executive Orders
13,132 ........ 8
13,603 ........ 2, 21
14,391 ........ 2, 22

## INTRODUCTION

Plaintiff State of California (California) submits this opposition to the motion to dismiss filed by Defendants United States Department of Energy (DOE) and Secretary Chris Wright (collectively Defendants) and joined by Intervenor-Defendants Sable Offshore Corporation and Pacific Pipeline Company (collectively Sable).

California recognizes that this Court's August 19, 2026, Order Denying California's Motion for a Preliminary Injunction (PI Order) may leave little active dispute at this stage. *See* ECF 82. That ruling denied California's request for a preliminary injunction on the ground that California "has not demonstrated even a serious question as to the merits" of its claim. *Id.* at 29. This Court held that "the DPA Order . . . is an allocation order, generally authorized by the plain language of Section 101." *Id.* at 30. The Court held that the Wright Order satisfies the "low bar" required to withstand challenge under the APA's arbitrary and capricious standard, because "the agency made all necessary findings" under 10 C.F.R. parts 216 and 217, and the Wright Order "substantively complies" with the requirements of 10 C.F.R. § 217.54. *Id.* at 31-33. The Court "disagree[d]" with California's arguments that the DPA did not authorize Executive branch officials to preempt state law in the manner at issue in this case, *id.* at 34, and rejected California's arguments under separation-of-powers and Tenth Amendment principles, *id.* at 37-38.

California maintains that those rulings were incorrect, both for the reasons stated in the briefing on that motion and for those stated below. We recognize that the Court is likely to adhere to them and dismiss the case on similar grounds.

## BACKGROUND

On March 13, 2026, Secretary Wright issued an order pursuant to Sections 101(a) and (c) of the Defense Production Act (DPA), 50 U.S.C. § 4501 *et seq*., titled *Pipeline Capacity Prioritization and Allocation Order* (Wright Order or Order). ECF 72, First Amended Complaint (FAC) ¶¶ 3, 61. The Order directs Sable

to (1) "immediately prioritize and allocate pipeline transportation services" for oil produced at the Santa Ynez Unit; (2) "immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought," for oil transported through Lines CA-324/325; and (3) comply with the Order until otherwise directed by DOE. *Id.* ¶¶ 5, 61; ECF 23-1, Attach. 1, at 3.

The DPA authorizes the President, or his delegee,[1] to issue orders to prioritize and give preference to federal contracts or orders over non-federal contracts or orders and "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a). The DPA also authorizes the President, or his delegee, to order "the allocation of, or the priority performance under contracts or orders . . . relating to, materials, equipment, and services in order to maximize domestic energy supplies . . ." *Id.* § 4511(c).

The Wright Order is the culmination of Sable's campaign to restart operation of Lines CA-324/325 (Pipelines) after a decade of dormancy following a catastrophic oil spill in 2015, in which Line CA-324 ruptured and released over 120,000 gallons of heavy crude oil along the Santa Barbara County coast, ECF 72 ¶ 33, causing widespread damage to California's natural resources and economy, *id.* ¶¶ 33-36. After years of litigation, state and federal agencies entered a court-issued consent decree with then-owner and operator Plains All American Pipeline, L.P. (Consent Decree) filed in and approved by this Court. *See United States v. Plains All American Pipeline, L.P.*, Case No. 2:20-cv-02415 (C.D.Cal. Mar. 13, 2020) (*United States v. Plains*), ECF 6-1; *see also* ECF 72 ¶¶ 38-39. The Consent Decree assigned sole authority to approve a restart plan for Lines CA-324/325 to

[1] The Wright Order cited authority delegated to the Secretary by the President the same day. *Adjusting Certain Delegations Under the Defense Production Act* (Exec. Order No. 14,391, 91 Fed. Reg. 13,199 (Mar. 13, 2026)) amended the March 2012 Executive Order titled *National Defense Resources Preparedness* (Exec. Order No. 13,603) by adding the Secretary of Energy to a list of agency heads with authority to issue orders under Section 101(c) of the DPA. *See* ECF 72 ¶¶ 25-26.

California's Office of the State Fire Marshal (OSFM). *Id.* ¶ 41. Under its terms, Line CA-324 could only restart if Plains first received a waiver from OSFM to use anti-corrosion measures that differ from federally required technology. *Id*. ¶ 42.

Soon after Sable acquired the Pipelines in February 2024, it began the process of restarting Lines CA-324/325, which State law governed. *Id.* ¶¶ 95-109. The restart fell under the jurisdiction of state agencies with regulatory authority over the Pipelines and related facilities and activities, or whose property the Pipelines cross. *Id.* Rather than come into compliance with the State Waiver requirements, Sable petitioned PHMSA to step in and unilaterally assume jurisdiction over Lines CA-324/325. *Id.* ¶ 51. Shortly thereafter, in December 2025, Sable requested that DOE authorize Sable to restart Lines CA-324/325 by invoking the DPA. *Id.* ¶ 58. On March 13, 2026, Secretary Wright issued the Order, *id*. ¶ 61, and on March 14, 2026, Sable restarted the transportation of oil through Lines CA-324/325 despite two standing preliminary injunctions enjoining pipeline maintenance and restart in state court, despite lacking certain permits or approvals from either the state or the federal government for operation, and despite not having an easement to use the pipeline segment crossing California state property (*id*. ¶¶ 63-64, 66). The Wright Order was the first time that the DPA was used to compel the production and transportation of materials from facilities that were at the time dormant.

On March 31, 2026, California filed this case against Defendants challenging the Wright Order. California's FAC alleges the Order is contrary to law (Count I) and arbitrary and capricious (Count II), in violation of the APA, 5 U.S.C. § 706. ECF 72 ¶¶ 126-55. It also asserts claims that the Wright Order violates the constitutional separation of powers doctrine (Count III) and the Tenth Amendment (Count IV), *id.* ¶¶ 156-75, and that Defendants acted ultra vires by exceeding their statutory and constitutional authority in issuing the Wright Order (Count V), *id.* ¶¶ 176-81.

## LEGAL STANDARD

Defendants filed their motion to dismiss under Rule 12(b)(1) and 12(b)(6). Because "[t]he judicial review provisions of the APA are not jurisdictional," Defendants have no basis to move to dismiss California's APA claims (Counts I and II) under Rule 12(b)(1). *See Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 n.3 (1991) (citing *Califano v. Sanders*, 430 U.S. 99 (1977)); *see also FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 n.3 (2025) (a zone-of-interest "question is not one of standing, but of whether the statute grants the plaintiff the cause of action that he asserts") (internal quotation marks omitted). And to survive a Rule 12(b)(6) motion to dismiss, California need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When resolving a motion to dismiss, the Court assumes that the allegations in the complaint are true and draws all reasonable inferences in favor of California. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## ARGUMENT

### I. CALIFORNIA'S APA CLAIMS (COUNTS I AND II) ARE WELL PLED.

Defendants contend that California's APA claims, Counts I and II, must be dismissed based on the reasons set forth in the PI Order and Rule 12 (b)(6). ECF 85-1 at 12. As alleged in California's FAC, California's APA claims are sufficiently well pled.

#### A. The Wright Order Is Contrary to Law and Not a Valid DPA Order.

Although the Wright Order purports to proceed under Sections 101(a) and (c) of the DPA, it is not valid because it is contrary to the requirements for contract

prioritizations and allocation orders in the statute and regulations. *See* ECF 72 ¶¶ 137-39. Under those provisions, the federal government may order a private actor to "prioritiz[e]" performance of certain contracts over others and to honor a particular "allocat[ion]" of material and services among competing needs. *See* 50 U.S.C. § 4511(a), (c); 10 C.F.R. §§ 217.20, 217.31. The Wright Order does neither.

Sable had no relevant contracts and therefore it cannot "prioritize" one over another. *See* Priority, Merriam-Webster, ("superiority in rank, position, or privilege" or "legal precedence in exercise of rights over the same subject matter").[2] And, instead of allocating oil already produced, the Wright Order directed Sable to begin production and transportation of oil through a dormant pipeline in violation of state law, federal law, and two court orders. But to allocate is a similar power to "*apportion* for a specific purpose or to particular persons or things," Allocate, Merriam-Webster, https://www.merriam-webster.com/dictionary/allocate (emphasis added)—that is, to "divide and share out according to a plan," Apportion, Merriam-Webster, https://www.merriam-webster.com/dictionary/apportion; *see also* 50 U.S.C. § 4502(a)(3)(D) (congressional policy recognizing that defense preparedness sometimes requires "the diversion of certain materials and facilities from ordinary use to national defense purposes" (emphasis added)). This too is a power to decide how available resources should be divided between multiple potential counterparties—something that the Wright Order does not do. When a company is not operating and has no contracts to shuffle and prioritize, the use of the DPA's prioritization and allocation authority order is inapplicable.

In its PI Order, this Court stated that the Wright Order is an allocation order and satisfies the requirements of Section 101, as well as the DPA's regulatory

[2] *See* Webster's New Collegiate Dictionary (7th ed. 1963) (same), https://tinyurl.com/ynfcmuuh; *see also* Preference, Merriam-Webster, https://www.merriam-webster.com/dictionary/preference ("priority in the right to demand and receive satisfaction of an obligation"); Webster's New Collegiate Dictionary (7th ed. 1963) (same), https://tinyurl.com/3ddbjpdd.

requirements for an allocation order contained in 10 C.F.R. § 217.54. ECF 82 at 30-31. However, this misapprehends the Wright Order and the DPA. Defendants are using the Wright Order to *begin* new production from a dormant pipeline—not to allocate or "diver[t] … materials and facilities from ordinary use to national defense purposes." *See* 50 U.S.C. § 4502(a)(3)(D). DOE's use of the Wright Order unlawfully expands the DPA's allocation power by compelling the start of energy production in a manner that is wholly inconsistent with the statute.

Moreover, the FAC plausibly alleges that the Wright Order is unlawful because it violates DOE's regulations for an allocation order. ECF 72 ¶ 139, *See also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) (agencies must follow their own rules). The Wright Order lacks calendar start and end dates, 10 C.F.R. §§ 217.51(f), 217.54(b), a statement affirming that it is an allocation order certified for national defense use, *id.* § 217.54(d), and a current copy of the Energy Priorities and Allocations System regulation, *id.* § 217.54(e). Moreover, if allocation action is "used to control the general distribution of a material in the civilian market," DOE must submit their findings "for the President's approval" before exercising this allocation power. *Id.* § 217.52. DOE acknowledges they never did so. ECF 23 at 18.[3] These requirements constrain executive power and should not be discarded. The requirement that allocation orders must include a specific "calendar end date" places a temporal limit on the federal government's power and protects those whose rights are adversely affected by the order. *See* 10 C.F.R. § 217.54(b). The PI Order finds that these omissions constitute harmless errors. ECF 82 at 33 n.16. California respectfully disagrees. The

[3] DOE simply asserts they were "not required to submit findings to the President under 10 C.F.R. § 217.52, because the Order does not control the general distribution of a material in the civilian market." ECF 23 at 18. But they provide no reason for why the Wright Order is akin to the more limited restrictions Congress contemplated would fall short of "control [of] the general distribution," such as "end use restrictions, a set aside for independent small business, [or] inventory restrictions." S. Rep. No. 2237, 84th Cong., 2d Sess., *reprinted in* 1956 U.S.C.C.A.N. 2930, 2938.

failure to provide an end date is no mere procedural or harmless error here because it would allow for the Wright Order to continue to violate state law and California's sovereign power over its property and natural resources for an unlimited time. Uncertainty surrounding the duration of a national energy or national defense emergency does not excuse noncompliance. The DPA and its regulations were enacted to address national defense emergency needs on a short-term, temporary basis, hence the requirement for a date and duration limitation. These requirements constrain executive power and should not be discarded.

**B. The Wright Order Is Arbitrary and Capricious.**

California has plausibly alleged in the FAC that the Wright Order is arbitrary and capricious for two primary reasons: 1) the national defense determination findings are pretextual and not rationally supported by the evidence; and 2) the impact of the Wright Order on California's state sovereignty and resources is ignored. ECF 72 ¶¶ 149-53.

**1. The National Defense Findings are Pretextual.**

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). Agency action taken on pretextual grounds violates the APA's requirements of reasoned agency-decision-making, and agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 780-85 (2019).

The Wright Order and its supporting documents, including the findings required under Section 101(a), (b) and (c), fail to provide a rational basis explaining how ordering Sable to "require acceptance and prioritize performance" of

"contracts" or "allocations" promotes the "national defense" (as defined by the DPA) or maximizes domestic energy supplies. 50 U.S.C. § 4511(a), (c); *see* ECF 72 ¶¶ 143-53. Defendants claim that Sable's oil is needed to meet national defense needs but fail to provide evidence showing *how* Sable's oil meets these needs. Defendants have not shown that Sable is part of a national energy program or a national defense program, and they fail to provide a reasonable explanation how the specific allocation promotes the national defense with respect to energy. *Id.* ¶ 90, 150-51; *see also* ECF 16-1, Ex. 1, at 3. The Wright Order fails to state where, or to whom, Sable will sell the crude oil it produces. ECF 72 ¶¶ 77, 138. Nor does it state in the Order or the findings how much of Sable's oil will reach military end users. *Id.* ¶ 90. And there is no evidence of a fuel readiness gap provided by a credible military source that shows military fuel needs cannot be met without Sable's oil, as they have since the Pipelines have been shut down. *Id.* Notably, "[t]he Secretary fails to rationally explain why the Wright Order only favors Sable." *Id.* ¶ 87.

### 2. The Wright Order's Impacts on California's Sovereignty and Resources Are an Important Aspect Not Considered.

The agency also "failed to consider . . . important aspect[s] of the problem" before it. *State Farm,* 463 U.S. at 43 (1983). The FAC plausibly alleges how Defendants failed to consider important aspects of the problem, including but not limited to the past failure of Sable's pipeline that caused the 2015 oil spill and the resulting impacts —which caused hundreds of millions of dollars of damage to California's natural resources and economy—and the impact of another oil spill on California's economy. ECF 72 ¶ 33-36, 88-89. The Wright Order also contains no analysis of its impact on California's state regulatory framework and the fact that immediately restarting transportation of crude oil through the Pipelines would violate state and federal law and court orders. *Id.* ¶¶ 94-116, 124-25, 152-53. The importance of these issues is further underscored by federal policies requiring agencies to consider the effects of their actions on the balance of power between the

federal government and the states. *See Federalism* (Executive Order 13,132) 64 Fed. Reg. 43,255 (Aug. 4, 1999); *cf.* Prioritization and Allocation of Certain Scarce or Threatened Health and Medical Resources for Domestic Use, 85 Fed. Reg. 20,195-01 (Apr. 10, 2020) (assessing "federalism implications" of "implementing policies or regulations that preempt State law" and noting no further analysis was warranted, because the Order had no effect on the States or "the distribution of power and responsibilities").

## II. CALIFORNIA'S CONSTITUTIONAL AND ULTRA VIRES CLAIMS (COUNTS III, IV AND V) ARE WELL PLED.

### A. California's Separation of Powers and Ultra Vires Claims Are Not Barred.

Defendants and Sable contend that under *Dalton v. Specter*, 511 U.S. 462 (1994), California's separation of powers claim is indistinguishable from its APA statutory claim and should therefore be dismissed. Defendants misconstrue California's claim. In both its original Complaint and FAC,[4] California asserts that the Wright Order is not a valid order under Title I of the DPA and thus violates the APA, because the DPA authorizes federal prioritization of orders and contracts and allocation of existing resources, not the restart of a dormant pipeline with no applicable contracts or orders to prioritize. California's APA claims are, at their core, about exceeding authority. But separate and apart from the issues raised by California's APA claims, California makes an "absence of any statutory authority" separation-of-powers claim for which a direct cause of action may be brought. California's claim asserts that the DPA does not authorize the issuance of an order that defies (either expressly or impliedly) state and federal laws and judicial orders. Because Defendants have used the Wright Order to allow Sable to ignore state and federal law and violate two court orders barring restart of the pipeline, their actions violate separation of powers principles. Indeed, the Ninth Circuit applies an

[4] California did not, as Defendants contend, add ultra vires to circumvent APA's limit on reviewability. The underlying constitutional claims were always part of the complaint.

expansive view of justiciability, and "[w]hile an action taken by the President in excess of his statutory authority does not necessarily violate the Constitution, specific allegations regarding separation of powers may suffice." *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (citation modified); *see also Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019). Construed liberally, California's separation of powers claim does not rely on the APA, but is a separate, independent constitutional claim that is not precluded by *Dalton*.

Defendants and Sable also contend that under *NRC v. Texas*, 605 U.S. 665 (2025), California's ultra vires claim is precluded from judicial review. But *NRC* merely reaffirmed the high bar to relief on a non-constitutional ultra vires claim where a statute—there, the Hobbs Act—expressly precluded review. *See id.* at 681-83. Because California's claims against Defendants "implicate constitutional concerns," and no statute expressly precludes review, Defendants' ultra vires actions are reviewable under the default standard of whether the challenged conduct is authorized by law. *Murphy Co.*, 65 F.4th at 1129-31; *see also Sierra Club*, 929 F.3d at 694 (ability to bring an ultra vires action to "enjoin unconstitutional actions by state and federal officers . . . reflects a long history of judicial review of illegal executive action"). As further explained below, nothing in the DPA authorizes the sort of limitless preemption of state laws pertaining to safety, environmental protection, and property rights that the defendants assert the Wright Order authorizes. Nor can the DPA be reasonably construed to authorize the Executive Branch to flout judicial orders in violation of separation of powers principles, or to require that California dedicate state-owned property to Sable's restart of the Pipelines in violation of the anti-commandeering doctrine. For these reasons, Defendants have acted in excess of their delegated powers under the DPA, and California has pled "plausible factual allegations" identifying how Defendants' actions are ultra vires. *Murphy Co.*, 65 F.4th at 1131.

Finally, Sable asserts that is not within the DPA's "zone of interests." The Court need not reach this issue because the Ninth Circuit is "skeptical that there could be a zone of interests requirement for a claim alleging that official action was taken in the absence of all authority, like that which [California] assert[s] here." *Sierra Club*, 929 F.3d at 700–01; *accord Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) (finding where a plaintiff challenges official action as ultra vires, the zone-of-interests test does not apply). As the Supreme Court has explained in other contexts, "the separation of powers is designed to preserve the liberty of all the people . . . [s]o whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021) (citations omitted).

### B. The Wright Order's Preemptive Effect Over State Law Is Unlawful and Unconstitutional.

Relying on the Court's PI Order, Defendants and Sable assert that the Wright Order's preemptive effect over state law is impliedly authorized by the DPA "because allowing states . . . to retain '*de facto* vetoes [through enforcement of conflicting state or local laws] . . . would neuter the force of the act and compromise its policy goals.'" ECF 86 at 4 (quoting ECF 82 at 34); *accord* ECF 85-1, 16-17. Where preemption is asserted, the federal restriction or right that is alleged to conflict with state law must stem from specific constitutional text or a valid statute enacted by Congress. *Hencely v. Fluor Corp*., 146 S. Ct. 1086, 1093 (2026) ("[t]here is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it" (internal quotation marks omitted)). Defendants, like the Court, ground their implied preemption argument in Section 707 of the DPA.

The DPA, however, does not have broad preemptive force. Nor does it preclude state authorities from enforcing state laws or protecting their property rights against private companies. Instead, specific provisions of the DPA confer private parties with defenses against certain types of claims. *See, e.g.*, 50 U.S.C. §

4558(j) (creating a narrow immunity to federal and state antitrust claims under specified circumstances). But Title I of the DPA has no such language. That Congress saw fit to include narrow preemptive language in one provision of the DPA shows that Congress did not intend for the DPA orders to possess general preemptive effect. *See United States v. Youssef*, 547 F.3d 1090, 1094 (9th Cir. 2008) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citation omitted). At most, the DPA may preempt state law claims like breach of contract that fall within the scope of the risks inherent in complying with the DPA. *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995); *see also In Re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 844-45 (E.D.N.Y. 1984).

Indeed, no provision in the DPA—including Section 707—requires the Court to read such an expansive preemptive scope into the DPA. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("Congress does not cavalierly pre-empt state law causes of action."). Section 707 states: "No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with" a DPA order. 50 U.S.C. § 4557. But "[t]he protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization," and goes no further. *Hercules Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996); *accord Vertac*, 46 F.3d at 812. As *Hercules* explained, "the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed." *Hercules*, 24 F.3d at 204.

Section 707's liability shield extends only to the risk of breaching a contract due to the allocation of materials or prioritization of contracts, and to hold otherwise would give the executive branch the authority to shield any person subject to a DPA order from state tort liability or state regulation. Such a holding would also mark a dramatic change from the federal government's longstanding disavowal of DPA interpretations that "would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." *Vertac*, 46 F.3d at 812; *see also, e.g.*, *Hercules Inc. v. United States*, 516 U.S. 417, 430 n.14 (1996) (noting United States' position that § 707 "only bar[s] liability to customers whose orders are delayed or displaced on account of the priority accorded Government orders under § 101 of the DPA"); *accord* Brief for Respondent United States, *Hercules, Inc. v. United States*, 516 U.S. 417, 1995 WL 495540, at *37-38 (No. 94 818) ("[E]very court that has considered the matter has, like the courts below, rejected the argument that Congress intended the DPA's protection to sweep as broadly as Thompson claims.").

Finally, there is no "conflict preemption" here of the sort that occurs "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002). The purpose and objective of Section 101(a) is to require a contractor to prioritize defense consumption above non-defense consumption, notwithstanding existing private contracts. ECF 16-2 at 8-9, 13-15. Enforcement of state laws pertaining to safety, environmental protection, or property rights over state-owned land does not interfere with the goal of prioritizing some contracts over others. Nor can the DPA reasonably be read for Congress to have intended to authorize the Executive Branch to flout judicial orders. It is not "necessary" to "allow[] a government contractor to violate the laws with impunity" in order for it to "perform[] a rated contract" under section 101(a). *Vertac*, 46 F.3d at 812.

**C. The Wright Order Usurps Article III Judicial Power.**

Defendants argue that California fails to state a separation of powers claim because the Wright Order does not violate the Consent Decree, and that even if it did, it was justified in doing so because the Consent Decree should yield to the Wright Order. Defendants are mistaken.

First, as this Court has already determined, Defendants' use and reliance on the Wright Order to restart the Pipelines was in direct conflict with the Consent Decree. ECF 82 at 3. The Consent Decree required Sable to obtain approval from OSFM before it was allowed to restart. *Id.* at 24 ("[A]uthorization from OSFM is an explicit pre-restart requirement in the Consent Decree."). It is undisputed that OSFM did not provide that approval and had in fact expressly forbidden the restart of the Pipelines. *Id.* at 23. Citing the Consent Decree as one of its reasons, Defendants issued the Wright Order to direct the immediate restart of the Pipelines. ECF 72 ¶¶ 61-62. This Court ruled that Sable violated the Consent Decree and imposed fines of $1.449 million for a violation that lasted 159 days. ECF 82 at 25, 27. While the Court modified the Consent Decree, it held that the Wright Order did not authorize Sable's violation of the Consent Decree.

Second, neither the Constitution nor the DPA grants Defendants authority to violate a court order. As this Court concluded, "[S]able has violated express provisions of the Consent Decree, without justification." ECF 82 at 27. It is unconstitutional for Congress to vest review of Article III court decisions in officials of the Executive Branch. *Plaut v. Spendthrift Farm*, Inc., 514 U.S. 211, 218 (1995). "As we recognized in *Plaut*, such an effort by a coequal branch to 'annul a final judgment' is "'an assumption of Judicial power' and therefore forbidden." *Miller v. French,* 530 U.S. 327, 343 (quoting *Plaut*, 514 U.S. at 224). Yet here, the Executive branch did exactly that when it directed Sable to immediately restart the pipeline in violation of the Consent Decree. Defendants' attempt to annul the Consent Decree by issuing the Wright Order encroaches on the

Judicial Branch's Article III power, in violation of the Constitution. It is only for this Court to say if its judicial order need not be followed, not Defendants. "If the Secretary of Energy, exercising unilateral executive authority, were able to directly interfere with a federal court's discretion to enforce its own orders, it would implicate major questions about separation of powers." ECF 82 at 26-27.

Granted, in *United States v. Plains*, this Court modified the Consent Decree on August 19, 2026, in a way that Sable would argue permits its actions going forward. *See* ECF 82. But that modification is the subject of a pending motion for reconsideration. *See United States v. Plains* ECF 87. If either this Court or the Court of Appeals deems the modification unjustified, Sable will be in continuing violation of a consent decree. Even if the modification remains effective from August 19 on, that will not excuse Defendants' failure to consider the Consent Decree as part of its decision-making process under the APA.

**D. The Wright Order Violates the Tenth Amendment.**

Each state as a sovereign has a reserved power to own, manage, and dispose of its land. *See, e.g.*, *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993); *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017). As a result of the Wright Order, California is deprived of its right to own, manage, and dispose of its property in violation of the Tenth Amendment. Defendants' arguments that California has failed to state a claim are meritless.

First, Defendants assert that since California does not facially challenge the constitutionality of the DPA itself, then any action the Secretary takes pursuant to the DPA must also be valid. ECF 85-1 at 18. But California's challenge to the Wright Order includes an as-applied challenge to this constitutionally unauthorized application of the DPA. It is, however, a constitutional challenge that the court need not reach if it rules that the Wright Order violates the DPA itself. There is no language in the DPA that authorizes Defendants to infringe on California's

sovereign power to own, manage and dispose of its property. In fact, Congress has expressed its clear intent to limit the DPA's power over private property. When the DPA was first enacted it included the power to requisition private property for government use to serve the national defense, Congress allowed this power to expire in 1953. ECF 72 ¶ 31. Since then, the DPA has never authorized the federal government and its contractors to requisition property—indicating Congress's intent *not* to allow such requisitions.

Second, Defendants suggest that the conscription of state land for federal purposes would be better handled as a Takings claim and is not a violation of anti-commandeering. ECF 85-1 at 18. But the federal government is not seeking to acquire State property. Instead, Defendants are leaving the property with the State but requiring the State to devote it to federal use. That is a commandeering issue—just as it is a commandeering issue when the federal government requires state employees to execute federal tasks instead of hiring federal employees to do them. *See generally Printz v. United States*, 521 U.S. 898 (1997); *cf. New York v. United States*, 505 U.S. 144, 177 (1992) (Congress could not force State to "take title" to previously private property). Both the federal government and Sable interpret the Order to require California to dedicate state property to Sable's immediate restart of the Pipelines. The Executive is using the Order to command that California relinquish sovereign control of its property and expend state resources to serve a federal regulatory program in direct violation of the Tenth Amendment. However, the anti-commandeering doctrine prevents states from being forced to bear the costs and burden of implementing a federal regulatory program. *See Murphy v. NCAA*, 584 U.S. 453, 474 (2018). As in *New York*, *Printz* and *Murphy v. NCAA*, Defendants may not compel California to dedicate state resources and funds to serve a federal objective or regulatory program. The Tenth Amendment forbids such an outcome.

Third, Defendants argue that the Wright Order directs Sable, not California, and thus falls outside the scope of the anti-commandeering doctrine. ECF 85-1 at 18-19. Defendants cite to *Murphy v. NCAA*, claiming that the Order only has an "indirect" effect on California, which fails to trigger the anti-commandeering claim. *Id.* at 18-19. However, California has sufficiently pled facts to show the impact on California is not merely "indirect" but results in the dedication of state resources to serve the Executive's energy program and that losing sovereignty over its property has a direct effect on California. *See* ECF 72 ¶¶ 5-9, 32-57, 61-63, 136, 170-73.

## III. California's APA Claims (Counts I and II) Are Reviewable.

If this Court were to rule that California fails to state a claim based on the Parties' arguments on the above issues, then it need not reach Defendants' and Sable's other arguments that California fails to state its APA claims because those claims are unreviewable. Defendants argue that: 1) the Wright Order is presidential action unreviewable under the APA, and 2) even if the Wright Order is final agency action, California's claim that the Wright Order is arbitrary and capricious (Count II) challenges determinations that are "committed to agency discretion" and unreviewable under the APA. ECF 85-1 at 6-12. Sable further argues that 3) California's APA claims are not reviewable because California does not fall "within the DPA's zone of interests." ECF 86 at 2-3, 6-7. If this Court were to reach these arguments, it must reject them, because each argument is fatally flawed.

### A. The Wright Order Is Final Agency Action, Not Presidential Action, and Is Reviewable Under the APA.

Defendants argue that agency actions based on delegated presidential authority, like the Wright Order, are unreviewable presidential actions. ECF 85-1 at 6-9. Defendants attempt to evade Ninth Circuit precedent that undermines their argument by citing case law limited to foreign affairs and international treaties. These cases offer no insight into the legislative intent for reviewability under the DPA. Indeed, nothing in the DPA suggests non-reviewability. Defendants fail to

overcome the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). APA review is precluded "only upon a showing of clear and convincing evidence of a contrary legislative intent." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967) (internal quotation marks omitted). "[T]he APA's language is plain. The APA applies to *any* 'final agency action.' 5 U.S.C. § 704. No language in the APA prevents or exempts review of an agency action that implements a presidential action." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) (emphasis added).

Defendants cite *Nebraska* in passing, ECF 85-1 at 8, but they ignore that *Nebraska* rejected the argument they now raise. The Ninth Circuit held that exempting agency actions from review merely because they derive from executive orders would permit agencies "to implement regulations without the public involvement, transparency, and deliberation required under the APA"—and without any action by Congress to create an exemption from the APA. 121 F.4th at 16. Nor can *Nebraska* be distinguished as concerning "agency actions that simply implement executive orders." ECF 85-1 at 8. In *Nebraska*, the Ninth Circuit reviewed not only the agency's implementation but also the statutory authority for the President's decision, 121 F.4th at 7-13, 15-17, demonstrating that review is not barred when a Presidential order and agency action together create the legal obligations being challenged. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669 (9th Cir. 2021).

Defendants' invocation of the President's constitutional power in the field of foreign affairs is irrelevant. *See* ECF 85-1 at 6-8. *Jensen v. National Marine Fisheries Service*, 512 F.2d 1189 (9th Cir. 1975), is unavailing, as the relevant "agency" was a fisheries commission created under a binational treaty. *Id.* at 1191. It was not, unlike Defendant DOE, a conventional cabinet agency subject to the standard rules of administrative procedure. *Id.* (reasoning that "presidential action

in the field of foreign affairs" presents non-justiciable political questions). In *Jensen*, the court found that the challenged agency action—the Secretary of State's approval of regulations issued under an international treaty—was based on a delegation of the president's authority "in the field of foreign affairs," which "is committed to presidential discretion by [the Constitution]." *Id.* In contrast, here the President did not delegate his unfettered Constitutional authority to the Secretary, but rather Congressionally circumscribed statutory authority upon which Congress imposed limitations and constraints.

Defendants' out-of-circuit cases are also irrelevant for essentially the same reason: they turn on Presidential authority deriving from the Constitution or international treaty. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 101 (D.D.C. 2016) ("actions of USDS derived from the President's inherent constitutional authority over foreign affairs"); *Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*, 801 F. Supp. 2d 383, 404 (D. Md. 2011) ("deference to the President was appropriate given the foreign policy considerations inherent in deciding whether to impose import restrictions"); *Nat. Res. Def. Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 111 (D.D.C. 2009) ("the President and his delegee here are acting pursuant to the President's inherent foreign affairs power, not pursuant to any enabling statute"); *Sisseton–Wahpeton Oyate v. U.S. Dep't of Stat*e, 659 F. Supp. 2d 1071, 1081 (D.S.D. 2009) ("President . . . was acting under his inherent constitutional authority to manage foreign affairs"). Defendants attempt to extend these cases to the DPA and the Wright Order, but Section 101 of the DPA does not provide the President with complete discretion. The DPA and DOE regulations provide requirements for the president or the Secretary to exercise statutory authority under Section 101. *See supra* § I.A.; ECF 72 ¶¶ 17-31. Congress elsewhere in the DPA expressly exempted presidential action from judicial review, 50 U.S.C. § 4565, but chose not to do the same under Section 101. Regardless, these out-of-circuit cases cannot displace on-point Ninth

Circuit authority such as *Nebraska*— as those cited by Defendants rely on *Tulare County v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001), a case the Ninth Circuit has found "misapprehended the APA." *Nebraska*, 121 F.4th at 16.

Further, Defendants argue that an agency action downstream of a Presidential action is itself functionally presidential and shielded from review. In support, Defendants rely on *Franklin v. Massachusetts*, 505 U.S. 788 (1992), but *Franklin* only limits APA review of actions made by the President himself. *Id.* at 800-01; *see also E. Bay Sanctuary Covenant v. Biden,* 993 F.3d 640, 669 (9th Cir. 2021) ("'*Franklin* is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties'") (citation omitted). In *Franklin*, "[t]he Court reasoned that although the President is not explicitly excluded from the definition of 'agency' in [the APA], his unique constitutional position is enough to overcome this 'textual silence.'" *Nebraska,* 121 F.4th at 15 (quoting *Franklin*, 505 U.S. at 800). If a Presidential delegation made an agency's actions pursuant to that delegation unreviewable, as Defendants suggest, agencies could evade accountability for their actions, "no matter how far removed from the decision the President actually was." *Protect Our Communities Fdn. v. Chu*, 2014 WL 1289444 at *6 (S.D. Cal., Mar. 27, 2014). Nothing in *Franklin* indicates that the actions of agency heads—who do not share the President's "unique constitutional position"—are exempt from APA review merely because their actions were taken pursuant to delegated presidential authority.

Defendants cite *Dalton* and *El-Shifa Pharmaceutical Industries Co. v. United States*, 402 F. Supp. 2d 267 (D.D.C. 2005), to support that the Wright Order is presidential action and thus unreviewable under the APA. ECF 85-1 at 6. But the courts in *Dalton* and *El-Shifa Pharmaceutical* found APA review unavailable only because the President himself took the final action. *El-Shifa Pharm.*, 402 F. Supp. 2d at 273 ("Here, the action in question is the President's decision to target and

strike El–Shifa."). In *El-Shifa Pharmaceutical*, there was no agency action at all. *Id.* at 269-70. And in *Dalton*, the agency's "'tentative recommendation'" to the President about which military bases to close "'carr[ied] no direct consequence[],'" because it was the President's submission of his "certification of approval to Congress," per the statute, that directly affected the bases. *Dalton*, 511 U.S. at 469 (quoting *Franklin*, 505 U.S. at 798).

In contrast, the Wright Order is a product of the Defendants alone. Neither the text of the Wright Order nor any of the evidence presented by Defendants indicate that the President was involved "at the final stage of the process," or had an important role in the "'integrity of the process,'" such that the Wright Order could be construed to be presidential action. *Pub. Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 551-52 (D.C. Cir. 1993) (quoting *Franklin*, 505 U.S. at 800). The Wright Order lacked presidential involvement. President Trump's delegation of authority under the DPA in EO 14,391 on March 13, 2026, was limited to amending EO 13,603 to grant the Secretary authority to act under the DPA "consistent with applicable law." ECF 72 ¶¶ 60, 134.[5] The Secretary then exercised his own discretion and did so in violation of applicable law. *Id.* ¶ 134.

**B. The DPA Statute and Regulations Provide this Court with a Standard of Review Under the APA.**

Defendants argue that even if the Wright Order were agency action for purposes of the APA, California's arbitrary and capricious claim (Count II) is unreviewable because it challenges the Secretary's determinations about the national defense and energy production, both of which Defendants argue are committed to agency discretion. ECF 85-1 at 8-12. But contrary to Defendants' assertions, California seeks judicial review of matters as to which there exist

[5] EO 14,391 is incorporated into the FAC by reference. *See* ECF 72 ¶ 26 n.15 & ¶ 60 n.37; *see also Gerritsen v. Warner Bros. Entertainment Inc.*, 116 F. Supp. 3d 1104, 1118-19 (C.D.Cal. 2015) (collecting cases regarding "incorporation by reference" doctrine). California previously requested the Court take judicial notice of EO 14,391. *See* ECF 16-1 at 2, 6 ¶ 14, Ex. 14.

"meaningful standards," *Heckler v. Chaney*, 470 U.S. 821, 834-35 (1985)—such as whether an order to restart a dormant pipeline is a "prioritization" or "allocation" order and whether each of the procedural requirements in the statute and regulations have been met. It is among the "traditional understandings and basic principles" of our system of government that, absent clear congressional intent to the contrary, "executive determinations generally are subject to judicial review." *Newsom v. Trump*, 141 F.4th 1032, 1050 (9th Cir. 2025) (internal quotation marks omitted).

Defendants' invocation of national defense does not ipso facto render final agency action unreviewable. *See* ECF 85-1 at 10-12. An agency cannot avoid judicial review simply by invoking its consideration of "foreign policy" or "national security" factors. *Baker v. Carr*, 369 U.S. 186, 211 (1969) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."). DOE is subject to the standard rules of administrative procedure, and the Wright Order has solely domestic economic implications and is based on a finding of domestic need.

Defendants' argument that this Court cannot "intrude" into "national security affairs" based on *Department of Navy v. Egan*, 484 U.S. 518 (1988), falls flat. *See* ECF 85-1 at 8, 10-11. *Egan* involved the President's ability to withhold sensitive national security information, pursuant to the President's constitutional role as Commander in Chief of the Navy. *Egan*, 484 U.S. at 527. But that differs from the Wright Order, which was issued by the Department of Energy and the findings of which refer to domestic energy production and alleged domestic threats from "State and local policies" that "jeopardize our Nation's core national defense." ECF 23-1, Attach. 1, at 1-2; *see Doe #1 v. Trump*, 957 F.3d 1050, 1067 (9th Cir. 2020) ("[I]n domestic economic matters, the national security and foreign affairs justifications for policy implementations disappear, and the normal policy-making channels remain the default rules of the game."). The Wright Order's findings are far from the compelling national security interest of safeguarding military secrets in *Egan*.

*See Egan* at 527. Further, the *Egan* Court "fortified" its conclusion that the Navy's method of removing an employee based on national security concerns was proper by considering the operative "statute's express language along with the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* at 530 (internal quotation marks omitted).

Here too, the underlying statute, the DPA, cannot be ignored just because Defendants cite the national defense. *See Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) ("[N]ational-security concerns must not become a talisman used to ward off inconvenient claims."). This Court may defer to the agency's national defense findings while also enforcing the DPA's requirements against Defendants. *See Nat. Res. Def. Council v. Winte*r, 527 F. Supp. 2d 1216, 1237 (C.D. Cal. 2008) ("Deference therefore does not mean a court must abjure judicial review whenever a party raises the specter of national security."), *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008).

Defendants' reliance on cases not involving national defense is likewise misplaced because all involve different statutes with distinct statutory structures and provisions. *See* ECF 85-1 at 9-11.[6] Unlike the statutes in Defendants' cited cases, Sections 101(a) and (c) of the DPA provide clear instructions and legal requirements for the President and his delegees to issue allocation or prioritization orders. The DPA provides extensive and specific guardrails and limitations on how and when the Secretary may exercise his delegated authority under the statute (*see*

[6] *Lincoln v. Vigil*, 508 U.S. 182 (1993), involved the Executive's discretion to defund a social services program funded by lump sum appropriations, when there was no statutory mandate to fund the particular program. *Id.* at 193. *Trump v. Hawaii*, 585 U.S. 667 (2018), the Court considered the president's authority to suspend entry of immigrants under the Immigration and Nationality Act, the text of which contained little substantive limitation on the president's exercise of authority (*id*. at 683-86), unlike Section 101 of the DPA and DOE's regulations. Similarly, *Webster v. Doe*, 486 U.S. 592 (1988), considered the Director of Central Intelligence's authority to terminate employment of employees under the National Security Act, which provided no basis for a court to review, other than examining the Director's "views of the Nation's security and whether the discharged employee was inimical to those interests." *Id*. at 594, 600.

*generally* 50 U.S.C. § 4501 *et seq*.), especially for the priorities and allocation authority under Section 101. Under the express provisions of Section 101(a), the Secretary cannot require any action that has any relation to the performance of contracts; the Secretary may only require that performance of certain contracts be given priority over performance of other contracts when the Secretary deems that doing so is necessary or appropriate to promote the national defense. 50 U.S.C § 4511(a)(1). The Secretary also cannot order the restart of dormant production processes for materials that have yet to be produced, but instead may "allocate materials, services, and facilities" already in existence. *Id.* § 4511(a)(2). Further, the Secretary's priority or allocation authority in Section 101(c)(1) "to maximize domestic energy supplies" is conditioned on his making specific findings under Section 101(c)(3). *Id.* § 4511(c)(2). The DPA even defines the term "national defense" and also contains a sunset provision subjecting authority conferred by the DPA to periodic congressional reauthorization. *Id.* §§ 4552(14), 4564(a).

Section 101 also requires agency heads to whom the president has delegated authority, such as the Secretary, to comply with additional requirements, such as issuing rules through a notice-and-comment rulemaking under the APA "that establish standards and procedures by which the priorities and allocations authority under this section is used to promote the national defense." *Id.* § 4511(d)(1). Defendants have issued and updated regulations governing the Secretary's exercise of delegated authority under the DPA. *See* 10 C.F.R. parts 216, 217. These regulations require specific procedures for DOE to make the "critical and essential" findings under Section 101(c)(2)(A). *See id.* §§ 216.1(b), 216.4(a); *see also* ECF 72 ¶¶ 26-29. This framework protects allocations and prioritizations orders from complete Executive discretion. This Court thus has law to apply, in the DPA and DOE's regulations, in reviewing whether the Wright Order is a lawful prioritization or allocation order under Section 101.

### C. California Is Within the DPA's Zone of Interests.

Sable asserts that California's interests in "enforcement of its environmental laws and sovereign property interests are outside the zone of interests of the DPA," so California's APA claims must fail. But the zone of interests test "is not meant to be especially demanding" in the APA context. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 225 (2012). A plaintiff's interests need only be "arguably within the zone of interests to be protected or regulated by the statute," and "the benefit of any doubt goes to the plaintiff." *Id*. at 224-25. "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).

Here, California's interests are directly related to and entirely consistent with the interests protected by the DPA provisions in question. As stated, Section 101 of the DPA provides extensive procedural guardrails and limitations on the exercise of priorities and allocation authority, and California's interest in ensuring that Defendants' use of the DPA is consistent with Congressional intent falls well within the zone protected by the statute. Indeed, given Defendants' (and this Court's) view of a DPA order's preemptive effect, California is a "predictable" challenger. *See Patchak*, 567 U.S. at 227. Finally, Congress did not signal any intent to preclude a state from seeking judicial review of executive actions taken under the DPA, and instead expressly included "any State" in the definition of "person" for purposes of the DPA. *See* 50 U.S.C. § 4552(15). At the very least, it is "'arguabl[e]'" that California falls within the relevant zone of interest, which is all the test requires. *Patchak*, 567 U.S. at 224-25.

## CONCLUSION

The motion to dismiss should be denied.

Dated: September 4, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
KAVITA LESSER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

Alicia Roessler
Deputy Attorney General
*Attorneys for Plaintiff State of California*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief is 25 pages in length, which complies with the page limit set by the Court's New Case Order, ECF 18 at 2.

Dated: September 4, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
KAVITA LESSER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

Alicia Roessler
Deputy Attorney General
*Attorneys for Plaintiff State of California*